UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| In the Matter of the Petition<br><br>of<br><br>GRACE OCEAN PRIVATE LIMITED, as Owner of the M/V DALI,<br><br>and<br><br>SYNERGY MARINE PTE LTD, as Manager of the M/V DALI,<br><br>for Exoneration from or Limitation of Liability | Docket No. JKB 24-cv-941<br><br>*IN ADMIRALTY* |

**CLASS ACTION CLAIM BY AMERICAN PUBLISHING, LLC, KAREN AUSTIN, AND CHARLES AUSTIN, JR. PURSUANT TO SUPPLEMENTAL FEDERAL RULE F(5) IN RELATION TO THE KEY BRIDGE ALLISION**

Specifically reserving all rights and defenses asserted in Claimants' accompanying Answer to the Petitioners' "Petition for Exoneration from or Limitation of Liability," Claimants, AMERICAN PUBLISHING, LLC, KAREN AUSTIN, and CHARLES AUSTIN, JR. (collectively, "Claimants"), individually and on behalf of all others similarly situated, hereby demand a jury trial and make this claim pursuant to Rule F(5) of the Supplemental Rules for Admiralty or Maritime Claims and Rule 23 of the Rules of Civil Procedure against Petitioners, GRACE OCEAN PRIVATE LIMITED and SYNERGY MARINE PTE LTD, as alleged owner and manager of the vessel M/V DALI (the "DALI") and in support thereof aver as follows:

**INTRODUCTION**

1. On an unremarkable and calm night with no atmospheric disturbances or visible impediments, at precisely 12:45 AM local time on March 26, 2024, the container ship Dali embarked

1

from the Port of Baltimore, setting a course for the Chesapeake Bay with no hint of the impending catastrophe.

2. The route intended for the Dali—a voyage down the expansive Patapsco River, beneath the sprawling 1.6-mile Francis Scott Key Bridge (the "Key Bridge"), and onward to the Chesapeake Bay—had been a well-traveled conduit for countless gargantuan container ships. Historically, these behemoths navigated this passage approximately 3,600 times annually without a single incident of allision with the Key Bridge in over four decades.

3. Until the disastrous day of March 26, 2024, the Port of Baltimore thrived as a bustling nexus of American maritime activity, ranking among the top twenty ports in the United States by total tonnage and a pivotal hub for vehicular imports and exports.

4. The port was well-acquainted with the substantial presence of massive freighters like the Dali.

5. A report dated March 13, 2024, titled "The 2023 Economic Impact Of The Port Of Baltimore In Maryland," commissioned by the Maryland Department of Transportation, revealed that the Baltimore Port District managed a staggering 55.5 million tons of cargo in 2023.[1] This commerce supported tens of thousands of jobs, and in turn, employees bolstered the local economy, generating significant revenues for businesses including that of Claimants.

6. The economic contribution of the Port of Baltimore was monumental, estimated at over $70 billion in 2023 alone[2], serving as a robust economic engine for a region that has known hardship.

---

[1] The 2023 Economic Impact Of The Port of Baltimore Maryland, Prepared for the Maryland Port Administration, available at https://mpa.maryland.gov/Documents/MarylandEconomicimpactofPOB2023.pdf.

[2] *Id.*

7. Since its designation as a point of entry in 1706, the Port of Baltimore has been a cornerstone of regional economic prosperity, supporting activities from the Revolutionary War era to present day. The construction of infrastructures like the Baltimore Harbor Tunnel and the Key Bridge responded to growing transportation needs, symbolizing the port's crucial role in fostering Baltimore's growth.

8. Yet, this vibrant economic engine was abruptly halted on March 26, 2024, when merely twelve minutes after departure, the Dali commenced a sweeping turn towards the Key Bridge. Alarmingly, the ship's onboard data recorder, later obtained by the National Transportation Safety Board ("NTSB"), captured a sequence of urgent aural alarms signaling the beginning of a dire predicament.[3]

9. Captured video footage chillingly illustrates the subsequent events: shortly after leaving port, the Dali, bereft of power and adrift, uncontrollably surged towards the Key Bridge at about seven knots.

