UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| In the Matter of the Petition<br><br>of<br><br>GRACE OCEAN PRIVATE LIMITED, as Owner of the M/V DALI,<br><br>and<br><br>SYNERGY MARINE PTE LTD, as Manager of the M/V DALI,<br><br>for Exoneration from or Limitation of Liability | Docket No. JKB 24-cv-941<br><br>*IN ADMIRALTY* |

**AMENDED CLAIM BY AMERICAN PUBLISHING, LLC,
KAREN AUSTIN, AND CHARLES AUSTIN, JR. PURSUANT
TO SUPPLEMENTAL FEDERAL RULE F(5)
IN RELATION TO THE KEY BRIDGE ALLISION**

Specifically reserving all rights and defenses asserted in Claimants' accompanying Amended Answer to the Petitioners' "Petition for Exoneration from or Limitation of Liability," Claimants, AMERICAN PUBLISHING, LLC, KAREN AUSTIN, and CHARLES AUSTIN, JR. (collectively, "Claimants"), individually and on behalf of all others similarly situated, hereby demand a jury trial and make this amended claim pursuant to Rule F(5) of the Supplemental Rules for Admiralty or Maritime Claims and the Rules of Civil Procedure against Petitioners, GRACE OCEAN PRIVATE LIMITED and SYNERGY MARINE PTE LTD, as alleged owner and manager of the vessel M/V DALI (the "DALI") and in support thereof aver as follows:

**INTRODUCTION**

1.  On an unremarkable and calm night with a temperature of 39 degrees Fahrenheit, wind speeds at five miles per hour, and no atmospheric disturbances or visible impediments, at precisely 12:45 AM local time on March 26, 2024, the container ship Dali embarked from the Port of

Baltimore, setting a course for the Chesapeake Bay.

2. The route the officers on the bridge sought for the Dali—a voyage down the Patapsco River, beneath the sprawling 1.6-mile Francis Scott Key Bridge (the "Key Bridge"), and onward to the Chesapeake Bay—was a well-traveled conduit for countless container ships. However, the officers of the Dali knew that their vessel was not ready to safely navigate passage past the vulnerable Key Bridge. In the face of this knowledge, those officers took the malfunctioning Dali away from the dock and toward the Key Bridge. This reckless decision killed six people and cost thousands of individuals and businesses millions of dollars.

3. Until that disastrous day, the Port of Baltimore thrived as a bustling nexus of American maritime activity, ranking among the top twenty ports in the United States by total tonnage and a pivotal hub for vehicular imports and exports in the Baltimore area and beyond. Despite this extraordinary activity, not a single person died as a result of a ship navigating that channel under the Key Bridge.

4. A report dated March 13, 2024, titled "The 2023 Economic Impact of The Port Of Baltimore In Maryland," commissioned by the Maryland Department of Transportation, revealed that the Baltimore Port District managed a staggering 55.5 million tons of cargo in 2023.[1] This commerce supported tens of thousands of jobs, and in turn, those employees bolstered the local economy, generating significant revenues that paid the costs for businesses including that of Claimants.

5. The economic contribution of the Port of Baltimore was monumental, estimated at over $70 billion in 2023 alone[2], serving as a robust economic engine for a region that has known much hardship.

---

[1] The 2023 Economic Impact Of The Port of Baltimore Maryland, Prepared for the Maryland Port Administration, available at https://mpa.maryland.gov/Documents/MarylandEconomicimpactofPOB2023.pdf.

[2] *Id.*

6. Since its designation as a point of entry in 1706, the Port of Baltimore has been a cornerstone of regional economic prosperity, supporting maritime activities since the Revolutionary War era. The construction of infrastructures, like the Baltimore Harbor Tunnel and the Key Bridge responded to growing transportation needs, symbolizing the port's crucial role in fostering Baltimore's business growth.

