**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| In the Matter of the Petition of ) | |
| ) | |
| GRACE OCEAN PRIVATE LIMITED, ) | |
| as Owner of the M/V DALI, ) | Civil Action No. 1:24-cv-00941 |
| ) | |
| and ) | *IN ADMIRALTY* |
| ) | |
| SYNERGY MARINE PTE LTD, ) | |
| as Manager of the M/V DALI, ) | |
| ) | |
| for Exoneration from or Limitation of Liability. ) | |

**UNITED STATES' CLAIM AND ANSWER TO PETITIONERS
GRACE OCEAN PRIVATE LIMITED AND SYNERGY MARINE PTE LTD'S
PETITION FOR EXONERATION FROM OR LIMITATION OF LIABILITY**

The United States of America respectfully files this claim and answer to the complaint of

Petitioners Grace Ocean Private Limited ("Grace Ocean"), as owner of the Motor Vessel

("M/V") DALI, and Synergy Marine Pte Ltd ("Synergy"), as the technical manager of the M/V

DALI.

**INTRODUCTION**

1.  On March 26, 2024, the containership M/V DALI crashed into and toppled the Francis

Scott Key Bridge.  Tragically, this event took the lives of six construction workers on the bridge

and injured two others.  In addition, the wreck of the DALI and the remnants of the Francis Scott

Key Bridge obstructed the Fort McHenry Channel, blocking access to the Port of Baltimore and

severing key links in the Nation's transportation and defense infrastructure.  As a result of the

disaster, the United States incurred more than $100,000,000 in losses and response costs in the

course of clearing the wreck and bridge debris from the navigable channel to reopen the Port of

Baltimore.

2.   This tragedy was entirely avoidable.  The electrical and mechanical systems on the DALI were improperly maintained and configured in a way that violated safety regulations and norms for international shipping.  These problems precipitated a power loss and then a cascading series of failures that culminated in the allision.  As events unfolded, and because of the unseaworthy condition of the ship, none of the four means available to help control the DALI—her propeller, rudder, anchor, or bow thruster—worked when they were needed to avert or even mitigate this disaster.

3.   Shortly after midnight, a Maryland-licensed pilot boarded the DALI to guide the ship from Baltimore's Seagirt Marine Terminal to the Chesapeake Bay.  After the captain assured the pilot that the ship was in good working order, the pilot directed the DALI's movements into the Fort McHenry Channel.  As the vessel approached the bridge, while only about four minutes from it, the ship lost electrical power when circuit breakers for the number 1 step-down transformer tripped open.

4.   The DALI's number 1 step-down transformer is a large electrical device that converts high-voltage power produced by the ship's diesel generators into lower 440-volt power.  This transformer and its circuity and breakers had long suffered the effects of heavy vibrations, a well-known cause of transformer and electrical failure.  Instead of taking steps to eliminate the source of excessive vibrations, Petitioners jury-rigged their ship.  They retrofitted the transformer with anti-vibration braces, one of which had cracked over time, had been repaired with welds, and had cracked again.  And they also wedged a metal cargo hook between the transformer and a nearby steel beam, in a makeshift attempt to limit vibration.

5.   These telltale signs of vibration problems were not isolated.  The ship's previous chief officer reported that "constant vibrations" above the engine room were shaking loose the ship's

cargo lashings.  Engineers noted that these problems were cracking equipment in the engine room.  A prior captain wrote that "heavy vibration[s]" at certain speeds had been reported to Synergy, the technical manager of the vessel.  Accordingly, it should have come as no surprise when the circuit breakers to the transformer tripped due to loose and damaged circuitry.

6.   With the failure at the number 1 step-down transformer, all power stopped flowing to the ship's 440-volt electrical panel.  The bridge and engine room went completely dark, the crew could not steer, and the main engine stopped, which caused the propeller to stop turning.  At that point, the power *should have* transferred automatically to the backup number 2 step-down transformer within just a few seconds, while there was still ample time to steer away from the bridge.  But this automation, a safety feature tailor made for the occasion at hand, had been recklessly disabled.  The engineers were left struggling in the dark to *manually* reset the tripped circuit breakers for the number 1 step-down transformer.  This took them a full minute, wasting critical time to regain control of the ship.

7.   In the interim, the DALI's emergency generator also *should have* turned on automatically and restored power so that the ship could be steered.  Maritime regulations require this to happen within 45 seconds.  But it did not.  Instead, well over a minute passed from the original blackout before the emergency generator provided power to the helm—more time wasted.

8.   When power was finally returned to the helm, the pilot, even though still without a working propeller, began issuing orders to steer the ship under the center span of the bridge.  Had the engineers successfully restored the main engine and propeller to working order, the pilot would have had greater control over the ship, including the ability to slow down.  But that never happened.  Instead, about a minute after regaining power, the DALI lost power a second time.

9.   This second power failure was caused by Petitioners' decision—made to save money and for their own convenience—to use a "flushing" pump to fuel the diesel generators that made the ship's electricity.  Unlike proper fuel pumps, this pump was designed to be used only for the temporary task of "flushing" out a pipeline when switching between different types of fuel.  It was not designed to recover automatically from a blackout, a critical safety feature of the proper fuel pumps that the DALI should have been using.

10. As a consequence, after the first blackout, the flushing pump turned off and stayed off. At that point, the diesel generators received fuel only via a small emergency pneumatic (air-driven) pump, which was not capable of providing enough fuel pressure to continuously run the diesel generators.  Starved of fuel, those engines began to slow down, leading the ship's computer to disconnect them from the electrical switchboards.  That dealt the pilot and crew a second blackout.

11. Facing a dire situation, but still two minutes from impact, the Maryland pilot gave an emergency order for the DALI to release the port (left) anchor in the hopes of pulling the vessel away from the bridge.  But because the DALI's anchor was not ready for immediate release in an emergency, as required by law, nothing happened.  By the time the ship finally dropped anchor, less than half a ship's length from the bridge, it was too late to have any effect.

12. Finally, and while still waiting on the anchor, the pilot gave an order to apply full power to the bow thruster in a last-ditch attempt to push the ship away from the bridge.  When nothing happened, the pilot was told the bow thruster was unavailable.

13. At approximately 1:28 a.m., the DALI slammed into one of the Francis Scott Key Bridge support piers, causing several sections of the bridge to fall into the Patapsco River.  Six people were killed, two more injured, and two critical components of the United States' transportation

infrastructure—the highway and channel—were taken out of service.  In response, the United States provided workforce, vessels, equipment, and technical expertise necessary to remove the DALI, Francis Scott Key Bridge remnants, and other debris from the Fort McHenry Channel.  As work progressed, the United States established and maintained temporary navigational channels to allow some access to the Port of Baltimore.  All told, it took months to restore the Fort McHenry Channel and reopen the port to its normal capacity, and it will take years to build a new bridge.  The Baltimore region continues to feel the adverse impacts of this entirely avoidable tragedy.

14. The ship's owner and manager—who now ask the Court to limit their liability to less than $44 million—sent an ill-prepared crew on an abjectly unseaworthy vessel to navigate the United States' waterways.  They did so to reap the benefit of conducting business in American ports.  Yet they cut corners in ways that risked lives and infrastructure.  Those responsible for the vessel must be held fully accountable for the catastrophic harm they caused, and punitive damages should be imposed to deter such misconduct.

## UNITED STATES' CLAIM

The United States, for its claim[1] against Grace Ocean and Synergy ("Petitioners"), avers upon information and belief as follows:

15. The United States brings this claim against Petitioners Grace Ocean and Synergy, *in personam*, as owner and technical manager, respectively, of the DALI, a container cargo vessel registered in and sailing under the flag of Singapore.  The DALI was operating in the Fort

---

[1] This pleading presents civil claims of the United States that are not "subject to limitation in the action" and claims that are.  *See* Fed. R. Civ. P. 8(a)(3); Supp. Admiralty Rule F(3).  The pleading should be construed as a claim or counterclaim under Rule 18(a) of the Federal Rules of Civil Procedure, which liberally permits the joinder of all claims against Petitioners, whether sounding in limitation or not.

McHenry Channel of the Patapsco River, a navigable waterway of the United States, when it allided with and destroyed the Francis Scott Key Bridge in Baltimore, Maryland, on March 26, 2024.

16. The United States brings this claim against Petitioners pursuant to the general maritime law of the United States; the Rivers and Harbors Appropriation Act of 1899 ("Rivers and Harbors Act"), 33 U.S.C. §§ 401 *et seq.*, as amended; the Oil Pollution Act of 1990, 33 U.S.C. §§ 2701-2762; and the law of public nuisance, to recover the United States' costs and other damages stemming from the DALI's allision with the Francis Scott Key Bridge.

17. The United States expressly reserves the right to amend this claim to assert additional allegations in support of this claim and/or to assert additional claims and allegations against additional parties and the present Petitioners herein.

## JURISDICTION AND VENUE

18. This is a case of admiralty and maritime jurisdiction against Petitioners.

19. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1333, and this is an admiralty and maritime claim and action within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

20. The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1345, which provides original jurisdiction of all civil actions, suits, or proceedings commenced by the United States.

21. Venue is proper in this District pursuant to Supplemental Rule F(9), as alleged in the Limitation Petition ¶ 2.

22. Venue is further proper pursuant to 28 U.S.C. § 1391(b) as it is the judicial district in which a substantial part of the events giving rise to this action occurred.

