## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
## NORTHERN DIVISION

In the Matter of the Petition

of

GRACE OCEAN PRIVATE LIMITED,
as Owner of the M/V DALI,

and

SYNERGY MARINE PTE LTD,
as Manager of the M/V DALI,

for Exoneration from or Limitation of Liability.

Docket No. JKB 24-cv-941

## CLAIMS FOR WRONGFUL DEATH, SURVIVAL, AND PUNITIVE DAMAGES

Claimants respectfully submit these claims arising from the death of Dorlian Ronial Castillo Cabrera, as a result of the March 26, 2024, collapse of the Francis Scott Key Bridge.

Claimants are: (1) Lillian Hummel, personal representatives of the Estate of Dorlian Ronial Castillo Cabrera; (2) Eban Perez, Dorlian's mother; (3) Jesus Castillo, Dorlian's father; and (4) Wilder Castillo Cabrera, Dorlian's older brother.

Claimants reserve all rights to proceed at law under 28 U.S.C. § 1333(1) on all claims and issues, against Petitioners and any other party, in a forum of their choice.

## PRELIMINARY STATEMENT

1.      On March 26, 2024, Petitioners killed six people and severely injured two others when they recklessly crashed an unseaworthy cargo vessel into the Francis Scott Key Bridge. Six days after the disaster that they caused, before all of the bodies of those who died had even been recovered, Petitioners invoked the jurisdiction of this Court, asserting that they owe nothing for the lives they destroyed. Claimants, surviving family members of decedent Dorlian Ronial Castillo

1

Cabrera, and the personal representative of his estate, now bring these claims to hold Petitioners accountable and to ensure an avoidable tragedy like the Key Bridge disaster never happens again.

2.      Dorlian was born on September 7, 1997, in the remote area of San Luis Peten, Guatemala. At the age of 20, he came to the United States to work and earn money for his family. Dorlian was a happy person who enjoyed spending time with his friends and listening to Mexican music, but his life revolved around working hard and being there for his parents and family. Dorlian worked hard in construction jobs, including working nights. He sent money back to his parents in Guatemala as often as he could.

3.      Eban Perez and Jesus Castillo are Dorlian's parents. Dorlian was proud that he could get his mother Eban so many things—a refrigerator, nice foods, whatever she wanted. Eban is diabetic and was hospitalized to have her toe amputated. Dorlian would often pay for his mother's medicine. Dorlian also frequently called home to talk with his parents, and he would often give his ailing mother advice on dealing with the difficulties of daily life.

4.      Wilder Castillo Cabrera is Dorlian's older brother. He also lives in Baltimore, and the two brothers were a team. They would do everything together. Dorlian was very close with his nieces, Wilder's daughters, frequently bringing them candy and surprising them with gifts.

5.      Dorlian's dream was that he could obtain legal status and one day bring his parents to live with him in Baltimore. When the *Dali* collided with the Francis Scott Key Bridge, Dorlian's life—and those dreams—were lost forever.

6.      Wilder couldn't bring himself to tell his mother about Dorlian's death all at once. She was in the hospital at the time, and he was too worried that the grief would be too much for her. Wilder had to break the news to her slowly, over several weeks. Even then, she was completely

devastated. Dorlian's young nieces are also heartbroken. Their uncle had been a large part of their lives. As for Wilder, he has lost his younger brother, friend, and partner in caring for their parents.

## PARTIES

7.      Claimant Lillian Hummel is the duly appointed personal representative of the Estate of Dorlian Ronial Castillo Cabrera. Letters of Administration were issued to Ms. Hummel by the Register of Wills for Baltimore County on August 28, 2024. She brings these claims on behalf of the Estate of Dorlian Ronial Castillo Cabrera and on behalf of all wrongful death beneficiaries.

8.      Eban Perez and Jesus Castillo are Dorlian's parents.

9.      Wilder Castillo Cabrera is Dorlian's brother.

10.     Petitioner Grace Ocean Private Ltd. is a Singapore-based corporation and the registered owner of the *Dali*. On information and belief, Grace Ocean Private Ltd. conducted vessel and crew management, training and selection onboard the *Dali*, as well as assessments, operations, and maintenance on the vessel and its equipment, including its electrical and propulsion systems. All crewmembers on board the *Dali* were answerable to Petitioner Grace Ocean Private Ltd.

