**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| In the Matter of the Petition<br><br>of<br><br>GRACE OCEAN PRIVATE LIMITED, as Owner of the M/V DALI,<br><br>and<br><br>SYNERGY MARINE PTE LTD, as Manager of the M/V DALI,<br><br>for Exoneration from or Limitation of Liability | Docket No. JKB 24-cv-941<br><br>*IN ADMIRALTY* |

**CLAIM BY BRAWNER BUILDERS, INC. AND ZURICH AMERICAN INSURANCE COMPANY FOR REIMBURSEMENT OF SPECIFIC WORKER'S COMPENSATION PAYMENTS MADE TO MIGUEL LUNA, SR. PURSUANT TO SUPPLEMENTAL FEDERAL RULE F(5) IN RELATION TO THE KEY BRIDGE ALLISION**

Specifically reserving all rights and defenses asserted in BRAWNER BUILDERS, INC. AND ZURICH AMERICAN INSURANCE COMPANY's ("Claimant") accompanying Answer to the Petitioners' "Petition for Exoneration from or Limitation of Liability," for benefits paid to and on behalf of, Miguel Luna, Sr. a.k.a. Miguel Angel Luna Gonzalez ("Luna"), claim number 001960-241468-WC-04, Claimant hereby demands a jury trial and makes this claim pursuant to Rule F(5) of the Supplemental Rules for Admiralty or Maritime Claims against Petitioners, GRACE OCEAN PRIVATE LIMITED and SYNERGY MARINE PTE LTD, as alleged owner and manager of the vessel M/V DALI (the "Dali") and in support thereof avers as follows:

**INTRODUCTION**

1.      In the early morning hours of March 26, 2024, the night was calm, there were no high winds and no visual obstructions. At about 12:45am, local time, the large container ship, the Dali, left the dock and began its journey to its next destination in Sri Lanka.

2.      The intended route for the Dali was to head down the Patapsco River, under the 1.6 mile expanse of the Francis Scott Key Bridge (the "Key Bridge"), and out to the Chesapeake Bay, a route that thousands of large container ships have previously used, without incident. Before the March 26, 2024 allision, more than 40 years had passed since a ship struck the Key Bridge.

3.      The Port of Baltimore (the "Port") is one of is the highest traffic ports in the United States and is well equipped to handle large vessels like the Dali.  In 2023, 11.7 million tons of general cargo were handled by the Port's public terminals and the Port ranked first in the nation in handling automobiles, light trucks, farm and construction machinery, as well as imported sugar and gypsum.[1]

4.      Approximately twelve minutes after leaving the dock, the Dali began its voyage towards the Key Bridge.

5.      At approximately 1:24am, local time, it is reported that signs of trouble came when numerous alarms sounded indicating erratic power supply issues.

6.      At approximately 1:25am, local time, it is reported that the Dali suffered its first blackout.[2] The blackout can be seen in many videos right before the catastrophic incident.

7.      It is believed that the Dali crew was able to restore electrical power to the vessel, but, when the ship was 0.2 miles from the bridge, a second electrical blackout occurred. [3]

---

[1] The 2023 Economic Impact Of The Port of Baltimore Maryland, Prepared for the Maryland Port Administration, available at https://msa.maryland.gov/msa/mdmanual/01glance/html/port.html
[2] NTSB Report
[3] Id.

8. At approximately 1:28am, local time, the Dali collided with the Key Bridge, causing it to collapse catastrophically sending seven Brawner Builders, Inc. ("Brawner") workers into the icy waters of the Patapsco River.

9. Six of the seven Brawner workers were tragically killed and the seventh sustained life altering, permanent injuries for which all of these workers or their dependents have either received and continue to receive workers' compensation benefits paid by Claimant or will receive worker's compensation benefits paid by Claimant in the future.

10. In addition to the tragic loss of multiple lives and personal injuries, the allision destroyed one of Baltimore's busiest bridges and halted almost all passenger and cargo shipping through the Port.

