<u>IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION</u>

| | |
|---|---|
| In the Matter of the Petition of | Docket No.: JKB 24-cv-941 |
| GRACE OCEAN PRIVATE LIMITED, as Owner of the M/V DALI, | **IN ADMIRALTY** |
| and | |
| SYNERGY MARINE PTE LTD, as Manager of the M/V DALI, | |
| For Exoneration from or Limitation of Liability | |

**<u>CLAIM BY BALTIMORE COUNTY PURSUANT TO SUPPLEMENTAL FEDERAL
RULE F(5) IN RELATION TO THE FRANCIS SCOTT KEY BRIDGE ALLISION</u>**

Specifically reserving all rights and defenses asserted in Claimant Baltimore County's (the "County" or "Claimant") accompanying Answer to Petitioners, Grace Ocean Private Limited's ("Grace") and Synergy Marine PTE LTD's ("Synergy" and, with Grace, the "Petitioners"), Petition for Exoneration from or Limitation of Liability (the "Petition"), the County hereby demands a jury trial and makes this claim pursuant to Rule F(5) of the Supplemental Rules for Admiralty or Maritime Claims against Petitioners as the owners, managers, and operators of the vessel M/V DALI (the "DALI") and, in support thereof, avers as follows:

**I.      INTRODUCTION**

1.      On March 26, 2024, at approximately 12:45 a.m. ET, the container ship DALI left its berth in the Port of Baltimore (the "Port") Seagirt Marine Terminal and began sailing down the Patapsco River and toward the Chesapeake Bay, bound for Colombo, Sri Lanka.

2.      The DALI's route was to take it under a 1.6 mile expanse of the Francis Scott Key Bridge (the "Key Bridge"), a passage made by approximately 1,800 ships, many of them similar in size to the DALI, each year.[1]  The DALI itself had passed under the Key Bridge not long prior.

3.      Weather conditions at the time of the DALI's departure were suitable for sailing, with no high winds or visual obstructions impacting the DALI's ability to navigate out of the Port.

4.      At approximately 1:25 a.m. ET, while approximately .6 miles—or three ship-lengths—from the Key Bridge and traveling at approximately 9 knots, the DALI suffered an electrical failure and lost electrical power to many of its key systems, including its steering pumps and most bridge equipment.  The power failure left the vessel with limited steering capability.

5.      Over the next few minutes, while the DALI drifted toward the Key Bridge supports in the Patapsco River, the crew, including the Petitioners agents, employees, superintendents and/or crew, struggled with the DALI's electrical systems in an effort to regain, and keep, power in key ship systems.

6.      At approximately 1:27 a.m. ET, the DALI's crew, in a last-ditch attempt to stop the out-of-control vessel, ordered the anchor dropped while the DALI was still in motion.

7.      At approximately 1:29 ET a.m. ET, the DALI crashed into the Key Bridge (the "Allision"), immediately causing its collapse (the "Collapse"), killing six individuals, destroying the Key Bridge completely, and freezing all ship traffic in and out of the Port.

8.      The allision and catastrophic collapse were preventable and a result of the Petitioners, their agents, employees, superintendents and crew, failing to adequately and properly

---

[1] https://msa.maryland.gov/msa/mdmanual/01glance/html/port.html

confirm the DALI's electrical system and engine were functioning properly and safely in advance of leaving the Port.

9.     As a direct and proximate result of the Petitioners' negligence, six people died, the Port was crippled, commerce was disrupted, and the public as well as governmental organizations in the vicinity of the Key Bridge, including the County, face years of recovery and rebuilding to return to something resembling normalcy.

10.     As a direct and proximate result of the Petitioners' negligence, the County has suffered significant damages, including damage to its property and the expenditure of costs to respond to the short-term and long-term impacts of the Allision and Collapse.

## II.     PARTIES

11.     Baltimore County is a body corporate and politic duly organized and existing by virtue of the laws of the State of Maryland.

12.     Baltimore County is a public governmental organization with the authority and responsibility to protect the interests and well-being of its residents, as well as its own property.

