### UNITED STATES DISTRICT COURT
### DISTRICT OF MARYLAND
### NORTHERN DIVISION

| | |
|---|---|
| In the Matter of the Petition<br><br>of<br><br>GRACE OCEAN PRIATE LIMITED, as<br>Owner of the M/V DALI,<br><br>and<br><br>SYNERGY MARINE PTE LTD, as Manager<br>of the M/V DALI,<br><br>for Exoneration from or Limitation of Liability | Docket No. JKB 1:24-cv-941<br><br>*IN ADMIRALTY* |

### CLAIM BY HUSSAIN ALI SAEED AL DOSARIY PURSUANT TO SUPPLEMENTAL FEDERAL RULE F(5) IN RELATION TO THE KEY BRIDGE ALLISON

Claimant, Hussain Ali Saeed Al Dosariy, respectfully submits these claims arising from the March 26, 2024, collapse of the Francis Scott Key Bridge.

Claimant reserves all rights to proceed at law under 28 U.S.C. § 1333(1) on all claims and issues, against Petitioners and any other party, in a forum of their choice.

### PRELIMINARY STATEMENT

1. On a normal, tempered evening, with a temperature of 39 degrees Fahrenheit, wind speeds at five miles per hour, and no atmospheric disturbances or visible impediments, at precisely 12:45 AM local time on March 26, 2024, the container ship Dali embarked from the Port of Baltimore and set sail for the Chesapeake Bay.

2. The path the Dali was to take-down the wide Patapsco River, under the 1.6-mile expanse of the Francis Scott Key Bridge (the "Key Bridge"), and out to the Chesapeake Bay, was one that

thousands of large container ships had taken before without incident. Every year, ocean carriers pay approximately 1,800 discrete calls to the Port of Baltimore. On each such visit, they enter the Port by going underneath the Key Bridge, and leave the Port the same way, meaning that boats pass under the Key Bridge approximately 3,600 times each and every year. Before March 26, 2024, no ship had struck the Key Bridge in over 40 years.

3.   Approximately twelve minutes after leaving its dock, the Dali began to make a large arc, turning toward the Key Bridge. Reporting has indicated that at approximately 1:24 AM, local time, the Dali's onboard data recorder-obtained by the National Transportation Safety Board ("NTSB")-recorded audio from the boat indicating "numerous aural alarms." The onboard data recorder briefly stopped recording, and then turned on again, using the ship's redundant power source.[1]

4.   Video shows what occurred: the Dali, only minutes after leaving port, suddenly lost power at about 1:25 AM, local time. Adrift, and moving at approximately seven knots, with no sufficient power to steer, it sluiced its way toward the Key Bridge.

5.   At approximately 1:28 AM, local time, the Dali slammed into the bridge, causing the bridge's immediate collapse, killing at least six individuals, destroying Baltimore property, and bringing the region's primary economic engine to a grinding halt. The impact of this disaster will be felt for years, and indeed, for the rest of the lives of the families of the people killed as a result of Petitioners' conduct.

6.   None of this should have happened. Reporting has indicated that, *even before leaving port,* alarms showing an inconsistent power supply on the Dali had sounded. The Dali left port anyway, despite its clearly unseaworthy condition.

---

[1] https://www.cbsnews.com/news/francis-scott-key-bridge-collapse-timeline-911-call-dali-cargo-ship-mayday-maps-construction-workerrecovery/#:~:text=Around%201:30%20a.m.%20on%20Tuesday,%20Baltimore's%20Francis%20Scott

7. This disaster was wholly preventable by the Dali's officers. Reports indicate that alarms signaling erratic power supply had been activated even before the Dali's departure, obviously signifying its unfit state for voyage. Nevertheless, the officers directed the crew to leave port, a decision marked by their flagrant disregard for human life and the economic health of the area, including the Claimant. This decision by the officers directing the Dali was made in reckless disregard for the lives that were lost and the livelihoods that were irreversibly damaged.

8. Six days after the disaster that they caused, before all of the bodies of those who were lost were even recovered, Petitioners invoked the jurisdiction of this Court, asserting that they owe nothing for the lives and property they destroyed.

9. Claimant contracted with Neom Logistics to transport his two brand new vehicles from the United States to Saudia Arabia, for a port-to-port transport.

10. Neom logistics contracted with A.P. Moller-Maersk for a spot booking to transport Claimants goods to the final destination of Riyadh, Saudia Arabia.

