UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| In the Matter of the Petition<br><br>of<br><br>GRACE OCEAN PRIVATE LIMITED, as Owner of the M/V DALI,<br><br>and<br><br>SYNERGY MARINE PTE LTD, as Manager of the M/V DALI,<br><br>for Exoneration from or Limitation of Liability | Docket No. 1:24-cv-941-JKB<br><br>IN ADMIRALTY |

**CLAIM BY CONSOL ENERGY INC. PURSUANT TO SUPPLEMENTAL FEDERAL RULE F (5)**
**IN RELATION TO THE KEY BRIDGE ALLISION**

Specifically reserving all rights and defenses asserted in Claimant's accompanying Answer to the Petitioners' "Petition for Exoneration from or Limitation of Liability," Claimant, CONSOL ENERGY INC. ("Consol" or "Claimant"), on behalf of itself and its insurers, hereby demands a jury trial and makes this claim pursuant to Rule F(5) of the Supplemental Rules for Admiralty or Maritime Claims against Petitioners, GRACE OCEAN PRIVATE LIMITED and SYNERGY MARINE PTE LTD, as alleged owner and manager of the vessel M/V DALI (the "Dali" or "Vessel") and in support thereof avers as follows:[1]

### INTRODUCTION

1. At approximately 12:45 AM E.S.T, on March 26, 2024, container ship, the Dali, left its dock in the Port of Baltimore and began sailing toward the Chesapeake Bay.

---

[1] To the extent that Consol's insurance carriers make payment on its claimed damages, they will assume subrogation rights to Consol's insured damages.

1

2. Weather conditions were suitable for sailing, with no high winds or visual obstructions in sight that would tend to show a disaster was imminent.

3. The Dali was supposed to sail down the Patapsco River, pass under the 1.6 mile area of the Francis Scott Key Bridge (the "Key Bridge"), and sail out to the Chesapeake Bay.

4. This route was one that thousands of large container ships similar to the Dali had sailed without incident.

5. Prior to March 26, 2024, no allision incidents with the Key Bridge had occurred in over 40 years.

6. At approximately 1:28am, E.S.T., the Dali crashed into the Key Bridge, immediately causing its collapse (the "Key Bridge Allision"), killing six individuals, destroying property, and devastating the region's primary economic source.

7. The allision with the Key Bridge was foreseeable, avoidable, and a direct and proximate result of Petitioners' carelessness, negligence, gross negligence, and recklessness, coupled with the unseaworthiness of the Dali.

8. Debris from the collapse of the Key Bridge blocked the Baltimore shipping channel on the Patapsco River to commercial traffic, including shipping to and from the Consol Marine Terminal.

9. As a result of the blockage arising from the allision, Claimant was required to effectively shut down operations at its Consol Marine Terminal, limiting the company's ability to ship coal for overseas export, resulting in severe economic impact including revenue loss and loss of storage.

10. Petitioners' liability should not be limited. An example should be made by Petitioners actions to deter other unseaworthy vessels to conduct due diligence, maintain

seaworthiness and more importantly to avoid future unfortunate national disasters that have taken six innocent lives.

## PARTIES

16. Claimant, Consol, files this claim to seek compensation for economic losses sustained as a result of the Key Bridge Allision.

17. Consol's principal place of business and headquarters is 275 Technology Drive, Suite 101, Canonsburg, PA 15317-9565.

18. Upon information and belief, Petitioner Grace Ocean Private Limited ("Grace") is a corporation organized and existing under the laws of Singapore with its registered office in Singapore and was the registered owner of the M/V Dali at all times relevant hereto. The officers on the Dali at the time of the disaster were actual and apparent agents of the owner of the Vessel.

19. Upon information and belief, Synergy Marine Pte Ltd ("Synergy") is a corporation organized and existing under the laws of Singapore with its registered office in Singapore and was the manager of the Vessel. Upon information and belief, Synergy was responsible for, among other things, manning and victualing the Vessel; procuring and providing deck, engine, and cabin stores; maintenance, monitoring, and repairs of the Vessel's hull, engines, electrical systems, and operating navigational systems and devices; provisioning of spare parts, maintenance and repairs for the Vessel; and communicating with the officers and crew, the Owner and the Vessel's time charterers at all times relevant hereto. The officers on board the Dali were acting as the actual and apparent agents of Synergy at the time of this tragedy.

20.     The officers on board the Dali, all agents of the Petitioners, made crucial decisions that directly led to this allision. These reckless decisions established that Grace and Synergy failed to hire, train, monitor, instruct, or discipline these officers who so recklessly disregarded the most fundamental rules of navigation.

## JURISDICTION AND VENUE

21.     The Key Bridge Allision occurred within the navigable waters of the United States and within the territorial waters of the State of Maryland. The incident had an actual and potential impact on maritime commerce, involves a traditional maritime activity, and is subject to admiralty tort jurisdiction, pursuant to Fed. R. Civ. P. 9(h).

