**UNITED STATES DISTRICT**
**COURT OF MARYLAND**
**NORTHERN DIVISION**

| |
|---|
| In the Matter of the Petition<br><br>of<br><br>GRACE OCEAN PRIVATE LIMITED, as Owner of the M/V DALI,<br><br>and<br><br>SYNERGY MARINE PTE LTD, as Manager of the M/V DALI,<br><br>for Exoneration from or Limitation of Liability |

Docket No. JKB 24-cv-941

*IN ADMIRALTY*

**AMENDED CLASS ACTION CLAIM BY CLAIMANTS**
**PURSUANT TO SUPPLEMENTAL FEDERAL RULE F(5)**
**IN RELATION TO THE KEY BRIDGE**
**ALLISION**

Claimants, R.E. WEST, INC., E. MARINE MOTOR YACHT SALES PTY LTD., CAPTAIN C LOGISTICS LLC, AMERICAN PUBLISHING LLC, B&R CONSTRUCTION SERVICES, INC., and INTERNATIONAL TRADING SOLUTIONS, Inc., PENN MANUFACTURING INDUSTRIES LLC, PMI ENG EXPORTS PRIVATE TLD, and PMI GLOBAL TECHNOLOGIES PVT LTD (collectively, "Claimants"), individually and on behalf of all others similarly situated, hereby demand a jury trial and make this claim pursuant to Rule F(5) of the Supplemental Rules for Admiralty or Maritime Claims and the Rule 23 of the Federal Rules of Civil Procedure against Petitioners, GRACE OCEAN PRIVATE LIMITED and SYNERGY MARINE PTE LTD, as alleged owner and manager of the vessel M/V DALI (the "DALI") and in support thereof aver as follows:

1

## **INTRODUCTION**

1.      On an unremarkable and calm night with a temperature of 39 degrees Fahrenheit, wind speeds at five miles per hour, and no atmospheric disturbances or visible impediments, at precisely 12:45 AM local time on March 26, 2024, the container ship Dali embarked from the Port of Baltimore, setting a course for the Chesapeake Bay.

2.      The route the officers on the bridge sought for the Dali—a voyage down the Patapsco River, beneath the sprawling 1.6-mile Francis Scott Key Bridge (the "Key Bridge"), and onward to the Chesapeake Bay. The Petitioners and the Dali's officers knew, however, that their vessel was not ready to safely navigate passage past the Key Bridge. In the face of this knowledge, and pursuant to the explicit directions of the Petitioners, the Dali's officers took the malfunctioning ship away from the dock and toward the Key Bridge. This intentional decision killed six people and continues to collectively cost thousands of individuals and businesses billions of dollars.

3.      Until that disastrous day, the Port of Baltimore thrived as a bustling nexus of American maritime activity, ranking among the top twenty ports in the United States by total tonnage and a pivotal hub for vehicular imports and exports in the Baltimore area and beyond.

4.      A report dated March 13, 2024, titled "The 2023 Economic Impact of The Port of Baltimore in Maryland," commissioned by the Maryland Department of Transportation, revealed that the Baltimore Port District managed a staggering 55.5 million tons of cargo in 2023.[1] This

---

[1] The 2023 Economic Impact of The Port of Baltimore Maryland, Prepared for the Maryland Port Administration, available at https://mpa.maryland.gov/Documents/MarylandEconomicimpactofPOB2023.pdf.

commerce supported tens of thousands of jobs, and in turn, those employees bolstered the national economy, generating significant revenues that paid the costs for countless businesses including that of Claimants. All of this economic activity entirely depended upon a navigable channel in the Patapsco River.

5.      The economic contribution of the Port of Baltimore was monumental, estimated at over $70 billion in 2023 alone[2], serving as a robust economic engine for a region that has known much financial hardship.

6.      Since its designation as a point of entry in 1706, the Port of Baltimore has been a cornerstone of regional economic prosperity, supporting maritime activities since the Revolutionary War era. The construction of infrastructures, like the Baltimore Harbor Tunnel and the Key Bridge responded to growing transportation needs, symbolizing the port's crucial role in fostering Baltimore's business growth. The Key Bridge, built in 1977, reflected the state of knowledge of bridge support protection at that time, but had no substantial improvement in more than forty years. During those decades, the size of cargo ships quintupled. As a result, the vulnerability of the Key Bridge to the impact of a ship the size of the Dali was obvious and well known to any experienced commercial vessel officer, including the Petitioners and the Dali's officers, when they demanded that the malfunctioning Dali depart the Port of Baltimore on March 26, 2024. Predictably, just twelve minutes after departure, and only 2.55 miles away from where it had been safely moored at the Port of Baltimore, the Dali commenced a turn towards the Key Bridge. The ship's onboard data recorder, later obtained by the National Transportation Safety Board ("NTSB"), captured a sequence of urgent aural

---

[2] *Id.*

alarms signaling the beginning of this completely preventable disaster.[3]

7.     The captured video footage chillingly illustrates the events: shortly after leaving port, the Dali, bereft of power and adrift, uncontrollably surged towards the Key Bridge at a speed of about seven knots. The Bridge, obviously vulnerable to such an impact, collapsed within thirty seconds. Six people working on the highway traversing the bridge plunged to their deaths.

8.     The Dali's catastrophic allision with the Key Bridge precipitated its immediate destruction and crippled the region's economic lifeline by severing the most important highway in the Baltimore region, the I-695 Beltway. This catastrophe's repercussions will resonate for decades. As of August 29, 2024, the Maryland Transportation Authority awarded a $74 million contract for the first stage of the new Bridge's construction. It is estimated that a new Bridge will not be constructed until 2028, at a price tag of $1.7 Billion. In the timeframe before the construction of the new Key Bridge, there will continue to be disruptions to the shipping and trucking industries as movement through Baltimore and around the port must be rerouted away from the wreckage of Interstate 695 on the Key Bridge.

9.     This disaster was wholly foreseeable by the Petitioners and the Dali's officers. Reports indicate that alarms signaling erratic power supply had been activated even before the Dali's departure, obviously signifying its unfit state for voyage.[4] Nevertheless, the Petitioners, in order to promote their financial interests in delivering the Dali's cargo, ordered the crew to

---

[3] Emily Mae Czacho, *What To know about the Francis Scott Key Bridge collapse in Baltimore that left 6 presumed dead*, CBS News, available at https://www.cbsnews.com/baltimore/news/francis-scott-key-bridge-collapse-baltimore-maryland-what-to-know/.

[4] Upon information and belief, a forward thruster was not functioning at the time the vessel departed as evidenced by the Pilot's reported call for the same to avoid the bridge and response from the crew; however, at the time of this filing the inspection has not been completed.

leave port. This decision represented a flagrant disregard for human life and the serious economic consequences for the Claimants. This reckless and intentional act by the officers commanding the Dali at the behest of the Petitioner's shoreside engineers, was not merely negligent, it was made in total disregard for human life and their responsibility as ship officers to do nothing that would cause harm or loss.

10.     The Petitioners intentionally put their economic interest in delivering the Dali's cargo to their customers above the interests of the Claimants. This call by the Petitioners and the instructions given to the Dali's officers by the Petitioners establishes privity between the Petitioners and these Claimants.

## PARTIES

11.     This action seeks reimbursement of costs and losses already incurred and to be incurred, for each Claimant individually and their business, and as representatives on behalf of a putative class described herein.

12.     Claimant R.E. West, Inc. ("R.E. West") is a company organized and existing under the laws of Maryland with its principal office located in Ashland City, Tennessee.

13.     Claimant E. Marine Motor Yacht Sales PTY LTD ("E. Marine") is a company organized and existing under the laws of Australia with its principal office located in Clontarf, New South Wales, Australia.

14.     Claimant Captain C. Logistics, LLC ("CCL") is a company organized and existing under the laws of Maryland with its principal office located in Pasadena, Maryland.

15.     Claimant American Publishing, LLC ("American Publishing") is a company organized and existing under the laws of Maryland with its principal office located in Baltimore, Maryland.

16.     Claimant B&R Construction Services, Inc. ("B&R Construction") is a company organized and

existing under the laws of Maryland with its principal office located in Glen Burnie, Maryland.

17.     Claimant International Trading Solutions, Inc. ("International Trading Solutions") is a company organized and existing under the laws of Michigan, with its principal office located in Canton, Michigan.

18.     Claimant Penn Manufacturing Industries, LLC (Penn Manufacturing") is a company organized and existing under the laws of Pennsylvania, with its principal office located in Montgomeryville, Pennsylvania.

19.     Claimant PMI ENG Exports Private LTD ("PMI ENG") is a company organized and existing under the laws of India with its principal office located in Tambaram, Chennai, India.

17.20.  Claimant PMI Global Technologies PVT LTD ("PMI LTD") is a company organized and existing under the laws of India with its principal office located in Tambaram, Chennai, India.

18.21.  Upon information and belief, Petitioner Grace Ocean Private Limited ("Grace") is a corporation organized and existing under the laws of Singapore with its registered office in Singapore and was the registered owner of the M/V DALI (the "Dali" the "Vessel") at all times relevant hereto. The Dali's officers and crew at the time of the disaster were actual and apparent agents of the Petitioners of the vessel and were in direct contact with the Petitioners who made the decision to order the Dali to depart from the Port on March 26, 2024.

19.22.  Upon information and belief, Synergy Marine Pte Ltd ("Synergy") is a corporation organized and existing under the laws of Singapore with its registered office in Singapore

and was the manager of the Vessel. Upon information and belief, Synergy was responsible for, among other things, manning and victualing the vessel; instructing the vessel crew how to safely enter and depart from ports; authorizing and directing all port entries and departures, including the date, time, and vessel seaworthiness;  procuring and providing deck, engine, and cabin stores; maintenance, monitoring, and repairs of the Vessel's hull, engines, electrical systems, and operating navigational systems and devices; provisioning of spare parts, maintenance and repairs for the Vessel; evaluating it's seaworthiness and directing the officers and crew, the Owner and the Vessel's time charterers at all times relevant hereto. Accordingly, the officers on board the Dali were required to report all operational problems to the Petitioners and to follow the instructions given to them by the Petitioners as they did when the Dali left the dock on the night of March 25, 2024, extending into the early morning of March 22, 2024.

20.23.  The officers on board the Dali, pursuant to real-time, profit-driven instructions of the Petitioners, understood that they would be jeopardizing their jobs if they refused to abide by the Petitioners' instructions to depart from the dock. At the same time, the officers on the Dali knew that the ship was not seaworthy and that maintaining it on course within the narrow river channel flowing between two massive, but fragile, bridge supports made an allision probable. The Petitioners and the officers on board the Dali jointly made critical decisions that caused this deadly allision, the blocking of the Patapsco River Channel, and destruction of the Key Bridge. These reckless decisions were made at the express direction of the Petitioners who thereby intentionally disregarded the most fundamental rules of safe maritime navigation in order to assure that the Dali's cargo was delivered and profits made.

## JURISDICTION AND VENUE

7

21.24.  The incident that gave rise to this maritime claim began on the navigable waters of the United States within the territorial waters of the State of Maryland, had a devastating impact on maritime commerce by blocking the Patapsco River channel, involved a traditional maritime activity, and the Petitioners' liability for damages is subject to admiralty tort jurisdiction.

22.25.  The allision caused hazardous chemicals to be spilled into the Patapsco River, in violation of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), as stated below. Upon information and belief, those hazardous chemicals and materials leaked into the Patapsco from the submerged containers, the ship wreckage, and the "stirring up" of contaminated litter by the Dali.

23.26.  This action is within this Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) and (d), because the parties are in complete diversity, the putative class size is greater than 100, and the aggregate amount in controversy for the proposed Class exceeds $5,000,000.00, exclusive of interest and costs.

24.27.  In addition, this action against the Petitioners is within the Court's admiralty and maritime jurisdiction, pursuant to U.S. Constitution Article 3, Section 2, and 28 U.S.C. § 1333.

25.28.  Venue is appropriate in this district pursuant to 28 U.S. Code § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this district, and a substantial part of property that is the subject of the action, including the Vessel, was situated in this district at the time of the allision.

26.29.  Venue is appropriate in this district pursuant to Federal Rules of Civil Procedure, Supplemental Rules for Admiralty F(9), because the Vessel was in this district at the time

the Petition was filed.

**FACTUAL ALLEGATIONS**
**COMMON TO ALL CLAIMS**

A.       *The Francis Scott Key Bridge: A Critical Connector*

27.30.  Upon information and belief, the Key Bridge was constructed within a mere 100 yards

from the spot where Francis Scott Key observed the unsuccessful British assault on Fort

McHenry in September 1814, during the War of 1812. Inspired by the sight of the flag

waving the following morning, Key penned what would become known as the "Star-

Spangled Banner," originally titled the "Defense of Fort McHenry."

