**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| **In the Matter of the Petition**<br><br>**of**<br><br>**GRACE OCEAN PRIVATE LIMITED, as Owner of the M/V DALI,**<br><br>**and**<br><br>**SYNERGY MARINE PTE LTD, as Manager of the M/V DALI,**<br><br>**for Exoneration from or Limitation of Liability** | **Docket No. JKB 24-cv-941**<br><br>*IN ADMIRALTY* |

**CLASS ACTION CLAIM BY CLAIMANTS GERALD BARNEY, THOMAS CRAWLEY, RYAN HALE, TULANI HASAN, DONNY JACKSON, ALONZO KEY, CHARLES PEACOCK, AND DOUGLAS RAMOS BOTH INDIVIDUALLY AND AS CLASS REPRESENTATIVES, FOR PECUNIARY AND PUNITIVE DAMAGES**

COMES NOW Claimants GERALD BARNEY, THOMAS CRAWLEY, RYAN HALE, TULANI HASAN, DONNY JACKSON, ALONZO KEY, CHARLES PEACOCK, and DOUGLAS RAMOS, each individually ("Representative Claimants") and on behalf of others similarly situated ("Class Members") (collectively referred to as "Claimants"), by attorneys William H. Murphy, Jr., Andrew K. O'Connell, Ronald E. Richardson, and Jason P. Foster and respectfully submit these claims arising from economic losses sustained by Claimants as a result of the March 26, 2024, collapse of the Francis Scott Key Bridge.[1]

---

[1] Claimants bring this class action as a matter of, among other things, judicial economy and efficiency. Claimants are aware of the U.S. Court of Appeals for the Fifth Circuit's opinion in *Lloyd's Leasing, Ltd. v. Bates*, 902 F.2d 368 (5th Cir. 1990), but believe that it is not controlling in this case for various reasons. In the event that the Court determines that class certification is unavailable in this matter, Claimants reserve the right to amend this Answer to name the approximately 2200 longshoremen who are the specific members of the class.

1

At all times relevant to this action, Representative Claimants were members of the International Longshoremen's Association Local 333 (ILA-333), comprised of approximately one thousand eight hundred (1,800) members and ILA Locals 953 and 1429, comprised of approximately four hundred (400) members collectively. Due to the nature of their employment and the impact of the collapse of the Key Bridge on their respective livelihoods, Representative Claimants and Class Members are similarly situated. This action is not being brought by any of these unions.

Claimants reserve all rights to proceed at law under 28 U.S.C. § 1333(1) on all claims and issues, against Petitioners and any other party, in a forum of their choice.

## PRELIMINARY STATEMENT

1)   On March 26, 2024, Petitioners killed six people and severely injured two others when they recklessly crashed an unseaworthy cargo vessel into the Francis Scott Key Bridge.

2)   In addition to causing this tragic loss of life and serious injuries to the survivors, Petitioners' acts and omissions completely halted the flow of commerce in an out of the Port of Baltimore for two months.

3)   Nearly six months later, shipping traffic in the Port of Baltimore has still not returned to pre-disaster levels.

4)   Claimants' incomes were and continues to be entirely dependent on the flow of cargo vessels in and out of the Port of Baltimore.

5)   Six days after the disaster that they caused, before all of the dead were even recovered, Petitioners invoked the jurisdiction of this Court, asserting that they owe nothing for either the lives or the livelihoods they destroyed. Claimants now bring these claims to hold

Petitioners accountable and to ensure an avoidable tragedy like the Key Bridge disaster never happens again.

## PARTIES

6)      Named Claimant, GERALD BARNEY, is, and at all times relevant to this litigation, a United States citizen, and a citizen and resident of the State of Maryland.

7)      Named Claimant, THOMAS CRAWLEY, is, and at all times relevant to this litigation, a United States citizen, and a citizen and resident of the State of Maryland.

8)      Named Claimant, RYAN HALE, is, and at all times relevant to this litigation, a United States citizen, and a citizen and resident of the State of Maryland.

9)      Named Claimant, TULANI HASAN, is, and at all times relevant to this litigation, a United States citizen, and a citizen and resident of the State of Maryland.

10)     Named Claimant, DONNY JACKSON, is, and at all times relevant to this litigation, a United States citizen, and a citizen and resident of the State of Maryland.

11)     Named Claimant, ALONZO KEY, is, and at all times relevant to this litigation, a United States citizen, and a citizen and resident of the State of Maryland.

12)     Named Claimant, CHARLES PEACOCK, is, and at all times relevant to this litigation, a United States citizen, and a citizen and resident of the State of Maryland.

13)     Named Claimant, DOUGLAS RAMOS, is, and at all times relevant to this litigation, a United States citizen, and a citizen and resident of the State of Maryland.

14)     Petitioner Grace Ocean Private Ltd. is a Singapore-based corporation and the registered owner of the *Dali*. On information and belief, Grace Ocean Private Ltd. conducted vessel and crew management, training and selection onboard the *Dali*, as well as assessments, operations, and maintenance on the vessel and its equipment, including its electrical and propulsion

systems. All crewmembers on board the *Dali* were answerable to Petitioner Grace Ocean
Private Ltd.

