# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### NORTHERN DIVISION

In the Matter of the Petition

   of

GRACE OCEAN PRIVATE LIMITED, as
Owner of the M/V DALI,

   and

SYNERGY MARINE PTE LTD, as Manager
of the M/V DALI,

for Exoneration from or Limitation of
Liability,

Docket No.  JKB 24-cv-941

*IN ADMIRALTY*

## CLAIM OF CLAIMANTS/RESPONDENTS, MARKEL
## SYNDICATE MANAGEMENT LIMITED ET AL., AND FURTHER
## AS ASSIGNEES OF PORTS AMERICA CHESAPEAKE, LLC

NOW INTO COURT, and specifically reserving all rights and defenses asserted in
Claimants' accompanying Answer to the Petitioners' "Petition for Exoneration from or Limitation
of Liability," (the "Petition") through undersigned counsel, come MARKEL SYNDICATE
MANAGEMENT LIMITED (IN ITS CAPACITY AS MANAGING AGENT FOR SYNDICATE
3000 AT LLOYD'S), WHICH ISSUED POLICY NO. B1526MALIA2300913 ("Markel");
LIBERTY MUTUAL INSURANCE EUROPE SE, WHICH ISSUED POLICY NO.
B1526MALIA2300905 ("Liberty"); QBE CORPORATE LIMITED, THE SOLE CORPORATE
MEMBER OF SYNDICATE 1036, WHICH ISSUED POLICY NO. B1526MALIA2300907
("QBE"); MUNICH RE SYNDICATE LIMITED, for and on behalf of LLOYD'S
UNDERWRITER SYNDICATE NO. 457, WHICH ISSUED POLICY NO.
B1526MALIA2300906 ("MunichRe"); AXA XL UNDERWRITING AGENCIES LIMITED for

and on behalf of the CORPORATE MEMBER OF LLOYD'S SYNDICATE 2003, WHICH ISSUED POLICY NO. B1526MALIA2300908 ("AXUAL"); EVANSTON INSURANCE COMPANY, WHICH ISSUED POLICY NO. MKLV1PPR000235 ("Evanston"); and CANOPIUS CORPORATE CAPITAL LTD., THE LEAD UNDERWRITER OF LLOYD'S SYNDICATE NO. 4444, WHICH ISSUED POLICY NO. B55695HBA ("Canopius" and, together with Markel, Liberty, QBE, MunichRe, AXUAL, and Evanston, the "Insurers"), as subrogees of Ports America Chesapeake, LLC ("PAC"), and as assignees of PAC (collectively, "Claimants"), hereby make this claim pursuant to Rule F(5) of the Supplemental Rules for Admiralty or Maritime Claims (the "Claim") against Petitioners, GRACE OCEAN PRIVATE LIMITED and SYNERGY MARINE PTE LTD, as alleged owner and manager of the vessel M/V DALI (the "Dali" or the "Vessel"), and for their Claim state as follows:

## <u>INTRODUCTION</u>

1.      At approximately 12:45 a.m. local time on March 26, 2024, the container ship Dali is alleged to have left its dock in the Port of Baltimore and sailed toward the Chesapeake Bay.

2.      The Dali's course on the Patapsco River—under the 1.6-mile-long Francis Scott Key Bridge (the "Key Bridge"), out to the Chesapeake Bay, and then onward to sea—was routine and one that numerous ships have taken without allision with the Key Bridge and without affecting the shipping lane for decades. Each year, over 50 ocean carriers make nearly 1,800 visits to the Port of Baltimore.[1] Each of these visits necessarily entailed passing under the Key Bridge—twice for each such visit—without harm to the waterway or the Key Bridge.

---

[1] *See Maryland at a Glance: Waterways: Port of Baltimore*, Md. Manual Online, https://msa.maryland.gov/msa/mdmanual/01glance/html/port.html.

