**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| In the Matter of the Petition<br><br>of<br><br>GRACE OCEAN PRIVATE LIMITED, as Owner of the M/V DALI,<br><br>and<br><br>SYNERGY MARINE PTE LTD, as Manager of the M/V DALI,<br><br>for Exoneration from or Limitation of Liability | Docket No. 1:24-cv-941-JKB<br><br>**IN ADMIRALTY** |

**AMENDED CLAIM BY CONSOL ENERGY INC. PURSUANT TO SUPPLEMENTAL FEDERAL RULE F (5)**
**IN RELATION TO THE KEY BRIDGE ALLISION**

Specifically reserving all rights and defenses asserted in Claimant's

accompanying Answer to the Petitioners' "Petition for Exoneration from or Limitation of

Liability," Claimant, CONSOL ENERGY INC. ("Consol" or "Claimant"), on behalf of itself and

its insurers, hereby demands a jury trial and makes this claim pursuant to Rule F(5) of the

Supplemental Rules for Admiralty or Maritime Claims against Petitioners, GRACE OCEAN

PRIVATE LIMITED and SYNERGY MARINE PTE LTD, as alleged owner and manager of the

vessel M/V DALI (the "Dali" or "Vessel") and in support thereof avers as follows:[1]

**INTRODUCTION**

1.     At approximately 12:45 AM E.S.T, on March 26, 2024, container ship, the Dali,

left its dock in the Port of Baltimore and began sailing toward the Chesapeake Bay.

---

[1] To the extent that Consol's insurance carriers make payment on its claimed damages, they will assume subrogation rights to Consol's insured damages.

2.      Weather conditions were suitable for sailing, with no high winds or visual obstructions in sight that would tend to show a disaster was imminent.

3.      The Dali was supposed to sail down the Patapsco River, pass under the 1.6 mile area of the Francis Scott Key Bridge (the "Key Bridge"), and sail out to the Chesapeake Bay.

4.      This route was one that thousands of large container ships similar to the Dali had sailed without incident.

5.      Prior to March 26, 2024, no allision incidents with the Key Bridge had occurred in over 40 years.

6.      At approximately 1:28am, E.S.T., the Dali crashed into the Key Bridge, immediately causing its collapse (the "Key Bridge Allision"), killing six individuals, destroying property, and devastating the region's primary economic source.

7.      The allision with the Key Bridge was foreseeable, avoidable, and a direct and proximate result of Petitioners' carelessness, negligence, gross negligence, and recklessness, coupled with the unseaworthiness of the Dali.

8.      Debris from the collapse of the Key Bridge blocked the Baltimore shipping channel on the Patapsco River to commercial traffic, including shipping to and from the Consol Marine Terminal.

9.      As a result of the blockage arising from the allision, Claimant was required to effectively shut down operations at its Consol Marine Terminal, limiting the company's ability to ship coal for overseas export, resulting in severe economic impact including revenue loss and loss of storage.

10.     Petitioners' liability should not be limited. An example should be made by Petitioners actions to deter other unseaworthy vessels to conduct due diligence, maintain

seaworthiness and more importantly to avoid future unfortunate national disasters that have taken six innocent lives.

## PARTIES

11.     Claimant, Consol, files this claim to seek compensation for economic losses sustained as a result of the Key Bridge Allision.

12.     Consol's principal place of business and headquarters is 275 Technology Drive, Suite 101, Canonsburg, PA 15317-9565.

13.     Upon information and belief, Petitioner Grace Ocean Private Limited ("Grace") is a corporation organized and existing under the laws of Singapore with its registered office in Singapore and was the registered owner of the M/V Dali at all times relevant hereto.  The officers on the Dali at the time of the disaster were actual and apparent agents of the owner of the Vessel.

14.     Upon information and belief, Synergy Marine Pte Ltd ("Synergy") is a corporation organized and existing under the laws of Singapore with its registered office in Singapore and was the manager of the Vessel.  Upon information and belief, Synergy was responsible for, among other things, manning and victualing the Vessel; procuring and providing deck, engine, and cabin stores; maintenance, monitoring, and repairs of the Vessel's hull, engines, electrical systems, and operating navigational systems and devices; provisioning of spare parts, maintenance and repairs for the Vessel; and communicating with the officers and crew, the Owner and the Vessel's time charterers at all times relevant hereto. The officers on board the Dali were acting as the actual and apparent agents of Synergy at the time of this tragedy.

