**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| In the Matter of the Petition<br><br>of<br><br>GRACE OCEAN PRIVATE LIMITED, as Owner of the M/V DALI,<br><br>and<br><br>SYNERGY MARINE PTE LTD, as Manager of the M/V DALI,<br><br>for Exoneration from or Limitation of Liability | Civ. No. 24-00941-JKB<br><br>*IN ADMIRALTY* |

**JOINT STATUS REPORT**

Petitioners and Claimants (hereinafter the "Parties"), through undersigned counsel, submit this Joint Status Report in accordance with the Court's September 27, 2024, Memorandum (ECF No. 325).

**Lead Counsel Panel**

The Court directed the parties to address the Court's authority to appoint "lead or liaison counsel to speak for Claimants," and to "require other counsel to participate in such an arrangement." ECF 325 at 3. Federal district courts are vested with inherent powers to manage their dockets. *See Manual for Complex Litigation*, §22.61. These powers are acutely on display in mass transportation disasters. *See, e.g.*, *In re Air Crash Disaster at Fla. Everglades on Dec. 29, 1972*, 549 F.2d 1006, 1012 (5th Cir. 1977) ("A trial court has managerial power that has been described as "the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.") (quoting *Landis v. North*

*American Co.,* 299 U.S. 248, 254 (1936)).  This power is specifically reflected in Federal Rule of Civil Procedure 16(c)(2)(L), which states that at a pre-trial conference the court may "consider and take appropriate action . . . adopting special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems."

While the appointment of lead or liaison counsel frequently arises in multidistrict litigation, *see, e.g.*, *In re Showa Denko K.K.L-Tryptophan Prods. Liab. Litig.-II*, 953 F.2d 162, 165 (4th Cir. 1992) ("We recognize that a district court needs to have broad discretion in coordinating and administering multi-district litigation."), the procedure is not limited to such cases, *Manual for Complex Litigation* §22.6.  Courts have used the same procedure with other disasters that have spawned a multitude of tort claims, including in limitation-of-liability actions.  *In re City of New York*, No. 03-6049, 2011 WL 7145228, at *2-3 (E.D.N.Y. 2011) (discussing use of liaison counsel and maritime counsel in a limitation action arising out of a ferry crash in New York City); *In re Clearsky Shipping Corp.*, No. 96-4099, 2003 WL 1563820 (E.D. La. Feb. 26, 2003) (discussing role of lead counsel in limitation action arising from ship collision in New Orleans who had "general responsibility for coordinating the activity of claimants during pre-trial proceedings").

In compliance with the Court's order, counsel for the claimants met by video conference on October 10, 2024, to discuss, *inter alia,* proposed members of the lead counsel panel.  Counsel for claimants agreed to propose a seven-member panel consisting of the following parties or categories of claimants:  (1) the State of Maryland, (2) the United States of America, (3), Personal Injury and Wrongful Death, (4) Property Damage, (5) Local Governments, (6) Private Economic

Loss, and (7) Cargo.[1]   Subsequently, each category of claimant met separately to select a representative, and was able to do so without objection.  The following individual attorneys were selected to serve on the lead counsel panel, subject to the Court's approval:

> State of Maryland – David Reisman (Liskow & Lewis)
>
> United States – Thomas Brown (Department of Justice)
>
> Personal Injury and Wrongful Death – Daniel Rose (Kreindler & Kreindler)
>
> Property Damage – Robert Phelan (Cozen O'Connor)
>
> Local Governments – Adam Levitt (DiCello Levitt)
>
> Private Economic Loss – Todd Lochner (Lochner Law Firm)
>
> Cargo – Terry Goddard (Skeen & Kauffman)

PETITIONERS' COMMENTS:  Petitioners support the notion of establishing representative lead counsel to streamline the proceedings but take the view that there should be a single category encompassing the State of Maryland and ACE, who are the subrogated insurers for the Bridge, since their interests are substantially aligned.  Additionally, the "Local governments" – namely, the City and County of Baltimore – are also economic loss claimants and should be consolidated with the other economic loss claimants.

