UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| In the Matter of the Petition<br><br>of<br><br>GRACE OCEAN PTE LTD., as Owner of the M/V DALI,<br><br>and<br><br>SYNERGY MARINE PTE LTD, as Manager of the M/V DALI,<br><br>for Exoneration from or Limitation of Liability. | Docket No. JKB 24-cv-941<br><br>*IN ADMIRALTY* |

**PETITIONERS' OPPOSITION TO
CLAIMANTS' MOTIONS TO PARTIALLY LIFT STAY**

Petitioners, through undersigned counsel BLANK ROME LLP, submit this Memorandum in Opposition to Claimant the State of Maryland's ("State Claimants[1]") Motion to Partially Lift the Stay entered by this Court on April 1, 2024 (ECF No. 451) and Claimant Ace American Insurance Company's ("Ace") related Motion for Partial Lifting of Stay (ECF No. 454) (collectively "Claimants").

**SUMMARY OF OPPOSITION**

For the reasons previously identified by this Court and by Claimants themselves, Phase 1 of the Limitation Proceeding is not intended to address any specific claims, but rather will focus only on Petitioners' potential exoneration from or limitation of liability. More significantly, and

---

[1] The "State Claimants" are the State of Maryland, by and through Anthony G. Brown, Attorney General of Maryland; the Maryland Transportation Authority ("MDTA"); the Maryland Port Administration ("MPA"); and the Maryland Department of the Environment ("MDE"). (See ECF No.451 n. 1).

1

also as *expressly admitted* by Claimants, this Court has supplemental jurisdiction over the claims that are the subject of the State Claimants' motion because they arise out of the same case or controversy that gave rise to admiralty jurisdiction in the first instance. Thus, there is no reason to grant Claimants' motions, and they both should be denied.

Further, with respect to the merits of Claimants' claims, the breach of contract claims are facially meritless for a number of reasons, and the environmental claims are not adequately plead and/or not ripe for adjudication. Meantime, Ace has identified no grounds upon which it should be entitled to the same relief requested by the State Claimants, and its motion should also be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

In the early morning hours of March 26, 2024, the M/V DALI (the "Vessel"), owned by GRACE OCEAN PRIVATE LIMITED ("Owner") and managed by SYNERGY MARINE PTE LTD ("Synergy") (jointly referred to as "Petitioners"), allided with the Francis Scott Key Bridge (the "Key Bridge").

On April 1, 2024, pursuant to the Shipowners Limitation of Liability Act of 1851, 46 U.S.C. §§ 30501, *et seq.* ("Limitation Act"), Petitioners filed a Complaint seeking exoneration from and/or limitation of liability before this Court (the "Limitation Proceeding"). As part of the Limitation Proceeding, Petitioners sought, and the Court issued, an Injunction Order enjoining "the commencement or further prosecution of any claims or causes of action against Petitioners and/or the Vessel arising out of the Casualty . . . until the hearing and determination of this proceeding." (ECF No. 8 at ¶ 2).

To date, 45 claims remain in the Limitation Proceeding,[2] including by the State Claimants, (ECF No. 157) seeking recovery for, *inter alia*, damages associated with the collapse of the Key Bridge, and Ace, (ECF No. 121), as the allegedly subrogated insurer of the Key Bridge.

On November 7, 2024, the Court issued Case Management Order No. 3, which provides, in relevant part:

> The Court will confine its determinations during Phase 1 to those **necessary to resolving whether Petitioners are entitled to exoneration from or limitation of liability**.
>
> * * *
>
> Answers to particular Claims not being germane to the successful completion of Phase 1 of this litigation, the Court will not require Petitioners to file answers at this time. This comports with the Court's position that it **will not address individual claims during Phase 1**, and that Phase 1 will instead focus only on Petitioners' potential exoneration from or limitation of liability.
>
> * * *
>
> For the same reasons, **dispositive motions addressed to particular claims have no utility in Phase 1**. . . . Although the Court may have jurisdiction to resolve these questions during the first phase, a more prudent way of navigating the "tension [that] exists between the savings to suitors clause and the Limitation Act," *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 448 (2001), is to resolve the limitation question first, and only then turn to the merits of individual claims, to the extent any remain in this forum.
>
> **The Court expects counsel to file only those motions that are relevant to the issues in Phase 1**.

