UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(NORTHERN DIVISON)

-------------------------------------------------- )   Docket No. 1:24-cv-00941
                                                  )
In the Matter of the Petition of              )
                                                  )   ***IN ADMIRALTY***
GRACE OCEAN PRIVATE LIMITED, as   )
Owner of the M/V DALI,             )
                                                  )
   -   And –                      )
                                                  )
SYNERGY MARINE PTE LTD., as     )
Manager of the M/V DALI,          )
                                                  )
For Exoneration from or Limitation of   )
Liability.                                    )
                                                  )
-------------------------------------------------- )

**<u>AMENDED CLAIM AND ANSWER OF AMERICAN SUGAR REFINING, INC. AND
FLORIDA SUGAR & MOLASSES EXCHANGE, INC. TO PETITIONERS GRACE
OCEAN PRIVATE LTD. AND SYNERGY MARINE PTE LTD.'S UNVERIFIED
PETITION FOR EXONERATION FROM OR LIMITATION OF LIABILITY</u>**

NOW COMES, Claimants AMERICAN SUGAR REFINING, INC. ("hereinafter "ASR")

and FLORIDA SUGAR & MOLASSES EXCHANGE, INC.  (hereinafter "FSME") (ASR and

FSME hereinafter collectively referred to as "Claimants"), for their Amended Claim and

Answer to the Unverified Petition for Exoneration from or Limitation of Liability of Grace

Ocean Private Ltd. and Synergy Marine Pte. Ltd. ("The Petitioners"), pursuant to the

Court's November 7, 2024 Case Management Order, and in support thereof alleges as

follows:

## CLAIM FOR DAMAGES

1. Claimant ASR is an importer of raw sugar into the United States, as well as a manufacturer and distributor of sugar and other products throughout the United States.  Claimant FSME is a marketer and shipper of raw sugar and molasses.

2. In support of its business operations, Claimant ASR is both an owner and operator of a terminal facility in the Port of Baltimore which is used for receiving raw sugar from Claimant FSME and other sources.

3. Petitioner GRACE OCEAN PRIVATE LIMITED ("The Vessel Dali Owners"), was at all times relevant hereto the registered sole owner of M/V Dalii (IMO No. 9697428) ("the Vessel Dali").

4. Petitioner SYNERGY MARINE PTE LTD. ("SYNERGY") was the employer of The Vessel Dali's crew and/or technical manager responsible for the management and proper operation of The Vessel Dali (collectively, herein, The Vessel Dali Owner and Synergy shall be referred to "the Vessel Interests").

5. Synergy was and is not an 'owner' of The Vessel Dali as that term is defined under the Limitation of Shipowners Liability Act, 46 U.S.C. Sec. 30501, et seq. and therefore is not entitled to the protections of that Act.

6. On March 26, 2024, The Vessel Dali was under the direction and control of The Vessel Interests when it allided with a stationary object, the Key Bridge ("The Allision"), causing significant damages to the bridge and other businesses which rely upon access to the Port of Baltimore.

7. The destruction of the Key Bridge by The Vessel Dali caused damage to the bridge itself, blocked the For McHenry Channel, shut down the Port of Baltimore, caused

massive expense for debris removal, and resulted in other losses or damages which are as of today's date unquantifiable.

8. As a result of the destruction of the Key Bridge, Claimants have suffered significant damages arising from the closure of the Port of Baltimore.

9. As of the date of this filing, Claimants have suffered at least $5,565,000 in damages, or as can be quantifiable under the circumstances.

**THIS TRAGEGY WAS AVOIDABLE**

10. The Allision that occurred at 1:29 a.m. on March 26, 2024, was arguably the largest maritime disaster in United States history and, sadly, it was caused by greed and was entirely avoidable. This tragedy occurred because the electrical and mechanical systems on The Vessel Dali were recklessly maintained and configured by The Vessel Interests in a way that bypassed automated safety-minded redundancies and violated safety regulations and good practices for international shipping.

11. The unseaworthy condition of The Vessel Dali was the direct result of changes made by The Vessel Interests to cut fuel costs and for crew convenience. The result was a series of foreseeable and preventable equipment failures that plunged The Vessel Dali and its crew into darkness and a loss of power from which it could not recover before The Allision. As the cascading fuel and electrical system failures mounted, none of the four means available to help control The Vessel Dali - her propeller, rudder, anchor, or bow thruster - operated when they were called upon, and all were called upon by a heroic Baltimore pilot that was told nothing about the dangerous condition of The Vessel Dali before it left its berth or The Allision.

