# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND
# NORTHERN DIVISION

| | |
|---|---|
| In the Matter of the Petition<br><br>Of<br><br>**GRACE OCEAN PRIVATE LIMITED,**<br>**as Owner of the M/V DALI,**<br><br>And<br><br>**SYNERGY MARINE PTE LTD, as**<br>**Manager of the M/V DALI,**<br><br>**for Exoneration from or Limitation of**<br>**Liability** | **Docket No. 24-cv-000941-JKB**<br><br>_**IN ADMIRALTY**_ |

### AMENDED ANSWER AND CLAIM BY THE STATE OF MARYLAND, THE MARYLAND TRANSPORTATION AUTHORITY, THE MARYLAND PORT ADMINISTRATION, AND THE MARYLAND DEPARTMENT OF THE ENVIRONMENT

The State of Maryland, by and through Anthony G. Brown, Attorney General of Maryland, on its own behalf and on behalf of all its agencies (the "State"); the Maryland Transportation Authority ("MDTA"); the Maryland Port Administration ("MPA"); and the Maryland Department of the Environment ("MDE") (collectively, "Claimants"), hereby respond to the Petition for Exoneration from or Limitation of Liability (the "Complaint") filed by Grace Ocean Private Limited ("Grace") and Synergy Marine Pte Ltd. ("Synergy") (collectively "Petitioners"), asserting as follows:

**INTRODUCTION**

At 0129 hours on March 26, 2024, the M/V DALI, a heavily-loaded, 947-foot containership purportedly owned and operated by Singapore-based shipping conglomerates, crashed into one of the primary support piers of the Francis Scott Key Bridge (the "FSK Bridge"). The overwhelming force of the impact destroyed the iconic bridge, tragically killed six men, and injured two others. The resulting wreckage from the allision fell into the Patapsco River, blocked access to most of the Port of Baltimore, and caused massive damages and other significant harm to the State of Maryland and its citizens that will continue for many years.

This disaster was entirely preventable had the DALI's owners and operators exercised proper care and diligence. Investigation has established that the ship experienced two electrical power failures on March 25, hours before she departed from her berth. The ship's owner and operator did not diagnose or correct these electrical system failures. Nor were these failures reported to the United States Coast Guard, as required by law — a requirement acknowledged during discovery. Similarly, these failures were not divulged to the two local pilots from the Association of Maryland Pilots (the "Pilots") who boarded the DALI to guide its departure from the Port of Baltimore, which was also required by law. In fact, the DALI's master falsely reported to the Pilots that everything was in good working order.

Yet shortly after the DALI set sail on March 26, the ship lost electrical power *again,* which—predictably—caused the ship to lose propulsion and steerage. This loss of power should have come as no surprise to Grace and Synergy, the ship's owner and operator,

respectively, given the serious and longstanding vibration problem on board the ship. The vibration was so severe that the crew was forced to improvise remedies in an unsuccessful effort to curb damage to the ship's electrical transformers and switchboards.



The photo above depicts an improvised "turnbuckle" being used
to dampen vibration on one of the DALI's transformers.

Grace and Synergy's failure to rectify the severe vibration problem resulted in loose nuts and bolts (some of which fell completely out) and broken cable ties within the ship's electrical transformers and switchboards. In fact, the vibration damage was so severe that

an independent electrical testing contractor refused to conduct testing on the DALI's transformer and switchboard due to "safety concerns."

Investigation has revealed that the initial loss of power on March 26 was the result of a loose connection in the electrical switchboard. When the blackout occurred, the ship's equipment−intended to automatically restore electrical power−failed to function as designed, because the ship's owner, operator, and crew intentionally circumvented critical safety features. Although power flickered on briefly, the ship quickly went black for the *fourth* time. The DALI's crew has acknowledged that the ship should have been operating with three of the ship's four generators online, operating in parallel. Improper instructions from shoreside management permitted the ship to operate with only two generators online. The defects in the DALI's equipment that caused these repeated blackouts also compromised the ship's ability to restore power and caused her essential navigation and safety capabilities to likewise fail. These defects had been present for many months. The DALI's owner and operator failed to address these critical defects in equipment and the concomitant deficiencies in ship personnel.

For reasons not yet fully understood, the DALI's crew failed to restore propulsion after the power outages, and the blacked-out vessel continued on its allision course toward the FSK Bridge. If not for the Pilots' prompt action, more lives would have surely been lost. The Pilots were able to warn MDTA staff, who immediately closed the bridge to traffic moments before the allision. Tragically, the DALI and its crew were not capable of carrying out all the Pilots' requests. The Pilots asked the DALI's master to engage the bow thruster to steer the ship away from the bridge, a standard collision avoidance maneuver,

but the crew advised the Pilots for the first time that the bow thruster was "unavailable." Next, the Pilots asked for the DALI's port anchor to be dropped, invoking another standard protocol to slow or divert the path of the ship, but this request could not be promptly followed because the port anchor was incapable of being "ready to be let go" as required by U.S. law.  Specifically, the hydraulic brake on the DALI's port anchor windlass was inoperable – and had been inoperable for nearly two weeks.  That unseaworthy condition meant the port anchor windlass could only be operated with the manual brake, a two-man job.  Despite that situation, only one man was posted to the DALI's bow on March 26, which meant when the time came to deploy the anchor, he was unable to do so.  These inabilities to implement the Pilots' requests had devastating consequences, as the DALI's course toward the FSK Bridge was not altered.

With no change in course, the DALI continued on its path and struck the bridge pier with a catastrophic force.  The enormous power of the impact caused multiple spans of the FSK Bridge to collapse into the Patapsco River and onto the bow of the ship.  Some of the DALI's cargo, including pollutants, fluids, and containers, were released into the waters of the State.  Wreckage of the FSK Bridge sank onto the State's submerged lands, blocked the shipping channel, and interrupted all commercial vessel traffic into or out of the Port of Baltimore.

Ships like the DALI are designed with backup systems to ensure that the vessels do not lose power, steering, and propulsion at critical moments—such as during the approach to the FSK Bridge.  As a result of mismanagement, disinterest, and/or incompetency by the

DALI's owner and operator, many of the ship's backup systems were removed, inoperable, and/or intentionally overridden.

Ships such as the DALI are also designed with automatic re-start features so that critical electrical and fuel systems come back online quickly and efficiently when power is restored following a blackout. When the DALI was acquired by Grace in 2017, the generators powering the ship received fuel from dedicated supply and booster pumps. Without fuel, the generators cannot produce the needed electrical power for the ship; accordingly, the supply and booster pumps had backups and were designed to automatically re-start following a loss of power. Investigation has revealed, however, that Grace and Synergy reconfigured the fuel supply to the ship's generators. As reconfigured by Grace and Synergy, generators 3 and 4 (the generators in use on the night the DALI destroyed the FSK Bridge) received fuel from an electric "flushing" pump rather than the supply and booster pumps. The flushing pump, as its name implies, is intended for intermittent use while cleaning out fuel lines. The electric flushing pump was neither intended nor suitable for use in normal operation of the ship, much less during critical maneuvering such as the approach to the FSK Bridge. In addition, the electric flushing pump was not equipped with an automatic re-start feature, meaning that once power was lost, a crew member had to manually restart the flushing pump. Grace and Synergy never bothered to submit this radical reconfiguration plan for approval to Nippon Kaiji Kyokai (known as Class NK), the vessel classification society that is tasked with reviewing and approving such design changes. Grace and Synergy made the decision to skip class approval precisely because

they knew Class NK would never approve the use of a flushing pump to supply fuel to generators during normal operation of the ship.

As a result of the reckless and unsafe re-configuration of the fuel system, once power was lost for the first time on March 26, it was axiomatic that power would be lost again within minutes as the generators providing power to the ship would quickly be starved of fuel and shut down. And that is exactly what happened. If the DALI had been running with three generators online, power would never have been lost the second time. Following the second loss of power, the DALI was unable to take any meaningful action to avoid or mitigate the allision with the FSK Bridge.

The grievous impact that Petitioners' culpable conduct has had on the State of Maryland, its people, its environment, and its economy cannot be overstated. The FSK Bridge was in excellent condition and was an incredibly valuable asset of the State. Moreover, the FSK Bridge was a major regional artery for State citizens, a critical piece of the Port's supply chain, and a significant source of toll revenue. The scope of harm to the safety, welfare, and convenience of Maryland residents caused by the allision is broad and far-ranging. Also significant, the allision's environmental impacts, including to air quality, will disproportionately impact citizens in the communities proximate to the collapse-communities that already bear increased health, environmental, and economic burdens.

As a direct and foreseeable result of the Petitioners' reckless and grossly negligent decision to send the DALI to sea in a patently unseaworthy condition, the State of Maryland has and will continue to suffer tremendous costs and damages, including but not limited to the following:

- removal costs for the remnants of the FSK Bridge;

- massive costs to replace the FSK Bridge;

- lost toll revenues until the FSK Bridge is re-opened in several years;

- monies and time spent by numerous State agencies to respond to the casualty, to perform salvage operations, and to try to mitigate the impact to the welfare and safety of Maryland residents;

- environmental damage to State waters and to the State's air quality due to the DALI's release and threatened release of pollutants and debris into the Patapsco River and the significant increase in vehicle mileage necessitated by the loss of the FSK Bridge;

- increased wear and tear on roads, highways, and other infrastructure;

- revenue and taxes lost; and

- other forms of economic loss that flow from the DALI's destruction of the FSK Bridge and the resulting closure of the channel providing access to the Port of Baltimore.

For all these reasons, the State respectfully asks this Court to (a) deny the effort by Petitioners to limit their liability, and (b) hold Petitioners accountable for their reckless conduct, negligence, mismanagement, and incompetency.