10. By approximately 1:28 AM local time, the Dali had catastrophically allided with the Key Bridge, precipitating its immediate downfall, claiming lives, ravaging local property, and crippling the region's economic lifeline—a catastrophe whose repercussions will resonate for generations.

11. This catastrophe was wholly preventable. Reports indicate that alarms signaling erratic power supply had been activated even before the Dali's departure, clearly signifying its unfit state for voyage. Nevertheless, it was allowed to leave port, a decision marred by flagrant disregard for seaworthiness.

---

[3] Emily Mae Czacho, *What To know about the Francis Scott Key Bridge collapse in Baltimore that left 6 presumed dead*, CBS NEWS, available at https://www.cbsnews.com/baltimore/news/francis-scott-key-bridge-collapse-baltimore-maryland-what-to-know/.

12. Historically, vessels have navigated under the Key Bridge seamlessly for over four decades. The tragic events of March 26, 2024, marked a devastating departure from this record, a result of Petitioners' egregious and potentially criminal negligence, which should not mitigate their liability.

**PARTIES**

13. This action seeks compensatory damages for each Claimant individually, and as representatives on behalf of the putative class described herein.

14. Claimants Karen Austin and Charles Austin, Jr. are citizens and residents of Baltimore, Maryland, and at all times relevant hereto, owned and operated Claimant American Publishing, LLC, a company organized and existing under the laws of Maryland with its principal office located in Baltimore, Maryland. Claimants appear in their individual capacities and as representatives of the class as more fully set forth herein.

15. Upon information and belief, Petitioner Grace Ocean Private Limited ("Grace") is a corporation organized and existing under the laws of Singapore with its registered office in Singapore, and was the registered owner of the M/V DALI (the "Dali" or the "Vessel") at all times relevant hereto.

16. Upon information and belief, Synergy Marine Pte Ltd ("Synergy") is a corporation organized and existing under the laws of Singapore with its registered office in Singapore and was the manager of the Vessel. Upon information and belief, Synergy was responsible for, among other things, manning and victualing the Vessel; procuring and providing deck, engine, and cabin stores; maintenance and repairs of the Vessel's hull and machinery; provisioning of spare parts, maintenance and repairs for the Vessel; and communicating with Owner and the Vessel's time charterers at all times relevant hereto.

## JURISDICTION AND VENUE

17. The incident that gave rise to this claim occurred upon the navigable waters of the United States within the territorial waters of the State of Maryland, had an actual and potential impact on maritime commerce, involved a traditional maritime activity, and is subject to admiralty tort jurisdiction.

18. This action is within this Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) and (d), because the parties are in complete diversity, the putative class size is greater than 100, and the aggregate amount in controversy for the proposed Class exceeds $5,000,000.00, exclusive of interest and costs.

19. In addition, this action is within the Court's admiralty and maritime jurisdiction, pursuant to U.S. Constitution Article 3, Section 2, and 28 U.S.C. § 1333.

20. Venue is appropriate in this district pursuant to 28 U.S. Code § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this district, and a substantial part of property that is the subject of the action, including the Vessel, is situated in this district.

## FACTUAL ALLEGATIONS

*A. The Francis Scott Key Bridge: A Critical Connector*

21. It is believed by historians that the Key Bridge was constructed within a mere 100 yards from the very spot where Francis Scott Key observed the unsuccessful British assault on Fort McHenry in September 1814, during the War of 1812. Inspired by the sight of the flag waving the following morning, Key penned what would become known as the "Star-Spangled Banner," originally titled the "Defense of Fort McHenry."

22. Built between 1972 and 1977, the Key Bridge was designed to alleviate significant traffic flows into and out of Baltimore City and to facilitate the transport of "hazardous materials,"

which were prohibited in the existing tunnel crossings prior to the bridge's erection. Since its completion, local businesses have maintained a vested interest in the bridge, recognizing its critical role in the local economy.