7. The Key Bridge, built in 1977, has not been substantially changed or updated since its original construction more than forty years ago, despite the cargo ships such as the Dali more than doubling in size since that time. The vulnerability of the Key Bridge to the impact of the Dali ship was obvious to any experienced commercial vessel officer, including the officers in charge of the Dali on March 26, 2024. Yet just twelve minutes after departure, the Dali commenced a sweeping turn towards the Key Bridge. The ship's onboard data recorder, later obtained by the National Transportation Safety Board ("NTSB"), captured a sequence of urgent aural alarms signaling the beginning of this quite predicted disaster.[3]

8. Captured video footage chillingly illustrates the events: shortly after leaving port, the Dali, bereft of power and adrift, uncontrollably surged towards the Key Bridge at about seven knots. The Bridge, obviously unprepared for such an impact, collapsed within 30 seconds. Six people working on the highway traversing the bridge plunged to their deaths.

9. The Dali's catastrophic allision with the Key Bridge precipitated its immediate destruction and crippled the region's economic lifeline—a catastrophe whose repercussions will resonate for decades.

10. This disaster was wholly preventable by the Dali's officers. Reports indicate that alarms signaling erratic power supply had been activated even before the Dali's departure, obviously

---

[3] Emily Mae Czacho, *What To know about the Francis Scott Key Bridge collapse in Baltimore that left 6 presumed dead*, CBS NEWS, available at https://www.cbsnews.com/baltimore/news/francis-scott-key-bridge-collapse-baltimore-maryland-what-to-know/.

signifying its unfit state for voyage. Nevertheless, the officers directed the crew to leave port, a decision marked by their flagrant disregard for human life and the economic health of the area, including the Claimants. This decision by the officers directing the Dali was made in reckless disregard for the lives that were lost and the livelihoods that were irreversibly damaged.

## PARTIES

11. This action seeks reimbursement of business costs for each Claimant individually and their business.

12. Claimants Karen Austin and Charles Austin, Jr. are citizens and residents of Baltimore, Maryland, and at all times relevant hereto, owned and operated Claimant American Publishing, LLC, a company organized and existing under the laws of Maryland with its principal office located in Baltimore, Maryland. Claimants appear in their individual capacities, and as the owners of the LLC Claimant.

13. Upon information and belief, Petitioner Grace Ocean Private Limited ("Grace") is a corporation organized and existing under the laws of Singapore with its registered office in Singapore and was the registered owner of the M/V DALI (the "Dali" or the "Vessel") at all times relevant hereto. The officers on the Dali at the time of the disaster were actual and apparent agents of the owner of the vessel.

14. Upon information and belief, Synergy Marine Pte Ltd ("Synergy") is a corporation organized and existing under the laws of Singapore with its registered office in Singapore and was the manager of the Vessel. Upon information and belief, Synergy was responsible for, among other things, manning and victualing the Vessel; procuring and providing deck, engine, and cabin stores; maintenance, monitoring, and repairs of the Vessel's hull, engines, electrical systems, and operating navigational systems and devices; provisioning of spare parts, maintenance and repairs for the Vessel; and communicating with the officers and crew, the Owner and the Vessel's time

charterers at all times relevant hereto. The officers on board the Dali were acting as the actual and apparent agents of Synergy at the time of this tragedy.

15. The officers on board the Dali, all agents of the Petitioners, made crucial decisions that directly led to this allision. These reckless decisions established that Grace and Synergy failed to hire, train, monitor, instruct, or discipline these officers who so recklessly disregarded the most fundamental rules of navigation.

## JURISDICTION AND VENUE

16. The incident that gave rise to this claim occurred upon the navigable waters of the United States within the territorial waters of the State of Maryland, had an actual and potential impact on maritime commerce by blocking the Patapsco River channel, involved a traditional maritime activity, and is subject to admiralty tort jurisdiction. Moreover, the allision caused hazardous chemicals to be spilled into the Patapsco River, in violation of Comprehensive Environmental Response, Compensation, and Liability Act (hereafter, "CERCLA"), as stated below.

17. This action is within this Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) and (d), because the parties are in complete diversity, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

18. In addition, this action is within the Court's admiralty and maritime jurisdiction, pursuant to U.S. Constitution Article 3, Section 2, and 28 U.S.C. § 1333.

19. Venue is appropriate in this district pursuant to 28 U.S. Code § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this district, and a substantial part of property that is the subject of the action, including the Vessel, is situated in this district.