**PARTIES**

23. The United States is a sovereign nation authorized to sue under 28 U.S.C. § 1345.

24. Petitioner Grace Ocean, International Maritime Organization ("IMO") Company Number 5532064, is the sole owner of the DALI.  Grace Ocean is a Singapore-registered company with a principal place of business at 35-01, OUE Downtown, 6 Shenton Way, Singapore 068809.

25. At all times relevant hereto, the DALI answered to the instructions of Grace Ocean or its agents.

26. The DALI was not under an actual or constructive bareboat (or demise) charter at the time of the allision.

27. No entity besides Grace Ocean had the status of owner or owner *pro hac vice* of the DALI on March 26, 2024.

28. As the owner of the DALI, Grace Ocean was operating and doing business within the United States and this District at the time of the allision that is the subject of this action.

29. As a result of having filed the instant action and thereby invoking and taking advantage of the laws of the United States, Grace Ocean has fully and irrevocably subjected itself to the jurisdiction of this Court and the laws of the United States.

30. Petitioner Synergy, IMO Company Number 5507517, is the technical manager of the DALI and is a Singapore-registered company with a principal place of business at 1 Kim Seng Promenade #10-11/12 Great World City, Singapore 237994.

31. At all times relevant hereto, the DALI was technically managed by, but was not owned or chartered by, Synergy or its agents.

32. Synergy was not an "owner" of the DALI for purposes of the Limitation of Liability Act, 46 U.S.C.§§ 30501 *et seq.*

33. As the technical manager of the DALI, Synergy was operating and doing business within the United States and this District at the time of the allision that is the subject of this action.

34. As a result of having filed the instant action and thereby invoking and taking advantage of the laws of the United States, Synergy has fully and irrevocably subjected itself to the jurisdiction of this Court and the laws of the United States.

### THE BALTIMORE HARBOR ANCHORAGES AND CHANNELS, FEDERAL NAVIGATION PROJECT, AND THE FORT McHENRY CHANNEL

35. Section 101 of the River and Harbor Act of 1970[2] authorized the Baltimore Harbor Anchorages and Channels ("BHAC") Federal Navigation Project, a collection of channels through the Chesapeake Bay from the Virginia Capes and up the Patapsco River to the Port of Baltimore, as well as from the Patapsco River north up the Chesapeake Bay to the entrance of the Chesapeake and Delaware Canal.

36. The U.S. Army Corps of Engineers ("Corps of Engineers") routinely spends tens of millions of dollars each year to maintain the BHAC network, including the Fort McHenry Channel.

37. The Fort McHenry Channel is a key part of the BHAC Federal Navigation Project, providing access via the Patapsco River to the Port of Baltimore, Maryland.

38. The Fort McHenry Channel is currently maintained as a 700-foot-wide channel, with an authorized depth of 50 feet.[3]

---

[2] The River and Harbor Act of 1970, Title I of Pub. L. No. 91-611, 84 Stat. 1818 (1970), is a distinct piece of legislation, apart from the Rivers and Harbors Appropriation Act of 1899.

[3] Congress initially authorized a more limited 42-foot-deep channel in the River and Harbor Act of 1958, Pub. L. No. 85-500, § 101, 72 Stat. 297 (1958), and later passed additional legislation including the River and Harbor Act of 1970 to create and maintain the current channel configuration.

39. The Corps of Engineers' maintenance operations include periodic surveys of the Fort McHenry Channel and dredging to ensure that the channel's dimensions are maintained.

40. The Fort McHenry Channel offers the only means for deep-draft ships, like the DALI, to access marine terminals at the Port of Baltimore located above where the Francis Scott Key Bridge once stood on the Patapsco River.

41. Because it offers the only means for deep-draft vessels to access the Port of Baltimore, the Fort McHenry Channel is a vital link in America's transportation infrastructure—one critical to the prosperity of maritime commerce on the eastern seaboard.[4]

42. At the time of the allision, the Maritime Administration ("MARAD") of the U.S. Department of Transportation had five Ready Reserve Force ships assigned to layberths in Baltimore, with four of those in port. Additionally, the U.S. Coast Guard Cutter DILIGENCE was in the Port of Baltimore. These vessels are important to the national security interests of the United States.

## THE FRANCIS SCOTT KEY BRIDGE

43. The Francis Scott Key Bridge opened on March 23, 1977. It was constructed, and is owned, operated, and maintained, by the State of Maryland.

44. Before its destruction, the bridge crossed the Patapsco River between Hawkins Point and Sollers Point and was the third-longest continuous truss bridge in the world. The bridge was a primary route for transporting hazardous cargoes to and from the Port of Baltimore.

---

[4] According to the U.S. Department of Transportation's Bureau of Transportation Statistics, the Port of Baltimore is among the top 20 ports in the United States by tonnage and in terms of the number of containers handled. It is the tenth largest port for the transportation of dry bulk and a major hub for the import and export of vehicles.

45. The Francis Scott Key Bridge carried Interstate 695 traffic over the Patapsco River and was a critical component of the United States' east coast transportation infrastructure.

### THE DALI'S CONSTRUCTION AND OWNERSHIP

46. The DALI, IMO Number 9697428, is a 984-foot long, 158-foot wide neopanamax container ship[5] that displaced (weighed) 112,363 metric tons, as laden at the time of the allision.

47. The DALI was built by Hyundai Heavy Industries, with construction beginning in July 2014.  The ship was launched in December 2014, and delivered to Stellar Marine, LLC for commercial service in March 2015.

48. In October 2016, the DALI was sold to Grace Ocean and placed under the management of Synergy.

49. The DALI is registered in Singapore, which makes Singapore the vessel's flag state.

50. Since October 2016, the DALI has been under a long-term time charter to operator Maersk Line A/S, a Danish shipping company.

### THE DALI'S ENGINEERING SYSTEMS

*A. The Engines, Auxiliary Engines, and Engine Pumps*

51. The DALI is propelled by a 55,626 horsepower Hyundai MAN B&W diesel engine, known as the "main engine," which is mechanically connected to a single propeller.

52. Lubricating oil pumps, which are powered by electricity generated on the ship, lubricate the main engine by circulating oil through it.

---

[5] The Panama Canal locks were historically limited to accommodate vessels up to 106 feet wide. Ships within the size limits for the canal were described as "panamax," and those too large were known as "post-panamax."  Following modern expansions, much larger ships called "neopanamax" vessels can transit the canal.

53. Cooling water pumps, also powered by electricity generated on the ship, cool the main engine by circulating water through its systems.

54. The DALI's main engine has automatic shutdown features, which are designed to prevent damage to the engine.  If there is a loss of electrical power to the lubricating oil pumps or the cooling water pumps, they will stop running, eventually leading to an automated shutdown of the main engine.

55. In addition to the main engine, the DALI has four "auxiliary engines."  These large diesel engines are each coupled to their own electrical generator.  Each engine-generator pair, commonly referred to as a "diesel generator," works together to supply electrical power to the ship.

56. The diesel generators are designed to receive fuel through a set of dedicated supply and booster pumps.  These electric pumps are able to restart automatically after a blackout.  Failing that, the pumps can be restarted "remotely" with the push of a button from within the engine control room, which is where the duty engineers work while the DALI travels through confined waters such as the Fort McHenry Channel.

57. The DALI also has an electric "flushing pump."  As the name suggests, this is a special-purpose pump designed for the temporary task of "flushing" fuel through the pipes when changing from one fuel type to another.

58. The DALI's flushing pump is not designed for constant use, and it is not designed to allow for immediate restart after a loss of power.  Specifically, and in stark contrast to the supply and booster pumps, the DALI's flushing pump cannot be restarted automatically, and cannot even be restarted from within the engine control room.  After a blackout, the flushing pump can only be restarted "locally," and by hand, at the physical location of the pump itself.

59. The flushing pump is located in the purifier room, near the bottom of the DALI's engineering spaces.  The engine control room is located near the top of the engineering spaces. That is, the engineers on watch were several decks (floors) away from the flushing pump as the ship was maneuvering out of Baltimore Harbor.

60. To restart the flushing pump following a blackout, an engineer would have to descend 55 stair steps from the engine control room to the purifier room, and then press a "start" button.

61. The ship also has an emergency pneumatic pump, which is a small pump driven by compressed air instead of electricity.  Its purpose is to allow for the restart of a completely "dead ship" that has no available electricity.  The pneumatic pump is designed to provide sufficient fuel to supply one diesel generator, which—once running—would allow engineers to bring electric fuel pumps back on-line to provide a reliable fuel supply to that engine.

62. The pneumatic pump is located approximately 25 feet beneath the auxiliary engines, which means that the fuel has to be pushed upwards to reach them, resulting in an inevitable loss of pressure.  If the pneumatic pump is used to fuel several online diesel generators, a "fuel starvation" situation can develop because the pneumatic pump is designed to provide fuel to only one online diesel generator, and only for the brief period of time needed to bring other systems online.[6]

63. The DALI's automation is designed to take auxiliary engines offline when their speed or power drop following fuel starvation, in order to prevent damage to equipment.

---

[6] Fuel starvation occurs when an engine's fuel supply is inadequate, even though there is still fuel on board.