11.     Petitioner Synergy Marine PTE LTD is a Singapore-based corporation. Synergy Marine PTE LTD conducted technical and crew management, training and selection on board the *Dali*, as well as assessments, risk analysis, operations, and maintenance on the vessel and its equipment, including its electrical and propulsion systems.

## JURISDICTION AND VENUE

12.     This Court has maritime jurisdiction because Claimants' claims arise from a cargo vessel allision upon the Patapsco River, which are navigable waters of the United States, and the decedent was injured within those waters. In addition, or alternatively, there is subject matter

jurisdiction under the Admiralty Extension Act, 46 U.S.C. § 30101, in that a vessel on navigable waters caused injuries to Claimants on land.

13.     Petitioners have consented to the jurisdiction of this Court in filing the pending Limitation Action and negligently and recklessly committing acts and omissions in Maryland that caused catastrophic injuries to individuals in the state of Maryland.

14.     Venue is proper because the incident giving rise to Claimants' claims occurred in this district.

## FACTS

15.     In the early morning hours of March 26, 2024, the *Dali*, a containership, was departing Baltimore for Sri Lanka when the vessel lost electrical power and struck the Francis Scott Key Bridge.

16.     At the time of the allision, the *Dali* was a seagoing vessel at the beginning of its voyage under 46 U.S.C. § 30524. The Master of the *Dali* committed numerous reckless and negligent acts prior to the disaster, each of which is imputable to Petitioners as a matter of law.

### The *Dali*'s Electrical System

17.     A substantial portion of the *Dali*'s improper acts involved reckless and negligent operation of the *Dali*'s electrical generating and distribution system.

18.     The *Dali* generates electrical power using four main diesel generators (Diesel Generators 1, 2, 3, and 4) and one emergency backup diesel generator. These generators create high voltage electricity (6,600 Volts) that is distributed from the vessel's High Voltage Bus.

19.     The High Voltage Bus is the Primary electrical source supplying two identical transformers: Transformer 1 and Transformer 2. Transformer 1 and Transformer 2 are "step down transformers" that convert high voltage electricity energy to low voltage electricity (440 Volts),

which is then distributed ship-wide via a Low Voltage Bus, which is the Secondary side of the transformer.

20.    Both high and low voltage electricity is required to power critical components on the *Dali*, such as the main propulsion engine lubricating oil pumps and the main engine cooling pumps. These pumps run on high and low voltage, respectively. If they are denied electrical power, the main propulsion engine is designed to shut down to prevent damage to its components.

21.    On either side (Primary side and Secondary side) of the *Dali*'s Transformer 1 are two circuit breakers: High Voltage Breaker 1 and Low Voltage Breaker 1, respectively. Similarly, on either side (Primary side and Secondary side) of Transformer 2, there are two circuit breakers: High Voltage Breaker 2 and Low Voltage Breaker 2, respectively.

22.    The purpose of these breakers is to interrupt electrical pathways when the current (amperage) passing through the breaker is above the circuit breaker's designed limit. These circuit breakers "trip" when an overcurrent condition is sensed to protect the ship's wiring from overheating.

23.    A *low* voltage condition will also cause High Voltage Breaker 1 or 2 or Low Voltage Breaker 1 or 2 to "trip," preventing equipment damage. A low voltage condition can damage equipment requiring a constant, steady source of electrical energy for proper operation. To prevent such damage, voltage sensing devices are integrated into the *Dali*'s distribution system.

24.    Transformers 1 and 2 on the *Dali* are redundant, meaning only one transformer needs to be online to power the vessel. The *Dali*'s Integrated Control Management System ("ICMS") can be configured so that one transformer comes online automatically if the other ceases operation for whatever cause. The system can also be operated in manual mode, as it was on the

date of the disaster, which requires a crewmember to engage the controls to energize the offline transformer.

### *Power Loss Prior to Departure*

25.    Just hours prior to departure, the *Dali* suffered a complete electrical blackout. At that time, the vessel was running solely on Transformer 2 and was powered by Diesel Generator 2.

26.    The blackout allegedly occurred after a *Dali* crewmember improperly closed an inline engine exhaust damper in the diesel engine driving Diesel Generator 2. This prevented the venting of exhaust gases, which, when detected, resulted in the automatic shutdown of the engine and Diesel Generator 2.