11. This fatal and costly disaster could and should have been avoided.

12. Reports indicate that, even before leaving the port, and as early as the day before the incident, the Dali experienced issues with electrical power loss,[4] indicating its unseaworthiness condition. Yet, the Vessel was allowed to embark on its voyage.

13. Petitioners, Grace Ocean Private Limited and Synergy Marine Pte Ltd were aware of the issues with the vessel and allowed a clearly unseaworthy vessel into the water.

14. Petitioners' actions were grossly negligent, and their liability should not be limited.

## PARTIES

15. Brawner Builders, Inc. is a corporation organized and existing under the laws of the State of Maryland, with a principal place of business of 11011 McCormick Road, Hunt Valley, MD, 21031.

16. Zurich American Insurance Company, is an insurance company organized and existing under the laws of the state of New York with its principal place of business in Illinois.

---

[4] NTSB Report

-3-

33641222v.1

17. Upon information and belief, Petitioner Grace Ocean Private Limited ("Grace") is a corporation organized and existing under the laws of Singapore with its registered office in Singapore and was the registered owner of the M/V DALI (the "Dali" or the "Vessel") at all times relevant hereto.

18. Upon information and belief, Synergy Marine Pte Ltd ("Synergy") is a corporation organized and existing under the laws of Singapore with its registered office in Singapore and was the manager of the Vessel.

19. Upon information and belief, Synergy was responsible for, among other things, manning and victualing the Vessel; procuring and providing deck, engine, and cabin stores; maintenance and repairs of the Vessel's hull and machinery; provisioning of spare parts, maintenance, and repairs for the Vessel; and communicating with the Owner and the Vessel's time charterers at all times relevant hereto.

## JURISDICTION AND VENUE

20. The incident that gave rise to this claim occurred upon the navigable waters of the United States within the territorial waters of the State of Maryland, had an actual and potential impact on maritime commerce, involved a traditional maritime activity, and is subject to admiralty tort jurisdiction.

21. This action is within this Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332, because the parties are in complete diversity, and the amount in controversy exceeds $75,000.

22. Further, this action is within the Court's admiralty and maritime jurisdiction, pursuant to U.S. Constitution Article 3, Section 2, and 28 U.S.C. § 1333, and is brought pursuant to the Supplemental Rules for Admiralty and Maritime Claims.

23. Venue is appropriate in this district pursuant to 28 U.S. Code § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this district, and until recently, a substantial part of property that is the subject of the action, including the Vessel, remained situated in this district.

## FACTUAL ALLEGATIONS

### A. *Brief Bridge Background*

24. Construction of the Key Bridge began in 1972, and the Bridge opened to traffic in 1977. The 1.6 mile Bridge was designed to alleviate substantial traffic into and out of the City of Baltimore and to facilitate the transportation of "hazardous materials" which were prohibited in the tunnels.

25. The Key Bridge's western approach, which is located on Hawkins Point in the City of Baltimore, carried an estimated 11.5 million vehicles annually, and became a commute staple and local landmark to the City of Baltimore.

### B. *The Allision*

26. At approximately 12:45am, local time, on March 26, 2024, the Dali, a 985-foot long Neopanamax container ship built in 2015 by Hyundai Heavy Industries, took off from the Port of Baltimore, heading towards its next destination in Sri Lanka, where it was scheduled to arrive on April 22, 2024.

27. According to reports, less than an hour after the Dali left Baltimore's port, signs of trouble came when numerous alarms sounded indicating erratic power supply issues. On information and belief, the power supply problem was either not investigated or, if investigated, not fixed.

28. Subsequent reports note that around 1:24 AM, the ship's onboard data recorder captured multiple urgent alarms before it momentarily ceased recording, then resumed using an auxiliary power source.

29. At approximately 1:25am, it is believed that an electrical breaker, which fed most of the vessel's equipment and lighting unexpectedly tripped, which caused the first blackout (loss of electrical power). [5]

30. Upon information and belief, the loss of electrical power to the pumps required for its operation resulted in the main engine being automatically shut down, and the vessel lost main propulsion, meaning its propeller stopped and the rudder was unable to be moved.