13.     Baltimore County has all the rights and powers of local self-government and home rule provided or implied by its Charter and by the Constitution and laws of the State of Maryland.

14.     Upon information and belief, Grace Ocean is a corporation organized and existing under the laws of Singapore with a registered office in that country.

15.     At all times relevant hereto, Grace Ocean was the registered owner of the DALI.

16.     Upon information and belief, Synergy is a corporation organized and existing under the laws of Singapore with its registered office in that country.

17.     At all times relevant hereto, Synergy was the manager of the DALI and conducted technical and crew management, training, and selection onboard the DALI, as well as assessments, operations, and maintenance on the vessel and its equipment, including its electrical and propulsion systems.

## III.     JURISDICTION AND VENUE

18.     The incident that gave rise to this claim occurred upon the navigable waters of the United States within the territorial waters of the State of Maryland, had an actual and potential impact on maritime commerce, involved a traditional maritime activity, and is subject to admiralty tort jurisdiction, pursuant to Fed. R. Civ. P. 9(h).

19.     This action is within the Court's admiralty and maritime jurisdiction, pursuant to U.S. Constitution Article 3, Sec. 2, and 28 U.S.C. §1333, and is brought pursuant to the Supplemental Rules for Admiralty and Maritime Claims.

20.     In addition, this claim is within the Court's diversity jurisdiction pursuant to 28 U.S.C. §1332(a) and (b), because the parties are in complete diversity, and the amount in controversy exceeds $75,000.

21.     Venue is appropriate in this district pursuant to 28 U.S. Code § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this district, and a substantial part of property that is the subject of the action, including the Patapsco River, is situated in this district.

## IV.     FACTUAL ALLEGATIONS

### A.     THE KEY BRIDGE IS A VITAL ECONOMIC AND TRANSPORTATION ARTERY BOTH WITHIN BALTIMORE COUNTY AND BETWEEN BALTIMORE COUNTY AND BALTIMORE CITY.

22.     The Key Bridge was constructed between 1972 and 1977 to alleviate the substantial traffic going in and out of Baltimore City and provide an alternative route for the transportation of hazardous materials that could not pass through the area's tunnels.

23.     The Key Bridge is part of Interstate 695, more commonly known as the Baltimore Beltway, a highway system of over 50 miles (located almost entirely in the County) that carries traffic from Interstate 95 around, and into, the County.

24.     The Key Bridge connects Baltimore, Maryland's most populous city, with the County.

25.     The eastern entrance to the Key Bridge, the section of I-695 in Dundalk, Maryland, is located on County land.

26.     Because the County surrounds Baltimore City, the Key Bridge is often the fastest and most direct route from the southeastern part of the County to the southwestern part of the County.

27.     Prior to the Collapse, approximately 35,000 vehicles crossed the Key Bridge each day.[2]

28.     The people in these vehicles included County employees traveling in connection with their County duties, individuals who live in the County, and individuals bringing goods and services into and out of the County.

29.     The latest estimates of the repair timeline for the Key Bridge suggest the rebuilt bridge will not be open for travel until 2028.[3]

**B.     THE DALI DESTROYS THE KEY BRIDGE.**

---

[2] https://www.reuters.com/world/us/baltimores-weary-commuters-face-traffic-nightmare-after-bridge-collapse-2024-03-26/#:~:text=About%2035%2C000%20vehicles%20used%20to,mother%2C%20in%20a%20phone%20interview.
[3] https://www.wmar2news.com/keybridgecollapse/plan-timeline-for-rebuilding-the-key-bridge

30.     On March 26, 2024, the DALI, a 947-foot-long[4] cargo ship, was loaded with over 56,000 metric tons of containerized cargo.[5]

31.     The ship, along with its cargo, displaced over 112,000 metric tons, almost 250,000,000 pounds, at the time of its departure from the Port.

32.     At approximately 1:25 a.m. ET, while approximately .6 miles—or three ship-lengths—from the Key Bridge and traveling at approximately 9 knots, the DALI suffered an electrical failure and lost electrical power to many of its key systems, including it steering pumps and most bridge equipment.