11. This action seeks reimbursement of individual costs incurred by Claimant for loss of property and damages.

**PARTIES**

12. Claimant, Hussain Ali Saeed Al Dosariy, is a citizen and resident of McLean, Virgina, who brings loss of property claims.

13. Petitioner Grace Ocean Private Limited (hereinafter "Grace") is a Singapore-based corporation and the registered owner of the MN DALI (the "Dali" or the "Vessel") at all times relevant hereto. On information and belief, Grace, conducted vessel and crew management, training and selection onboard the Dali, as well as assessments, operations, and maintenance on

the vessel and its equipment, including its electrical and propulsion systems. The officers on the Dali at the time of the disaster were actual and apparent agents of the owner of the vessel.

14. Upon information and belief, Synergy Marine Pte Ltd ("Synergy") is a corporation organized and existing under the laws of Singapore with its registered office in Singapore and was the manager of the Vessel. Upon information and belief, Synergy was responsible for, among other things, manning and victualing the Vessel; procuring and providing deck, engine, and cabin stores; maintenance, monitoring, and repairs of the Vessel's hull, engines, electrical systems, and operating navigational systems and devices; provisioning of spare parts, maintenance and repairs for the Vessel; and communicating with the officers and crew, the Owner and the Vessel's time charterers at all times relevant hereto. The officers on board the Dali were acting as the actual and apparent agents of Synergy at the time of this tragedy.

15. The officers on board the Dali, all agents of the Petitioners, made crucial decisions that directly led to this allision. These reckless decisions established that Grace and Synergy failed to hire, train, monitor, instruct, or discipline these officers who so recklessly disregarded the most fundamental rules of navigation.

## JURISDICTION AND VENUE

16. This Court has maritime jurisdiction because Claimants' claims arise from a cargo vessel allision upon the Patapsco River, navigable waters of the United States and Claimant suffered damages by loss of property in these waters. In addition, or alternatively, there is subject matter jurisdiction under the Admiralty Extension Act, 46 U.S.C. § 30101, in that a vessel on navigable waters caused injury to Claimant on land.

17. This action is within this Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) and (d), because the parties are in complete diversity, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

18. In addition, this action is within the Court's admiralty and maritime jurisdiction, pursuant to U.S. Constitution Article 3, Section 2, and 28 U.S.C. § 1333.

19. Venue is appropriate in this district pursuant to 28 U.S. Code§ 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this district, and a substantial part of property that is the subject of the action, including the Vessel, is situated in this district.

## FACTUAL ALLEGATIONS

### *The Key Bridge*

20. Before its destruction, the bridge crossed the Patapsco River between Hawkins Point and Sollers Point and was the third-longest continuous truss bridge in the world. The bridge was a primary route for transporting hazardous cargoes to and from the Port of Baltimore.

21. The Francis Scott Key Bridge carried Interstate 695 traffic over the Patapsco River and was a critical component of the United States' east coast transportation infrastructure.

22. Upon information and belief, because the Key Bridge was constructed in the 1970's, the bridge's design was only intended to protect it from strikes by cargo ships that were constructed during that period. Since the 1970's, however, cargo ships, like the Dali, have more than doubled in size. As every experienced large vessel officer knew, the Key Bridge was not designed nor improved to withstand allisions with these larger vessels.

23. Likewise, the officers of the Dali knew, with just one glance at the Key Bridge, that it was woefully unprotected from an impact with their vessel. The Dali's officers also knew, on March

26, 2024, that their vessel had to be running perfectly to safely navigate under the Key Bridge. Tragically, they also knew it was not running perfectly, or even operational, and would be unable to avoid an impact with the Bridge in the narrow channel without all of its systems working well.

24. Upon information and belief, the Key Bridge's susceptibility to heavy ship strikes were widely known to the maritime community, including the Petitioners and their agents. On numerous occasions, for example, these concerns were openly discussed at meetings of the Baltimore Harbor Safety and Coordination Committee, a committee consisting of the Maryland Transportation Authority, the U.S. Coast Guard, and civilian ship piloting organizations that discussed any safety issues regarding the Baltimore Harbor. Included in the committee was a vessel captain, Joseph Smith, who raised this problem many times, reflecting that this was the common knowledge of all large vessel operators that utilized the Port of Baltimore. Upon information and belief, the minutes of these discussions have been publicly available for many years. Moreover, this knowledge was known by the Petitioners and their agents, the officers of the Dali, on March 26, 2024.

25. At the time of the allision, the Dali was a seagoing vessel at the beginning of its voyage under 46 U.S.C. § 30524. The master of the Dali committed numerous reckless and negligent acts prior to the disaster, each of which is imputable to Petitioners as a matter of law.