22.     This action is within the Court's admiralty and maritime jurisdiction, pursuant to U.S. Constitution Article 3, Sec. 2, and 28 U.S.C. §1333, and is brought pursuant to the Supplemental Rules for Admiralty and Maritime Claims.

23.     In addition, this claim is within the Court's diversity jurisdiction pursuant to 28 U.S.C. §1332(a) and (b), because the parties are in complete diversity, and the amount in controversy exceeds $75,000.

24.     Venue is appropriate in this district pursuant to 28 U.S.C. §1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this district, and a substantial part of the property that is the subject of the action, including the Vessel itself (the Dali), is situated in this district.

## FACTUAL ALLEGATIONS

**a. The Francis Scott Key Bridge Connects Baltimore City to Baltimore County**

26. Built between 1972 and 1977, the Key Bridge was designed and constructed to provide additional traffic capacity in and out of Baltimore City and to facilitate the transport of "hazardous materials" which were prohibited in the existing tunnel crossings.

27. The Key Bridge spans the Patapsco River which is the main channel between the Baltimore Harbor and the Chesapeake Bay which leads to the Atlantic Ocean.

28. Since opening to traffic in March of 1977, local businesses, such as Consol, have utilized the channel on the Patapsco River passing underneath the Key Bridge as the main shipping channel to and from the Baltimore Harbor to facilitate commerce.

29. Upon information and belief, since the Key Bridge was constructed in the 1970's, cargo ships, like the Dali, have significantly increased in size.

30. Upon information and belief, the officers of the Dali knew that the Key Bridge was not designed nor improved to withstand allisions with a vessel of its size. Likewise, the officers of the Dali also knew, on March 26, 2024, that their vessel had to be operated perfectly to safely navigate under the Key Bridge to avoid impact.

31. Upon information and belief, due to the narrow width of the Patapsco River, the officers on board the Dali were specifically aware that their vessel, if aground, would cause complete blockage to commercial traffic.

**b. The Vessel Allides with the Key Bridge Causing Structural Failure and Collapse**

32. At approximately 12:45 AM E.S.T. on March 26, 2024, the Dali departed from the Port of Baltimore, ultimately bound for Sri Lanka, and expected to arrive on April 22, 2024.

33. Weather conditions were suitable for sailing, with no high winds or visual obstructions in sight.

34. Prior to March 26, 2024, no allision incidents with the Key Bridge had occurred in over 40 years.

35. In the hours leading up to the Dali's departure, alarms on the Dali's refrigerated containers were reported, indicating erratic and unstable power supply issues.

36. These power supply concerns were either overlooked, ignored, or insufficiently addressed by Petitioners.

37. Approximately twelve minutes after the Dali's cast off, the Dali initiated a turn towards the Key Bridge. Upon information and belief, around 1:24 AM E.S.T., the Vessel's onboard data recorder captured multiple urgent alarms before it momentarily ceased recording, then resumed using an auxiliary or redundant power source.

38. At approximately 1:24 AM E.S.T., the Dali experienced a sudden loss of power. Without power, the Vessel was adrift and gliding at about seven knots per hour, with inadequate steering capabilities, and headed towards the Key Bridge.

39. It is also believed that the Vessel's emergency diesel generator either failed to activate or did not provide sufficient emergency power to prevent the Vessel from alliding with the bridge. This backup power was insufficient and inadequate for the crew to regain control of the Dali.

40. At approximately 1:28 AM E.S.T., the Dali collided with the Key Bridge, leading to the immediate structural failure and collapse into the harbor below.

41. The catastrophic Key Bridge Allision resulted in the deaths of six individuals and caused nearly all commercial maritime traffic to and from the Port of Baltimore to cease for a period of approximately eight weeks.

### c. Petitioners' Negligence Was the Direct and Proximate Cause of the Key Bridge Allision and Destruction

42. Petitioners' negligence is clear and no blame could conceivably be placed on Claimant for the allision.

43. The Key Bridge Allision was foreseeable, avoidable, and a direct and proximate result of Petitioners' carelessness, negligence, gross negligence, and recklessness, coupled with the unseaworthiness of the Dali.

44. Among their other acts and omissions, and on information and belief, Petitioners were careless, negligent, grossly negligent, and/or reckless in the following ways:

   a. Employed a crew that lacked attentiveness to responsibilities;

   b. Employed a crew that did not adhere to local navigational norms and customs;

   c. Employed a crew that navigated the Vessel improperly;

   d. Employed a crew deficient in the necessary skills to operate the Vessel safely under the Key Bridge;

   e. Employed a crew deficient in the necessary training to operate the Vessel safely under the Key Bridge;

   f. Failed to adequately staff the Vessel;

   g. Mismanaged the Vessel and its crew;

   h. Neglected to equip the Vessel with suitable policies and procedures;

   i. Neglected to implement adequate policies, procedures, and training for safe vessel operation;

   j. Failed to oversee their fleet adequately to ensure safe operations;

   k. Utilized a vessel equipped with unfit systems and equipment;