28.31.  Built between 1972 and 1977, the Key Bridge was designed to alleviate significant

vehicular traffic flows into and out of Baltimore City and to facilitate the transport of

"hazardous materials," which are prohibited in the existing tunnel crossings. Since 1977,

it has been part of the iconic Baltimore City skyline. As was obvious to any commercial

cargo vessel captain, owner, or charterer, the Bridge was both vulnerable and "fracture

critical." Indeed, the Bridge was completely unprotected from a ship strike at the height of

the Dali's upper hull and foredeck.

29.32.  The investigation into this allision is incomplete. Consequently, this Claim describes what

information is available at the time of its filing. Much of this information is based upon

information and belief gleaned from reports from Maryland archives, press reports, articles,

the Petitioners in this litigation, plus marine and maritime accident reconstruction experts

and their reports.

30.33.  Upon information and belief, because the Key Bridge was constructed in the 1970's, the

bridge's design was intended to protect it from strikes by the much smaller cargo ships that

were in use during that period. Since the 1970's, however, container vessels, like the Dali, have grown exponentially. In the mid-1970's, the largest container vessels in the world could fit only 3,000 twenty-foot containers at one time, but today, the largest container ships can handle 24,000 containers or more.

31.34.  The Petitioners and the Dali's officers, knew, with just one glance at the Key Bridge, that it was obviously unprotected from an impact with their vessel. The Petitioners and the Dali's officers, also knew, on March 26, 2024, that their vessel had to be running perfectly to safely navigate the narrow channel under the Key Bridge. Additionally, they knew the ship was not running adequately at all. It had already lost power while at the dock and they knew that if that happened while under way in the narrow channel, the Dali would become a 1,000 foot, 100,000 ton weapon capable of destroying the Bridge. Moreover, the Petitioners and the Dali's officers knew full well that such an allision would block the channel, shut down the Baltimore Port, and destroy the Bridge.

32.35.  The vulnerability of the Bridge had been widely understood by the maritime community for decades. Indeed, on numerous occasions, concerns about its vulnerability were openly discussed at meetings of the Baltimore Harbor Safety and Coordination Committee. This committee consisting of the Maryland Transportation Authority, the United States Coast Guard, and civilian ship piloting organizations that discussed all safety issues regarding the Baltimore Harbor. Included in the committee was a vessel captain, Captain Joseph Smith, who raised this problem many times. His warnings reflected the common knowledge among all large vessel officers that utilized the Port of Baltimore.

33.36.  Remarkably, nearly a decade ago, an Engineer from the Maryland Department of Transportation stated on March 15, 2006: "The Key Bridge is not designed to withstand

collisions with large vessels." Upon information and belief, the minutes of these discussions have been publicly available for decades. Moreover, this knowledge was known by the Petitioners and the Dali's officers, on March 26, 2024, before they decided to leave the dock with a vessel that they knew was unseaworthy and likely to lose the power required to safely navigate the Channel past the Bridge.

34.37.   Upon information and belief, due to the narrow width of the Patapsco River, the Petitioners and the Dali's officers, were specifically aware that their large vessel, if aground within the channel, whether it struck the Key Bridge or not, would cause a complete blockage of the Patapsco River to commercial traffic, directly causing substantial economic costs to be incurred by the Claimants. That, of course, is exactly what happened on March 26, 2024.

35.38.   Upon information and belief, the Petitioners and crew of the Dali had constructive knowledge of the thousands of businesses that relied on the Port, channel, and Bridge to obtain, maintain, and receive payment pursuant to written contracts and business relationships, just as the Petitioners have contractual and business relationships at the Port that allow them to profit by picking up, transporting, and delivering cargo at the Port of Baltimore.

36.39.   The blockage of the channel by the Dali and destruction of the Key Bridge dramatically increased the Claimants' business property's operational costs, caused significant business loss, and continues to prevent the Claimant from earning the income necessary to cover the costs incurred by their property. The Claimants have actual possession and ownership of their business, and the fiscal **responsibility** to maintain their business.

B.   *The Petitioner's Commitment to Cost-Cutting, Negligent Maintenance of Integral Systems, and Misrepresentation Prior to the Allision.*

11

37.40.  Upon information and belief, the Dali had a long history of mechanical problems, had not been maintained in accordance with Maritime regulations and industry norms, and these mechanical problems directly caused the failures that led to the Key Bridge Allision on March 26, 2024.

38.41.  Upon information and belief, the Petitioners had a longstanding commitment to putting their profits over the seaworthiness and safety of their ship. This priority was reflected in the Petitioner's "core policies" posted on the ship's engine control room (see below), which specify that the crew should prioritize maintaining the Petitioner's schedule (and thereby their profits) over safety concerns, that Petitioner's shoreside personnel had to approve all changes to the ship, and instructed the crew not to spend excess time and money on various repairs.



*Posted "Core Policies" Taken on Board the Dali Post Allision.*

~~39.~~42.  Upon information and belief, this commitment to profit-seeking led the Petitioners to a pattern of delaying structural repairs, "cheap fixes" to the Dali's integral systems, and misrepresentations about the unseaworthy condition of the Dali.

   a.   The Dali's Engines, Auxillary Engines, and Engine Pumps.

~~40.~~43.  Upon information and belief, the Dali is propelled by a 55,626 horsepower Hyundai MAN B&W diesel engine, known as the "main engine," which is mechanically connected to a single propeller.

~~41.~~44.  Upon information and belief, lubricating oil pumps, which are powered by electricity generated on the ship, lubricate the main engine by circulating oil through it.

~~42.~~45.  Upon information and belief, cooling water pumps, also powered by electricity generated

13

on the ship, cool the main engine by circulating water through its systems.

43.46.  Upon information and belief, the Dali's main engine has automatic shutdown features, which are designed to prevent damage to the engine.  If there is a loss of electrical power to the lubricating oil pumps or the cooling water pumps, they will stop running, eventually leading to an automated shutdown of the main engine.

44.47.  Upon information and belief, in addition to the main engine, the Dali has four "auxiliary engines." These large diesel engines are each coupled to their own electrical generator. Each engine-generator pair, commonly referred to as a "diesel generator," works together to supply electrical power to the ship.

45.48.  Upon information and belief, the diesel generators are designed to receive fuel through a set of dedicated supply and booster pumps.  These electric pumps are able to restart automatically after a blackout.  Failing that, the pumps can be restarted "remotely" with the push of a button from within the engine control room, which is where the duty engineers work while the Dali travels through confined waters such as the Fort McHenry Channel.

46.49.  Upon information and belief, the Dali also has an electric "flushing pump."  As the name suggests, this is a special- purpose pump designed for the temporary task of "flushing" fuel through the pipes when changing from one fuel type to another.

47.50.  Upon information and belief, the Dali's flushing pump is not designed for constant use, and it is not designed to allow for immediate restart after a loss of power.  Specifically, and in stark contrast to the supply and booster pumps, the Dali's flushing pump cannot be restarted automatically, and cannot even be restarted from within the engine control room.  After a blackout, the flushing pump can only be restarted "locally," and by hand, at the physical location of the pump itself.

14

48.51.  Upon information and belief, the flushing pump is located in the purifier room, near the bottom of the Dali's engineering spaces.  The engine control room is located near the top of the engineering spaces.  That is, the engineers on watch were several decks away from the flushing pump as the ship was maneuvering out of Baltimore Harbor.

49.52.  Upon information and belief, to restart the flushing pump following a blackout, an engineer would have to descend 55 stair steps from the engine control room to the purifier room, and then press a "start" button.

50.53.  Upon information and belief, the ship also has an emergency pneumatic pump, which is a small pump driven by compressed air instead of electricity.  Its purpose is to allow for the restart of a completely "dead ship" that has no available electricity.  The pneumatic pump is designed to provide sufficient fuel to supply one diesel generator, which—once running—would allow engineers to bring electric fuel pumps back on-line to provide a reliable fuel supply to that engine.

51.54.  Upon information and belief, the pneumatic pump is located approximately 25 feet beneath the auxiliary engines, which means that the fuel has to be pushed upwards to reach them, resulting in an inevitable loss of pressure.  If the pneumatic pump is used to fuel several online diesel generators, a "fuel starvation" situation can develop because the pneumatic pump is designed to provide fuel to only one online diesel generator, and only for the brief period of time needed to bring other systems online.

52.55.  Upon information and belief, the Dali's automation is designed to take auxiliary engines offline when their speed or power drop following fuel starvation, in order to prevent damage to equipment.

53.56.  Upon information and belief, on March 26, 2024 the engines that were generating

15

electricity for the ship—the number 3 and number 4 auxiliary engines—had been receiving their fuel supply via the ship's "flushing pump" instead of via the supply and booster fuel pumps.

54.57.  Upon information and belief, this was improper practice, but not unusual on board the Dali. It had been Petitioners' longstanding custom and practice to use the flushing pump to supply fuel to the number 3 and number 4 auxiliary engines.

55.58.  Upon information and belief, the decision to use a "flushing pump," rather than the more proper supply and booster fuel pumps, was made solely because it lowered the Petitioners maintenance costs. In essence, the Petitioners made an intentional decision to reduce their ability to respond to an emergency power failure because they prioritized lowering their costs and increasing their profits over the seaworthiness of their vessel and safety of the Baltimore Harbor community.

b. The Dali's History of Vibration.

56.59.  Upon information and belief, the Dali had a longstanding problem with excessive vibrations, which had damaged numerous engineering systems, including critical electrical systems in both the engine control room and the transformer room.

57.60.  Upon information and belief, during recent inspections aboard the Dali, the ship was found to have loose bolts, nuts, and washers and broken electrical cable ties inside the step-down transfo1mers and electrical switchboards.  The ship's electrical equipment was in such poor condition that an independent testing agency discontinued further electrical testing due to "safety concerns."

58.61.  Upon information and belief, these warning signs are not new.  Sometime prior to the accident voyage, the Dali had been fitted with steel braces to limit vibration at the top of the electrical

16

transformers.  These braces were welded to the bulkheads (walls) on one end.  On the other end, they were crudely bolted to the tops of the transformers via a steel bracket.

59.62.  Upon information and belief, excessive vibrations caused multiple cracks to form in one of the braces to the number 1 step-down transformer, including in the steel bracket between it and the top of the transformer.



*Cracked steel bracket with weld repair at the number 1 step-down transformer*

60.63.  Upon information and belief, rather than address the underlying vibration problem, or even replace the cracked component, Petitioners simply welded over the cracks and carried on with business as usual.

61.64.  Upon information and belief, the Dali also had a vibration dampening rod wedged between the number 1 step-down transformer and a steel beam in the transformer room.  It was jury-rigged, in the literal sense, from spare cargo equipment and painted white on one end.  The anti-vibration rod is a post-construction and non-classification society approved modification, not original to the build of the ship.



*Cargo chain turnbuckle, welded to angle iron, and wedged between the number 1 step-down transfonner (left) and a steel beam {right).*

~~62.~~65.  Upon information and belief, problems obviously persisted after the rod's installation, since the steel bracket atop the number 1 step-down transformer cracked again.

~~63.~~66.  Upon information and belief, the Dali's vibration issues were documented, well-known, and of concern to the crew. The prior captain of the vessel noted "heavy vibration" in his handover notes on May 23, 2023, and he reported the same to the Petitioners:

> Main engine RPM above 60 is on load up program. Also note the Aux blowers cut in at around 55-58 RPM depending on the Load. M/E cannot be run between RPM 65-68 due to heavy vibration, in past same informed to Synergy.

~~64.~~67.  Upon information and belief, other crew records confirm that the ship's excessive vibrations were causing numerous problems. For example, the chief officer reported in his handover notes that "constant vibration" was causing the cargo lashings above the engineering spaces to work loose:

> Main engine RPM above 60 is on load up program. Also note the Aux blowers cut in at around 55-58 RPM depending on the Load. M/E cannot be run between RPM 65-68 due to heavy vibration, in past same informed to Synergy.

~~65.~~68.  Upon information and belief, Petitioners never reported their concerns about excessive

vibration or their after-market modifications to the number 1 step-down transformer to manufacturer Hyundai Heavy Industries. Nor did the Petitioners ever endeavor to find a permanent solution to the problem of excessive vibration on board the Dali.

66.69.  Upon information and belief, excessive vibration can be detrimental to the proper functionality of electrical systems, including wire connections and transformers.

67.70.  Upon information and belief, before the DALI's call in the Port of Baltimore, excessive vibration had loosened electrical connections in circuitry that was necessary to keep the circuit breakers for the number 1 step-down transformer from tripping.

> c.  The Petitioner's Nondisclosures and Misrepresentations of the Unseaworthy Condition of the Dali Upon their Arrival in Baltimore.