15)     Petitioner Synergy Marine PTE LTD is a Singapore-based corporation. Synergy
Marine PTE LTD conducted technical and crew management, training and selection on board the
*Dali*, as well as assessments, risk analysis, operations, and maintenance on the vessel and its
equipment, including its electrical and propulsion systems.

## JURISDICTION AND VENUE

16)     This Court has maritime jurisdiction because Claimants' claims arise from a cargo
vessel allision upon the Patapsco River in Maryland, navigable waters of the United States.

17)     Petitioners have consented to the jurisdiction of this Court in filing the pending
Limitation Action and negligently and recklessly committing acts and omissions in Maryland that
caused catastrophic injuries to citizens of this state in Maryland.

18)     Venue is proper because the incident giving rise to Claimants' claims occurred in
this district.

## FACTS

19)     In the early morning hours of March 26, 2024, the *Dali*, a containership, was
departing Baltimore for Sri Lanka when the vessel lost electrical power and struck the Francis
Scott Key Bridge.

20)     At the time of the allision, the *Dali* was a seagoing vessel at the beginning of its
voyage under 46 U.S.C. § 30524. The Master of the *Dali* committed numerous reckless and
negligent acts prior to the disaster, each of which is imputable upon Petitioners as a matter of law.

**The Fort McHenry Channel**

21)     The Fort McHenry Channel connects the Port of Baltimore to the Chesapeake Bay via the Patapsco River.

22)     The Fort McHenry Channel is the only means for deep-draft ships, like the *Dali*, to access the Port of Baltimore.

23)     Because it offers the only means for deep-draft vessels to access the Port of Baltimore, the Fort McHenry Channel is a vital link in America's transportation infrastructure— one critical to the prosperity of maritime commerce on the eastern seaboard and essential to Claimants' livelihood.

**The *Dali's* Electrical System**

24)     A substantial portion of the *Dali's* improper acts involved reckless and negligent operation of the *Dali*'s electrical generating and distribution system.

25)     The *Dali* generates electrical power using four main diesel generators (Diesel Generators 1, 2, 3, and 4) and one emergency backup diesel generator. These generators create high voltage electricity (6,600 Volts) that is distributed from the vessel's High Voltage Bus.

26)     The High Voltage Bus is the Primary electrical source supplying two identical transformers: Transformer 1 and Transformer 2. Transformer 1 and Transformer 2 are "step down transformers" that convert high voltage electricity energy to low voltage electricity (440 Volts), which is then distributed ship wide via a Low Voltage Bus, which is the Secondary side of the transformer.

27)     Both high and low voltage electricity is required to power critical components on the *Dali*, such as the main propulsion engine lubricating oil pumps and the main engine cooling

pumps. These pumps run on high and low voltage, respectively. If they are denied electrical power, the main propulsion engine is designed to shut down to prevent damage to its components.

28)    On either side (Primary side and Secondary side) of the *Dali's* Transformer 1 are two circuit breakers: High Voltage Breaker 1 and Low Voltage Breaker 1, respectively. Similarly, on either side (Primary side and Secondary side) of Transformer 2, there are two circuit breakers: High Voltage Breaker 2 and Low Voltage Breaker 2, respectively.

29)    The purpose of these breakers is to interrupt electrical pathways when the current (amperage) passing through the breaker is above the circuit breaker's designed limit. These circuit breakers "trip" when an over current condition is sensed to protect the ship's wiring from overheating.

30)    A *low* voltage condition will also cause High Voltage Breaker 1 or 2 or Low Voltage Breaker 1 or 2 to also "trip," preventing equipment damage. A low voltage condition can damage equipment requiring a constant, steady source of electrical energy for proper operation. To prevent such damage, voltage sensing devices are integrated into the *Dali*'s distribution system.

31)    Transformers 1 and 2 on the *Dali* are redundant, meaning only one transformer needs to be online to power the vessel. The *Dali*'s Integrated Control Management System ("ICMS") can be configured so that one transformer comes online automatically if the other ceases operation for whatever cause. The system can also be operated in manual mode, as it was on the date of the disaster, which requires a crewmember to engage the controls to energize the offline transformer.

### Power Loss Prior to Departure

32)    Just hours prior to departure, the *Dali* suffered a complete electrical blackout. At that time, the vessel was running solely on Transformer 2 and was powered by Diesel Generator 2.

33)    The blackout allegedly occurred after a *Dali* crewmember improperly closed an inline engine exhaust damper in the diesel engine driving Diesel Generator 2. This prevented the venting of exhaust gases, which, when detected, resulted in the automatic shutdown of the engine and Diesel Generator 2.

34)    When the engine shutdown was detected, High Voltage Breaker 2 and Low Voltage Breaker 2 opened or "tripped" automatically. The opening of the breakers interrupted the flow of electrical current in the vessel's electrical system as designed, causing the blackout. Diesel Generator 3 then came online and re-supplied power to the High Voltage Bus, making up for Diesel Generator 2's absence.