3.      In 1977, the Key Bridge was opened. It is named after the author of the Star-Spangled Banner, Francis Scott Key.[2]

4.      For at least the past 40 years, no ship has allided with the Key Bridge.

5.      According to a March 13, 2024 report prepared by Martin Associates for the Maryland Port Administration ("MPA"), the movement of cargo via the Port of Baltimore generates revenue throughout the state and national economies as a result of moving export cargo to the Port and distributing imported commodities inland after receipt at the Port.[3] According to the 2023 Economic Report, in 2023, the Baltimore Port District handled 55.5 million tons of cargo for exporters and importers.[4]

6.      The 2023 Economic Report noted that:

>      The firms in the maritime service sector receive revenue from arranging for transportation services, cargo handling, providing services to vessels in port and repairs to vessels calling the Port. The Maryland Port Administration (MPA) receives revenue from terminal and equipment leases at Dundalk Marine Terminal, the concession of Seagirt to Ports America Chesapeake, Masonville, Fairfield, Hawkins Point, North and South Locust Point Terminals, and from the World Trade Center. In addition, revenue is received by shippers/consignees from the sales of cargo shipped or received via Baltimore and from the sales of products made with raw materials received through the Port.[5]

7.      The Port of Baltimore is incredibly important to the local economy, not to mention to the companies that operate at or near the Port of Baltimore.

---

[2] *See Key Bridge News: Francis Scott Key Bridge History*, Md. Transp. Auth. (MDTA), https://mdta.maryland.gov/keybridgenews.

[3] *See* The 2023 Economic Impact of the Port of Baltimore in Maryland, Martin Assocs. 27 (2024), https://mpa.maryland.gov/Documents/MarylandEconomicimpactofPOB2023.pdf ("2023 Economic Report").

[4] *Id.* at 1.

[5] *Id.* at 27.

8.      PAC, a terminal operator and stevedore operating at various terminals in the Port of Baltimore, was one of these companies that were central to the regional economy.

9.      On March 26, 2024, at approximately 1:24 a.m. local time, the Dali's data recorder recorded "numerous aural alarms . . . on the ship's bridge audio."[6]

10.     One minute later, at 1:25 a.m. local time, the Dali lost power, and the crew on the ship issued a mayday call.[7] Although the crew managed to apparently restore power for a short time, the Dali lost power a second time shortly thereafter.

11.     The Dali, and its crew, failed to stop the Dali from careening into—and alliding with—the Key Bridge, causing the latter to collapse into the waters of the Patapsco and killing six construction workers on the Key Bridge (the "Allision" or "Collapse").

12.     None of this tragedy should have happened. Reporting suggests that before the Dali left port, alarms indicating inconsistent power supply had sounded. In spite of this unseaworthy condition, the Dali left port anyway.

13.     Petitioners (Grace Ocean Private Limited and Synergy Marine Pte Ltd) chose to operate a demonstrably and known unseaworthy vessel into the water and send it on its way. Petitioners' actions, therefore, were grossly (and potentially criminally)[8] negligent. Their liability should not be limited, let alone exonerated.

---

[6] Caitlin O'Kane, *A Timeline of the Francis Scott Key Bridge Collapse*, CBS News (Mar. 28, 2024, 10:46 AM), https://www.cbsnews.com/news/francis-scott-key-bridge-collapse-timeline-911-call-dali-cargo-ship-mayday-maps-construction-worker-recovery/.

[7] *Id.*

[8] *See generally, e.g.*, Elizabeth Worthington, *Dali Crew Still in Limbo as FBI Investigation Continues*, WMAR 2 Baltimore (June 13, 2024, 6:18 PM), https://www.wmar2news.com/keybridgecollapse/dali-crew-still-in-limbo-as-fbi-investigation-continues.

14.     Accordingly, Claimants bring this Claim against Petitioners pursuant to the general and maritime law of the United States and the law of public nuisance to recover Claimants' damages stemming from the Allision.

15.     Claimants expressly reserve the right to amend this Claim to assert additional allegations in support of this Claim and/or to assert additional claims and/or allegations against Petitioners and/or additional parties.

**RELEVANT PARTIES AND ENTITIES**

16.     At all times pertinent to the Claim, PAC was and is now a Delaware LLC.

17.     PAC is a leading U.S. terminal operator and a leading provider of container, bulk, breakbulk, military, project and roll-on/roll-off cargo handling, cruise terminal operations, intermodal facilities, and maintenance and repair services in the United States.