15.     The officers on board the Dali, all agents of the Petitioners, made crucial decisions that directly led to this allision. These reckless decisions established that Grace and Synergy failed to hire, train, monitor, instruct, or discipline these officers who so recklessly disregarded the most fundamental rules of navigation.

## JURISDICTION AND VENUE

16.     The Key Bridge Allision occurred within the navigable waters of the United States and within the territorial waters of the State of Maryland. The incident had an actual and potential impact on maritime commerce, involves a traditional maritime activity, and is subject to admiralty tort jurisdiction, pursuant to Fed. R. Civ. P. 9(h).

17.     This action is within the Court's admiralty and maritime jurisdiction, pursuant to U.S. Constitution Article 3, Sec. 2, and 28 U.S.C. §1333, and is brought pursuant to the Supplemental Rules for Admiralty and Maritime Claims.

18.     In addition, this claim is within the Court's diversity jurisdiction pursuant to 28 U.S.C. §1332(a) and (b), because the parties are in complete diversity, and the amount in controversy exceeds $75,000.

19.     Venue is appropriate in this district pursuant to 28 U.S.C. §1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this district, and a substantial part of the property that is the subject of the action, including the Vessel itself (the Dali), is situated in this district.

## FACTUAL ALLEGATIONS

### a.  The Francis Scott Key Bridge Connects Baltimore City to Baltimore County

20.     Built between 1972 and 1977, the Key Bridge was designed and constructed to provide additional traffic capacity in and out of Baltimore City and to facilitate the transport of "hazardous materials" which were prohibited in the existing tunnel crossings.

21.     The Key Bridge spans the Patapsco River which is the main channel between the Baltimore Harbor and the Chesapeake Bay which leads to the Atlantic Ocean.

22.     Since opening to traffic in March of 1977, local businesses, such as Consol, have utilized the channel on the Patapsco River passing underneath the Key Bridge as the main shipping channel to and from the Baltimore Harbor to facilitate commerce.

23.     Upon information and belief, since the Key Bridge was constructed in the 1970's, cargo ships, like the Dali, have significantly increased in size.

24.     Upon information and belief, the officers of the Dali knew that the Key Bridge was not designed nor improved to withstand allisions with a vessel of its size. Likewise, the officers of the Dali also knew, on March 26, 2024, that their vessel had to be operated perfectly to safely navigate under the Key Bridge to avoid impact.

25.     Upon information and belief, due to the narrow width of the Patapsco River, the officers on board the Dali were specifically aware that their vessel, if aground, would cause complete blockage to commercial traffic.

**b.  The Vessel Allides with the Key Bridge Causing Structural Failure and Collapse**

26.     At approximately 12:45 AM E.S.T. on March 26, 2024, the Dali departed from the Port of Baltimore, ultimately bound for Sri Lanka, and expected to arrive on April 22, 2024.

27.     Weather conditions were suitable for sailing, with no high winds or visual obstructions in sight.

28.     Prior to March 26, 2024, no allision incidents with the Key Bridge had occurred in over 40 years.

29.     In the hours leading up to the Dali's departure, alarms on the Dali's refrigerated containers were reported, indicating erratic and unstable power supply issues.

30.     These power supply concerns were either overlooked, ignored, or insufficiently addressed by Petitioners.

31.     Approximately twelve minutes after the Dali's cast off, the Dali initiated a turn towards the Key Bridge. Upon information and belief, around 1:24 AM E.S.T., the Vessel's onboard data recorder captured multiple urgent alarms before it momentarily ceased recording, then resumed using an auxiliary or redundant power source.

32.     At approximately 1:24 AM E.S.T., the Dali experienced a sudden loss of power. Without power, the Vessel was adrift and gliding at about seven knots per hour, with inadequate steering capabilities, and headed towards the Key Bridge.

33.     It is also believed that the Vessel's emergency diesel generator either failed to activate or did not provide sufficient emergency power to prevent the Vessel from alliding with the bridge. This backup power was insufficient and inadequate for the crew to regain control of the Dali.