CLAIMANTS' REPLY:

Claimants take issue with Petitioners' efforts to interject themselves into Claimants' self-organization.   In its Memorandum (ECF No. 325), the Court instructed "Counsel for the Claimants"—not Petitioners—"[to] meet and confer regarding whom they would jointly propose

---

[1]   The categorization and selection of lead counsel matches the categories of claimants suggested in the Court's memorandum, ECF 325 at 3, with the addition of property damage claimants.  The proposed panel allows for representation by the distinct governmental entities, which each have legally unique and relatively large claims, and each of which anticipate bearing a significant share of discovery and expert costs.

as lead or liaison counsel..." *Id*. at 3.  Counsel for Claimants did so and, despite their number, worked together cooperatively to privately order and select the proposed lead counsel group. Indeed, Claimants' categorization and selection of lead counsel matches, with one addition, the categories of claimants suggested by the Court in its Memorandum, ECF No. 325 at 3, and ensures appropriate representation of the diverse constituencies harmed in the Key Bridge tragedy. Claimants added a category for property damage claimants, as a number of Claimants asserted narrow claims arising from physical damage to property over which they indisputably have a proprietary interest.  To ensure representation of this group, Claimants propose to include a representative for pure property damage claimants on the lead counsel panel, and selected Rob Phelan (counsel for ACE American Insurance) for that role.

Petitioners' attempt to insert themselves into Claimants' cooperative self-ordering is inappropriate and, in fact, epitomizes Judge Posner's observation in *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130*, 657 F.2d 890, 895 (7th Cir. 1981), that a defendant, trying to interpose itself into plaintiff-side issues,[2] "is a bit like permitting a fox, although with a pious countenance, to take charge of the chicken house."  Petitioners caused this tragedy.  They should not be permitted to veto the composition of team that is charged with seeking justice for what Petitioners have done.

Petitioners voice two apparent objections to the proposed self-organization, neither of which should persuade the Court.  First, Petitioners state that "there should be a single category encompassing the State of Maryland and ACE."  Second, they state that "the 'Local governments' – namely, the City and County of Baltimore – are also economic loss claimants and should be consolidated with the other economic loss claimants."

---

[2] Here, a petitioner and a claimant, rather than a defendant and a plaintiff, but the point is identical.

4

First, while the interests of the State of Maryland and ACE are substantially aligned on a subset of issues, their interests are not fully aligned. For example, the State of Maryland has asserted a number of claims that will not inure to ACE's benefit, including economic losses flowing from the destruction of the Francis Scott Key Bridge, pollution claims, contract claims, and punitive damages claims. ACE's interest is more aligned with those claimants who sustained traditional and limited property damage claims, such as Baltimore Gas & Electric and Brawner Builders, and who are not otherwise represented by a specific claimant group.

Second, and as the Court itself appeared to recognize when it mentioned a separate representative from "government entities," the City of Baltimore and Baltimore County, as municipalities, have unique damages, responsibilities, and legal theories on which they may ultimately rely. By way of some non-limiting examples, both the City and County own and are responsible for certain basic infrastructure and/or public property ***directly*** damaged by the allision. *See*, *e.g.*, ECF No. 142 at 13-14 (among many other things, City public works and infrastructure directly harmed by allision), ECF No. 171 at 16-17 (among many other things, County shoreline property harmed by allision). They are subject to a unique statutory schema—*see*, *e.g.*, Baltimore City Code, Art. X, Sub. 10. And, at bottom, they stand for those whose voices *must* be represented throughout the resolution of this Petition: the citizens of Baltimore City and County, whose lives and livelihoods were, and continue to be, directly impacted by the allision. In other words, not only is Petitioners' apparent implication that Baltimore City and County have solely "economic loss" claims patently untrue, Petitioners purposefully fail to recognize that government entities have unique interests, damages, and responsibilities—a position that, at minimum, necessitates their representation among leadership in this action.