(ECF No. 438) (emphasis added).[3]

---

[2] A majority of these claims are subject to dismissal under the US Supreme Court's holding in *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927), and the nearly century's worth of Circuit and District Court decisions that have followed, on the basis that they are purely economic loss claims by claimants who allege no proprietary interest in the Key Bridge.

[3] Petitioners acknowledge that the Court's schedule at ECF No. 438 sets a deadline of December 2, 2024, for any motion addressing the partial lifting of the stay. However, Petitioners respectfully submit that the above-quoted language from Case Management Order No. 3 should inform this Court's approach to considering Claimants' application.

**ARGUMENT**

I. **Policy Considerations Favor all Claims Remaining in the Limitation Proceeding.**

As noted above, this Court has already determined that "[a]lthough the Court may have jurisdiction to resolve these questions during the first phase, a more prudent way of navigating the 'tension [that] exists between the savings to suitors clause and the Limitation Act,' is to resolve the limitation question first, and only then turn to the merits of individual claims . . .." (ECF No. 438, CMO 3 at 5 p. 5) (quoting *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 448 (2001)). While Petitioners disagree with Claimants' characterization of certain categories of the State Claimants' claims as being beyond the reaches of the Limitation Proceeding, if any are, they can and should be separated only after the completion of Phase 1 as already contemplated by the Court.

"The purpose of a limitation proceeding is not merely to limit liability but to bring all claims into concursus and settle every dispute in one action." *In re River City Towing Servs., Inc.*, No. 04-291-C-1, 2005 WL 8155290, at *3 (M.D. La. Apr. 15, 2005), *aff'd*, 2005 WL 8155566 (M.D. La. June 10, 2005) (quoting *The Quarrington Court*, 102 F.2d 916, 918 (2d Cir.), *cert. denied*, 307 U.S. 645 (1939)). Indeed, "[t]he heart of [the limitation] system is a concursus of all claims to ensure the prompt and economical disposition of controversies in which there are often a multitude of claimants . . . Moreover, it is important to bear in mind that the concursus is not solely for the benefit of the shipowner. The elaborate notice provisions of the Admiralty Rules are designed to protect injured claimants." *Md. Cas. Co. v. Cushing*, 347 U.S. 409, 415 (1954); *River City Towing*, 2005 WL 8155290, at *3. As acknowledged by the Supreme Court, "[t]he benefits a concursus bestows on the shipping industry were thus described in the hearings on the 1936 amendments to the Limitation Act:"

> Under the limitation statutes, as we have had them since 1851, they had two different purposes to serve; one was to limit the liability of the owner and the other

was to draw into one court, in the case of a large accident, all of the claims, in order that they might be heard by one judge on one state of facts, in one trial, and intelligently disposed of.

*Md. Cas. Co.*, 347 U.S. at 415 (citations and quotations omitted). These policy considerations remain true today.

Indeed, not only will holding a single Phase 1 trial encompassing all issues of all parties in federal court protect the Petitioners herein, but it will also advance judicial economy and prevent significant delay and the waste of all parties' resources that will result from separate actions in different forums at this early stage.

For the same reasons that the Court in Case Management Order No. 3 elected not to give *Petitioners* the option to move to dismiss individual claims, so too should *Claimants* be precluded from relief on dispositive motions addressed to particular claims: "that interest is outweighed, as a matter of sequencing, by [the purposes of the Limitation Act and the Saving-to-Suitors Clause]." (*See* ECF No. 438 at p. 5) (quoting *In re Skanska USA Civ. Se. Inc.*, Civ. No. LAC-20-5980, 2021 WL 4955040, at *9 (N.D. Fla. July 28, 2021) (alteration in original)).