12. These cascading equipment failures were compounded by an incompetent crew and culminated in a complete lack of control over an approximately 247-million-pound ship moving uncontrollably toward the Key Bridge and unsuspecting bridge workers. The Vessel Dali hit the Key Bridge with energy equivalent to approximately 330 pounds of TNT. Sadly, the result was the complete destruction of the Key Bridge, the death of six innocent bridge workers and an interruption of all shipping activities through the Fort McHenry Channel. In short, The Vessel Interests willfully and wantonly set up The Vessel Dali for a disaster and its incompetent crew executed on it.

## JURISDICTION AND VENUE

13. This is a case of admiralty and maritime jurisdiction against Petitioners.

14. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1333, and this is an admiralty and maritime claim and action within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

15. Venue is proper in this District pursuant to Supplemental Rule F(9), as alleged in the Limitation Petition ¶ 2.

16. Venue is also proper pursuant to 28 U.S.C. § 1391(b) as it is the judicial district in which a substantial part of the events giving rise to this action occurred.

## OVERVIEW OF THE VESSEL DALI AND FUNCTION OF ITS SYSTEMS

17. To explain how this sequence of failures led to The Allision, it is necessary to provide an overview of The Vessel Dali's history and system functions as well as the changes made to The Vessel Dali prior to The Allision.

18. The Vessel Dali was built by H.D. Hyundai Heavy Industries Co., Ltd. of South Korea, one of the world's largest shipbuilders, and was launched in 2015. It is a Neo-Panamax container ship with a length of nearly 1,000 feet and when fully loaded, weighing more than 116,000 tons, and carrying thousands of containers of cargo.

19. According to the pilot card, at the time The Vessel Dali started its fateful voyage, it displaced 112,383 metric tons or approximately 247 million pounds.

20. Despite its size, The Vessel Dali is operated by a limited crew because much of its equipment and electrical systems are automated and intended to be operated accordingly. For this reason, the crew of The Vessel Dali consisted of only twenty-one (21) foreign crew members, all of whom hailed from India and Sri Lanka.

21. The automation designed and built into The Vessel Dali provides certain redundancies and safety features intended to eliminate single point failures. In fact, both the International Convention for the Safety of Life at Sea ("SOLAS")[1] and The Vessel Dali's classification society, ClassNK, recognize the need for automation

---

[1] SOLAS in its successive forms is regarded as the most important of all international treaties concerning the safety of merchant ships. The first version was adopted in 1914 in response to the Titanic disaster. The main objective of the SOLAS convention is to specify minimum standards for the construction, equipment, and operation of ships, compatible with their safety. Relevant SOLAS regulations provide as follows:

Chapter II-1, Regulation 53, Section 4.1 The control system shall be such that the services needed for the operation of the main propulsion machinery and its auxiliaries are ensured *through the necessary automatic arrangements*.

Chapter II-1, Regulation 41, Section 5.1.1 Where the main source of electrical power is necessary for propulsion and steering of the ship, the system shall be so arranged that the electrical supply to equipment necessary for propulsion and steering and to ensure safety of the ship will be maintained and immediately restored in the case of loss of any one of the generators in service;

Chapter II-1, Regulation 43, Section 3.1.3 Where the emergency source of electrical power is a generator, it shall be …capable … of being automatically started and supplying the required load as quickly as is safe and practicable and subject to a maximum of 45 seconds.

and provide guidelines for that automation. As will be demonstrated below, The Vessel Interests implemented, designed, and encouraged procedures that bypassed these critical safety driven redundancies. This reckless conduct on the part of The Vessel Interests was a substantial factor in causing The Allision.

22. The Vessel Dali's main engine turns the propeller which drives The Vessel Dali through the water. To run the main engine, one of The Vessel Dali's four diesel generators must be operating and supplying The Vessel Dali with electrical power.

23. The four diesel generators provide power to a 6600V switchboard that, in turn, provides power through two step down transformers (Transformer No. 1 and Transformer No. 2) to a 440V switchboard. Each generator has its own circuit breaker. Below is a true and accurate picture taken on The Vessel Dali of the line diagram of electrical power system described above.



24. The 440V panel provides power to most of the equipment on The Vessel Dali including the steering gear pumps, main engine cooling water pumps and other

equipment necessary for the main engine to operate. Power to the 440V switchboard is powered by one of the two transformers but not at the same time. Power can be routed through either of the two transformers by selection of the crew.

25. Transformer No. 1 and its circuity and breakers had long suffered the effects of heavy vibrations, a well-known cause of transformer and electrical failure. Instead of taking steps to eliminate the source of excessive vibrations, Petitioners improvised makeshift dampeners. For example, they retrofitted the transformer with ad-hoc anti-vibration braces, one of which had cracked over time.  As shown in the photo below, they even wedged a metal cargo hook between the transformer and a nearby steel beam, in a slipshod attempt to dampen vibrations.