## **FIRST DEFENSE**
## **LACK OF SUBJECT-MATTER JURISDICTION**

With respect, this Court lacks subject matter jurisdiction over the Claimants by virtue of the sovereign immunity memorialized in the 11th Amendment to the United States Constitution.  Absent waiver of such immunity, federal courts may not compel the appearance of the State or its agencies to answer a claim or to make an affirmative claim. The Limitation of Liability Act, 46 U.S.C. § 30501, *et seq*. ("Limitation Act"), neither

waives the State's sovereign immunity nor grants this Court subject matter jurisdiction over the Claimants' claims against the Petitioners.

## SECOND DEFENSE
## NO WAIVER OF SOVEREIGN IMMUNITY

Claimants hereby reserve the right to assert their sovereign immunity and they neither waive nor intend to waive their sovereign immunity by virtue of this appearance. To the contrary, Claimants specifically assert and reserve their entitlement to sovereign immunity and object to this Court's assertion of subject-matter jurisdiction over them in any capacity.

## THIRD DEFENSE
## MARYLAND TORT CLAIMS ACT

The State (and its agencies) have only consented to a waiver of sovereign immunity for claims properly asserted under the Maryland Tort Claims Act, State Gov't § 12-101, *et seq.* Any such claims must be brought in Maryland state court in compliance with the statute and its pre-suit procedural requirements. By asserting their claim herein, Claimants do not waive their rights and defenses under the Tort Claims Act and do not consent to the assertion of affirmative claims against them in this forum.

## FOURTH DEFENSE
## SAVINGS TO SUITORS' CLAUSE

Claimants specifically reserve their right under the savings-to-suitors clause, 28 U.S.C. §1333(1), to have their claims for damages adjudicated in a forum of their choosing, and specifically reserve their right to bring their claims for damages in state

court after this Court determines whether Petitioners may limit their liability under 46 U.S.C. § 30505(b).

**FIFTH DEFENSE**
**SYNERGY NOT ENTITLED TO SEEK LIMITATION**

The Limitation of Liability Act confines the benefits of the statute to "the owner of a vessel." 46 U.S.C. § 30505(a), 30511(a). Petitioner Synergy admits it is not an owner of the DALI. Discovery has shown that Synergy had no risk of financial loss in operating the DALI, because Grace Ocean or Maersk A/S pay all operational expenses, and Grace Ocean indemnifies Synergy for all losses that result from vessel operations, including all claims arising from this litigation. As such, the protections of the Limitation of Liability Act are unavailable to Synergyit.

**SIXTH DEFENSE**
**PETITIONERS' PRIVITY AND KNOWLEDGE**

The allision that gave rise to Petitioners' Complaint, the March 26, 2024 strike on the FSK Bridge, was caused by the negligence, unseaworthiness, statutory fault, or want of due care of Petitioners and/or their officers, directors, managers, supervisors, superintendents, and/or such persons whose privity and knowledge are imputable to them. Petitioners bear the burden of proving the lack of privity or knowledge. Such negligence within the privity and knowledge of Petitioners eliminates any right they might have to seek limitation of liability under 46 U.S.C. § 30505(b).

## SEVENTH DEFENSE
## THE DALI'S UNSEAWORTHINESS FORECLOSES LIMITATION

The allision that gave rise to Petitioners' Complaint was caused by the unseaworthiness of the DALI, which unseaworthiness predated the voyage of March 26, 2024. Such unseaworthiness of the DALI is imputed to Petitioners and extinguishes any right they might have to seek limitation of liability.

## EIGHTH DEFENSE
## PETITIONERS' INSURERS CANNOT LIMIT

To the extent that Petitioners' insurers attempt to avail themselves of the Limitation of Liability Act, such benefits are unavailable to them under the circumstances.

## NINTH DEFENSE
## INADEQUATE LIMITATION FUND

The Petitioners' limitation fund is inadequate and should be increased to the extent it does not properly account for the value of the DALI and/or its engines, apparel, appurtenances, attachments, and pending freight/charter hire. Claimants reserve their right to contest the adequacy of security posted by the Petitioners in accordance with Rule F(7) of the Supplemental Rules for Admiralty or Maritime Claims.

## TENTH DEFENSE
## NO COMPARATIVE FAULT

Claimants aver that they were not negligent, at fault, or in any way~~anyway~~ responsible for the allision or resulting damage caused when the DALI struck the FSK Bridge.

## ELEVENTH DEFENSE
## FAILURE TO STATE A CLAIM

Petitioners' Complaint fails to state a claim or cause of action upon which relief can be granted.

## RESPONDING TO THE NUMBERED
## PARAGRAPHS IN PETITIONERS' COMPLAINT

Without waiving any of the foregoing defenses, Claimants answer the allegations of Petitioners' Complaint categorically and by paragraph:

1.    The allegations in Paragraph 1 are legal conclusions to which no response is required.  To the extent a response is deemed required, Claimants deny the allegations for lack of sufficient information to form a belief thereof.

2.    Claimants admit that venue is proper in this District, but otherwise deny the allegations contained in Paragraph 2.

3.    Claimants deny the allegations in Paragraph 3 for lack of sufficient information to form a belief thereof.

4.    Claimants deny the allegations in Paragraph 4 for lack of sufficient information to form a belief thereof.

5.    Claimants deny the allegations in Paragraph 5 for lack of sufficient information to form a belief thereof.

6.    Claimants deny the first sentence of Paragraph 6 except admit that the FSK Bridge was a span over the Patapsco River.  Claimants admit the second sentence of

Paragraph 6. Claimants deny the third sentence of Paragraph 6 except admit that the FSK Bridge carried Interstate 695, which is known as the Baltimore Beltway.

7.    Claimants deny the allegations in Paragraph 7 for lack of sufficient information to form a belief thereof.

8.    Claimants deny the allegations in Paragraph 8 for lack of sufficient information to form a belief thereof.

9.    Claimants deny the allegations in Paragraph 9 for lack of sufficient information to form a belief thereof except admit, upon information and belief, that the DALI twice experienced a loss of power and propulsion in the shipping channel.

10.    Claimants admit the allegations in Paragraph 10.

11.    Claimants admit the allegations in Paragraph 11.

12.    Claimants admit the allegations in the first sentence of Paragraph 12. Claimants deny the allegations in the second sentence of Paragraph 12 except admit that six construction workers were killed, and two construction workers were seriously injured, when the DALI struck the FSK Bridge.

13.    Claimants deny the allegations in Paragraph 13.

14.    Claimants deny the allegations in Paragraph 14.

15.    Claimants deny the allegations in Paragraph 15 for lack of sufficient information to form a belief thereof.

16.    Claimants deny the allegations in Paragraph 16 for lack of sufficient information to form a belief thereof.

17.     Claimants deny the allegations in Paragraph 17 for lack of sufficient information to form a belief thereof.

18.     Claimants deny the allegations in Paragraph 18 for lack of sufficient information to form a belief thereof.

19.     Claimants deny the allegations in Paragraph 19 for lack of sufficient information to form a belief thereof.

20.     Claimants deny the allegations in Paragraph 20 for lack of sufficient information to form a belief thereof.

21.     Claimants deny the allegations in Paragraph 21 for lack of sufficient information to form a belief thereof, except to admit that they are aware of other claims filed against Petitioners.

22.     Claimants admit the allegations in Paragraph 22.

23.     Claimants deny the allegations in Paragraph 23.

24.     Claimants deny the allegations in Paragraph 24.

25.     The unnumbered paragraph following Paragraph 24 contains a prayer for relief to which no response is required.  To the extent a response is required, Claimants deny the allegations in the unnumbered paragraph following Paragraph 24, including subparts (a-f).

26.     Claimants deny the allegations of any unnumbered or misnumbered paragraphs and deny any other allegations in the Complaint not specifically addressed herein.

## <u>CLAIMANTS' CLAIMS FOR DAMAGES AND OTHER RELIEF</u>

Pursuant to Rule F(5) of the Supplemental Rules for Admiralty or Maritime Claims, Claimants hereby make their claims against Petitioners and, as grounds therefore, represent the following:

1.      This Claim is made subject to Claimants' reservation of their objection that they are not required to assert claims in this forum due to the doctrine of sovereign immunity, and nothing stated in this pleading shall be deemed to waive that right.

2.      Likewise, this Claim is made subject to Claimants' right under the Savings-to-Suitors clause to have their claims heard in a forum of their choosing.  This right is specifically reserved, and nothing stated in this pleading shall be deemed to waive this right.

3.      Subject to Claimants' reservation of their rights to assert sovereign immunity and the savings-to-suitors clause, this Court has subject matter jurisdiction under 28 U.S.C. §1333 because the casualty that gave rise to this lawsuit occurred on navigable waters, involved traditional maritime activity, and impacted maritime commerce.  In addition, this Court has supplemental jurisdiction under 28 U.S.C. §1367(a) over other, non-maritime claims given that they arise out of the same case or controversy that gave rise to admiralty jurisdiction.

## THE PARTIES

4.     Claimants include the State of Maryland, on its own behalf and on behalf of all of its agencies, the Maryland Transportation Authority ("MDTA"), the Maryland Port Administration ("MPA"), and the Maryland Department of the Environment ("MDE").

5.     The responsibilities of the Attorney General include the investigation, commencement, and prosecution of civil suits on the part of the State. *See* Maryland Constitution, Art. V, § 3.  "[T]he Attorney General has general charge of the legal business of the State."  State Gov't § 6-106.

6.     The State brings this action (a) directly in its own right, (b) in its *parens patriae* capacity, and (c) as public trustee of Maryland's natural resources.

7.     The State has a proprietary interest in the destroyed FSK Bridge. On November 17, 1967, by Public Law No. 90-144, the U.S. Congress granted the State the right to build, operate, and maintain what became the FSK Bridge.  The U.S. Coast Guard approved the State's plans for the FSK Bridge and issued the State the legal permit for the bridge.  Construction on the FSK Bridge began in 1972, and the bridge opened to traffic in 1977.