23. The Key Bridge's western terminus sits at Hawkins Point within Baltimore City. This strategic location means that all 30,000 daily commuters traversing this 1.6-mile span enter or exit Baltimore City, directly impacting local enterprises, including that operated by Karen Austin and Charles Austin, Jr.

## B. Disaster at Sea

24. Around 12:45 AM on March 26, 2024, the Dali—a 985-foot Neopanamax container vessel constructed in 2015 by Hyundai Heavy Industries—cast off from the Port of Baltimore, bound for its next destination in Sri Lanka, with an expected arrival of April 22, 2024.

25. In the hours leading up to its departure, it was reported that alarms had been triggered on the Dali's refrigerated containers, indicating erratic power supply issues.[4] It is believed that these power supply concerns were either overlooked or insufficiently addressed. Roughly twelve minutes after embarking, the Dali initiated a turn towards the Key Bridge. Subsequent reports note that around 1:24 AM, the ship's onboard data recorder captured multiple urgent alarms before it momentarily ceased recording, then resumed using an auxiliary power source. It is understood that this backup power was inadequate for the crew to regain control of the vessel.

26. Based on available information, it is believed that at around 1:24 AM, the Dali experienced a sudden loss of power. Rendered adrift and moving at about seven knots without adequate steering capabilities, the vessel began drifting towards the Key Bridge. It is also believed that the ship's emergency diesel generator either failed to activate or did not provide sufficient

---

[4] Eric Tucker, et al., *Ship that caused bridge collapse had apparent electrical issues while still docked, AP source says*, ASSOCIATED PRESS (April 15, 2024), *available at* https://whyy.org/articles/baltimore-bridge- collapse-ship-electrical-issues/.

emergency power to prevent the vessel from alliding with the bridge.

27. At about 1:28 AM, the Dali violently collided with the Key Bridge, leading to its immediate structural failure and plunging into the harbor below. This catastrophic event resulted in the deaths of six individuals and halted nearly all commercial maritime traffic to and from the Port of Baltimore.

### C. Direct Consequence of Negligence

28. In 2023, the Port of Baltimore was approached by ocean carriers approximately 1,800 times.[5] Each of these visits involved a journey beneath the Key Bridge, totaling around 3,600 separate passages under the bridge throughout that year.

29. Until March 26, 2024, the Key Bridge had not been struck by any vessel since 1980. Even with a conservative estimate of 1,500 annual visits—300 fewer than those recorded in 2023—it is calculated that ships made around 130,000 crossings under the Key Bridge before the incident involving the Dali.

30. The negligence of the Petitioners is starkly evident, and no fault can reasonably be attributed to Claimants for the allision. Instead, the allision resulted directly and proximately from the Petitioners' carelessness, negligence, gross negligence, and recklessness, compounded by the unseaworthiness of the vessel.

31. Further, based on available information, the Petitioners are believed to have:

a. Employed a crew that lacked attentiveness to their responsibilities;

b. Allowed a crew that did not adhere to local navigational norms and customs;

c. Engaged a crew that navigated the vessel improperly;

d. Employed a crew deficient in the necessary skills;

---

[5] *Maryland Manual On-Line, A Guide to Maryland and its Government, Port of Baltimore*, available at https://msa.maryland.gov/msa/mdmanual/01glance/html/port.html.