## FACTUAL ALLEGATIONS

### A.   The Francis Scott Key Bridge: A Critical Connector

20.     Upon information and belief, the Key Bridge was constructed within a mere 100 yards from the spot where Francis Scott Key observed the unsuccessful British assault on Fort McHenry in September 1814, during the War of 1812. Inspired by the sight of the flag waving the following morning, Key penned what would become known as the "Star-Spangled Banner," originally titled the "Defense of Fort McHenry."

21.     Built between 1972 and 1977, the Key Bridge was designed to alleviate significant traffic flows into and out of Baltimore City and to facilitate the transport of "hazardous materials," which were prohibited in the existing tunnel crossings. Since its completion, local businesses, such as the Claimants here, have developed financial dependence on the channel on the Patapsco River that passed beneath the Bridge. As long as the free flow of commerce continued on that channel, the Claimants were able to pay the costs and expenses of their business, since the collapse, they cannot.

22.     The investigation into this allision has, of course, only just begun. This Amended Claim describes what information is available at the time of its filing. Much of this information is based upon information and belief gleaned from reports in the press, the Petitioners in this litigation, and marine and maritime accident reconstruction experts.

23.     Upon information and belief, because the Key Bridge was constructed in the 1970's, the bridge's design was only intended to protect it from strikes by cargo ships that were constructed during that period. Since the 1970's, however, cargo ships, like the Dali, have more than doubled in size. As every experienced large vessel officer knew, the Key Bridge was not designed nor improved to withstand allisions with these larger vessels. Likewise, the officers of the Dali knew, with just one glance at the Key Bridge, that it was woefully unprotected from an impact with their vessel. The Dali's

officers also knew, on March 26, 2024, that their vessel had to be running perfectly to safely navigate under the Key Bridge. Tragically, they also knew it was not running perfectly, or even operational, and would be unable to avoid an impact with the Bridge in the narrow channel without all of its systems working well.

24. Upon information and belief, the Key Bridge's susceptibility to heavy ship strikes were widely known to the maritime community, including the Petitioners and their agents. On numerous occasions, for example, these concerns were openly discussed at meetings of the Baltimore Harbor Safety and Coordination Committee, a committee consisting of the Maryland Transportation Authority, the U.S. Coast Guard, and civilian ship piloting organizations that discussed any safety issues regarding the Baltimore Harbor. Included in the committee was a vessel captain, Joseph Smith, who raised this problem many times, reflecting that this was the common knowledge that all large vessel that utilized the Port of Baltimore. Upon information and belief, the minutes of these discussions have been publicly available for many years. Moreover, this knowledge was known by the Petitioners and their agents, the officers of the Dali, on March 26, 2024.

25. Upon information and belief, due to the narrow width of the Patapsco River, the officers on board the Dali were specifically aware that their large vessel, if aground within the channel would cause a complete blockage of the Patapsco River to commercial traffic, thereby negatively impacting the Claimants.

26. The Key Bridge's western terminus sits at Hawkins Point within Baltimore City. This strategic location means that all 30,000 daily commuters traversing this 1.6-mile span enter or exit Baltimore City, directly impacting local enterprises, including that operated by Karen Austin and Charles Austin, Jr., by increasing their operational costs and preventing them from earning the income necessary to cover their costs. The Claimants have actual possession and

7

ownership of their business, have a responsibility to repair their business, and the responsibility to maintenance their business.

### B.   Disaster at Sea

27.   Upon information and belief, at 12:45 AM on March 26, 2024, the Dali—a 985-foot Neopanamax container vessel constructed by Hyundai Heavy Industries in 2015, nearly thirty years after the construction of the Key Bridge—cast off from the Port of Baltimore, bound for its next destination in Sri Lanka, with an expected arrival of April 22, 2024.

28.   Upon information and belief, in the hours leading up to its departure, alarms had been triggered on the Dali's refrigerated containers, indicating erratic power supply issues.[4] These power supply problems were known but ignored by the officers of the Dali. Twelve minutes after embarking, the Dali initiated a turn towards the Key Bridge. At 1:24 AM, the ship's onboard data recorder captured multiple urgent alarms before it momentarily ceased recording, then ultimately resumed using an auxiliary power source. As the officers on board knew, this backup power was inadequate for the crew to maintain control of the vessel. It was one more factor in causing the allision with the Key Bridge.