*B. The Electrical Systems*

64. The power generated by the ship's diesel generators (i.e., the auxiliary engines and their paired electrical generators) passes through a high-voltage electrical bus within the "6.6 Kilovolt Switchboard" located in the DALI's engine control room.

65. Much of the power from the 6.6 Kilovolt Switchboard is routed through two parallel "step-down" transformers to a low-voltage electrical bus within the "440 Volt Switchboard." Critically, through either the number 1 or number 2 step-down transformer, this bus distributes power to the pumps that cool and fuel the main engine, and to the steering pumps that turn the ship's rudder.

66. The step-down transformers are large electrical components that convert 6,600-volt electricity into 440-volt electricity. They are fully redundant, operate independently, and are housed inside cabinets in the ship's transformer room. Associated circuit breakers are housed inside the engine control room. The transformer room and the engine control room are separate and discrete spaces on the vessel, located next to each other.

67. There are two control modes for the number 1 and number 2 step-down transformers: "automatic" and "manual."

68. When in the automatic mode, if there is a loss of power through one of the step-down transformers, then the electrical system automatically transfers power to the other step-down transformer. Automatic transfer does not require crew intervention and results in the restoration of electrical power to the ship in a small number of seconds.

69. In contrast, when in manual mode, if there is a loss of power through one of the step-down transformers, the DALI's crew must manually transfer electrical power to the other step-down transformer—while in the darkness of a power outage.



*Step-down transformer controls, with the Auto/Manual Control Mode selector at far left.*
*This photograph was taken post-accident.*

### C. Vibration Issues on the DALI

70. The DALI had a longstanding problem with excessive vibrations, which had damaged numerous engineering systems, including critical electrical systems in both the engine control room and the transformer room.

71. During recent inspections aboard the DALI, the ship was found to have loose bolts, nuts, and washers and broken electrical cable ties inside the step-down transformers and electrical switchboards. The ship's electrical equipment was in such poor condition that an independent testing agency discontinued further electrical testing due to "safety concerns."

72. These warning signs are not new. Sometime prior to the accident voyage, the DALI had been fitted with steel braces to try to limit vibration at the top of the electrical transformers. These braces were welded to the bulkheads (walls) on one end. On the other end, they were crudely bolted to the tops of the transformers via a steel bracket.

73. Excessive vibrations caused multiple cracks to form in one of the braces to the number 1 step-down transformer, including in the steel bracket between it and the top of the transformer.



*Cracked steel bracket with weld repair at the number 1 step-down transformer.*

74. Rather than address the underlying vibration problem, or even replace the cracked component, Petitioners simply welded over the cracks and carried on with business as usual.

75. The DALI also had a vibration dampening rod wedged between the number 1 step-down transformer and a steel beam in the transformer room.  It was jury-rigged, in the literal sense, from spare cargo equipment and painted white on one end.  The anti-vibration rod is an after-market modification, not original to the build of the ship.



*Cargo chain turnbuckle, welded to angle iron, and wedged between the number 1 step-down transformer (left) and a steel beam (right).*

76. Problems obviously persisted after the rod's installation, since the steel bracket atop the number 1 step-down transformer cracked again.

77. The DALI's vibration issues were documented, well-known, and of concern to the crew. As explained in the introduction, the prior captain of the vessel noted "heavy vibration" in his handover notes on May 23, 2023, and he reported the same to Synergy:

> Main engine RPM above 60 is on load up program. Also note the Aux blowers cut in at around 55-58 RPM depending on the Load. M/E cannot be run between RPM 65-68 due to heavy vibration, in past same informed to Synergy.

78. Other crew records confirm that the ship's excessive vibrations were causing numerous problems.  For example, the chief officer reported in his handover notes that "constant vibration" was causing the cargo lashings above the engineering spaces to work loose:

> Lashing checks to be done on daily basis. The aft bays (Bay56-68) are subject to constant vibration and have noticed lashing tending to slack quickly.

79. On information and belief, Petitioners never reported their concerns about excessive vibration or their after-market modifications to the number 1 step-down transformer to manufacturer Hyundai Heavy Industries.

80. Excessive vibration can be detrimental to the proper functionality of electrical systems, including wire connections and transformers.

81. Before the DALI's call in the Port of Baltimore, excessive vibration had loosened electrical connections in circuitry that was necessary to keep the circuit breakers for the number 1 step-down transformer from tripping.

## THE DALI'S LOSSES OF POWER IN BALTIMORE

82. Immediately prior to calling on Baltimore, the DALI had called on the Ports of Norfolk, Virginia, and Newark, New Jersey.

83. On March 23, 2024, the DALI arrived at Seagirt Marine Terminal in Baltimore, Maryland.

84. On March 25, 2024, the DALI experienced losses of electrical power while at the pier.

85. The March 25, 2024, power losses constituted reportable marine casualties, and required the DALI to notify the Coast Guard "immediately after addressing the resultant safety concerns." 46 C.F.R. § 4.05-1.

86.  Despite this obligation, the DALI's power losses in Baltimore were not reported to the Coast Guard.

## THE DALI'S DEPARTURE FROM BALTIMORE

87. Shortly after midnight on March 26, 2024, the DALI prepared to depart from the Seagirt Marine Terminal on a voyage bound for Colombo, Sri Lanka.

88. At the time of departure, the DALI was loaded with a cargo of 4,680 containers, amounting to 56,675 metric tons of containerized cargo.

89. The 984-foot Singaporean ship had a relatively small crew, which consisted of twenty Indian members and one Sri Lankan member.  The official language on the ship was English.

90. Before the DALI got underway, a senior pilot licensed by the State of Maryland, along with an apprentice pilot, boarded the ship and completed a master-pilot exchange with the captain.

91. The DALI was required to inform the pilots of the vessel's characteristics, the peculiarities of the vessel, and of any abnormal circumstances on the vessel that might affect its safe navigation.  33 C.F.R. § 164.11(k).  The "master-pilot exchange" is the normal occasion for the captain to relay such information to the pilot.  But the DALI's captain did not report the vessel's prior losses of power, nor did he disclose other mechanical or electrical defects or abnormalities to the Maryland pilot or apprentice pilot.

92. At around 12:40 a.m. (local time), with two tugboats assisting, the DALI pulled away from its berth at the Seagirt Marine Terminal.  At 1:08 a.m., the DALI entered the Fort McHenry Channel under its own propulsion, which it followed in a southeasterly direction.

93. At all relevant times, the DALI was located on the navigable waters of the United States and engaged in maritime commerce.

94. At all relevant times, the weather was clear and not causally related to the allision.

## THE DALI'S FIRST LOSS OF POWER WHILE IN THE CHANNEL

95. When departing Baltimore's Seagirt Terminal and transiting the Fort McHenry Channel, the DALI was operating on the number 1 step-down transformer.

96. The DALI's step-down transformers were set in "manual" mode when the ship departed Seagirt Marine Terminal.

97. At approximately 1:25 a.m., the DALI experienced a loss of power when the number 1 step-down transformer circuit breakers tripped open.  That is, even though the diesel generators continued to generate power, power was no longer being distributed to the low-voltage systems, including the ship's critical steering and propulsion systems.

98. These circuit breakers opened because of a loss of electrical continuity through control circuitry that was necessary to keep the breakers from tripping, which circuitry had loosened over time from excessive vibration.

99. This first loss of power was caused by the gross negligence of the ship's owners, operators, managers, and their employees, and by unseaworthy conditions of the ship, which were known, or should have been known, by Petitioners or their agents.

100. As a result of the initial loss of power through the number 1 step-down transformer, the ship went dark, both inside and out.  The hydraulic steering pumps were rendered inoperative,

leaving the helmsman unable to turn the rudder, which meant that the DALI was no longer able to maintain her heading within the channel.[7]



*The DALI, seen on the left side of the image, first goes dark after losing electricity.*

101. Also, as a result of the loss of power, critical fuel pumps and cooling water pumps necessary to run the main engine stopped running.  Consequently, the main engine began an automated shutdown sequence.  Without the ability to operate the main engine, those in control of the ship could not use the propeller to slow down, stop, or help change course.

## THE DALI'S DELAYED RECOVERY OF POWER

102. Even after losing power at the number 1 step-down transformer, which in and of itself should not have occurred, the DALI should have been without power for only a few seconds.

103. Had the transformers been in the "automatic" control mode, the circuit breakers for the number 2 step-down transformer would have closed automatically after only a few seconds, restoring lighting, steering, and propulsion.  This would have occurred rapidly and without crew intervention.

---

[7] The helmsman is the crewmember responsible for steering the ship as ordered by the captain or his designee.

104. But the DALI sailed from Baltimore with the step-down transformers in the "manual" control mode instead of the "automatic" control mode.

105. In this configuration, when the ship lost power through the number 1 step-down transformer, the DALI was set adrift down the channel until a crewmember could troubleshoot the issue, find the appropriate circuit breaker control panel, and then manually close that circuit breaker—all while in the dark, due to the loss of lighting on the vessel.

106. The fully redundant number 2 step-down transformer was fully functional at all times.

107. The inexplicable failure to use the "automatic" control mode on the step-down transformers rendered the DALI unseaworthy under the circumstances and was caused by Petitioners' mismanagement of the ship and failure to properly instruct or train the crew. *See, e.g.*, *In re Hercules Carriers, Inc*, 566 F. Supp. 962, 976 (M.D. Fla. 1983) ("A shipowner has a non-delegable duty to provide a competent master and crew and to insure that its vessel is seaworthy so that any loss occurring by reason of fault or neglect in these particulars is within the privity and knowledge of the shipowner.").