27.    When the engine shutdown was detected, High Voltage Breaker 2 and Low Voltage Breaker 2 opened or "tripped" automatically. The opening of the breakers interrupted the flow of electrical current in the vessel's electrical system as designed, causing the blackout. Diesel Generator 3 then came online and re-supplied power to the High Voltage Bus, making up for Diesel Generator 2's absence.

28.    In response to the blackout, *Dali*'s crewmembers closed High Voltage Breaker 2 and Low Voltage Breaker 2. This restored electrical power to the ship's electrical distribution system and the generating source was now Diesel Generator 3.

29.    Shortly thereafter, however, Diesel Generator No. 3 experienced a loss of fuel pressure and, as a result, *its* breaker opened. This caused a second blackout due to the ensuing loss of electrical power to the High Voltage Bus and, then, loss of the ship's electrical power.

30.    On information and belief, Diesel Generator 3 came offline because a defective pneumatic pump did not provide the generator with sufficient fuel. Notably, the *Dali*'s original fuel oil system was re-designed by Petitioners in approximately 2020. That re-design included the

installation of a "flushing" pump to provide fuel to the Diesel Generators. The flushing pump, however, was not manufactured to be a primary fuel source for a diesel generator. As a result, it lacked important safety features, such as the ability to automatically re-start after a power failure. As a back-up to the flushing pump, Petitioners also installed the pneumatic pumps, which could only provide intermittent fuel to the generators.

31.     In re-engineering their fuel oil system in this fashion, Petitioners intentionally removed vital redundancies from their vessel's electrical and propulsion systems for the purpose of saving money.

32.     During *Dali*'s pre-departure blackout, the crew allegedly realized that Diesel Generator 2's exhaust damper was closed. When the crew opened the damper, Diesel Generator 2 came online again, providing the needed power to the High Voltage and Low Voltage busses.

33.     The *Dali* never notified the Coast Guard of the two vessel-wide blackouts, in violation of applicable regulations, including 46 C.F.R. § 4.05-1. What is more, in an improper response to the power losses, the *Dali* switched the vessel's operative transformer from Transformer 2 to Transformer 1 prior to departing.

34.     Transformer 1 had not been used for several months and, in fact, was known by the *Dali* to be damaged. Intentional reliance on a damaged and infrequently used transformer was not only a clear breach of industry standards but incredibly dangerous.

### *The Dali's Well-Documented Issues with Vessel Vibration*

35.     The *Dali* had a well-recorded history of severe and dangerous vessel vibration issues, which directly affected its electrical system and rendered the vessel entirely unseaworthy. These defects were known to Petitioners before departure for Sri Lanka, but they departed anyway.

Petitioners' reckless decision to leave berth in the face of these dangerous deficiencies was motivated by profit.

36.     Post-incident inspections of the vessel revealed extensive evidence of damage to the vessel caused by excessive vibration and haphazard methods to try and contain it. The vessel's electrical transformers were crudely secured using steel braces, which themselves were damaged by vibration. Written notations regarding vibration were observed in the vessel's bow thruster room and within its vessel logs and records. Loose cable wires and hardware were observed within the vessel's transformers and switchboards. Finally, and most glaringly, Transformer 1 was secured against vibration with an ad-hoc "jury-rigged" contraption made out of a spare cargo chain turnbuckle.

37.     Despite these open and obvious dangerous conditions, some of which Petitioners intentionally created, Petitioners sailed their enormous vessel directly towards a major bridge using Transformer 1, in wanton and reckless disregard for the safety of others. Petitioners' reckless decision would soon kill six people and severely injure two others.

### The Key Bridge Disaster

38.     The *Dali* initially departed with the aid of a senior pilot and apprentice pilot with the Association of Maryland Pilots. A pilot's role is to assist with the navigation of the vessel in local waters.

39.     During the master/pilot exchange, the Master knowingly and falsely assured the assisting pilots that all equipment was in "good working order" and recklessly failed to inform the pilots about the system-wide electrical failures and vibration issues plaguing the *Dali*. This was a violation of applicable regulations, including 33 C.F.R. § 1641.11(k).

40.     Additionally, the Master never reported to the pilot that any issues were affecting the vessel's bow thruster prior to the voyage. Yet, in the course of the subsequent failure, when the pilot called for use of the bow thruster to prevent the allision, the Master reported that it was "unavailable."

41.     As it departed, the *Dali* was initially aided by two tugboats. As the vessel entered the Fort McHenry channel, however, the tugboats were ordered to return to port. This occurred even though the Master knew that the *Dali* was prone to sudden, complete electrical failures that would prevent adequate steering of the enormous vessel.