31. Upon information and belief, the Dali crew was able to restore electrical power to the vessel, but, when the ship was less than a half a mile from the Bridge, a second electrical blackout occurred. [6]

32. Upon information and belief, the Dali's emergency diesel generator either did not start, or did not provide the Dali with emergency power sufficient to allow it to avoid an allision with the Key Bridge.

33. At approximately 1:28am, local time, the Dali crashed into the Bridge, causing the Bridge's immediate structural collapse into the harbor.

34. This catastrophic event resulted in the deaths of six Brawner workers and serious and permanent injuries to a seventh worker and halted all commercial traffic into and out of the Port of Baltimore.

---

[5] NTSB Report
[6] NTSB Report

33641222v.1

## C.     The Allision Was a Direct Result of Petitioners' Negligence

35.     In 2023, ocean carriers made approximately 1,800 discrete calls to the Port of Baltimore.[7] Each of these visits the carriers entered and exited the Port by going underneath the Key Bridge, meaning that in 2023 approximately 3,600 trips were made underneath the Key Bridge throughout the year.

36.     Until March 26, 2024, the Key Bridge had not been struck by any ships since 1980, meaning that even with conservative estimates of 1,500 annual visits, ships would have taken 130,000 trips underneath the Bridge prior to the disaster with the Dali.

37.     The negligence of the Petitioners is evident. The allision was a direct and proximate result of the Petitioners' carelessness, negligence, gross negligence, and recklessness, compounded by the unseaworthiness of the vessel.

38.     Further, based on available information, the Petitioners are believed to have:

    a.  Provided the Vessel with an incompetent crew that was inattentive to its duties;

    b.  Provided the Vessel with a crew that failed to comply with local navigation customs and/or usage;

    c.  Provided the Vessel with a crew that improperly navigated the Vessel prior to colliding with the Key Bridge;

    d.  Provided the Vessel with a crew that lacked proper skill;

    e.  Provided the Vessel with a crew that lacked proper training;

    f.  Otherwise failed to properly man the Vessel;

    g.  Failed to properly manage the Vessel and/or her crew;

---

[7] *Maryland Manual On-Line, A Guide to Maryland and its Government, Port of Baltimore*, available at https://msa.maryland.gov/msa/mdmanual/01glance/html/port.html.

    h. Failed to provide the Vessel with adequate policies and procedures;

    i. Failed to implement policies, procedures, and training to ensure the safe operation of the Vessel;

    j. Failed to properly oversee their fleet to ensure that the Vessel was being operated in accordance with company policies and procedures, principles of good seamanship, and in accordance with all applicable laws and regulations;

    k. Provided a vessel with unseaworthy equipment, systems, and appurtenances;

    l. Failed to properly maintain the Vessel in a reasonable manner;

    m. Failed to properly maintain and/or use the Vessel's systems and appurtenances;

    n. Failed to properly maintain and/or use the Vessel's engine;

    o. Failed to properly maintain and/or use the Vessel's propulsion system;

    p. Failed to properly maintain and/or use the Vessel's steering system;

    q. Failed to properly equip the Vessel;

    r. Failed to equip the Vessel with a properly functioning engine;

    s. Failed to equip the Vessel with an engine that was suitable and reasonably fit for its intended use;

    t. Failed to timely eliminate known or knowable hazards;

    u. Failed to timely rectify known or knowable deficiencies;

    v. Failed to inspect the Vessel; and/or

    w. Failed to comply with industry standards, customs, and practices;

39. The allision was a direct consequence of these and other failures, acts, or omissions by the Petitioners and the vessel, which may be shown at trial.

33641222v.1

D.     *The Workers' Compensation Impact of the Allision*

40.    As a direct result of the Dali's catastrophic allision of the Key Bridge, six Brawner workers are deceased, and one is severely and permanently injured.

41.    Zurich issued a policy of insurance under policy number WC 0380833-08 ("the Brawner Policy") to Brawner Builders Inc. providing insurance coverage for workers compensation, and insuring Brawner for certain losses subject to the terms of the Brawner Policy.