33.     Over the next few minutes, while the DALI drifted toward the Key Bridge, the crew, including Petitioners agents, employees, superintendents and/or crew, struggled with the DALI's electrical systems in an effort to regain, and keep, power in key ship systems.

34.     When the vessel was approximately .2 miles from the Key Bridge, the DALI once again lost electrical power.

35.     At approximately 1:27 a.m. ET, the DALI's crew, in a last-ditch attempt to stop the out-of-control vessel, ordered the anchor dropped while the DALI was still in motion.

36.     At approximately 1:29 ET a.m. ET, the DALI allided with pier no. 17 of the Key Bridge at 6.5 knots.

37.     Almost immediately, due to the DALI's incredible mass, six spans of the Key Bridge collapsed into the water and across the ship's bow.

38.     Seven maintenance workers who were working on the Key Bridge at the time of the Allision were trapped in their vehicles as they fell along with the Key Bridge.

**C.     THE COLLAPSE DEPOSITS TONS OF DEBRIS INTO THE SURROUNDING WATER.**

---

[4] As a point of reference, the tallest building in Maryland, the Transamerica Tower, stands just 529 feet tall.
[5] *Contact of the Containership Dali with the Francis Scott Key Bridge and Subsequent Bridge Collapse*, NTSB, May 14, 2024 (the "May 14 NTSB Report") at 1.

39.     The Collapse sent 50,000 tons of debris into the surrounding waterways.[6]

40.     The debris included huge chunks of steel, concrete, and rebar that sunk to the bottom of the Patapsco River, as well as smaller pieces of debris that floated along with the currents to other waters and the nearby shoreline.

41.     On information and belief, the debris also included contaminants—oil and gas from the roadway and vehicles, lubricants from the bridge, trash dropped by commuters that accumulated on the bridge—that mix with or float on the water.

42.     Both large chunks of debris and surface contaminants resulting from the Collapse reached County waterways and County property.

43.     For example, the Patapsco River received tons of debris and additional debris was detected and subsequently removed from Jones Creek.

44.     Large pieces of debris removed from the Patapsco River are currently being stored in the County at the Tradepoint Atlantic terminal in Sparrow's Point, Maryland.

45.     Surface contaminants drifted along the Patapsco into other County waterways and onto the County shoreline.

46.     The efforts to remove the debris and otherwise clean up and restore the waterways, including County waterways, are expected to continue for months.

47.     The long-term impacts of the Collapse and of the resultant debris and other substances discharged into the waterways and surrounding property of the County is still unknown.

**D.     THE ALLISION WAS A DIRECT RESULT OF PETITIONERS' NEGLIGENCE.**

---

[6] https://www.nab.usace.army.mil/Media/News-Stories/Article/3758726/large-flock-of-cranes-nibbles-at-key-bridge-wreckage/

48.     Weather conditions at the time were suitable for sailing, with no high winds or visual obstructions impeding the DALI's journey.

49.     In 2023, ocean carriers paid approximately 1,800 discrete calls to the Port.[8]  On each such visit, those carriers entered and exited the Port by going underneath the Key Bridge, meaning that in 2023 approximately 3,600 discrete trips were made underneath the Key Bridge throughout the year.

50.     Before March 26, 2024, no ship had struck the Key Bridge since 1980. Assuming only 1,500 ports of call at the Port every year (*i.e.*, 300 fewer calls than actually took place in 2023), ships would have taken approximately 130,000 trips underneath the Key Bridge prior to the Dali's allision.

51.     On March 25, about 10 hours before leaving the Port, the DALI experienced a blackout during in-port maintenance.[7]

52.     Despite Petitioners' efforts to restore reliable power, the DALI experienced a *second* blackout shortly afterwards.[8]

53.     With full knowledge of its failing electrical systems, the DALI still chose to leave the Port just a few hours after its multiple electrical failures.