***The Dali***

26. At approximately 12:45 AM, local time, on March 26, 2024, the Dali, a 985-foot long Neopanamax container ship built in 2015 by Hyundai Heavy Industries, unmoored from the Port of Baltimore. Its next port of call was to be Sri Lanka, where it was scheduled to arrive by April 22, 2024.

27. Reporting has indicated that hours before departing alarms went off on the Dali's refrigerated containers, showing that the Dali had been experiencing an inconsistent power

supply.[2] On information and belief, the power supply problem was either not investigated or, if investigated, not fixed. Approximately twelve minutes after leaving its dock, the Dali began to turn toward the Key Bridge. Reporting has indicated that shortly thereafter, at approximately 1:24 AM, local time, the Dali's onboard data recorder recorded audio of "numerous aural alarms." The onboard data recorder then briefly stopped recording, and then turned on again, using a redundant power source.[3]

28. On information and belief, this redundant power source was not substantial enough to allow the crew of the Dali to regain control over the ship.

29. On information and belief, the Dali had suddenly lost power at about 1:24 AM, local time. Adrift, and moving at approximately seven knots, without sufficient power for steering, it drifted toward the Key Bridge.

30. Upon information and belief, the Dali's emergency diesel generator either did not start, or did not provide the Dali with emergency power sufficient to allow it to avoid alliding into the Key Bridge.

31. At approximately 1:28 AM, local time, the Dali slammed into the bridge, causing the bridge's immediate collapse into the harbor. Six people were killed, and all or nearly all commercial traffic into and out of the Port of Baltimore ceased.

***The Dali—Electrical Systems***

---

[2] Eric Tucker, *et al., Ship that caused bridge collapse had apparent electrical issues while still docked, AP source says,* Associated Press (April 15, 2024), *available at* https://whyy.org/articles/baltimore-bridgecollapse-ship-electrical-issues/

[3] https://www.cbsnews.com/news/francis-scott-key-bridge-collapse-timeline-911-call-dali-cargo-ship-mayday-maps-construction-worker-recovery/#:~:text=Around%201:30%20a.m.%20on%20Tuesday,%20Baltimore's%20Francis%20Scott

32. The Dali generates electrical power using four main diesel generators (Diesel Generators 1, 2, 3, and 4) and one emergency backup diesel generator. These generators create high voltage electricity (6,600 Volts) that is distributed from the vessel's High Voltage Bus.

33. The High Voltage Bus is the Primary electrical source supplying two identical transformers: Transformer 1 and Transformer 2. Transformer 1 and Transformer 2 are "step down transformers" that convert high voltage electricity energy to low voltage electricity (440 Volts), which is then distributed ship-wide via a Low Voltage Bus, which is the Secondary side of the transformer.

34. Both high and low voltage electricity is required to power critical components on the Dali, such as the main propulsion engine lubricating oil pumps and the main engine cooling pumps. These pumps run on high and low voltage, respectively. If they are denied electrical power, the main propulsion engine is designed to shut down to prevent damage to its components.

35. On either side (Primary side and Secondary side) of the Dali's Transformer 1 are two circuit breakers: High Voltage Breaker 1 and Low Voltage Breaker 1, respectively. Similarly, on either side (Primary side and Secondary side) of Transformer 2, there are two circuit breakers: High Voltage Breaker 2 and Low Voltage Breaker 2, respectively.

36. The purpose of these breakers is to interrupt electrical pathways when the current (amperage) passing through the breaker is above the circuit breaker's designed limit. These circuit breakers "trip" when an over current condition is sensed to protect the ship's wiring from overheating.

37. A *low* voltage condition will also cause High Voltage Breaker 1 or 2 or Low Voltage Breaker 1 or 2 to "trip," preventing equipment damage. A low voltage condition can damage

equipment requiring a constant, steady source of electrical energy for proper operation. To prevent such damage, voltage sensing devices are integrated into the Dali's distribution system.

38. Transformers 1 and 2 on the Dali are redundant, meaning only one transformer needs to be online to power the vessel. The Dali's Integrated Control Management System ("ICMS") can be configured so that one transformer comes online automatically if the other ceases operation for whatever cause. The system can also be operated in manual mode, as it was on the date of the disaster, which requires a crewmember to engage the controls to energize the offline transformer.

*The Dali—Loss of Power*

39. Just hours prior to departure, the Dali suffered a complete electrical blackout. At that time, the vessel was running solely on Transformer 2 and was powered by Diesel Generator 2.