7

l.   Neglected proper maintenance of the Vessel;

m.   Failed to maintain or utilize the Vessel's systems and equipment properly;

n.   Failed to maintain or utilize the Vessel's engine adequately;

o.   Failed to maintain or utilize the Vessel's propulsion system adequately;

p.   Failed to maintain or utilize the Vessel's steering adequately;

q.   Failed to equip the Vessel adequately;

r.   Failed to provide a functioning engine;

s.   Failed to provide an engine suitable for the Vessel's intended use;

t.   Failed to address known or foreseeable hazards promptly;

u.   Failed to rectify known or foreseeable deficiencies promptly;

v.   Failed to conduct necessary inspections of the Vessel;

w.   Failed to adhere to industry standards, customs, and practices.

45.   The Key Bridge Allision was the consequence of these and other failures, acts or omissions by the Petitioners, which may be further demonstrated at trial.

### d. Economic Impact of the Allision and Destruction of the Key Bridge on Consol's Business

51.   Claimant Consol is a producer and exporter of high-BTU bituminous coal.

52.   Claimant owns the Consol Marine Terminal located at 3800 Newgate Avenue, Baltimore, MD 21224 (the "Consol Marine Terminal").

53.   The company operates through its key segments, the Pennsylvania Mining Complex located in southwestern Pennsylvania and the Consol Marine Terminal in the Port of Baltimore.

54. Focused on the mining, preparation, and marketing of thermal and metallurgical coal, Consol primarily serves power generators and overseas industrial markets and is known for its efficient, large-scale longwall mining operations in the Northern Appalachian Basin.

55. Consol also has a smaller metallurgical coal mine and preparation plant in Wyoming County, WV.

56. Consol ships approximately 65-70% of their total coal production for export from the United States to overseas industrial and metallurgical markets.

57. The vast majority of these exports typically go through the Consol Marine Terminal.

58. During 2023, Consol reportedly shipped approximately 350,000 tons of coal per week from the Consol Marine Terminal.

59. Since the Key Bridge Allision on March 26, 2024, debris from the collapse of the Key Bridge blocked the Baltimore shipping channel on the Patapsco River to commercial traffic, including shipping to and from the Consol Marine Terminal, for approximately eight weeks.

60. As a result of the blockage arising from the Key Bridge Allision, Claimant was required to effectively shut down operations at its Consol Marine Terminal, limiting the company's ability to ship coal for overseas export.

61. As a result of, and in addition to, the shutdown of operations as a result of the Key Bridge Allision, Claimant has sustained economic impact, including, but not limited to, the following:

   a. Revenue loss associated with the inability to ship Consol mined coal to their customers through the Consol Marine Terminal;

   b. Loss of revenue of terminal fees for shipping third party coal from the Consol Marine Terminal;

      c.      Loss of storage at the Consol Marine Terminal;

      d.      Reduced mining operations at the Claimant's Pennsylvania Mining Complex.

      62.      Claimant has actual possession and ownership of their business, responsibility to repair their business, and the responsibility to maintain their business.

      63.      Claimant has suffered and will continue to suffer damages in the form of lost profits and lost business as a result of the Key Bridge collapse attributable to the allision caused by Petitioners. Claimant's evaluation of the precise amount of its losses is ongoing, but its consequential damages related to the Key Bridge Allision are expected to exceed $100 million.

      64.      The losses incurred by Claimant were a foreseeable consequence of Petitioners' carelessness, negligence, gross negligence, and recklessness, coupled with the unseaworthiness of the Dali.

## REQUEST FOR RELIEF

**WHEREFORE,** Claimant, CONSOL ENERGY INC., prays for judgment against Petitioners, GRACE OCEAN PRIVATE LIMITED and SYNERGY MARINE PTE LTD, as follows:

      a)      The full amount of Claimant's damages as may be proven at trial;

      b)      Cost of suit;

      c)      Attorneys' Fees;

      d)      Pre-judgment and post-judgment interest as allowed by law;

      e)      Injunctive relief;

      f)      Punitive damages; and

      g)      All other relief that this Court deems just and proper.

Respectfully submitted,

*/s/ Mark J. Stiller*
Mark J. Stiller (Bar No.: 27408)
Niles, Barton & Wilmer, LLP
111 South Calvert Street, Suite 1400
Baltimore, MD 21202
410-783-6361
410-783-6363 (facsimile)
mjstiller@nilesbarton.com
*Counsel for Consol Energy, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th day of September 2024, a copy of the foregoing Claim by Consol Energy, Inc., Pursuant to Supplemental Federal Rule F (5) in Relation to the Key Bridge Allision was served via the court's CM/ECF system on all counsel of record.

*/s/ Mark J. Stiller*
Mark J. Stiller (Bar No.: 27408)