68.71.  Upon information and belief, on March 25, 2024, while docked at the Port of Baltimore, the Dali experienced losses of electrical power while at the pier.

69.72.  Upon information and belief, the March 25, 2024 power losses constituted reportable marine casualties, and required the DALI to notify the Coast Guard "immediately after addressing the resultant safety concerns.[5]" Despite this obligation, the DALI's power losses in Baltimore were not reported to the Coast Guard.

70.73.  Next, as the Dali prepared to disembark from the Port of Baltimore, a senior pilot licensed by the State of Maryland, along with an apprentice pilot, boarded the ship and completed a master-pilot exchange with the captain.

71.74.  Upon information and belief, The Dali was required to inform the pilots of the vessel's characteristics, the peculiarities of the vessel, and of any abnormal circumstances on the

---

[5] 46 C.F.R. § 4.05-1.

vessel that might affect its safe navigation.[6] The "master-pilot exchange" is the normal occasion for the captain to relay such information to the pilot, and as organizations with experience in the American shipping industry, the Petitioners were aware of their obligations to report the obvious abnormalities and glaring safety issues with the Dali at this juncture. Nonetheless, the Dali's captain, at the direction of the Petitioners, did not report the vessel's prior losses of power, nor did he disclose other mechanical or electrical defects or abnormalities to the Maryland pilot or apprentice pilot.

72.75.  Upon information and belief, the Petitioners had numerous opportunities to address the Dali's glaring mechanical and electrical problems, or at least disclose these problems to relevant authorities in Maryland that could have made preparations to ensure the Dali could safely leave the Port of Baltimore. Instead, the Petitioners made an intentional decision to neglect and misrepresent the miserable condition of their ship for the sole purpose of saving money and maintaining their profit schedules.

## C. *Disaster at Sea*

73.76.  Upon information and belief, at 12:45 AM on March 26, 2024, the Dali—a 985-foot Neopanamax container vessel constructed in 2014 by Hyundai Heavy Industries, nearly thirty years after the construction of the Key Bridge—cast off from the Port of Baltimore, bound for its next destination in Sri Lanka, with an expected arrival of April 22, 2024.

74.77.  At the time of departure, the DALI was loaded with a cargo of 4,680 containers, amounting to 56,675 metric tons of containerized cargo.

75.78.  Upon information and belief, in the hours leading up to its departure, alarms were triggered

---

[6] 33 C.F.R. § 164.11(k).

on the Dali's refrigerated containers, indicating erratic power supply issues.[7] These power

supply problems were known, but intentionally ignored by the Petitioners and the Dali's

officers pursuant to the Petitioner's profit-driven motive to timely deliver its cargo.

76.79.  When departing Baltimore's Seagirt Terminal and transiting the Fort McHenry Channel, the

DALI was operating on the number 1 step-down transformer. The Dali's step-down

transformers were set in "manual" mode when the ship departed Seagirt Marine Terminal.

77.80.  At approximately 1:25 a.m., the Dali experienced a loss of power when the number 1 step-

down transformer circuit breakers tripped open.  That is, even though the diesel generators

continued to generate power, power was no longer being distributed to the low-voltage

systems, including the ship's critical steering and propulsion systems.

78.81.  These circuit breakers opened because of a loss of electrical continuity through control

circuitry that was necessary to keep the breakers from tripping, which circuitry had loosened

over time from excessive vibration.

79.82.  Upon information and belief, this first loss of power was caused by the gross negligence of

the ship's owners, operators, managers, and their employees, and by unseaworthy conditions

of the ship, which were known, or should have been known, by Petitioners or their agents.

80.83.  As a result of the initial loss of power through the number 1 step-down transformer, the ship

went dark, both inside and out.  The hydraulic steering pumps were rendered inoperative,

leaving the helmsman unable to turn the rudder, which meant that the DALI was no longer

able to maintain her heading within the channel.

81.84.  Also, as a result of the loss of power, critical fuel pumps and cooling water pumps necessary

---

[7] Eric Tucker, et al., *Ship that caused bridge collapse had apparent electrical issues while still docked, AP source says*, ASSOCIATED PRESS (April 15, 2024)*, available at* https://whyy.org/articles/baltimore-bridge- collapse-ship-electrical-issues/.

to run the main engine stopped running. Consequently, the main engine began an automated shutdown sequence. Without the ability to operate the main engine, those in control of the ship could not use the propeller to slow down, stop, or help change course.

82.85.   Even after losing power at the number 1 step-down transformer, which in and of itself should not have occurred, the DALI should have been without power for only a few seconds. Had the transformers been in the "automatic" control mode, the circuit breakers for the number 2 step-down transformer would have closed automatically after only a few seconds, restoring lighting, steering, and propulsion. This would have occurred rapidly and without crew intervention. But the DALI sailed from Baltimore with the step-down transformers in the "manual" control mode instead of the "automatic" control mode.

83.86.   In this configuration, when the ship lost power through the number 1 step-down transformer, the DALI was set adrift down the channel until a crewmember could troubleshoot the issue, find the appropriate circuit breaker control panel, and then manually close that circuit breaker—all while in the dark, due to the loss of lighting on the vessel.

84.87.   The inexplicable failure to use the "automatic" control mode on the step-down transformers rendered the DALI unseaworthy under the circumstances and was caused by Petitioners' mismanagement of the ship and failure to properly instruct or train the crew.

85.88.   In addition to these and other acts of incompetence and neglect, Petitioners failed to properly train, manage, and instruct the ship's crew on how to properly and safely manage the ship's electrical and mechanical systems.

86.89.   Petitioners knew or should have known that the ship's crew was improperly operating the DALI's step-down transformers in manual mode because, on information and belief, this had been a longstanding practice.

22

87.90.  Indeed, it was exceptionally dangerous and reckless to operate the DALI in the Fort McHenry Channel with the step-down transformers in manual mode.

88.91.  Had the step-down transformers been in the automatic mode, the DALI would not have lost power and steering for any meaningful period of time, and the devastating tragedy that ensued would not have occurred.

89.92.  Compounding the problems faced by the ship's crew and pilots, the ship's emergency generator failed to provide emergency power, as required by regulations implementing the Safety of Life at Sea ("SOLAS") Convention, within a maximum of 45 seconds from the original loss of power.[8]

90.93.  Instead, it took about one minute for DALI engineers to manually close a breaker to restore power to the ship, including power that would allow the helmsman to steer with the rudder.

91.94.  This first restoration of electricity was short-lived.  Only about 65 seconds later—even as the crew still had not restored control over the main engine and propeller—the DALI lost power a second time, adding to the confusion of those trying to regain control of the vessel.

92.95.  When the DALI got underway from Baltimore, the engines that were generating electricity for the ship—the number 3 and number 4 auxiliary engines—had been receiving their fuel supply via the ship's "flushing pump" instead of via the supply and booster fuel pumps.

93.96.  As stated previously, the use of a flushing pump for this purpose was improper, and when the Dali originally lost electrical power on March 26, 2024, the flushing pump and all other electric fuel pumps stopped pumping. In response, the pneumatic pump came on.

94.97.  When the Dali first regained electrical power, the flushing pump, which was not designed

---

[8] *See* SOLAS, Chapter II-1, Part D, Regulation 43, Subpart 3.1.3 (2012).

23

for automatic recovery from a blackout, remained off.

95.98.  After the first restoration of power, auxiliary engines 3 and 4 continued to receive fuel from the pneumatic pump.  But this small pump was never intended for such a task and could not provide enough fuel pressure to keep two diesel generators (i.e., the auxiliary engines and their paired electrical generators) running while carrying an electrical load.  Short of fuel, these engines began to slow and lose power.

96.99.  Detecting the problem, the DALI's computers took auxiliary engines 3 and 4 offline by opening circuit breakers between them and the 6.6 Kilovolt Switchboard.  When this happened, the ship blacked out a second time.

97.100.When choosing the practice of using the flushing pump to fuel diesel generators, Petitioners failed to perform a proper risk assessment, safety analysis, or other means to ensure process safety, instead the Petitioners were squarely focused on the fact that it would save them money at the expense of safety.

98.101.It was also contrary to SOLAS regulations, the rules of the vessel's Classification Society, and prudent marine practice to use the flushing pump to power the ship's auxiliary engines on this transit.  The SOLAS rules include a requirement that the ship's "automated control system shall be such that the services needed for the operation of the main propulsion machinery and its auxiliaries are insured through the necessary automatic arrangements.[9]"

99.102.As previously noted, the flushing pump cannot be restarted automatically or from within the engine control room.  Had the DALI used the proper supply and booster pumps to supply fuel to the diesel generators, these pumps would have restarted automatically and the

---

[9] SOLAS Chapter II-1, Part E, Regulation 53, Subpart 4.1 (2012).

second power outage never would have occurred.

~~100.~~103.  It was grossly negligent for the DALI to use the flushing pump to fuel auxiliary engines 3 and 4 on March 26, 2024, as she sailed in the Fort McHenry Channel toward the Francis Scott Key Bridge.

~~101.~~104.  This second loss of power, which occurred as the ship approached the Francis Scott Key Bridge, was caused by the gross negligence of the ship's owners, operators, managers, and their employees, and by unseaworthy conditions of the ship, which were known, or should have been known, by Petitioners or their agents.

~~102.~~105.  Throughout these power losses, the DALI also failed to release the port anchor in a timely manner to help swing the ship away from the Francis Scott Key Bridge.  This was caused by an unseaworthy condition in the vessel, lack of adequate training for the crew, and/or lack of proper procedures to ensure that the anchors were prepared for immediate release in the event of a loss of control.[10]

~~103.~~106.  Still over a minute before impact, the Maryland pilot ordered the crew to apply full power to the bow thruster in an attempt to turn the ship to the port (left), away from the Francis Scott Key Bridge's support pier.

~~104.~~107.  But once again, an unseaworthy condition of the ship impeded this effort to prevent or mitigate the allision, as the bow thruster was inexplicably "unavailable." The vessel was mechanically unable to navigate the narrow channel and avoid the Bridge.  The Dali became a 100,000-ton behemoth aimed at the unfortified and plainly unprotected Key Bridge.

---

[10] *See* 33 C.F.R. § 164.11 ("The owner, master, or person in charge of each vessel underway shall ensure that: . . . (o) The vessel's anchors are ready for letting go").

| | | |
|---|---|---|
| | 0127 | PILOT asked to give THRUSTER |
| | | Full to PORT / THRUSTER Unavailable |
| | | PILOT and MASTER Ordered |
| | | to LET GO PORT ANCHOR |
| | 0128 | VSL COLLIDED with FRANCIS |
| | | SCOTT BRIDGE. |

*DALI log showing bow thruster "Unavailable."*

~~105.~~108. Due to these and other acts of negligence and unseaworthy conditions, those aboard the DALI were unable to timely regain control of the ship before it hit the bridge. All of this was known by the Petitioners, their engineer, and the Dali's officers before the Dali left port. In the face of this knowledge, the Petitioners instructed the crew to disregard the most basic vessel requirements for safely navigating the channel underneath the Key Bridge in order to promote their financial interests. The Petitioners intentionally placed their vessel in a situation which cost lives and caused ongoing extraordinary economic cost to the Claimants.

~~106.~~109. Upon information and belief, the Dali's officers disembarked from the Port of Baltimore knowing that they had purposely entered an area of danger. Prior to alliding with the Key Bridge, the Dali's owners and crew had the last clear chance to avoid impacting the Bridge before they caused deadly harm and an economic catastrophe.

~~107.~~110. Upon information and belief, at 1:28 AM the wide foredeck and upper hull of the Dali violently collided with support columns of the Key Bridge, leading to the immediate structural failure of the Bridge and plunging much of the Bridge into the channel below. Because of the Dali's immense size, it made direct contact with the Key Bridge support

structure without making contact with the fendering at the base of the Bridge's support columns. This occurred because the width of the hull and deck of the ship was built to accommodate thousands of sixteen-ton cargo containers. The capability to carry this enormous amount of cargo made the Dali a hugely profitable vessel for the Petitioners since it's commission in 2014. Yet, this construction, as is well known in the maritime industry, resulted in a ship design that would enable the Dali to strike the Bridge's supports unimpeded by the fendering one-hundred feet below the foredeck with the force of a 100,000-ton vessel moving at seven knots. In short, the Bridge was destroyed by the ship exploiting the obsolete construction of the Bridge.

108.111.  Upon information and belief, the allision between the Dali and the Key Bridge caused the breach of fourteen containers containing hazardous materials, such as lithium batteries, soap products, perfume products, and other resins, and these hazardous materials then leached into the Patapsco River. Therefore, the Petitioners' acts caused a hazard in violation of the Comprehensive Environmental Response, Compensation, and Liability Act (hereafter, "CERCLA").[11]

## CLAIMANTS' ECONOMIC LOSSES AND INCREASED COSTS

### a. Economic Losses and Costs for R.E. West Inc.

109.112.        Claimants reallege each and every allegation contained in the paragraphs above, as though set forth herein in full.