35)    In response to the blackout, *Dali*'s crewmembers closed High Voltage Breaker 2 and Low Voltage Breaker 2. This restored electrical power to the ship's electrical distribution system and the generating source was now Diesel Generator 3.

36)    Shortly thereafter, however, Diesel Generator No. 3 experienced a loss of fuel pressure and, as a result, its breaker opened. This caused a second blackout due to the ensuing loss of electrical power to the High Voltage Bus and then, loss of the ship's electrical power.

37)    On information and belief, Diesel Generator 3 came offline because a defective pneumatic pump did not provide the generator with sufficient fuel. Notably, the *Dali*'s original fuel oil system was re-designed by Petitioners in approximately 2020. That re-design included the installation of a "flushing" pump to provide fuel to the Diesel Generators. The flushing pump, however, was not manufactured to be a primary fuel source for a diesel generator. As a result, it lacked important safety features, such as the ability to automatically re-start after a power failure. As a back-up to the flushing pump, Petitioners also installed the pneumatic pumps, which could only provide intermittent fuel to the generators.

38)     In re-engineering their fuel oil system in this fashion, Petitioners intentionally removed vital redundancies from their vessel's electrical and propulsion systems for the purpose of saving money.

39)     During *Dali*'s pre-departure blackout, the crew allegedly realized that Diesel Generator 2's exhaust damper was closed. When the crew opened the damper, Diesel Generator 2 came online again, providing the needed power to the High Voltage and Low Voltage busses.

40)     The *Dali* never notified the Coast Guard of the two vessel-wide blackouts, in violation of applicable regulations, including 46 C.F.R. § 4.05-1. What is more, in an improper response to the power losses, the *Dali* switched the vessel's operative transformer from Transformer 2 to Transformer 1 prior to departing.

41)     Transformer 1 had not been used for several months and, in fact, was known by the *Dali* to be damaged. Intentional reliance on a damaged and sparsely used transformer was not only a clear breach of industry standards but incredibly dangerous.

### The Dali's Well-Documented Issues with Vessel Vibration

42)     The *Dali* had a well-recorded history of severe and dangerous vessel vibration issues, which directly affected its electrical system and rendered the vessel blatantly unseaworthy. These defects were known to Petitioners before departure for Sri Lanka and they departed anyway. Petitioners' reckless decision to leave berth in the face of these dangerous deficiencies was motivated by profit.

43)     Post-incident inspections of the vessel revealed extensive evidence of damage to the vessel caused by excessive vibration and haphazard methods to try and contain it. The vessel's electrical transformers were crudely secured using steel braces, which themselves were damaged by vibration. Written notations regarding vibration were observed in the vessel's bow thruster

room and within its vessel logs and records. Loose cable wires and hardware were observed within the vessel's transformers and switchboards. Finally, and most glaringly, Transformer 1 was secured against vibration with an ad-hoc "jury-rigged" contraption made up of a spare cargo chain turnbuckle.

44)     Despite these open and obvious dangerous conditions, some of which Petitioners intentionally created, Petitioners sailed their enormous vessel directly towards a major bridge on Transformer 1, in wanton and reckless disregard for the safety of others. Petitioners' wanton and reckless decision would soon kill six people, severely injure two others and negatively impact maritime commerce resulting in a significant decrease in Claimants' incomes.

### The Key Bridge Disaster

45)     The *Dali* initially departed with the aid of a senior pilot and apprentice pilot with the Association of Maryland Pilots. A pilot's role is to assist with the navigation of the vessel in local waters.

46)     During the master/pilot exchange, the Master knowingly and falsely ensured the assisting pilots that all equipment was in "good working order" and recklessly failed to inform the pilots about the system-wide electrical failures and vibration issues plaguing the *Dali*. This was a violation of applicable regulations, including 33 C.F.R. § 1641.11(k).

47)     Additionally, the Master never reported to the pilot that any issues were affecting the vessel's bow thruster prior to the voyage. Yet, in the course of the subsequent failure, when the pilot called for use of the bow thruster to prevent the allision, the Master reported that it was "unavailable."

48)     As it departed, the *Dali* was initially aided by two tugboats. As the vessel entered the Fort McHenry channel, however, the tugboats were ordered to return to port. This occurred

even though the Master knew that the *Dali* was prone to sudden complete electrical failures that would prevent adequate steering of the enormous vessel.

49)     Given this knowledge, the *Dali's* Master should have requested tugs through the bridge's main span. At the very least, he should have slowed the vessel and stationed crewmembers at the anchor winch, a standard industry practice. This would have allowed for rapid dropping of the anchor and slowing of the vessel in the event of another power failure. None of these basic precautions were taken by the *Dali*, indicating Petitioners had insufficient safety management procedures and risk assessments.

50)     As the unaided vessel came within a half mile from the Key Bridge, the *Dali*, just as it had before the departure, lost all electrical power.

51)     The power loss occurred after High Voltage Breaker 1 and Low Voltage Braker 1 "tripped," preventing primary power to Transformer 1 and therefore de-powering the secondary 440 Volt system. Defects in the *Dali's* electrical system (e.g., loose cable wires or defective coils) caused the "tripping" of High Voltage Breaker 1 and Low Voltage Breaker 1. On information and belief, these defects were known to Petitioners, their agents, employees, superintendents and crew, including the Master of the vessel prior to the beginning of the voyage.