18.     PAC provides services through at least the following marine terminals in the Port of Baltimore: Seagirt Marine Terminal ("Seagirt"), which is focused on moving containers measured in twenty-foot-equivalent units ("TEU") and is equipped to handle 1,500,000 TEUs per year; Dundalk Marine Terminal ("Dundalk"), which is equipped to handle roll-on/roll-off cargo, breakbulk, containers, and other services; Atlantic Terminal ("Atlantic"); Chesapeake Terminal ("Chesapeake"); Fairfield Terminal ("Fairfield"); South Locust Point Terminal ("South Locust Point"); TradePoint Atlantic Terminal ("TradePoint"); and the Intermodal Container Transfer Facility ("ICTF").

19.     In 2009, PAC entered into a public-private partnership deal with the Maryland Port Administration and signed a 50-year lease to operate Seagirt (the "Public-Private Partnership").[9]

---

[9] *See Baltimore, MD: Our Advantages*, Ports America Chesapeake, https://www.portsamerica.com/our-locations/advantages/baltimore-md.

As part of the Public-Private Partnership, PAC agreed to invest $500 million into Seagirt and provide $140 million to the state fund for highway, bridge, and tunnel projects near the port.[10]

20.     Upon information and belief, at all times pertinent to the Claim, the Public-Private Partnership was and is in effect.

21.     PAC procured several policies of insurance to provide coverage, subject to their terms, conditions, and wording, for certain loss resulting from physical loss or damage to its property, as well as for various business interruption losses. Specifically, PAC procured insurance policies from the insurers filing this Claim as Insurers. The insurance policies PAC procured from Insurers are written on the same policy form and provide for substantially the same coverage ("Insurance Program"). Each insurer provides a specified percentage of the overall Insurance Program limit of liability. PAC has asserted a claim under the Insurance Program. Furthermore, PAC has assigned its right to pursue its claim to the Insurers.

22.     At all times pertinent to the Claim, Markel was and is now a private limited company registered and incorporated in England under Company No. 03114590 with its principal place of business located in London, England. At all times described herein, Markel provided one of the insurance policies in the Insurance Program to PAC.

23.     At all times pertinent to the Claim, Liberty was and is now a public limited liability company registered in Luxembourg with RCS No. B232280 with its principal place of business located in Leudelange, Luxembourg. At all times described herein, Liberty provided one of the insurance policies in the Insurance Program to PAC.

24.     At all times pertinent to the Claim, QBE was and is now a private limited company registered and incorporated in England under Company No. 03115135 with its principal place of

---

[10] *See id.*

business located in London, England. At all times described herein, QBE provided one of the insurance policies in the Insurance Program to PAC.

25.     At all times pertinent to the Claim, MunichRe was and is now a private limited company registered and incorporated in England under Company No. 01328742 with its principal place of business located in London, England. At all times described herein, MunichRe provided one of the insurance policies in the Insurance Program to PAC.

26.     At all times pertinent to the Claim, AXUAL was and is now a private limited company registered and incorporated in England under Company No. 01815126 with its principal place of business located in London, England. At all times described herein, AXUAL provided one of the insurance policies in the Insurance Program to PAC.

27.     At all times pertinent to the Claim, Evanston was and is now a Illinois Corporation with its principal place of business located in Illinois. At all times described herein, Evanston provided one of the insurance policies in the Insurance Program to PAC.

28.     At all times pertinent to the Claim, Canopius was and is now a private limited company registered and incorporated in England under Company No. 03073140 with its principal place of business located in London, England. At all times described herein, Canopius provided one of the insurance policies in the Insurance Program to PAC.

29.     Pursuant to their policies of insurance, Insurers may and/or will make payments to their insured, PAC, and are therefore legally, contractually, and equitably subrogated to the rights of PAC, and assert all rights of PAC in this action.

30.     Upon information and belief, Petitioner Grace Ocean Private Limited ("Grace" or "Owner") is a corporation organized and existing under the laws of Singapore with its registered office in Singapore and was the registered owner of the Dali at all times relevant to the Claim.