34.     At approximately 1:28 AM E.S.T., the Dali collided with the Key Bridge, leading to the immediate structural failure and collapse into the harbor below.

35.     The catastrophic Key Bridge Allision resulted in the deaths of six individuals and caused nearly all commercial maritime traffic to and from the Port of Baltimore to cease for a period of approximately eight weeks.

c. **Economic Impact of the Allision and Destruction of the Key Bridge on Consol's Business**

36.     Claimant Consol is a producer and exporter of high-BTU bituminous coal.

37.     Claimant owns the Consol Marine Terminal located at 3800 Newgate Avenue, Baltimore, MD 21224 (the "Consol Marine Terminal").

38.     The company operates through its key segments, the Pennsylvania Mining Complex located in southwestern Pennsylvania and the Consol Marine Terminal in the Port of Baltimore.

39.     Focused on the mining, preparation, and marketing of thermal and metallurgical coal, Consol primarily serves power generators and overseas industrial markets and is known for its efficient, large-scale longwall mining operations in the Northern Appalachian Basin.

40.     Consol also has a smaller metallurgical coal mine and preparation plant in Wyoming County, WV.

41.     Consol ships approximately 65-70% of their total coal production for export from the United States to overseas industrial and metallurgical markets.

42.     The vast majority of these exports typically go through the Consol Marine Terminal.

43.     During 2023, Consol reportedly shipped approximately 350,000 tons of coal per week from the Consol Marine Terminal.

44.     Since the Key Bridge Allision on March 26, 2024, debris from the collapse of the Key Bridge blocked the Baltimore shipping channel on the Patapsco River to commercial traffic, including shipping to and from the Consol Marine Terminal, for approximately eight weeks.

45.     As a result of the blockage arising from the Key Bridge Allision, Claimant was required to effectively shut down operations at its Consol Marine Terminal, limiting the company's ability to ship coal for overseas export.

46.     As a result of, and in addition to, the shutdown of operations as a result of the Key Bridge Allision, Claimant has sustained economic impact, including, but not limited to, the following:

    a.    Revenue loss associated with the inability to ship Consol mined coal to their customers through the Consol Marine Terminal;

    b.    Loss of revenue of terminal fees for shipping third party coal from the Consol Marine Terminal;

    c.    Loss of storage at the Consol Marine Terminal;

    d.    Reduced mining operations at the Claimant's Pennsylvania Mining Complex.

47.     Claimant has actual possession and ownership of their business, responsibility to repair their business, and the responsibility to maintain their business.

48.     Claimant has suffered and will continue to suffer damages in the form of lost profits and lost business as a result of the Key Bridge collapse attributable to the allision caused by Petitioners. Claimant's evaluation of the precise amount of its losses is ongoing, but its consequential damages related to the Key Bridge Allision are expected to exceed $100 million.

## ALLEGATIONS

**a. Petitioners' Negligence Was the Direct and Proximate Cause of the Key Bridge Allision and Destruction**

49.     Petitioners' negligence is clear and no blame could conceivably be placed on Claimant for the allision.

50.     The Key Bridge Allision was foreseeable, avoidable, and a direct and proximate result of Petitioners' carelessness, negligence, gross negligence, and recklessness, coupled with the unseaworthiness of the Dali.

51.     Among their other acts and omissions, and on information and belief, Petitioners were careless, negligent, grossly negligent, and/or reckless in the following ways:

8

a.    Employed a crew that lacked attentiveness to responsibilities;

b.    Employed a crew that did not adhere to local navigational norms and customs;

c.    Employed a crew that navigated the Vessel improperly;

d.    Employed a crew deficient in the necessary skills to operate the Vessel safely under the Key Bridge;

e.    Employed a crew deficient in the necessary training to operate the Vessel safely under the Key Bridge;

f.    Failed to adequately staff the Vessel;

g.    Mismanaged the Vessel and its crew;

h.    Neglected to equip the Vessel with suitable policies and procedures;

i.    Neglected to implement adequate policies, procedures, and training for safe vessel operation;

j.    Failed to oversee their fleet adequately to ensure safe operations;

k.    Utilized a vessel equipped with unfit systems and equipment;

l.    Neglected proper maintenance of the Vessel;