As even Petitioners must recognize, *all* Claimants agree that Petitioners are not entitled to exoneration or limitation of liability. The Claimants have self-ordered and stand ready to litigate cooperatively toward that end. They have worked to ensure adequate representation across the numerous parties harmed by the allision. They respectfully request that the structure they have worked together to propose be accepted, and that the Court disregard Petitioners' attempted interposition into Claimants' affairs.

**Litigation Phases and Schedule**

CLAIMANTS' POSITION:  The Court directed the Parties to "draft and submit a proposal regarding the litigation phases of this case, including a proposed schedule."  ECF 325 at 3.  To that end, Claimants prepared the proposed Scheduling Order attached hereto as Exhibit 1, detailing a bifurcated proceeding, as envisioned by the Court, with "questions of exoneration and limitation of liability [being] resolved before determining Petitioners' alleged liability as to any individual claim."  *Id.* at 3-4.

Claimants—consistent with the Court's Order and Memorandum—propose that Phase 1 discovery, motions practice, and trial will only address the issues of Petitioners' negligence, unseaworthiness of the M/V DALI, and whether Petitioners had or lacked privity or knowledge of the same.  The proposed schedule for this phase is "detailed and precise," and includes prompt deadlines for completing pre-discovery motions practice, discovery, post-discovery motions practice, and trial.  *See* ECF 325 at 4.

As proposed, "[o]nly after resolution of the questions of whether Petitioners are entitled to exoneration from or limitation of liability" will the Court set "deadlines relating to discovery and further litigation of Petitioners' liability, and appropriate relief as to any particular Claimant."  *See* ECF 325 at 3.  In other words, any issues relating to "relief as to any particular Claimant" would

be addressed during Phase 2 only.  ECF 325 at 4.  Staging the litigation in this manner makes good practical sense, particularly given that many claimants may choose to proceed before other courts upon resolution of the exoneration and limitation issues.  For these same reasons, the Parties believe that a scheduling order addressing individual claims, including any counterclaims, crossclaims, or third-party claims (including attendant damages), should await resolution of the narrow issues of limitation and exoneration.  Claimants anticipate that the Phase 2 trial would proceed approximately 18 months after the Court issues an Opinion and Order answering the questions taken up in Phase 1.

Petitioners rejected Claimants' proposed Scheduling Order, advocating for a much broader scope in Phase 1.  Petitioners insist that Phase 1 include motion practice with respect to particular claims (economic loss and class action) and resolution of comparative fault and third-party liability allegations.[3]  This inefficient approach directly conflicts with "the Court's view that questions of exoneration and limitation of liability should be resolved before determining Petitioners' alleged liability as to any individual claim" (*id.*), would generate significant delay such as delays associated with interlocutory appeals, and force this Court to resolve issues that it likely will never need to address.  As outlined by this Court already, the simple and straightforward threshold questions posed in this limitation action are: (i) whether the DALI allided with the Francis Scott Key Bridge due, at least in part, to the Petitioners' negligence or the unseaworthiness of the DALI, and (ii) whether Petitioners had privity or knowledge of any such negligence or unseaworthiness. If the Court resolves those issues in the affirmative, there will be no need for this Court to address the many issues Petitioners demand the Court presently address.  Conversely, if the Court resolves

---

[3] The State of Maryland and Brawner Builders deny Petitioners' argument that they bear comparative fault, but they do not believe a "Joint Status Report" is the appropriate vehicle for such arguments.

Petitioners' entitlement to exoneration in the affirmative, there will similarly be no need for this Court to address any other issues.