In fact, in the parties' Joint Status Report and Proposed Scheduling Order, the claimants stated:

> Claimants—consistent with the Court's Order and Memorandum—propose that Phase 1 discovery, **motions practice**, and trial will **only address the issues of Petitioners' negligence, unseaworthiness of the M/V DALI, and whether Petitioners had or lacked privity or knowledge of the same**. The proposed schedule for this phase is "detailed and precise," and includes prompt deadlines for completing pre-discovery motions practice, discovery, post-discovery motions practice, and trial. (*See* ECF No. 325 at 4).
>
> As proposed, "[o]nly after resolution of the questions of whether Petitioners are entitled to exoneration from or limitation of liability" will the Court set "deadlines relating to discovery and further litigation of Petitioners' liability, and appropriate relief as to any particular Claimant." *See* ECF No. 325 at 3. In other words, **any issues relating to "relief as to any particular Claimant" would be addressed during Phase 2 only**. ECF No. 325 at 4. **Staging the litigation in this manner**

5

> **makes good practical sense, particularly given that many claimants may choose to proceed before other courts upon resolution of the exoneration and limitation issues**. For these same reasons, the Parties believe that a scheduling order addressing individual claims, including any counterclaims, crossclaims, or third-party claims (including attendant damages), should await resolution of the narrow issues of limitation and exoneration. Claimants anticipate that the Phase 2 trial would proceed approximately 18 months after the Court issues an Opinion and Order answering the questions taken up in Phase 1.

(ECF No. 406 at 6-7 (emphasis added)). The arguments in the instant motions fly in the face of the positions stated by the Claimants in the Joint Status Report and should be rejected.

## II. This Court has Supplemental Jurisdiction Over the State Claimants' Claims.

As admitted by the State Claimants in their Answer and Claim, the "[c]ourt has supplemental jurisdiction under 28 U.S.C. §1367(a) over other, non-maritime claims given that they arise out of the same case or controversy that gave rise to admiralty jurisdiction." (ECF No. 157 at p. 14). In a limitation proceeding, the court can consider state law claims, along with the maritime and other federal law claims against the owner or charterer, because the issue in such a proceeding is whether the *total liability* against the owner or charterer is limited to the value of the vessel and her cargo. *In re Bridge Constr. Servs. of Fla.*, 39 F. Supp. 3d 373, 382 n. 2 (S.D.N.Y 2014) (citing *Van Schaeffer v. Tsakos Shipping & Trading, S.A.*, No. 05cv4486, 2006 WL 1192939, at *1 (E.D. Pa. May 2, 2006) ("The . . . state common-law claims must be litigated as part of the Limitation Action. The Limitation Act permits a vessel owner to compel *all suits* to be filed in a single action limited to the value of the vessel and its freight.") (emphasis added) (internal citation omitted)).

Of course, if the owner is found not to be entitled to either exoneration from or limitation of liability, a *separate* proceeding may then be initiated to pursue those claims outside the limitation against the owner. *See In re Arntz*, 380 F. Supp. 2d 1156, 1158 (C.D. Cal. 2005); *see*

*also Moore-McCormack Lines, Inc. v. Richardson*, 295 F.2d 583, 595 (2d Cir. 1961). Until a decision on limitation is determined, however, suits outside limitation are premature.

In Case Management Order No. 3, the Court quoted *Skanska USA Civ. Se. Inc. v. Bagelheads*, 75 F. 4th 1290, 1308 (11th Cir. 2023): "[W]henever the court [denies limitation and exoneration], it is appropriate to dismiss the petition to protect the claimants' rights under the savings to suitors clause—even if that means forgoing (in part or in entirety) a decision on the vessel owner's liability." Thus, as acknowledged by the Court, the appropriate time for an analysis of the savings to suitors clause is *after* the court has ruled on a petitioner's ability to limit its liability. Such bifurcation is not just appropriate, but is common.[4]

### III. The State Claimants' Breach of Contract Claims are Meritless.

The State Claimants' breach of contract claims fail as a matter of law and likely would, if the Court's scheduling order permitted, be the subject of an early motion to dismiss. Granting the State Claimants' motion with respect to their claims for breach of contract would require the Court to conclude that the Vessel was bound, at the time of the Casualty (when she was – according to State Claimants' own pleading – not at the Terminal), by a "Terminal Services Schedule" issued by the Maryland Port Authority[5] ("MPA Tariff"), that applies to vessels berthed at Maryland terminal facilities. The Court could not do so because such conclusion is plainly incorrect on its face. It strains credulity that the MPA Tariff could have contractually bound the Vessel to the State Claimants *in any way* after the Vessel left the Terminal. In the alternative, if the State's breach of contract claims could survive early dismissal (which is denied) – then at a minimum there are