26. During post Allision testing and inspections that occurred on September 11, 2024, loose bolts were found on Transformer No. 2 and in the Generator DG4 switchboard cubicle. The conditions were so alarming that the independent testing company that opened Transformer No. 2 and the Generator DG4 switchboard cubicle issued a letter "strongly" encouraging that Transformer No. 2 and Generator DG4 be locked out for the safety of the vessel, personnel and to comply with "safety regulations and best practices in the industry."

27. The existence of excessive, and damaging but undiagnosed vibrations was known to The Vessel Interests as evidenced by repeated references in Handover Notes passed from crew to crew before The Allision.

28. The Handover Notes establish that several pieces of critical equipment on The Vessel Dali suffered premature failure and that the crew attributed these failures to the excessive vibration. These Handover Notes foreshadowed critical equipment failures caused by excessive vibration.

29. A complete loss of 440V power can result in the complete loss of engine power, propulsion and rudder control depending on how long the 440V power outage lasts. Accordingly, the circuits are designed to allow automatic transfer of power from one circuit to the other in the event of a loss of power or circuit breaker trip. Specifically, each transformer has a control mode knob allowing power to be transferred either manually or automatically in the event of its circuit breaker tripping or an electrical blackout.

30. Consistent with SOLAS requirements and good practices, the control mode on the transformers should have been set to automatic.

31. On departure, The Vessel Dali was operating the transformers in manual mode thereby recklessly bypassing a redundancy built into the electrical system.

32. Below is a true and accurate picture of the Transformer No. 1, that shows the control mode selection dial that can be used to switch from auto to manual.



33. Although the main engine may shut down during the automatic transfer of power process, the engine can be quickly restarted to restore propulsion. Moreover, immediately on transfer of power from one transformer to another, multiple steering pumps, water jacket and other critical equipment start immediately.

34. Another critical safety redundancy integrated into the design of The Vessel Dali is the backup electric power generator that was designed and intended to turn on in 35 seconds or less to provide power to designated critical emergency equipment including, but not limited to, rudder control.

35. Below is a true and correct picture of The Vessel Dali's emergency generator start procedures requiring automatic startup and connection to the emergency generator 440V panel withing 35 seconds.



36. Prior to departing the Port of Baltimore, The Vessel Dali experienced failures to start on generators, which the crew was aware of and failed to correct.

## MODIFICATIONS TO THE VESSEL DALI FUEL LINES

37. In or about 2020, The Vessel Dali underwent substantial modifications of its fuel lines during installation of scrubbers, which was done to comply with new fuel regulations. During and after those modifications, The Vessel Interests designed, encouraged, and approved reckless generator and main engine fuel lineup changes and practices that removed critical automated redundancies. These changes were substantial contributing factors to The Vessel Dali being unseaworthy and The Allision.

38. On January 1, 2020, the International Marine Organization's (IMO) fuel regulation went into effect, which significantly changed the way vessels carried and used fuel.[2]

39. As a result of IMO 2020, now, as a common practice, cargo vessels such as The Vessel Dali use more expensive low sulfur fuel (MGO) when inside designated Emissions Control Areas ("ECA") and use a more inexpensive higher sulfur fuel (HFO) when traveling in international waters.

40. In or about 2020, the owners of The Vessel Dali installed sulfur scrubbers (also known as exhaust gas cleaning systems) on Generators DG1 & DG2 and the main engine. As part of that retrofit, The Vessel Dali Owners re-designed and altered the existing fuel line setup and operational procedures in a way that was obviously intended to save money on fuel and lessen the crew workload relating to switching between fuels.

41. The fuel system retrofit removed critical backwash fuel filters, MGO cooler, fuel oil heaters and the viscometer for proper management of fuel viscosity. The same retrofit implemented a fuel lineup to Generators DG3 and DG4 with only lower sulfur fuels and the Generators DG1 and DG2 on either higher or lower sulfur fuels. The lack of backwash filters caused the inline fuel filters to Generators DG3 and DG4 to clog resulting in low fuel pressure, low fuel pressure alarms, failures to start and fluctuations in voltages on these generators. In fact, the October 2023

---

[2] IMO 2020 requires effective January 1, 2020, that vessels operating anywhere in the world must use marine fuel oil with a lesser sulfur content than the fuels previously permitted within designated Emission Control Areas (ECAs). As an alternative to using the more expensive lower sulfur fuel oil, the regulations under the International Convention for the Prevention of Pollution from Ships (known as MARPOL) permit vessels to install and use exhaust gas "scrubbers" that remove sulfur oxides from the vessels' emissions.

Handover Notes indicate that Generator DG3 could not be started remotely without a crew member manually pushing the governor fuel lever.