8.     The State also has a proprietary interest in other properties that have been damaged by the DALI's allision with the FSK Bridge, including but not limited to the waters of the State including the Patapsco River, submerged lands, and other natural resources, as well as in the navigational channel that was blocked by the destroyed FSK Bridge.

9.      As a sovereign, the State also has *parens patriae* standing to seek redress for injuries to the State's interests in the health, safety, and economic wellbeing of its residents, and its natural resources.  The State may for the common good exercise all the authority necessary to protect its interests and those of its residents.

10.      The State is further empowered as public trustee to bring suit on behalf of all of its citizens to protect the corpus of the public trust−including the State's waters and other natural resources−for the beneficiaries of the trust; *i.e.*, the public.  The State is tasked with protecting the public rights of navigation, fishery, and recreational uses of the State's waters, as well as its residents' interests in clean air and uncontaminated natural resources. Protection of public trust property and rights is a matter of public concern in which the State has an interest apart from that of particular individuals who may be affected.

11.      The State also brings this action under its police powers, which include but are not limited to, its powers to prevent and abate nuisances, to protect the State's navigable waterways, to prevent and abate pollution of the natural resources of the State, and to prevent and abate hazards to the environment and to the public health, safety, and welfare.

12.      The MDTA acts on behalf of the Maryland Department of Transportation and the State and "has those powers and duties relating to the supervision, financing, construction, operation, maintenance, and repair of transportation facilities projects" and has "general supervision" and "shall finance, construct, operate, repair, and maintain in good order" all such projects.  Transp. §§ 4-101(h); 4-204 ("'Transportation facilities projects' includes . . . the Francis Scott Key Bridge, together with [its] appurtenant

17

causeways, approaches, interchanges, entrance plazas, toll stations, and service facilities.").

13.     MDTA owned and operated the FSK Bridge on the State's behalf at the time of the allision. The MPA owns and operates public port facilities, including at the Port of Baltimore.  MPA owns the Seagirt Marine Terminal at the Port of Baltimore, where the DALI was docked and experienced electrical outages hours prior to its allision with the FSK Bridge

14.     The Maryland legislature has recognized that "the ports and harbors of this State are assets of value to the entire State."  Transp. § 6-102.  The MPA has territorial jurisdiction to exercise its authority "in or near any of the navigable waters of this State[.]" *Id.* at § 6-103.  The MPA can "acquire, construct, reconstruct, rehabilitate, improve, maintain . . . repair and operate . . . port facilities within its territorial jurisdiction, including the dredging of ship channels[.]" § 6-204(i).

15.     MDE is tasked with protecting and preserving the State's air, water, and land resources and safeguarding the environmental health of Maryland's citizens.  MDE is statutorily empowered to bring suit against any person who "discharge[s] any pollutant into the waters of this State" without a permit.   Envir. §§ 9-322, 9-339(a).

16.     Maryland has declared the policy of the State "to maintain the degree of purity of the air necessary to protect the health, the general welfare, and property of the people of this State" and has vested in MDE "jurisdiction over emissions into the air and ambient air quality in this State" and "responsib[ility] for monitoring ambient air quality in this State."  Envir. §§ 2-102, 2-103.

17.    Grace alleges it is a corporation organized and existing under the laws of Singapore and that it was, at all relevant times, the owner of the DALI (IMO NO. 9697428), a 947-foot, 116,851-DWT, containership.  This Court has personal jurisdiction over Grace because it was doing business within the United States and this judicial district at the time of the allision, and also because it purposely subjected itself to the jurisdiction of this Court by initiating this lawsuit to take advantage of United States law.

18.    Synergy alleges it is a corporation organized and existing under the laws of Singapore that was, at all relevant times, the manager of the DALI pursuant to a contract with Grace.  This Court has personal jurisdiction over Synergy because it was doing business within the United States and this judicial district at the time of the allision, and also because it purposely subjected itself to the jurisdiction of this Court by initiating this lawsuit to take advantage of United States law.

## **FACTUAL BACKGROUND**

### **The Allision with the FSK Bridge**

19.    The DALI is a 947-foot container vessel flagged in Singapore. It has a rated capacity of 9,971 TEU (twenty-foot equivalent units).  It is ~~allegedly~~ owned by Grace and operated by Synergy.

~~19.~~20. As solely the technical operator with no ownership interest in the DALI, Synergy provides none of the DALI's operating funding, bears no financial risk for the DALI's commercial success or failures, ~~and~~ has no involvement in fixing the DALI's

charters or setting its schedule, and is protected by indemnity from all claims resulting from this tragic loss.

20.21. The DALI is propelled by a single 55,626 horsepower direct-drive diesel engine manufactured by Hyundai MAN B&W.  For the main engine to function, one or more of the DALI's four diesel-powered generators must be operating and supplying the vessel with electrical power.  Proper use of the vessel's generators calls for two generators to be in service simultaneously when the DALI is in open water, but for three generators to be online, operating in parallel, when the ship is arriving and departing from port.

21.22. When Petitioners took delivery of the DALI in 2016, the ship's four diesel generators received fuel from the ship's dedicated generator engine fuel supply and booster pumps.  The ship's generators were designed to operate on one supply and one booster pump, but for safety and redundancy purposes the DALI was equipped with secondary supply and booster pumps.  If the primary supply or booster pump fails, the design provides for the secondary pump to come online to take its place.  In addition, following a loss of power, all of these supply and booster pumps were designed to automatically re-start once power was restored.

22.23. Petitioners made changes to the DALI's generator fuel supply system in 2020 for which they obtained approval from Class NK.  Petitioners reconfigured the piping arrangement so that generators 1 and 2 used the main engine fuel supply and booster pumps.  Generators 3 and 4 continued to receive fuel from the generator supply and booster pumps.

23.24. Petitioners thereafter made additional changes to the DALI's generator fuel supply system. Specifically, Petitioners reconfigured the fuel supply piping for generators 3 and 4 such that the generators received fuel from an electric flushing pump rather than the generator supply and booster pumps. The electric flushing pump was neither intended nor adequate for use as a fuel supply pump during normal operation of the ship. The electric flushing pump is not capable of automatically re-starting following a loss of power.

24.25. Petitioners never sought or received the required approval from the ship's classification society to use the electric flushing pump as the primary fuel pump for generators 3 and 4.

26. Petitioners' changes to the fuel supply arrangement for generators 3 and 4 removed the redundancy previously provided by the secondary supply and booster pumps. Instead, the electric flushing pump was backed up by a small pneumatic pump which lacked the capacity to keep generators 3 and 4 running at even low loads for more than two minutes.

25.27. In 2020, the DALI underwent a required dry docking for inspections and maintenance. During this dry docking, in an effort to save money and get the vessel back into commercial service faster, Petitioners elected to defer several required and standard inspections and maintenance items including but not limited to overhaul of the DALI's steering gear, and bow thruster.

28. In mid-March of 2024, the hydraulic brake for the DALI's port anchor windlass was found to be inoperable. tive. This meant that the crew had to rely on the manual brake for the port anchor, a two-man operation. Yet on March 26, only yet the

DALI's Bosun was positioned on the vessel's bow to operate the anchor.  When time came to deploy the anchor, the Bosun was physically incapable of operating the port anchor's manual brake by himself.

29.    The DALI's shoreside managers knew that the port anchor hydraulic brake was inoperable on March 19, 2024 or earlier, yet failed to ensure the hydraulic brake was repaired before the DALI arrived in the United States or before the vessel departed Baltimore.

26.30. On March 23, 2024, the DALI arrived in the Port of Baltimore, docking at the Seagirt Marine Terminal.

27.31. Dockage at the Seagirt Marine Terminal is subject to MPA's Schedule No. 23 (the "Tariff").  The Tariff applies to all vessels that use the terminal: "Use of the piers, wharves, bulkheads, docks, land, buildings, and other Terminal Facilities shall constitute a consent to the terms and conditions of this Schedule and evidences an agreement on the part of all Users, to pay all applicable charges and to be governed by all rules and regulations now published herein and which may in the future be published in the Schedule."  Tariff, § 34-014.

28.32. The terms of the Tariff provide clear rights to the State as a third-party beneficiary.  This includes, for example, Users' obligation to indemnify the State under specified circumstances.  *See, e.g.*, Tariff § 34-034.

29.33. The Tariff is published by MPA, publicly available, and therefore binding against all users of the Seagirt Marine Terminal.  Tariff §§ 34-014, 34-001.

34.    Petitioners became bound by the terms and conditions of the Tariff on March 23, 2024, when the DALI arrived at Seagirt Marine Terminal.

30.35. While in Baltimore, the DALI's shoreside managers allowed two crewmembers to sign off the vessel and return to their homes, but failed to replace those crewmembers before the ship departed Baltimore on March 26.

31.36. On March 25, while docked at the Seagirt Marine Terminal, the DALI suffered two electrical blackouts.

32.37. Although the DALI's crew was able to restore power after both of the March 25 blackouts, Petitioners failed to take adequate steps to investigate and ensure that the ship's electrical system, generators, and fuel system were properly functioning before departure.  In fact, the cause of the second blackout on March 25 persisted, and was the cause of the second blackout on March 26.

33.38. Immediately following restoration of power on March 25, and while still at the Seagirt Marine Terminal, the DALI was required to report the blackouts to the United States Coast Guard. 46 C.F.R. §4.05-1, a fact admitted by one or more of the DALI's officers.  Despite that legal obligation, no such report was made.