e. Employed a crew deficient in the necessary training;

f. Failed to adequately staff the vessel;

g. Mismanaged the vessel and its crew;

h. Neglected to equip the vessel with suitable policies and procedures;

i. Neglected to implement adequate policies, procedures, and training for safe vessel operation;

j. Failed to oversee their fleet adequately to ensure safe operations;

k. Utilized a vessel equipped with unfit systems and equipment;

l. Neglected proper maintenance of the vessel;

m. Failed to maintain or utilize the vessel's systems and equipment properly;

n. Failed to maintain or utilize the vessel's engine adequately;

o. Failed to maintain or utilize the vessel's propulsion system adequately;

p. Failed to maintain or utilize the vessel's steering system adequately;

q. Failed to equip the vessel adequately;

r. Failed to provide a functioning engine;

s. Failed to provide an engine suitable for the vessel's intended use;

t. Failed to address known or foreseeable hazards promptly;

u. Failed to rectify known or foreseeable deficiencies promptly;

v. Failed to conduct necessary inspections of the vessel;

w. Failed to adhere to industry standards, customs, and practices.

32. The allision was a consequence of these and other failures, acts, or omissions by the Petitioners and the vessel, which will be further demonstrated at trial.

**D.** *Economic Fallout on Local Businesses*

33. Since the disastrous allision, commercial activities in and around Baltimore have virtually come to a standstill. It could take several years for the area to recover fully.

34. Among the impacted businesses is that of Claimants. This family-run enterprise, based in Baltimore and operational since July 2007, benefits from Mrs. Austin's extensive background as a former counter-terrorism equipment specialist and her lineage as the daughter of William C. Horn, a U.S. Navy Veteran and retired Baltimore City Homicide Detective. Her deep-rooted connection to military and law enforcement has driven her to serve military communities.

35. Mrs. Austin's professional journey began in physical security, where she initially worked as a first responder specializing in safety equipment. During the events of 9/11, she was pivotal as a Counterterrorism Security Equipment Specialist, coordinating extensively to supply essential equipment for command setups at Ground Zero. Her relentless effort continued as she later served in high-risk U.S. territories prone to terrorist activities, such as Guam, Saipan, Puerto Rico, the Virgin Islands, and American Samoa, deploying crucial equipment and training local first responders.

36. Transitioning from her security role, Mrs. Austin has accumulated over 30 years in business, sales, and publishing, including American Publishing, LLC's launch and publication of the United States Cybersecurity Magazine since 2013, a periodical addressing critical national cybersecurity challenges.

37. Mr. and Mrs. Austin also head the biannual production of the Armed Forces Directory, a publication that American Publishing initiated in 2007. This directory aids military and civilian personnel, facilitating their transitions associated with Aberdeen Proving Ground and Fort Meade—key military installations located strategically near the Francis Scott Key Bridge.[6]

38. The Armed Forces Directory not only serves as a crucial resource for military and civilian transitions but also offers advertising opportunities for local businesses, enhancing their visibility to a broad audience that includes both current and potential future clientele.[7]

---

[6] *Armed Forces Directory, About Us*, available at https://www.armedforcesdirectory.org/about/.
[7] *Armed Forces Directory, Aberdeen Proving Ground*, available at: https://www.armedforcesdirectory.org/aberdeen-

39. The strategic position of the Francis Scott Key Bridge was vital to local businesses, including those advertised in Claimants' directory, which relied heavily on the bridge for the movement and transportation of goods, underscoring the interconnected nature of local commerce and infrastructure.

40. Before the bridge's destruction, Claimants' business was flourishing, with increasing distribution and significant advertisement revenue from local enterprises in and around Baltimore. The escalation in customer engagement and sales effectiveness boosted the economic benefits to both military and civilian communities, reflecting positively on Claimants' publication's impact. Last year, this success led Claimants to secure a contract to publish the Base Guide for Fort Meade, anticipating an influx of new personnel and their associated needs.

41. However, the immediate aftermath of the Key Bridge's destruction saw a dramatic halt in business activities. The local business community, stunned by the event, ceased communications, resulting in a sharp decline in service calls and sales for Claimants.

42. Claimants were positioned to continue their business operations undisturbed, yet the destruction of the Key Bridge directly undermined this stability, causing ongoing significant revenue losses. Claimants' income declined 84% when comparing April 2023 to April 2024. There was no other reason for this dramatic loss of income other than the destruction of the Key Bridge.