29.   Upon information and belief, as the Dali exited the Port of Baltimore, the Dali was required to enter a state of "restricted maneuvering," but its systems were not aligned nor ever reached a level of readiness required for such maneuvering. Additionally, one of Dali's propulsion system transformers, which provides electricity to Dali's propulsion systems, had been out of commission for an extended period of time and was not available for use on the night of March 26, 2024. All of this was known by the officers in charge of the Dali, yet the officers intentionally disregarded the most basic vessel requirements for safely navigating the channel underneath the Key Bridge. Their decisions and actions establish more than mere negligence. They intentionally placed their vessel in a

---

[4] Eric Tucker, et al., *Ship that caused bridge collapse had apparent electrical issues while still docked, AP source says*, ASSOCIATED PRESS (April 15, 2024), *available at* https://whyy.org/articles/baltimore-bridge- collapse-ship-electrical-issues/.

8

situation which endangered lives and threatened extraordinary economic loss.

30. Upon information and belief, at 1:24 AM, the Dali experienced a sudden loss of power. Rendered adrift and moving at about seven knots without adequate steering capabilities, the vessel began drifting towards the Key Bridge. The ship's emergency diesel generator either failed to activate or did not provide sufficient emergency power to prevent the vessel from alliding with the bridge. Thus, upon information and belief, there is more than sufficient evidence that the Dali's officers knew that their vessel was unprepared to navigate this narrow channel, and that the bridge they had to avoid was unprotected and could not withstand a strike from their ship.

31. Upon information and belief, at 1:28 AM, the Dali violently collided with the Key Bridge, leading to its immediate structural failure, and plunging it into the harbor below. This catastrophic event resulted in the deaths of six individuals and halted nearly all commercial maritime traffic to and from the Port of Baltimore through that channel.

32. Upon information and belief, the allision between the Dali and the Key Bridge caused the breach of fourteen containers containing hazardous materials, such as lithium batteries, soap products, perfume products, and other resins, and these hazardous materials then leached into the Patapsco River. Thereby, the allision caused a hazard in violation of CERCLA.[5]

**C.    *Direct Consequence of an Intentional Disregard for Safety by Dali Officers.***

33. Upon information and belief, on the night of March 26, 2024, but for the intervening risk taking of the Dali officers, the Dali would also have safely passed through the Patapsco River and into the Chesapeake Bay just as thousands of similar vessels had before March 26, 2024.

34. The officers in charge of the Dali on March 26, 2024 knew that the Key Bridge was decades old and had been built for much smaller ships with substantially less beam and dramatically

---

[5] Claimants contend that this release of hazardous materials into a navigable water invokes CERCLA, particularly Section 107(h), which preserves the right of these Claimants to make maritime tort claims under state law.

less tonnage. Having navigated through harbors throughout the world, the officers of the Dali knew that their decision to leave the dock with a ship of the Dali's width and weight meant that any impact with the vulnerable bridge would result in a blockage of the channel that was necessary for thousands of individuals and businesses that depend on a navigable channel in the Patapsco River.

35. The fault of the Petitioners is starkly evident. No fault can reasonably be attributed to Claimants for the allision. The allision resulted directly from the Petitioners' reckless and intentional acts, compounded by the unseaworthiness of the Dali and the known frailty of the Key Bridge.

36. Further, based on available information, the Dali's officers are believed to have:

a. Employed a crew that lacked attentiveness to their responsibilities;

b. Employed a crew that did not adhere to local navigational norms and customs;

c. Employed a crew that navigated the vessel improperly;

d. Employed a crew deficient in the necessary skills;

e. Employed a crew deficient in the necessary training;

f. Failed to adequately staff and equip the vessel;

g. Failed to equip and maintain the vessel's electrical systems;

h. Failed to train the officers in appropriate decision-making when human lives are at risk;

i. Mismanaged the vessel and its crew;

j. Neglected to equip the vessel with suitable policies and procedures;