108. In addition to these and other acts of incompetence and neglect, Petitioners failed to properly train, manage, and instruct the ship's crew on how to properly and safely manage the ship's electrical and mechanical systems.

109. Petitioners knew or should have known that the ship's crew was improperly operating the DALI's step-down transformers in manual mode because, on information and belief, this had been a longstanding practice.

110. Indeed, it was exceptionally dangerous and reckless to operate the DALI in the Fort McHenry Channel with the step-down transformers in manual mode.

111. Had the step-down transformers been in the automatic mode, the DALI would not have lost power and steering for any meaningful period of time, and the devastating tragedy that ensued would not have occurred.

112. Compounding the problems faced by the ship's crew and pilots, the ship's emergency generator failed to provide emergency power, as required by regulations implementing the Safety of Life at Sea ("SOLAS") Convention, within a maximum of 45 seconds from the original loss of power.  *See* SOLAS, Chapter II-1, Part D, Regulation 43, Subpart 3.1.3 (2012).[8]

113. Instead, it took about one minute for DALI engineers to manually close a breaker to restore power to the ship, including power that would allow the helmsman to steer with the rudder.



*The DALI's first restoration of electricity.*

---

[8] "'The international Convention for the Safety of Life at Sea, 1974, signed at London on November 1, 1974, and proclaimed by the President of the United States on January 28, 1980 (TIAS 9700), entered into force for the United States on May 25, 1980.' Exec. Order No. 12234, 45 Fed. Reg. 58801 (Sept. 3, 1980). SOLAS 'is a maritime treaty that establishes uniform regulations and standards for vessels that regularly travel in international waters.' *United States v. Gonzalez*, 540 F. App'x 967, 969 (11th Cir. 2014)." *Holderbaum v. Carnival Corp.*, No. 13-cv-24216, 2014 WL 12516074, at *3 (S.D. Fla. Dec. 11, 2014).

## THE DALI'S SECOND LOSS OF POWER

114. This first restoration of electricity was short-lived.  Only about 65 seconds later—even as the crew still had not restored control over the main engine and propeller—the DALI lost power a second time, adding to the confusion of those trying to regain control of the vessel.

115. When the DALI got underway from Baltimore, the engines that were generating electricity for the ship—the number 3 and number 4 auxiliary engines—had been receiving their fuel supply via the ship's "flushing pump" instead of via the supply and booster fuel pumps.

116. While improper, this was not unusual for the DALI.  It had been Petitioners' longstanding custom and practice to use the flushing pump to supply fuel to the number 3 and number 4 auxiliary engines.

117. Petitioners chose to use the flushing pump, instead of the proper supply and booster pumps, as a matter of economy and convenience.  This configuration reduced overall maintenance costs on the number 3 and number 4 auxiliary engines and reduced vessel delays when switching between heavy and lighter fuel oils upon entering emissions control areas of the United States.  In short, using the flushing pump saved money.

118. When the DALI originally lost electrical power on March 26, 2024, the flushing pump and all other electric fuel pumps stopped pumping.

119. In response, the pneumatic pump came on.

120. When the DALI first regained electrical power, the flushing pump, which was not designed for automatic recovery from a blackout, remained off.

121. After the first restoration of power, auxiliary engines 3 and 4 continued to receive fuel from the pneumatic pump.  But this small pump was never intended for such a task and could not provide enough fuel pressure to keep two diesel generators (i.e., the auxiliary engines and their

paired electrical generators) running while carrying an electrical load.[9]  Short of fuel, these engines began to slow and lose power.

122. Detecting the problem, the DALI's computers took auxiliary engines 3 and 4 offline by opening circuit breakers between them and the 6.6 Kilovolt Switchboard.  When this happened, the ship blacked out a second time.

123. When choosing the practice of using the flushing pump to fuel diesel generators, Petitioners failed to perform a proper risk assessment, safety analysis, or other means to ensure process safety.

124. It was also contrary to SOLAS regulations, the rules of the vessel's Classification Society, and prudent marine practice to use the flushing pump to power the ship's auxiliary engines on this transit.  The SOLAS rules include a requirement that the ship's "automated control system shall be such that the services needed for the operation of the main propulsion machinery and its auxiliaries are insured through the necessary automatic arrangements."  SOLAS Chapter II-1, Part E, Regulation 53, Subpart 4.1 (2012).

125. As previously noted, the flushing pump cannot be restarted automatically or from within the engine control room.  Had the DALI used the proper supply and booster pumps to supply fuel to the diesel generators, these pumps would have restarted automatically and the second power outage never would have occurred.

126. It was grossly negligent for the DALI to use the flushing pump to fuel auxiliary engines 3 and 4 on March 26, 2024, as she sailed in the Fort McHenry Channel toward the Francis Scott Key Bridge.

---

[9] When these diesel generators were supplying power to the 6.6 Kilovolt Switchboard, the engines had to work harder to keep up with the increased electrical load placed on their generators.  This increased workload increased the fuel supply needed by the engines.

127. This second loss of power, which occurred as the ship approached the Francis Scott Key Bridge, was caused by the gross negligence of the ship's owners, operators, managers, and their employees, and by unseaworthy conditions of the ship, which were known, or should have been known, by Petitioners or their agents.



*The DALI loses power a second time.*

## ALLISION AND COLLAPSE OF THE FRANCIS SCOTT KEY BRIDGE

128. After the ship's computers took auxiliary engines 3 and 4 offline, auxiliary engine number 2 started automatically.

129. Unlike auxiliary engines number 3 and 4, which had been in use and fueled by the flushing pump, auxiliary engine number 2 was configured to receive fuel from another set of pumps that could (and did) restart automatically after a blackout.

130. Upon information and belief, after the number 2 auxiliary engine started, the crew finally brought the lights and power back on by manually switching to the number 2 step-down transformer. This happened about 90 seconds before impact.

131. However, the main engine did not restart, and the ship never regained propulsion before alliding with the bridge.

132. Throughout these power losses, the DALI also failed to release the port anchor in a timely manner to help swing the ship away from the Francis Scott Key Bridge.  This was caused by an unseaworthy condition in the vessel, lack of adequate training for the crew, and/or lack of proper procedures to ensure that the anchors were prepared for immediate release in the event of a loss of control.  *See* 33 C.F.R. § 164.11 ("The owner, master, or person in charge of each vessel underway shall ensure that: . . . (o) The vessel's anchors are ready for letting go . . . .").

133. Still over a minute before impact, the Maryland pilot ordered the crew to apply full power to the bow thruster in an attempt to turn the ship to the left, away from the Francis Scott Key Bridge's support pier.

134. But once again, an unseaworthy condition of the ship impeded this effort to prevent or mitigate the allision, as the bow thruster was inexplicably "unavailable."



*DALI log showing bow thruster "Unavailable."*

135. Due to these and other acts of negligence and unseaworthy conditions, those aboard the DALI were unable to timely regain control of the ship before it hit the bridge.

136. In sum, none of the four tools that might have averted disaster—the rudder, the propeller, the anchor, or the bow thruster—was working or operating as it should have been.

137. As a result, at approximately 1:28 a.m., the DALI allided with a critical support pier of the Francis Scott Key Bridge.



*The DALI strikes the Francis Scott Key Bridge.*

138. At the time of the impact, the DALI was moving at a speed of approximately 6.5 knots.

139. Immediately following the DALI allision, six spans of the Francis Scott Key Bridge collapsed into the Patapsco River.

140. Through the professionalism of the Maryland Pilots and officers of the Maryland Transportation Authority Police, vehicular traffic was stopped and cleared from the bridge in the approximately four minutes between when the DALI first lost power and the allision.

141. Tragically, however, a team of eight bridge construction workers was on the bridge when it collapsed.  One worker ran to a safe position on the bridge, another was rescued from the Patapsco River, and six lost their lives.

142. The remnants of the Francis Scott Key Bridge fell onto and were draped across the bow of the DALI, while other parts dropped into the Fort McHenry Channel and the Patapsco River.



*Wreck of the DALI intertwined with the bridge in the Fort McHenry Channel.*

143. As a result of the allision, the DALI became wrecked and/or grounded alongside and partially within the Fort McHenry Channel, causing damage to the channel.

144. The wreck of the DALI obstructed the Fort McHenry Channel and the Patapsco River, and impaired safe passage of the United States' navigable waters.

145. The remnants of the Francis Scott Key Bridge, which were entangled with the wrecked vessel, also obstructed and damaged the Fort McHenry Channel and the Patapsco River, and impaired safe passage of the United States' navigable waters.

146. The collapse of the bridge also destroyed property of the National Oceanic and Atmospheric Administration ("NOAA"), specifically, an air gap tool that measures the vertical clearance between the bridge and the surface of the water, as well as a meteorological station attached to the bridge.

**RIVER AND CHANNEL CLEARING AND MARINE SALVAGE OPERATIONS**

147. A Unified Command, which included the Coast Guard, the Corps of Engineers, the Maryland Department of the Environment, the Maryland Transportation Authority, the Maryland

State Police, and Synergy as the "Responsible Party" for this maritime disaster, was established on

March 26, 2024. The Unified Command coordinated the various entities' response efforts.