42.     Given this knowledge, the *Dali*'s Master should have requested tugs through the bridge's main span. At the very least, he should have slowed the vessel and stationed crewmembers at the anchor winch, a standard industry practice. This would have allowed for rapid dropping of the anchor and slowing of the vessel in the event of another power failure. None of these basic precautions were taken by the *Dali*, indicating Petitioners had insufficient safety management procedures and risk assessments.

43.     As the unaided vessel came within a half mile from the Key Bridge, the *Dali*, just as it had before the departure, lost all electrical power.

44.     The power loss occurred after High Voltage Breaker 1 and Low Voltage Breaker 1 "tripped," preventing primary power to Transformer 1 and therefore de-powering the secondary 440 Volt system. Defects in the *Dali*'s electrical system (e.g., loose cable wires or defective coils) caused the "tripping" of High Voltage Breaker 1 and Low Voltage Breaker 1. On information and belief, these defects were known to Petitioners, their agents, employees, superintendents, and crew, including the Master of the vessel prior to the beginning of the voyage.

45.     The resulting loss of electrical power to critical engine equipment resulted in the automatic shutdown of the main engine, and the loss of the vessel's propulsion system and steering system. The steering system was partially restored (at a lower speed of rudder control) after the emergency backup diesel started to supply limited electrical power to selected systems.

46.     At this time, if the vessel's ICMS was in "automatic mode," then Low Voltage Circuit Breaker 2 and High Voltage Circuit Breaker 2 would have both closed, resulting in Transformer 2 coming online and restoring power to the entire vessel in about ten seconds, avoiding an extended blackout.

47.     The *Dali* negligently and recklessly failed to utilize "automatic mode" at the outset of the voyage. Instead, the *Dali* used "manual" mode, which required a crewmember to switch transformers manually.

48.     Since the transformer control switch was in manual mode, the *Dali* should have manually switched to Transformer 2 immediately after the failure. The crew failed to do so, again indicating deficient safety management systems and procedures.

49.     In addition, there is no indication that the vessel's emergency generator provided emergency power after the first blackout, as required by the Safety of Life at Sea ("SOLAS") Convention. This is further evidence of the unseaworthiness of the vessel.

50.     Instead of switching transformers, the *Dali*'s crew simply closed High Voltage Breaker 1 and Low Voltage Breaker 1 and crossed their fingers that another failure would not happen again.

51.     As during the pre-departure blackout, closing the tripped breakers did initially restore power to the *Dali*. But, as before, a second blackout occurred soon after.

52.     When the vessel was just .2 miles from the bridge, the breakers connecting the vessel's online diesel generators (Diesel Generator 3 and Diesel Generator 4) to the High Voltage Bus opened and disconnected. This occurred because the vessel's flushing pumps were turned off and the back-up defective pneumatic pump could not generate sufficient fuel to supply the running generators.

53.     The tripping of the generator breakers eliminated power again to both the High Voltage Bus and Low Voltage Bus, causing the second blackout and loss of the enormous vessel's propulsion and steering systems.

54.     In response, the crew manually closed High Voltage Breaker 2 and Low Voltage Breaker 2, something that should have occurred automatically within seconds of the initial power loss. This re-introduced power to the High Voltage bus, finally allowing Transformer 2 to come online.

55.     The manual transition to Transformer 2 was too little, too late.  While power was regained, there was insufficient time for the vessel to regain main engine propulsion and full steering rudder control.

56.     While the port anchor was belatedly released, it was lowered too late to prevent the disaster because the *Dali* was not prepared for a foreseeable emergency. The pilot's last-ditch, desperate calls for the bow thruster were met only with a report from the Master that it was "unavailable."

57.     Shortly thereafter, the vessel struck the Key Bridge. After the impact, the ground fell from underneath Dorlian and he fell with the bridge into the Patapsco river, suffering extreme fright, pain, suffering, and, ultimately, death.

**COUNT ONE: WRONGFUL DEATH,**

## **AS AGAINST GRACE OCEAN PRIVATE LTD**

58.     Claimants incorporate the foregoing paragraphs.

59.     At all relevant times, as the registered owner of the *Dali*, Petitioner Grace Ocean Private Ltd owed Claimants a duty to ensure that the voyage on March 26, 2024, was adequately planned and executed; that the *Dali* was seaworthy and appropriately equipped for the voyage; that all on board the *Dali* had sufficient training, equipment and provisions to complete the voyage successfully; and that the vessel had appropriate safety management systems and risk assessments to avoid injury to others.