42.    Brawner supplies equipment and labor for many large-scale projects including bridge construction.

43.    On the Key Bridge, Brawner was assisting in bridge maintenance and had supplied equipment and labor for pothole repair when the incident occurred.

44.    The seven Brawner employees who were on the Bridge at the time of the accident were: Dorlian Cabrera, Carlos Estrella, Alejandro Fuentes, Jose Lopez, Miguel Luna, Sr, Maynor Sandoval, and Julio Suarez.

45.    Claimant has investigated and continues to investigate the work-related claims of each of the Brawner employees on the Bridge at the time of the accident.

46.    Claimant continues using its best efforts to identify the whereabouts of any and all family members and/or dependents for the remaining four workers killed in the accident.

47.    Luna's dependents have yet to file a workers' compensation claim with the Claimant or the Maryland Workers' Compensation Commission.

48.    Pursuant to Labor and Empl. §9-709(b)(3), they have two years from the date of accident, or until March 26, 2026, to file a claim and should not be limited by the September 24, 2024, filing deadline established in these proceedings.

49.    Once a claim is filed, Claimant intends to pay all workers' compensation benefits to which Luna's dependents are entitled to under the Act.

50. Claimant specifically reserves all rights to supplement and amend this filing to include benefits payable to Luna's dependents, once identified, on or before March 26, 2026.

51. Claimant hereby files an individual Claim Petition on behalf of deceased employee Luna.

52. Pursuant to Md. Lab. & Empl. § 9-901-903 *et. seq.*, Claimant has a direct right of action, and a right of reimbursement for the benefits payable to and on behalf of Luna and/or his dependents.

53. Claimant has a lien against any third-party recovery in the amount of benefits paid and the lien must be reimbursed first from any third-party recovery, less a prorated share of costs and attorneys' fees.

54. Claimant reserves all rights to a future credit, for any amount in excess of the past paid lien, recovered by the employee in a third-party action, against future compensation which the dependents may become entitled to pursuant to Md. Lab. & Empl. § 9-901-903 *et. seq.*

55. Petitioners' negligence is the direct and proximate cause of Luna's death. As a result of Petitioners' conduct, Claimant is obligated to pay worker's compensation benefits. Petitioners should be held accountable for their actions and Claimant should be reimbursed pursuant to its statutory rights.

## **REQUEST FOR RELIEF**

WHEREFORE, Claimant, BRAWNER BUILDERS INC. and ZURICH AMERICAN INSURANCE COMPANY, prays for judgment against Petitioners, GRACE OCEAN PRIVATE LIMITED and SYNERGY MARINE PTE LTD, as follows:

a. The full amount of Claimant's damages, including but not limited to its statutory lien reimbursement pursuant to Md. Lab. & Empl. §9-901-903 *et. seq.* as may be proven at trial;

b. Costs of suit;

    c. Attorney's fees;

    d. Pre-judgment and post-judgment interest as allowed by law;

    e. Injunctive relief;

    f. Punitive damages; and

    g. All other relief that this Court deems just and proper.


Dated: September 20, 2024          Respectfully submitted,

                                       */s/ Anthony J.M. Kikendall*
                                       Anthony J. M. Kikendall (21905)
                                       Robert M. Caplan (*pro hac vice*)
                                       CoraAnn M. Foley (*pro hac vice*)
                                       **WHITE AND WILLIAMS LLP**
                                       600 Washington Avenue, Suite 303
                                       Towson, Maryland 21204
                                       (443)-761-6500
                                       kikendalla@whiteandwilliams.com
                                       *Attorneys for Attorneys Brawner Builders, Inc.*
                                       *and Zurich American Insurance Company*

33641222v.1

## **CERTIFICATE OF SERVICE**

      In compliance with Supplemental Federal Rule F(5), I HEREBY CERTIFY that on the 20th day of, 2024, I electronically filed the foregoing pleading with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel who are CM/ECF participants.

                                                  */s/ Anthony J.M. Kikendall*

33641222v.1