54.     Predictably to the Petitioners and DALI crew, in light of the foregoing electrical failures, the DALI suffered a third blackout just minutes after leaving Port.

55.     When the vessel was approximately .2 miles from the Key Bridge, the DALI, for the fourth time, again lost electrical power.

56.     Thereafter, Petitioners failed to prevent the vessel from alliding with the Key Bridge.

---

[7] May 14 NTSB Report at 13.
[8] *Id*. at 14.

57.     The DALI's crew, including the Petitioners' agents and employees, were negligently trained, selected, and supervised by Petitioners.

58.     On information and belief, no tug was aiding the DALI at the time of the power loss because Petitioners, including their agents, employees, superintendents and crew, made the conscious decision to decline tug assistance through the main channel of the Key Bridge, despite knowledge of the repeated electrical failures.

59.     The DALI's crew were aware that the vessel was going to strike the Key Bridge but never took appropriate actions to prevent the allision and never even sounded an aural bell or alarm to alert those on the bridge of the imminent impact or took necessary and appropriate action to ensure the bridge was completely clear of people.

60.     Among other acts and omissions, and upon information and belief, Petitioners acted negligently by:

a.  Knowingly departing the Port with a defective electrical system;

b.  Failing to properly troubleshoot and diagnose defects with the electrical system, engine system, and propulsion system;

c.  Failing to utilize tug vessels through the Key Bridge's main span;

d.  Failing to divert DALI's route of travel when its engine lost power;

e.  Failing to equip the DALI with appropriate equipment to ensure that she could be navigated properly and that emergency authorities could be contacted at any time if necessary;

f.  Failing to timely contact emergency authorities;

g.  Hiring, training, and retaining a crew unfit to manage and operate the DALI;

h.  Failing to sound an aural bell or alarm to alert those on the Key Bridge of the imminent impact in a timely manner;

i.  Attempting to navigate without electrical power and adequate propulsion;

j.  Providing the DALI with an incompetent crew that was inattentive to its duties;

k.  Providing the DALI with a crew that failed to comply with local navigation customs and/or usage;

l.  Providing the DALI with a crew that improperly navigated the DALI prior to alliding with the Key Bridge;

m.  Providing the DALI with a crew that lacked proper skill;

n.  Providing the DALI with a crew that lacked proper training;

o.  Otherwise failing to properly man the DALI;

p.  Failing to properly manage the DALI and/or her crew;

q.  Failing to provide the DALI with adequate policies and procedures;

r.  Failing to implement policies, procedures, and training to ensure the safe operation of the DALI;

s.  Failing to properly oversee their fleet to ensure that the DALI was being operated in accordance with company policies and procedures, principles of good seamanship, and in accordance with all applicable laws and regulations;

t.  Providing the DALI with unseaworthy equipment, systems, and appurtenances;

u.  Failing to properly maintain the DALI in a reasonable manner;

v.  Failing to properly maintain and/or use the DALI's systems and appurtenances;

w.  Failing to properly maintain and/or use the DALI's engine;

x.  Failing to properly maintain and/or use the DALI's propulsion system;

y.  Failing to properly maintain and/or use the DALI's steering system;

z.  Failing to properly equip the DALI;

aa.  Failing to equip the DALI with a properly functioning engine;

bb.  Failing to equip the DALI with an engine that was suitable and reasonably fit for its intended use;

cc.  Failing to timely eliminate known or knowable hazards;

dd.  Failing to timely rectify known or knowable deficiencies;

ee.  Failing to inspect the DALI;

ff.  Failing to comply with industry standards, customs, and practices; and/or

gg. Otherwise causing the Allision.

61.     In addition to the failures, acts, or omissions by, or on behalf of, Petitioners, alleged herein, the County expressly adopts and incorporates as though set forth fully herein the allegations against Petitioners in Paragraphs 51 through 127 of the United States' Claim and Answer to Petitioners' Grace Ocean Private Limited and Synergy Marine PTE LTD's Petition for Exoneration From or Limitation Of Liability [ECF No. 82], filed in this action on September 18, 2024.