40. The blackout allegedly occurred after a Dali crewmember improperly closed an inline engine exhaust damper in the diesel engine driving Diesel Generator 2. This prevented the venting of exhaust gases, which, when detected, resulted in the automatic shutdown of the engine and Diesel Generator 2.

41. When the engine shutdown was detected, High Voltage Breaker 2 and Low Voltage Breaker 2 opened or "tripped" automatically. The opening of the breakers interrupted the flow of electrical current in the vessel's electrical system as designed, causing the blackout. Diesel Generator 3 then came online and re-supplied power to the High Voltage Bus, making up for Diesel Generator 2's absence.

42. In response to the blackout, Dali's crewmembers closed High Voltage Breaker 2 and Low Voltage Breaker 2. This restored electrical power to the ship's electrical distribution system and the generating source was now Diesel Generator 3.

43. Shortly thereafter, however, Diesel Generator 3 experienced a loss of fuel pressure and, as a result, *its* breaker opened. This caused a second blackout due to the ensuing loss of electrical power to the High Voltage Bus and then, loss of the ship's electrical power.

44. On information and belief, Diesel Generator 3 came offline because a defective pneumatic pump did not provide the generator with sufficient fuel. Notably, the Dali's original fuel oil system was re-designed by Petitioners in approximately 2020. That re-design included the installation of a "flushing" pump to provide fuel to the Diesel Generators. The flushing pump, however, was not manufactured to be a primary fuel source for a diesel generator. As a result, it lacked important safety features, such as the ability to automatically re-start after a power failure. As a back-up to the flushing pump, Petitioners also installed the pneumatic pumps, which could only provide intermittent fuel to the generators.

45. In re-engineering their fuel oil system in this fashion, Petitioners intentionally removed vital redundancies from their vessel's electrical and propulsion systems for the purpose of saving money.

46. During the Dali's pre-departure blackout, the crew allegedly realized that Diesel Generator 2's exhaust damper was closed. When the crew opened the damper, Diesel Generator 2 came online again, providing the needed power to the High Voltage and Low Voltage busses.

47. The Dali never notified the Coast Guard of the two vessel-wide blackouts, in violation of applicable regulations, including 46 C.F.R. § 4.05-1. What is more, in an improper response to the power losses, the Dali switched the vessel's operative transformer from Transformer 2 to Transformer 1 prior to departing.

48. Transformer 1 had not been used for several months and, in fact, was known by the Dali to be damaged. Intentional reliance on a damaged and infrequently used transformer was not only a clear breach of industry standards but incredibly dangerous.

***The Dali—Vibrational Issues***

49. The Dali had a longstanding problem with excessive vibrations which had damaged numerous engineering systems, including critical electrical systems in both the engine control room and the transformer room.

50. The Dali had a well-recorded history of severe and dangerous vessel vibration issues, which directly affected its electrical system and rendered the vessel entirely unseaworthy. These defects were known to Petitioners before departure for Sri Lanka, but they departed anyway. Petitioners' reckless decision to leave berth in the face of these dangerous deficiencies was motivated by profit.

51. Post-incident inspections of the vessel revealed extensive evidence of damage to the vessel caused by excessive vibration and haphazard methods to try and contain it. The vessel's electrical transformers were crudely secured using steel braces, which themselves were damaged by vibration. Written notations regarding vibration were observed in the vessel's bow thruster room and within its vessel logs and records. Loose cable wires and hardware were observed within the vessel's transformers and switchboards. Finally, and most glaringly, Transformer 1 was secured against vibration with an ad-hoc "jury-rigged" contraption made out of a spare cargo chain turnbuckle.

52. Despite these open and obvious dangerous conditions, some of which Petitioners intentionally created, Petitioners sailed their enormous vessel directly towards a major bridge using

Transformer 1, in wanton and reckless disregard for the safety of others. Petitioners' reckless decision would soon kill six people and severely injure two others.

***The Key Bridge and Dali Disaster***

53. The Dali initially departed with the aid of a senior pilot and apprentice pilot with the Association of Maryland Pilots. A pilot's role is to assist with the navigation of the vessel in local waters.

54. During the master/pilot exchange, the Master knowingly and falsely assured the assisting pilots that all equipment was in "good working order" and recklessly failed to inform the pilots about the system-wide electrical failures and vibration issues plaguing the Dali. This was a violation of applicable regulations, including 33 C.F.R. § 1641.ll(k).