110.113.        R.E. West is based in Tennessee and operational since 1944, that specializes in interstate transportation. The company services the continental United States and Canada

---

[11] This release of hazardous materials into a navigable water invokes CERCLA, particularly Section 107(h), which preserves the right of Claimants to make maritime tort claims that are not limited either by this Petition or an "economic loss rule" under *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927).

with their main routes being in Tennessee, Michigan, Texas, Pennsylvania, Maryland, South Carolina, and California.

~~111.~~114.    R.E. West has two trucking divisions: dry van trucking and specialized freight. Dry van trucking is one of the most common types of trucking in which large quantities of loads, non-perishable goods, and products are trucked in basic box trailers. Specialized freight transportation is any cargo that cannot be transported with a basic box trailer and requires special handling services and shipping methods due to the shipment's size, weight, or dimensions and demands during transit. Its most common cargo is hot water heaters and farming equipment. R.E. West has approximately 140 total employees, around 105-108 tractor units, and close to 300 semi-trailers.

~~112.~~115.    R.E. West has been leasing a truck yard in Dundalk, Maryland since 2006. This yard employs seven people, all of whom work as drivers and one who doubles as an office worker. The truck yard functions by dispatching local drivers to the Port of Baltimore, who unload cargo directly off cargo ships in the port and transport them back to the truck yard, where they are picked up by regional and interstate drivers.

~~113.~~116.    Before the blockage of the Patapsco River and destruction of the Key Bridge, R.E. West's business was flourishing, with approximately 40% of their business being routed through the Patapsco River Channel and into the Port of Baltimore. In January 2024, this success led R.E. West to secure a contract to extend their lease in Dundalk, and they anticipated hiring two additional employees to help with the influx of work around the Port of Baltimore.

~~114.~~117.    However, the immediate aftermath of the blockage and destruction saw a dramatic halt in business activities. R.E. West was forced to stop using their truck yard at Dundalk

and reroute much of their business through the Ports of Newark, Wilmington, and Norfolk, at a significant expense of time and money. The operating cost of a truck such as those belonging to R.E. West is more than $100 an hour, and this rerouting forced it to spend hundreds of additional hours operating their trucks to distant ports.[12] The delays and delivery failures have, and continue to, cost R.E. West hundreds of thousands of dollars as a result of the closure of the Port of Baltimore.

115.118.    This rerouting was made more difficult by the destruction of the Key Bridge, which was a route used directly by the truck drivers of R.E. West. It faced significantly increased costs because of the rerouting of completing their routes and deliveries. The delays and delivery failures have, and continue to, cost R.E. West hundreds of thousands of dollars, because of the blockage of this vital waterway and the destruction of this vital economic artery.

116.119.    The Port of Baltimore is now reopened, but the damage the blockage inflicted on R.E. West has not ended. To this day, the volume of shipping through the Port of Baltimore has not recovered to pre-blockage levels, and R.E. West has been unable to recover relationships with long time customers because of the complete disruption that occurred to the shipping industry as a result of a prolonged blockage.

117.120.    R.E. West was positioned to continue their business operations undisturbed, but the blockage of the Patapsco River Channel and destruction of the Key Bridge by the Dali forced them to incur extended and ongoing significant costs. Upon information and belief, these increased costs have amounted to multiple millions dollars in damages for R.E. West.

---

[12] Alex Leslie, Ph.D & Dan Murray, An Analysis of the Operational Costs of Trucking: 2024 Update, American Transportation Research Institute, June 2024, at 12.

These damages have wreaked financial havoc on R.E. West, who was forced to terminate eight employees, defer payments on their debts, and inject their personal funds into the business just to keep their doors open. There was no other reason for this dramatic increase in costs and resultant dire consequences for R.E. West other than the blockage of the Patapsco River channel and destruction of the Key Bridge by the Petitioners.

~~118.~~121.    The Petitioners must be held accountable for their actions, which have had such devastating impacts on R.E. West.

### b. Economic Losses and Costs for East Marine Motor Yacht Sales PTY LTD

~~119.~~122.    Claimants reallege each and every allegation contained in the paragraphs above, as though set forth herein in full.

~~120.~~123.    E. Marine, based in Australia and operational since 2006, specializes in the sale, brokerage, and delivery of previously owned vessels. The company operates in Australia and New Zealand. E. Marine is the sole owner of the company, has two other employees and approximately a dozen subcontractors who perform yacht service, repair, and vessel delivery.

~~121.~~124.    E. Marine operates by transporting vessels from Maine which are trucked down to the Port of Baltimore and then shipped through the port to clients in Australia and New Zealand.

~~122.~~125.    In February of 2024, E. Marine signed a contract to sell a 2024 Sabre 43 Salon Express yacht (hereafter the "yacht") at a sales price of approximately nearly one million dollars. E. Marine then arranged to ship the yacht overland from South Casco, Maine, to the Port of Baltimore for shipping at a cost of tens of thousands of dollars. In preparation for its arrival at the Port of Baltimore, E. Marine also arranged for a "cradle" to be

constructed at the port to ensure that the yacht could be safely stored while awaiting shipment. The cost of the cradle was an additional ten thousand dollars. The yacht arrived at the Port of Baltimore on March 14, 2024.

~~123.~~126.    Before the blockage of the Patapsco River channel and destruction of the Key Bridge by the Petitioners, E. Marine's yacht was under contract to depart Baltimore in route to Port Kembla, Australia on April 7, 2024. This shipping schedule fell within the Port of Baltimore's "grace period," wherein E. Marine would not be charged storage fees.

~~124.~~127.    However, in the immediate aftermath of the blockage of the Channel and destruction of the Bridge, there was an immediate stop on cargo exiting the Port of Baltimore. E. Marine was forced to store his yacht at the Port of Baltimore indefinitely at a daily cost. Additionally, E. Marine has had to pay extended storage and capital costs associated with having to store his property at the Port of Baltimore. E. Marine has finally shipped his yacht through the Port of Baltimore in June, and the costs associated with the storage of his yacht at the Port of Baltimore have yet to be fully calculated.

~~125.~~128.    The extraordinary delay E. Marine endured due to the blockage of the Patapsco River Channel and destruction of the Key Bridge by the Petitioners caused it to incur additional costs when the vessel arrived in Australia. Due to the extreme delay, E. Marine has needed to undergo additional customs procedures and pay additional fees at port in Australia. Consequently, the vessel was stuck at port in Australia until July 16, 2024 and E. Marine had pay additional storage fees until the vessel was released.

~~126.~~129.    Additionally, because the ship has been delayed for nearly five months, E. Marine's vessel has still not been delivered to its end user. As a result, E. Marine has had to front hundreds of thousands of dollars in shipping costs out of their own pocket cause

tremendous stress to their business's financial health.

127.130.    E. Marine was positioned to continue its business operations undisturbed, but, upon information and belief,  the blockage of the Patapsco River Channel and destruction of the Key Bridge by the Dali forced them to incur multiple millions of dollars in costs. There was no other reason for this dramatic increase in costs to E. Marine other than the blockage of the Patapsco River channel and destruction of the Key Bridge by the Petitioners.

128.131.    E. Marine was positioned to continue their business operations undisturbed, but the blockage of the Patapsco River Channel and destruction of the Key Bridge by the Dali forced them to incur extended and ongoing significant costs. There was no other reason for this dramatic increase in costs to E. Marine other than the blockage of the Patapsco River channel and destruction of the Key Bridge by the Petitioners.

129.132.    The Petitioners must be held accountable for their actions, which have had such devastating impacts on E. Marine.

### c. Economic Losses and Costs for Captain C Logistics, LLC

130.133.    Claimants reallege each and every allegation contained in the paragraphs above, as though set forth herein in full.

131.134.    CCL is a family-run enterprise, based in Maryland and operational since 2017, specializes in interstate transportation. The company services the continental United States with their main routes being in Maryland, Virginia, Pennsylvania, New Jersey, and Delaware.

132.135.    CCL handles freight via drayage, dry van, reefer and tanker trucks with plans to diversify in the future. CCL's most common cargo is construction and farming equipment. CCL has around ten total full-time employees, and many 18-wheeler trucks.

133.136.    Before the blockage of the Patapsco River and destruction of the Key Bridge, CCL's business was flourishing, with approximately 90% of their business being routed through the Patapsco River Channel and into the Port of Baltimore.

134.137.    However, the immediate aftermath of the blockage and destruction saw a dramatic halt in business activities. CCL was forced to shut their business down for a month to recalibrate their approach. Upon reopening, they had to reroute much of their business through the Port of Norfolk, at a significant expense of time and money.

135.138.    This rerouting was made virtually impossible by the destruction of the route used directly by the truck drivers of CCL. They faced hugely increased costs because of the near impossibility of completing their routes and deliveries. The operating cost of a truck such as those belonging to CCL is more than $100 an hour, and this rerouting forced CCL to spend hundreds of additional hours operating their trucks to distant ports.[13] The delays and delivery failures have, and continue to, cost CCL hundreds of thousands of dollars as a result of the destroyed, vital, roadway.

136.139.    The Port of Baltimore is now reopened, but the damage the blockage and destruction inflicted on the Claimants has not ended. To this day, the volume of shipping through the Port of Baltimore has not recovered to pre-blockage levels, and CCL was unable to recover relationships with long time customers because of the complete disruption that occurred to the shipping industry as a result of a prolonged blockage. Prior to the blockage, CCL had many customers and enjoyed a reputation among shipping brokers as a top company for shipping diverse cargo through the Port. Since the blockage,

---

[13] Alex Leslie, Ph.D & Dan Murray, An Analysis of the Operational Costs of Trucking: 2024 Update, American Transportation Research Institute, June 2024, at 12.

CCL's customer base has been completely hollowed out and their decreased capacity has damaged their reputation among shipping brokers.

137.140.    CCL was positioned to continue its business operations undisturbed, but the blockage of the Patapsco River Channel and destruction of the Key Bridge by the Dali forced it to incur extended and ongoing significant costs. Upon information and belief, the increased costs caused CCL multiple million dollars in damages. These damages have wreaked financial havoc on CCL, who had to terminate most of their staff, take on significant debt, and sell half their fleet of trucks just to keep their doors open. There was no other reason for this dramatic increase in costs, and the resultant dire consequences for CCL other than the blockage of the Patapsco River channel and destruction of the Key Bridge by the Petitioners.

138.141.    The Petitioners must be held accountable for their actions, which have had such devastating impacts on CCL.

### d.  Economic Losses and Costs for American Publishing LLC

139.142.    Claimants reallege each and every allegation contained in the paragraphs above, as though set forth herein in full.

140.143.    American Publishing is a family-run enterprise, based in Baltimore and operational since July 2007, benefits from its owner's Karen Austin's extensive background as a former counter-terrorism equipment specialist and her lineage as the daughter of William C. Horn, a U.S. Navy Veteran and retired Baltimore City Homicide Detective. Mrs. Austin's deep-rooted connection to the military and law enforcement has driven her to serve military communities.

141.144.    Transitioning from her security role, Mrs. Austin has accumulated over thirty years

34

in business, sales, and publishing, including American Publishing's launch and publication of the United States Cybersecurity Magazine since 2013, a periodical addressing critical national cybersecurity challenges. Mrs. Austin and her husband also head the biannual production of the Armed Forces Directory, a publication that American Publishing initiated in 2007. This directory aids military and civilian personnel, facilitating their transitions associated with Aberdeen Proving Ground and Fort Meade— key military installations located strategically near the Francis Scott Key Bridge.[14]

142.145.    The Armed Forces Directory not only serves as a crucial resource for military and civilian transitions but also offers advertising opportunities for local businesses, enhancing their visibility to a broad audience that includes both current and potential future clientele.[15]

143.146.    The strategic position of the Patapsco River commercial channel and the Key Bridge is vital to local businesses, including those advertised in American Publishing's directory, which relied heavily on the channel for the transportation of goods, underscoring the interconnected nature of local commerce and an open and unrestricted channel.

144.147.    Before the blockage of the Patapsco River Channel and destruction of the Key Bridge by the Petitioner, American Publishing's business was flourishing, with increasing distribution and significant advertisement revenue from local enterprises in and around Baltimore. The escalation in customer engagement and sales effectiveness boosted the economic benefits to both military and civilian communities, reflecting positively on

---

[14] *Armed Forces Directory, About Us*, available at https://www.armedforcesdirectory.org/about/.

[15] *Armed Forces Directory, Aberdeen Proving Ground*, available at: https://www.armedforcesdirectory.org/aberdeen-proving-ground-directory/; *Armed Forces Directory, Fort Meade*, available at https://www.armedforcesdirectory.org/fort-meade-digital-directory/.