52)     The resulting loss of electrical power to critical engine equipment resulted in the automatic shutdown of the main engine, and the loss of the vessel's propulsion system and steering system. The steering system was partially restored (at a lower speed of rudder control) after the emergency backup diesel started to supply limited electrical power to selected systems.

53)     At this time, if the vessel's ICMS was in "automatic mode," then Low Voltage Circuit Breaker 2 and High Voltage Circuit breaker 2 would have both closed, resulting in

Transformer 2 coming online and restoring power to the entire vessel in about ten seconds, avoiding an extended blackout.

54)     The *Dali* negligently and recklessly failed to utilize "automatic mode" at the outset of the voyage. Instead, the *Dali* used "manual" mode, which required a crewmember to switch transformers manually.

55)     Since the transformer control switch was in manual mode, the *Dali* should have manually switched to Transformer 2 immediately after the failure. They failed to do so, again indicating deficient safety management systems and procedures.

56)     Instead of switching transformers, *Dali's* crew simply closed High Voltage Breaker 1 and Low Voltage Breaker 1, and crossed their fingers, hoping another failure would not happen again.

57)     As during the pre-departure blackout, closing the tripped breakers did initially restore power to the *Dali*. But, as before, a second blackout occurred soon after.

58)     When the vessel was just .2 miles from the bridge, the breakers connecting the vessel's online diesel generators (Diesel Generator 3 and Diesel Generator 4) to the High Voltage Bus opened and disconnected. This occurred because the vessel's flushing pumps were turned off and the back-up defective pneumatic pump could not generate sufficient fuel to supply the running generators.

59)     The tripping of the generator breakers eliminated power again to both the High Voltage Bus and Low Voltage Bus, causing the second blackout and loss of the enormous vessel's propulsion and steering systems.

60)     In response, the crew manually closed High Voltage Breaker 2 and Low Voltage Breaker 2, something that should have occurred automatically within seconds of the initial power

loss. This re-introduced power to the High Voltage bus, finally allowing Transformer 2 to come online.

61)     The manual transition to Transformer 2 was too little, too late.  While power was regained, there was insufficient time for the vessel to regain main engine propulsion and full steering rudder control.

62)     While the port anchor was belatedly released, it was lowered too late to prevent the disaster because the *Dali* was not prepared for a foreseeable emergency. The pilot's last-ditch, desperate calls for the bow thruster were met only with a report from the Master that it was "unavailable."

63)     In addition, there is no indication that the vessel's emergency generator provided emergency power after the first blackout, as required by the Safety of Life at Sea ("SOLAS") Convention. This is further evidence of the unseaworthiness of the vessel.

64)     Shortly thereafter, the vessel struck the Key Bridge causing the Bridge to collapse into the Patapsco River, killing six people, injuring two others, and completely blocking the Fort McHenry Channel, including the Port of Baltimore, for the following two months.

## CLASS ACTION ALLEGATIONS

65)     Representative Claimants bring this Claim as a class action on behalf of themselves individually and on behalf all others similarly situated as members of the proposed Claimants' Class pursuant to Federal Rules of Civil Procedure 23(a), (b)(3), and/or (b)(2). This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of those provisions.

66)     The Class that the Representative Claimants seek to represent is defined as all Longshoremen who are members of ILA-333, ILA-953, and ILA-1429.

67)     Numerosity: ILA-333 is comprised of approximately one thousand eight hundred (1,800) members and ILA-953 and ILA-1429 are comprised of approximately two hundred (200) members each. These members' wages and benefits were severely impacted as result of the Key Bridge collapse.; therefore, joinder of all members individually is impracticable.  The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. As the Class Members are all members of ILA-333, ILA-953, and ILA-1429, they are readily identifiable.

68)     Typicality: Representative Claimants' claims are typical of the claims of the Class. Like all Class Members, Representative Claimants are members of the aforementioned locals. Representative Claimants, like all Class Members, have been damaged by Petitioners' wrongful acts and omissions in that they have incurred and continue to incur lost income caused by the months-long complete shut-down of the Port of Baltimore and the ongoing reduction in shipping commerce associated therewith that continues to this day and that will continue into the future.

69)     Commonality:  There are questions of law and fact common to the Representative Claimants and the Class Members that predominate over any question affecting only individual Class Members.  These common legal and factual issues include the following:

a)     Whether Petitioners are entitled to either exoneration or limitation under the Limited Liability Act;

b)     Whether Petitioners' wrongful acts and omissions constitute a public nuisance;

c)     Whether Claimants have been harmed in a manner is that different in both nature and magnitude from the harm suffered by the general public;

d)     Whether Petitioners were negligent, wanton and willfull in alliding with the Key Bridge causing it to collapse into the Patapsco River;

e)      Whether there is actual privity of contract between the Class Members and Petitioners; and

f)      Whether there is an intimate nexus between the services Class Members provide and the shipping interests such as Petitioners.