31.     Upon information and belief, Synergy Marine Pte Ltd ("Synergy") is a corporation organized and existing under the laws of Singapore with its registered office in Singapore and was the manager of the Vessel. Upon information and belief, Synergy was responsible for, *inter alia*, manning and provisioning the Vessel; maintaining and/or repairing the Vessel's hull, machinery, and systems; procuring and providing deck, cabin, and engine stores; provisioning spare parts, maintaining, and repairing the Vessel; and communicating with the Owner and the Vessel's time charterers at all times relevant to the Claim.

## JURISDICTION AND VENUE

32.     Claimants incorporate paragraphs 1 through 31 as though fully stated herein.

33.     The Allision that this Claim is based upon took place on the navigable waters of the United States within the territorial waters of the State of Maryland, had an actual and potential impact on maritime commerce, involved a traditional maritime activity, and is subject to admiralty tort jurisdiction pursuant to Fed. R. Civ. P. 9(h) and 28 U.S.C. § 1333.

34.     This action is within the Court's admiralty and maritime jurisdiction, pursuant to U.S. Constitution, Article 3, Section 2, and 28 U.S.C. § 1333, and is brought pursuant to the Supplemental Rules for Admiralty and Maritime Claims.

35.     Furthermore, this action is within the Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the Claimants are completely diverse from the Petitioners and the amount in controversy exceeds $75,000.

36.     Venue is appropriate in this district pursuant to 28 U.S.C. §§ 1390 and/or 1391(b)(2). First, the Owner, through its acts, omissions, and with its privity or knowledge, caused tortious injury in Maryland while in Maryland and has purposefully availed itself of this Court's

jurisdiction by filing the Petition. Additionally, a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTUAL ALLEGATIONS

37.     Claimants incorporate paragraphs 1 through 36 as though fully stated herein.

**A.**     ***The Key Bridge Was the Gateway to the Port of Baltimore***

38.     The Key Bridge was constructed between 1972 and 1977. Its purpose was to ease traffic in and around the City of Baltimore and to allow for the transportation of "hazardous materials" through shipping lanes that were not allowed in roadway tunnels.

39.     Any oceangoing vessel going into or out of the Port of Baltimore had to pass under the Key Bridge to reach the terminals in the Port of Baltimore via the shipping channel.

40.     These terminals handle millions of tons of cargo each year, and PAC derives revenue from operations at these terminals.

41.     It is entirely foreseeable that, if the Key Bridge collapsed into the Patapsco River, its wreckage would affect the water and the shipping channel, thereby obstructing ships both from entering the terminals in the Port of Baltimore and from leaving the Port of Baltimore to reach the ocean.

**B.**     ***The Dali's Losses of Power in Baltimore***

42.     Prior to calling on Baltimore, the Dali had called on the Ports of Norfolk, Virginia, and Newark, New Jersey.

43.     On March 23, 2024, the Dali moored at Seagirt Marine Terminal in Baltimore, Maryland.

44.     On March 25, 2024, the Dali experienced losses of electrical power while at the pier.

45.     As of March 25, 2024, power losses constituted reportable marine casualties, and as such, the Dali was required to notify the Coast Guard "immediately after addressing the resultant safety concerns." 46 C.F.R. § 4.05-1.

46.     Despite this, the Dali's power losses in Baltimore were not reported to the Coast Guard.

## C.     *The Dali Destroys the Key Bridge*

47.     At about 12:45 a.m. local time, on March 26, 2024, the Dali left the Port of Baltimore.

48.     Prior to leaving the Port of Baltimore, a senior pilot licensed by the State of Maryland, along with an apprentice pilot, boarded the ship and completed a master-pilot exchange with the captain.

49.     The Dali was required to inform the pilots of the vessel's characteristics, the peculiarities of the vessel, and of any abnormal circumstances on the vessel that might affect its safe navigation. 33 C.F.R. § 164.11(k). This master-pilot exchange is the normal occasion for the captain to relay the aforementioned information to the pilot. The Dali's captain, however, did not report the vessel's prior losses of power, nor did he disclose other mechanical or electrical defects or abnormalities to the Maryland pilot or apprentice pilot.