m.    Failed to maintain or utilize the Vessel's systems and equipment properly;

n.    Failed to maintain or utilize the Vessel's engine adequately;

o.    Failed to maintain or utilize the Vessel's propulsion system adequately;

p.    Failed to maintain or utilize the Vessel's steering adequately;

q.    Failed to equip the Vessel adequately;

r.    Failed to provide a functioning engine;

s.    Failed to provide an engine suitable for the Vessel's intended use;

t.    Failed to address known or foreseeable hazards promptly;

u.    Failed to rectify known or foreseeable deficiencies promptly;

v.    Failed to conduct necessary inspections of the Vessel;

w.       Failed to adhere to industry standards, customs, and practices.

52.      The Key Bridge Allision was the consequence of these and other failures, acts or omissions by the Petitioners, which may be further demonstrated at trial.

53.      The losses incurred by Claimant were a foreseeable consequence of Petitioners' carelessness, negligence, gross negligence, and recklessness, coupled with the unseaworthiness of the Dali.

**b.   The Allision was a Direct Consequence of an Intentional Disregard for Safety by the Petitioners and Dali Officials Leading to an Impact where the Bridge Support was Most Susceptible to Collapse**

54.      Upon information and belief, on the night of March 26, 2024, but for the intervening intentional acts of the Petitioners and the Dali's officers, the Dali would have safely passed through the Patapsco River and into the Chesapeake Bay just as thousands of similar vessels had before March 26, 2024.

55.      The Petitioners and the Dali's officers on March 26, 2024 knew that they had a duty to the Claimant to assure that their vessel was sufficiently seaworthy to traverse the Patapsco River from the Port of Baltimore to the Chesapeake Bay, including the narrow channel that passed between the two large bridge supports that set astride the river. They also knew that the Key Bridge was decades old and had been built for much smaller ships with dramatically less beam and tonnage.

56.      Having navigated through harbors throughout the world, the Petitioners, and the Dali's officers, knew that their decision to leave the dock with a ship of the Dali's width and weight meant that any impact with the vulnerable bridge would result in a blockage of the channel that was necessary for the thousands of individuals and businesses, like the Claimant's, that depend on a navigable channel in the Patapsco River. The Petitioners breached this duty and

10

multiple other duties owed to the Claimant by failing to act reasonably as stated more fully herein.

57.    Further, based on available information, the Dali's officers, and the Petitioners:

a.    Followed orders from the Petitioners to leave the dock knowing that an allision with the Key Bridge, the only massive obstacle sitting within the small channel was inevitable;

b.    Employed a crew that lacked attentiveness to their responsibilities;

c.    Employed a crew that did not adhere to local navigational norms and customs;

d.    Employed a crew that navigated the Vessel improperly;

e.    Employed a crew deficient in the necessary skills;

f.    Employed a crew deficient in the necessary training;

g.    Failed to adequately staff and equip the Vessel;

h.    Failed to equip, monitor, and repair the Vessel's electrical systems;

i.    Failed to train the officers in appropriate decision-making when human lives are at risk;

j.    Mismanaged the Vessel and its crew prior to the Dali's departure;

k.    Failed to equip the Vessel with suitable policies and procedures;

l.    Failed to implement appropriate policies, procedures, and training for safe vessel operation;

m.    Failed to oversee their ship adequately to ensure safe operations;

n.    Utilized a vessel equipped with unfit systems and equipment;

o.    Failed proper maintenance of the Vessel, particularly the electrical systems;

p.    Failed to maintain or utilize the Vessel's systems and equipment properly;

q.    Failed to maintain or utilize the Vessel's engines adequately;

r.    Failed to maintain, utilize, or repair the Vessel's electrical system adequately to prevent power failures and limitations;

s.      Failed to maintain or utilize the Vessel's steering system adequately;

t.      Failed to equip the Vessel adequately;

u.      Failed to provide a safe and fully functioning propulsion system;

v.      Failed to provide and maintain an engine suitable for the Vessel's departure from Port through the Patapsco River Channel;

w.      Failed to address known hazards promptly;

x.      Failed to rectify known deficiencies promptly;

y.      Failed to conduct necessary inspections of the Vessel;

z.      Failed to adhere to industry standards, customs, and practices;

aa.     Recklessly disregarded the most basic safety provisions and the obvious mechanical failures on March 26, 2024;

bb.     Left port knowing that their ship that was not performing adequately and was likely to impede traffic in the channel;

cc.     Intentionally misrepresented the unseaworthy nature of their ship to relevant authorities;

dd.     Intentionally ignored the known vulnerability of the Key Bridge, the largest and most unprotected obstacle to their safe passage through the channel, in an effort to pursue the financial interests of the Petitioners by leaving the Port and delivering their cargo.