Petitioners' suggestion to incorporate "non-exoneration/limitation" issues into Phase 1 would unnecessarily prolong discovery, increase expenses for all parties, delay trial of the "exoneration/limitation" issues, and pose a risk of prejudice to claimants who are dismissed from the limitation action and thereby precluded from participating in discovery and further motion practice. This is to say nothing of the specter of a dismissed claimant seeking an appeal—an act that could either: (1) lead this Court to decide that a stay is required until the appeal is fully litigated; or (2) ultimately lead to substantial unfairness if the claimant were successful on appeal and needed to be reinserted into the litigation. And, contrary to Petitioners' assertion, given the modest (under the circumstances) limitation fund, unless and until the Court rules on their entitlement to exoneration or limitation, there is no realistic path toward resolution of the claims. Holding the personal injury and wrongful death claimants, the United States, and property damage claimants hostage while Petitioners argue over collateral and unnecessary issues is neither efficient nor equitable. Making matters worse, Petitioners' proposal would add at least thirteen months to the Phase 1 schedule (moving trial from December 2025 until January 2027). If the Court denies exoneration and limitation, there will no longer be a need for this concursus proceeding and those thirteen months provide ample time for Claimants to proceed to resolution in the venues of their choosing, where issues of damages and comparative fault can be easily resolved.

Further, Petitioners' suggestion that its pre-discovery motions could actually be accomplished "pre-discovery" is inaccurate. While Petitioners argue that numerous Claimants fail to show a "proprietary interest" in property damaged, Petitioners neglect to acknowledge that the question of "proprietary interest" is a fact-bound one for which discovery will likely be required.

Indeed, several of the supposedly "pure economic loss" claimants describe harm *directly* to their property *in their claims*.[4]  To the extent Petitioners are contending, despite the allegations of direct damage to Claimants' property, that those damages are somehow illusory, that is what discovery is for.

Petitioners' statement that "it would greatly streamline the proceedings and the management of the remaining claims if these eleven facially defective claims can be dealt with at the outset of the proceedings" is incorrect.  The elimination of a few claims at the outset of the litigation unquestionably risks delay and unfairness later.  But, if the Court proceeds with the two-phase structure it described in the Memorandum (ECF No. 325), elimination of those claims would not change a single witness, motion, or element of discovery during Phase 1.  The same question— whether liability can be limited—will be adjudicated, at which point many of the parties that Petitioners seek to eliminate may (in the event liability is *not* limited) ultimately choose to pursue their claims in other venues.

Proceeding on issues that are not germane to limitation would not only be inefficient, it would violate Claimants' rights under the "saving to suitors clause" of 28 U.S.C. § 1333 to obtain common law remedies in a non-admiralty court, the most important of which is trial by jury on all non-limitation issues.  If this Court were to address comparative fault within the limitation action, it would deprive a Claimant of its right under the saving to suitors clause to have a jury determine that issue in a non-admiralty court.

Finally, given Petitioners' stated intention to assert affirmative claims against the State of Maryland, including issues of comparative fault in Phase 1 would improperly infringe on the State's Eleventh Amendment sovereign immunity.

---

[4] *See*, *e.g.*, *supra* at p. 5.

The Court further directed that the Status Report "should identify the types of responsive pleadings or pre-discovery motions that the parties anticipate filing." ECF 325 at 4. As for responsive pleadings, while Petitioners previously obtained *ex parte* relief from certain deadlines to answer claims, *see* ECF 23 (Letter from Petitioners) and ECF 24 (Order), Claimants plan to move for clarification of the Court's order and to seek a deadline by which Petitioners' must answer.

Claimants also anticipate filing the following pre-discovery motions addressing the issues of exoneration and limitation, the full briefing of which (if necessary) could occur concurrently with Phase 1 discovery:

    i.    Motion for Partial Judgment on the Pleadings and/or to Dismiss the Petition for Exoneration or Limitation of Synergy Marine Pte Ltd, as Manager of the M/V Dali (*see, e.g.*, United States' Eighth Affirmative Defense, ECF 82 at 51, State of Maryland's Fifth Affirmative Defense, ECF 157 at 9, Claimant Julio Cervantes Suarez's Eighth Affirmative Defense, ECF 92 at 8, and various other Claimants' Sixteenth Affirmative Defenses, ECF 146,148,149,150,151 and 152);

    ii.    Motion to Partially Lift the Limitation Stay as to Certain Claims;

    iii.    Motion to Enter a Protective Order Under Rule 26(c); and

    iv.    Motion to Enter an Order Governing Discovery Procedures.