---

[4] This bifurcation approach - deciding liability and limitation first in a bench trial and then lifting the stay to allow claimants to choose where to litigate the remaining issues, including damages - is common among courts as a way to ease the conflict between the saving to suitors clause and the Limitation of Liability Act. *See, e.g.*, *Pickle v. Char Lee Seafood, Inc.*, 174 F.3d 444, 449-51 (4th Cir. 1999).

[5] A copy of the MPA Tariff is annexed hereto as Exhibit 1.

7

disputes of fact with respect to whether the claims, as framed by the State, would fall outside the reach of the Limitation Proceeding. The MPA Tariff defines Terminals/Facilities[6] as:

> [T[hose portions of the various terminals or properties, including but not limited to the piers, wharves, bulkheads, docks, banks, land, buildings, and other facilities, under the control (now and in the future) of the Administration including:
>
> Childs Street (Piers 3 & 4)
> Clinton Street (Boathouse)
> Cox Creek
> Dundalk Marine Terminal
> Fairfield Automobile Terminal
> Hawkins Point Marine Terminal
> Locust Point Marine Terminal – North
> Locust Point Marine Terminal – South
> Seagirt Marine Terminal
> Seagirt Intermodal Container Transfer Facility (ICTF)
> 2001 Broening Highway
> 2200C Broening Highway (Parcel D1A, Baltimore City Plat 3259)
> 10 Maryland Avenue, Dundalk, MD

(Ex. 1, MPA Tariff at pp. 3-4). The Definition of "Terminal" does not include the Patapsco River, the Baltimore Harbor shipping channel, or any waterway of any kind.

Rule 34-034 of the MPA Tariff ("Environmental Standards") provides, in relevant part:

> All Users shall ascertain and comply with all applicable environmental standards set by international, federal, state or local laws, rules or regulations related to User's entry onto, use, occupancy, and services **provided or received by User on Terminal Facilities**, including but not limited to, obtaining and all required permits and/or governmental approvals (hereinafter referred to as "Environmental Standards").

(Ex. 1 at p. 33 (emphasis added)).

The argument underlying each of the State Claimants' MPA Tariff causes of action (ECF No. 157, Counts XI, XII, XIII) is that an electrical outage on the Vessel that occurred on March 25, 2024, while the Vessel was at the Terminal, was a violation of the MPA Tariff because vessels

---

[6] "Terminal," "Terminals," "Facility," "Facilities," and "Terminal Facilities" are collectively defined.

using the Terminal are required to abide by certain "Environmental Standards." The State Claimants allege the Vessel breached these "environmental standards" because that term is "broadly defined," and, therefore, according to the State Claimants, the power outage that occurred while at the Terminal was a violation of such standards. (ECF No. 157 at ¶¶ 151-157; 163-170; 174-178). The State Claimants argument is untenable.

Rule 34-034 of the MPA Tariff references "best management practices" for maintaining environmental standards. Ex. 1 at pp. 33-34. External references cited in the Tariff define such practices as waste management, oil spill prevention and response, stormwater pollution practices, air and noise pollution, and natural resources protection.[7] There is no reference to electrical outages in the Tariff or the external references cited therein. It is a considerable stretch to argue that a power outage that occurred while the Vessel was at the Terminal could possibly be construed as a violation of "environmental standards," much less a power outage that was demonstrably unrelated to the Casualty. More attenuated still is the State Claimants' argument that any damages alleged

---

[7] The MPA Tariff provides, in Rule 34-034 that: A current list of the Administration's best management practices can be found on the Administration's website http://www.mpa.maryland.gov/greenport/. From that link, "Port Operations" references an "Environmental Strategy," which links to a document that provides, in relevant part:

> The MPA will achieve its goals by expanding on the actions it is taking to meet the standards of state and federal water quality permits that protect the Chesapeake Bay and its rivers, as well as the wildlife and people who depend on them. These permits address a wide range of issues, including sediment, nutrients, chemicals, and stormwater runoff. By implementing this plan, the MPA will develop strategies that will serve as guides to improving and maintaining water quality, including the Water Quality Master Plan (for terminals); Institutional Stormwater Management Plan (construction/engineering); and Waste Load Allocation Implementation Plan (harbor development for dredge sites). Several best management practices and technologies are already completed or underway as a result of these efforts:
> • Removal of all underground storage tanks
> • Retrofitting of sand filters, wetlands, wet swales, and bioretention structures at several terminals
> • Installation of several engineered stormwater quality treatment technologies featuring pretreatment and filtering systems
> • Creation of hundreds of acres of wetlands and wildlife habitat
> • Implementation of offsite projects, such as schoolyard greenings, wetland and shoreline restoration, and other community enhancements
> • Demonstration of emerging technologies, such as floating wetlands and an algal turf scrubber

as a result of the Casualty (that occurred after the Vessel left the Terminal) could flow from a contractual obligation under the MPA Tariff that applies to vessels at the Terminal.

Further, pursuant to Rule 34-034 of the MPA Tariff, the MPA is entitled (but not obliged) to remediate any violation of the "environmental standards," and to charge the cost of such actions plus an administrative fee of 15% to the User. "In instances where a vessel is the responsible User, full payment of the Administration's preventive, investigatory or remedial actions **must be paid** by the franchised agent or vessel representative before the vessel will be permitted to sail from the Terminal Facility." (Ex. 1 at p. 33 (emphasis added)). Thus, if the Vessel had violated the environmental standards of the MPA Tariff (which is denied), it would not have been permitted to leave the Terminal until it had paid any MPA-issued fine. No such fine was ever issued, and the Vessel was not refused departure at any point.

The State Claimants are attempting to shoehorn the MPA Tariff's Environmental Standards indemnity provision into their claims in an attempt to escape the Limitation Proceeding. They should not be permitted to do so. But for the Court's prohibition on motions to dismiss during Phase 1 (ECF No. 438 at p. 5), Petitioners would move to dismiss the State Claimants' MPA Tariff causes of action as they are clearly baseless and improper. That aside, the Court still maintains supplemental jurisdiction over these claims and should retain jurisdiction due to the substantially overlapping facts at issue.

**IV.    The State Claimants' Evaluation of their Federal and State Environmental Claims is Improper.**

The State Claimants' environmental claims are a cynical side show, and their motion here to seek relief from the stay is nothing more than a thinly veiled attempt to circumvent this Court's limitation injunction. In this respect it is notable that the Patapsco River, in the most recent 2023 water quality report, not only received an "F" grade, but "posted slightly worse marks than in 2022.

This comes two decades after Baltimore signed a consent decree to meet the standards of the Clean Water Act."[8] The State's failure to meet *any* Clean Water Act standards for over 20 years, within the Patapsco River, is a result of "sewage overflows, uncontrolled stormwater runoff, malfunctioning wastewater treatment plants, and other problems on land [that] contribute excessive nutrients to our waterways which ultimately lead to algae blooms and fish kills." *Id.* In any event, the State Claimants' motion should be denied.

### a. Environmental claims can be addressed in bifurcated limitation proceedings.

Addressing environmental claims within limitation proceedings is not novel. In the Deepwater Horizon Multi-District Litigation, the court commenced a Phase 1 bench trial on the limitation action that did not address issues particular to any one claimant. During Phase 1, in addition to determining fault and liability issues, the court ruled on Oil Pollution Act of 1990 ("OPA 90") matters and issued a scheduling order to prepare certain claims made by the State of Alabama for trial. *In re Oil Spill*, 98 F. Supp. 3d 872, 876-77 (E.D. La. 2015). Environmental claims did not receive special treatment outside the limitation proceeding, even in light of OPA 90's unique statutory construction. There is no reason to lift the stay with respect to environmental claims at this time.