## AUX. ENGINE #3

AE # 3 not able to start without pushing governor fuel control lever.

42. In addition, Handover Notes and other documentation establish that The Vessel Dali was regularly running two different fuel lineups that were encouraged, known, and approved by The Vessel Interests.

43. Below is a diagram showing the two fuel lineups (yellow and green) used by The Vessel Dali prior to The Allision.



44. At the time of The Allision, the green fuel lineup was to the main engine and Generator DG1 & Generator DG2 (when in use). The yellow fuel lineup was set up to use an electric flushing pump to supply fuel to Generator DG3 and Generator DG4 instead of via the normal supply and booster fuel pumps.

45. Unlike the booster and supply pumps that were designed and intended to supply fuel to all four auxiliary diesel generators, the electric flushing pump operates at lower bar pressures and has a circuit breaker that must be manually reset in the event of a blackout. For these reasons, the electric flushing pump should only be used when a vessel switches over from HFO to MGO, i.e., when entering waters that are within the ECA.

46. Below (left) is a generator booster pump circuit breaker showing its capability for automatic restart upon blackout recovery.  Below (right) is the flushing pump circuit breaker showing no auto restart capability upon blackout recovery.



47. As a result of these and other changes to the fuel system, fuel pressure alarms settings were reduced to one bar (effectively turned off) to avoid frequent low fuel pressure alarms.

48. It was grossly negligent and reckless for The Vessel Interests to design a fuel lineup and implement a policy to utilize an electric flushing pump for auxiliary Generators DG3 and DG4 for many reasons, but, most critically, because: (1) it was powered by a circuit breaker that must be manually reset in the event of a blackout; and (2) runs at lower bar pressures.

49. When The Vessel Dali originally lost electrical power on March 26, 2024, the flushing pump and all other electric fuel pumps stopped pumping and the emergency pneumatic pump came on.

50. When the crew closed the tripped circuit breakers manually and The Vessel Dali recovered briefly from the first blackout it experienced, the flushing pump remained off.

51. After the crew closed the tripped circuit breakers manually and The Vessel Dali recovered briefly from the initial blackout, Generators DG3 and DG4 were receiving fuel only from the pneumatic pump. However, the pneumatic pump was only intended to provide enough fuel to start a generator. With the electric flushing not working the fuel pressure continued to drop until Generators DG3 and DG4 were starved of fuel and went offline.

## THE ALLISION TIMELINE

52. The Vessel Dali departed its berth in the Baltimore Harbor on March 26, 2024, operating under power from Generators DG3 and DG4.

53. Sea state was calm, visibility was good, and there was no wind.

14

54. At or about 01:25 a.m., The Vessel Dali was in the center of the channel when the breakers on the Transformer No. 1, which was powering The Vessel Dali, tripped, thereby interrupting power to the 440V switchboard ("The First Blackout").

55. The First Blackout was caused by a loose connection associated with an undervoltage release on the Transformer No. 1 circuit that was caused by excessive vibration that The Vessel Interests knew was occurring but which they failed to convey to the pilot or Coast Guard before departure.

56. At the time of the First Blackout, the crew was operating The Vessel Dali with the transformer settings on manual rather than automatic mode contrary to SOLAS requirements and good practices. As a result of being operated in manual mode, the power from the 6600V switchboard did not automatically transfer from Transformer No. 1 to the other redundant transformer, Transformer No. 2, and all 440V power on The Vessel Dali was lost until the crew manually reclosed the Transformer No. 1 circuits.

57. When The First Blackout occurred, The Vessel Dali was without power long enough to cause the main engine to shut down. The main engine shut down resulted in complete loss of rudder control and propulsion.

58. In addition, the emergency generator did not start and connect to the emergency switchboard for more than 60 seconds instead of the maximum designed time of 35 seconds and the regulatory limit of 45 seconds.

59. During The First Blackout and prior to the crew attempting to close the Transformer No. 1 breakers, Generator DG3 and Generators DG4 continued running but were

not powering the 440V switchboard because the Transformer No. 1 breakers tripped.

60. At this time, the fuel pressure on Generators DG3 and DG4 was substantially less than what it should have been because The Vessel Interests designed the flushing pump as a fuel supply for Generators DG3 and DG4, instead of the intended supply and booster pumps.

61. As the First Blackout continued, the fuel pressure to Generators DG3 and DG4 steadily declined because the emergency pneumatic fuel pump was the only fuel supply and could not keep up with fuel demands.

62. Had The Vessel Dali been running on the generator supply and booster pumps designed and intended by the manufacturer of the ship, when the crew closed the Transformer No. 1 circuit breakers, power would have been restored to the 440V panel and those pumps would have been working. However, in this instance, when the crew manually closed the Transformer No. 1 circuit breakers to restore power, the fuel pump in the generator lineup was the flushing pump and its circuit breaker was in a tripped position. At that point, the only available fuel supply to Generators DG3 and DG4 was the emergency pneumatic fuel pump, which was only operating at approximately twenty five percent of the fuel pressure that was required.