39.    The DALI was scheduled to depart from the Seagirt Marine Terminal, heading to Colombo, Sri Lanka, on March 26.  In preparation for departure, the DALI's engineers could not start one of the vessel's generators.  That inoperability left the ship with three operable generators.  Nonetheless, the engineers placed only two generators online, operating in parallel.  This was in compliance with management instructions, but contrary to the DALI's operating procedures.

34.40. At about 0005 hours on that day, two local compulsory pilots from the Association of Maryland Pilots (the "Pilots") boarded the DALI to guide its departure. Whenever a compulsory pilot boards a vessel, custom and statute require the ship's master to advise the pilot of the ship's condition and capabilities. Upon information and belief, theThe master of the DALI did not advise the Pilots that the DALI had suffered two power failures less than 12 hours before departure, was operating without one of its four generators, was sailing shorthanded of its normal complement, and was having issues with the port anchor windlass which rendered the hydraulic brake inoperable. Instead, the master represented to the Pilots that the DALI was in good working order. Moreover, the master also represented that the DALI's bow thruster was available for use. Failure to disclose the abnormal circumstances on the vessel that may affect its safe navigation constituted a violation of U.S. law. 33 C.F.R. 164.11(k). The DALI's deck officers, lacking proper training from Petitioners, wrongfully withheld this information from the compulsory Pilots.

35.41. The DALI used two tugs to assist in undocking from Seagirt Marine Terminal, the M/V BRIDGET McALLISTER and the M/V ERIC McALLISTER.

36.42. The DALI departed Seagirt Marine Terminal at around 0036 hours and entered the Fort McHenry Channel in the Patapsco River at around 0107 hours.

37.43. As the DALI entered the Fort McHenry Channel, the Pilots released the assist tugs. Despite their awareness of the two prior power failures, known problems with the ship's generators, known issues with releasing the port anchor, the sensitive nature of their

cargo, and the dangers in transiting under the FSK Bridge, Petitioners and the DALI's master and crew allowed the two assist tugs to be released.

38.44. At 0109 hours, the Pilots ordered the DALI to steer a course of 141 degrees true to effect the transit under the FSK Bridge.

39.45. At approximately 0125 hours, when the DALI was 0.6 nautical miles from the FSK Bridge, two electrical breakers connecting the DALI's generators to the ship's electrical switchgear tripped, causing a loss of electrical power to most shipboard equipment, including the pumps servicing the main engine, the pumps servicing the generators, and the pumps servicing the steering gear and the lighting. According to the National Transportation Safety Board, the breakers were caused to trip due to loose wiring in the DALI's electrical switchgear.

40.46. The loss of electrical power forced the main engine to shut down, which caused the DALI to lose propulsion. The loss of electrical power also stopped all three steering gear pumps and, therefore, the rudder also lost function. The ship began to drift out of the shipping channel.

41.47. Without its main generators in operation, the DALI's emergency generator should have come online automatically within 54 seconds. That did not happen. The emergency generator took more than 75 seconds to come online. But the emergency generator only powers certain electrical systems, such as lighting; it does not provide power to the ship's propulsion system.

42.48. Oceangoing vessels like the DALI are designed with redundant power sources. When power is lost, whether because of a problem with a generator or a fault

within the electrical system, the vessel's automation should ensure that other generators and electrical circuitry automatically restore full electrical power within seconds to all shipboard equipment.  This did not happen aboard the DALI. The DALI's crew had to manually restore full power from the ship's Engine Control Room ("ECR").

43.49.  Had the crew been properly trained and competent, they would have utilized the ship's automation features, which would have ensured power restoration within 11 seconds.  Instead, the crew took roughly one minute to restore electrical power following the first blackout on March 26.

44.50.  The Pilots attempted to implement a series of emergency strategies, but they were unsuccessful either due to prior decisions by Petitioners and/or the DALI's crew, or because the crew did not implement the commands as ordered.  First, the Pilots recalled the two tugs, but they were too far away.  Next, the Pilots ordered the helm hard to port, but without propulsion or full power to the steering gear (the ship's emergency generator only powers one of the ship's three steering gear pumps), the command was ineffective.  Third, the Pilots called for use of the DALI's bow thruster, but it was unavailable, likely due to insufficient generators being in service.  Finally, the Pilots ordered the crew to drop the port anchor.  But because the vessel's port anchor windlass had an inoperable hydraulic brake, the anchor windlass needed to be operated with two men.  Only one man was on the bow and available to deploy the anchor.  He could not do so.  As a result, anchor deployment was delayed until mere seconds before the allision when it was far too late to slow, stop, or change the DALI's course.  the DALI's anchors were evidently not ready for

26

immediate release, because the port anchor was not immediately deployed and engaged as ordered.

45.51. Although the crew of the DALI manually restored electrical power after the first blackout, the crew was never able to restore propulsion.  A second electrical blackout occurred two minutes after the first, when the DALI was 0.2 nautical miles from the FSK Bridge.  The second blackout was the result of insufficient fuel pressure to the engines powering the DALI's generators, the same condition which had caused the second blackout on March 25, and which was a direct result of Petitioners' unsafe and unapproved reconfiguration of the generator fuel supply system.  As admitted by the DALI's Chief Engineer, the second blackout would never have occurred if the ship had been using three generators rather than two.

46.52. At 0129 hours, the starboard bow of the DALI struck pier no. 17 of the FSK Bridge with great force.  The DALI was moving at nearly 6.5 knots at the time of the allision.

47.53. The force with which the DALI struck the pier caused multiple spans of the FSK Bridge to collapse into the Patapsco River, with some bridge components lodging on top of the ship's bow, pinning the vessel aground within the Port of Baltimore ship channel.

48.54. At the time of the allision, the DALI was carrying 4,679 shipping containers, including reportedly 56 containers that carried hazardous materials.  Its cargo included over 700 tons of hazardous materials, composed of corrosive, flammable, and other hazardous substances, and the vessel itself carried more than 1.5 million gallons of fuel and other hazardous fluids.

49.55. The DALI's allision with the FSK Bridge resulted in the unauthorized discharges of various pollutants into the Patapsco River, including at least two containers and the items contained therein. The vessel also discharged a currently unquantified volume of oil and hazardous substances. The composition, volume, and extent of contaminants released by the DALI is still under investigation.

50.56. The allision-induced collapse of the FSK Bridge led to additional discharges of pollutants, including but not limited to bridge debris and vehicles into the River. More than 50,000 tons of the FSK Bridge's concrete, iron trusswork, and rebar fell into the Patapsco River.

51.57. A substantial amount of bridge debris also fell on the DALI, immobilizing the vessel. To reopen access to that portion of Baltimore Harbor located northwest of the FSK Bridge, and mitigate the extent of the catastrophe, the emergency response focused on removing the deposited material from the Patapsco River and refloating the DALI.

52.58. The DALI remained immobilized in Baltimore Harbor under a portion of the FSK Bridge for almost two months. Massive floating cranes were used to remove large pieces of the collapsed FSK Bridge from the vessel's bow. The salvage work also required the removal of 178 cargo containers, each weighing over 1.5 tons when empty. During this time, the DALI remained laden with and threatened to release oil, hazardous materials, and many other potential contaminants to the environment. The full extent of these releases remains subject to further discovery and investigation. The DALI was not freed until May 20, 2024.

**The Harm to Claimants**

~~53.~~59. Claimants have suffered significant injury, loss, and damages as a result of the allision and its aftermath.  The full extent of the economic and environmental impact to the State and its agencies remains to be seen, but there is no doubt that Claimants have incurred direct costs, property damage, and decreased revenues as a result of Petitioners' actions and omissions.

~~54.~~60. In the immediate hours and days after the collapse, emergency response and cleanup were paramount in ensuring the safety of residents and limiting Port disruption, and several State agencies expended direct costs as part of the U.S. Coast Guard's Unified Command, towage charges, salvage, and other emergency response efforts.  These agencies were forced to redirect employee time and expenditures from other public services to address and help mitigate the widespread effects of the FSK Bridge collapse.

~~55.~~61. The FSK Bridge was destroyed by the allision, and portions collapsed into the Patapsco River and onto the bow of the DALI.

~~56.~~62. The collapse necessitated salvage efforts and expense over many months, as well as the costs, time, and effort to demolish what remains of the FSK Bridge.

~~57.~~63. The FSK Bridge was a crucial piece of the State's infrastructure, allowing maritime vessel access to the Port of Baltimore as well as supporting local and regional economic activity.  The Bridge was the central feature of the Francis Scott Key Bridge facility, consisting of approximately 9 miles along mainline I-695, comprised of 22 bridges and related roadways.  An estimated 12.5 million vehicles crossed the FSK Bridge in 2023,

and it was the only one of the three Baltimore Harbor crossings that served as a truck route for hazardous materials.

58.64.  Replacing the FSK Bridge will require a substantial, years-long undertaking to design and build a new crossing.  MDTA has preliminarily estimated that the rebuilding project wouldill cost at least $1.7 billion.  However, the $1.7 billion preliminary estimate was based on limited data and early-stage design assumptions, and will thus require revision as a natural result of the design process.  Additional costs, including financing, are also expected beyond rebuilding estimates. The final cost to rebuild the bridge will not be known until its construction is complete.

59.65. In addition to these and other direct costs incurred by the State and its agencies, the collapse of the FSK Bridge and ensuing closure of the channels providing access to much of Port has caused and will continue to cause lost revenue to the State.

60.66.  First, loss of the FSK Bridge crossing has deprived MDTA of substantial toll revenue.  The FSK Bridge was one of three tolled crossings of the Patapsco River, and the only available crossing for oversized vehicles and those carrying hazardous cargo.

61.67.  Without the FSK Bridge, some passenger and commercial traffic is diverted to the Baltimore Harbor Tunnel and Fort McHenry Tunnel, the two other tolled harbor crossings.  The diverted traffic has added 18 percent to the combined volumes for the Fort McHenry and Harbor Tunnels, according to the U.S. Bureau of Transportation Statistics. Toll revenue from traffic diverted to the two Tunnels does not replace the lost toll revenue MDTA was receiving from the FSK Bridge.