43. The losses incurred by Claimants were a foreseeable consequence of the Petitioners' negligence, given their failure to ensure the seaworthiness of the vessel that ultimately led to the bridge's destruction.

44. Consequently, the destruction wrought by the Petitioners has significantly impaired Claimants' proprietary interests, with considerable financial losses that are expected to persist.

---

proving-ground-directory/; *Armed Forces Directory, Fort Meade*, available at https://www.armedforcesdirectory.org/fort-meade-digital-directory/.

45. Essentially, the negligence of the Petitioners not only led to the physical destruction of the Key Bridge but also precipitated a broader economic shutdown in Baltimore, severely affecting local business owners like Claimants.

46. It is imperative that the Petitioners be held accountable for their actions, which have had such devastating impacts on the community and its businesses.

E. *Petitioners Should Be Held to Account to Claimants and the Class.*

47. This action is brought by Claimants individually, and as representatives of all other similarly situated under the provisions of Rule 23(a) and (c) of the Federal Rules of Civil Procedure, for compensatory damages as set forth in more detail below. Claimants, as a representative of the class, have suffered one or more elements of damages alleged herein and is a member of the class set forth below.

48. The **Class** is defined as all businesses, individuals, and other entities who have sustained a loss as a result of Petitioners' destruction of the Key Bridge.

49. Excluded from the above-defined class are those businesses, individuals, or other entities who would otherwise be class members, but who or which are: (i) Petitioners, or any of their employees, agents, insurers, contractors, and subcontractors, including employees of Petitioners' agents, contactors or subcontractors, (ii) the Court, court personnel and their immediate families, and (iii) the attorneys for any of the Parties and members of their law firms.

50. The proposed class meets all of the requirements to be certified under Rule 23:

    a. <u>Numerosity</u>: The putative class is so numerous that joinder of all members is impracticable. In addition to the named Claimants, a significant number of other businesses, individuals, and other entities suffered losses as a result of Petitioners' destruction of the Key Bridge. While the exact number of members of the class is unknown, Claimants are informed and believe that the class

consists of tens of thousands of businesses, individuals, and other entities.

b. <u>Commonality</u>: There is a well-defined community of interest among the class and there a numerous common questions of law or fact which include, but are not limited to, the following:

- Whether Petitioners employed a crew that lacked attentiveness to their responsibilities;

- Whether Petitioners allowed a crew that did not adhere to local navigational norms and customs;

- Whether Petitioners engaged a crew that navigated the vessel improperly;

- Whether Petitioners employed a crew deficient in the necessary skills;

- Whether Petitioners employed a crew deficient in the necessary training;

- Whether Petitioners failed to adequately staff the vessel;

- Whether Petitioners mismanaged the vessel and its crew;

- Whether Petitioners neglected to equip the vessel with suitable policies and procedures;

- Whether Petitioners neglected to implement adequate policies, procedures, and training for safe vessel operation;

- Whether Petitioners failed to oversee their fleet adequately to ensure safe operations;

- Whether Petitioners utilized a vessel equipped with unfit systems and equipment;

- Whether Petitioners neglected proper maintenance of the vessel;

- Whether Petitioners failed to maintain or utilize the vessel's systems and equipment properly;

- Whether Petitioners failed to maintain or utilize the vessel's engine adequately;

- Whether Petitioners failed to maintain or utilize the vessel's propulsion system adequately;

- Whether Petitioners failed to maintain or utilize the vessel's steering system adequately;

- Whether Petitioners failed to equip the vessel adequately;

- Whether Petitioners failed to provide a functioning engine;

- Whether Petitioners failed to provide an engine suitable for the vessel's intended use;

- Whether Petitioners failed to address known or foreseeable hazards promptly;

- Whether Petitioners failed to rectify known or foreseeable deficiencies promptly;

- Whether Petitioners failed to conduct necessary inspections of the vessel; and

- Whether Petitioners failed to adhere to industry standards, customs, and practices.