k. Neglected to implement appropriate policies, procedures, and training for safe vessel operation;

l. Failed to oversee their ship adequately to ensure safe operations;

m. Utilized a vessel equipped with unfit systems and equipment;

n. Neglected proper maintenance of the vessel;

o. Failed to maintain or utilize the vessel's systems and equipment properly;

p. Failed to maintain or utilize the vessel's engines adequately;

q. Failed to maintain or utilize the vessel's propulsion system adequately;

r. Failed to maintain or utilize the vessel's steering system adequately;

s. Failed to equip the vessel adequately;

t. Failed to provide functioning propulsion systems;

u. Failed to provide an engine suitable for the vessel's intended use;

v. Failed to address known hazards promptly;

w. Failed to rectify known deficiencies promptly;

x. Failed to conduct necessary inspections of the vessel;

y. Failed to adhere to industry standards, customs, and practices;

z. Recklessly disregarded the most basic safety provisions and the obvious mechanical failures on March 26, 2024.

aa. Left port knowing that their ship that was not performing adequately and was likely to impede traffic in the channel;

ab. Ignored the obviously vulnerability of Key Bridge.

37. As a result of these factors, the officers and crew aboard the Dali knew, before they left, that the Dali was likely not capable of safely passing under the Key Bridge.

38. Nevertheless, instead of delaying their scheduled departure, the officers of the Dali intentionally and recklessly moved the Dali from its position of safety at the dock and into the channel.

39. Rather than remain at the dock, the officers of the Dali put their own financial self-interest, the financial interests of their employer, and the financial interest of the Dali's owner, ahead of the safety and economic interests of the individuals and businesses that rely on the flow of vessels through the Patapsco River, and the use of the highway traversing the bridge.

40. The allision was a consequence of these and other acts, failures, and omissions by the

Petitioners and the vessel, which will be further demonstrated at trial.

　　D.　　*Economic Cost for Local Businesses*

　　41.　　Since the disastrous allision, commercial use of the Patapsco River in and around the Port of Baltimore has come to a virtual standstill.

　　42.　　Among the impacted businesses is that of Claimants. This family-run enterprise, based in Baltimore and operational since July 2007, benefits from Mrs. Austin's extensive background as a former counter-terrorism equipment specialist and her lineage as the daughter of William C. Horn, a U.S. Navy Veteran and retired Baltimore City Homicide Detective. Her deep-rooted connection to the military and law enforcement has driven her to serve military communities.

　　43.　　Mrs. Austin's professional journey began in physical security, where she initially worked as a first responder specializing in safety equipment. During the events of 9/11, she was pivotal as a Counterterrorism Security Equipment Specialist, coordinating extensively to supply essential equipment for command setups at Ground Zero. Her relentless effort continued as she later served in high-risk U.S. territories prone to terrorist activities, such as Guam, Saipan, Puerto Rico, the Virgin Islands, and American Samoa, deploying crucial equipment and training local first responders.

　　44.　　Transitioning from her security role, Mrs. Austin has accumulated over 30 years in business, sales, and publishing, including American Publishing, LLC's launch and publication of the United States Cybersecurity Magazine since 2013, a periodical addressing critical national cybersecurity challenges.

　　45.　　Mr. and Mrs. Austin also head the biannual production of the Armed Forces Directory, a publication that American Publishing initiated in 2007. This directory aids military and civilian personnel, facilitating their transitions associated with Aberdeen Proving Ground and Fort Meade— key military installations located strategically near the Francis Scott Key Bridge.[6]

---

[6] *Armed Forces Directory, About Us*, available at https://www.armedforcesdirectory.org/about/.

46. The Armed Forces Directory not only serves as a crucial resource for military and civilian transitions but also offers advertising opportunities for local businesses, enhancing their visibility to a broad audience that includes both current and potential future clientele.[7]

47. The strategic position of the Patapsco River commercial channel is vital to local businesses, including those advertised in Claimants' directory, which relied heavily on the channel for the transportation of goods, underscoring the interconnected nature of local commerce and an open and unrestricted channel.