148. The Corps of Engineers was primarily tasked with clearing and restoring the Fort McHenry Channel.

149. On March 26, 2024, the Corps of Engineers issued a Declaration of Emergency.

150. In accordance with the Economy Act, 31 U.S.C. § 1535, the Corps of Engineers transferred funds to the United States Navy Supervisor of Salvage and Diving, enabling the Navy to mobilize assets and begin clearing the channel.

151. The Navy employed a contractor, Donjon Marine Co., Inc. ("Donjon"), to clear the Fort McHenry Channel, concentrating on removing bridge debris blocking and buried within the channel.

152. The Navy employed another contractor, Global PCCI ("GPC"), to survey the Fort McHenry Channel utilizing government-owned, contractor-operated survey equipment and boats to assess the wreckage field in a manner that would be more expeditious than using salvage divers alone.

153. A 2,000-yard safety zone surrounding the DALI was quickly established by the Coast Guard to protect personnel, vessels, and the marine environment from the potential hazards associated with the salvage and channel clearing work.  Coast Guard vessels enforced this safety zone around the clock.

154. Because first responders observed sheening in the water, hard containment booms and sorbent booms were deployed to contain oil and hazardous substance discharges.  In addition to the pollutants that had been discharged into the Patapsco River, the DALI had at least 1.8 million gallons of oil aboard and other potential pollutants within damaged containers.

155. The pollutants aboard the DALI did not pose the only substantial threat of a pollution event.  Baltimore Gas and Electric Company ("BGE") owns a 24-inch submerged pipeline used to transport natural gas across the Patapsco River.  This pipeline was located underneath the DALI and the remains of the Francis Scott Key Bridge and necessitated further care during salvage and channel clearing operations.

156. Additionally, BGE owns high-voltage electrical transmission lines that cross the Patapsco River approximately 500 feet north of the Francis Scott Key Bridge alignment, with a 215-foot vertical clearance from the water at the lowest catenary.  These power lines contained dielectric fluids that also required due care and attention.

157.   Over the course of river and channel clearing operations, and marine salvage operations, the Coast Guard monitored the DALI and other potential sources of pollution, using both vessels and aircraft.

158. Wreckage removal began on March 30, 2024, with demolition crews cutting pieces of the bridge into smaller sections for safe removal by crane.  At the same time, dive teams conducted underwater surveys to prepare for the eventual removal of submerged bridge debris.

159. On or about March 31, 2024, the Coast Guard established a temporary channel with a controlling depth of 11 feet, a horizontal clearance of 264 feet, and a vertical clearance of 95 feet. This temporary channel, which Coast Guard personnel marked with lighted aids to navigation, allowed the resumption of small-vessel traffic into and out of the Port of Baltimore, including those engaged in recovery efforts.

160. On April 2, 2024, the Coast Guard established a second temporary alternative channel, available for daytime use and marked with lighted aids to navigation.  This channel had a controlling depth of 14 feet, a horizontal clearance of 280 feet, and a vertical clearance of 124 feet.

161. On April 7, 2024, the process of removing containers from the DALI began, with river and channel clearing operations continuing.

162. On April 19, 2024, a third temporary channel was opened, with a controlling depth of 20 feet, a horizontal clearance of 300 feet, and a vertical clearance of 135 feet. This channel, which the Coast Guard marked with lighted aids to navigation, allowed larger vessels to transit into and out of the Port of Baltimore.

163. On April 25, 2024, the Coast Guard established a fourth channel, the Fort McHenry Limited Access Channel, which had a controlling depth of 35 feet and a horizontal clearance of 300 feet, allowing five deep-draft vessels trapped in the Port of Baltimore to depart.

164. Among other vessels impounded upriver of the wreck of the DALI were ready reserve force ships owned by MARAD, as well as the Coast Guard Cutter DILIGENCE.

165. The designation of each of these temporary and limited access channels was a necessary steppingstone toward resuming full use of the United States' navigational servitude on the Patapsco River, and each was established to mitigate the economic devastation caused by the DALI.

166. In early May 2024, with thousands of tons of wreckage and debris already removed, the salvage and channel clearing teams prepared for the complex and dangerous task of extricating the large span of bridge that was lying on top of the DALI on one end and embedded into the channel's floor at the other.

167. On May 13, 2024, a controlled demolition process was used to remove most of the bridge from the bow of the ship.

168. Salvage teams worked on removing the DALI from the Fort McHenry Channel in the Patapsco River and moving it back to the Seagirt Marine Terminal in the Port of Baltimore. This

process included removing unstable bridge wreckage that had fallen into the waterway after the demolition, followed by dive inspections of the channel, and removal of debris on the deck of the ship.

169. On May 20, 2024, the DALI was refloated and pushed by tugboats to the Seagirt Marine Terminal, arriving at approximately 9:00 a.m.

170. On May 21, 2024, the Coast Guard Captain of the Port opened the Fort McHenry Limited Access Channel to commercial vessel traffic for 24-hour availability.  At this point, the channel had a depth of 50 feet and a horizontal clearance of 400 feet.

171. On June 3-4, 2024, salvage crews removed the final large steel truss segment blocking the Fort McHenry Channel.  This allowed other wreckage strewn across the river bottom to be cleared. Finally, the area was swept with sonar, lidar, and a magnetometer to ensure that there were no remaining hazards to navigation.

172. On June 10, 2024, the Fort McHenry Channel was fully restored to its original operational dimensions of 50 feet deep and 700 feet wide, allowing deep-draft commercial navigation to and from the Port of Baltimore.

173. Additional clearance operations continued to remove steel and roadbed material below the channel's 50-foot mudline until June 20, 2024, to ensure that future channel dredging operations will not be impacted by bridge debris.

174. On or about July 7, 2024, the United States and its contractors demobilized from the project location, and on or about August 11, 2024, processing and disposal of bridge remnants and other debris was completed.

175. The river and channel clearing operations and marine salvage operations were complex and inherently dangerous, involving the cutting and lifting of submerged, heavy bridge parts that

were under constant tension or compression.  Some of these pieces were entangled and buried below the mudline of the Fort McHenry Channel.  Frequent diving operations were necessary to determine the best cutting points and positioning, which added to the hazardous conditions associated with clearing the channel.

176. There were extensive efforts to locate the bodies of the bridge workers killed during the collapse, which also complicated river and channel clearing operations and salvage operations.

177. Removal of the wreck of the DALI and the bridge debris, which separately and together obstructed the United States' navigable waters, were integrated efforts.

178. Fully restoring the Fort McHenry Channel to its original dimensions involved the removal of approximately 50,000 tons of bridge wreckage from the Patapsco River.  At the height of operations, the Unified Command led response efforts among approximately 56 federal, state, and local agencies, represented by over 1,500 individual responders.  Additionally, approximately 500 specialists from around the world operated a fleet of 18 barges, 22 tugboats, 13 floating cranes, 10 excavators, and 4 survey boats.

## UNITED STATES' DAMAGES

179. As a result of the aforesaid allision, the DALI caused tragic losses of life and the catastrophic collapse of the Francis Scott Key Bridge, which caused significant known and unknown damages to various parties, including the United States.

180. The United States has a legal interest in preventing and removing obstructions of the Patapsco River, a navigable water, and in maintaining the Fort McHenry Channel and its ongoing utility as a right-of-way for maritime commerce and national security assets, i.e., preserving its navigational servitude over the channel.  *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 205 (1967).  *See also United States v. Perma Paving Co.*, 332 F.2d 754, 758 (2d

Cir. 1964) ("More important, [the remedy of damages] assures the United States the speedy and competent removal of an obstruction to navigation which may be vital to the avoidance of accidents imperiling life, limb or property, to the interests of commerce, or even to the national defense.").

181. The United States expended significant monies removing obstructions in the Patapsco River, in returning the Fort McHenry Channel to full navigability, and in otherwise responding to the DALI disaster.  The United States also expended significant funds in other ways.  Those agencies known at this time to have incurred damages because of the DALI's allision with the Francis Scott Key Bridge are summarized as follows.

**The Corps of Engineers**

182. The Corps of Engineers provided funding for the Navy to hire Donjon and GPC and commence immediate wreck removal and channel clearing operations.  The Corps of Engineers was a key member of the Unified Command, and led efforts to restore the Fort McHenry Channel to its original operational dimensions so that commerce and ships that are part of the national security program could access the Port of Baltimore.  During the response, the Corps of Engineers also conducted periodic surveys of the Fort McHenry Channel and the temporary channels, assisted with wreckage and debris removal, and actively participated in salvage, diving, and channel clearing operations, which facilitated the location and recovery of the bodies of the missing bridge workers.

183. Because of the emergency need to fund the response, the Corps of Engineers was required to pull funding from other authorized civil works operations and maintenance projects.  The United States reserves the right to seek damages for any resulting delay or interruptions that carry

quantifiable damages to the Corps of Engineers' operations and maintenance missions and responsibilities, now or until such time as the United States has been made whole.

184. Based on information currently known, the Corps of Engineers incurred emergency response and channel clearing costs of approximately $74,000,000.