60.     Petitioner Grace Ocean Private Ltd breached these duties in that Petitioner, its agents and employees, including the Master, crew members, agents, superintendents, and executives:

      a.   Conducted a voyage with an unseaworthy vessel;

      b.   Failed to navigate the vessel properly;

      c.   Knowingly departed with a defective electrical system;

      d.   Failed to properly operate the vessel's electrical system;

      e.   Failed to properly troubleshoot and diagnose defects with the electrical system;

      f.   Failed to utilize tug vessels through the Key Bridge's main span;

      g.   Failed to slow the vessel as it approached the Key Bridge;

      h.   Failed to station crew at the anchor winch during departure;

      i.   Failed to divert the *Dali*'s route of travel when its engine lost power;

      j.   Failed to equip the *Dali* with appropriate equipment to ensure that she could be navigated properly and that emergency authorities could be contacted at any time if necessary;

k.  Failed to properly crew the *Dali* with an appropriate and trained crew;

l.  Failed to implement appropriate safety policies and procedures to ensure a seaworthy vessel;

m.  Failed to properly maintain the vessel;

n.  Failed to conduct appropriate planning to ensure the *Dali* was equipped to complete the planned voyage;

o.  Failed to properly contact emergency authorities;

p.  Failed to institute appropriate training procedures;

q.  Negligently retained the crewmembers, Master, managing agent, and superintendent of the vessel;

r.  Failed to sound an aural bell or alarm, or otherwise alert those on the Key Bridge of the *Dali*'s imminent impact;

s.  Failed to ensure a properly functioning bow thruster prior to and during the voyage;

t.  Knowingly and recklessly placed Dorlian's life in danger by deliberately attempting to navigate with a defective electrical system;

u.  Knowingly and recklessly placed Dorlian's life in danger by deliberately attempting to navigate with a vessel that was known to suffer from excessive vibration, resulting in alteration and damage to components, including electrical components;

v.  Failed to institute proper training, procedures, risk assessments, and safety management systems;

w.  Failed to properly equip the vessel;

13

x.   Violated applicable regulations and laws;

y.   Violated applicable industry standards, customs and practices;

z.   Failed to properly manage and plan the voyage;

aa. Negligently and recklessly planned and conducted the voyage with an unseaworthy vessel in other ways to be proven in the course of discovery and at trial.

61.     As a result of these reckless, negligent acts and omissions, Dorlian was killed.

62.     Claimants therefore seek all available damages under applicable law, including but not limited to compensation for:

a.   The pain, suffering and emotional distress of Dorlian;

b.   The pre-impact fear of Dorlian;

c.   The post-impact fear of Dorlian;

d.   Dorlian's fear of impending death and drowning;

e.   Past and future emotional distress of Dorlian's survivors;

f.   Past and future medical expenses;

g.   Past and future economic losses;

h.   Hedonic damages;

i.   Loss of enjoyment of life;

j.   Loss of society and consortium;

k.   The value of personal property lost;

l.   Loss of inheritance;

m.  Loss of services;

n.   Funeral and burial expenses;

14

o.   Loss of care, guidance, nurture, and counsel;

p.   Punitive damages;

q.   Costs of suit and attorneys' fees;

r.   All other damages available under applicable law.

63.    To the extent that any of the above remedies are not available under general maritime law, Claimants seek all available supplemental remedies under applicable state law.

### COUNT TWO: WRONGUL DEATH,
### AS AGAINST SYNERGY MARINE PTE LTD

64.    Claimants incorporate the foregoing paragraphs.

65.    At all relevant times, as the technical manager of the *Dali* and her crew, Petitioner Synergy Marine PTE LTD owed Claimants a duty to ensure that the voyage on March 26, 2024, was adequately planned and executed; that the *Dali* was seaworthy and appropriately equipped for the voyage; that all on board the *Dali* had sufficient training, equipment, and provisions to complete the voyage successfully; and that the vessel had appropriate safety management systems and risk assessments to avoid injury to others.