62.     The Allision was a direct and proximate result of these, and other, failures, acts, or omissions by, or on behalf of, Petitioners.

**E.     THE COUNTY RESPONDS TO THE COLLAPSE.**

63.     Immediately after the Allision and Collapse, numerous local agencies were called upon to assist in the search and rescue efforts, including federal, Maryland state, and local government agencies.

64.     Upon information and belief, the search and rescue efforts were coordinated by the State of Maryland (the "State") and the United States Coast Guard (the "USCG").

65.     The Baltimore County Police Department ("County PD") and Baltimore County Fire Department ("County FD") were some of the first emergency responders on-site.

66.     Just hours after the Allision and Collapse, County PD officers responded to requests for assistance from the Maryland Transportation Authority ("MDTA") to participate in search and rescue efforts for the individuals that fell from the Key Bridge.  The County's roles included serving as divers with the search-and-rescue teams and securing the water around the location of the Collapse with County boats.

67. The County, also at the request of the MDTA and/or the USCG, provided County helicopters and aircrews to monitor and secure the surrounding area, and a mobile command post to coordinate a response.

68. County PD officers secured the entrances to the Key Bridge to prevent further vehicle access.

69. Upon information and belief, the County FD assisted in the casualty collection efforts, providing ambulances and personnel.

70. County PD also provided crisis intervention services to victims and other first responders.

71. Rescue efforts by the County and other governmental agencies were coordinated on, based from, or launched from, County property.

72. The immediate search-and-rescue efforts included hundreds of County person-hours and the use of County equipment and vehicles, including boats and helicopters, among others.

73. As a result of its role in the search and rescue efforts, the County incurred significant costs, including unexpected overtime costs and wear and tear on its equipment and vehicles.

74. After the immediate search-and-rescue efforts had concluded, the USCG assigned the County a role in establishing and monitoring the Key Bridge Security Zone (the "Security Zone"), a secured area in the Patapsco River that surrounds the location of the Collapse.

75. The County participated in Security Zone planning and development, and contributed personnel and boats to assist in securing the Security Zone from unauthorized boat traffic.

76.     The County PD were still actively involved in maintaining the Security Zone through, at least, June 2024.

77.     As a result of its role in Security Zone, the County incurred significant costs, including unexpected overtime costs and wear and tear on its equipment and vehicles.

78.     Additionally, County personnel and vehicles have been involved in the monitoring and removal of debris from County property and waterways.

79.     In the immediate aftermath of the Collapse, County PD personnel were asked to monitor the waterways for fuel and oil contaminants.

80.     Later, County PD personnel assisted the USCG in the removal of large debris from Jones Creek by the USCG.

81.     As a result of its role in the management and removal of debris, the County incurred significant costs, including unexpected overtime costs and wear and tear on its equipment and vehicles.

**F.      THE COLLAPSE HAS SUBSTANTIALLY HARMED THE COUNTY.**

82.     The County possesses a strong legal interest in the integrity, safety, health, and accessibility of the public waterways within its jurisdiction, including the Patapsco River and Jones Creek.   The County invests significant financial resources and staff resources in the protection and maintenance of the quality of such waterways, including by, among other things, implementing best management practices and engaging in impervious surface restoration to control pollution from harming such waterways.

83.     In addition, the County possesses a strong legal interest in the safety, health, and well-being of the population within its jurisdiction.   The County invests significant financial resources and staff resources in the protection of the public health and safety, including by, among other things, operating agencies such as County PD, County FD, the Baltimore County

Department of Health, and others, which serve to protect the public safety, health, and well-being.

84.     Accordingly, by virtue of its responsibility and authority to protect the public health and safety and to maintain the quality and integrity of public waterways within the County, including the Patapsco River and Jones Creek, the County possesses a proprietary interest in such waterways and associated shorelines, which have been damaged as a result of the Allision and Collapse.

85.     The Allision and Collapse has deposited thousands of tons of debris and other substances in the surrounding waterways.