55. Additionally, the Master never reported to the pilot that any issues were affecting the vessel's bow thruster prior to the voyage. Yet, in the course of the subsequent failure, when the pilot called for use of the bow thruster to prevent the allision, the Master reported that it was "unavailable."

56. As it departed, the Dali was initially aided by two tugboats. As the vessel entered the Fort McHenry channel, however, the tugboats were ordered to return to port. This occurred even though the Master knew that the Dali was prone to sudden, complete electrical failures that would prevent adequate steering of the enormous vessel.

57. Given this knowledge, the Dali's Master should have requested tugs through the bridge's main span. At the very least, he should have slowed the vessel and stationed crewmembers at the anchor winch, a standard industry practice. This would have allowed for rapid dropping of the anchor and slowing of the vessel in the event of another power failure. None of these basic

12

precautions were taken by the Dali, indicating Petitioners had insufficient safety management procedures and risk assessments.

58. As the unaided vessel came within a half mile from the Key Bridge, the Dali, just as it had before the departure, lost all electrical power.

59. The power loss occurred after High Voltage Breaker 1 and Low Voltage Braker 1 "tripped," preventing primary power to Transformer 1 and therefore de-powering the secondary 440 Volt system. Defects in the Dali's electrical system (e.g., loose cable wires or defective coils) caused the opening "tripping" of High Voltage Breaker 1 and Low Voltage Breaker 1.

60. On information and belief, these defects were known to Petitioners, their agents, employees, superintendents and crew, including the Master of the vessel prior to the beginning of the voyage.

61. The resulting loss of electrical power to critical engine equipment resulted in the automatic shutdown of the main engine, and the loss of the vessel's propulsion system and steering system. The steering system was partially restored (at a lower speed of rudder control) after the emergency backup diesel started to supply limited electrical power to selected systems.

62. At this time, if the vessel's ICMS was in "automatic mode," then Low Voltage Circuit Breaker 2 and High Voltage Circuit breaker 2 would have both closed, resulting in Transformer 2 coming online and restoring power to the entire vessel in about ten seconds, avoiding an extended blackout.

63. The Dali negligently and recklessly failed to utilize "automatic mode" at the outset of the voyage. Instead, the Dali used "manual" mode, which required a crewmember to switch transformers manually.

64. Since the transformer control switch was in manual mode, the Dali should have manually switched to Transformer 2 immediately after the failure. The crews failed to do so, again indicating deficient safety management systems and procedures.

65. In addition, there is no indication that the vessel's emergency generator provided emergency power after the first blackout, as required by the Safety of Life at Sea ("SOLAS") Convention. This is further evidence of the unseaworthiness of the vessel.

66. Instead of switching transformers, Dali's crew simply closed High Voltage Breaker 1 and Low Voltage Breaker 1, and crossed their fingers that another failure would not happen again

67. As during the pre-departure blackout, closing the tripped breakers did initially restore power to the Dali. But, as before, a second blackout occurred soon after.

68. When the vessel was just .2 miles from the bridge, the breakers connecting the vessel's online diesel generators (Diesel Generator 3 and Diesel Generator 4) to the High Voltage Bus opened and disconnected. This occurred because the vessel's flushing pumps were turned off and the back-up defective pneumatic pump could not generate sufficient fuel to supply the running generators.

69. The tripping of the generator breakers eliminated power again to both the High Voltage Bus and Low Voltage Bus, causing the second blackout and loss of the enormous vessel's propulsion and steering systems.

70. In response, the crew manually closed High Voltage Breaker 2 and Low Voltage Breaker 2, something that should have occurred automatically within seconds of the initial power loss. This re-introduced power to the High Voltage bus, finally allowing Transformer 2 to come online.

71. The manual transition to Transformer 2 was too little, too late. While power was regained, there was insufficient time for the vessel to regain main engine propulsion and full steering rudder control.

72. While the port anchor was belatedly released, it was lowered too late to prevent the disaster because the Dali was not prepared for a foreseeable emergency. The pilot's last-ditch, desperate calls for the bow thruster were met only with a report from the Master that it was "unavailable."

73. Shortly thereafter, the vessel struck the Key Bridge.

74. Upon impact of the vessel with the bridge, Claimants' property being transported in the cargo container was struck and damaged by the impact.

75. The freight carrier, A.P. Moller-Maersk, sent a letter to Claimant on July 10, 2024, which stated that the Claimants' property was damaged in the collision and was deemed a complete and total loss by the surveyor who did the post collision inspections.