Claimants' publication's impact. Last year, this success led American Publishing to secure a contract to publish the Base Guide for Fort Meade, anticipating an influx of new personnel and their associated needs. This business achievement, however, the caused American Publishing to incur much higher costs, which are the subject of this claim.

145.148.    The immediate aftermath of the channel blockage and Bridge destruction, however, was a dramatic halt in business activities. The local business community, stunned by the event, ceased communications, resulting in a sharp decline in service calls and sales for American Publishing. As a result, American Publishing experienced a significant increase in business costs, without any income to pay them. Upon information and belief, the increased costs caused over one million dollars in damages for American Publishing.

146.149.    The Claimants assert that the Petitioner knew that their profit-driven decisions would likely strike the only obstacle present in the Patapsco River Channel, and that this allision by a ship the size of the Dali would likely result in serious damage to the Bridge and anyone on it at the time of the strike.

147.150.    American Publishing was positioned to continue its business operations undisturbed, but the blockage of the Patapsco River Channel and destruction of the Key Bridge by the Dali forced them to incur extended and ongoing significant costs. There was no other reason for this dramatic increase in costs to American Publishing other than the blockage of the Patapsco River channel and destruction of the Key Bridge by the Petitioners.

148.151.    The Petitioners must be held accountable for their actions, which have had such devastating impacts on American Publishing.

### e.  Economic Losses and Costs for B&R Construction Services, Inc.

36

149.152.        Claimants reallege each and every allegation contained in the paragraphs above, as though set forth in full herein.

150.153.        B&R is based in Maryland and has been operational since 1992. It specializes in a multitude of construction sectors, such as mechanical, electrical and plumbing design, construction management, and dry utility design. B&R has completed multiple successful projects regionally and across the country. B&R has worked with commercial, retail, mixed-use, office, government, casinos and sports and entertainment facilities.

151.154.        Before the blockage of the Patapsco River and destruction of the Key Bridge, B&R's business was flourishing, having recently been awarded contracts to install solar panels on major warehouses in Sparrows Point, Maryland, directly adjacent to the Key Bridge, just on the other side of the Bridge from their offices in Glen Burnie, Maryland. This project is valued at millions of dollars and has the potential to lead to referrals for similarly lucrative solar projects.

152.155.        The immediate aftermath of the blockage of the channel and destruction of the Bridge was a dramatic halt in B&R's business activities. The destruction of the Key Bridge by the Petitioners caused a huge loss of productivity, as their workers could no longer conveniently access their jobsites at Sparrow Point, and the blockage of the Patapsco River and destruction of the Key Bridge completely disrupted B&R's supply lines of accessory equipment and materials.

153.156.        B&R sought to continue its business operations undisturbed, but the blockage of the Patapsco River Channel and destruction of the Key Bridge by the Dali forced them to incur expensive new cost increases. They were forced to hire a significant number of subcontractors to keep their projects on schedule, pay their employees for significant

37

overtime costs, and purchase additional supplies at premium costs to ensure their workers had the requisite materials to complete their jobs. Upon information and belief, the increased costs have caused multiple millions of dollars in damages for B&R. There was no other reason for these dramatic consequences for B&R's business other than the blockage of the Patapsco River channel and destruction of the Key Bridge by the Petitioners.

154.157.    The Petitioners must be held accountable for their actions, which have had such devastating impacts on B&R.

### *f.  Economic Losses and Costs for International Trading Solutions, Inc., Penn Manufacturing, PMI ENG, and PMI LTD (collectively the "Container Claimants")*

155.158.    Claimants reallege each and every allegation contained in the paragraphs above, as though set forth herein in full.

156.159.    International Trading Solutions, based in Michigan and operational for over 35 years, specializes in the sale and delivery of used textiles, specializing in the sale of high quality pre-owned footwear.

157.160.    International Trading Solutions operates by collecting pre-owned footwear in the United States, and then shipping them to the United Arab Emirates for sorting and international sale.

158.161.    On March 26, 2024, International Trading Solutions was scheduled to ship four containers of shoes (hereafter, the "shoes") through the Port of Baltimore on the Dali, which were supposed to arrive in Dubai, United Arab Emirates in May 2024. However, in the immediate aftermath of the blockage of the Channel as a result of the allision and

38

destruction of the Bridge, International Trading Solutions have sustained loss due to damaged, partially damaged, or spoiled cargo property; loss due to delay, demurrage, detention, and/or General Average of cargo property, as well as lost profits and loss of business reputation.there was an immediate stop on cargo exiting the Port of Baltimore. As a result, International Trading Solutions' shoes were stranded at the Port of Baltimore until the Port reopened 78 days later. The shoes are not capable of maintaining their condition after such an extended time in a shipping container, so they are likely to be ruined and will not be sold. The shoes are not scheduled to arrive in Dubai until October 5, 2024.

159.162.    Similar to International Trading Solutions, Penn Manufacturing, PMI ENG, and PMI LTD delivered to the Petitioners and the Dali cargo shipped within certain modular shipping containers that were laden on board the Dali when it allided with the Key Bridge. As such, like International Trading Solutions, Penn Manufacturing, PMI ENG, and PMI LTD have sustained loss due to damaged, partially damaged, or spoiled cargo property; loss due to delay, demurrage, detention, and/or General Average of cargo property, as well as lost profits and loss of business reputation.The extraordinary delay International Trading Solutions endured due to the blockage of the Patapsco River Channel and destruction of the Key Bridge by the Petitioners caused it to incur additional costs related to its insurance coverage. Due to the extreme delay, International Trading Solutions has had to use it's insurance coverage to cover losses. Consequently, International Trading Solutions was required to pay their insurance company a percentage of the value of their lost goods.

160.163.    While the Containers have since been delivered, but the Container Claimants have been called upon by Petitioners to guarantee alleged General Average expenses and/or certain salvage claims. Indeed, as a result of the allision of the Dali with the Key Bridge,

all of the above cargo taken off or discharged from the Dali and having value became subject to alleged liens of salvors and/or as a condition precedent to obtaining the release of the cargo formerly laden on board the Dali, the Container Claimants were required or will be required to give security as a condition precedent to the release of the above Containers and/or to the salvors of same for amounts allegedly due for salvage services, Petitioners required Container Claimants to give general average security for contributions to or for charges allegedly due from cargo in connection with the above voyage.International Trading Solutions was positioned to continue its business operations undisturbed, but, upon information and belief, the blockage of the Patapsco River Channel and destruction of the Key Bridge by the Dali forced them to incur multiple millions of dollars in costs. There was no other reason for this dramatic increase in costs and losses to International Trading Solutions other than the blockage of the Patapsco River channel and destruction of the Key Bridge by the Petitioners.

161.164.    The Petitioners must be held accountable for their actions, which have had such devastating impacts on the Port of Baltimore and its businessesthe Container Claimants.

## CLASS ACTION ALLEGATIONS

*Petitioners Must be Held Accountable to Claimants and Class.*

162.165.    Claimants reallege each and every allegation contained in the paragraphs above, as though set forth in full herein.

163.166.    This action is brought by Claimants individually, and as representatives of all other similarly situated under the provisions of Rule 23(a) and (c) of the Federal Rules of Civil Procedure, for compensatory damages as set forth in more detail below. Claimants, as representatives of the class, have suffered one or more elements of damages alleged herein

and is a member of the class set forth below.

~~164.~~167.    The Class is defined as:

      a.    All corporate entities or other businesses that have sustained increased costs and/or losses as a result of the total or partial closure of the Port of Baltimore and/or the destruction of the Key Bridge resulting from the Dali allision.

168.    This Class consists of two subclasses:

      i.    All corporate entities or other businesses that delivered to the Petitioners and the Dali cargo shipped within certain modular shipping containers which were laden on board the Dali when it allided with the Key Bridge.

      ii.    All corporate entities or other businesses that have sustained economic losses and/or increased costs that did not have cargo shipped within certain modular shipping containers which were laden on board the Dali when it allided with the Key Bridge.

~~=a range of businesses impacted by the allision, including but not limited to Port-based suppliers, motor vehicle and vessel parts, repair and servicing, food and retail facilities, automobile manufacturers and retailers; vessel owners, brokers, and retailers; interstate and intrastate truckload carriers; cargo owners and carriers; terminal operators and stevedores; and any company with a subrogated interest in a business loss. The Class has incurred business losses in the form of decreased revenue and increased costs related to the rerouting of their businesses to other ports, including increased costs for fuel and tolls, licensing costs to operate in new ports, regulatory costs, increased maintenance costs, and increased salary and accommodation costs for their employees.~~

~~165.~~169.    Excluded from the above-defined class are those businesses, individuals, or other

entities who would otherwise be class members, but who or which are: (i) Petitioners, or any of their employees, agents, insurers, contractors, and subcontractors, including employees of Petitioners' agents, contactors or subcontractors, (ii) the Court, court personnel and their immediate families, and (iii) the attorneys for any of the Parties and members of their law firms.

166.170.    The proposed class meets all of the requirements to be certified under Rule 23:

    a.  Numerosity: The putative class is so numerous that joinder of all members is impracticable.  In addition to the named Claimants, a significant number of other businesses, individuals, and other entities suffered these increased costs, and past, present, and ongoing business loss as a result of the Petitioners' destruction of the Key Bridge and blockage of the Patapsco River Channel. While the exact number of members of the class is unknown, Claimants are informed and believe that the class consists of thousands of businesses, individuals, and other entities.

    b.  Commonality: There is a well-defined community of interest among the class and there a numerous common questions of law or fact which include, but are not limited to, the following:

- Whether Petitioners employed a crew that lacked attentiveness to their responsibilities;

- Whether Petitioners allowed a crew that did not adhere to local navigational norms and customs;

- Whether Petitioners engaged a crew that navigated the vessel improperly;

42

- Whether Petitioners employed a crew deficient in the necessary skills;

- Whether Petitioners employed a crew deficient in the necessary training;

- Whether Petitioners failed to adequately staff the vessel;

- Whether Petitioners mismanaged the vessel and its crew;

- Whether Petitioners neglected to equip the vessel with suitable policies and procedures;

- Whether Petitioners neglected to implement adequate policies, procedures, and training for safe vessel operation;

- Whether Petitioners failed to oversee their fleet adequately to ensure safe operations;

- Whether Petitioners utilized a vessel equipped with unfit systems and equipment;

- Whether Petitioners neglected proper maintenance of the vessel;

- Whether Petitioners failed to maintain or utilize the vessel's systems and equipment properly;

- Whether Petitioners failed to maintain or utilize the vessel's engine adequately;

- Whether Petitioners failed to maintain or utilize the vessel's propulsion system adequately;

- Whether Petitioners failed to maintain or utilize the vessel's steering system adequately;

43

- Whether Petitioners failed to equip the vessel adequately;

- Whether Petitioners failed to provide a functioning engine;

- Whether Petitioners failed to provide an engine suitable for the vessel's intended use;

- Whether Petitioners failed to address known or foreseeable hazards promptly;

- Whether Petitioners failed to rectify known or foreseeable deficiencies promptly;

- Whether Petitioners failed to conduct necessary inspections of the vessel; and

- Whether Petitioners failed to adhere to industry standards, customs, and practices.

- Whether Petitioners intentionally ordered their crew to leave Port with an unrepaired, unseaworthy ship to assure that their cargo was delivered on schedule and they continued to make satisfactory profits.

c.  Typicality: Claimants' claims are typical of the claims of the members of the proposed class. Plaintiffs' claims arise from the same practices and conduct that give rise to the claims of all class members and are based on the same legal theories.

d.  Adequacy: Claimants will fairly and adequately represent and protect the interests of the class in that they have no disabling conflicts of interest that would be antagonistic to those of the other members of the class. Claimants

44

seek no relief that is antagonistic or adverse to members of the class and the infringement of the rights and the damages they have suffered are typical of all other class members.  Claimants have retained attorneys experienced in class actions and complex litigation as counsel.

~~167.~~171.        Prosecuting separate actions by individual class members would create a risk of: (1) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the Petitioners; or (2) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

~~168.~~172.        Questions of law or fact common to class member predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  Because of the number and nature of common questions of fact and law, multiple separate lawsuits would not serve the interest of judicial economy.

~~169.~~173.        Claimants will fairly and adequately protect the interests of the class.  The interests of Claimants are consistent with those of class members.

~~170.~~174.        The proposed Class is also certifiable under Federal Rule of Civil Procedure 23(c)(4). Rule 23(c)(4) states that Claimants may carve the proposed Class into subclasses. *See Gunnells v. Healthplan Servs., Inc.,* 348 F.3d 417, 439 (4th Cir. 2003).  Rule 23 (c)(4) allows for class certification with respect to specific or particular issues, and is well suited for identifying a single, common issue relevant to the entire class—liability as an example, while allowing for appropriate treatment of a class members damages. The Rule is intended

45

to give courts discretion when handling complex cases by allowing them to divide cases into subclasses to distinguish unusual or complicated issues or claims that would otherwise prevent class certification because an individual class representative could not represent the entire class.