70)     Adequate Representation:  The Representative Claimants will fairly and adequately protect the interests of the Class Members.  The Representative Claimants have retained attorneys experienced in the prosecution of class actions, and the Representative Claimants intend to prosecute this action vigorously. Furthermore;

a)      The interests of the Representative Claimants are identical to and not antagonistic to the interests of the Class Members;

b)      The prosecutions of separate actions by individual Class Members would create a risk of inconsistent and varying adjudications with respect to individual Class Members, and it would establish incompatible standards of conduct for the parties anticipated to oppose the class;

c)      The prosecutions of separate actions by individual Class Members would, as a practical matter, substantially impair or impede the ability of the other Class Members to preserve and protect their interests; and

d)      The Representative Claimants allege that it is desirable to concentrate all litigation in one forum because all their claims arose from the Key Bridge Disaster; and consolidation of their claims will promote judicial efficiency to resolve their common questions of law and fact in one single forum.

71)     Predominance and Superiority:   The Representative Claimants and the Class Members have all suffered and will continue to suffer harm and damages because of Petitioners' unlawful and wrongful conduct.  A class action is superior to other available methods for the fair

14

and efficient adjudication of the controversy.  Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.  It is likely that only a few Class Members could afford to seek legal redress for Petitioners' misconduct.  Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

**COUNT ONE: PUBLIC NUISANCE,**
**AS AGAINST GRACE OCEAN PRIVATE LTD**

72)   Claimants incorporate the foregoing and subsequent paragraphs.

73)   The collapse of the Key Bridge caused by Petitioner Grace Ocean Private Ltd's wrongful acts and omissions unreasonably interfered with the flow of cargo vessels into and out of the Port of Baltimore which is a right common to the general public.

74)   Petitioner Grace Ocean Private Ltd's wrongful acts and omissions violated one or more statutes and/or regulations including but not limited to the Rivers and Harbors Act, 33 U.S.C. §§ 401, *et seq.*

75)   Claimants suffered special and particular damage, different in both degree and kind from that experienced in common with other citizens. Specifically, Claimants were entirely dependent on the flow of cargo into and out of Baltimore for their livelihood. When Petitioner Grace Ocean Private Ltd carelessly and recklessly alllided with the Key Bridge, that flow ceased immediately and completely.

76)   Nearly six months later, shipping traffic in the Port of Baltimore has still not returned to pre-disaster levels. And will not do so for the foreseeable future.

77)    As a result of the public nuisance created by Petitioner Grace Ocean Private Ltd's
wrongful acts and omissions, Claimants suffered pecuniary losses.

78)    Claimants therefore seek all available damages under applicable law, including but
not limited to compensation for:

a.    Past and future economic losses;

b.    Punitive damages;

c.    Costs of suit and Attorneys' fees; and

d.    All other damages available under applicable law.

79)    To the extent that any of the above remedies are not available under general
maritime law, Claimants seek all available supplemental remedies under applicable state law.

## COUNT TWO: PUBLIC NUISANCE,
## AS AGAINST SYNERGY MARINE PTE LTD

80)    Claimants incorporate the foregoing and subsequent paragraphs.

81)    The collapse of the Key Bridge caused by Petitioner Synergy Marine PTE LTD's
wrongful acts and omissions unreasonably interfered with the flow of cargo vessels into and out
of the Port of Baltimore which is a right common to the general public.

82)    Petitioner Synergy Marine PTE LTD's wrongful acts and omissions violated one
or more statutes and/or regulations including but not limited to the Rivers and Harbors Act, 33
U.S.C. §§ 401, *et seq*.

83)    Claimants suffered special and particular damage, different in both degree and kind
from that experienced in common with other citizens. Specifically, Claimants were entirely
dependent on the flow of cargo into and out of Baltimore for their livelihood. When Petitioner
Synergy Marine PTE LTD carelessly and recklessly allided with the Key Bridge, that flow ceased
immediately and completely.

84)      Nearly six months later, shipping traffic in the Port of Baltimore has still not returned to pre-disaster levels.

85)      As a result of the public nuisance created by Petitioner Synergy Marine PTE LTD's wrongful acts and omissions, Claimants suffered and continue to suffer pecuniary losses.

86)      Claimants therefore seek all available damages under applicable law, including but not limited to compensation for:

a.      Past and future economic losses;

b.      Punitive damages;

c.      Costs of suit and Attorneys' fees; and

d.      All other damages available under applicable law.

87)      To the extent that any of the above remedies are not available under general maritime law, Claimants seek all available supplemental remedies under applicable state law.

**COUNT THREE: NEGLIGENCE,**
**AS AGAINST GRACE OCEAN PRIVATE LTD**

88)      Claimants incorporate the foregoing and subsequent paragraphs.

89)      The movement of cargo into and out of the Port of Baltimore is controlled by contracts negotiated by bargaining agents representing the shipping interests, including Petitioners, and labor, including the Class Members. Consequently, Petitioners and Claimants are in contractual privity.