50.     Public reporting has indicated that, in the hours before the Dali's departure, alarms had sounded on the Dali's refrigerated containers, showing that the Dali was experiencing an inconsistent power supply.[11] Upon information and belief, the power supply issue was either not investigated or, alternatively, if investigated, not resolved. After it left the dock, the Dali's onboard

---

[11] *See* Eric Tucker, Lea Skene & Sarah Brumfield, *Ship That Caused Bridge Collapse Had Apparent Electrical Issues While Still Docked, AP Source Says*, Associated Press (Apr. 15, 2024), https://whyy.org/articles/baltimore-bridge-collapse-ship-electrical-issues/.

data recorder recorded audio of "numerous aural alarms."[12] The onboard data recorder briefly stopped recording, then turned back on again with the help of a redundant power source.[13] Upon information and belief, this redundant power source was insufficient to enable the Dali's crew to regain control over the Vessel.

51.     The National Transportation Safety Board, in a public report entitled "Contact of Containership *Dali* With the Francis Scott Key Bridge and Subsequent Bridge Collapse," noted that at about 1:25 a.m. local time, when the Dali was 0.6 miles—or three ship lengths—from the Key Bridge, electrical breakers HR1 and LR1 "that fed most of the vessel's equipment and lighting unexpectedly opened (tripped) . . . ."[14] This, in turn, "caused the first blackout . . . to all shipboard lighting and most equipment, including the main engine cooling water pumps (which controlled engine cooling water pressure) and steering gear pumps."[15] Simultaneously, "[m]ost [ship] bridge equipment also lost power."[16]

52.     Despite the fact that the Dali's main propulsion diesel engine was independent of its four diesel-driven electrical generators, "the loss of electrical power to the pumps required for

---

[12] Caitlin O'Kane, *A Timeline of the Francis Scott Key Bridge Collapse*, CBS News (Mar. 28, 2024, 10:46 AM), https://www.cbsnews.com/news/francis-scott-key-bridge-collapse-timeline-911-call-dali-cargo-ship-mayday-maps-construction-worker-recovery/.

[13] *See id.*

[14] Nat'l Transp. Safety Bd., Contact of Containership *Dali* With the Francis Scott Key Bridge and Subsequent Bridge Collapse 9 (2024), https://www.ntsb.gov/investigations/Documents/DCA24MM031_PreliminaryReport%203.pdf.

[15] *Id.*

[16] *Id.*

its operation resulted in the main engine being automatically shut down[.]"[17] This caused the Dali's propeller to stop at approximately 1:25 a.m. local time.[18]

53.     About one minute after the Dali lost power, it was traveling at a speed of 8.6 knots.[19] The apprentice pilot, who had been piloting the Dali, called the pilot dispatcher at about 1:26 a.m. local time.[20] Shortly thereafter, the senior pilot "regained control from the apprentice pilot."[21]

54.     At 1:26 a.m. local time, the crew manually closed breakers HR1 and LR1, which restored electrical power to the ship.[22] Also at 1:26 a.m. local time, the pilots called for tug assist.[23]

55.     At 1:27 a.m. local time, the senior pilot ordered the crew to drop anchor, and the crew began to carry out the order.[24] However, the crew failed to release the anchor in a timely manner. This was caused by an unseaworthy condition in the vessel, lack of adequate training for the crew, and/or lack of proper procedures to ensure that the anchors were prepared for immediate release in the event of a loss of control. *See* 33 C.F.R. § 164.11 ("The owner, master, or person in charge of each vessel underway shall ensure that: . . . (o) The vessel's anchors are ready for letting go . . . ."). The pilot dispatcher contacted the United States Coast Guard about the loss of power on the Dali.

---

[17] *Id.* at 10.

[18] *Id.* at 9–10.

[19] *Id.* at 10.

[20] *Id.*

[21] *Id.*

[22] *Id.* at 11.

[23] *Id.*

[24] *Id.*

56.    "[W]hen the ship was 0.2 miles from the bridge, a second electrical blackout occurred because DGR3 and DGR4, the breakers that connected generator nos. 3 and 4 to the HV bus, opened, causing a total loss of vessel electrical power[.]"[25]

57.    After this second power outage occurred, the pilot ordered the rudder "hard to port."[26] By this time, the main engine was still shut down and there was "no propulsion to assist with steering."[27] Shortly after this second outage, the crew again manually closed the breakers that had tripped, restoring power to the vessel.[28] By this point, it was too late to avoid the Allision.