58.     As a result of these factors, the officers and crew aboard the Dali, along with the Petitioners, knew, before they left, that the Dali was not capable of safely passing under the Key Bridge.

59.     Nevertheless, instead of delaying their departure, the Petitioners, and the Dali's officers, driven by their profit motives, breached their duty to act reasonably when they intentionally and recklessly moved the Dali from its position of safety at the dock and into the channel.

12

60.     The fault of the Petitioners is starkly evident. No fault can reasonably be attributed to Claimant for this allision and its consequences to them. It was proximately and directly caused by the intentional and reckless acts of the Petitioners' agents, who were willing to risk the lives of the deceased and livelihoods of the Claimant.

### c.   The Intentional and Reckless Acts of the Petitioners and Dali Officials Created a Public Nuisance

61.     Petitioners, individually and in concert with each other, by their affirmative acts and omissions, have created, contributed to, and/or assisted in creating, conditions that significantly interfere with rights general to the public, including public enterprises, public health, public safety, public navigation, the public comfort, and the public convenience.

62.     The nuisance created and contributed to by Petitioners is substantial and unreasonable. It has caused, continues to cause, and will continue to cause far into the future, significant harm to the Claimant as alleged herein, and that harm outweighs any offsetting benefit. The ability to travel on the Patapsco River Channel, use the I-695 artery over the Key Bridge, and fully utilize the Port of Baltimore is a matter of great public interest and a financial necessity for Claimant.

63.     Petitioners specifically created, contributed to, and/or assisted, and/or were a primary contributing factor in the creation of the public nuisance by:

a.     Affirmatively and knowingly ignoring the unseaworthy state of their vessel;

b.     Affirmatively and knowingly deciding to disembark from the Port and enter a narrow, dangerous channel with an unseaworthy ship;

c.     Affirmatively and knowingly misrepresenting the unseaworthy state of their vessel;

d.     Acting with gross negligence by failing to configure their ship properly to safely exit the channel;

e.      Alliding with the unguarded Key Bridge, thereby causing its collapse and the blockage of the Patapsco River Channel

64.     Because of their complete control over the maintenance and operations of the Dali, Petitioners were in a unique position to prevent the nuisance, but failed to do so, including by failing to warn public officials, or the United States Coast Guard, of the risks posed by their unseaworthy vessel, and failing to take any other precautionary measures to prevent or mitigate these known likely damages, and losses.

65.     The public nuisance caused, contributed to, maintained, and/or participated in by Petitioners has caused and continues to cause special damages to the Claimant.

66.     The seriousness of the Key Bridge allision, and subsequent blockage of the Patapsco River Channel, destruction of the Key Bridge, and ensuing financial losses are extremely grave and outweigh any social utility of Petitioners' conduct because:

a.      The ultimate nature of the harm is the loss of life, loss of economic resources, and damage to the public convenience, safety, and general welfare, rather than mere annoyance;

b.      The social benefit of the Petitioners placing their ship into the stream of commerce is outweighed by the availability of safety precautions that would have facilitated the Vessel to enter the stream of commerce without causing an allision with the Key Bridge, and the attendant destruction and costs described herein; Petitioners knew of the external costs to the Claimant of placing their unseaworthy ship into the Patapsco River Channel, and rather than striving to move through the channel safely, Petitioners instead acted affirmatively to cause catastrophic loss of life, and devastating economic consequences;

c.      The cost to society as a result of the collapse of the Key Bridge caused by the intentional and reckless conduct of the Petitioners, is more harmful and costly than if the Petitioners had decided to repair the Dali's malfunction and not enter the channel until the Dali was seaworthy; and

d.      It was practical for the Petitioners, considering their extensive and exclusive knowledge of the Dali's limitations and the conditions of the Patapsco River Channel, to implement safe navigational practices that would have prevented the Dali's allision with the Key Bridge.