PETITIONERS' POSITION:

1.    Litigation Phases and Schedule

Petitioners take a very different view on how this matter should proceed in order to ensure the proper preservation of relevant evidence and to foster the probability that at some stage in the proceedings it may be possible to resolve some or all of the claims in this matter.

While Petitioners recognize and acknowledge the desirability of streamlining the proceedings and focusing on threshold issues, determining liability in this matter will not be as simple as merely determining whether Petitioners are entitled to exoneration or limitation of

liability.  There are at least two other major factors that will bear on the overall allocation of fault in this matter.

a.      First is the question of comparative fault on the part of the State of Maryland and its agencies in failing to take proper steps to protect the bridge from vessel strikes notwithstanding longstanding knowledge that the bridge was not designed to withstand significant vessel contact, was inadequately protected from contact by vessels, and was poorly maintained such that the bridge was particularly vulnerable to catastrophic failure in the event of such a strike.  Some of these issues have been widely reported in the press.   For instance, the State of Maryland commissioned an engineering study in the early 2000s to assess vulnerabilities of critical bridges, including the potential impact of a ship impact to the Key Bridge.  And starting in at least 2003, a working group comprised of members of the United States Coast Guard and the American Waterways Operators warned the State of Maryland that the Key Bridge was vulnerable to ship strikes.  That committee made specific recommendations to enhance bridge safety which went ignored for decades.  Indeed, the very construction methods for the bridge – with non-redundant steel superstructure on pin and rocker bearings and hollow pier columns – was specifically designed to be light enough to be supported by light concrete foundations but with the consequence that it was known to be prone to complete collapse in the event of significant external contact. And despite all of the above knowledge, the State of Maryland failed to take appropriate steps to protect the bridge from such contact, including, but not limited to, failing to improve or upgrade physical protections around the bridge itself, failing to install adequate dolphins or other collision avoidance devices, failing to properly maintain the bridge, and failing to ensure that tugboats be available to escort and assist vessels as they pass under the bridge.

b.      Second is the question of potential third-party liability on the part of the manufacturer and/or service companies responsible for designing and maintaining certain electrical components aboard the vessel.  Without disclosing any confidential information learned in connection with the National Transportation Safety Board's on-going investigation, it has been publicly reported that a loose wire in the vessel's high-voltage switchboard was the likely cause of the circuit trip which caused the vessel to lose power to its high voltage electrical system on the early morning hours of March 26 and which Petitioners assert was the proximate cause of the allision with the Key Bridge.  The cause of that loose wire is still under investigation, but even claimants have already indicated that they intend to seek third-party discovery of the manufacturer, Hyundai Heavy Industries Co., Ltd. ("HHI").  We consider that, after further factual investigation, there is a fair probability that Petitioners and/or claimants will ultimately seek to join HHI or some other entity as a third-party defendant in this matter.

c.      A third issue, albeit less broadly applicable than the above points, is that there may be issues of comparative fault relating to the claims by Brawner Builders, Inc., employer of the six claimants who were killed in this casualty, and one claimant who was injured, based on its failure to adequately equip its employees to receive prompt warning and/or evacuation assistance in the event of an emergency on the bridge.

Petitioners respectfully submit that discovery and trial in respect of the above additional liability issues should proceed simultaneously with discovery and trial relating to exoneration and limitation.  Indeed, the issues are inextricably intertwined, and it would be highly prejudicial to Petitioners to conduct a trial on issues relating to its own liability without also considering the roles that the State of Maryland and/or third parties such as HHI and Brawner may have played in the casualty.