### b. Alternatively, the State Claimants' environmental claims are not ripe for adjudication.

The State Claimants assert claims for cost recovery and Natural Resource Damages (NRD) under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a), that are not ripe for adjudication (ECF No. 157, Counts IX,

---

[8] Fern Shen, *This year's water quality report card tells the grim truth about the overall state of Baltimore Harbor*. BaltimoreBrew (June 18, 2024), https://www.baltimorebrew.com/2024/06/18/this-years-water-quality-report-card-tells-the-grim-truth-about-the-state-of-baltimore-harbor/ (last visited Dec. 5, 2024).

X). The State Claimants have failed to allege *any* necessary costs of response[9] consistent with the National Contingency Plan (NCP). They have also failed to provide *any* evidence of – nor even plead – any response costs incurred to date. Further, since a remedy to resolve any environmental impacts has not been decided, claims for NRD are premature. *Quapaw Tribe of Okla. v. Blue Tee Corp.*, No. 03-cv-0846-CVE-PJC, 2008 WL 2704482 at *10 (N.D. Okl. July 7, 2008).

The Maryland State Law claims (ECF No. 157, Counts VI, VII, VIII) are also not ripe for adjudication, as the State Claimants fail to assert a penalty amount in controversy against the Vessel and its owners. *See id.* Thus, the Maryland State Law claims are not ripe because they do not articulate a specific, definite, and concrete recovery.[10] The State Claimants also attempt to sidestep typical administrative processes executed by the MDE. Normally, when the State obtains evidence of a violation of Maryland's Environmental Title, the MDE issues an Administrative Complaint, Order, and *Penalty* for the alleged wrongful act that is subject to administrative review. *See, e.g.*, *Md. Dep't of the Env't v. Guthmann*, No. 2524, 2016 WL 562720, at *1 (Md. Ct. Spec. App. Feb. 11, 2016).[11] The avoidance of conventional procedures is the State Claimants' attempt to prematurely sever the Maryland State Law claims from the limitation proceeding.

---

[9] A party's liability for cleanup costs can be limited by the costs necessary to reach a level of cleanup consistent with prior uses of the property, e.g., "industrial" cleanup levels. Under CERCLA and state counterparts to CERCLA, response costs recoverable are those "necessary" in light of the nature and type of property to be cleaned up. Costs incurred to achieve a higher level of use than the property necessitates violates this requirement.

[10] *See Aetna Life Ins. Co. of Hartford v. Haworth*, 300 U.S. 227, 240-41 (1937) (For a case to be ripe for judicial review, the controversy must (1) be definite and concrete; (2) implicate legal relations of the opposing parties; and (3) result in a grant of specific relief through a decree of a conclusive character, such as an order or judgment). Cases that raise only hypothetical or abstract questions are not considered ripe for judicial review. *Nike, Inc. v. Already, LLC*, 663 F. 3d 89, 94 (2d Cir. 2011).

[11] Those issued a penalty can request a contested case hearing on the penalty assessment before an Administrative Law Judge ("ALJ"). *Guthmann*, No. 2524, 2016 WL 56720, at *1 (appealing penalties under Maryland Environmental Title § 9-342 and § 4-417). Subsequently, the ALJ issues a decision deciding whether the penalty proposed by the MDE was proper under State law. The decision of the ALJ can only then be appealed to the Maryland Court of Special Appeals.

As the State Claimants environmental claims are not even ripe, they will not be prejudiced by waiting until the completion of Phase 1 of the Limitation Proceeding to seek removal of any environmental claims. Such lack of prejudice is further highlighted by the fact that the Court has supplemental jurisdiction over these claims, as they are directly related to claims in the action within the Court's original jurisdiction. Further, the State Claimants cannot assert claims based on a convenient litigating position that contradicts the regulations MDE has promulgated for itself.

## V.     Ace Is Not Entitled to the Relief Requested.

Ace's motion states that: "As Ace [ ] stands in the shoes of and is subrogated to the rights of the Maryland Transportation Authority, should this Court grant the State Claimants' Motion, the same result should inure to Ace., i.e., a partial lifting of the stay permitting Ace to bring breach of contract claims outside of this limitation action." (ECF No. 454 at 1).