63. Within moments of manually closing the Transformer No. 1 circuit breakers, Generators DG3 and DG4 were starved of fuel and their circuit breakers opened taking them offline and resulting in a second blackout ("The Second Blackout"). Until the emergency generator connected to the emergency 440V panel (more

than a minute later), multiple steering pumps were without power, and the rudder was not capable of correcting The Vessel Dali's heading.

64. The Vessel Dali was left without any propulsion and/or rudder control for approximately 72 seconds during the critical approach to the Key Bridge because the Captain, crew, and The Vessel Interests chose to operate the step down transformers in manual mode and relied on a flushing pump that required manual reclosing of its circuit breaker in the event of a blackout.

65. The pilot called for release of the port anchor to change course, but the crew failed to have the anchor ready for immediate release as required by law.[3]

66. Still over a minute before The Allision, the pilot ordered full power to the bow thruster. However, without auxiliary generators online, the bow thruster was unavailable and the fate of six innocent bridge workers, the Key Bridge and the The Vessel Dali was sealed.

67. At or about 01:28 a.m., The Vessel Dali, in a condition without propulsion or steering control, allided with the Key Bridge with an energy equivalent to 330 pounds of TNT, causing its complete destruction, killing six innocent bridge workers, and seriously injuring another.

68. As a result of the collapse and destruction of the Key Bridge, the structural spans were caused to fall into the Patapsco River and onto The Vessel Dali thereby blocking the Fort McHenry Channel and shutting down the Port of Baltimore.

---

[3] See 33 C.F.R. § 164.11 ("The owner, master, or person in charge of each vessel underway shall ensure that: . . . (o) The vessel's anchors are ready for letting go . . . .").

**<u>CONDITIONS/MODIFICATIONS THAT LED TO THE ALLISION</u>**

69. At the time The Vesseli Dali left its berth, it was unseaworthy because:

   a. The Vessel Interests knew of and failed to address the cause of the excessive vibrations that were known to be damaging critical equipment necessary for the safe operation of The Vessel Dali;

   b. The Vessel Dali left its berth operating with its step down transformers set in "manual" mode; and

   c. The Vessel Dali was operating a grossly negligent and reckless fuel lineup designed and approved by The Vessel Interests to cut corners and save money on fuel, maintenance costs and time.

70. The Vessel Interests and crew failed to consider and/or conduct a proper failure analysis for the fuel lineup that was being used when The Vessel Dali left its berth and at the time of The Allision.

71. Notwithstanding the lack of a proper failure analysis of its fuel lineup, The Vessel Dali got an eerie preview of what might occur during a blackout recovery prior to departing on the fateful voyage when The Allision occurred.  Indeed, while in port and operating on Generator DG2 for power, a crew member accidentally closed a Generator DG2 exhaust damper causing the standby generator, Generator DG3, to come online which shortly thereafter was starved of fuel and went offline itself.  Generator DG3 was starved of fuel for the same reason that occurred in the moments before The Allision – the flushing pump tripped, and the emergency pneumatic pump had insufficient fuel pressure to keep Generator DG3 running.

72. Just hours after experiencing an inability to recover from a blackout because of its unreliable fuel lineup while still docked, The Vessel Dali got underway on March 26th on the same unreliable fuel lineup and, to compound the recklessness, used a jury-rigged Transformer No. 1 and set the step-down transformers on manual instead of automatic. The Vessel Interests set up The Vessel Dali to fail and the crew carried through on it.

73. Records from The Vessel Dali show excessive vibrations were well documented and that the fuel lineup existed for a period of more than one hundred days prior to The Allision. As such, the unseaworthy condition of The Vessel Dali was known to or can be directly imputed to The Vessel Interests.

74. It was grossly negligent, reckless, careless, negligent and a deviation from nautical standards of care for The Vessel Interests and crew to knowingly and intentionally operate The Vessel Dali's electrical systems in a way that prevented the automatic transfer of power from one transformer circuit to the other in the event of a loss of power.

75. It was grossly negligent, reckless, careless, negligent and a deviation from nautical standards of care for the Vessel Interests and crew to knowingly and intentionally operate The Vessel Dali with a fuel lineup that relies exclusively on a fuel pump that is intended only for flushing fuel lines and includes a circuit breaker that must be manually reset in the event of an unexpected loss of power.