62.68. Trucks carrying hazardous materials are not permitted to enter the Fort McHenry or Harbor Tunnels, and therefore those trucks are using other routes including through residential neighborhoods.

63.69. Not only do the changing traffic patterns impair MDTA's toll revenue, they affect, the health, safety, welfare, and convenience of Maryland residents, due to longer trips, more congested roads, increased traffic accidents, and congestion, as well as increased air emissions from the diverted traffic.

64.70. The increased use of alternative routes also accelerates infrastructure depreciation as large and smaller roadways experience higher traffic volumes.

65.71. The DALI's allision with the FSK Bridge also significantly impacted economic activity in and around the Port of Baltimore, to the detriment of Claimants and Maryland residents. The collapse of the FSK Bridge blocked navigation of the Patapsco River, halting all vessel traffic to much of the Port of Baltimore as of March 26. Full access to the channel was not restored until June 12, 78 days later. Recreational boating and use of the River was also interrupted.

66.72. The Port is a major source of economic activity for the region, yielding large beneficial impacts for state and local agencies. The handling of marine cargo—containers, autos, bulk, and breakbulk—entails an extensive ecosystem of port-related activities, including stevedoring, transloading, warehousing, drayage and long-haul trucking, and rail. The Port also includes a cruise terminal that serves several major cruise lines. These activities generate business revenue and wages, including revenue to MPA, and the disruption of these activities for nearly two months had wide-ranging impacts.

67.73. Tax revenues are directly affected by economic activity. According to a recent report commissioned by MPA, in 2023 direct and secondary impacts of marine cargo activities at the Port supported an estimated $643.4 million in state and local taxes ($362.9 million collected by the State, and $280.5 million collected by the county and local governments). The report also found that the publicly and privately owned terminals directly supported 20,193 jobs in 2023.

68.74. The fiscal impact of the allision and resulting channel closure diverted cargo to other U.S. cities that may never return, permanently reducing future property, sales, income, and license tax revenues. In 2023, firms dependent on the Port of Baltimore made $982.7 million in local purchases, which supported 7,140 indirect jobs in the Maryland economy. Local purchases by businesses and their employees incur a 6% state sales tax.

69.75. In addition, to limit economic disruptions from the allision, the State enacted legislation entitled the "Maryland Protecting Opportunities and Regional Trade (PORT) Act," (Chapter 2, 2024 Laws of Maryland). The legislation supports businesses and workers who have been affected by the collapse of the FSK Bridge.

## COUNT I
## NEGLIGENCE UNDER GENERAL MARITIME LAW

70.76. The preceding paragraphs are incorporated herein by reference as if restated herein in extenso.

71.77. Petitioners were negligent and otherwise at fault for the DALI's allision with the FSK Bridge in the following non-exclusive ways:

    a)    Failure to make the DALI seaworthy;

b)     Failure to adequately maintain the equipment on the DALI, including, but not limited to, failure to maintain the electrical system and generators;

c)     Failure to hire and train a competent crew for the DALI;

d)     Failure to make required reports to the U.S. Coast Guard;

e)     Negligent design of the generator fuel supply system;

f)     Failure to obtain class approval to operate generators 3 and 4 on an electric flushing pump;

g)     Negligent operation of the DALI's generators and/or electrical system;

h)     Failure of the crew and shoreside management to adequately and appropriately respond to the power failures that occurred prior to departure;

i)     Failure of the crew to adequately and appropriately respond to the power failures that occurred after departure;

j)     Failure to advise the Pilots of the electrical, vibration, and fuel system problems with the DALI prior to departure;

k)     Failure to ensure the anchors were ready for letting go in a reasonable time;

l)     Failure to properly train the crew members of the DALI;

m)     Failure to take all actions to avoid the allision;

n)     Negligent operation of the DALI;

o)     Failure to take actions ordered by the Pilots;

p)     Failure to utilize assist tugs to transit under the FSK Bridge given the DALI's power problems;

q)     Failure to comply with the International Convention for Safety of Life at Sea (SOLAS), including but not limited to, failure to comply with the requirements of the ship's classification society;

r)     Failure to comply with the Convention on the International Regulations for Preventing Collisions at Sea (COLREGS), codified at

33 U.S.C. § 1602, et seq., including, but not limited to, failure to sound the danger signal; and

s)    All other acts of negligence, fault, strict liability, and unseaworthiness that may be proven at trial.

~~72.~~78. Under the *Oregon* Rule, the DALI is presumed to be at fault for hitting the FSK Bridge, a stationary object.  In the alternative, to the extent the DALI is determined not to have been under its own power at the time of the allision, the DALI is nevertheless presumed to be at fault for hitting the FSK Bridge under the *Louisiana* Rule.

~~73.~~79. Under the *Pennsylvania* Rule, Petitioners are presumed to be at fault due to the DALI's violation of federal statutes and regulations, including, but not limited to, violations of SOLAS, the COLREGS, multiple violations of 33 C.F.R. §164.11, 33 C.F.R. § 164.25, and 46 C.F.R. § 4.05-1, and all other regulatory and statutory violations as may be established through discovery.

~~74.~~80. Management of Petitioners had privity or knowledge of the negligence,  and fault alleged herein.

~~75.~~81. The allision was caused by the unseaworthiness, negligence, or other fault within the privity or knowledge of Petitioners.  Such privity and knowledge extinguishes any right Petitioners might have to seek limitation of liability under 46 U.S.C. § 30505(b).

~~76.~~82. As described above, Claimants have suffered catastrophic damages as a result of the Petitioners' fault, in amounts to be proven at trial.

## COUNT II
## UNSEAWORTHINESS UNDER GENERAL MARITIME LAW

~~77.~~83.  The preceding paragraphs are incorporated herein by reference as if restated herein in extenso.

~~78.~~84.  Petitioners failed to make the DALI seaworthy prior to the vessel's departure on March 26.  The vessel had multiple unseaworthy conditions, including the following, which are non-exclusive:

> a.    The electrical and/or engineering problems that caused the two power outages on March 25 were not fully diagnosed and corrected prior to departure;
>
> b.    The DALI's diesel-powered generators were not properly designed or operated to restore power after an electrical fault;
>
> c.    The DALI's redundant power systems were inoperable;
>
> d.    The DALI had a severe vibration problem which caused unsafe conditions in the ship's electrical system;
>
> e.    The DALI's anchor system was inadequate for prompt deployment;
>
> f.    The DALI's bow thruster was unavailable;
>
> g.    The DALI's crew was not competent in multiple respects, including but not limited to:  an inability to ensure the ship's generators could automatically restore electrical power after an electrical fault, an inability to restore electrical power promptly upon failure, an inability to restore propulsion and steering promptly after a power failure, an inability to restore fuel supply to generators 3 and 4 after a power failure, an inability to deploy anchors quickly, an inability to use the bow thruster effectively, an inability to accurately characterize the condition of the ship to the Pilots, an inability to comply with advice of Pilots, and an inability to follow statutory and regulatory requirements for safe navigation;
>
> h.    The DALI was not in compliance with Class NK, SOLAS, or U.S. law requirements;

      i.      The DALI did not have adequate policies and procedures to address the problems associated with the loss of electrical power, including how to maintain control of the vessel; and

      j.      Other defects as will be proven at trial.

~~79.~~85. The foregoing acts of unseaworthiness caused or contributed to the DALI's allision with the FSK Bridge.

~~80.~~86. The forgoing acts of unseaworthiness, which predated the DALI's voyage of March 26, are imputed to Petitioners and extinguish any right they might have to seek the benefits of the Limitation of Liability Act.

~~81.~~87. As described above, Claimants have suffered catastrophic damages as a result of the Petitioners' unseaworthiness, in amounts to be proven at trial.

**COUNT III**
**GROSS NEGLIGENCE AND PUNITIVE**
**DAMAGES UNDER GENERAL MARITIME LAW**

~~82.~~88. The preceding paragraphs are incorporated herein by reference as if restated herein in extenso.

~~83.~~89. The DALI's allision with the FSK Bridge was the result of Petitioners' gross negligence and willful, wanton, and reckless indifference to the rights of others.

~~84.~~90. Petitioners, directly and/or through the acts of their managerial agents and/or through the acts of employees which were ratified by their managerial agents, were grossly negligent and willfully, wantonly, and recklessly indifferent to the rights of others in the following non-exclusive manners:

      a.      Failing to ensure the DALI departed on March 26 in a seaworthy condition;

b.    Failing to ensure the crew properly utilized the safety features of the DALI's electrical and fuel supply systems;

c.    Failing to comply with and/or ensure compliance with U.S. laws intended to protect vessels, structures such as the FSK Bridge, people, and the environment;

d.    Failing to comply with and/or ensure compliance with SOLAS and class requirements intended to protect vessels, structures such as the FSK Bridge, people, and the environment;

e.    Reconfiguring the DALI's generator engine fuel supply system without a proper safety risk analysis and with disregard for the consequences of such reconfiguration;

f.    Directing, authorizing, or allowing the circumvention of critical safety features on the DALI;

g.    Failing to train the crew of the DALI to safely operate the ship;

h.    Failing to employ a competent crew on board the DALI;

i.    Operating and/or allowing the operation of the DALI's generators on an unauthorized, unsafe, and inadequate flushing pump;

j.    Eliminating vital redundancy in the generator engine fuel supply system;

k.    Failing to implement policies and procedures which ensured compliance with laws and regulations designed to protect vessels, bridges, people, and the environment;

l.    Failing to manage, monitor, audit, and otherwise ensure compliance with policies, procedures, laws and regulations;

m.    Failing to address known safety concerns on the DALI, including vibration, faulty generators, and inadequate fuel pumps, before departure from Baltimore on March 26;

n.    Failing to investigate and take corrective action following the blackouts on March 25;

o.    Failing to report the March 25 blackouts to the United States Coast Guard as required by law;

p.   Failing to ensure the Pilots were aware of the DALI's March 25 blackouts;

q.   Failing to ensure the Pilots were aware that the DALI's bow thruster was unavailable;

q.r.   Failing to ensure the Pilots were aware that the DALI's port anchor hydraulic brake was unavailable;

r.s.   Failing to ensure that the crew of the DALI was trained to perform critical safety functions intended to avoid allisions and collisions, such as restoring power, restarting the main engine, restarting the fuel supply system to the generators, releasing the anchor, and operating the bow thruster; and

s.t.   Other actions and inactions as may be proved at trial.