c. <u>Typicality</u>: Claimants' claims are typical of the claims of the members of the proposed class. Plaintiffs' claims arise from the same practices and conduct that give rise to the claims of all class members and are based on the same legal theories.

d. <u>Adequacy</u>: Claimants will fairly and adequately represent and protect the interests of the class in that they have no disabling conflicts of interest that would be antagonistic to those of the other members of the class. Claimants seek no relief that is antagonistic or adverse to members of the class and the infringement of the rights and the damages they have suffered are typical of all other class members. Claimants have retained attorneys experienced in class actions and complex litigation as counsel.

51. Prosecuting separate actions by individual class members would create a risk of: (1) inconsistent or varying adjudications with respect to individual class members that would establish

incompatible standards of conduct for the Petitioners; or (2) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

52. Questions of low or fact common to class member predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Because of the number and nature of common questions of fact and law, multiple separate lawsuits would not serve the interest of judicial economy.

53. Claimants will fairly and adequately protect the interests of the class. The interests of Claimants are consistent with those of class members.

54. The proposed Class is also certifiable under Federal Rule of Civil Procedure 23(c)(4). Rule 23(c)(4) states that Claimants may carve the proposed Class into subclasses. *See Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 439 (4th Cir. 2003). Rule 23 (c)(4) allows for class certification with respect to specific or particular issues, and is well suited for identifying a single, common issue relevant to the entire class—liability as an example, while allowing for appropriate treatment of a class members damages. The Rule is intended to give courts discretion when handling complex cases by allowing them to divide cases into subclasses to distinguish unusual or complicated issues or claims that would otherwise prevent class certification because an individual class representative could not represent the entire class.

**REQUEST FOR RELIEF**

WHEREFORE, Claimants AMERICAN PUBLISHING, LLC, KAREN AUSTIN, and CHARLES AUSTIN, JR. individually and on behalf of all others similarly situated, pray for judgment against Petitioners, GRACE OCEAN PRIVATE LIMITED and SYNERGY MARINEPTE LTD, as follows:

a. That this action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b. The full amount of Claimants' and the Classes' damages as may be proven at trial;

c. Costs of suit;

d. Attorney's fees;

e. Pre-judgment and post-judgment interest as allowed by law;

f. Injunctive relief;

g. Punitive damages; and

h. All other relief that this Court deems just and proper.

Dated: April 25, 2024	Respectfully submitted,

**SMOUSE & MASON, LLC**

/s/*Roy L. Mason*
Roy L. Mason (00922)
Zachary E. Howerton (20688)
223 Duke of Gloucester Street
Annapolis, Maryland 21401
Tel.: 410-269-6620
Fax: 410-269-1235
rlm@smouseandmason.com
zeh@smouseandmason.com

**MILBERG BRYSON COLEMAN PHILLIPS GROSSMAN, PLLC**

Marc D. Grossman*
Gregory F. Coleman*
Victoria J. Maniatis*
James R. DeMay*
Melissa K. Sims*
800 South Gay Street, Suite 1100
Knoxville, Tennessee 37929
Tel.: 866-252-0878
mgrossman@milberg.com
gcoleman@milberg.com
vmaniatis@milberg.com
jdemay@milberg.com
msims@milberg.com

* pro hac vice motions to be filed

**LOCHNER LAW FIRM, P.C.**

*/S/ Todd D. Lochner*
Todd D. Lochner (25691)
Lochner Law Firm, P.C.
91 Main Street, 4th Floor
Annapolis, Maryland 21401
Tel.: 410-716-4400
tlochner@boatinglaw.com

*Counsel for Claimants*

**CERTIFICATE OF SERVICE**

In compliance with Supplemental Federal Rule F(5), I HEREBY CERTIFY that on the 25th day of April, 2024, I electronically filed the foregoing pleading with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel who are CM/ECF participants.

/s/*Roy L. Mason*_____
Roy L. Mason