48. Before the bridge's destruction, and the Dali's blockage of the Patapsco River, Claimants' business was flourishing, with increasing distribution and significant advertisement revenue from local enterprises in and around Baltimore. The escalation in customer engagement and sales effectiveness boosted the economic benefits to both military and civilian communities, reflecting positively on Claimants' publication's impact. Last year, this success led Claimants to secure a contract to publish the Base Guide for Fort Meade, anticipating an influx of new personnel and their associated needs. This business achievement, however, the caused the Claimants to incur much higher costs, which are the subject of this claim.

49. The immediate aftermath of the channel blockage, however, was a dramatic halt in business activities. The local business community, stunned by the event, ceased communications, resulting in a sharp decline in service calls and sales for Claimants. As a result, the Claimants experienced a significant increase in business costs, without any income to pay them.

50. Claimants were positioned to continue their business operations undisturbed, yet the blockage of the Patapsco River directly undermined this stability, causing significant, ongoing, and extended costs. Claimants estimate that they have had more than $100,000 in additional costs to date.

---

[7] *Armed Forces Directory, Aberdeen Proving Ground*, available at: https://www.armedforcesdirectory.org/aberdeen-proving-ground-directory/; *Armed Forces Directory, Fort Meade*, available at https://www.armedforcesdirectory.org/fort-meade-digital-directory/.

There was no other reason for this dramatic cost increase other than the Dali's blockage of the Patapsco River Channel by the Petitioners' vessel.

51. Consequently, the destruction wrought by the Petitioners has significantly impaired Claimants' proprietary interests, with considerable financial losses that will persist and increase.

52. The officers on board the Dali were also aware that, due to the compromised nature of their ship, if an emergency arose, they would be unable to avoid a disastrous allision with the Key Bridge.

53. It is imperative that the Petitioners be held accountable for their actions, which have had such devastating impacts on the community and its businesses.

### E. Eligibility for Relief

54. The most often cited and quoted case in maritime law is *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927). Decided nearly a century ago, it does not consider many fundamental principles that have since become cornerstones of American law. The inadequacy of *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927) is demonstrated by foundational, but still more recent case law. Most importantly, the seminal decision on proximate cause in American jurisprudence was decided less than a year after *Robins Dry Dock* was published. *Palsgraf v Long Island R.R.*, 248 N.Y.339, 354-55 (1928). Thus, Judge Benjamin Cardozo's opinion was not available to Justice Holmes when he drafted his opinion in *Robbins Dry Dock*.

55. In Phillip A. Vagin, Who Can Sue for Losses Caused by a Collision Under U.S. and English Law: *Robins Dry Dock* and it's Exceptions, 45 Tul. Mar. L.J. 509, 516-17 (2021), Phillip Vagin summarized three nonexclusive factors arising in the Fifth Circuit to determine whether a Claimant has a proprietary interest in property for purposes of a maritime claim. These criteria are 1) actual possession or control of the property, 2) responsibility to repair the property, or 3) whether they have a responsibility for the maintenance of the damaged property. Here, the property in question is

the Claimant's business, which has been damaged by the accumulation of costs due to the blockage of the Patapsco River Channel. At all times, the Claimants have been in actual possession and control of this property, and are responsible for the property's maintenance. Therefore, the Claimants have a proprietary interest in the cost of their property interest in this case.

56. In *Goldnoy Barge v. M/T Shinoussa*, 1991 AMC 2930 (S.D. Tex. 1992), a ship in the Port of Houston collided with several other stationary barges, causing 700,000 gallons of oil to leak into the Houston Channel. Here, the Port of Houston Port Authority sued all vessels involved for costs incurred due to the closure of the channel, lost dockage fees, and profit losses due to decreased calls brought on by bad publicity. This action survived a motion of dismiss in part because the court held that since the Port Authority had a right to use and manage the waters in the Houston Channel, it had a sufficient interest in the water itself, and could had a valid cause of action for losses related to being unable to use the Houston Channel. This is similar to the circumstances of this case, where the Claimants have a right to use the Patapsco River Channel, and have incurred significant costs due to the closure of the channel.