### The Coast Guard

185. The Coast Guard's response to the DALI disaster was expansive, including but not limited to establishing and operating a Unified Command comprised of the various governmental and private interests involved in the salvage and channel clearing operations, providing security at the scene of the accident, deploying and maintaining aids to navigation for the temporary navigation channels, assisting with deploying and monitoring pollution control equipment, deploying patrol vessels to maintain a safety area around the wreck site, committing buoy tenders and an Aids to Navigation Team to establish temporary channels and then to reconstitute the permanent channel, and providing overflights to ensure that there were no further oil spills.

186. Over the course of the response, various Coast Guard assets and hundreds of Coast Guard personnel were deployed.

187. Based on information currently known, the Coast Guard, National Pollution Funds Center ("NPFC"), incurred removal costs under the Oil Pollution Act of approximately $97,294.

188. Based on information currently known, the Coast Guard incurred additional emergency response costs of approximately $22,000,000.

### The Navy

189. Over the course of the salvage project, the Navy's involvement included, but was not limited to, supervising salvage operations and the clearing of the Fort McHenry Channel, including removal of the DALI.  In connection with this work, the Navy activated assets and personnel.

190. Based on information currently known, the Navy incurred additional emergency response and channel clearing costs of approximately $1,799,226.[10]

## The National Oceanic and Atmospheric Administration

191. In response to the allision, NOAA provided aircraft and vessels to conduct marine surveys and provide imagery over the course of river and channel clearing operations and marine salvage operations, updated charts showing the locations and dimensions of the temporary channels established to allow limited vessel access to and from the Port of Baltimore as operations continued, provided on-scene scientific support regarding pollution abatement operations, deployed equipment to provide real-time river current and meteorological data, and provided meteorologists who supported the operation by providing onsite weather forecasts.

192. In addition, as noted above, NOAA lost air gap and meteorological monitoring equipment attached to the bridge as a result of the allision.

193. Based on information currently known, NOAA incurred emergency response costs and losses in the amount of approximately $853,916.

## The Department of Labor

194. To support the recovery of jobs lost or interrupted by the closure of the Port of Baltimore and the collapse of the Francis Scott Key Bridge, the U.S. Department of Labor issued funds to the State of Maryland to aid displaced workers under the National Dislocated Worker Grant program ("DWG").

195. The Department of Labor is authorized to award dislocated worker grants pursuant to the Workforce Innovation and Opportunity Act, 29 U.S.C. § 3225.

---

[10] This figure does not include the Donjon contract, GPC contract, or Navy government travel costs, all of which were borne by the Corps of Engineers.

196. Based on the information currently known, the Department of Labor has incurred the cost of an initial disbursement of DWG funds to the State of Maryland in the amount of approximately $3,500,000.

### The Maritime Administration

197. The MARAD vessel M/V CAPE WRATH is a Logistics Naval Vessel homeported in Baltimore.  At the time of the allision, the CAPE WRATH was in transit to its layberth in Baltimore.

198. As a result of the allision, the CAPE WRATH was unable to return to its layberth in Baltimore, and was diverted to a temporary berth in Hampton Roads, Virginia.

199. Based on the information currently known, MARAD incurred costs of approximately $827,620 for facilities, crew, pier services, and other support arising from the temporary layberth.

### Damages Summary

200. The United States incurred losses and damages as a result of Petitioners' negligence in the total amount of approximately $103,078,056.

201. While these damages figures are based on information currently available, the United States reserves the right to amend these figures, including the addition of costs not listed above, as additional information becomes known.

### UNITED STATES' CLAIMS

### COUNT I:  NEGLIGENCE UNDER THE GENERAL MARITIME LAW

202. Paragraphs 1-201 are incorporated herein as if set forth in full.

203. Under the general maritime law, when a moving vessel allides with a stationary object, there is a heavy presumption that the vessel was at fault for the allision.  This presumption is known as the "*Oregon*" Rule.  *See The Oregon*, 158 U.S. 186 (1895); *Bunge Corp. v. M/V*

*Furness Bridge*, 558 F.2d 790, 795 (5th Cir. 1977) ("The common sense behind the rule makes the burden [to rebut the presumption] a heavy one.  Such accidents simply do not occur in the ordinary course of things unless the vessel has been mismanaged in some way.").

204. The *Oregon* presumption applies here because the DALI, a power-driven vessel then underway and making way, struck the stationary Francis Scott Key Bridge.

205. During the days or weeks preceding the voyage that began (and ended) on March 26, 2024, because of the negligence alleged, and other negligence to be proven after a reasonable opportunity for further investigation and discovery, which negligence is presumed in any event, Petitioners failed to ensure that the DALI could be and/or was safely operated within the Fort McHenry Channel.  *See The Oregon*, 158 U.S. 186 (1895).

206. At the time of the allision and during the critical minutes preceding the allision, as a result of the negligence alleged, and other negligence to be proven after a reasonable opportunity for further investigation and discovery, which negligence is presumed in any event, the DALI failed to remain in the navigable channel and clear of the Francis Scott Key Bridge.  *See id.*

207. At all times relevant hereto, the DALI ultimately was in the control of the *in personam* Petitioners by and through their agents, employees, servants, and/or the ship's master.

208. At all times relevant hereto, Petitioners owed the United States a legal duty under the general maritime law to maintain the vessel in a seaworthy condition and in good working order to safely ply the navigable waters of the United States, including the Fort McHenry Channel.

209. Petitioners owed the United States a legal duty under the general maritime law to observe the standards of good and prudent seamanship, to exercise reasonable care when operating and navigating their vessel, and to avoid the resulting allision.

210. Petitioners owed the United States a legal duty under the general maritime law to adequately and competently train and supervise the crew, and otherwise oversee the vessel.

211. At all times relevant hereto, Petitioners were obliged to comply with, *inter alia*, the laws, rules, and regulations of the United States, into whose waters the ship had navigated, including the provisions of the Rivers and Harbors Act and the Oil Pollution Act.

212. At all times relevant hereto, Petitioners were obliged to comply with, *inter alia*, the provisions of the International Convention for the Safety of Life at Sea, as amended, the International Safety Management Code, as amended, the vessel's Safety Management System, and the laws, rules, and regulations of the vessel's flag state of Singapore, as well as any other duties proven at trial.

213. Petitioners' violations of statutes, rules, and regulations regarding avoiding the loss of steering and propulsion, and regaining the same, means that the rule from *The Pennsylvania*, 86 U.S. (19 Wall.) 125 (1874), applies:

> when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case, the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute.

214. This rule of admiralty, which has been the law of the United States since 23 years *after* the Limitation of Liability Act of 1851, 46 U.S.C.§§ 30501 *et seq.*, upon which Petitioners now rely, encompasses allisions, and applies to the present case. *See* Thomas J. Schoenbaum, 2 Admiralty & Mar. Law § 14:4 (6th ed.) ("The rule applies to collisions of vessels underway, allisions, collisions between a vessel and a stationary object, and vessel strandings.").

215. *Res ipsa loquitur* is "a form of circumstantial evidence that permits an inference of negligence to be drawn from a set of proven facts." *Ashland v. Ling-Temco-Vought, Inc.*, 711 F.2d

1431, 1437 (9th Cir. 1983). "The doctrine is applicable in admiralty cases." *Id.* Its elements are met in this admiralty case and an inference of negligence must be drawn from the DALI's loss of power and control prior to alliding with the Francis Scott Key Bridge.

216. In addition, given the "logical inference" that the DALI would not have had power failures "had it not been defective," under the doctrine of *res ipsa loquitur* the DALI was unseaworthy as a matter of law. *Gibbs v. Kiesel*, 382 F.2d 917, 919 (5th Cir. 1967) ("The fact that [the ship doors] fell during ordinary intended use indicates a defective condition; therefore rendering [the vessel] unseaworthy as a matter of law.").

217. The allision was caused by and occurred as a result of the acts, omissions, negligence, faults, recklessness, lack of due care, and breaches and violations of duties and law by the DALI and her crew, and by Petitioners, and/or their principals, agents, and/or employees.

218. The allision was caused by and occurred as a result of the aforementioned unseaworthiness of the DALI.

219. As a result of the faults and breaches of Petitioners, and/or their principals, agents, and/or employees, and/or the unseaworthiness of the DALI, the United States has suffered and will continue to suffer the damages alleged, for which Petitioners and each of them are liable, jointly and severally.

220. The foregoing acts, omissions, negligence, unseaworthiness, fault, recklessness, lack of due care, and/or breaches and violations of duties and law that were direct and proximate causes of the collision were within the privity and knowledge of Petitioners and their principals, agents, and/or employees.

221. As a direct and proximate result of the foregoing acts, omissions, negligence, unseaworthiness, fault, recklessness, lack of due care, and/or breaches and violations of duties and

law by the DALI and her crew, and as a further result of Petitioner Grace Ocean's and Petitioner Synergy's privity and knowledge concerning the same, Petitioners are jointly and severally liable to the United States for the full amount of its damages, plus prejudgment interest accruing at a rate of 6% annually or such other rate to be determined by the Court.

## COUNT II: RIVERS AND HARBORS ACT COST RECOVERY CLAIM

222. Paragraphs 1-221 are incorporated herein as if set forth in full.

223. The Rivers and Harbors Act was intended to prevent obstructions in the Nation's waterways. *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967). The coverage of the Act is broad, and the principal beneficiary of the Act—if not the sole beneficiary—is the United States Government itself. *Id*.