66.    Petitioner Synergy Marine PTE LTD breached these aforesaid duties in that, among other things, Petitioner, its agents and employees, including the Master, crew members, agents, superintendents and executives:

a.   Conducted a voyage with an unseaworthy vessel;

b.   Failed to navigate the vessel properly;

c.   Knowingly departed with a defective electrical system;

d.   Failed to properly operate the vessel's electrical system;

e.   Failed to properly troubleshoot and diagnose defects with the electrical system;

f.   Failed to utilize tug vessels through the Key Bridge's main span;

g.   Failed to slow the vessel as it approached the Key Bridge;

h.   Failed to station crew at the anchor winch during departure;

i.   Failed to divert the *Dali*'s route of travel when its engine lost power;

j.   Failed to equip the *Dali* with appropriate equipment to ensure that she could be navigated properly and that emergency authorities could be contacted at any time if necessary;

k.   Failed to properly crew the *Dali* with an appropriate and trained crew;

l.   Failed to implement appropriate safety policies and procedures to ensure a seaworthy vessel;

m.   Failed to properly maintain the vessel;

n.   Failed to conduct appropriate planning to ensure the *Dali* was equipped to complete the planned voyage;

a.   Failed to properly contact emergency authorities;

b.   Failed to institute appropriate training procedures;

c.   Negligently retained the crewmembers, Master, managing agent, and superintendent of the vessel;

d.   Failed to sound an aural bell or alarm, or otherwise alert those on the Key Bridge of the *Dali*'s imminent impact;

e.   Failed to ensure a properly functioning bow thruster prior to and during the voyage;

f.   Knowingly and recklessly placed Dorlian's life in danger by deliberately attempting to navigate with a defective electrical system;

16

g.  Knowingly and recklessly placed Dorlian's life in danger by deliberately attempting to navigate with a vessel that was known to suffer from excessive vibration, resulting in alteration and damage to components, including electrical components;

h.  Failed to institute proper training, procedures, risk assessments, and safety management systems;

i.  Failed to properly equip the vessel;

j.  Violated applicable regulations and laws;

k.  Violated applicable industry standards, customs and practices;

l.  Failed to properly manage and plan the voyage;

m.  Negligently and recklessly planned and conducted the voyage with an unseaworthy vessel in other ways to be proven in the course of discovery and at trial.

67.   As a result of these reckless, negligent acts and omissions, Dorlian was killed.

68.   Claimants therefore seek all available damages under applicable law, including but not limited to compensation for:

a.   The pain, suffering, and emotional distress of Dorlian;

b.  The pre-impact fear of Dorlian;

c.  The post-impact fear of Dorlian;

d.  Dorlian's fear of impending death and drowning;

e.  Past and future emotional distress of Dorlian's survivors;

f.  Past and future medical expenses;

g.  Past and future economic losses;

h.   Hedonic damages;

i.   Loss of enjoyment of life;

j.   Loss of society and consortium;

k.   The value of personal property lost;

l.   Loss of inheritance;

m.  Loss of services;

n.   Funeral and burial expenses;

o.   Loss of care, guidance, nurture, and counsel;

p.   Punitive damages;

q.   Costs of suit and attorneys' fees;

r.   All other damages available under applicable law.

69.    To the extent that any of the above remedies are not available under general maritime law, Claimants seek all available supplemental remedies under applicable state law.

## COUNT THREE: SURVIVAL CLAIM -
## <u>AS AGAINST GRACE OCEAN PRIVATE LTD</u>

70.   Claimants incorporate the foregoing paragraphs.

71.   As a direct and proximate result of Petitioner Grace Ocean Private LTD's previously described wrongful acts, Dorlian suffered damages before his death, including extreme mental anguish, physical pain, and a profound fear for his life prior to his death.

72.   Claimants therefore seek all available survival damages under applicable law, including but not limited to compensation for:

a.   The pain, suffering and emotional distress of Dorlian;

b.   The pre-impact fear of Dorlian;

c.   The post-impact fear of Dorlian;

d.   Dorlian's fear of impending death and drowning;

e.   Funeral and burial expenses;

f.   Estate legal and administrative costs;

g.   Punitive damages;

h.   Costs of suit and attorneys' fees;

i.   All other damages available under applicable law.

73.     To the extent that any of the above remedies are not available under general maritime law, Claimants seek all available supplemental remedies under applicable state law.

## COUNT FOUR SURVIVAL CLAIM -
## AS AGAINST SYNERGY MARINE PTE LTD

74.     Claimants incorporate the foregoing paragraphs.

75.     As a direct and proximate result of Petitioner Synergy Marine PTE LTD's previously described wrongful acts, Dorlian suffered damages before his death, including extreme mental anguish, physical pain, and a profound fear for his life prior to his death.