86.     The County, at great expense and effort, has developed its waterways and shorelines to benefit its residents and businesses and to provide for the public good.

87.     The County, at great expense and effort, maintains its waterways and shorelines for the benefit of its residents and businesses and to provide for the public good.

88.     The debris and other substances resulting from the Allision and Collapse has contaminated or otherwise damaged those waterways and shorelines.

89.     The County has already incurred significant costs associated with monitoring the integrity and accessibility of those waterways and in connection with the removal of debris from its shorelines and water, and expects to continue to incur costs and suffer such losses until the consequences of the Collapse are fully contained and resolved.

90.     Additionally, based on recent developments, the proposed efforts to rebuild the Key Bridge are expected to further impact the County's waterways and shoreline.[9]

---

[9] Maryland Transportation Authority Water Quality Certification Request, July 1, 2024, at 110.

91.     The rebuilding process is still in its early stages and the full impacts and damages resulting from that process will not be known for some time, but the County reasonably believes and therefore alleges that such impacts and damages will be significant.

92.     Further, as a result of the Allision and Collapse, trade in the Port of Baltimore, one of the economic centers of the region, has ground to a halt.

93.     A 2023 Economic Impact Study produced by the Maryland Port Administration (the "2023 Port Study") found that there were over 20,000 "direct" jobs generated by activities at the Port, and another 7,000 "indirect" jobs tied to the Port's activities.[10]

94.     Of those employees holding "direct" jobs, more live in the County—32.8%— than any other county or city.[11]

95.     The 2023 Port Study determined that the Port's activities substantially impacted County tax revenues, and that the Port paid over $280 million in taxes to county and local governments in Maryland.[12]

96.     As a result of the Allision and Collapse and its impact on the Port, the County has suffered, and will continue to suffer, significant damages.

97.     Separately, the Key Bridge and I-695 served as a key component of the County's transportation network.

98.     As a result of the Allision and Collapse and its impact on the area's transportation network, County employees and residents are forced to endure longer commutes over greater distances, which accordingly puts additional, unexpected stress and wear-and-tear on County roads.

---

[10] 2023 Port Study at 4.
[11] *Id.* at 19.
[12] *Id.* at 32.

99.     As a result of the Allision and Collapse and its impact on the area's transportation network, County employees, residents and agencies are forced to spend significant time and resources reorganizing their operations.

100.    This reorganization includes revising County evacuation plans which are critical to the safety and security of the County's residents and relied on the Key Bridge.

101.    More generally, and on a day-to-day basis, the loss of the Key Bridge has negatively impacted County Residents' safety and security by, among other things, making it more difficult to access medical care in a timely manner and increasing resident exposure to hazardous materials normally transported out of the area via the Key Bridge.

102.    In sum, Petitioners have harmed the County through the damage and destruction of its property and other public property, the damage to its residents and the public health and safety, and damage to County agencies.  This damage includes, but is not limited to:

   a. Costs associated with the obstruction of the Patapsco River, which directly resulted from the Allision;

   b. Costs associated with the interruption of transportation through the County;

   c. Costs associated with an increased need for road maintenance and traffic management, to account for the increased traffic traveling through the County which previously would have traveled over the Key Bridge;

   d. Costs associated with increased and substantial expenditures relating to the protection of public welfare, including but not limited to increased expenditures on police, fire, and other public employees' overtime;

   e. Costs associated with increased and substantial expenditures relating to the County's role in the search-and-rescue efforts following the Collapse;

   f. Costs associated with increased and substantial expenditures relating to the County's role in monitoring and securing the location of the Collapse;

   g. Costs associated with the loss of taxes and fees levied on businesses, including the import and export of trade goods, the loading and unloading of cargo from vessels, and in general, the operation of trade at the Port, which has been significantly curtailed and reduced by the inability of ships to move in and out of the Port;

h.  Costs associated with the County's loss of property and income tax revenue due to the substantial and foreseeable economic interruption caused by the allision;

i.  Costs associated with the monitoring and cleanup of debris and other substances that has been or will be deposited into the environment and on property, waterways, and shorelines maintained by the County and in which the County possesses a proprietary interest as a result of the Allision;

j.  Costs associated with the monitoring and cleanup of debris and other substances that has been or will be deposited into the environment and on property, waterways, and shorelines maintained by the County and in which the County possesses a proprietary interest as a result of the efforts to rebuild the Key Bridge.