76. Following receipt of this letter on July 17, 2024, Neom Logistics, on behalf of Claimant, filed a claim against Maersk for recovery of damages due to the total loss of property.

77. Maersk has since state that all claims arising out of the allision of the Key Bridge are on hold pending the outcome of the litigation herein.

## COUNT ONE: NEGLIGENCE
## AS AGAINST GRACE OCEAN PRIVATE LTD

78. Claimant fully incorporates by reference the foregoing paragraphs.

79. At all relevant times, as the registered owner of the Dali, Petitioner Grace Ocean Private Ltd owed Claimant a duty to ensure that the voyage on March 26, 2024, was adequately planned and executed, that the Dali was seaworthy and appropriately equipped for the voyage, that all on board the Dali had sufficient training, equipment and provisions to complete the voyage

successfully and that the vessel had appropriate safety management systems and risk assessments to avoid injury to others.

80. Petitioner Grace Ocean Private Ltd breached these duties in that, Petitioner, its agents and employees, including the Master, crew members, agents, superintendents and executives:

a.  Conducted a voyage with an unseaworthy vessel;

b.  Failed to navigate the vessel properly;

c.  Knowingly departed with a defective electrical system;

d.  Failed to properly operate the vessel's electrical system;

e.  Failed to properly troubleshoot and diagnose defects with the electrical system;

f.  Failed to utilize tug vessels through the Key Bridge's main span;

g.  Failed to slow the vessel as it approached the Key Bridge;

h.  Failed to station crew at the anchor winch during departure;

i.  Failed to divert the Dali's route of travel when its engine lost power;

j.  Failed to equip the Dali with appropriate equipment to ensure that she could be navigated properly and that emergency authorities could be contacted at any time if necessary;

k.  Failed to properly crew the Dali with an appropriate and trained crew;

l.  Failed to implement appropriate safety policies and procedures to ensure a seaworthy vessel;

m.  Failed to properly maintain the vessel;

n.  Failed to conduct appropriate planning to ensure Dali was equipped to complete the planned voyage;

o.  Failed to properly contact emergency authorities;

p.  Failed to institute appropriate training procedures;

q.  Negligently retained the crewmembers, Master, managing agent, and superintendent of the vessel;

r.  Failed to sound an aural bell or alarm, or otherwise alert those on the Key Bridge of Dali's imminent impact;

s.  Failed to ensure a properly functioning bow thruster prior to and during the voyage;

t.  Knowingly and recklessly placed Claimant's property in danger by deliberately attempting to navigate with a defective electrical system;

u.  Knowingly and recklessly placed Claimant's property in danger by deliberately attempting to navigate with a vessel that was known to suffer from excessive vibration, resulting in alteration and damage to components, including electrical components;

v.  Failed to institute proper training, procedures, risk assessments, and safety management systems;

w.  Failed to properly equip the vessel;

x.  Violated applicable regulations and laws;

y.  Violated applicable industry standards, customs and practices;

z.  Failed to properly manage and plan the voyage;

aa. Negligently and recklessly planned and conducted the voyage with an unseaworthy vessel in other ways to be proven in the course of discovery at trial.

81. As a result of these reckless, negligent acts and omissions, Claimant Hussain A. Al Dosariy suffered damages.

82. Claimant therefore seeks all available damages under applicable law, including but not limited to compensation for:

    a.   Value of personal property lost in the voyage;

    b.   Punitive damages;

    c.   Cost of suit and Attorneys' fees;

    d.   All other damages available under applicable law.

83. To the extent that any of the above remedies are not available under general maritime law, Claimant seeks all available supplemental remedies under applicable state law.

**COUNT TWO: NEGLIGENCE**
**AS AGAINST SYNERGY MARINE PTE LTD**

84. Claimant fully incorporates by reference the foregoing paragraphs.

85. At all relevant times, as the technical manager of the Dali and her crew, Petitioner Synergy Marine PTE LTD owed Claimant a duty to ensure that the voyage on March 26, 2024, was adequately planned and executed, that the Dali was seaworthy and appropriately equipped for the voyage, that all on board the Dali had sufficient training, equipment and provisions to complete the voyage successfully and that the vessel had appropriate safety management systems and risk assessments to avoid injury to others.