## <u>THE RULE OF ROBINS DRY DOCK DOES NOT APPLY TO THIS CASE</u>

~~171.~~175.      The holding of *Robins Dry Dock* does not apply to intentional or reckless acts, nor does it Apply to public nuisance claims or intentional interference with business relationships. In this case, the Petitioners instructed their crew to intentionally disregard the grossly unsafe condition of their ship and recklessly leave port knowing that the Bridge was the largest obstacle bracketing the narrow channel. They knew that their ship was probably going to lose power again, become uncontrollable and unstoppable, and be in no condition to safely "thread the needle" and avoid the Bridge. The Petitioners' decision was compelled by their choice to put their profits over the lives and livelihoods of others. This decision killed six people and caused immense and ongoing economic damage to thousands of businesses that depended on the Port, including the Claimants. [16][17]

---

[16] *See Barber Lines A/S v. M/V Donau Maru*, 764 F.2d 50 (1st Cir. 1985) (Breyer, J.) (explicitly recognizing an intentional torts exception to *Robins Dry Dock* by holding that plaintiffs who cannot recover for foreseeable economic loss based on a negligently caused oil spill could recover if the oil spill was intentional); *Ballard Shipping Co. v. Beach Shellfish*, 32 F.3d 623, n.1 (9th Cir. 1994) (citing *Dick Meyers Towing Service, Inc. v. U.S.*, 577 F.2d 1023 (5th Cir. 1978)) (referring to cases of intentional torts as a "classic exception" to *Robins Dry Dock*). See *generally In re Deepwater Horizon*, 784 F.3d 1019 (5th Cir. 2015) (holding that the Fifth Circuit has recognized an exception to *Robins Dry Dock* for "criminal or intentional conduct"), *accord Amoco Transport Co. v. S/S Mason Lykes*, 768 F.2d 659, 666 (5th Cir. 1985) ("*Robins Dry Dock* means that there can be no recovery for economic losses caused by <u>unintentional</u> maritime torts absent physical damage….") (emphasis added); *Showa Line, Ltd. v. Diversified Fuels, Inc.*, 1991 WL 211527 (E.D. La. 1991) (denying a motion for summary judgment based on *Robins Dry Dock* because the Claimant made allegations of fraud and other intentional torts that "[took] the claims out of the *Robins Dry Dock* parameters"); *Norwegian Bulk Transport A/S v. International Marine Terminals Partnership*, 520 F.3d 409 (5th Cir. 2008) (citing *Showa*, 1991 WL 211527 at *1) (recognizing that in the absence of physical injury or intentional torts, a claimant was not eligible for relief under *Robins Dry Dock*).

[17] The Claimants also contend that the rule of *Robins Dry Dock* has been superseded by statute in this case pursuant to CERCLA. Under 42 U.S.C. § 9607(h): "the owner or operator of a vessel shall be liable in accordance with this

~~172.~~176.        The Petitioners conduct can only be characterized as an intentional act, as a result, this case falls beyond the parameters of *Robins Dry Dock*.[18] Therefore, the Claimants can recover foreseeable economic losses without the need for physical damage to a proprietary interest.[19]

---

section, under maritime tort law, … notwithstanding… the absence of physical damage to the proprietary interest of the Claimant." The preemptive effect that this provision of CERCLA has on the rule of *Robin's Dry Dock* extends the Petitioners liability for other federal and state claims. In this case, when the Dali allided with the Key Bridge, 14 containers of hazardous materials breached aboard the Dali and spilled into the Patapsco River. Therefore, the Petitioners are liable in accordance with CERCLA, and the rule of *Robins Dry Dock* is not applicable to this case.

[18] *Barber Lines A/S v. M/V Donau Maru*, 764 F.2d 50 (1st Cir. 1985) (Breyer, J.)

[19]        At the heart of the Supreme Court's decision in *Robins Dry Dock* is "the spectre of runaway recovery." *Amoco Transport Co. v. S/S Mason Lykes*, 768 F.2d 659, 668 (5th Cir. 1985). Justice Holmes, when writing the opinion in Robins Dry Dock, was participating in the greater legal movement that sought to define the parameters of liability in negligence cases. Indeed, one year after Robins Dry Dock was decided, the New York Court of Appeals decided Palsgraf v. LIRR. In that case, Judges Cardozo and Andrews eloquently defined the parameters of negligence by delineating foreseeable harms occurring to foreseeable victims, and the "relationship between man and those whom he might reasonably expect his act to injure." *Palsgraf v. Long Island R. Co*., 248 N.Y. 339, 344, 348 (1928). Thus, we should interpret the doctrine in *Robins Dry Dock* in light of these foundational developments in American tort law. Indeed, the legal contentions in this claim present the contemporary legal support to modify the Robins Dry Dock decision by clarifying and even establishing a new interpretation of this ninety-four-year-old bastion of maritime law

        The maritime industry of today would be unimaginable to Justice Holmes writing in 1927. The modern "container ship" was not even invented until nearly three decades later. At first, these ships were approximately 500 feet long, 30 feet wide, and only held 800 twenty-foot containers. In comparison, the Dali, a medium-sized cargo ship, is 984 feet long, 157 feet wide, and carried nearly 10,000 twenty-foot containers. This increased ship weight by 10 times, which lead to behemoths like the Dali weighing over 100,000 tons. The Claimants allege that the height, weight, and width of the Dali was the cause-in-fact of the Key Bridge's collapse. In the pursuit of higher profits, large shipping companies have exponentially increased the size of their vessels, and as a result, the ability for maritime malfeasance to have an impact on economic conditions has increased exponentially too. Therefore, the scope of liability for actors in the shipping industry must be reevaluated to account for the increased size of their vessels.

        There is no ceiling for the size of new cargo ships, but many of the bridges, canals, and docks in this country remain the same size, with protective structures designed for a much smaller maritime world. Meanwhile, the number of these behemoth ships on the sea rises every year. In 1990, there were 78,300 commercial ships registered in the United States, in 2023 there were 106,700. The ever-increasing size and volume of massive commercial ships means that maritime catastrophes, like the Dali allision and collapse of the Key Bridge, are more likely to occur in the future. Since the Dali allision on March 26, 2024, at least seven commercial ships suffered a loss of power or steering in Maryland waters. These disastrous events could potentially cost thousands of lives and take billions of dollars out of the economy. The law must ensure that these shipping companies, who profit the most from these gargantuan ships and are in the greatest position to avoid disaster, are sufficiently liable for the foreseeable consequences of their conduct.

        The facts of this case illustrate why the increased size of these ships caused the death of six men and the economic loss of hundreds of millions of dollars. *Robins Dry Dock* involved the negligent damaging of a single ship's propeller, with a total case value of $30,000. In this case, in addition to the deaths of six people, an important artery of interstate transportation was severed which cut off access to a major port for nearly 80 days. It was obviously foreseeable to the Petitioners that their intentional acts would lead to this Bridge destruction and a disastrous economic effect on anyone who depends on the Port for their business activities. This catastrophic loss was completely foreseeable by the Petitioners. The Petitioners are liable to the people who they would reasonably expect to injure by

173.177. At all times relevant hereto, the Claimants were the owners in possession of their property.

174.178. All actual damage suffered by the Claimants relates to the added cost from the loss of access, use, and maintenance of their property to pursue their economic interest.

175.179. All costs and business losses incurred by the Claimants were and are a direct and foreseeable consequence of the Petitioner's intentional and reckless conduct.

176.180. Based upon the case law and facts, Claimants are therefore permitted to collect actual monetary damages related to the loss of beneficial use of their property that resulted from the Petitioner's intentional and reckless acts.

**CAUSES OF ACTION**

**COUNT I**

***The Allision was a Direct Consequence of an Intentional Disregard for Safety by the Petitioners and Dali Officials Leading to an Impact where the Bridge Support was most susceptible to collapse.***

177.181. Claimant realleges each and every allegation contained above, as though set forth in full herein.

178.182. Upon information and belief, on the night of March 26, 2024, but for the intervening

their intentional and reckless acts.

The use of a "foreseeability" analysis in maritime claims has occurred in other jurisdictions. In *Petitions of Kinsman Transit Co*., 388 F.2d 821 (2nd Cir. 1968), the Second Circuit applied a proximate cause "remoteness" analysis to negligence in a maritime claim. Citing Judge Andrew's dissent in *Palsgraf v. Long Island R.R*., 248 N.Y. 339, 354-55 (1928), the Second Circuit held that Claimants could recover from a maritime collision if they could prove that their damages were a "foreseeable consequence" of the Petitioner's actions. That is certainly the case here, where increased costs to any business utilizing the Port of Baltimore are a foreseeable consequence of the Petitioner's allision with the Key Bridge which caused subsequent blockage of the Patapsco River channel by the collapsed bridge. In *Marine Nav. Sulphur Carriers, Inc v. Lone Star Industries, Inc*., 638 F.2d 700 (4th Cir. 1981), the Fourth Circuit adopted the reasoning of *Petitions of Kinsman Transit Co*., 388 F.2d 821 (2nd Cir. 1968) in a case that concerned an allision between a vessel and a bridge which disrupted commerce on a navigable river. Those exact circumstances are present in this case. An allision between a vessel and a bridge caused the closure of a channel, and the Claimants have suffered increased costs and business losses as a result.

48

intentional acts of the Petitioners and the Dali's officers, the Dali would have safely passed through the Patapsco River and into the Chesapeake Bay just as thousands of similar vessels had before March 26, 2024.

179.183. The Petitioners and the Dali's officers on March 26, 2024 knew that they had a duty to the Claimants to assure that their vessel was sufficiently seaworthy to traverse the Patapsco River from the Port of Baltimore to the Chesapeake Bay, including the narrow channel that passed between the two large bridge supports that set astride the river. They also knew that the Key Bridge was decades old and had been built for much smaller ships with dramatically less beam and tonnage.

180.184. Having navigated through harbors throughout the world, the Petitioners, and the Dali's officers knew that their decision to leave the dock with a ship of the Dali's width and weight meant that any impact with the vulnerable bridge would result in a blockage of the channel that was necessary for the thousands of individuals and businesses, like the claimants, that depend on a navigable channel in the Patapsco River. The Petitioners breached this duty and multiple other duties owed to the Claimants by failing to act reasonably as stated more fully herein.

181.185. Further, based on available information, the Dali's officers, and the Petitioners:

    a. Followed orders from the Petitioners to leave the dock knowing that an allision with the Bridge, the only massive obstacle sitting within the small channel was inevitable;

    b. Employed a crew that lacked attentiveness to their responsibilities;

    c. Employed a crew that did not adhere to local navigational norms and customs;

    d. Employed a crew that navigated the vessel improperly;

e.      Employed a crew deficient in the necessary skills;

f.      Employed a crew deficient in the necessary training;

g.      Failed to adequately staff and equip the vessel;

h.      Failed to equip, monitor, and repair the vessel's electrical systems;

i.      Failed to train the officers in appropriate decision-making when human lives are at risk;

j.      Mismanaged the vessel and its crew prior to the Dali's departure;

k.      Failed to equip the vessel with suitable policies and procedures;

l.      Failed to implement appropriate policies, procedures, and training for safe vessel operation;

m.      Failed to oversee their ship adequately to ensure safe operations;

n.      Utilized a vessel equipped with unfit systems and equipment;

o.      Failed proper maintenance of the vessel, particularly the electrical systems;

p.      Failed to maintain or utilize the vessel's systems and equipment properly;

q.      Failed to maintain or utilize the vessel's engines adequately;

r.      Failed to maintain, utilize, or repair the vessel's electrical system adequately to prevent power failures and limitations;

s.      Failed to maintain or utilize the vessel's steering system adequately;

t.      Failed to equip the vessel adequately;

u.      Failed to provide a safe and fully functioning propulsion system;

v.      Failed to provide and maintain an engine suitable for the vessel's departure from Port through the Patapsco River Channel;

w.      Failed to address known hazards promptly;

x.      Failed to rectify known deficiencies promptly;

y.      Failed to conduct necessary inspections of the vessel;

z.      Failed to adhere to industry standards, customs, and practices;

aa.     Recklessly disregarded the most basic safety provisions and the obvious mechanical failures on March 26, 2024.

ab.     Left port knowing that their ship that was not performing adequately and was likely to impede traffic in the channel;

ac.     Intentionally misrepresented the unseaworthy nature of their ship to relevant authorities;

ac.     Intentionally ignored the known vulnerability of the Key Bridge, the largest and most unprotected obstacle to their safe passage through the channel, in an effort to pursue the financial interests of the Petitioners by leaving the Port and delivering their cargo.