90)      The relationship between Petitioners and the Class Members is sufficiently close— or intimate—to support finding a tort duty owed by Petitioners to the Class Members. Specifically: (1) the Petitioners were aware that the Patapsco River provided the only shipping route into the Port of Baltimore; (2) the Class Members were known to rely of the unimpeded flow of cargo into and out of the Port of Baltimore as their sole means of income; (3) the Petitioners were coming in

17

to the Port of Baltimore for the sole purpose of delivering and/or receiving cargo; (4) the Petitioners knew or reasonably should have known that cargo could be loaded and/or unloaded only by Class Members; (5) Petitioners knew or reasonably should have known that the Class Members were particularly vulnerable to interruptions in the flow of cargo in and out of the Port of Baltimore if shipping interests such as Petitioners failed to exercise due care; and (6) the loading and unloading of cargo in intimately related to the transportation of cargo.

91)    At all relevant times, as the registered owner of the *Dali*, Petitioner Grace Ocean Private Ltd owed Claimants a duty to ensure that the voyage on March 26, 2024, was adequately planned and executed, that the *Dali* was seaworthy and appropriately equipped for the voyage, that all on board the *Dali* had sufficient training, equipment and provisions to complete the voyage successfully and that the vessel had appropriate safety management systems and risk assessments to avoid injury to others.

92)    Petitioner Grace Ocean Private Ltd breached these duties in that, Petitioner, its agents and employees, including the Master, crew members, agents, superintendents and executives:

  a.    Conducted a voyage with an unseaworthy vessel;

  b.    Failed to navigate the vessel properly;

  c.    Knowingly departed with a defective electrical system;

  d.    Failed to properly operate the vessel's electrical system;

  e.    Failed to properly troubleshoot and diagnose defects with the electrical system;

  f.    Failed to utilize tug vessels through the Key Bridge's main span;

  g.    Failed to slow the vessel as it approached the Key Bridge;

  h.    Failed to station crew at the anchor winch during departure;

18

i.    Failed to divert *Dali*'s route of travel when its engine lost power;

j.    Failed to equip *Dali* with appropriate equipment to ensure that she could be navigated properly and that emergency authorities could be contacted at any time if necessary;

k.    Failed to properly crew *Dali* with an appropriate and trained crew;

l.    Failed to implement appropriate safety policies and procedures to ensure a seaworthy vessel;

m.    Failed to properly maintain the vessel;

n.    Failed to conduct appropriate planning to ensure *Dali* was equipped to complete the planned voyage;

o.    Failed to institute appropriate training procedures;

p.    Negligently retained the crewmembers, Master, managing agent, and superintendent of the vessel;

q.    Failed to ensure a properly functioning bow thruster prior to and during the voyage;

r.    Knowingly and recklessly attempting to navigate with a defective electrical system;

s.    Knowingly and recklessly attempting to navigate with a vessel that was known to suffer from excessive vibration, resulting in alteration and damage to components, including electrical components;

t.    Failed to institute proper training, procedures, risk assessments, and safety management systems;

u.    Failed to properly equip the vessel;

v.    Violated applicable regulations and laws;

w.    Violated applicable industry standards, customs and practices;

x.      Failed to properly manage and plan the voyage;

y.      Negligently and recklessly planned and conducted the voyage with an unseaworthy

vessel in other ways to be proven in the course of discovery at trial; and

z.      Negligently and recklessly planned and conducted the voyage with an unseaworthy

vessel in other ways to be proven in the course of discovery at trial.

93)     As a result of these reckless, negligent acts and omissions, Claimants suffered and

continue to suffer pecuniary losses.

94)     Claimants therefore seek all available damages under applicable law, including but

not limited to compensation for:

a.   Past and future economic losses;

b.      Punitive damages;

c.      Costs of suit and Attorneys' fees; and

d.      All other damages available under applicable law.

95)     To the extent that any of the above remedies are not available under general

maritime law, Claimants seek all available supplemental remedies under applicable state law.

## COUNT FOUR: NEGLIGENCE,
## AS AGAINST SYNERGY MARINE PTE LTD

96)     Claimant incorporates the foregoing and subsequent paragraphs.

97)     The movement of cargo into and out of the Port of Baltimore is controlled by

contracts negotiated by bargaining agents representing the shipping interests, including Petitioners,

and labor, including the Class Members. Consequently, Petitioners and Claimants are in

contractual privity.

98)     The relationship between Petitioners and the Class Members is sufficiently close—

or intimate—to support finding a tort duty owed by Petitioners to the Class Members. Specifically:

(1) the Petitioners were aware that the Patapsco River provided the only shipping route into the Port of Baltimore; (2) the Class Members were known to rely of the unimpeded flow of cargo into and out of the Port of Baltimore as their sole means of income; (3) the Petitioners were coming in to the Port of Baltimore for the sole purpose of delivering and/or receiving cargo; (4) the Petitioners knew or reasonably should have known that cargo could be loaded and/or unloaded only by Class Members; (5) Petitioners knew or reasonably should have known that the Class Members were particularly vulnerable to interruptions in the flow of cargo in and out of the Port of Baltimore if shipping interests such as Petitioners failed to exercise due care; and (6) the loading and unloading of cargo in intimately related to the transportation of cargo.