58.    Without propulsion to aid in proper steering, the Dali drifted toward the Key Bridge.

59.    At about 1:28 a.m. local time, the Dali allided with the Key Bridge, causing the Key Bridge to collapse into the Patapsco River. Because the maritime shipping channel on the Patapsco was affected, so too was the commercial traffic into and out of the Port of Baltimore. This also impaired safe passage of the navigable waters of the United States.

**D.    *Petitioners' Negligence Directly Caused the Collapse***

60.    In 2023, approximately 3,600 discrete trips were made—without incident—underneath the Key Bridge.

61.    Tens of thousands of trips underneath the Key Bridge by ocean carriers' ships have occurred since 1980 without incident.

---

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Id.* at 12.

62.     Accordingly, Petitioners' negligence is plain, speaks for itself and there are no other parties that could conceivably be viewed as responsible for the Allision. Rather, the Allision was a direct and proximate result of the unseaworthy condition of the Vessel and Petitioners' carelessness, recklessness, negligence, and gross negligence.

63.     Upon information and belief, and among other acts and omissions already alleged, Petitioners:

    a.  Provided the Dali with an incompetent crew that was inattentive to the necessary duties;

    b.  Provided the Dali with a crew that improperly navigated the Vessel before alliding with the Key Bridge;

    c.  Provided the Dali with a crew that failed to adhere to local navigation customs, practice, and/or usage;

    d.  Provided the Dali with a crew lacking proper training and/or experience;

    e.  Provided the Dali with a crew lacking the proper skill(s);

    f.  Otherwise failed to properly man the Dali;

    g.  Provided the Dali with unseaworthy equipment, systems, appurtenances, and/or other devices required for safe and proper navigation and operation on navigable waters;

    h.  Failed to properly manage the Dali and/or her crew;

    i.  Failed to provide the Dali with adequate policies and procedures, including, but not limited to policies and procedures that may have prevented the Collapse from occurring in the first place;

j.   Failed to properly oversee and ensure that the Dali was being operated in accord with their policies, procedures, guidelines, rules, principles of good seamanship, and otherwise congruent with all applicable laws, regulations, standards, and/or directives;

k.   Failed to implement policies, procedures, guidelines, standards, rules, and/or training to ensure the safe operation of the Dali;

l.   Failed to properly maintain the Dali in a reasonable manner;

m.   Failed to properly maintain, repair, and/or use the Dali's systems and appurtenances;

n.   Failed to properly maintain, repair, and/or use the Dali's engine;

o.   Failed to properly maintain, repair, and/or use the Dali's generators;

p.   Failed to properly maintain, repair, and/or use the Dali's propulsion system(s);

q.   Failed to properly maintain, repair, and/or use the Dali's steering system;

r.   Failed to properly equip and/or provision the Dali;

s.   Failed to equip, supply, and/or provision the Dali with a properly functioning engine;

t.   Failed to equip the Dali with an engine that was suitable and/or reasonably fit for its intended use;

u.   Failed to timely eliminate, abate, alleviate, remediate, rectify, and/or cure known, knowable, and/or reasonably knowable hazards;

v.   Failed to timely eliminate, abate, alleviate, remediate, rectify, and/or cure known, knowable, and/or reasonably knowable deficiencies;

w.   Failed to inspect the Dali; and/or

x.   Failed to comply with industry standards, customs, practices, and/or usage.

64.     The Collapse was caused by these, and other, failures, acts, and/or omissions of the Petitioners and of the Dali which may be shown at trial.

**E.     *The Key Bridge's Destruction Has Wrought Harm to PAC***

65.     For a time after, and as a direct result of, the Allision and subsequent damage to the shipping channel, maritime commerce in and about the Port of Baltimore was significantly impacted and PAC has suffered some foreseeable damages.

66.     Historically, the Port of Baltimore is busy. In 2023 alone, the Baltimore Port District was reported to have handled 111 billion pounds of international and domestic cargo, with PAC handling a significant portion of the cargo moving through the Port of Baltimore.