67.     Petitioners' actions were the primary contributing factor to the unreasonable violation the of public rights enjoyed by the Claimant as set forth above, because Petitioners knew or should have known that their conduct would create a continuing problem with long-lasting significant negative effects on the rights of the Claimant and the public, and absent Petitioners' conduct the violations of the public rights described herein would not have occurred or would have been far less severe.

68.     Petitioners knew that their vessel was unseaworthy and was likely to create the nuisance complained of and yet acted with reckless disregard for the probable dangerous and ongoing consequences of their conduct's foreseeable impact upon the rights of others, including Claimant.

69.     Therefore,  Claimant requests an award of punitive damages in an amount reasonable, appropriate, and sufficient to punish these Petitioners for the good of society and deter these Petitioners from ever committing the same or similar acts.

**d.  The Petitioners and Dali Officials must be Liable for Punitive Damages.**

70.     Under the general maritime law, punitive damages are available where a defendant's conduct is outrageous, owing to gross negligence, willful, wanton, and reckless indifference for the rights of others, or behavior even more deplorable. *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 493 (2008).

71.     Petitioners' conduct was outrageous, grossly negligent, willful, wanton, and reckless, and punitive damages are available in this case because the Dali got underway with known unseaworthy conditions in confined waters where a ship of its magnitude had every opportunity to cause catastrophic damage and loss of life, which, in fact, happened. These conditions include, but are not limited to, navigating with the transformers in manual mode, and

with no risk assessment or safety mitigation in place, running the auxiliary on a temporary flushing pump that could not be immediately restarted in an emergency, failing to have the Vessel's anchors ready for immediate deployment in transit-confined waters, failing to have the bow thruster "available" for use, ignoring known and longstanding vibration problems that were causing actual damage and distress to the Vessel's electrical systems, and willfully misrepresenting the unseaworthy state of the Vessel to relevant authorities.

72.     Punitive damages "are aimed not at compensation but principally at retribution and deterring harmful conduct." *Id*. at 492.

73.     Other vessel owners and operators must be deterred from engaging in such reckless and exceedingly harmful behavior in the United States' navigable waters. Indeed, Petitioners themselves need to be deterred because they continue to operate their vessels, including a sister ship to the Dali, in U.S. waters and benefit economically from those activities.

**e.   The Rule Of Robins Dry Dock Does Not Apply To This Case**

74.     The holding of *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 48 S. Ct. 134, 72 L. Ed. 290 (1927) does not apply to intentional or reckless acts, nor does it apply to public nuisance claims. In this case, the Petitioners instructed their crew to intentionally disregard the grossly unsafe condition of their ship and recklessly leave port knowing that the Key Bridge was the largest obstacle bracketing the narrow channel.  They knew that their ship was probably going to lose power again, become uncontrollable and unstoppable, and be in no condition to safely "thread the needle" and avoid the Key Bridge. The Petitioners' decision was compelled by their choice to put their profits over the lives and livelihoods of others. This

decision killed six people and caused immense and ongoing economic damage to thousands of businesses that depended on the port, including the Claimant.[23]

75.     The Petitioners conduct can only be characterized as an intentional act, as a result, this case falls beyond the parameters of *Robins Dry Dock*.[4]  Therefore, the Claimant can recover foreseeable economic losses without the need for physical damage to a proprietary interest.[5]