At the same time, while Petitioners generally support the idea of bifurcating any trial between liability and damages issues, they are strongly of the view that it would be unhelpful to stay all discovery relating to damages until after liability issues are resolved. Particularly with respect to the claim by the State of Maryland, the damages issues are certain to be complex. It is clear even from their claim as filed (Dkt no. 157, pp. 52-53), that there are many categories of damages alleged, all of which will need to be analyzed and vetted. In the first place, if discovery is stayed with respect to these claims until after trial on liability and limitation, then there is substantial risk that critical evidence will be lost. Witnesses' memories will fade, and third-parties may not retain relevant documents and information. Moreover, and perhaps even more importantly, if there is to be any prospect whatsoever of settling any of the claims in this matter, then Petitioner will need sufficient discovery so that it can understand and properly analyze those claims in order to determine what, if any, settlement value they may have. If the Court bifurcates all discovery on damages until after liability and limitation are decided, then it is essentially guaranteeing that a trial on liability and limitation will have to occur before the parties could even begin to try to negotiate a settlement. Petitioners respectfully submit this would be counterproductive.

Petitioners' proposed scheduling order is attached hereto as Exhibit 2. Petitioners respectfully submit that their proposed schedule more accurately accounts for the significant discovery that will be required in this matter even if the Court accepts the claimants' "streamlined" view of how the matter should progress. This is particularly so bearing in mind that many of the witnesses and much of the evidence are located overseas and in the control of third parties, which will significantly add to the logistical challenges of conducting discovery. That being said, under Petitioners' proposed schedule, the overall resolution of this matter will actually be substantially

accelerated because it will allow the parties to engage in discovery relating to all liability issues – and not just Petitioners' exoneration and limitation – and also damages, so that once the Phase 1 issues are resolved the parties are not starting at square one with respect to Phase 2.

       2.       Pre-discovery motions

       Irrespective of how the Court decides to manage discovery and trial in this matter, there are two categories of claim as to which Petitioners submit early motion practice is appropriate and, indeed, necessary because the applicable law exonerates them from liability.  They are (i) the class action claims, and (ii) the purely economic loss claims.  We briefly address each below.

       a.       Class Action claims – Two of the claims filed in this action, Dkt Nos. 222 and 239, purport to assert class action claims on behalf of categories of claimants who allegedly have been injured but who have not filed claims in this action notwithstanding this Court's injunction and monition that all claims be filed, if at all, on or before September 24, 2024.  (Dkt No. 8).  Petitioners respectfully submit that these class action claims are fundamentally improper on several grounds and are violative of basic principles underlying a limitation of liability action.  *See e.g., Lloyd's Leasing Ltd. v. Bates*, 902 F.2d 368 (5th Cir. 1990) (finding class action inconsistent with limitation proceeding).  If these claims are permitted to persist, it will substantially undermine the parties' and the Court's ability to assess the full universe of potential claimants so that they can be adjudicated consistent with the Limitation Act.

       b.       Economic Loss Claims – Eleven of the claims filed in this action, Dkt Nos. 78, 142, 171, 183, 186, 188, 189, 213, 222, 239 and 241, are on behalf of 26 claimants who solely seek recovery for economic losses allegedly incurred as a result of the casualty.  Under controlling Supreme Court precedent, however, such claims are not cognizable as a matter of law unless the claimant can demonstrate that it had a proprietary interest in the damaged property, *i.e.*, the Key

Bridge. *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927). Apart from Dkt Nos 142 and 213, none of the claimants alleging economic loss contend that they had a proprietary interest in any property whatsoever. In the two remaining claims, the "property" alleged to be damaged was a water pipe and a gas pipe, respectively; however, those claimants assert damages not relating to their allegedly damaged property but relating to the loss of the Francis Scott Key Bridge, as to which they fail to allege any proprietary interest. Accordingly, Petitioners contend that all of these claims should be dismissed as a matter of law. Petitioners respectfully contend that it would greatly streamline the proceedings and the management of the remaining claims if these eleven facially defective claims can be dealt with at the outset of the proceedings. Indeed, it would benefit those claimants as well so that they can know where they stand at the outset of this action rather than having to incur substantial expense in participating in this litigation to pursue a claim that may ultimately be deemed futile. There is no reason this briefing could not proceed simultaneously with discovery, so no delay should result.