In the Joint Status Report to the Court, however (ECF No. 406), the parties stated, in support of their argument as to why Ace should have a separate seat at counsel's table before the Court, as follows:

> First, while the interests of the State of Maryland and ACE are substantially aligned on a subset of issues, their interests are not fully aligned. For example, the State of Maryland has asserted a number of claims that will not inure to ACE's benefit, including economic losses flowing from the destruction of the Francis Scott Key Bridge, **pollution claims, contract claims**, and punitive damages claims. ACE's interest is more aligned with those claimants who sustained traditional and limited property damage claims, such as Baltimore Gas & Electric and Brawner Builders, and who are not otherwise represented by a specific claimant group.

(ECF No. 406 at 5 (emphasis added)). This representation to the Court should be taken as an admission that Ace is not subrogated to the MPA Tariff or environmental claims. In this respect, it is also highly relevant that Ace's Answer and Claim (ECF No. 121) did not raise any breach of contract claims (ECF No. 121 at 19-21) or attempt to incorporate the State Claimants' claims by reference.

Ace's motion has not provided any explanation or supporting documentation to show that, notwithstanding its prior representations to the Court, it somehow stands in the shoes of and is subrogated to the rights of the MDTA with respect to the State Claimants' contract claims. Indeed, Ace fails even to provide the Court with a copy of the governing insurance policy! Ace's failure to assert such claims in its Claim, and the express statement to the contrary in the Joint Status Report, should end the inquiry and result in denial of its motion.

In any event, the scope of Ace's coverage of the MDTA is clearly an issue of fact and requires the completion of discovery to determine whether or not such claims are in fact covered under the insurance policy issued by ACE to MDTA.

Ace's motion should also be denied for the same reasons set forth above with respect to the State Claimants.

## **CONCLUSION**

This Court has already identified a number of reasons why *all* claims should remain in the Limitation Action until Phase 1 is completed, and Claimants have admitted that the Court has supplemental jurisdiction over the claims in question. That should end the inquiry.

Moreover, the categories of claims identified by the State Claimants are either entirely baseless (breach of contract claims) or fail to state a claim (statutory environmental claims). To the extent such claims are even viable as presented, a fact-based analysis must be conducted to determine if they are eligible for severance from the Limitation Proceeding.

Ace has not even plead that it is subrogated to the State Claimants for the claims alleged in their motion. In fact, it admitted that its interests are not fully aligned with the State Claimants on the breach of contract and pollution claims.

Petitioners do not dispute that the savings to suitors clause may allow certain claims to proceed outside of the Limitation Action; however, such right to proceed in a different jurisdiction arises only once the Court has determined whether or not Petitioners are entitled to limit their liability. Now is not the time.

**WHEREFORE**, Petitioners respectfully request that the Court grant an Order as follows:

a. Denying the State Claimants' Motion to Partially Lift the Stay in its entirety;

b. Denying Ace's Motion to Partially Lift the Stay in its entirety; and

c. Granting such other and further relief as the Court may deem just and appropriate.

Dated: December 10, 2024

BLANK ROME LLP

*/s/ Luke M. Reid*

Luke M. Reid (Bar No. 31228)
Luke.Reid@blankrome.com
125 High Street, 3rd Floor
Boston, MA 02110
617-415-1200

William R. Bennett, III*
William.Bennett@blankrome.com
Thomas H. Belknap, Jr.*
Thomas.Belknap@blankrome.com
1271 Avenue of the Americas
New York, NY 10020
212-885-5000

Kierstan L. Carlson*
Kierstan.Carlson@blankrome.com
Emma C. Jones*
Emma.Jones@blankrome.com
1825 Eye St. NW
Washington, DC 20006
202-420-2200
*Admitted *pro hac vice*

15

## **CERTIFICATE OF SERVICE**

I CERTIFY that on this 10th day of December 2024, the foregoing was filed in the United States District Court for the District of Maryland via the Court's CM/ECF filing system, which will provide notice of this filing to all counsel of record.

*/s/ Luke M. Reid*