76. The preexisting, serious electrical and fuel problems known to The Vessel Interests and crew included but was not limited to: (1) intermittent and unreliable power caused by running MGO without cooling; (2) improper use of an electric flushing

pump as a primary pump for auxiliary generators; (3) unreliable fuel lineups concocted to save fuel costs and crew convenience; (4) damage to critical components caused by excessive vibration known to exist without resolution; (5) multiple and repeated emergency generator and auxiliary generator start failures demonstrating unreliability; and (6) operating the transformer circuits in "manual" mode thereby removing critical redundancies built into a ship that was staffed to be automated.

77. The fault, neglect and want of care on the part of The Vessel Interests, The Vessel Dali and its crew were occasioned with Vessel Interests; and/or the crews' privity and/or knowledge.

78. The Vessel Dali was neither seaworthy nor ship-shape when it left the Port of Baltimore and in fact was not tight, staunch, strong, properly, or competently manned, equipped, maintained, and/or supplied and was not seaworthy and fit and proper for the service in which she was engaged.

79. The Allision and resulting damages were caused by the fault, neglect, and want of care on the part of The Vessel Interests and crew, a lack of maintenance and care of The Vessel Dali, a failure to perform proper, thorough and timely inspections of The Vessel Dali and their failure to report its condition before leaving the Port of Baltimore. Each of the above was individually and collectively a substantial factor in bringing about the harm

## COUNT I: NEGLIGENCE

80. Paragraphs 1-79 are incorporated herein as if set forth in full.

81. The Allision was caused by and occurred as a result of the acts, omissions, negligence, faults, recklessness, lack of due care, and breaches and violations of duties and law by the The Vessel Dali and her crew, and by Petitioners, and/or their principals, agents, and/or employees as set forth above and due to other negligence to be proven after a reasonable opportunity for further investigation and discovery.

82. The foregoing acts, omissions, negligence, fault, recklessness, lack of due care, and/or breaches and violations of duties and law that were direct and proximate causes of the Allision were within the privity and knowledge of Petitioners and their principals, agents, and/or employees.

83. The Petitioner's negligence and allision with the stationary Key Bridge caused damage to Claimants' property and related operations.

84. Claimants now seek recovery from the Petitioners for the damages sustained.

## COUNT II: UNSEAWORTHINESS

85. Paragraphs 1-84 are incorporated herein as if set forth in full.

86. Petitioners owed Claimants a legal duty under the general maritime law to maintain The Vessel Dali in a seaworthy condition, ship-shape, and in good working order to safely ply the navigable waters of the United States.

87. The Allision was caused by and occurred as a result of the aforementioned unseaworthiness of The Vessel Dali.

88. The foregoing unseaworthiness that was a direct and proximate cause of The Allision was within the privity and knowledge of Petitioners and their principals, agents, and/or employees.

89. The Vessel Dali's unseaworthiness caused damage to Claimants.

90. Claimants now seek recovery from the Petitioners for the damages sustained.

### COUNT III:  THE OIL POLLUTION ACT

91. Paragraphs 1-90 are incorporated herein as if set forth in full.

92. Upon information and belief, the Vessel Dali discharged oil into navigable waters because first responders observed an oily sheen around the vessel.

93. Upon information and belief, the Vessel Dali posed a substantial threat of a discharge of oil into navigable waters, because it carried 1.8 million gallons of oil, and it grounded above a natural gas pipeline.

94. Upon information and belief, the United States Coast Guard determined that the Vessel Dali discharged oil into navigable waters and/or posed a substantial threat of the discharge of oil in navigable waters, established a unified command to address oil pollution, drew funding for its response and removal costs from the Oil Spill Liability Trust Fund, designated Petitioners as responsible parties , and ordered Petitioners to place booms from the Vessel Dali.

95. Under the Oil Pollution Act, 33 U.S.C. § 2700 et seq., a party responsible for a vessel that discharges oil or poses a substantial threat of a discharge of oil into United States navigable waters is strictly liable for:

a. "Damages for injury to, or economic losses resulting from destruction of, real or personal property, which shall be recoverable by a claimant who owns or leases that property";

b. "Damages for loss of subsistence use of natural resources, which shall be recoverable by any claimant who so uses natural resources which have been injured, destroyed, or lost, without regard to the ownership or management of the resources"; and

c. "Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources which shall be recoverable by any claimant."

96. Petitioners are the responsible parties and, therefore, are liable to Claimants for loss or damages sustained.

## COUNT IV:  PUBLIC NUISANCE

97. Paragraphs 1-96 are incorporated herein as if set forth in full.

98. Petitioners' conduct created an unreasonable obstruction to navigation, blocking the sue of the Fort McHenry channel, and preventing any traffic from entering or leaving Baltimore Harbor.