85.91. Petitioners' gross negligence and willful, wanton, and reckless conduct entitle Claimants to recover punitive damages.

**COUNT IV**
**PUBLIC NUISANCE UNDER GENERAL MARITIME LAW**

86.92. The preceding paragraphs are incorporated herein by reference as if restated herein in extenso.

87.93. The use and enjoyment of the State's waterways, the rights to navigation and fishery, the right to use and enjoyment of uncontaminated natural resources, and the unobstructed use of the State's infrastructure and roadways are all rights common to the general public.

88.94. Obstruction of a navigable waterway is a public nuisance.

89.95. The DALI's allision with the FSK Bridge caused it to collapse and block the Patapsco River.  The allision resulted in, among other things, the ensuing closure of the shipping channel, and disruption of most maritime activity in the public and private

terminal of the Port, the need to conduct further demolition and construct a new bridge, and the loss of the public's use of the FSK bridge, leading to years of traffic diversions and increased air pollution.

90.96. Each of the foregoing constitutes an ongoing unreasonable and substantial interference, both actual and potential, with the exercise of the public's common rights.

91.97. Petitioners are liable for the creation and continued presence of a public nuisance in contravention of the public's common rights, which jeopardizes the health, welfare, and safety of the public at large.

92.98. Claimants seek all costs to investigate, remediate, monitor, restrain, remove, abate, or otherwise remedy the public nuisance.

93.99. As described above, Claimants have suffered catastrophic damages as a result of the Petitioners' creation of a public nuisance in amounts that will proved at trial.

## COUNT V
## PURPRESTURE

94.100.      The preceding paragraphs are incorporated herein by reference as if restated herein in extenso.

95.101.      The Patapsco River is navigable in law and in fact and is continuously used by the public for commercial and recreational purposes.

96.102.      The DALI's allision with the FSK Bridge has caused an unlawful encroachment and obstruction of the public's common rights including rights in the commercial, navigational, and recreational uses of the Patapsco River and the Port of Baltimore, and constitutes a purpresture.

39

97.103.      The DALI's allision with the FSK Bridge has caused an unlawful encroachment and obstruction of the public's common right to use a public highway and destroyed a major Harbor crossing used daily by Maryland residents, and constitutes a purpresture.

98.104.      Petitioners are liable for the creation and continued presence of the foregoing purprestures.

99.105.      The State as trustee has the authority to institute a proceeding in equity and hereby seeks to compel abatement of the purprestures created by Petitioners.

100.106.      Claimants seek all costs to investigate, remediate, monitor, restrain, remove, abate, or otherwise remedy these purprestures.

101.107.      Claimants have suffered significant damages as a result of Petitioner's purprestures in amounts that will proved at trial.

## COUNT VI
### ENVIRONMENT TITLE 7, SUBTITLE 2 CLAIM UNDER MARYLAND LAW

**(Unauthorized Discharge of Controlled Hazardous Substances – Maryland Department of the Environment and the State of Maryland)**

102.108.      The preceding paragraphs are incorporated herein by reference as if restated herein in extenso.

103.109.      Maryland prohibits the discharge or disposal of a controlled hazardous substance in the State of Maryland except in a controlled hazardous substance facility and in accordance with Title 7, Subtitle 2. Envir. § 7-224.

104.110.      MDE is charged with the responsibility of enforcing Title 7, Subtitle 2, of the Environment Article, which governs the control, handling, storage, disposal, and

remediation of controlled hazardous substances.  Envir. §§ 7-256 through 7-266. The Attorney General is also authorized to prosecute claims arising under Title 7, Subtitle 2 on behalf of the State.  Envir. § 7-268.

~~105.~~111.    "Controlled hazardous substance" is any hazardous substance identified by MDE, including hazardous waste.  Envir. § 7-201(b); Md. Code Regs. ("COMAR") 26.13.01.03.

~~106.~~112.    As relevant here, "hazardous waste" is any waste not excluded by regulation, is specifically listed as a hazardous waste by regulation, exhibits any characteristic of a listed hazardous waste, or that is mixed with any listed hazardous waste. COMAR 23.13.01.03(31); *id.* 26.13.02.15-.19.

~~107.~~113.    "Discharge" is defined as the addition, introduction, leaking, spilling, or emitting of a pollutant into waters of the State; or placing a pollutant in a location where the pollutant is likely to pollute waters of the State.  Envir. § 7-201(h).  The Patapsco River is a water of State of Maryland.  Envir. § 9-101(1).

~~108.~~114.    The DALI's allision with the FSK Bridge caused the discharge of controlled hazardous substances into the Patapsco River, including but not limited to discharges from ruptured containers on the vessel, personal and industrial vehicles on the FSK Bridge, and bridge debris.

~~109.~~115.    Following the allision, the DALI remained in place, holding 700 tons of controlled hazardous substances in at least 56 containers, including but not limited to substances with corrosive or flammable characteristics.  State and Federal efforts were required to refloat the vessel and remove it, and its cargo, to a safe location.  The DALI's

allision with the FSK Bridge placed the controlled hazardous substances on the vessel in a position where they were likely to pollute the waters of the State.

~~110.~~116.    Petitioners do not have any permits to discharge controlled hazardous substances into the waters of the State.

~~111.~~117.    Petitioners have discharged controlled hazardous substances into the waters of the State and are liable for civil penalties up to $25,000 per violation.  Envir. § 7-266(a).  Each day a violation occurs is a separate violation under Title 7, Subtitle 2.

~~112.~~118.    The State's investigation remains ongoing, and it reserves the right to seek full recovery for additional violations of Title 7, Subtitle 2 of the Environment Code that are discovered in its investigation.

## COUNT VII
## ENVIRONMENT TITLE 4, SUBTITLE 4 CLAIM UNDER MARYLAND LAW

**(Unauthorized Discharge of Oil – Maryland Department of the Environment and the State of Maryland)**

~~113.~~119.    The preceding paragraphs are incorporated herein by reference as if restated herein in extenso.

~~114.~~120.    Under Title 4, Subtitle 4, it is "unlawful for any person to discharge or permit the discharge of oil in any manner into or on waters of this State."  Envir. § 4-410.

~~115.~~121.    MDE is responsible for administering and enforcing state laws regarding oil pollution in and on the land and waters of the State.  Envir. §§ 4-401 through 4-708.  The Attorney General is also authorized to prosecute claims arising under Title 4 on behalf of the State.  Envir. § 4-502.

116.122.    "Discharge" is defined as the addition, introduction, leaking, spilling, or emitting of oil into waters of the State; or placing oil in a location where it is likely to pollute waters of the State.  Envir. § 4-401(d).

117.123.    "Oil" is defined to include petroleum, petroleum by-products, fuel oil, sludge containing oil and oil residues, oil refuse, crude oils, gasoline, light and heavy fuel oils, and "every other nonedible, nonsubstituted liquid petroleum fraction unless that fraction is specifically identified as a hazardous substance under the Comprehensive Environmental Response, Compensation, and Liability Act[.]"  Envir. § 4-401(h).

118.124.    The DALI has discharged oil into the Patapsco River, including but not limited to oil from the vessel's bow thruster.

119.125.    The DALI's allision also caused the addition of pollutants to the Patapsco River that included passenger and industrial vehicles which contained various types of oil.  Through the addition of vehicles to the Patapsco River, Petitioners thereby placed oil in a location where it is likely to pollute the waters of the State.

120.126.    Following the allision, the DALI remained in place, carrying over a million gallons of fuel.  State and Federal efforts were required to refloat the vessel and remove it, and its cargo, to a safe location.  The DALI's allision with the FSK Bridge placed the oil on the vessel in a position where it was likely to pollute the waters of the State.

121.127.    Petitioners do not have any permits to discharge oil into the waters of the State.

122.128.      Petitioners have discharged oil into the waters of the State and are liable for civil penalties in the amount of up to $25,000.  Envir. § 4-417.  Each day a violation occurs is a separate violation under Title 4, Subtitle 4.

123.129.      The State's investigation remains ongoing, and it reserves the right to seek full recovery for additional violations of Title 4, Subtitle 4 of the Environment Code that are discovered in its investigation.

**COUNT VIII**
**ENVIRONMENT TITLE 9, SUBTITLE 3 CLAIM UNDER MARYLAND LAW**

**(Unauthorized Discharge of Pollutants & Wastes – Maryland Department of the Environment and the State of Maryland)**

124.130.      The preceding paragraphs are incorporated herein by reference as if restated herein in extenso.

125.131.      MDE is charged with the responsibility of enforcing Title 9, Subtitle 3 of the Environment Article, which governs water pollution.  Envir. §§ 9-334 through 9-344.  The Attorney General is also authorized to prosecute claims arising under Title 9 on behalf of the State.  Envir. § 9-344.

126.132.      Under Title 9, Subtitle 3, a person may not discharge any pollutant into waters of the State without a discharge permit issued by the Department.  Envir. §§ 9-322, 323.  It also prohibits the unpermitted "discharge of any wastes . . . regardless of volume[.]"  COMAR 26.08.03.01(A)(1).