57. In another example, in *Petitions of Kinsman Transit Co.,* 388 F.2d 821 (2nd Cir. 1968), the Second Circuit applied a proximate cause "remoteness" analysis to negligence in a maritime claim. Citing Judge Andrew's dissent in *Palsgraf v. Long Island R.R.*, 248 N.Y. 339, 354-55 (1928), the Second Circuit held that Claimants could recover from a maritime collision if they could prove that their damages were a "foreseeable consequence" of the Petitioner's actions. That is certainly the case here, where increased costs to local business were a foreseeable consequence of the Petitioner's allision with the Key Bridge and subsequent blockage of the Patapsco River channel.

58. In *Marine Nav. Sulphur Carriers, Inc v. Lone Star Industries, Inc.*, 638 F.2d 700 (4th Cir. 1981), the Fourth Circuit adopted the reasoning of *Petitions of Kinsman Transit Co.,* 388 F.2d 821 (2nd Cir. 1968) in a case that concerned an allision between a vessel and a bridge which disrupted

commerce on a navigable river. Those exact circumstances are present in this case, where an allision between a vessel and a bridge caused the closure of a channel, and the Claimants have suffered increased costs as a result.

59. Additionally, in *Venore Transp. Co. v. M/V Struma*, 583 F.2d 708 (4th Cir. 1978), the Fourth Circuit established that *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303 (1927) permits someone who possesses property from receiving actual damages related to the loss of use of that property that are incurred by the Claimant as a consequence of the Petitioner's reckless or negligent conduct. Once again, this is exactly the claim made here by the Claimants. They seek to recover the increased costs incurred by the business or a result of the acts of the Petitioner's agents.

60. At all times relevant hereto, the Claimants were the owner in possession of their property.

61. All actual damage suffered by the Claimants relates to the added cost from the loss of use of their property.

62. All costs incurred by the Claimants were and are a direct and foreseeable consequence of the Petitioner's negligent and reckless conduct.

63. The Claimants are therefore permitted to collect actual monetary damages related to the loss of use of their property their business LLC, that resulted from the Petitioner's intentional and reckless acts.

**REQUEST FOR RELIEF**

WHEREFORE, Claimants AMERICAN PUBLISHING, LLC, KAREN AUSTIN, and CHARLES AUSTIN, pray for judgment against Petitioners, GRACE OCEAN PRIVATE LIMITED and SYNERGY MARINE PTE LTD, as follows:

    a. The full amount of Claimants' damages as may be proven at trial;

    b. Costs of suit;

c. Attorney's fees;

d. Pre-judgment and post-judgment interest as allowed by law;

e. Injunctive relief; and

f. All other relief that this Court deems just and proper.

Dated: June 4, 2024  Respectfully submitted,

**SMOUSE & MASON, LLC**

/s/*Roy L. Mason*
Roy L. Mason (00922)
Zachary E. Howerton (20688)
223 Duke of Gloucester Street
Annapolis, Maryland 21401
Tel.: 410-269-6620
Fax: 410-269-1235
rlm@smouseandmason.com
zeh@smouseandmason.com

**MILBERG BRYSON COLEMAN PHILLIPS GROSSMAN, PLLC**

Marc D. Grossman*
Gregory F. Coleman*
Victoria J. Maniatis*
James R. DeMay*
Melissa K. Sims*
800 South Gay Street, Suite 1100
Knoxville, Tennessee 37929
Tel.: 866-252-0878
mgrossman@milberg.com
gcoleman@milberg.com
vmaniatis@milberg.com
jdemay@milberg.com
msims@milberg.com

* pro hac vice motions to be filed

*Counsel for Claimants*

**LOCHNER LAW FIRM, P.C.**

*/S/ Todd D. Lochner*
Todd D. Lochner (25691)
Lochner Law Firm, P.C.
91 Main Street, 4th Floor
Annapolis, Maryland 21401
Tel.: 410-716-4400
tlochner@boatinglaw.com

*Counsel for Claimants*

## CERTIFICATE OF SERVICE

In compliance with Supplemental Federal Rule F(5), I HEREBY CERTIFY that on the 4th day of June, 2024, I electronically filed the foregoing pleading with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel who are CM/ECF participants.

/s/*Roy L. Mason*
Roy L. Mason