224. The Act prevents "anything, wherever done or however done, within the limits of the jurisdiction of the United States, which tends to destroy the navigable capacity of one of the navigable waters of the United States." *United States v. Republic Steel*, 362 U.S. 482, 487-88 (1960).

225. From March 26 to May 20, 2024, the DALI was aground and wrecked in the Fort McHenry Channel, which is a navigable waterway of the United States.

226. During this period of time, the DALI was entangled with the remnants of the Francis Scott Key Bridge, which effectively trapped the ship in its location.

227. The DALI and the remnants of the bridge, along with the shipping containers that had fallen into the water, obstructed the Fort McHenry Channel and the Patapsco River.

228. The United States has incurred substantial expenses in planning and performing wreck and debris removal, and continues to incur related expenses.

229. As described in more particularity below, Petitioners and/or the DALI violated the Rivers and Harbors Act, 33 U.S.C. §§ 401 *et seq*., by causing obstructions to the navigable waters of the United States and failing to remove those obstructions.

**COUNT II.A:  SECTION 10 OF THE RIVERS AND HARBORS ACT, 33 U.S.C. § 403**

230. Paragraphs 1-229 are incorporated herein as if set forth in full.

231. Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403, prohibits "[t]he creation of any obstruction not affirmatively authorized by Congress . . . to the navigable capacity of any of the waters of the United States."

232. A Corps of Engineers permit is required under Section 10 of the Rivers and Harbors Act for structures obstructing navigable waters of the United States.  33 U.S.C. § 403; 33 C.F.R. § 322.3(a).

233. The "term 'obstruction' as used in [Section 10 of the Rivers and Harbors Act] is broad enough to include diminution of the navigable capacity of a waterway."  *United States v. Republic Steel Corp.*, 362 U.S. 482, 489 (1960).

234. The entangled DALI, the wreckage from the Francis Scott Key Bridge, the containers that fell off of the DALI, and all other debris resulting from the allision that fell into the Patapsco River and Fort McHenry Channel constituted obstructions within the meaning of the Rivers and Harbors Act.

235. Petitioners created these obstructions without obtaining a permit from the Corps of Engineers, and the obstructions diminished the navigable capacity of portions of the Patapsco River, including the Fort McHenry Channel.

236. Section 12 of the Rivers and Harbors Act, 33 U.S.C. § 406, authorizes a remedy by which the United States can remove an obstruction and seek reimbursement of the removal costs from the party or parties that created the obstruction.

237. As a result of the violation of Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403, Petitioners are strictly liable and must reimburse the United States for costs and disbursements incurred by the United States related to the removal of the DALI, remnants of the Francis Scott Key Bridge, containers, and other debris from the Patapsco River and the Fort McHenry Channel.

238. The United States' claims under Section 10 of the Rivers and Harbors Act are not subject to the Limitation of Liability Act of 1851, 46 U.S.C. §§ 30501 *et seq.*

**COUNT II.B:  SECTION 15 OF THE RIVERS AND HARBORS ACT, 33 U.S.C. § 409**

239. Paragraphs 1-238 are incorporated herein as if set forth in full.

240. Section 15 of the Rivers and Harbors Act, 33 U.S.C. § 409, provides that "[i]t shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft; or to sink, or permit or cause to be sunk, vessels or other craft in navigable channels . . . ."

241. Section 15 of the Rivers and Harbors Act further imposes a duty on the owner of a sunken craft to "commence the immediate removal of the same and prosecute such removal diligently."

242. Section 16 of the Rivers and Harbors Act, 33 U.S.C. § 414(b), provides that the owner, lessee, or operator of a sunken vessel that obstructs or endangers a navigable waterway "shall be liable to the United States for the cost of removal or destruction and disposal," to the extent that such costs exceed any recovery based on the sale of the vessel, its property and cargo.

243. Section 20 of the Rivers and Harbors Act, 33 U.S.C. § 415, grants the Secretary of the Army authority to remove any "vessel, boat, water craft, or raft, or other similar obstruction, sinking or grounding" where the vessel stops, seriously interferes with, or specially endangers navigation.

244. Section 20 of the Rivers and Harbors Act further provides that the removal costs, including administrative expenses, shall be a charge against the vessel and its cargo, 33 U.S.C. § 415(a), and that the owner, operator or lessee of the vessel "shall be liable to the United States for the actual cost, including administrative costs, of removal or destruction and disposal," to the extent such costs exceed any recovery from the vessel and its cargo. *Id*. at § 415(c).

245. The DALI was aground in the Fort McHenry Channel, and remnants of the Francis Scott Key Bridge were draped across the bow of the DALI, extending into the navigable waters surrounding the ship.

246. To refloat and remove the DALI from the Fort McHenry Channel, the ship had to be extricated from the remnants of the Francis Scott Key Bridge, a process that took almost two months.

247. The United States incurred substantial costs planning and executing the extrication of the DALI from the remnants of the Francis Scott Key Bridge, and for disposal of the bridge remnants and other debris.

248. These costs fall within Section 15 of the Rivers and Harbors Act because they were incurred in order to remove the DALI from the Fort McHenry Channel.

249. The owners, operators, and lessees of the DALI are strictly liable for the costs incurred by the United States, including administrative expenses, associated with the removal of the DALI from the Fort McHenry Channel.

250. The United States' claims under Section 15 of the Rivers and Harbors Act are not subject to the Limitation of Liability Act of 1851, 46 U.S.C. §§ 30501 *et seq.*

## COUNT III:  THE OIL POLLUTION ACT

251. Paragraphs 1-250 are incorporated herein as if set forth in full.

252. Over the course of the marine salvage and channel clearing project, the Coast Guard directed and monitored the response in order to abate the substantial threat of an oil pollution incident, and to contain sheening that had been observed.

253. The removal costs incurred by the United States were both reasonable and necessary.

254. Pursuant to the Oil Pollution Act, each responsible party for a vessel from which oil is discharged, or which poses the substantial threat of discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone of the United States, is subject to strict joint and several liability for all costs, damages, and/or disbursements specified in the Oil Pollution Act.

255. As owner and technical manager of the DALI, Petitioners are strictly liable for the oil spill removal costs incurred by the United States through the NPFC.

256. The Oil Pollution Act provides limited defenses to liability, none of which are applicable here.  *See* 33 U.S.C. § 2703.

257. The United States' claims under the Oil Pollution Act are not subject to the Limitation of Liability Act of 1851, 46 U.S.C. §§ 30501 *et seq.*

258. The Oil Pollution Act provides that in every cost-recovery lawsuit "the court shall enter a declaratory judgment on liability for removal costs or damages that will be binding on any subsequent action or actions to recover further removal costs or damages."  33 U.S.C. § 2717(f)(2).

## COUNT IV: PUBLIC NUISANCE

259. Paragraphs 1-258 are incorporated herein as if set forth in full.

260. The DALI created a danger and hazard to navigation, thereby creating a public nuisance, which had to be removed, repaired, and abated.

261. Petitioners are liable to the United States for all costs, damages, and disbursements proximately resulting from the creation of said nuisance.

## COUNT V: PUNITIVE DAMAGES

262. Paragraphs 1-261 are incorporated herein as if set forth in full.

263. Under the general maritime law, punitive damages are available where a defendant's conduct is outrageous, owing to gross negligence, willful, wanton, and reckless indifference for the rights of others, or behavior even more deplorable. *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 493 (2008).

264. Petitioners' conduct was outrageous, grossly negligent, willful, wanton, and reckless, and punitive damages are available in this case, because the DALI got underway with known unseaworthy conditions in confined waters where a ship of its magnitude had every opportunity to cause catastrophic damage and loss of life, which in fact happened. These conditions included —but were not limited to—navigating with the transformers in manual mode, and with no risk assessment or safety mitigation in place, running the auxiliary engines on a temporary flushing pump that could not be immediately restarted during an emergency, failing to have the ship's anchors ready for immediate deployment while transiting confined waters, failing to have the bow thruster "available" for use, and ignoring known and longstanding vibration problems that were causing actual damage and distress to the ship's electrical systems.

265.   Punitive damages "are aimed not at compensation but principally at retribution and deterring harmful conduct." *Id.* at 492.

266. Other vessel owners and operators must be deterred from engaging in such reckless and exceedingly harmful behavior in the United States' navigable waters.  Indeed, Petitioners themselves need to be deterred because they continue to operate their vessels, including a sister ship to the DALI, in U.S. waters and benefit economically from those activities.

## THE UNITED STATES' ANSWER

The United States, for its Answer to the Petition filed by Grace Ocean and Synergy ("Petitioners"), contests Petitioners' right to exoneration from or right to limitation of liability, and further avers upon information and belief as follows:

1.   The United States admits the allegations contained in Paragraph 1.

2.   The United States admits the allegations contained in Paragraph 2.

3.   The United States admits that Grace Ocean Private Limited is a Singapore-based company and the registered owner of the DALI at the time of the incident.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 3 and therefore denies those allegations.

4.   The United States admits that Synergy Marine Pte Ltd is a Singapore-based company and the technical manager of the DALI at the time of the incident.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 4 and therefore denies those allegations.