76.     Claimants therefore seek all available survival damages under applicable law, including but not limited to compensation for:

a.   The pain, suffering and emotional distress of Dorlian;

b.   The pre-impact fear of Dorlian;

c.   The post-impact fear of Dorlian;

d.   Dorlian's fear of impending death and drowning;

e.   Funeral and burial expenses;

f.   Estate legal and administrative costs;

g.   Punitive damages;

h.   Costs of suit and attorneys' fees;

i.   All other damages available under applicable law.

77.   To the extent that any of the above remedies are not available under general maritime law, Claimants seek all available supplemental remedies under applicable state law.

**COUNT FIVE: PUNITIVE DAMAGES
AS AGAINST GRACE OCEAN PRIVATE LTD**

78.   Claimants incorporate the foregoing paragraphs.

79.   At all relevant times, Petitioner Grace Ocean Private LTD conducted intentional, willful, wanton, reckless, and/or grossly negligent acts and omissions, causing Claimants' injuries and one of the worse maritime disasters in the history of the United States. Punitive damages are therefore appropriate to punish Petitioner Grace Ocean Private LTD and deter similar future acts and omissions.

80.   Petitioner Grace Ocean Private LTD should be assessed punitive damages in that, motivated by profit, it intentionally, willfully, wantonly, grossly negligently, and recklessly:

a.   Conducted a voyage with an unseaworthy vessel;

b.   Failed to navigate the vessel properly;

c.   Departed with a defective electrical system;

d.   Failed to properly operate the vessel's electrical system;

e.   Failed to properly troubleshoot and diagnose defects with the electrical system;

f.   Failed to utilize tug vessels through the Key Bridge's main span;

g.   Failed to slow the vessel as it approached the Key Bridge;

h.   Failed to station crew at the anchor winch during departure;

i.   Failed to divert the *Dali*'s route of travel when its engine lost power;

j.  Failed to equip the *Dali* with appropriate equipment to ensure that she could be navigated properly and that emergency authorities could be contacted at any time if necessary;

k.  Failed to properly crew the *Dali* with an appropriate and trained crew;

l.  Failed to implement appropriate safety policies and procedures to ensure a seaworthy vessel;

m.  Failed to properly maintain the vessel;

n.  Failed to conduct appropriate planning to ensure the *Dali* was equipped to complete the planned voyage;

o.  Failed to properly contact emergency authorities;

p.  Failed to institute appropriate training procedures;

q.  Retained the crewmembers, Master, managing agent, and superintendent of the vessel;

r.  Failed to sound an aural bell or alarm, or otherwise alert those on the Key Bridge of the *Dali*'s imminent impact;

s.  Failed to ensure a properly functioning bow thruster prior to and during the voyage;

t.  Placed Dorlian's life in danger by deliberately attempting to navigate with a defective electrical system;

u.  Placed Dorlian's life in danger by deliberately attempting to navigate with a vessel that was known to suffer from excessive vibration, resulting in alteration and damage to components, including electrical components;

     v.  Failed to institute proper training, procedures, risk assessments, and safety management systems;

     w.  Failed to properly equip the vessel;

     x.  Violated applicable regulations and laws;

     y.  Violated applicable industry standards, customs and practices;

     z.  Failed to properly manage and plan the voyage;

     aa.  Planned and conducted the voyage with an unseaworthy vessel in other ways to be proven in the course of discovery and at trial.

81.     As a result of the foregoing, Dorlian was killed and Claimants suffered damages.

82.  Claimants are therefore entitled to punitive damages.

**COUNT SIX: PUNITIVE DAMAGES**
**<u>AS AGAINST SYNERGY MARINE PTE LTD</u>**

83.     Claimants incorporate the foregoing paragraphs.

84.     At all relevant times, Petitioner Synergy Marine PTE Ltd conducted intentional, willful, wanton, reckless, and/or grossly negligent acts and omissions, causing Claimants' injuries and one of the worse maritime disasters in the history of the United States. Punitive damages are therefore appropriate to punish Petitioner Grace Ocean Private LTD and deter similar future acts and omissions.