k.  Costs associated with monitoring, abating, and otherwise suffering the presence of potentially hazardous substances and other potential pollutants that have been stockpiled as a direct result of the closure of the Port, resulting in the release or threatened release of hazardous substances, fugitive dust, and other contaminants into the environment and on property, waterways, and shorelines maintained by the County and in which the County possesses a proprietary interest, resulting in a public nuisance and trespass;

l.  Costs associated with the public nuisance suffered by the County and its residents, who have had their enjoyment and free and safe use of public resources, including the Patapsco River, Jones Creek, and associated waterways and shorelines interrupted; and

m.  Other damages and losses to the County's legal and proprietary interests that are daily accruing as a direct and proximate result of the Allision and Collapse.

103.  Additionally, the County reasonably anticipates that the State of Maryland will require or request financial or other assistance from the County in connection with its efforts to rebuild the Key Bridge.  The County reserves the right to assert such costs.

104.  The foregoing categories of damage and loss are the direct and proximate result of Petitioners' negligence, and Petitioners must be held accountable for their actions, which continue to impact the County and its residents today.

### FIRST CAUSE OF ACTION AGAINST PETITIONERS
### NEGLIGENCE UNDER THE GENERAL MARITIME LAW

105.  The County realleges and reaffirms each and every allegation set forth in paragraphs 1 through 104 as if fully restated in this cause of action.

106.    When a moving vessel allides with a stationary object, there is a heavy presumption that the vessel was at fault for the allision. This presumption is known as the "*Oregon*" Rule. *See The Oregon*, 158 U.S. 186 (1895); *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 (5th Cir. 1977) ("The common sense behind the rule makes the burden [to rebut the presumption] a heavy one. Such accidents simply do not occur in the ordinary course of things unless the vessel has been mismanaged in some way.").

107.    The *Oregon* presumption applies here because the DALI, a power-driven vessel then underway and making way, struck the stationary Key Bridge.

108.    During the days or weeks preceding the voyage that began (and ended) on March 26, 2024, because of the negligence alleged, and other negligence to be proven, Petitioners failed to ensure that the DALI could be and/or was safely operated while leaving the Port. *See The Oregon*, 158 U.S. 186 (1895).

109.    At the time of the Allision and during the critical minutes preceding the Allision, as a result of the negligence alleged, and other negligence to be proven, the DALI failed to remain in the navigable channel and clear of the Key Bridge supports.

110.    At all times relevant hereto, the DALI ultimately was in the control of the *in personam* Petitioners by and through their agents, employees, servants, and/or the ship's master.

111.    At all times relevant hereto, Petitioners owed the County a legal duty under maritime law to maintain the DALI in a seaworthy condition and in good working order to safely ply the navigable waters of the Port and the Patapsco River.

112.    Petitioners owed the County a legal duty under maritime law to observe the standards of good and prudent seamanship, to exercise reasonable care when operating and navigating their vessel, and to avoid the resulting Allision.

113.     Petitioners owed the County a legal duty under maritime law to adequately and competently train and supervise the DALI's crew, and otherwise oversee the DALI.

114.     Petitioners' violations of statutes, rules, and regulations regarding avoiding the loss of steering and propulsion, and regaining the same, means that the rule from *The Pennsylvania*, 86 U.S. (19 Wall.) 125 (1874), applies:

> when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case, the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute.

115.     This rule of admiralty, which has been the law of the United States since 23 years *after* the Limitation of Liability Act of 1851, 46 U.S.C.§§ 30501 *et seq.*, upon which Petitioners now rely, encompasses allisions, and applies to the present case. *See* Thomas J. Schoenbaum, 2 Admiralty & Mar. Law § 14:4 (6th ed.) ("The rule applies to collisions of vessels underway, allisions, collisions between a vessel and a stationary object, and vessel strandings.")