86. Petitioner Synergy Marine PTE LTD breached these aforesaid duties in that, among other things, Petitioner, its agents and employees, including the Master, crew members, agents, superintendents and executives:

    a.   Conducted a voyage with an unseaworthy vessel;

    b.   Failed to navigate the vessel properly;

    c.   Knowingly departed with a defective electrical system;

    d.   Failed to properly operate the vessel's electrical system;

e.  Failed to properly troubleshoot and diagnose defects with the electrical system;

f.  Failed to utilize tug vessels through the Key Bridge's main span;

g.  Failed to slow the vessel as it approached the Key Bridge;

h.  Failed to station crew at the anchor winch during departure;

i.  Failed to divert the Dali's route of travel when its engine lost power;

j.  Failed to equip the Dali with appropriate equipment to ensure that she could be navigated properly and that emergency authorities could be contacted at any time if necessary;

k.  Failed to properly crew the Dali with an appropriate and trained crew;

l.  Failed to implement appropriate safety policies and procedures to ensure a seaworthy vessel;

m.  Failed to properly maintain the vessel;

n.  Failed to conduct appropriate planning to ensure Dali was equipped to complete the planned voyage;

o.  Failed to properly contact emergency authorities;

p.  Failed to institute appropriate training procedures;

q.  Negligently retained the crewmembers, Master, managing agent, and superintendent of the vessel;

r.  Failed to sound an aural bell or alarm, or otherwise alert those on the Key Bridge of the Dali 's imminent impact;

s.  Failed to ensure a properly functioning bow thruster prior to and during the voyage;

t.  Knowingly and recklessly placed Claimant's property in danger by deliberately attempting to navigate with a defective electrical system;

19

u.  Knowingly and recklessly placed Claimant's property in danger by deliberately attempting to navigate with a vessel that was known to suffer from excessive vibration, resulting in alteration and damage to components, including electrical components;

v.  Failed to institute proper training, procedures, risk assessments, and safety management systems;

w.  Failed to properly equip the vessel;

x.  Violated applicable regulations and laws;

y.  Violated applicable industry standards, customs and practices;

z.  Failed to properly manage and plan the voyage;

aa. Negligently and recklessly planned and conducted the voyage with an unseaworthy vessel in other ways to be proven in the course of discovery at trial.

87. As a result of these reckless, negligent acts and omissions, Claimant Hussain A. Al Dosariy suffered damages.

88. Claimant therefore seeks all available damages under applicable law, including but not limited to compensation for:

a.  Value of personal property lost in the voyage;

b.  Punitive damages;

c.  Cost of suit and Attorneys' fees;

d.  All other damages available under applicable law.

89. To the extent that any of the above remedies are not available under general maritime law, Claimant seeks all available supplemental remedies under applicable state law

**COUNT THREE: PUNITIVE DAMAGES**
**AS AGAINST GRACE OCEAN PRIVATE LTD**

90. Claimant fully incorporates by reference the foregoing paragraphs.

91. At all relevant times, Petitioner Grace Ocean Private LTD conducted intentional, willful, wanton, reckless, and/or grossly negligent acts and omissions, causing Claimants' injuries and one of the worse maritime disasters in the history of the United States. Punitive damages are therefore appropriate to punish Petitioner Grace Ocean Private LTD and deter similar future acts and omissions.

92. Petitioner Grace Ocean Private LTD should be assessed punitive damages in that, motivated by profit, it intentionally, willfully, wantonly, grossly negligently, recklessly:

    a.  Conducted a voyage with an unseaworthy vessel;

    b.  Failed to navigate the vessel properly;

    c.  Departed with a defective electrical system;

    d.  Failed to properly operate the vessel's electrical system;

    e.  Failed to properly troubleshoot and diagnose defects with the electrical system;

    f.  Failed to utilize tug vessels through the Key Bridge's main span;

    g.  Failed to slow the vessel as it approached the Key Bridge;

    h.  Failed to station crew at the anchor winch during departure;

    i.  Failed to divert the Dali's route of travel when its engine lost power;

    j.  Failed to equip the Dali with appropriate equipment to ensure that she could be navigated properly and that emergency authorities could be contacted at any time if necessary;

    k.  Failed to properly crew the Dali with an appropriate and trained crew;

    l.  Failed to implement appropriate safety policies and procedures to ensure a seaworthy vessel;

m. Failed to properly maintain the vessel;

n. Failed to conduct appropriate planning to ensure *Dali* was equipped to complete the planned voyage;

o. Failed to properly contact emergency authorities;

p. Failed to institute appropriate training procedures;

q. Retained the crewmembers, Master, managing agent, and superintendent of the vessel;

r. Failed to sound an aural bell or alarm, or otherwise alert those on the Key Bridge of the Dali's imminent impact;

s. Failed to ensure a properly functioning bow thruster prior to and during the voyage;

t. Failed to institute proper training, procedures, risk assessments, and safety management systems;

u. Failed to properly equip the vessel;

v. Violated applicable regulations and laws;

w. Violated applicable industry standards, customs and practices;

x. Failed to properly manage and plan the voyage;

y. Planned and conducted the voyage with an unseaworthy vessel in other ways to be proven in the course of discovery at trial.