~~182.~~186. As a result of these factors, the officers and crew aboard the Dali, along with the Petitioners, knew, before they left, that the Dali was not capable of safely passing under the Key Bridge.

~~183.~~187. Nevertheless, instead of delaying their departure, the Petitioners, and the Dali's officers, driven by their profit motives, breached their duty to act reasonably when they intentionally and recklessly moved the Dali from its position of safety at the dock and into the channel.

~~184.~~188. The fault of the Petitioners is starkly evident. No fault can reasonably be attributed to Claimants for this allision and its consequences to them. It was proximately and directly caused by the intentional and reckless acts of the Petitioner's agents, who were willing to risk the lives of the deceased and livelihoods of the Claimants.

51

## COUNT II

### *The Petitioners and Dali Officials Acted Negligently under General Maritime Law.*

185.189. Claimants reallege each and every allegation contained above, as though set forth herein in full.

186.190. Under general maritime law, when a moving vessel allides with a stationary object, there is a heavy presumption that the vessel was at fault for the allision. This presumption is known as the "Oregon" Rule. See *The Oregon*, 158 U.S. 186 (1895); *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 (5th Cir. 1977) ("The common sense behind the rule makes the burden [to rebut the presumption] a heavy one. Such accidents simply do not occur in the ordinary course of things unless the vessel has been mismanaged in some way.").

187.191. The Oregon presumption applies here because the Dali, a power-driven vessel then underway and making way, struck the stationary Francis Scott Key Bridge.

188.192. During the days or weeks preceding the voyage that began (and ended) on March 26, 2024, because of the negligence alleged, and other negligence to be proven after a reasonable opportunity for further investigation and discovery, which negligence is presumed in any event, Petitioners failed to ensure that the DALI could be and/or was safely operated within the Fort McHenry Channel. See *The Oregon*, 158 U.S. 186 (1895).

189.193. At the time of the allision and during the critical minutes preceding the allision, as a result of the negligence alleged, and other negligence to be proven after a reasonable opportunity for further investigation and discovery, which negligence is presumed in any event, the DALI failed to remain in the navigable channel and clear of the Francis Scott Key Bridge. *See Id.*

52

190.194.  At all times relevant hereto, the Dali ultimately was in the control of the in personam Petitioners by and through their agents, employees, servants, and/or the ship's master. Additionally, privity between the Petitioners and the crew is established because the crew acted on their orders.

191.195.  At all times relevant hereto, Petitioners owed the Claimants a legal duty under the general maritime law to maintain the vessel in a seaworthy condition and in good working order so as to safely ply the navigable waters of the Patapsco River Channel.

192.196.  Petitioners owed the Claimants a legal duty under the general maritime law to observe the standards of good and prudent seamanship, to exercise reasonable care when operating and navigating their vessel, and to avoid the resulting allision.

193.197.  Petitioners owed the United States a legal duty under the general maritime law to adequately and competently train and supervise the crew, and otherwise oversee the vessel.

194.198.  At all times relevant hereto, Petitioners were obliged to comply with, inter alia, the laws, rules, and regulations of the United States, into whose waters the ship had navigated.

195.199.  At all times relevant hereto, Petitioners were obliged to comply with, inter alia, the provisions of the International Convention for the Safety of Life at Sea, as amended, the International Safety Management Code, as amended, the vessel's Safety Management System, and the laws, rules, and regulations of the vessel's flag state of Singapore, as well as any other duties proven at trial.

196.200.  Petitioners' violations of statutes, rules, and regulations regarding avoiding the loss of steering and propulsion, and regaining the same, means that the rule from *The Pennsylvania*, 86 U.S. (19 Wall.) 125 (1874), applies:

> when, as in this case, a ship at the time of a collision is in actual violation of a

statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case, the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute.

197.201.  This rule of admiralty, which has been the law of the United States since 23 years after the Limitation of Liability Act of 1851, 46 U.S.C. §§ 30501 et seq., upon which Petitioners now rely, encompasses allisions, and applies to the present case. See Thomas J. Schoenbaum, 2 Admiralty & Mar. Law § 14:4 (6th ed.) ("The rule applies to collisions of vessels underway, allisions, collisions between a vessel and a stationary object, and vessel strandings.").

198.202.  Res ipsa loquitur is "a form of circumstantial evidence that permits an inference of negligence to be drawn from a set of proven facts." *Ashland v. Ling-Temco-Vought, Inc*., 711 F.2d 1431, 1437 (9th Cir. 1983). "The doctrine is applicable in admiralty cases." *Id.* Its elements are met in this admiralty case and an inference of negligence must be drawn from the DALI's loss of power and control prior to alliding with the Francis Scott Key Bridge.

199.203.  In addition, given the "logical inference" that the Dali would not have had power failures "had it not been defective," under the doctrine of res ipsa loquitur the DALI was unseaworthy as a matter of law. *Gibbs v. Kiesel*, 382 F.2d 917, 919 (5th Cir. 1967) ("The fact that [the ship doors] fell during ordinary intended use indicates a defective condition; therefore rendering [the vessel] unseaworthy as a matter of law.").

200.204.  The allision was caused by and occurred as a result of the intentional acts, omissions, negligence, faults, recklessness, lack of due care, and breaches and violations of duties and law by the Dali and her crew, and by Petitioners, and/or their principals, agents, and/or employees.

201.205.  The allision was caused by and occurred as a result of the aforementioned unseaworthiness of the Dali.

202.206.  As a result of the faults and breaches of Petitioners, and/or their principals, agents, and/or employees, and/or the unseaworthiness of the Dali, the United States has suffered and will continue to suffer the damages alleged, for which Petitioners and each of them are liable, jointly and severally.

203.207.  The foregoing acts, omissions, negligence, unseaworthiness, fault, recklessness, lack of due care, and/or breaches and violations of duties and law that were direct and proximate causes of the collision were within the privity and knowledge of Petitioners and their principals, agents, and/or employees.

204.208.  As a direct and proximate result of the foregoing acts, omissions, negligence, unseaworthiness, fault, recklessness, lack of due care, and/or breaches and violations of duties and law by the Dali and her crew, and as a further result of Petitioner Grace Ocean's and Petitioner Synergy's privity and knowledge concerning the same, Petitioners are jointly and severally liable to the Claimants for the full amount of its damages.

## COUNT III

*The Intentional and Reckless Acts of the Petitioners and Dali Officials Created a Public Nuisance.*

205.209.  Claimants reallege each and every allegation contained above, as though set forth herein in full.

206.210.  Petitioners, individually and in concert with each other, by their affirmative acts and omissions, have created, contributed to, and/or assisted in creating, conditions that significantly interfere with rights general to the public, including public enterprises, public

health, public safety, public navigation, the public comfort, and the public convenience.

207.211. The nuisance created and contributed to by Petitioners is substantial and unreasonable. It has caused, continues to cause, and will continue to cause far into the future, significant harm to the Claimants as alleged herein, and that harm outweighs any offsetting benefit. The ability to travel on the Patapsco River Channel, use the I-695 artery over the Key Bridge, and fully utilize the Port of Baltimore is a matter of great public interest and a financial necessity for the Claimants.

208.212. Petitioners specifically created, contributed to, and/or assisted, and/or were a primary contributing factor in the creation of the public nuisance by:

    a.    Affirmatively and knowingly ignoring the unseaworthy state of their vessel;

    b.    Affirmatively and knowingly deciding to disembark from the Port and enter a narrow, dangerous channel with an unseaworthy ship;

    c.    Affirmatively and knowingly misrepresenting the unseaworthy state of their vessel to avoid regulatory scrutiny and ensure the timely disembarking of their doomed vessel;

    d.    Acting with gross negligence by failing to configure their ship properly to safely exit the Channel;

    e.    Alliding with the unguarded Key Bridge, thereby causing its collapse and the blockage of the Patapsco River Channel;

    f.    Disabling the critical portion of Interstate 695 that traversed the Key Bridge, which increased travel costs for the Claimants at a rate of $100 per additional hour

traveled,[20] and has caused severe ongoing disruption to the tens of thousands of
drivers that regularly used the Bridge. This disruption will continue until at least
2028, when a new Bridge is estimated to be constructed.

~~209.~~213. Because of their complete control over the maintenance and operations of the Dali,
Petitioners were in a unique position to prevent the nuisance, but failed to do so, including
by failing to warn public officials, or the United States Coast Guard, of the risks posed by
their unseaworthy vessel, and failing to take any other precautionary measures to prevent
or mitigate these known likely damages, and losses.

~~210.~~214. The public nuisance caused, contributed to, maintained, and/or participated in by
Petitioners has caused and continues to cause special damages to the Claimants.

~~211.~~215. The seriousness of the Key Bridge allision, and subsequent blockage of the Patapsco
River Channel, destruction of the Key Bridge, and ensuing financial losses are extremely
grave and outweigh any social utility of Petitioners' conduct because:

a.    The ultimate nature of the harm is the loss of life, loss of economic resources, and
damage to the public convenience, safety, and general welfare, rather than mere
annoyance;

b.    the social benefit of the Petitioners placing their ship into the stream of commerce
is outweighed by the availability of safety precautions that would have facilitated
the ship to enter the stream of commerce without causing an allision with the Key
Bridge, and the attendant destruction and costs described herein; Petitioners knew
of the external costs to the Claimants of placing their unseaworthy ship into the

---

[20] Alex Leslie, Ph.D & Dan Murray, An Analysis of the Operational Costs of Trucking: 2024 Update, American
Transportation Research Institute, June 2024, at 12.

Patapsco River Channel, and rather than striving to move through the channel safely, Petitioners instead acted affirmatively to cause catastrophic loss of life, and devastating economic consequences;

c.    the cost to society of the collapse of the Key Bridge caused by the intentional and reckless conduct of the Petitioners, is more harmful and costly than if the Petitioners had decided to repair the Dali's malfunction and not enter the channel until the Dali was seaworthy; and

d.    it was practical for the Petitioners, considering their extensive and exclusive knowledge of the Dali's limitations and the conditions of the Patapsco River Channel, to implement safe navigational practices that would have prevented the Dali's allision with the Key Bridge.

212.216.  Petitioners' actions were the primary contributing factor to the unreasonable violation the of public rights enjoyed by the Claimants as set forth above, because Petitioners knew or should have known that their conduct would create a continuing problem with long-lasting significant negative effects on the rights of the Claimants and the public, and absent Petitioners' conduct the violations of the public rights described herein would not have occurred or would have been far less severe.

213.217.  Petitioners knew that their vessel was unseaworthy and was likely to create the nuisance complained of and yet acted with reckless disregard for the probable dangerous and ongoing consequences of their conduct's foreseeable impact upon the rights of others, including the Claimants.

214.218.  Therefore, the Claimants request an award of punitive damages in an amount reasonable, appropriate, and sufficient to punish these Petitioners for the good of society and deter

58

these Petitioners from ever committing the same or similar acts.

## COUNT IV

***The Petitioners and Dali Officials Intentionally and Willfully Interfered with the Claimants Contractual Relations and Business Relationships.***

~~215.~~219. Claimants reallege each and every allegation contained above, as though set forth herein in full.

~~216.~~220. Claimants entered into valid contracts, and maintained extensive business relationships, with individuals and entities involved in the movement of goods and commerce through the Patapsco River Channel, out of the Port of Baltimore, and on the I-695 artery on the Key Bridge.

~~217.~~221. Upon information and belief, as entities with extensive business experience in the operation of ports around the world, the Petitioners were aware of the business agreement and contractual obligations involved with the usual, daily functions of a major port. For example, they knew that if the Dali blocked the Channel, in any way, that their cargo contracts would be breached and so would hundreds of other cargo contracts all other world.

~~218.~~222. Upon information and belief, the Petitioners were constructively aware of the Claimants contractual and/or business relationships in their commercial activities at the Port of Baltimore because the Petitioners had multiple contracts and other business agreements as part of their business of dropping off, picking up, and transporting thousands of containers on board the Dali. Despite this knowledge that the blocking the Channel would halt the completion of countless contracts at the Port, the Petitioners and the Dali' officers left the dock with a total disregard of the business of the Port.

59

219.223. The Petitioners disregarded the rights if the Claimants to effectuate their own contractual obligations to deliver their cargo and ensure their payment.

220.224. On the evening of March 26, 2024, the Petitioners intentionally failed to disclose and misrepresented the unseaworthy condition of their vessel to the Coast Guard, and their Maryland pilot, respectively. The Petitioners and Dali officials then intentionally placed an unseaworthy ship into the Patapsco River Channel, knowing that it was likely that this ship would block the channel, and destroy the Bridge, and that this destruction would interfere with all commerce in the Port of Baltimore and in the Baltimore metropolitan area. As a result of this devastating allision, businesses had to travel hundreds of extra miles to perform their most basic functions.