99)     At all relevant times, as the technical manager of the *Dali* and her crew, Petitioner Synergy Marine PTE LTD owed Claimants a duty to ensure that the voyage on March 26, 2024, was adequately planned and executed, that the *Dali* was seaworthy and appropriately equipped for the voyage, that all on board the *Dali* had sufficient training, equipment and provisions to complete the voyage successfully and that the vessel had appropriate safety management systems and risk assessments to avoid injury to others.

100)     Petitioner Synergy Marine PTE LTD breached these aforesaid duties in that, among other things, Petitioner, its agents and employees, including the Master, crew members, agents, superintendents and executives:

a)     Conducted a voyage with an unseaworthy vessel;

b)     Failed to navigate the vessel properly;

c)     Knowingly departed with a defective electrical system;

d)     Failed to properly operate the vessel's electrical system;

e)     Failed to properly troubleshoot and diagnose defects with the electrical system;

f)      Failed to utilize tug vessels through the Key Bridge's main span;

g)      Failed to slow the vessel as it approached the Key Bridge;

h)      Failed to station crew at the anchor winch during departure;

i)      Failed to divert *Dali*'s route of travel when its engine lost power;

j)      Failed to equip *Dali* with appropriate equipment to ensure that she could be navigated properly and that emergency authorities could be contacted at any time if necessary;

k)      Failed to properly crew *Dali* with an appropriate and trained crew;

l)      Failed to implement appropriate safety policies and procedures to ensure a seaworthy vessel;

m)      Failed to properly maintain the vessel;

n)      Failed to conduct appropriate planning to ensure *Dali* was equipped to complete the planned voyage;

o)      Failed to institute appropriate training procedures;

p)      Negligently retained the crewmembers, Master, managing agent, and superintendent of the vessel;

q)      Failed to ensure a properly functioning bow thruster prior to and during the voyage;

r)      Knowingly and recklessly attempting to navigate with a defective electrical system;

s)      Knowingly and recklessly attempting to navigate with a vessel that was known to suffer from excessive vibration, resulting in alteration and damage to components, including electrical components;

t)      Failed to institute proper training, procedures, risk assessments, and safety management systems;

u)    Failed to properly equip the vessel;

v)    Violated applicable regulations and laws;

w)    Violated applicable industry standards, customs and practices;

x)    Failed to properly manage and plan the voyage;

y)    Negligently and recklessly planned and conducted the voyage with an unseaworthy vessel in other ways to be proven in the course of discovery at trial; and

z)    Negligently and recklessly planned and conducted the voyage with an unseaworthy vessel in other ways to be proven in the course of discovery at trial.

101)    As a result of these reckless, negligent acts and omissions, Claimants suffered and continue to suffer pecuniary losses.

102)    Claimants therefore seek all available damages under applicable law, including but not limited to compensation for:

a)    Past and future economic losses;

b)    Punitive damages;

c)    Costs of suit and Attorneys' fees; and

d)    All other damages available under applicable law.

103)    To the extent that any of the above remedies are not available under general maritime law, Claimants seek all available supplemental remedies under applicable state law.

## COUNT FIVE: PUNITIVE DAMAGES
## AS AGAINST GRACE OCEAN PRIVATE LTD

104)    Claimant incorporates the foregoing and subsequent paragraphs.

105)    At all relevant times, Petitioner Grace Ocean Private LTD conducted intentional, willful, wanton, reckless, and/or grossly negligent acts and omissions, causing Claimant's injuries and one of the worse maritime disasters in the history of the United States. Punitive damages are

therefore appropriate to punish Petitioner Grace Ocean Private LTD and deter similar future acts and omissions.

106)    Petitioner Grace Ocean Private LTD should be assessed punitive damages in that, motivated by profit, it intentionally, willfully, wantonly, grossly negligently, recklessly:

a)    Conducted a voyage with an unseaworthy vessel;

b)    Failed to navigate the vessel properly;

c)    Departed with a defective electrical system;

d)    Failed to properly operate the vessel's electrical system;

e)    Failed to properly troubleshoot and diagnose defects with the electrical system;

f)    Failed to utilize tug vessels through the Key Bridge's main span;

g)    Failed to slow the vessel as it approached the Key Bridge;

h)    Failed to station crew at the anchor winch during departure;

i)    Failed to divert *Dali*'s route of travel when its engine lost power;

j)    Failed to equip *Dali* with appropriate equipment to ensure that she could be navigated properly and that emergency authorities could be contacted at any time if necessary;

k)    Failed to properly crew *Dali* with an appropriate and trained crew;

l)    Failed to implement appropriate safety policies and procedures to ensure a seaworthy vessel;

m)    Failed to properly maintain the vessel;

n)    Failed to conduct appropriate planning to ensure *Dali* was equipped to complete the planned voyage;

o)    Failed to institute appropriate training procedures;

p)    Retained the crewmembers, Master, managing agent, and superintendent of the vessel;

q)    Failed to ensure a properly functioning bow thruster prior to and during the voyage;

r)    Placed Claimant's life in danger by deliberately attempting to navigate with a defective electrical system;

s)    Placed Claimant's life in danger by deliberately attempting to navigate with a vessel that was known to suffer from excessive vibration, resulting in alteration and damage to components, including electrical components;

t)    Failed to institute proper training, procedures, risk assessments, and safety management systems;

u)    Failed to properly equip the vessel;

v)    Violated applicable regulations and laws;

w)    Violated applicable industry standards, customs and practices;

x)    Failed to properly manage and plan the voyage; and

y)    Planned and conducted the voyage with an unseaworthy vessel in other ways to be proven in the course of discovery at trial.