67.     As a result of the Allision and concomitant obstruction of the maritime shipping routes of the Patapsco River, PAC has claimed to suffer more than $40 million in claimed damages and/or business interruption loss, that may include, but are not limited, to:

a.   Costs associated with the obstruction of the Patapsco River;

b.   Costs associated with the interruption of transportation through the Patapsco River;

c.   Lost profits;

d.   Costs associated with the public nuisance suffered by PAC, which has had its enjoyment and use of the Patapsco River, the Baltimore Harbor, and all other associated waterways severely hindered by the Allision; and

e.   Other damages and losses to PAC's business interests.

68.     None of these foreseeable damages would have happened absent the Petitioners' negligence, reckless acts, and intentional disregard of the grossly unsafe condition of the Vessel,

which caused the Allision, affected the shipping channels, and foreseeably impacted the terminals PAC depended on to conduct its vitally important business.

69.     Each of the insurance policies issued by the Insurers in PAC's Insurance Program contain a provision entitled "Subrogation and Subrogation Waiver" (the "Subrogation Clause").

70.     The Subrogation Clause states, in relevant part, the following:

> It is agreed that upon payment of any loss, this Insurer is subrogated to all the rights of the Insured to the extent of such payment. Any written or oral release or waiver of liability entered into by the Insured in the normal course of their business prior to loss hereunder shall not affect this insurance or the right of the Insured to recover hereunder.

*See* Markel Policy, Section 17.A. (p.23 of 60). Insurers' Policies which are part of the Insurance Program are incorporated by reference herein.

> The Subrogation Clause additionally states the following:

> In the event of any payment under this policy, this Insurer shall be subrogated to the extent of such payment to all the Insured's rights of recovery therefore.

*Id.*, Section 17.B. (p. 23 of 60).

71.     As a result of the Allision, PAC presented a claim to the Insurers herein for its alleged damages, and pursuant to their respective policies of insurance with PAC, the Insurers are or may be obligated to and may or will pay PAC for certain damages. Therefore, the Insurers are legally, contractually, and equitably subrogated to PAC's rights against the Petitioners, GRACE OCEAN PRIVATE LIMITED and SYNERGY MARINE PTE LTD, to the extent of any and all such payments, and assert all rights of PAC in this action.

72.     Additionally, PAC has assigned its rights in connection with the Allision to Insurers herein.

73.     Petitioners ought to be held to account.

## CLAIMANTS' CLAIMS

## COUNT I: NEGLIGENCE UNDER THE GENERAL AND MARITIME LAW

74.     Claimants incorporate paragraphs 1 through 73 as though fully stated herein.

75.     The Allision was the caused by and was a result of the acts, omissions, negligence, fault, recklessness, lack of due care, breaches, unseaworthiness of the Dali, and violations of duties, laws, and regulations by the Dali and her crew, and by Petitioners, and/or their principals, agents, and/or employees.

76.     As a result of the faults, acts, omissions, and breaches of Petitioners, and/or their principals, agents, and/or employees, and/or the unseaworthiness of the Dali, PAC and, as subrogees of PAC, Insurers, have suffered and will continue to suffer the damages alleged, for which Petitioners and each of Petitioners are liable, jointly and severally.

77.     Additionally, as assignees of PAC, Insurers may recover the damages alleged to have been suffered by PAC.

78.     The foregoing acts, omissions, negligence, unseaworthiness, fault, lack of due care, recklessness, and/or breaches and violations of duties, laws, and regulations that were the direct and proximate causes of the Allision were within the privity and knowledge of Petitioners and their principals, agents, and/or employees.

79.     The damages resulting from the foregoing acts, omissions, negligence, unseaworthiness, fault, lack of due care, recklessness, and/or breaches and violations of duties, laws, and regulations were the entirely foreseeable result of same.

## COUNT II: PUBLIC NUISANCE

80.     Claimants incorporate paragraphs 1 through 79 as though fully stated herein.

81.    The Dali created a danger and hazard to navigation, thereby creating a public nuisance, which had to be removed, repaired, and abated.

82.    Petitioners are liable to PAC and, as subrogees and assignees of PAC, Insurers, for all costs, damages, and disbursements proximately resulting from the creation of said public nuisance.