---

[2] *See Barber Lines A/S v. M/V Donau Maru*, 764 F.2d 50 (1st Cir. 1985) (Breyer, J.) (explicitly recognizing an intentional torts exception to *Robins Dry Dock* by holding that plaintiffs who cannot recover for foreseeable economic loss based on a negligently caused oil spill could recover if the oil spill was intentional); *Ballard Shipping Co. v. Beach Shellfish*, 32 F.3d 623, n.1 (9th Cir. 1994) (citing *Dick Meyers Towing Service, Inc. v. U.S.*, 577 F.2d 1023 (5th Cir. 1978)) (referring to cases of intentional torts as a "classic exception" to *Robins Dry Dock*). *See generally In re Deepwater Horizon,* 784 F.3d 1019 (5th Cir. 2015) (holding that the Fifth Circuit has recognized an exception to *Robins Dry Dock* for "criminal or intentional conduct"), *accord Amoco Transport Co. v. S/S Mason Lykes*, 768 F.2d 659, 666 (5th Cir. 1985) ("*Robins Dry Dock* means that there can be no recovery for economic losses caused by unintentional maritime torts absent physical damage….") (emphasis added); *Showa Line, Ltd. v. Diversified Fuels, Inc.,* 1991 WL 211527 (E.D. La. 1991) (denying a motion for summary judgment based on *Robins Dry Dock* because the Claimant made allegations of fraud and other intentional torts that "[took] the claims out of the *Robins Dry Dock* parameters"); *Norwegian Bulk Transport A/S v. International Marine Terminals Partnership*, 520 F.3d 409 (5th Cir. 2008) (citing *Showa*, 1991 WL 211527 at *1) (recognizing that in the absence of physical injury or intentional torts, a claimant was not eligible for relief under *Robins Dry Dock*).

[3] The Claimant also contends that the rule of *Robins Dry Dock* has been superseded by statute in this case pursuant to CERCLA. Under 42 U.S.C. § 9607(h): "the owner or operator of a vessel shall be liable in accordance with this section, under maritime tort law, … notwithstanding… any statute of physical damage to the proprietary interest of the Claimant." The preemptive effect that this provision of CERCLA has on the rule of *Robin's Dry Dock* extends the Petitioners' liability for other federal and state claims. In this case, when the Dali allided with the Key Bridge, 14 containers of hazardous materials breached aboard the Dali and spilled into the Patapsco River. Therefore, the Petitioners are liable in accordance with CERCLA, and the rule of *Robins Dry Dock* is not applicable to this case.

[4] *Barber Lines A/S v. M/V Donau Maru*, 764 F.2d 50 (1st Cir. 1985) (Breyer, J.)

[5] At the heart of the Supreme Court's decision in *Robins Dry Dock* is "the spectre of runaway recovery." *Amoco Transport Co. v. S/S Mason Lykes*, 768 F.2d 659, 668 (5th Cir. 1985). Justice Holmes, when writing the opinion in *Robins Dry Dock*, was participating in the greater legal movement that sought to define the parameters of liability in negligence cases. Indeed, one year after *Robins Dry Dock* was decided, the New York Court of Appeals decided *Palsgraf v. LIRR*. In that case, Judges Cardozo and Andrews eloquently defined the parameters of negligence by delineating foreseeable harms occurring to foreseeable victims, and the "relationship between man and those whom he might reasonably expect his act to injure." *Palsgraf v. Long Island R. Co.*, 248 N.Y. 339, 344, 348 (1928). Thus, we should interpret the doctrine in *Robins Dry Dock* in light of these foundational developments in American tort law. Indeed, the legal contentions in this claim present the contemporary legal support to modify the *Robins Dry Dock* decision by clarifying and even establishing a new interpretation of this ninety-four-year-old bastion of maritime law.

The maritime industry of today would be unimaginable to Justice Holmes writing in 1927. The modern "container ship" was not even invented until nearly three decades later. At first, these ships were approximately 500 feet long, 30 feet wide, and only held 800 twenty-foot containers. In comparison, the Dali, a medium-sized cargo ship, is 984 feet long, 157 feet wide, and carried nearly 10,000 twenty-foot containers. This increased ship weight by 10 times, which lead to behemoths like the Dali weighing over 100,000 tons. Claimant alleges that the height, weight, and width of the Dali was the cause-in-fact of the Key Bridge's collapse. In the pursuit of higher profits, large shipping companies have exponentially increased the size of their vessels, and as a result, the ability for maritime malfeasance to have an impact on economic conditions has increased exponentially too. Therefore, the scope of liability for actors in the shipping industry must be revaluated to account for the increased size of their vessels.

There is no ceiling for the size of new cargo ships, but many of the bridges, canals, and docks in this country remain the same size, with protective structures designed for a much smaller maritime world. Meanwhile, the number of these behemoth ships on the sea rises every year. In 1990, there were 78,300 commercial ships registered in the United States, in 2023 there were 106,700. The ever-increasing size and volume of massive commercial ships means that maritime catastrophes, like the Dali

76.     At all times relevant hereto, the Claimant was the owner in possession of their property.

77.     All actual damage suffered by the Claimant relates to the added cost from the loss of access, use, and maintenance of their property to pursue their economic interest.