### **Short Term Discovery**

The Court directed the parties that, "in relation to exoneration and limitation issues, the Status Report should address whether any Court-authorized discovery is required in the short term, before the anticipated formal opening of discovery after the Court's resolution of pre-discovery matters." ECF 325 at 4. The Parties have already engaged in informal discovery and have an agreement pursuant to which Petitioners shall respond to discovery requests from the Claimants prior to the opening of formal discovery. Claimant motions directed at the preliminary matters of "additional responsive pleadings and pre-discovery motions relating to exoneration and limitation of liability," ECF 325 at 2, will not need early discovery under the timeline contained in the proposed Scheduling Order. The Parties request that third-party discovery as to the shipbuilder

(Hyundai Heavy Industries, Co., Ltd.), the classification society (Nippon Kaiji Kyokai a/k/a Class NK), the time charterer (Maersk), and certain service providers such as Everhonest Ship Engineering Co., Ltd. be allowed to commence before the formal opening of discovery.

## Status Conference Attendance

Each Petitioner and each Claimant has selected two representatives who will attend the October 29, 2024, Status and Scheduling Conference (the "Conference") on its behalf. The representatives are listed on the attached Appendix. No Petitioner or Claimant requests more than two representatives.

## Additional Issues

The Claimants have identified the following further issues to raise with the Court during the Status and Scheduling Conference on October 29, 2024:

i.   The NTSB's position with respect to the release and production of information and documents which do not constitute investigation work product. (Claimant United States of America respectfully abstains from raising this issue. Separate counsel for the United States would represent the NTSB independently if the Court desires to hear from the Board and so directs.).

ii.  Duration of depositions and the number of Claimants and attorneys who may attend and participate.

iii. The location for depositions of Petitioners' employees, and Claimants' need to depose the crewmembers who are still within the jurisdiction early in the discovery process before those crewmembers are allowed to leave the United States.

PETITIONERS' COMMENT:  Petitioners are prepared to work with counsel in this respect, but the witnesses referenced in this paragraph are all represented by their own counsel and Petitioners do not control these witnesses.

iv.     Intended venue for individual Claimants if the petitions for exoneration and limitation are denied in part or in full.

v.      The possibility of a partial lifting of the stay against the prosecution of claims against Petitioners to the extent that certain claims are not subject to limitation.

vi.     The proper docketing of the cases and whether consolidation is necessary in light of the numerous docket numbers: 24-941; 24-463; 24-464; 24-465; 24-466; 24-467; 24-468; 24-469; 24-470; 24-471; 24-472; 24-473; 24-474; 24-475; 24-476; 24-477; 24-478; 24-479; 24-480; 24-481- 24-482; 24-483; 24-484; 24-485; 24-486; 24-487; 24-488; 24-489; 24-490; 24-492; 24-495; 24-496; 24-497; 24-498; 24-499; 24-500; 24-501; 24-502; 24-516; and 24-517.

vii.    The United States wishes to apprise the Court that Petitioners have paid its claim under the Oil Pollution Act in full, thereby fully resolving Count III of the United States' Claim and Answer.  *See* ECF 82 at 44.  The United States proposes to file an amended Claim and Answer which will reflect the resolution of this component of the United States' cost recovery claims.

Respectfully submitted this 22nd day of October, 2024

ANTHONY G. BROWN
Attorney General of Maryland

Robert A. Scott (24613)
Howard R. Feldman (05991)
Assistant Attorneys General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
rscott@oag.state.md.us
T: (410)576-63214

and

Margaret Fonshell Ward (04586)
DOWNS WARD BENDER HERZOG
& KINTIGH, P.A.
1350 McCormick Road
Executive Plaza 3, Suite 400
Hunt Valley, Maryland 21031
mward@downs-ward.com
(410) 584-2800