99. Petitioners created a public nuisance and, therefore, are liable to Claimants for loss or damages sustained.


## ANSWER TO PETITION

As for its Answer to the Petition, Claimants aver as follows:

100.     The allegations in paragraph # 1 of the Petition are admitted.

23

101.     The allegations in paragraph # 2 of the Petition are admitted.

102.     In response to the allegations in paragraph # 3 of the Petition, it is only admitted that Grace Ocean Private Ltd. was, at all times relevant hereto, the registered owner of The Vessel Dali. Claimants lack knowledge or information sufficient to form a belief about the remaining allegations of paragraph #3 and, therefore, the same are denied and strict proof is demanded.

103.     Claimants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph #4 of the Petition, and, therefore, the same are denied and strict proof is demanded.

104.     Claimants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph #5 of the Petition, and, therefore, the same are denied and strict proof is demanded.

105.     The allegations in paragraph # 6 of the Petition are admitted.

106.     In response to the allegations in paragraph # 7 of the Petition, it is admitted that The Vessel Dali commenced a voyage from Baltimore, Maryland on March 26, 2024. Claimants lack knowledge or information sufficient to form a belief about the remaining allegations of paragraph #7 and, therefore, the same are denied and strict proof is demanded.

107.     In response to the allegations in paragraph # 8 of the Petition, Claimants lack knowledge or information sufficient to form a belief as to their truth and, therefore, the same are denied and strict proof is demanded.

108.     In response to the allegations in paragraph # 9 of the Petition, it is admitted that The Vessel Dali entered the shipping channel at or about 01:08 local time. It

is also admitted that the Vessel Dali thereafter experienced a loss of power and propulsion in the shipping channel. Claimants lack knowledge or information sufficient to form a belief about the remaining allegations of paragraph # 9 and, therefore, the same are denied and strict proof is demanded.

109.     The allegations in paragraph # 10 of the Petition are admitted.

110.     The allegations in paragraph # 11 of the Petition are admitted.

111.     The allegations in paragraph # 12 of the Petition are admitted.

112.     The allegations in paragraph # 13 of the Petition are denied.

113.     The allegations in paragraph # 14 of the Petition are denied.

114.     The allegations in paragraph # 15 of the Petition are denied.

115.     The allegations in paragraph # 16 of the Petition are denied.

116.     The allegations in paragraph # 17 of the Petition are denied.

117.     The allegations in paragraph # 18 of the Petition are denied.

118.     Claimants lack knowledge or information sufficient to form a belief about the allegations of paragraph #19 and, therefore, the same are denied and strict proof is demanded.

119.     The allegations in paragraph # 20 of the Petition are denied.

120.     The allegations in paragraph # 21 of the Petition are admitted.

121.     The allegations in paragraph # 22 of the Petition are admitted.

122.     Paragraph #23 is a conclusion of law to which no response is required. To the extent an answer is required, Claimants admit only that this paragraph contains Petitioners' *claim* of exoneration from liability *allegations* that they have valid defenses to claims relating to The Allision they caused and the destruction of the

Key Bridge. To the extent an answer is required, Claimants specifically deny the claims and allegations of Paragraph 23 of the Petition.

123.     Paragraph #24 is a conclusion of law to which no response is required. To the extent an answer is required, Claimants admit only that Petitioners' *claim* the benefits of the Limitation Act and *claims* they are ready and willing to give a stipulation with sufficient surety for the payment into the Court of the value of The Vessel Dali (as they have valued it) and its pending freight (as they have valued it), and for costs, as provided for by the Limitation Act, Rule F of the Supplemental Rules, and the rules and practices of this Court. To the extent an answer is required, Claimants specifically deny that Petitioners are entitled to the benefits of the Limitation Act – 46 U.S.C. §§30501, *et seq.*

124.     The allegations of Petitioner's prayer(s) for relief are denied.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

125.     The Petition fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

126.     Petitioners, as Owners, managers and/or operators of The Vessel Dali, failed to exercise due diligence to maintain The Vessel Dali in a seaworthy condition in all respects; and The Vessel Dali was not in fact tight, staunch, strong and properly or competently manned, equipped and/or supplied and was not seaworthy and fit and proper for the service in which she was engaged.

### THIRD AFFIRMATIVE DEFENSE

127.     Petitioners, as Owners, managers and/or operators of The Vessel Dali, are not entitled to either exoneration from or limitation of liability pursuant to the Limitation Act -46 U.S.C. Sec. 30501, et seq., or exoneration or limitation of its liability for any and all loss, damage and/or injury caused by The Allision, or done, occasioned or incurred on the voyage on which The Allision occurred. Petitioners are not entitled to exoneration or limitation of liability because The Vessel Dali was in an unseaworthy condition and such condition(s) rendering it unseaworthy were within the privity and knowledge of Petitioners, including the privity and knowledge of the master, executive officer, superintendent, managing agent and/or corporate or managerial executives or officers, which are imputable to both Petitioners.