127.133.      "Discharge" is defined as the addition, introduction, leaking, spilling, or emitting of a pollutant into waters of the State; or placing a pollutant in a location where

44

the pollutant is likely to pollute waters of the State.   Envir. §§ 9-101(b); COMAR 26.08.01.01B(20).

~~128.~~134.        "Waste" is defined to include industrial waste—which refers to any material resulting from any industrial, manufacturing, trade, or business process—and all other "liquid, gaseous, solid, or other substances which will pollute any waters of this State."  COMAR 26.08.01.01(98); *see also id.* at (40).

~~129.~~135.        "Pollutant" is defined to mean: "(1) any waste or wastewater that is discharged from . . . an industrial source, or (2) any other liquid, gaseous, solid, or other substances which will pollute any waters of the State."  Envir. § 9-101(g).

~~130.~~136.        "Pollution" is defined as any contamination or other alteration of the physical, chemical, or biological properties of any waters of the State, including a change in temperature, taste, color, turbidity, or odor of the waters, or the discharge or deposit of any organic matter, harmful organism, or liquid, gaseous, solid, radioactive, or other substance into the waters of this State, that will render the waters harmful or detrimental to: (1) public health, safety, or welfare; (2) domestic, commercial, industrial, agricultural, recreational, or other legitimate beneficial uses; (3) livestock, wild animals, or birds; or (4) fish or other aquatic life.  Envir. § 9-101(h); COMAR 26.08.01.01B(67).

~~131.~~137.        The DALI's allision with the FSK Bridge caused the discharge of numerous pollutants and wastes into the Patapsco River, including but not limited to at least two containers from the vessel, the items located therein, personal and industrial vehicles, and bridge debris.  Due to the allision, the remaining structures of the FSK Bridge

45

must be demolished, and, this demolition will result in additional discharges to the Patapsco River.

132.138.    Following the allision, the DALI remained in place, loaded with more than 4,000 containers, many likely carrying numerous pollutants and wastes.  Upon information and belief, several containers aboard the DALI were also ruptured due to the allision.

133.139.    The allision also caused various pieces of debris from the FSK Bridge to land on the bow of the DALI.  The vessel's immobilization also necessitated State and Federal efforts to relocate at least 178 containers and remove bridge debris from the vessel. The vessel was then refloated and removed, along with its cargo, to a safe location.  The DALI's allision with the FSK Bridge placed numerous pollutants and wastes in a place where they were likely to pollute the waters of the State.

134.140.    Petitioners do not have any permits to discharge pollutants and wastes into the waters of the State.

135.141.    Because Petitioners discharged pollutants and wastes into the waters of this State, they shall "reimburse the Department for the reasonable costs incurred by the Department in conducting environmental health monitoring or testing, including the cost of collecting and analyzing soil samples, surface water samples, or groundwater samples for the purpose of assessing the effect on public health and the environment of the person's discharge."  Envir. § 9-342.2.

136.142.    Petitioners are liable for a civil penalty not exceeding $10,000 for each discharge.  Envir. § 9-342.  Each day a violation occurs is a separate violation under Title 9, Subtitle 3.

137.143.    The State's investigation remains ongoing, and it reserves the right to seek full recovery for additional violations of Title 9, Subtitle 3 of the Environment Code that are discovered in its investigation.

### COUNT IX
### COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT, 42 U.S.C. §§ 9607(a)

#### (Cost Recovery and Natural Resource Damages)

138.144.    The preceding paragraphs are incorporated herein by reference as if restated herein in extenso.

139.145.    Under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA," 42 U.S.C. §§ 9601, *et seq*.), owners and operators of "vessels" are liable for "all costs of removal or remedial action incurred by []a State," occasioned by a "release, or a threatened release which causes the incurrence of response costs, of a hazardous substance," "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release," and other forms of compensation.  42 U.S.C. § 9607(a).  In the case of a vessel, "owner or operator" includes "any person owning, operating, or chartering by demise, such vessel."  42 U.S.C. § 9601(20).

140.146.    Petitioners are "persons" within the meaning of CERCLA Section 101(21).  42 U.S.C. § 9601(21).

141.147.    Petitioners are and were at all relevant times "owners" and/or "operators" of the DALI.

142.148.    On information and belief, the State alleges that there have been "releases," 42 U.S.C. § 9601 (22) and threatened releases of "hazardous substances," 42 U.S.C. § 9601 (14) from the DALI.  The State is further informed and believes that these releases or threatened releases may be ongoing.

143.149.    The DALI is a "vessel," which is defined in CERCLA as "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water."  42 U.S.C. § 9601(28).

144.150.    The Patapsco River is squarely included within CERCLA's definition of "environment."  42 U.S.C. § 9601(8).

145.151.    The State has incurred and will incur necessary costs of response pursuant to CERCLA Section 107(a), none of which are inconsistent with the national contingency plan, as a result of releases and/or threatened releases of hazardous substances at and from the DALI.  42 U.S.C. § 9607(a)(4)(A).

146.152.    On information and belief, the State has incurred and/or will incur damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such releases and/or threatened releases of hazardous substances at and from the DALI.  42 U.S.C. § 9607(a)(4)(C).

**COUNT X**
**COMPREHENSIVE ENVIRONMENTAL RESPONSE,**
**COMPENSATION, AND LIABILITY ACT, 42 U.S.C. §§ 9613(G)**

**(Declaratory Relief)**

~~147.~~153.     The preceding paragraphs are incorporated herein by reference as if restated herein in extenso.

~~148.~~154.     CERCLA Section 113(g)(2) provides in pertinent part: "In any action described in this subsection the court shall enter a declaratory judgment of liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."

~~149.~~155.     The Declaratory Judgment Act further states: "In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201.

~~150.~~156.     An actual controversy now exists because Petitioners are liable parties under CERCLA Section 107(a) for all costs and damages compensable to the State in connection with the release or threatened release of hazardous substances from the DALI. 42 U.S.C. § 9607(a).

~~151.~~157.     The State seeks a judicial declaration of rights pursuant to CERCLA 113(g)(2), binding Petitioners in any subsequent action or actions to recover response costs or other damages incurred by the State, as appropriate and in the interest of justice.  42 U.S.C. § 9613(g)(2).

## COUNT XI
## BREACH OF MARITIME CONTRACT, TARIFF § 34-034

### (By the State and the Maryland Port Administration)

~~152.~~158.    The preceding paragraphs are incorporated herein by reference as if restated herein in extenso.

~~153.~~159.    MPA maintains the Tariff and publishes the Tariff's complete terms and conditions on its website, which is publicly available.[1]

~~154.~~160.    The Tariff is a valid and enforceable maritime contract by and between the MPA and all "Users" of its "Facilities."  Tariff § 34-014; 46 U.S.C. § 40501(f).

~~155.~~161.    As defined by the Tariff, the Seagirt Marine Terminal is a "Facility," and Petitioners qualify as "Users" because they are each "an ocean carrier, . . . independent contractor, . . . shipper, consignee, visitor, lessee, or other user of the terminal facilities, or their agents, servants, and/or employees."  Tariff § 34-001.

~~156.~~162.    Section 34-034 of the Tariff requires "Users" to comply with broadly defined Environmental Standards:

> All Users shall ascertain and comply with all applicable environmental standards set by international, federal, state or local laws, rules or regulations related to User's entry onto, use, occupancy, and services provided or received by User on Terminal Facilities, including but not limited to, obtaining and [sic] all required permits and/or governmental approvals (hereinafter referred to as "Environmental Standards").

~~157.~~163.    Petitioners, as "Users," are also responsible under Section 34-034 for *all* preventative, investigative, and remedial measures required, among other things, under

---

[1]    *See* https://mpa.maryland.gov/Pages/rate-schedules.aspx.

the Environmental Standards, by government authorities, or necessary to prevent or minimize environmental damage:

> User shall undertake and be liable for any and all preventive, investigatory, or remedial actions (including emergency response, removal, containment and other remedial actions) that are either: required by an applicable Environmental Standards or governmental authorities; or necessary to prevent or minimize property damage to the Terminal Facilities, personal injury or damage to the environment, by releases of or exposure to materials deemed hazardous under the Environmental Standards. User shall undertake such preventive, investigatory or remedial actions regardless of whether the release occurs on land leased or otherwise controlled by the User.

~~158.~~164.    Petitioners have failed to comply with Environmental Standards and are therefore in breach of Section 34-034 of the Tariff.

~~159.~~165.    Petitioners have also failed to comply with their obligation as "Users" under Section 34-034 to undertake and be liable for all preventative, investigative, remedial, and other actions, and are therefore in breach of Section 34-034 of the Tariff.

~~160.~~166.    The State is a third-party beneficiary to the Tariff and has a legal right to enforce Section 34-034 of the Tariff.

~~161.~~167.    Because of Petitioners' breaches of Section 34-034, the State and MPA have been forced to undertake the preventative, investigative, remedial, and other actions Petitioners were responsible for and have incurred damages as a result.

~~162.~~168.    Contractual claims such as this are not subject to limitation under the Limitation of Liability Act, whose provisions apply only to claims that sound in tort. The State and MPA, therefore, assert their right to have this breach-of-contract claim heard in a forum of their choosing.

~~163.~~170.    The State and MPA seek an award of damages against Petitioners, in an amount to be determined at trial, on account of Petitioners breaches of Tariff Section 34-034.

## COUNT XII
## BREACH OF INDEMNIFICATION
## OBLIGATION IN MARITIME CONTRACT, TARIFF § 34-034

### (By the State and the Maryland Port Administration)

~~164.~~170.    The preceding paragraphs are incorporated herein by reference as if restated herein in extenso.

~~165.~~171.    MPA maintains the Tariff and publishes the Tariff's complete terms and conditions on its website, which is publicly available.