5.   The United States admits that the DALI is a containership, is registered under the laws of Singapore, and has a length overall of 299.92 meters (or 984 feet) and a beam (width) of 48.2 meters (or 158 feet).  The United States lacks knowledge or information sufficient to form a belief

as to the truth of the remaining allegations contained in Paragraph 5 and therefore denies those allegations.

6.   The United States admits that the Francis Scott Key Bridge was a 1.6-mile-long bridge over the Patapsco River owned by the State of Maryland, completed in 1977, and carried U.S. Interstate 695 traffic across the Patapsco River.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 6 and therefore denies those allegations.

7.   The United States admits that on March 26, 2024, the DALI departed a Baltimore berth bound for Colombo, Sri Lanka.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 7 and therefore denies those allegations.

8.   The United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8 and therefore denies those allegations, except that a pilot and an apprentice pilot were aboard as the vessel left the berth at the Port of Baltimore.

9.   The United States admits that the DALI lost electrical power and propulsion in the Fort McHenry Channel on March 26, 2024, that it regained electrical power, that it lost electrical power a "second time," and that it veered to starboard (right) thereafter.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 9 and therefore denies those allegations.

10. The United States admits the allegations contained in Paragraph 10.

11. The United States admits the allegations contained in Paragraph 11.

12. The United States admits that six construction workers were killed when the bridge collapsed after the allision, and two others were injured.  The United States lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 12 and therefore denies those allegations.

13. Paragraph 13 contains allegations of law to which a responsive pleading is not required, however to the extent a response is required, the United States denies the allegations contained in Paragraph 13.

14. Paragraph 14 contains allegations of law to which a responsive pleading is not required, however to the extent a response is required, the United States denies the allegations contained in Paragraph 14.

15. The United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 15 and therefore denies those allegations.

16. The United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 16 and therefore denies those allegations.

17. The United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 17 and therefore denies those allegations.

18. The United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 18 and therefore denies those allegations.

19. The United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 19 and therefore denies those allegations.

20. The United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 20 and therefore denies those allegations.

21. The United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 21 and therefore denies those allegations.

22. The United States admits the allegations contained in Paragraph 22.

23. Paragraph 23 contains allegations of law to which a responsive pleading is not required, however to the extent a response is required, the United States denies the allegations contained in Paragraph 23.

24. Paragraph 24 contains allegations of law to which a responsive pleading is not required, however to the extent a response is required, the United States denies the allegations contained in Paragraph 24.  The United States specifically denies that Petitioners are entitled to the benefits provided by the Limitation of Liability Act, 46 U.S.C. §§ 30501 *et seq*.

25. The United States denies all allegations not expressly admitted contained in any unnumbered paragraph of the Petition, including the preamble and prayer for relief.  The United States expressly denies that Petitioners are entitled to exoneration from or limitation of liability or any other relief sought in the prayer.

<u>**AFFIRMATIVE DEFENSES**</u>

<u>**FIRST AFFIRMATIVE DEFENSE**</u>

Petitioners' Petition fails to state a claim upon which relief can be granted.

<u>**SECOND AFFIRMATIVE DEFENSE**</u>

The Limitation of Liability Act does not apply to claims by the United States asserted under the Rivers and Harbors Act, 33 U.S.C. §§ 401 *et seq.*, as amended.

<u>**THIRD AFFIRMATIVE DEFENSE**</u>

The Limitation of Liability Act does not apply to claims by the United States asserted under the Oil Pollution Act of 1990, 33 U.S.C. §§ 2701 *et seq.*

<u>**FOURTH AFFIRMATIVE DEFENSE**</u>

The allision and resulting damages, including the collapse of the Francis Scott Key Bridge into the Patapsco River, were not caused by, or contributed to, in any way by any fault, negligence,

or lack of due care on the part of any officer, agent, or employee of the United States or anyone for whom the United States is responsible, but were caused solely by the fault, recklessness, negligence, and lack of due care of those responsible for the DALI, including Petitioners and their officers, agents, and/or employees, and by the unseaworthiness of the DALI.

## FIFTH AFFIRMATIVE DEFENSE

Petitioners' liability to the United States extends beyond the value of the DALI because the fault, recklessness, negligence, and lack of due care of those responsible for the vessel, and the unseaworthiness of the vessel, and all damages and losses resulting therefrom, were within the privity or knowledge of Petitioners, including their agents, officers, and/or employees.

## SIXTH AFFIRMATIVE DEFENSE

The United States reserves the right to contest the present amount of the limitation fund to include the value of the DALI, her engines, apparel, appurtenances, pending freight, and any other assets described or implied in the Petition and the purported evidence in the Petition substantiating the fund.

## SEVENTH AFFIRMATIVE DEFENSE

Petitioners are not entitled to reduce the limitation fund by the cost of salvage, particularly where salvage was performed under a legal duty to remove the wreck of the DALI from the navigable channel.  Petitioners also are not entitled to reduce the limitation fund by the cost of salvage not borne by Petitioners.  The United States reserves the right to contest the value of the salvage costs sought by Petitioners to reduce the value of the limitation fund and the purported evidence supplied in the Petition related to the salvage costs.

## EIGHTH AFFIRMATIVE DEFENSE

Petitioner Synergy has not pleaded that it is an "owner" of the DALI, but only the ship's "technical manager."  While Petitioner Synergy has irrevocably subjected itself to this Court's personal jurisdiction by bringing this Petition, it is not entitled to a limitation of liability because it is not the ship's "owner."  46 U.S.C. § 30523(a) ("[T]he liability of **the owner of a vessel** for any claim, debt, or liability described in subsection (b) shall not exceed the value of the vessel and pending freight." (emphasis added)).  Accordingly, Petitioner Synergy faces unlimited liability for the damages caused in this disaster upon finding that it is at least 1% at fault.

## NINTH AFFIRMATIVE DEFENSE

The limitation fund established by Petitioners is insufficient and is less than the post-allision value of the DALI and her pending freight.

## PRAYER FOR RELIEF

**WHEREFORE**, the United States of America prays:

1.   That Petitioners Grace Ocean Private Limited and Synergy Marine Pte Ltd be denied exoneration from, or limitation of, liability;

2.   That Petitioners Grace Ocean Private Limited and Synergy Marine Pte Ltd be adjudged liable, without limitation, to the United States of America for all damages sustained by the United States of America under the general maritime law of the United States as a result of the allision, including interest, costs, and expenses;

3.   That Petitioners Grace Ocean Private Limited and Synergy Marine Pte Ltd be adjudged liable, without limitation, to the United States of America for all damages sustained by the United States of America under the Rivers and Harbors Act as a result of the allision, including but not limited to interest, costs, and expenses;

4.   That Petitioners Grace Ocean Private Limited and Synergy Marine Pte Ltd be adjudged liable, without limitation, to the United States of America for all removal costs or damages actually incurred by the United States of America under the Oil Pollution Act as a result of the allision, including but not limited to interest, costs, and expenses;

5.   That Petitioners Grace Ocean Private Limited and Synergy Marine Pte Ltd be declared liable, without limitation, to the United States of America for all removal costs or damages incurred in the future by the United States of America under the Oil Pollution Act as a result of the allision, including but not limited to interest, costs, and expenses;

6.   That Petitioners Grace Ocean Private Limited and Synergy Marine Pte Ltd be adjudged liable, without limitation, to the United States of America for all damages sustained by the United States of America under the law of public nuisance as a result of the allision, including but not limited to interest, costs, and expenses;

7.   That the United States of America, at its discretion, be permitted to commission an independent appraisal of the value of the DALI, including pending freight, and offer evidence of the same for the Court's consideration in setting the limitation amount should limitation be found to apply;

8.   That the United States of America be awarded punitive damages in an amount to be determined by the Court;

9.   That the United States of America be awarded prejudgment interest of 6% per annum or such other prejudgment interest rate as determined by the Court;

10. That the United States of America be awarded its costs and attorneys' fees as allowed under the Oil Pollution Act; and

11. For such other relief as the Court deems appropriate.

Dated: September 18, 2024.

Respectfully submitted,

FOR CLAIMANT UNITED STATES OF AMERICA

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

EREK L. BARRON
United States Attorney

RODNEY PATTON
Director

MICHAEL A. DiLAURO
Assistant Director (Admiralty)

MICHELLE T. DELEMARRE
Senior Admiralty Counsel

KELLY M. MARZULLO (Bar No. 28036)
Assistant United States Attorney
36 South Charles Street, 4th Floor
Baltimore, Maryland 21201
Tel: (410) 209-4956
Fax: (410) 762-5842
E-mail: kelly.marzullo@usdoj.gov

THOMAS M. BROWN (Bar No. 30334)
Trial Attorney
JESSICA G. SULLIVAN
Senior Trial Counsel
JEANNE L. AMY
GUYER S. BOGEN
LAINE M. GOODHUE
Trial Attorneys
United States Department of Justice
Torts Branch, Civil Division
P.O. Box 14271
Washington, DC 20044-4271
Tel: (202) 616-4036
Fax: (202) 616-4314
E-mail: michelle.delemarre@usdoj.gov
        thomas.m.brown@usdoj.gov
        jessica.sullivan@usdoj.gov
        jeanne.l.amy@usdoj.gov
        guyer.s.bogen@usdoj.gov
        laine.m.goodhue@usdoj.gov
United States Department of Justice
Civil Division