85.     Petitioner Synergy Marine PTE Ltd should be assessed punitive damages in that, motivated by profit, it intentionally, willfully, grossly, negligently, wantonly, and recklessly:

     a.  Conducted a voyage with an unseaworthy vessel;

     b.  Failed to navigate the vessel properly;

     c.  Departed with a defective electrical system;

     d.  Failed to properly operate the vessel's electrical system;

e.   Failed to properly troubleshoot and diagnose defects with the electrical system;

f.   Failed to utilize tug vessels through the Key Bridge's main span;

g.   Failed to slow the vessel as it approached the Key Bridge;

h.   Failed to station crew at the anchor winch during departure;

i.   Failed to divert the *Dali*'s route of travel when its engine lost power;

j.   Failed to equip the *Dali* with appropriate equipment to ensure that she could be navigated properly and that emergency authorities could be contacted at any time if necessary;

k.   Failed to properly crew the *Dali* with an appropriate and trained crew;

l.   Failed to implement appropriate safety policies and procedures to ensure a seaworthy vessel;

m.   Failed to properly maintain the vessel;

n.   Failed to conduct appropriate planning to ensure the *Dali* was equipped to complete the planned voyage;

o.   Failed to properly contact emergency authorities;

p.   Failed to institute appropriate training procedures;

q.   Retained the crewmembers, Master, managing agent, and superintendent of the vessel;

r.   Failed to sound an aural bell or alarm, or otherwise alert those on the Key Bridge of the *Dali*'s imminent impact;

s.   Failed to ensure a properly functioning bow thruster prior to and during the voyage;

t.  Placed Dorlian's life in danger by deliberately attempting to navigate with a defective electrical system;

u.  Placed Dorlian's life in danger by deliberately attempting to navigate with a vessel that was known to suffer from excessive vibration, resulting in alteration and damage to components, including electrical components;

v.  Failed to institute proper training, procedures, risk assessments, and safety management systems;

w.  Failed to properly equip the vessel;

x.  Violated applicable regulations and laws;

y.  Violated applicable industry standards, customs and practices;

z.  Failed to properly manage and plan the voyage;

aa. Planned and conducted the voyage with an unseaworthy vessel in other ways to be proven in the course of discovery and at trial.

86. As a result of the foregoing, Dorlian was killed and Claimants suffered damages.

87. Claimants are therefore entitled to punitive damages.

## **JURY DEMAND**

88. Claimants demand a trial by jury.

## **PRAYER FOR RELIEF**

89.     Claimants request damages far in excess of the value of the vessel, in an amount to be determined by the finder of fact for all available damages under applicable law, including but not limited to:

a.  The pain, suffering and emotional distress of Dorlian;

b.  The pre-impact fear of Dorlian;

24

c.   The post-impact fear of Dorlian;

d.   Dorlian's fear of impending death and drowning;

e.   Past and future emotional distress of Dorlian's survivors;

f.   Past and future medical expenses;

g.   Past and future economic losses;

h.   Hedonic damages;

i.   Loss of enjoyment of life;

j.   Loss of society and consortium;

k.   The value of personal property lost;

l.   Loss of inheritance;

m.   Loss of services;

n.   Funeral and burial expenses;

o.   Estate legal and administrative costs;

p.   Loss of care, guidance, nurture, and counsel;

q.   Punitive damages;

r.   Costs of suit and attorneys' fees;

s.   All other damages available under applicable law.

Respectfully Submitted:

*/s/ Nicholas Katz*
   Nicholas Katz, Esq.

**CASA, INC.**
8151 15th Avenue
Hyattsville, MD 20783
(240) 491-5743
Nicholas Katz, Esq. (Bar # 21920)
nkatz@wearecasa.org

**FRIEDMAN|RUBIN PLLC**
1109 1st Ave
Suite 501
Seattle, WA 98101
(206) 501-4446

David Roosa, Esq.*
Michael White, Esq.*
droosa@friedmanrubin.com

**GUPTA WESSLER LLP**
2001 K Street NW
Suite 850 North
Washington, DC 20006
(202) 888-1741

Matthew W.H. Wessler, Esq.*
Deepak Gupta, Esq.*
Thomas Scott-Railton, Esq.**
matt@guptawessler.com

*Counsel for Claimants Lillian Hummel, Eban Perez, Jesus Castillo, and Wilder Castillo Cabrera.*

---

\* *Pro hac vice application forthcoming.*
\*\* *Pro hac vice application forthcoming. Admitted in New York; practicing under direct supervision of members of the District of Columbia Bar under Rule 49(c)(8).*