116.     The Allision was caused by and occurred as a result of the acts, omissions, negligence, faults, recklessness, lack of due care, and breaches and violations of duties and law by the DALI and her crew, and by Petitioners, and/or their principals, agents, and/or employees.

117.     The Allision was caused by and occurred as a result of the aforementioned unseaworthiness of the DALI.

118.     As a direct and proximate result of these, and other, failures, acts, or omissions by, or on behalf of, Petitioners, Petitioners are jointly and severally liable to the County for the full amount of its damages.

## SECOND CAUSE OF ACTION AGAINST PETITIONERS
### PUBLIC NUISANCE

119.    The County realleges and reaffirms each and every allegation set forth in paragraphs 1 through 118 as if fully restated in this cause of action.

120.    The County brings this cause of action in its governmental capacity.  This claim is premised on the County's responsibility for, among other things, the preservation and maintenance of its property and public waterways and shorelines within the County, the safety, health, and welfare of its residents, the economic wellbeing of its residents and businesses, and maintaining the flow of commerce into, out of, and within, its borders.

121.    As a direct and proximate result of failures, acts, or omissions by, or on behalf of, Petitioners, Petitioners created a danger and hazard by, among other things, causing harm to the County's property and public waterways and shorelines within the County, the safety, health, and welfare of the County's residents, the County's residents' economic wellbeing, and commerce in the area, thereby creating a public nuisance.

122.    Petitioners are liable to the County for all costs, damages, and disbursements proximately resulting from the creation of this public nuisance.

## V.    REQUEST FOR RELIEF

**WHEREFORE,** Claimant, Baltimore County, prays for judgment against Petitioners, Grace Ocean Private Limited and Synergy Marine PTE LTD, as follows:

a.    The full amount of the County's damages as may be proven at trial;

b.    Costs of suit;

c.    Attorneys' fees;

d.    Pre-judgment and post-judgment interest as allowed by law;

e.    Injunctive relief;

f.      Abatement of a public nuisance and other appropriate equitable relief;

g.      Punitive damages;

h.      All other relief that this Court deems just and proper.

Dated: September 24, 2024

Respectfully submitted,

James R. Benjamin, Jr.
County Attorney

By:___*James R. Benjamin, Jr.*_____

**BALTIMORE COUNTY OFFICE OF LAW**
James R. Benjamin, Jr. (Bar No. 27056)
jrbenjamin@baltimorecountymd.gov
Jennifer R. Frankovich (Bar No. 26052)
jfrankovich@baltimorecountymd.gov
401 Washington Avenue, Suite 219
Towson, Maryland 21204
Tel. (410) 887-4420
Fax. (410) 296-0931

**BEKMAN, MARDER, HOPPER, MALARKEY &
PERLIN, L.L.C.**
Paul D. Bekman (Bar No. 00019)
bekman@mdtrialfirm.com
1829 Reisterstown Road, Suite 200
Baltimore, MD 21208
Tel. (410) 539-6633
Fax.: (410) 625-9554

**GRANT & EISENHOFER P.A.**
Kyle J. McGee (*pro hac vice* forthcoming)
kmcgee@gelaw.com
Kevin W. Boyle (*pro hac vice* forthcoming)
kboyle@gelaw.com
123 S. Justison Street
Wilmington, DE 19801
Tel.: (302) 622-7000
Fax.: (302) 622-7100

*Attorneys for Claimant Baltimore County*

21

## <u>CERTIFICATE OF SERVICE</u>

In compliance with Local Rule 102.1(c), I hereby certify that on the 24th day of

September, 2024, I electronically filed the foregoing pleading with the Clerk of Court by using

the CM/ECF system, which wills end notice of electronic filing to all counsel who are CM/ECF

participants.

/s/
Paul D. Bekman (Bar No. 00019)
Attorney for Claimant Baltimore County