93. As a result of the foregoing, Claimant suffered damages.

94. Claimant is therefore entitled to punitive damages.

95. To the extent that any of the above remedies are not available under general maritime law, Claimants seek all available supplemental remedies under applicable state law.\

### COUNT FOUR: PUNITIVE DAMAGES
### AS AGAINST SYNERGY MARINE PTE LTD

96. Claimant fully incorporates by reference the foregoing paragraphs.

97. At all relevant times, Petitioner Synergy Marine PTE LTD conducted intentional, willful, wanton, reckless, and/or grossly negligent acts and omissions, causing Claimant financial injury and one of the worse maritime disasters in the history of the United States. Punitive damages are therefore appropriate to punish Petitioner Synergy Marine PTE LTD and deter similar future acts and omissions.

98. Petitioner Synergy Marine PTE Ltd should be assessed punitive damages in that, motivated by profit, it intentionally, willfully, grossly, negligently, wantonly, and recklessly:

    a.  Conducted a voyage with an unseaworthy vessel;

    b.  Failed to navigate the vessel properly;

    c.  Departed with a defective electrical system;

    d.  Failed to properly operate the vessel's electrical system;

    e.  Failed to properly troubleshoot and diagnose defects with the electrical system;

    f.  Failed to utilize tug vessels through the Key Bridge's main span;

    g.  Failed to slow the vessel as it approached the Key Bridge;

    h.  Failed to station crew at the anchor winch during departure;

    i.  Failed to divert the Dali's route of travel when its engine lost power;

    j.  Failed to equip the Dali with appropriate equipment to ensure that she could be navigated properly and that emergency authorities could be contacted at any time if necessary;

    k.  Failed to properly crew the Dali with an appropriate and trained crew;

    l.  Failed to implement appropriate safety policies and procedures to ensure a seaworthy vessel;

23

m.  Failed to properly maintain the vessel;

n.  Failed to conduct appropriate planning to ensure Dali was equipped to complete the planned voyage;

o.  Failed to properly contact emergency authorities;

p.  Failed to institute appropriate training procedures;

q.  Retained the crewmembers, Master, managing agent, and superintendent of the vessel;

r.  Failed to sound an aural bell or alarm, or otherwise alert those on the Key Bridge of the Dali's imminent impact;

s.  Failed to ensure a properly functioning bow thruster prior to and during the voyage;

t.  Failed to institute proper training, procedures, risk assessments, and safety management systems;

u.  Failed to properly equip the vessel;

v.  Violated applicable regulations and laws;

w.  Violated applicable industry standards, customs and practices;

x.  Failed to properly manage and plan the voyage;

99. Planned and conducted the voyage with an unseaworthy vessel in other ways to be proven in the course of discovery at trial. As a result of the foregoing, Claimant was financially injured and suffered damages.

100.    Claimant is therefore entitled to punitive damages.

101.    To the extent that any of the above remedies are not available under general maritime law, Claimant seeks all available supplemental remedies under applicable state law.

**PRAYER FOR RELIEF**

102.     Claimant demands a trial by jury.

103.     Claimant requests damages in the amount of nine hundred thousand dollars ($900,000) including but not limited to:

     a.   The value of personal property lost in the voyage;

     b.   Punitive damages;

     c.   Cost of suit and Attorneys' fees;

     d.   Pre-judgment interest; and

     e.   Any such other and further relief as deemed proper and available under the applicable law.

Respectfully submitted,
Hussain Ali Saeed Al Dosariy
By Counsel

James Tate, Esq. (MD Fed. Ct. No. 14376)
Travis D. Tull, Esq. *(Pro Hac Vice Pending)*
TATE BYWATER
2740 Chain Bridge Road
Vienna, VA 22181
Phone: (703) 938-5100
Fax: (703) 991-0605
jtate@tatebywater.com
*Counsel for Claimant*

## **CERTIFICATE OF SERVICE**

In compliance with Supplemental Federal Rule F(5), I HEREBY CERTIFY that on September 24, 2024, I electronically filed the foregoing pleading with the Clerk of Court by using CM/ECF system which will send a notice of electronic filing to all counsel who are CM/ECF participants.

James R. Tate, Esq.