221.225. Petitioners and the Dali's officers intentionally and recklessly disembarked from the Port of Baltimore with an unseaworthy vessel knowing this act would shift pecuniary risks onto the Claimants without legal justification. They also knew that the blockage of the Patapsco River Channel and destruction of the Key Bridge would make the Claimants contractual and business relationships impossible to effectuate and bring to fruition. The Petitioner's goal was to protect their bottom line no matter the consequence. Thus, they decided to risk human life, the health of critical infrastructure, and the known contractual and/or business relationships of the Claimants, simply so they could make profits for themselves.

222.226. The Petitioners knowing and wrongful interference with the Claimants' formal contractual and/or business relationships was motivated by an unlawful purpose and was without reasonable justification, that is, they decided to disregard the lives and livelihoods of others working at the Port to accomplish their own business goals, without any

mitigating circumstances.

~~223.~~227. As a result of the Petitioners intentional and improper conduct, the Claimants have been

unable to maintain their prior contractual or business relationships at the Port. Instead,

many of these customers shifted to businesses in ports that were still operational, such as

the ports of Norfolk and Newark. Now that these customers have shifted to other ports, it

is not likely that they will return to their previous business relationships at the Port of

Baltimore.

~~224.~~228. Additionally, the destruction of the Interstate 695 artery on the Key Bridge, used daily

by the Claimants' businesses, caused the Claimants to suffer vast increases in business

costs and losses, as well as the loss of new business contracts and extensions of contracts

already in place.

~~225.~~229. As a result of this inability to perform under their otherwise valid agreements and/or

maintain these business relationships, Claimants have suffered significant and

permanent damages, as detailed further below.

~~226.~~230. Just as known to the Petitioners and the Dali's officers, after the disastrous allision,

commercial use of the Patapsco River and the Port of Baltimore came to a standstill for seventy-

eight days. Moreover, a bridge to replace the Key Bridge will not be available until at least the Fall

of 2028. Meanwhile, the economic losses of the Claimants herein continue and worsen.

## <u>COUNT V</u>

### *The Petitioners and Dali Officials must be Liable for Punitive Damages.*

~~227.~~231. Claimants reallege each and every allegation contained in the Counts and paragraphs

above, as though set forth herein in full.

~~228.~~232. Under the general maritime law, punitive damages are available where a defendant's

61

conduct is outrageous, owing to gross negligence, willful, wanton, and reckless indifference for the rights of others, or behavior even more deplorable. *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 493 (2008).

229.233. Petitioners' conduct was outrageous, grossly negligent, willful, wanton, and reckless, and punitive damages are available in this case, because the DALI got underway with known unseaworthy conditions in confined waters where a ship of its magnitude had every opportunity to cause catastrophic damage and loss of life, which in fact happened. These conditions include, but are not limited to, navigating with the transformers in manual mode, and with no risk assessment or safety mitigation in place, running the auxiliary on a temporary flushing pump that could not be immediately restarted in an emergency, failing to have the ship's anchors ready for immediate deployment in transit-confined waters, failing to have the bow thruster "available" for use, ignoring known and longstanding vibration problems that were causing actual damage and distress to the ships electrical systems, and willfully misrepresenting the unseaworthy state of their ship to relevant authorities.

230.234. Punitive damages "are aimed not at compensation but principally at retribution and deterring harmful conduct." *Id.* at 492.

235.    Other vessel owners and operators must be deterred from engaging in such reckless and exceedingly harmful behavior in the United States' navigable waters. Indeed, Petitioners themselves need to be deterred because they continue to operate their vessels, including a sister ship to the Dali, in U.S. waters and benefit economically from those activities.

### COUNT VI

*The Petitioners and Dali Officials must be Liable for Indemnification or Contribution of General Average.*
*(Claimants INTERNATIONAL TRADING SOLUTIONS, Inc., PENN MANUFACTURING*

*INDUSTRIES LLC, PMI ENG EXPORTS PRIVATE TLD, and PMI GLOBAL TECHNOLOGIES PVT LTD)*

236.    Claimants reallege each and every allegation contained in the Counts and paragraphs above, as though set forth herein in full.

237.    Claimants International Trading Solutions, Inc., Penn Manufacturing, PMI ENG, and PMI LTD (collectively the "Container Claimants") delivered to the Petitioners and the Dali cargo shipped within certain modular shipping containers (the "Containers").

238.    The Petitioners and the Dali received, accepted and agreed to transport the Containers.

239.    Since then, the Containers have been delivered, but the Container Claimants have been called upon by Petitioners to guarantee alleged General Average expenses and/or certain salvage claims.

240.    Petitioners, by reason of the premises, and the unseaworthiness of the Dali, breached their duties to the Container Claimants as common carrier by water for hire and/or otherwise and was otherwise at fault for the allision of the Dali with the Key Bridge.

241.    As a result of the allision of the Dali with the Key Bridge, all of the above cargo taken off or discharged from the Dali and having value became subject to alleged liens of salvors and/or as a condition precedent to obtaining the release of the cargo formerly laden on board the Dali, the Container Claimants were required or will be required to give security as a condition precedent to the release of the above Containers and/or to the salvors of same for amounts allegedly due for salvage services, Petitioners required Container Claimants to give general average security for contributions to or for charges allegedly due from cargo in connection with the above voyage.

242.    Container Claimants were the owners, insurers, shippers, or otherwise had a proprietary interest in the cargoes in the Containers, and bring this action on their own behalf and, as agents

and trustees, on behalf of and for the interest of all parties who may be or become interested in the said shipments as their respective interests may ultimately appear, and the Container Claimants are entitled to maintain this action.

243.   Container Claimants have duly performed all duties and obligations on their part to be performed.

~~231.~~   By reason of the premises, Container Claimants are entitled to indemnification and/or contribution from the Petitioners for any and all salvage and/or General Average charges or contributions and/or to be fully relieved from any and all alleged salvage and/or General Average contribution or obligation.

## COUNT VII

***The Petitioners and Dali Officials must be Liable for Damage to Cargo Shipped on Board by Claimants.***
*(Claimants INTERNATIONAL TRADING SOLUTIONS, Inc., PENN MANUFACTURING INDUSTRIES LLC, PMI ENG EXPORTS PRIVATE TLD, and PMI GLOBAL TECHNOLOGIES PVT LTD)*

244.   Claimants reallege each and every allegation contained in the Counts and paragraphs above, as though set forth herein in full.

245.   Claimants International Trading Solutions, Inc., Penn Manufacturing, PMI ENG, and PMI LTD (collectively the "Container Claimants") delivered to the Petitioners and the Dali cargo shipped within certain modular shipping containers (the "Containers").

246.   As a direct and proximate result of the foregoing acts, omissions, negligence, unseaworthiness, fault, recklessness, lack of due care, and/or breaches and violations of duties and law by the Dali and her crew, and as a further result of Petitioner Grace Ocean's and Petitioner Synergy's privity and knowledge concerning the same, Claimants have suffered one or more of the following damages:

a.  Loss due to damaged, partially damaged, or spoiled cargo property;

b.  Loss due to delay, demurrage, detention, and/or General Average of cargo property;

c.  Lost profits, loss of business reputation, and any other economic or non-economic losses to be proven at trial of this matter.

**REQUEST FOR RELIEF**

WHEREFORE, Claimants PORTS AMERICA, INC., R.E. WEST, INC., E. MARINE MOTOR YACHT SALES PTY LTD. CAPTAIN C LOGISTICS LLC, AMERICAN PUBLISHING LLC, B&R CONSTRUCTION SERVICES INC., ~~and~~ INTERNATIONAL TRADING SOLUTIONS, INC, PENN MANUFACTURING INDUSTRIES LLC, PMI ENG EXPORTS PRIVATE TLD, and PMI GLOBAL TECHNOLOGIES PVT LTD and all others similarly situated,  pray for judgment against Petitioners, GRACE OCEAN PRIVATE LIMITED and SYNERGY MARINE PTE LTD, as follows:

    a.     That the Class be certified;

    b.     The full amount of damages for Claimants and the Class as may be proven at trial;

    c.     Costs of suit;

    d.     Attorney's fees;

    e.     Pre-judgment and post-judgment interest as allowed by law;

    f.     As to all cargo of all vessels either entering or departing form the Port of Baltimore or scheduled to arrive or depart the Port of Baltimore from March 26, 2024, to December 31,2024,  any costs or losses  arising from the delay or denial of port entry or exit  for any vessel scheduled to leave or enter the port of Baltimore during that time period that incurred delays, and/or losses, increased costs,  property losses  or lost income whether  insured or uninsured;

    g.     Punitive damages for the grossly negligent, reckless, and intentional acts of the Petitioner's agents on board the Dali; and

h.      All other relief that this Court deems just and proper.


Dated: September 2~~43~~, 2024                    Respectfully submitted,

                                                **MILBERG BRYSON COLEMAN
                                                PHILLIPS GROSSMAN, PLLC**

                                                Gregory F. Coleman*
                                                800 South Gay Street, Suite 1100
                                                Knoxville, Tennessee 37929
                                                (T): 866-252-0878
                                                gcoleman@milberg.com

                                                Marc D. Grossman*
                                                Victoria J. Maniatis*
                                                James R. DeMay*
                                                Melissa K. Sims*
                                                100 Garden City Plaza, Suite 500
                                                Garden City, NY 11530
                                                T: (866) 252-0878
                                                mgrossman@milberg.com
                                                vmaniatis@milberg.com
                                                jdemay@milberg.com
                                                msims@milberg.com

                                                */s/ Roy L. Mason*
                                                Roy L. Mason (00922)
                                                Zachary E. Howerton (20688)
                                                *Of Counsel*
                                                Smouse and Mason, LLC
                                                223 Duke of Gloucester Street
                                                Annapolis, Maryland 21401
                                                (T): 410-269-6620
                                                (F): 410-269-1235
                                                rlm@smouseandmason.com
                                                zeh@smouseandmason.com

                                                *\* Pro Hac Vice motions to be filed*

                                                **LOCHNER LAW FIRM, P.C.**

_/s/Todd D. Lochner_
Todd D. Lochner (25691)
Lochner Law Firm, P.C.
7076 Bembe Beach Road
Suite 201, Mailbox 6
Annapolis, Maryland 21403
(T): 410-716-4400
(F): 443-716-4405
tlochner@lochnerlaw.com

*Counsel for Claimant*

67

**DEMAND FOR JURY TRIAL**

Claimants R.E. WEST, INC., E. MARINE MOTOR YACHT SALES PTY LTD., CAPTAIN C LOGISTICS LLC, AMERICAN PUBLISHING LLC, and B&R CONSTRUCTION SERVICES INC., PENN MANUFACTURING INDUSTRIES LLC, PMI ENG EXPORTS PRIVATE TLD, and PMI GLOBAL TECHNOLOGIES PVT LTD and all others similarly situated, demand a trial by jury on all claims so triable.

Dated: September 24~~3~~, 2024                    Respectfully submitted,

**MILBERG BRYSON COLEMAN PHILLIPS GROSSMAN, PLLC**

Gregory F. Coleman*
800 South Gay Street, Suite 1100
Knoxville, Tennessee 37929
(T): 866-252-0878
gcoleman@milberg.com

Marc D. Grossman*
Victoria J. Maniatis*
James R. DeMay*
Melissa K. Sims*
100 Garden City Plaza, Suite 500
Garden City, NY 11530
T: (866) 252-0878
mgrossman@milberg.com
vmaniatis@milberg.com
jdemay@milberg.com
msims@milberg.com

*/s/ Roy L. Mason*
Roy L. Mason (00922)
Zachary E. Howerton (20688)
*Of Counsel*
Smouse and Mason, LLC
223 Duke of Gloucester Street
Annapolis, Maryland 21401

(T): 410-269-6620
(F): 410-269-1235
rlm@smouseandmason.com
zeh@smouseandmason.com

*\* Pro Hac Vice motions to be filed*

**LOCHNER LAW FIRM, P.C.**

*/s/Todd D. Lochner*
Todd D. Lochner (25691)
Lochner Law Firm, P.C.
7076 Bembe Beach Road
Suite 201, Mailbox 6
Annapolis, Maryland 21403
(T): 410-716-4400
(F): 443-716-4405
tlochner@lochnerlaw.com

*Counsel for Claimants*

**<u>CERTIFICATE OF SERVICE</u>**

In compliance with Supplemental Federal Rule F(5), I HEREBY CERTIFY that on the 2~~4th~~3rd day of September, 2024, I electronically filed the foregoing pleading with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel who are CM/ECF participants.

*/s/ Roy L. Mason*
Roy L. Mason