107)    As a result of these acts and omissions, Claimants are entitled to punitive damages.

## COUNT SIX: PUNITIVE DAMAGES
## AS AGAINST SYNERGY MARINE PTE LTD

108)    Claimants incorporate the foregoing and subsequent paragraphs.

109)    At all relevant times, Petitioner Synergy Marine PTE Ltd conducted intentional, willful, wanton, reckless, and/or grossly negligent acts and omissions, causing Claimant's injuries and one of the worse maritime disasters in the history of the United States. Punitive damages are

therefore appropriate to punish Petitioner Grace Ocean Private LTD and deter similar future acts and omissions.

110)    Petitioner Synergy Marine PTE Ltd should be assessed punitive damages in that, motivated by profit, it intentionally, willfully, grossly, negligently, wantonly, and recklessly:

a)    Conducted a voyage with an unseaworthy vessel;

b)    Failed to navigate the vessel properly;

c)    Departed with a defective electrical system;

d)    Failed to properly operate the vessel's electrical system;

e)    Failed to properly troubleshoot and diagnose defects with the electrical system;

f)    Failed to utilize tug vessels through the Key Bridge's main span;

g)    Failed to slow the vessel as it approached the Key Bridge;

h)    Failed to station crew at the anchor winch during departure;

i)    Failed to divert *Dali*'s route of travel when its engine lost power;

j)    Failed to equip *Dali* with appropriate equipment to ensure that she could be navigated properly and that emergency authorities could be contacted at any time if necessary;

k)    Failed to properly crew *Dali* with an appropriate and trained crew;

l)    Failed to implement appropriate safety policies and procedures to ensure a seaworthy vessel;

m)    Failed to properly maintain the vessel;

n)    Failed to conduct appropriate planning to ensure *Dali* was equipped to complete the planned voyage;

o)    Failed to properly contact emergency authorities;

p)    Failed to institute appropriate training procedures;

q)    Retained the crewmembers, Master, managing agent, and superintendent of the vessel;

r)    Failed to sound an aural bell or alarm, or otherwise alert those on the Key Bridge of *Dali's* imminent impact;

s)    Failed to ensure a properly functioning bow thruster prior to and during the voyage;

t)    Placed Decedent's life in danger by deliberately attempting to navigate with a defective electrical system;

u)    Placed Decedent's life in danger by deliberately attempting to navigate with a vessel that was known to suffer from excessive vibration, resulting in alteration and damage to components, including electrical components;

v)    Failed to institute proper training, procedures, risk assessments, and safety management systems;

w)    Failed to properly equip the vessel;

x)    Violated applicable regulations and laws;

y)    Violated applicable industry standards, customs and practices; and

z)    Failed to properly manage and plan the voyage.

111)    Planned and conducted the voyage with an unseaworthy vessel in other ways to be proven in the course of discovery at trial.

112)    As a result of these acts and omissions, Claimants are entitled to punitive damages.

## **JURY DEMAND**

113)    Claimants demand a trial by jury.

## PRAYER FOR RELIEF

114)    Claimants request damages far in excess of the value of the vessel, in an amount to

be determined by the finder of fact for all available damages under applicable law, including but

not limited to:

a) Past and future economic losses;

b) Punitive damages;

c) Costs of suit and Attorneys' fees; and

d) All other damages available under applicable law.

e) Dated this 24th day of September, 2024.

Respectfully Submitted:


**By Counsel:**


_____/s/ Ronald E. Richardson_____
William H. Murphy, Jr., Esq.
Andrew K. O'Connell, Esq.
Ronald E. Richardson, Esq.
Jason P. Foster, Esq. (Pro hac vice)
One South Street, 30th Floor
Baltimore, MD 21202
Telephone: (410) 951-8744
Facsimile: (410) 539-6599
Email:
Billy.murphy@murphyfalcon.com
Andrew.oconnell@murphyfalcon.com
Ronald.richardson@murphyfalcon.com
Jason.foster@murphyfalcon.com

**UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| **In the Matter of the Petition**<br><br>**of**<br><br>**GRACE OCEAN PRIVATE LIMITED, as Owner of the M/V DALI,**<br><br>**and**<br><br>**SYNERGY MARINE PTE LTD, as Manager of the M/V DALI,**<br><br>**for Exoneration from or Limitation of Liability** | **Docket No. JKB 24-cv-941**<br><br>*IN ADMIRALTY* |

**CERTIFICATE OF SERVICE**

In compliance with Supplemental Federal Rule F(5), I HEREBY CERTIFY that on the 24th day of September, 2024, I electronically filed the foregoing pleading with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel who are CM/ECF participants.

_/s/ Ronald. E. Richardson_
Ronald E. Richardson, Esq.