## COUNT III: INTENTIONAL DISREGARD FOR SAFETY

83.    Claimants incorporate paragraphs 1 through 82 as though fully stated herein.

84.    Upon information and belief, on March 26, 2024, but for the intentional acts of Petitioners and the Dali's officers, the Dali would have safely passed under the Key Bridge and out to the Chesapeake Bay, just as thousands of similar vessels had before March 26, 2024.

85.    Petitioners, and the Dali's officers knew that deciding to leave the dock in Baltimore with a ship of the Dali's width and weight meant that any allision with the Key Bridge would result in an acute blockage of the shipping channel that was necessary for PAC's operations.

86.    Due to the aforementioned deficiencies in the seaworthiness of the Dali and conduct of the Petitioners, and/or their principals, agents, and/or employees, it was obvious that the Dali was not capable of safely passing under the Key Bridge.

87.    Nevertheless, rather than delaying the Dali's departure, Petitioners, the Dali's officers, and/or the principals, agents, and/or employees of Petitioners, driven by their profit motives, intentionally and recklessly moved the Dali from its position of safety at the dock and into the Patapsco River. This intentional decision led to the Allision.

88.    The Petitioners' fault is plainly evident. The Allision was foreseeable and proximately and directly caused by the intentional and reckless acts of the Petitioners, and/or their principals, agents, and/or employees.

## **REQUEST FOR RELIEF**

WHEREFORE, Claimants, Markel, Liberty, QBE, MunichRe, AXUAL, Evanston, and Canopius, as subrogees of PAC, and as assignees of PAC, pray that their claim be deemed good and sufficient, that Petitioners' limitation of liability be denied in all respects, and for judgment against Petitioners, GRACE OCEAN PRIVATE LIMITED and SYNERGY MARINE PTE LTD, as follows:

a.      The full amount of Claimants' damages as may be proven at trial;

b.      Costs of suit;

c.      Attorneys' fees;

d.      Pre-judgment and post-judgment interest as allowed by law;

e.      Punitive damages; and

f.      All other relief that this Court deems just and proper.

Dated: September 24, 2024

Respectfully Submitted,

TROUTMAN PEPPER HAMILTON
SANDERS LLP
401 Ninth Street, NW
Suite 1000
Washington, D.C. 20004

By: */s/ Daniel Cohen*
　　Daniel W. Cohen (Bar No. 17517)
　　875 Third Avenue
　　New York, NY 10022
　　(212) 704-6256
　　(202) 654-5807 (fax)
　　Dan.Cohen@troutman.com

　　Richard J. Pratt*
　　401 Ninth Street, NW

Suite 1000
Washington, DC 20004
(202) 662-2077
(202) 654-5834 (fax)
Richard.Pratt@troutman.com

Matthew J. Griffin*
401 Ninth Street NW
Suite 1000
Washington, DC 20004
(202) 274-2949
Matthew.Griffin@troutman.com

* *pro hac vice* motions to be filed

*Attorneys for Claimants*
*Markel Syndicate Management Limited*
*(In Its Capacity as Managing Agent for*
*Syndicate 3000 at Lloyd's), Liberty*
*Mutual Insurance Europe SE, QBE*
*Corporate Limited, the Sole Corporate*
*Member of Syndicate 1036,  Munich Re*
*Syndicate Limited, for and on Behalf of*
*Lloyd's Underwriter Syndicate No. 457,*
*AXA XL Underwriting Agencies Limited*
*for and on Behalf of the Corporate*
*Member of Lloyd's Syndicate 2003,*
*Evanston Insurance Company, and*
*Canopius Corporate Capital Ltd., the*
*Lead Underwriter of Lloyd's Syndicate*
*No. 4444.*

## <u>CERTIFICATE OF SERVICE</u>

In compliance with Supplemental Federal Rule F(5), I HEREBY CERTIFY that on the

24th day of September, 2024, I electronically filed the foregoing pleading with the Clerk of Court

by using the CM/ECF system which will send a notice of electronic filing to all counsel who are

CM/ECF participants.


By: */s/ Daniel Cohen*
     Daniel W. Cohen (Bar No. 17517)
     875 Third Avenue
     New York, NY 10022
     (212) 704-6256
     (202) 654-5807 (fax)
     Dan.Cohen@troutman.com