78.     All costs and business losses incurred by the Claimant were and are a direct and foreseeable consequence of the Petitioners' intentional and reckless conduct.

79.     Based upon the case law and facts, Claimant is therefore permitted to collect actual monetary damages related to the loss of beneficial use of their property that resulted from the Petitioner's intentional and reckless acts.

**REQUEST FOR RELIEF**

**WHEREFORE,** Claimant, CONSOL ENERGY INC., prays for judgment against Petitioners, GRACE OCEAN PRIVATE LIMITED and SYNERGY MARINE PTE LTD, as follows:

---

allision and collapse of the Key Bridge, are more likely to occur in the future. Since the Dali allision on March 26, 2024, at least seven commercial ships suffered a loss of power or steering in Maryland waters. These disastrous events could potentially cost thousands of lives and take billions of dollars out of the economy. The law must ensure that these shipping companies, who profit the most from these gargantuan ships and are in the greatest position to avoid disaster, are sufficiently liable for the foreseeable consequences of their conduct.

The facts of this case illustrate why the increased size of these ships caused the death of six men and the economic loss of hundreds of millions of dollars. *Robins Dry Dock* involved the negligent damaging of a single ship's propeller, with a total case value of $30,000. In this case, in addition to the deaths of six people, an important artery of interstate transportation was severed which cut off access to a major port for nearly 80 days. It was obviously foreseeable to the Petitioners that their intentional acts would lead to this Key Bridge destruction and a disastrous economic effect on anyone who depends on the port for their business activities. This catastrophic loss was completely foreseeable by the Petitioners. The Petitioners are liable to the people who they would reasonably expect to injure by their intentional and reckless acts.

The use of a "foreseeability" analysis in maritime claims has occurred in other jurisdictions. In *Petitions of Kinsman Transit Co.*, 388 F.2d 821 (2nd Cir. 1968), the Second Circuit applied a proximate cause "remoteness" analysis to negligence in a maritime claim. Citing Judge Andrew's dissent in *Palsgraf v. Long Island R.R.*, 248 N.Y. 339, 354-55 (1928), the Second Circuit held that Claimants could recover from a maritime collision if they could prove that their damages were a "foreseeable consequence" of the Petitioner's actions. That is certainly the case here, where increased costs to any business utilizing the Port of Baltimore are a foreseeable consequence of the Petitioners' allision with the Key Bridge which caused subsequent blockage of the Patapsco River channel by the collapsed bridge. In *Marine Nav. Sulphur Carriers, Inc v. Lone Star Industries, Inc.*, 638 F.2d 700 (4th Cir. 1981), the Fourth Circuit adopted the reasoning of *Petitions of Kinsman Transit Co.*, 388 F.2d 821 (2nd Cir. 1968) in a case that concerned an allision between a vessel and a bridge which disrupted commerce on a navigable river. Those exact circumstances are present in this case. An allision between a vessel and a bridge caused the closure of a channel, and the Claimants have suffered increased costs and business losses as a result.

a)      The full amount of Claimant's damages as may be proven at trial;

b)      Cost of suit;

c)      Attorneys' Fees;

d)      Pre-judgment and post-judgment interest as allowed by law;

e)      Injunctive relief;

f)      Punitive damages; and

g)      All other relief that this Court deems just and proper.

Respectfully submitted,


/s/ Mark J. Stiller
Mark J. Stiller (Bar No.: 27408)
Niles, Barton & Wilmer, LLP
111 South Calvert Street, Suite 1400
Baltimore, MD 21202
410-783-6361
410-783-6363 (facsimile)
mjstiller@nilesbarton.com
*Counsel for Consol Energy, Inc.*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 16th day of October 2024, a copy of the foregoing Claim by Consol Energy, Inc., Pursuant to Supplemental Federal Rule F (5) in Relation to the Key Bridge Allision was served via the court's CM/ECF system on all counsel of record.

*/s/ Mark J. Stiller*
Mark J. Stiller (Bar No.: 27408)