*/s/ David L. Reisman*
R. Keith Jarrett, T.A. *
David L. Reisman, T.A. (La. Bar # 21833)*
Raymond T. Waid*
Elizabeth B. McIntosh*
Jessie E. Shifalo*
Elizabeth A. Strunk*
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
T: (504) 581-7979
dreisman@liskow.com
rkjarrett@liskow.com
rwaid@liskow.com
ebmcintosh@liskow.com
jshifalo@liskow.com
eastrunk@liskow.com

Scott S. Partridge*
PARTRIDGE LLC
231 Glendale Drive
Metairie, Louisiana 70001
scott@partridgellc.com
(314) 952-4132

William J. Jackson*
Ivan Morales*
Maria F. Pimienta*
KELLEY DRYE & WARREN LLP
515 Post Oak Blvd, Suite 900
Houston, Texas 77027
bjackson@kelleydrye.com
imorales@kelleydrye.com
mpimienta@kelleydrye.com
(713) 355-5000

Philip D. Robben*
Julia Schuurman*
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, New York 10007
probben@kelleydrye.com
jschuurman@kelleydrye.com
T: (212) 808-7800

Andrew W. Homer*
KELLEY DRYE & WARREN LLP
888 Prospect Street, Suite 200
La Jolla, California 92037
ahomer@kelleydrye.com
T: (858) 795-0426

Mark Lanier*
The Lanier Law Firm
10940 W. Sam Houston Pkwy N
Suite 100
Houston, TX 77064
mark.lanier@lanierlawfirm.com
T: (713) 659-5200

*Admitted *Pro hac vice*
*Attorneys for State of Maryland*

19

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

EREK L. BARRON
United States Attorney

RODNEY H PATTON
Director

MICHELLE T. DELEMARRE
Senior Admiralty Counsel

*/s/ Thomas M. Brown*
THOMAS MACKINNON BROWN
Trial Attorney
JESSICAL G. SULLIVAN
Senior Trial Counsel
JEANNE L. AMY
GUYER S. BOGEN
LAINE M. GOODHUE
Trial Attorneys
Torts Branch, Civil Division
P.O. Box 14271
Washington DC 20044-4271
T: 202-616-4036
michelle.delemarre@usdoj.gov
thomas.m.brown@usdoj.gov
jessica.l.sullivan@usdoj.gov
jeanne.l.may@usdoj.gov
laine.m.goodhue@usdoj.gov

Kelly M. Marzullo
Assistant United States Attorney
360 South Charles Street, 4th Floor
Baltimore, Maryland 21201
T:  (410) 209-4956
kelly.marzullo@usdoj.gov

*Attorneys for the United States of America*

Robert B. Hopkins  (Bar No. 06017)
Laurie G. Furshman (Bar No. 29604)
Tristan A. Dietrick
DUANE MORRIS LLP
1201 Wills Street, Suite 330
Baltimore, MD 21231
T: (410) 949-2900
RBHopkins@duanemorris.com
LGFurshman@duanemorris.com
tdietrick@duanemorris.com

*/s/ William R. Bennett III*
William R. Bennett III*
Thomas H. Belknap, Jr.*
Alan Weigel*
Neil P. McMillan*
Noe S. Hamra*
BLANK ROME LLP
1271 Avenue of the Americas
New York, NY 10020
T: (212) 885-5000
William.Bennett@blankrome.com
Thomas.Belknap@blankrome.com
Alan.Weigel@BlankRome.com
Neil.McMillan@BlankRome.com
noe.hamra@blankrome.com

Kierstan L. Carlson*
Emma C. Jones*
BLANK ROME LLP
1825 Eye St. NW
Washington, DC 20006
T: (202) 420-2200
Kierstan.Carlson@blankrome.com
Emma.Jones@BlankRome.com

*Admitted *Pro Hac Vice*

*Counsel for Petitioners, Grace Ocean Private Limited
and Synergy Marine Pte Ltd.*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 22nd day of October 2024, a copy of the foregoing Joint

Status Report was served via the court's CM/ECF system on all counsel of record.

*/s/ David L. Reisman*
David L. Reisman (La. Bar # 21833)