### FOURTH AFFIRMATIVE DEFENSE

128.     The loss, damage and/or injuries caused by The Allision were caused or contributed to by the negligence, fault, recklessness, lack of due care of Petitioners

27

in their capacity as owner, manager and/or operator of The Vessel Dali and/or as a result of Petitioners' violations of applicable admiralty law, federal law and applicable statutes and regulations.

## FIFTH AFFIRMATIVE DEFENSE

129.    The amount of security posted by Petitioners or on their behalf in this limitation proceeding is neither sufficient nor adequate to properly discharge Petitioners' liabilities and obligations, nor does it reflect the correct values required by law. This Court should, therefore, strike the Petition or, failing that, order Petitioners to submit their interests in The Vessel Dali and other property for re-evaluation and thereafter direct that Petitioners file security in an increased amount to cover the claims herein.

## SIXTH AFFIRMATIVE DEFENSE

130.    Petitioners are not entitled to exoneration or limitation of liability because The Allision and any and all damages, injuries and losses resulting from The Allision were caused or contributed to by the fault, design, neglect, negligence or want of due care by Petitioners, their agents, employees and/or servants acting in the course and scope of their employment.

## SEVENTH AFFIRMATIVE DEFENSE

131.    Petitioners are jointly and severally liable for the negligent acts of third parties who are not entitled to exoneration and/or limitation of liability.

## EIGHTH AFFIRMATIVE DEFENSE

132.    The Limitation Petitioners have failed to mitigate any damages they may have sustained.

**NINTH AFFIRMATIVE DEFENSE**

133.    The limitation fund established by Owner and Operator is insufficient and is less than the post-collision value of The Vessel Dali and her pending freight.

**TENTH AFFIRMATIVE DEFENSE**

134.    To the extent Petitioners' insurer(s) attempt to avail themselves of the limitation/exoneration defense, Claimants assert that the Limitation of Liability Act is unavailable to insurers of The Vessel Dali or its owner and manager under the circumstances herein. In the alternative, no prima facie case has been made establishing The Vessel Dali owner and manager are entitled to avail themselves of the Limitation of Liability Act.

**ELEVENTH AFFIRMATIVE DEFENSE**

135.    To the extent Petitioners are not the owners or bareboat charterers of The Vessel Dali, Claimants assert that the Limitation of Liability Act is unavailable to them under the circumstances. Claimants specifically deny that Synergy is entitled to the benefits of the Limitation of Liability. In the alternative, no *prima facie* case has been made establishing they are entitled to avail themselves of the Limitation of Liability Act.

**TWELFTH AFFIRMATIVE DEFENSE**

136.    Claimants allege that if there is insurance coverage on M/V Dali insuring Petitioners in the event of an occurrence such as The Allision and Claimants' claims herein, then the proceeds of the insurance policy should be included in this limitation proceeding (in the event this Honorable Court determines that a limitation proceeding is appropriate).

WHEREFORE, Claimants pray:

a. That this Court issue an Order denying the Petitioners exoneration from, or limitation of, liability;

b. Directing Petitioners to post additional financial security to discharge Petitioners' liabilities and obligations to Claimants herein;

c. That Petitioners be adjudged liable, without limitation for all damages sustained by Claimants AMERICAN SUGAR REFINING, INC. and FLORIDA SUGAR & MOLASSES EXCHANGE, INC. under the general maritime law of the United States as a result of the allision, and award Claimants an amount of Five Million Five Hundred Sixty-Five Thousand Dollars ($5,565,000.00) along with interest, costs and expenses; and

d. Granting such other and further relief that justice so requires.

Respectfully submitted this 24th Day of December, 2024.

*/s/ David Y. Loh*
David Y. Loh (admitted *pro hac vice*)
KMA Zuckert LLP
1350 Broadway, Suite 1350
New York, New York 10018
T: (212) 922-0450
F: (212) 922-0530
dloh@kmazuckert.com


Terry L. Goddard Jr. (15460)
Skeen & Kaufmann, LLP
9256 Bendix Road, Suite 102
Columbia, MD 21045
T: (410) 625-2252
F: (410) 625-2292
tgoddard@skaufflaw.com


ATTORNEYS FOR CLAIMANTS
AMERICAN SUGAR REFINING, INC. and
FLORIDA SUGAR & MOLASSES
EXCHANGE, INC.

## Certificate of Service

I hereby certify that on the 24th day of December, 2024, I uploaded the foregoing and any attachments/exhibits to the Court's CM/ECF system for filing and service on all interested parties.

/s/ David Y. Loh
David Y. Loh