~~166.~~172.    The Tariff is a valid and enforceable maritime contract by and between the MPA and all "Users" of its "Facilities."  Tariff § 34-014; 46 U.S.C. § 40501(f).  The State also has a legal right, and is a primary party of interest in the performance of the Tariff's provisions, including those described in Section 34-034.

~~167.~~173.    As defined by the Tariff, the Seagirt Marine Terminal is a "Facility," and Petitioners qualify as "Users" because they are each "an ocean carrier, . . . independent contractor, . . . shipper, consignee, visitor, lessee, or other user of the terminal facilities, or their agents, servants, and/or employees."  Tariff § 34-001.

~~168.~~174.    The Tariff−a maritime contract−required Petitioners to comply with "Environmental Standards," defined as "all applicable environmental standards set by international, federal, state or local laws, rules or regulations related to User's entry onto,

use, occupancy, and services provided or received by User on Terminal Facilities."  Tariff § 34-034.

~~169.~~175.     Additionally, Tariff Section 34-034 requires Petitioners to "to indemnify, protect, defend and save harmless [MPA], the State of Maryland, and its agents and employees, from and against all suits, actions, claims, demands, damages, losses, expenses and costs of every kind and description to which [MPA] or the State of Maryland, its agents or employees may be subjected by reason of injury to or death of persons or by reason of injury or damage to, or destruction of property of any person, firm or corporation by reason of any act or of omission of User … arising out of, relating to, or resulting from User's . . . failure to comply with Environmental Standards."

~~170.~~176.     The State is a third-party beneficiary to the Tariff and has a legal right to enforce Section 34-034 of the Tariff.

~~171.~~177.     As alleged above, Petitioners' failure to comply with multiple Environmental Standards has subjected the State and MPA to damages, losses, expenses, and costs.

~~172.~~178.     Petitioners' failure to comply with Environmental Standards entitles the State and MPA to indemnity under Section 34-034 of the Tariff.

~~173.~~179.     Contractual claims such as this are not subject to limitation under the Limitation of Liability Act, whose provisions apply only to claims that sound in tort.  The State and MPA, therefore, asserts their right to have this breach-of-contract claim heard in a forum of their choosing.

~~174.~~181.    The State and MPA accordingly seek an indemnity award against Petitioners, in an amount to be determined at trial, on account of Petitioners' failure to comply with Environmental Standards that triggers a duty to indemnify the State and MPA under Tariff Section 34-034.

## COUNT XIII
## BREACH OF INDEMNIFICATION
## OBLIGATION IN MARITIME CONTRACT, TARIFF § 34-018

### (By the Maryland Port Administration)

~~175.~~181.    The preceding paragraphs are incorporated herein by reference as if restated herein in extenso.

~~176.~~182.    MPA maintains the Tariff and publishes the Tariff's complete terms and conditions on its website, which is publicly available.

~~177.~~183.    The Tariff is a valid and enforceable maritime contract by and between the MPA and all "Users" of its "Facilities."  Tariff § 34-014; 46 U.S.C. § 40501(f).

~~178.~~184.    As defined by the Tariff, the Seagirt Marine Terminal is a "Facility," and Petitioners qualify as "Users" because they are each "an ocean carrier, . . . independent contractor, . . . shipper, consignee, visitor, lessee, or other user of the terminal facilities, or their agents, servants, and/or employees."  Tariff § 34-001.

~~179.~~185.    Section 34-018 of the Tariff obligates "all Users [to] indemnify, defend and save harmless the [MPA] from and against all losses, claims, demands, or suits for damages, including death and personal injury, and including court costs and attorney's

fees, incidental or resulting from the operations, acts or omissions of the of the Users on the Facilities or Usage of the Facilities."

~~180.~~186.    The DALI's allision with the FSK Bridge was incidental to or resulting from Petitioners' use of the Seagirt Marine Terminal.

~~181.~~187.    The DALI's allision with, and destruction of, the FSK Bridge has caused MPA to suffer, among other things, losses, damages, costs, and attorneys' fees.

~~182.~~188.    MPA is entitled to be indemnified for these losses, damages, costs, attorneys' fees, and any other expenses or liabilities it incurs due to Petitioners' wrongful conduct under Tariff Section 34-018.

~~183.~~189.    Contractual claims such as this are not subject to limitation under the Limitation of Liability Act, whose provisions apply only to claims that sound in tort. MPA, therefore, asserts its right to have this breach-of-contract claim heard in a forum of its choosing.

~~184.~~190.    MPA accordingly seeks an indemnity award against Petitioners under Tariff Section 34-018, in an amount to be determined at trial, on account of losses, damages, costs, attorneys' fees, and any other expenses or liabilities it incurs due to Petitioners' wrongful conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Claimants pray that:

1. The Limitation of Liability Act, 46 U.S.C. § 30501, *et seq*., be found inapplicable to Claimants by virtue of their sovereign immunity memorialized in the 11th Amendment to the United States Constitution;

2. Petitioners' request for exoneration from or limitation of liability be denied;

3. Claimants thereafter be permitted to bring their claims for damages in other venues of their choosing in accordance with the savings-to-suitors clause, 28 U.S.C. §1333(1);

4. Alternatively, that judgment be entered in favor of Claimants and against Petitioners, awarding Claimants damages as follows:

   a. For the damage to the FSK Bridge, including but not limited to replacement of the bridge and removal of the remnants of the bridge;

   b. For all direct costs incurred by Claimants including emergency response, salvage costs, demolition costs, benefits paid to affected workers and businesses, and all other costs and expense incurred in responding to the allision and the collapse of the FSK Bridge;

   c. For all lost revenue caused by the allision and the collapse of the FSK Bridge, including but not limited to toll revenue, fees, and tax revenue;

   d. For indemnification, damages, and attorneys' fees pursuant to the Tariff as set forth herein;

   e. For damage to the State's natural resources including the water bodies, the shipping channel, and/or wetlands;

   f. For all costs to investigate, clean up, remove, restore, treat, monitor, and otherwise respond to actual or threatened environmental contamination;

   g. Statutory penalties for environmental violations as set forth herein;

h.   For increased wear and tear on the State's roads, highways, and other infrastructure;

i.   For all damages to compensate the citizens of the State for the lost use and value of its natural resources during all times of injury caused by the damage to the FSK Bridge, including but not limited to past and future testing, treatment, assessment, or monitoring;

j.   For all damages sustained by the State in its public trustee, *parens patriae*, and regulatory capacities as a direct and proximate result of Petitioners' acts and omissions alleged herein;

k.   For all compensable costs and damages available to the State under CERCLA Section 107(a);

l.   Declaring Petitioners liable for all past and future response costs pursuant to CERCLA Section 113(g)(2);

m.   For punitive damages;

n.   For costs and fees in this action, including attorneys' fees, incurred in connection with this action to the full extent permitted by law;

o.   For any and all other damages as may be proven at trial, including pre-judgment interest at the State's cost of borrowing; and

5.   For all such other general and equitable relief, as justice of the cause may require or permit.

## <u>DEMAND FOR JURY TRIAL</u>

The State demands a trial by jury on all claims for which a jury trial is available.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

*/s/ Robert A. Scott*

57

Robert A. Scott (24613)
Howard R. Feldman (05991)
Assistant Attorneys General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
rscott@oag.state.md.us
(410) 576-6324

and

*/s/ Margaret Fonshell Ward*
Margaret Fonshell Ward (04586)
DOWNS WARD BENDER HERZOG &
KINTIGH, P.A.
1350 McCormick Road
Executive Plaza 3, Suite 400
Hunt Valley, Maryland 21031
mward@downs-ward.com
(410) 584-2800

R. Keith Jarrett, T.A.*
David L. Reisman, T.A.*
Raymond T. Waid*
Elizabeth B. McIntosh*
Jessie E. Shifalo*
Elizabeth A. Strunk*
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
dreisman@liskow.com
rkjarrett@liskow.com
rwaid@liskow.com
ebmcintosh@liskow.com
jshifalo@liskow.com
eastrunk@liskow.com
(504) 581-7979

Scott S. Partridge*
Partridge LLC
231 Glendale Drive
Metairie, Louisiana 70001
scott@partridgellc.com

(314) 952-4132

William J. Jackson*
Andrew W. Homer*
Ivan Morales*
Maria F. Pimienta*
KELLEY DRYE & WARREN LLP
515 Post Oak Blvd, Suite 900
Houston, Texas 77027
bjackson@kelleydrye.com
ahomer@kelleydrye.com
imorales@kelleydrye.com
mpimienta@kelleydrye.com
(713) 355-5000

Philip D. Robben*
Julia Schuurman*
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, New York 10007
probben@kelleydrye.com
jschuurman@kelleydrye.com
(212) 808-7800

Melissa E. Byroade (31335)
KELLEY DRYE & WARREN LLP
Washington Harbour, Suite 400
3050 K Street, NW
Washington, DC 20007
mbyroade@kelleydrye.com
(202) 342-8400

Mark Lanier*
Alex Brown*
The Lanier Law Firm
10940 W. Sam Houston Pkwy N
Suite 100
Houston, TX 77064
mark.lanier@lanierlawfirm.com
(713) 659-5200

*Assistant Counsel to Claimants*

*Admitted Pro Hac Vice*

September 24, 2024June 2, 2025

## <u>CERTIFICATE OF SERVICE</u>

I CERTIFY that on this 2nd day of June, 2025, a copy of this Amended Answer and Claim by the State of Maryland, on its own behalf and on behalf of all its agencies; the Maryland Transportation Authority; the Maryland Port Administration; and the Maryland Department of the Environment was electronically filed using the court's CM/ECF system on all counsel of record.


*/s/ Margaret Fonshell Ward*
Margaret Fonshell Ward