FIRST ORIGINAL

| 1. Shipbroker | THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO) UNIFORM TIME CHARTER PARTY FOR CONTAINER VESSELS CODE NAME: "BOXTIME" |
|---|---|
| **Orient Marine Co., Ltd.** **1-8-1 Marunouchi, Chiyoda-ku, Tokyo, 100-0005 Japan** | PART I |

| 2. Place and date |
|---|
| **Copenhagen, 1st September 2016** |

| 3. Owners/Disponent Owners & Place of Business, Telephone, Telex and Telefax Number | 4. Charterers & Place of Business, Telephone, Telex and Telefax Number |
|---|---|
| **Grace Ocean Private Limited** | **Maersk Line A/S** |

| 5. Vessel's Name | 6. Call Sign/Telex Number |
|---|---|
| **M.V."DALI" (IMO No. 9697428)** | **As per description /** |

| 7. GRT/NRT | 8. DWT on Summer Freeboard | 9. TEU Capacity (Maximum) |
|---|---|---|
| **As per description /** | **As per description** | **As per description** |

| 10. Class (Cl. 5) | 11. Flag | 12. Service Speed (See Part III) | 13. Fuel Consumption (See Part III) |
|---|---|---|---|
| | **Singapore** | **As per description** | **As per description** |

| 14. Type(s) of Fuel(s)   (Cl. 12(d)) | 15. Maximum Bunker Capacity |
|---|---|
| **As per description** | **As per description** |

| 16. Bunkers/Price on Delivery (Min.-Max.)   (Cl. 12(a) and (c)) | 17. Bunkers/Price on Redelivery (Min.-Max.)   (Cl. 12(a) and (c)) |
|---|---|
| **Quantity as actually on board** | **See Clause 12 a** |

| 18. Place of Delivery (Cl. 1(b)) | 19. Earliest Date of Delivery (local time)   (Cl. 1(b)) |
|---|---|
| **The Vessel shall be delivered by the Owners to the Charterers at the time of Vessel's delivery from the Sellers to the Buyers under relevant MOA not earlier as stipulated in BOX 19 and not later than as stipulated in BOX 20, in Charterers' option.** **Should the Sellers under the said MOA is unable to deliver the Vessel within the said timing, the Owners and the Charterers mutually agree for new delivery timing with no additional costs to be suffered by the Owners. Forthwith upon the delivery of the Vessel under the said MOA, the Vessel is deemed to be delivered and accepted by the Charterers and a delivery notice shall be made to evidence the physical delivery of the Vessel hereunder.** **Unless otherwise agreed in writing, this Charter Party shall become null and void if the delivery of the Vessel under the said MOA does not occur, whether Owners exercise their cancelling option under the said MOA or otherwise.** | **1st August, 2016 at 00:01 hours local time** |

| 20. Latest Date of Delivery (local time)   (Cl. 1(b)) | 21. Place of Redelivery (Cl. 6(m)) |
|---|---|
| **31st October, 2016 23:59 hours local time** **See Clause 1** | **Dropping last outward sea pilot Hamburg / Algeciras / Gioia Tauro / Port Said range including Tangier and Malta or Colombo – Port Kelang / Tanjung Pelepas / Singapore / South Japan / South Korea range or Hong Kong, Yantian, Qingdao, Xingang, Shanghai, Dalian or NCSA, ECSA, USEC or Salalah – Jebel Ali range in Charterers' option any time, day, night, Sundays and Holidays included. Vessel to be redelivered always within I.W.L., excluding war or warlike zone(s).** |

Printed by BIMCO's idea

EXHIBIT **89**
WIT: Nakagawa
DATE: 4-24-25
MLG, CSR, RPR, CRR, CCR

This document is a computer generated BOXTIME form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

(continued)       "BOXTIME" UNIFORM TIME CHARTER PARTY FOR CONTAINER VESSELS       PART I

| | |
|---|---|
| **22. Trading Limits (Cl. 3 and Cl. 5(c))** <br><br>Vessel always to trade via safe port(s) / berth(s) / anchorage(s) always afloat, always within Institute Warranty Limits excluding Greenland, Cuba (unless U.S. sanctions are lifted), Turkish occupied part of Cyprus, Iraq, Iran (as long as U.N./U.S. sanctions apply. Charterers are allowed to call Iran 14 days after complete cancellation of the U.N./U.S. sanctions), North Korea, Russian Pacific ports except Vostochny, Somalia, Tanzania, Ethiopia, Yemen, Erithrea, Kenya, Albania, Iceland, Haiti, Syria, Sudan and countries that are sanctioned by United Nations and United States of America / Canada and/or European Union. Israel trading to be allowed subject to Owners prior approval which not to be unreasonably withheld and Clause 52 to apply. <br><br>Charterers are allowed to call Taiwan directly after calling People's Republic of China and vice versa, provided in accordance with the Cross-Strait Sea Transport Agreement and always at Charterers' risk, cost and time. However, Charterers are not allowed to discharge cargo in Taiwan which has been loaded in People's Republic of China and vice versa. <br><br>Breaking I.W.L.: <br>Charterers to be allowed to take out extra war risk insurance on behalf of Owners. Charterers have an insurance facility to cover extra war risk insurance for charter vessels. Owners agree to this cover. Owners have an option to choose insurance company for such extra war risk insurance. In such case Owners shall bare the cost difference between Owners quotation and Charterers quotation with supporting document by Charterers underwriter. <br><br>NAABSA: <br>Not to be allowed. <br><br>Ice Clause: <br>The Vessel shall not be ordered to push nor force ice nor follow ice breakers. <br><br>Asian Gypsy Moth: <br>As per Clause 51. | |
| **23. Period of Charter and Options if any (Cl. 1(a), Cl. 6(m) and Cl. 7(f))** <br><br>From the time of the delivery by the Owners to the Charterers for firm seven (7) years with sixty (60) days more or less in Charterers' option (hereinafter called the "Firm Period") <br><br>If the Charterers do not declare the purchase option stipulated in Clause 58 by the latest five (5) months prior to the minimum firm period, the following put/call option to apply; <br><br>The Charterers have the option to declare, by the latest four (4) months prior to the minimum firm period, an option to extend the Vessel for either: <br><br>(a) Five (5) years (hereinafter called the "Optional Period 1") or <br>(b) Seven (7) years (hereinafter called the Optional Period 2") <br><br>- If the Charterers do not declare one of the above options to extend the Charter, the Owners shall have the option to declare, one of the above options and put the Vessel to the Charterers for further five (5) or seven (7) years at the rates mentioned in BOX 25. <br><br>- In case the optional period is declared either by the Charterers or the Owners, the commencement of the declared optional period shall be the anniversary date. | **24. State number of Days Options have to be declared after commencement of Charter Period (Cl. 1(a))** <br><br>As per Clause 23. |
| **25. Rate of Hire per Day and to whom payable (Cl. 1(a), Cl. 7(a) and (b))** <br>For the Firm Period: US$32,500.- per day or pro-rata including overtime. <br>For the Optional Period 1: US$32,500.- per day or pro-rata including overtime. <br>For the Optional Period 2: US$30,000.- per day or pro-rata including overtime. <br><br>- In case required by Financier, Charterers to sign "Acknowledgement of Assignment for Charter Hire and Charter Party". | **26. Quantity of Hazardous Goods allowed (Cl. 4(b))** <br>In accordance with Vessel's Certificate of Compliance. |
| **27. Insured Value of Vessel (Cl. 18(a))** <br>To be advised | **28. Daily Rate for Supercargo (Cl. 13(h))** <br>US$10.- per day |
| | **29. Victualling Rate per Meal for other Charterers' Servants etc. (Cl. 13(h))** <br>US$100.- per month or pro-rata |
| **30. Name of Owners' P & I Club (Cl. 18(b))** <br>To be advised | **31. Name of Charterers' P & I Club (Cl. 18(b))** <br>To be advised |
| **32. Charterers' maximum Claim settlement authority (Cl. 16(h))** <br>US$3,000.-/claim | **33. General Average to be adjusted at (Cl. 14 (c))** <br>London, English Law to apply |
| **34. Law and Arbitration (state a, b, or c of Cl. 20, as agreed; if c agreed also state** <br>Place of Arbitration) (Cl. 20) <br>London   English Law to apply | **35. Brokerage Commission and to whom payable (Cl. 21)** <br>Nil Address Commission payable to Charterers. <br>1.25% brokerage commission to Orient Marine Co., Ltd. payable by Owners. |
| **36. Number of Additional Clauses covering special Provisions** <br>Clauses Nos. 23 - 63 | |



(continued)    "BOXTIME" UNIFORM TIME CHARTER PARTY FOR CONTAINER VESSELS    PART I

It is mutually agreed between the party mentioned in Box 3 (hereinafter referred to as "the Owners") and the Party mentioned in Box 4 (hereinafter referred to as "the Charterers") that this Contract shall be performed in accordance with the conditions contained   In Part I including additional clauses, if any agreed and stated in Box 36, and Part II as well as Part III. In the event of a conflict of conditions, the provisions of Part I and Part III shall prevail over those of Part II to the extent of such conflict but no further.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| Grace Ocean Private Limited<br>Heng Tock Hin Anthony, Director | PETER LUND<br>HEAD OF CHARTERING |

## INDEX
## "BOXTIME" Charter Party

CLAUSE NO.

1. PERIOD OF CHARTER PARTY AND DELIVERY

2. OWNERS' UNDERTAKING

3. TRADING LIMITS

4. PERMITTED CARGOES
    a) Uncontainerised Goods
    b) Hazardous Goods
    c) Live Animals
    d) Radioactive Goods
    e) Arms & Ammunition

5. OWNERS' OBLIGATIONS
    Maintain in Class and efficient operation.
    a) Container Lashings
    b) Crew Assistance
    c) Documentation
    d) Insurance of the Vessel
    e) Fumigation and/or Deratisation
    f) Smuggling

6. CHARTERERS' OBLIGATIONS
    a) Provision of Details
    b) Instructions to the Master
    c) Stevedoring
    d) Charterers' Lashings
    e) Condition of Containers
    f) Stowage in Containers
    g) Stowage Planning
    h) Operating Expenses
    j) Bunker Fuel
    k) Agency Costs
    l) Damage to Vessel
    m) Redelivery
    n) Additional Premiums
    o) Advances to Master
    p) Contraband

7. HIRE
    a) Rate
    b) Payment
    c) Default
    d) Redelivery Adjustment
    e) Deductions
    f) Extension

8. OFF HIRE
    a) Unable to Comply with Instructions
    b) Deviation
    c) Blocking & Trapping
    d) Requisitions
    e) Loss of Time

9. LOSS OF VESSEL

10. LASHINGS AND STEVEDORING
    a) Owners' Lashings
    b) Charterers' Lashings
    c) Stowage Planning
    d) Stevedoring
    e) Liability

11. VESSEL'S GEAR
    a) Regulations
    b) Condition
    c) Suez and Panama Canal
    d) Refrigeration
    e) Lighting

12. BUNKER FUEL
    a) Quantity at Delivery/Redelivery
    b) Pre and Post Charter Bunkering
    c) Purchase Price
    d) Specification
    e) Consumption
    f) Bunkering

13. CHARTERERS' REQUIREMENTS
    a) Plans
    b) Flag, Funnel, Name and Configuration
    c) Ballast Warranty
    d) Weather Routing
    e) Communications Facilities
    f) Logs and Witnesses
    g) Replacement of Master and Officers
    h) Supercargo
    j) Victualling
    k) Sub-Letting
    l) Inspections
    m) Substitution and Sub-Contracting
    n) Laid-Up Returns
    o) Signing Bills of Lading

14. OWNERS' REQUIREMENTS
    a) Maintenance
    b) Bills of Lading
    c) General Average
    d) Salvage
    e) Liens

15. SUNDRY MATTERS
    a) Pilotage/Towage
    b) Watchmen
    c) Stowaways
    d) On/Off Hire Surveys
    e) Sub-Contractors

16. CHARTERS' RESPONSIBILITIES/LIABILITIES
    a) Charterers' Responsibilities
    b) Claims Handling
    c) General Indemnity
    d) Fines etc. Indemnity
    e) Time Limit
    f) Agency
    g) General Average Exclusion
    h) Claims Authority

17. OWNERS' RESPONSIBILITIES/LIABILITIES
    a) For Goods and Containers
    b) For Refrigerated Goods
    c) Limitation of Liability
    d) Time Limit
    e) For Personal Injury
    f) Limitation Proceedings
    g) Consequential Loss

18. INSURANCES
    a) Hull and Machinery
    b) Protection and Indemnity (P & I)
    c) War Risks

19. WAR

20. LAW AND ARBITRATION
    a) London
    b) New York
    c) Alternative

21. COMMISSION

22. NOTICES

This document is a computer generated BOXTIME form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

PART II
"BOXTIME" Charter Party

It is agreed on the date shown in <u>Box 2</u> between the party named in <u>Box 3</u> as the Owners of the Vessel named in <u>Box 5</u> and the party named in <u>Box 4</u> as the Charterers as follows:   1 2 3

**1.  Period of Charter Party and Delivery**   4
(a) In consideration of the hire detailed in <u>Box 25</u> the Owners let and the Charterers hire the Vessel for the period together with any optional extension(s) thereto as indicated in <u>Box 23</u>. Such options, always at the Charterers' discretion, must be declared to the Owners within the period as indicated in <u>Box 24</u>, <u>Box 23</u>.   5 6 7 8 9
(b) The Owners shall deliver the Vessel to the Charterers at the Place of Delivery as indicated in <u>Box 18</u>. ~~Unless agreed by the Charterers to the contrary, delivery shall take place no earlier than the time/date as indicated in Box 19 and no later than the time/date as indicated in Box 20.~~   10 11 12 13
If prior to delivery the Owners give notice to the Charterers that the Vessel will not be ready for delivery by the time/date as indicated in <u>Box 20</u>, the Charterers shall declare within 48 hours after receiving notice thereof from the Owners whether they cancel or will take delivery of the Vessel but without prejudice to the Charterers' right to claim proved damages.   14 15 16 17 18
(c) If the Owners are unable to deliver the Vessel at the Place of Delivery as indicated in <u>Box 18</u> for any reason beyond the control of the Owners, delivery shall take place at the nearest point to the nominated Place of Delivery to which the Vessel may safely and reasonably proceed.   19 20 21 22
The Owners shall give notice of readiness to deliver to the Charterers and/or the Charterers' local agents when in position to come on hire.   23 24
(d) Delivery shall be effected at any time, day or night, Saturdays, Sundays and holidays included.   25 26
(e) At the time of delivery the Vessel shall be clean and in all respects fit to receive goods and ISO standard containers.   27 28
(f) The Charterers' acceptance of delivery of the Vessel shall not prejudice their rights against the Owners under this Charter Party.   29 30

**2.  Owners' Undertaking**   31
The Owners undertake that, at delivery, the Vessel shall be of the description set out in PARTS I and II hereof.   32 33

**3.  Trading Limits**   34
The Vessel shall be employed in lawful trades within Institute Warranty Limits (IWL) and within the Trading Limits as indicated in <u>Box 22</u> for the carriage of lawful goods between safe ports or places where she can safely lie always afloat. The Vessel shall not be obliged to force Ice nor to follow icebreakers.   35 36 37 38 39
~~The Owners warrant that, at the time of signing this Charter Party, the Vessel has not traded to any countries which would make the Vessel unacceptable for calls at ports within the Trading Limits as indicated in Box 22. The Charterers shall provide a list of such countries.~~   40 41 42 43

Subject to Owners' prior approval, Charterers have the right to break I.W.L. against payment of all extra insurance / costs. In case Vessel is trapped / blocked in ice, vessel will remain on-hire unless Vessel is trapped/blocked due to fault of Owners or the Vessel.

**4.  Permitted Cargoes**   44
Except as provided below, the Vessel shall be used exclusively for the carriage of goods in ISO standard containers complying with the International Convention for Safe Containers.   45 46 47
(a) ~~Uncontainerised Goods:~~ Uncontainerised goods ~~may be carried only with the prior consent of the Owners and the Master provided that they are suitably prepared for carriage,~~ must not be carried directly on the Vessel's weather deck or on its hatch covers.   48 49 50
Upon Master's approval, which is not to be unreasonably withheld, the Charterers have liberty to weld padeyes into the Vessel's weatherdeck and holds to secure containers, cargo and/or equipment at Charterers' risk and expense.
On redelivery such padeyes are to be removed including proper paint work, subject to Master's satisfaction, at the Charterers' risk and expense, in their time.
Should the Owners so desire, Master to advise reasonable precautions to be taken when welding / removing padeyes and Charterers to ensure same is carried out.
The Charterers are to be liable for loss or damage to cargo as a result of their failure to use due care to ensure that padeyes are properly and sufficiently welded.

(b) *Hazardous Goods:* The Owners agree that the Charterers may carry the maximum quantity as indicated in <u>Box 26</u> of hazardous goods in containers, provided same are loaded, stowed, discharged and documented in accordance with IMO regulations, any mandatory local requirements and regulations of the flag state, and according to Vessel's Document of Compliance for carriage of dangerous goods. With regard to the allowed IMO cargo it is   51 52 53 54 55

agreed that any possible extra insurance and any special and/or additional safety equipment required by local law or regulations in scheduled port(s) of call to be provided and paid for by Charterers.

Charterers are permitted to ship Calcium Hypochlorite as classified in the IMDG Code (and any future amendments to the IMDG Code) under UN1479, UN1748, UN2208, UN2880, UN3077, UN3485, UN3486 or UN3487. Such cargo to be carried on a full container load basis and packaged, loaded, stowed, segregated and documented strictly in accordance with the applicable requirements of the IMDG Code and the Guidelines for the Carriage of Calcium Hypochlorite, jointly published by CINS (Cargo Incident Notification System) and the International Group of P&I Clubs in May, 2016 or any subsequent amendments thereto. Calcium Hypochlorite from China shall be always excluded.

~~(c) Live Animals: Live animals may be carried only with the prior consent of the Owners and the Master.~~   56 57
~~(d) Radioactive Goods: Radioactive goods other than Isotopes shall be excluded. Radioactive Isotopes may be carried only with the prior consent of the Owners and the Master and provided that they are of such a category as not to invalidate the Vessel's P & I cover.~~   58 59 60 61
~~(e) Arms & Ammunition: Arms and ammunition may be carried only with the prior consent of the Owners and the Master.~~   62 63

Charterers will not load livestock, nuclear and radioactive products (except UN2912, Radioactive Material, low specific activity (LSA-1) and UN2911 Radioactive Materiel except package-instruments or articles, such as car light bulbs for example, always in accordance with the provisions of the current International Maritime Dangerous Goods Code and practices as guided by the World Nuclear Transport Institute), waste cargo (except non-hazardous waste as classified according to the Basel Convention), creosoted goods and tar products, loaded bombs, dynamite, TNT, etc., (however blasting caps and certain commodities of IMDG Class 1 sub class S and G such as for example pyrotechnics and airbags will be accepted always in accordance with the current International Maritime Dangerous Goods Code), wet hides, bulk cargoes (except Non-Dangerous Goods commodities transported as bulk in containers using liner bag system), logs (except when adequately protected from leakage of sap), pollutants (except where classified for carriage according to the current International Maritime Dangerous Goods Code), ammonium nitrate (except IMDG Class 9 UN2071), toxic cargoes always excluded.

**5.  Owners' Obligations**   64
Except as provided elsewhere in this Charter Party, the Owners shall, at their expense, maintain the Vessel in the Class as indicated in <u>Box 10</u>, in a thoroughly efficient state of hull and machinery and in every way fitted for the service throughout the currency of this Charter Party.   65 66 67 68
The Owners shall, inter alia, provide and pay the cost of the following:   69
(a) *Container Lashings:* (See Clause 10 (a)).   70
(b) ~~Crew Assistance with inter alia:~~   71
(i) ~~preparing the Vessel's cranes, derricks, winches and/or cargo handling gear for use;~~   72 73
(ii) opening and closing any hatches (other than pontoon type hatches), ramps and other means of access to goods and containers,   74 75
(iii) docking, undocking and shifting operations in port,   76
(iv) bunkering,   77
(v) maintaining power during loading and discharging operations,   78
(vi) ~~instructing crane-drivers and winchmen in use of Vessel's gear,~~   79
(vii) supervising stevedores lashing and unlashing goods and containers and the regular checking of lashings at sea when weather conditions permit (See Clause 10 (d)(ii)),   80 81 82
(viii) monitoring, recording performances and, when available, supplying labour for the repairing of the Charterers' refrigeration machinery, weather permitting (See Clause 17 (b)).   83 84 85
(ix) plugging / unplugging of reefer containers, if required, as Charterers' servants.
The above services shall be rendered by the crew if required, provided port and local labour regulations permit, and except when repairing the Charterers' refrigeration machinery any overtime incurred shall be for the account of the Owners.   86 87 88 89
(c) *Documentation:* Any documentation relating to the Vessel that may be required to permit the Vessel to trade within the limits as indicated in <u>Box 22</u>, including, but not limited to, sanitary certificate, certificates of financial responsibility for oil pollution, provided such oil pollution certificates are obtainable from the Owners' P&I club or some other available source, valid international tonnage certificate, Suez and Panama tonnage certificates, valid certificate of registry and certificates relating to the strength and/or serviceability of the Vessel's gear (See Clause 11 (a)).   90 91 92 93 94 95 96 97

This document is a computer generated BOXTIME form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**"BOXTIME" Charter Party**

(d) *Insurance of the Vessel:* (See Clause 16 ). 98
(e) *Fumigation and/or deratisation:* The provision of certificates thereof at 99
the commencement of the Charter Party and the renewal thereof throughout 100
the Charter Party, except if this is required as a result of the Charterers' 101
goods and containers carried under this Charter Party, in which case these 102
expenses shall be for the account of the Charterers. 103
(f) *Smuggling:* In the event of smuggling by the Master, Officers and/or crew, 104
the Owners shall bear the cost of any fines, taxes or imposts levied and the 105
Vessel shall be off hire for any time lost as a result thereof (See Clause 9 (b)). 106

**6.   Charterers' Obligations** 107
Except as provided elsewhere in this Charter Party, the Charterers shall 108
provide and pay the costs of the following throughout the currency of this 109
Charter Party: 110
(a) *Provision of Details:* The provision of full and accurate details of goods 111
and containers (including any documentation required at any ports of call), 112
their weights and stowage positions to the Master as early as possible but 113
not later than preferably upon arrival at the port of loading, with regular 114
updating

thereof and the provision of a full and accurate plan of the stowage of all 115
goods and containers actually loaded prior to sailing. Such details shall in- 116
clude:- 117
    i)    gross weights of containers, 118
    ii)   any feature of the goods requiring attention by the crew during the voy- 119
          age, including, but not limited to, any hazardous or other dangerous 120
          feature and/or the need for carriage within a specified temperature 121
          range. 122
(b) *Instructions to the Master:* The Master, although appointed by the Ow- 123
ners, shall at all times during the currency of this Charter Party be under the 124
orders and directions of the Charterers as regards employment and 125
agency. The Charterers shall be obliged at all times to furnish the Master 126
with full and timely instructions. 127
(c) *Stevedoring:* (See Clause 10 (d)(ii)). 128
(d) *Charterers' Lashings:* (See Clause 10 (b)). 129
(e) *Condition of Containers:* The Charterers warrant that all containers car- 130
ried pursuant to this Charter Party have been constructed to a design ap- 131
proved by a Classification Society and are properly maintained. 132
(f) *Stowage in Containers:* The correct stowage and safe securing of all 133
goods within containers (including securing to flat rack containers) to with- 134
stand the rigours of the voyage. 135
(g) *Stowage Planning:* (See Clause 10 (c)). 136
(h) *Operating Expenses:* All port charges, light and canal dues, pilotage, 137
towage, consular charges, compulsory expenses for launches, garbage, 138
watchmen / guards and all other charges and expenses relating to
the operation of the Vessel not otherwise provided for in this Charter Party, 139
other than charges or expenses relating to the crew. 140
(i) *Bunker Fuel:* (See Clause 12). 141
(k) *Agency Costs:* All agency fees and expenses for normal ship's husban- 142
dry at all ports or places of call. 143

Normal Ship's husbandry is determined as clearance by customs and
immigration of Vessel, minor crew changes, minor deliveries of stores and
spare parts. Normal ship's husbandry is to be attended by Charterers free
of any agency fee but actual expense incurred e.g. physical transport of
stores, landing of garbage when applicable etc. to be charged Owners at
actual costs. Charterers will not entertain Owners expsense for taxi, rail
or road transport of crew, which is to be paid by Master by means of funds
available through cash to Master.

In case of major Vessel repairs, crew's hospitalization, embarkation or
disembarkation for more than 4 men, general average or other major items
are to be handled by Charterers' Agency, Owners are to pay normal
agency fee in accordance with local tariffs plus expensese incurred, or
Owners are to appoint their owne Agents.

(i) *Damage to Vessel:* The Charterers are not responsible for a Any damage 144
to the Vessel or loss or damage to its
equipment caused by stevedores during the currency of this Charter Party 145
unless same is
shall be reported by the Master to the Charterers or their agents and the 146
stevedore(s) involved, in writing,
within immediately and in no event later than 24 hours of after the occurrence 147
or as soon as possible thereafter but la-
test when the loss or damage could have been discovered by the exercise of 148
due diligence. The Master shall endeavour to obtain written acknowledge- 149
ment by the party causing loss or damage prior to the Vessel's departure 150
unless it is made good in the
meantime. The Charterers shall pay for stevedore damage whether or not 151

payment has been made by stevedores to the Charterers. 152

When claiming such loss or damage, Owners shall use the format and
numbering system provided by Charterers. Any invoice forwarded to
Charterers must be broken down with an amount per stevedore damage
report.

In any event, Charterers shall not be responsible for any damage to the
Vessel's rubber seals or gangway, unless Owners prove that such
damage was caused by Charterers and/or Stevedores during cargo
operations.

If the Vessel is geared, Owners shall arrange for an independent surveyor
to survey any damage to crane wires. Owners shall ensure that the Vessel
has one set of spare wires on board, and when used a new set of spare
wires must be provided within 30 days. In the event that replacement of
wire is necessary, Charterers will pay wire replacement costs less 20%
depreciation per year. Charterers are not liable if the damage to wires is
caused by lack of maintenance.

Damage or loss for which the Charterers are responsible affecting 153
seaworthiness / cargo worthiness,
or the proper working of the Vessel and/or her equipment, shall be repaired or 154
replaced by Owners are Owners' subcontractors
without delay to the Vessel after each occurrence in the Charterers' time 155
and shall be paid for by the Charterers. Other repairs to damage or 156
replacement works for which
the Charterers are responsible shall also be arranged by Owners to be carried 157
out in the Charterers'
time but, if this is not possible, such repairs or replacement shall be carried out 158
whilst the
Vessel is in drydock in the Owners' time provided that such repairs will not 159
exceed time spent for Owners' drydock work and provided this does not
interfere with
the Owners' repair work, or by the Vessel's crew at the Owners' conve- 160
nience. In any event, unless otherwise agreed with Charterers, such repairs 161
or replacement shall be executed as aforesaid no later than 12 months
after the damage occurred. All reasonable direct costs of such repairs shall
be for the Charterers' account and shall be considered full and final
settlement   between Owners and Charterers thereof. Charterers shall not
be responsible for any costs arising from damage which they have not had
the reasonable opportunity to inspect prior to Owners arranging the repair
or replacement.
(m) *Redelivery:* Redelivery of the Vessel at the Place of Redelivery as indi- 162
cated in Box 21, unless agreed by the Owners or provided elsewhere to the 163
contrary, in the same condition to that pertaining when the Vessel was deli- 164
vered, fair wear and tear excepted, at the end of the period as indicated in 165
Box 23. The Charterers shall give the Owners one months 60 days' 166
approximate notice of for range and thereafter 45/30/15/7/5 approximate
notice for redelivery and 3/2/1 definite notice of redelivery of the Vessel.
expected
date and Place of Redelivery, which advice shall be updated 10, 5 and 2 167
days prior to expected redelivery. 168
At the time of redelivery the Vessel shall be clean and fit to load goods and 169
ISO standard containers. If the Charterers have changed the configuration 170
of the Vessel to carry different size ISO standard containers or non ISO 171
standard containers, they shall, in their time and at their cost, prior to rede- 172
livery, return the Vessel to its previous configuration, unless the Owners 173
agree to waive this requirement, in which case the Charterers shall return 174
the Vessel to its previous configuration, at their cost, after redelivery at such 175
time and place stipulated by the Owners but in the Owners' time. Without 176
prejudice to any other claim the Owners may have under this Charter Party 177
the Owners shall not be obliged to accept redelivery of the Vessel before it is 178
returned to its previous configuration. 179
(n) *Additional Premiums:* All additional premiums for hull and machinery, 180
war risks, including blocking and trapping, or protection and indemnity in- 181
surance incurred by the Owners over and above the premiums payable by 182
the Owners. The Owners shall allow the Charterers to arrange these addi- 183
tional covers on their behalf if the Charterers so request and if the proposed 184
insurers and terms are acceptable to the Owners. If the Charterers arrange 185
such insurance the Charterers' insurers shall confirm cover latest 24 hours 186
before the Vessel is due to be exposed to the risk so insured (See Clause 187
18). 188
(o) *Advances to Master:* The Charterers shall procure that their local agents 189
at all ports of call shall, upon request by the Master, make available to 190
him for disbursements, which advances the Charterers may recoup from the 191
Owners by deduction from the hire payments in accordance with Clause 192
7 (e). If requested by the Owners or by the Master directly (deemed on his 193

This document is a computer generated BOXTIME form printed by authority of BIMCO.  Any insertion or deletion to the form must be clearly visible.  In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply.  BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**"BOXTIME" Charter Party**

and the Owners' joint behalf), the Charterers may from time to time at their discretion agree to advance cash to the Master covering the Vessel's ordinary disbursements,

Any requests for cash advances shall be made in writing and be received by the Charterers minimum 5 working days before the intended cash delivery date.

On production of supporting vouchers, amounts advanced may be deducted from current and future hire at Charterers' discretion and shall furthermore be subject to prior deduction by the Charterers of a 2.5% fee to Charterers.

The Charterers are not privy to and shall not be responsible whatsoever for the use of cash advances, and the Owners hereby undertake to indemnify and hold harmless the Charterers for any consequences of cash advances made.

(b) *Contraband:* In the event that contraband and/or unmanifested drugs or | 194
goods are found to have been shipped as part of the goods and/or in con- | 195
tainers on board, any fines, taxes or imposts levied shall be for the Charter- | 196
ers' account, and the Vessel shall remain on hire during any time lost as a | 197
result thereof any security required shall be provided by the Charterers, | 198
unless it can be established that the Master, Officers and/or
crew are involved in smuggling (See Clause 5 (f)). In this event any security | 199
required shall be provided by the Owners Charterers. | 200

**7.** **Hire**
(a) *Rate:* The Charterers shall pay hire at the rate stated in Box 25, per day or | 201
pro rata for part of a day, from the time the Vessel is delivered to the Charter- | 202
ers until her redelivery to the Owners. All calculation of hire shall be made by | 203
reference to Universal Time Co-ordinated (U.T.C.). | 204
(b) *Payment:* Payment of hire shall be made in cash in full and without dis- | 205
count discount for periods of one month, semi-monthly in advance. Each | 206
hire period following the calendar month payable to Owners on the 15th of | 207
the same month. Payment of hire shall be made so as to be received by
Owners in Onwers nominated bank account.

If hire or any instalment thereof is not paid
as aforesaid, the Charterers shall pay interest at the rate of 0.1 per cent per | 208
day on the amount outstanding from and including the due date until the | 209
date of payment. | 210
(c) *Default:* In default of punctual and regular payment as herein specified, | 211
the Owners may require the Charterers to make payment of the amount due | 212
within 96 running hours of receipt of notification from the Owners, failing | 213
which the Owners will have the right to withdraw the Vessel without preju- | 214
dice to any claim the Owners may have against the Charterers under this | 215
Charter Party. Further, so long as the hire remains unpaid, the Owners shall | 216
be entitled to suspend the performance of any and all of their obligations | 217
hereunder and shall have no responsibility whatsoever for any consequen- | 218
ces thereof in respect of which the Charterers hereby indemnify the | 219
Owners. Hire shall continue to accrue and any extra expenses resulting | 220
from such suspension shall be for the Charterers' account. | 221
(d) *Redelivery Adjustment:* If at the time of any hire payment that is due | 222
within three months prior to Charterers' planned date of redelivery the
value of:
(i) bunker fuel on board at redelivery; and/or
(ii) advancements, disbursements and expenditure that have or will be
incurred on Owners' behalf in accordance with Clause 7 (a) is/are
reasonable expected by Charterers to exceed the remaining hire due under
the Charter Party, Charterers may deduct such amounts from the hire
payment(s) made in any or all of those three months. Such deductions
shall not be considered as an indication or notice of redelivery of the
Vessel by Charterers.
After the Vessel is redelivered to the Owners any difference shall be
refunded to or paid by the Charterers as the case may require. The value
of bunker quantities onboard at redelivery after deductions in prior hires
shall be settled no later than 3 weeks after redelivery of the Vessel.
Charterers shall provide a preliminary final account no later than three
months after redelivery of the Vessel.
~~Should the Vessel be on her voyage towards the~~
~~Place of Redelivery at the time payment of hire becomes due, said payment~~ | 223
~~shall be made for the estimated time necessary to complete the voyage, less~~ | 224
~~disbursements made by the Charterers for the Owners' account, including~~ | 225
~~the estimated value of bunker fuel on board at redelivery. When the Vessel is~~ | 226
~~redelivered to the Owners any difference shall be refunded to or paid by the~~ | 227
~~Charterers as appropriate, but not later than three months after redelivery of~~ | 228
~~the Vessel.~~

(e) *Deductions:* On production of supporting vouchers the Charterers shall | 229
be entitled to deduct from payments of hire any disbursement and expenditure | 230
incurred on be- | 231
half of the Owners ~~which may be payable by the Owners~~ under this Charter | 232
Party. If such disbursement or expenditure are is incurred in a currency other | 233
than that in which
hire is payable, conversion into such currency for the purpose of deduction | 234
shall be effected at the rate of exchange ~~at the place of the bank where hire~~ | 235
~~is paid~~ prevailing on the date when the expenditure was incurred. | 236
(f) *Extension:* The Charterers shall arrange the Vessel's trading so as to per- | 237
mit redelivery at the place and in the period as indicated in Boxes 21 and 23, | 238
respectively. If the Vessel is not chartered for a minimum/maximum period | 239
and the Vessel is sent on a final voyage scheduled rotation reasonably | 240
calculated to allow rede-
livery within such period at the Place of Redelivery as provided under this | 241
Charter Party, and the voyage scheduled rotation is prolonged for reasons | 242
beyond the Charter-
ers' control, the Charterers shall have the use of the Vessel at the rate and | 243
on the conditions of this Charter Party for such extended time as may be re- | 244
quired for completion of said voyage and redelivery as aforesaid. | 245

**8.** **Off Hire**
After delivery in accordance with Clause 1 hereof, the Vessel shall remain | 246
on hire until redelivered in accordance with Clause 6(m), except for the fol- | 247
lowing periods: | 248
(a) *Unable to Comply with Instructions:* If the Vessel is unable to comply with | 249
the instructions of the Charterers on account of: | 250
(i)   any damage, defect, breakdown, or deficiency of the Vessel's hull, ma- | 251
      chinery, equipment or repairs or maintenance thereto, including dry- | 252
      docking, excepting those occasions when Clause 8 (h) applies, | 253
(ii)  any deficiency of the Master, Officers and/or crew, including the fai- | 254
      lure, refusal or inability of the Master, Officers and/or crew to perform | 255
      service immediately required, whether or not within the control of the | 256
      Owners, | 257
(iii) arrest of the Vessel at the suit of a party where a claim is not caused by | 258
      the Charterers, their servants, agents or sub-contractors (See Clause | 259
      5(f)), | 260
(iv)  any delay occasioned by any breach by the Owners of any obligation | 261
      or warranty in this Charter Party, | 262
If any of the above incidents affect the full use of the Vessel, it shall be off | 263
hire for time actually lost until the end of the stevedore's shift. If they | 264
partially affect the use of the Vessel, it shall be off hire to the ex- | 265
tent such incidents affect the Charterers' use of the Vessel (See also Clause | 266
11 (b)). | 267
(b) *Deviation:* In the event of the Vessel deviating (which expression inclu- | 268
des putting back, or putting into any port or place other than that in which | 269
she is bound under the instructions of the Charterers) other than to save life | 270
or property, hire shall cease to be payable from the commencement of such | 271
deviation until the time when the Vessel is again ready to resume her service | 272
from a position not less favourable to the Charterers than that at which the | 273
deviation commenced, provided always that due allowance shall be given | 274
for any distance made good towards the Vessel's destination and any bun- | 275
kers saved. However, should the Vessel alter course to avoid bad weather or | 276
be driven into port or anchorage by stress of weather, the Vessel shall re- | 277
main on hire and all costs thereby incurred shall be for the Charterers' ac- | 278
count. | 279
(c) *Blocking and Trapping:* If during the currency of this Charter Party the | 280
Vessel is blocked or trapped in circumstances where Clause 19 (h) applies, | 281
the Vessel shall be off hire for the period blocked or trapped. If the Vessel is | 282
blocked or trapped for a period of 365 days this Charter Party shall be termi- | 283
nated. | 284
(d) *Requisitions:* Should the Vessel be requisitioned by any government or | 285
governmental authority during the period of this Charter Party, it shall be off | 286
hire during the period of such requisition and any hire or other compensa- | 287
tion paid by any government or governmental authority in respect of such | 288
requisition shall be paid to the Owners. However, the Charterers shall have | 289
the option of cancelling the balance period of this Charter Party, provided | 290
this option is exercised within 14 days of receipt of notice of requisition. | 291
(e) *Loss of Time:* In the event of loss of time for which the Owners are res- | 292
ponsible, including but not limited to terms of employment of Master, Offic- | 293
ers and/or crew, the Vessel shall be off hire for the time thereby lost. | 294
Any time during which the Vessel is off hire under this Charter Party may be | 295
added to the charter period, at the option of the Charterers. Such option | 296
shall be declared not less than two months before expected latest redelivery, or | 297
latest two weeks after the event if less than two months before expected re- | 298

This document is a computer generated BOXTIME form printed by authority of BIMCO.  Any insertion or deletion to the form must be clearly visible.  In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply.  BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

PART II
"BOXTIME" Charter Party

delivery. The applicable rate shall be the relevant rate at the time when the   299
Vessel was off hire.

(f) Cancellation: Should the Vessel be off-hire for more than 120
consecutive days, or should an off-hire event be reasonably estimated by
Owners in good faith to last for more than 120 consecutive days, or
alternatively should the aggregate off-hire throughout the period of this
Charter Party exceed 185 days in total, the Charterers shall have the
option to cancel this Charter Party with immediate effect and redeliver
when Vessel is free of cargo, and hire paid in advance, payment for
bunkers on redelivery, and disbursements are to be immediately refunded
by the Owners. In case the Owners estimate the off-hire event to exceed
120 days, Charterers to declare within 3 working days, whether or not they
wish to cancel the Charter Party.

Above condition shall not apply to the firm period stipulated in BOX 23.,
but only to apply for the optional period if declared.

(g) Phase in after off-hire: Notwithstanding anything to the contrary in this
Charter Party, it is agreed that if the Vessle is off-hire for more than 7
consecutive days for any other reason than scheduled dry-docking,
Charterers have the option to let the Vessle remain off-hire (for Owners'
account) for up to 48 hours for each 7 consecutive days the Vessel has
been off-hire. However, Charterers cannot delay the phase-in for more
than a maximum of 144 hours regardless how long the Vessel has been
off-hire. Owners to keep Charterers closely updated on expected phase-in
date and Charterers to advise latest three days prior to expected phase-in
date whether they wish to exercise their right to delay the phase-in and at
the same time advise when they wish the Vessel to phase back in.

(h) Fuel/bunkers and extra expenses during off-hire: For any time during
which the Vessel is off-hire under this Charter party, the payment of hire
shall cease and the cost of any extra fuel/bunkers consumed in
consequence. Any extra expenses of the vessel during off hire to be for
Owners' account.

9. Loss of Vessel                                                                300
Should the Vessel be lost, or become a constructive total loss, hire shall    301
cease at noon on the day of her loss or constructive total loss, and if mis-   302
sing, from noon on the date when last heard of, and any hire paid in advance   303
and not earned shall be returned to the Charterers and payment of any hire     304
due shall be suspended until the Vessel is reported safe.                       305

10. Lashings and Stevedoring                                                     306
(a) Owners' Lashings: The Owners shall supply and maintain in good work-       307
ing order throughout the currency of this Charter Party sufficient lashing      308
and securing equipment to facilitate the proper lashing and securing in ac-     309
cordance with the plan supplied by the Owners of the maximum number of          310
ISO standard containers which may be carried in accordance with the de-         311
tails provided in PART III hereto. The Owners further warrant that both the     312
strength of the lashings and the design of the lashing pattern are adequate     313
for the stowage in accordance with PART III hereto and that these have been     314
approved by the Vessel's Classification Society.                                315
(b) Charterers' Lashings: Should any additional or alternative lashings to      316
those supplied by the Owners be required, these shall be supplied by the        317
Charterers at their expense. All additional or alternative lashing to be        318
classification approved and flag state approved and in good working order.
Should the Charterers supply gear, equipment
or stores, the Master shall keep a record of it and care for it. Such gear,      319
equipment or stores shall be redelivered to the Charterers at the time requi-   320
red by the Charterers in the same condition as supplied fair wear and tear      321
excepted.                                                                       322
(c) Stowage Planning: The Charterers shall ensure that stowage is effected      323
in accordance with the requirements of this Charter Party and of the Ves-       324
sel's stability including, inter alia, that stack and tier weights are not ex-  325
ceeded and that heavy containers are not stowed over light containers on or     326
under deck, except with the Master's prior approval.                            327
(d) Stevedoring:                                                                328
(i)    The Charterers shall provide and pay for the cost of all stevedoring op- 329
       erations during the currency of this Charter Party including, inter alia,  330
       receipt, loading, handling, stowing, lashing, securing, unsecuring, un-    331
       lashing, unstowing, discharging, tallying and delivering of all uncontai-  332
       nerised goods and containers and shall be liable to the Owners for all     333
       loss or damage caused to the Vessel by the improper or careless per-       334
       formance of such operations.                                             335
(ii)   The Master shall supervise stevedores undertaking the tasks outlined       336
       in Clause 10 (d) (i) to ensure that these are done correctly and to his     337
       satisfaction. The Master shall ensure that all lashings are regularly       338
       checked whilst at sea, weather permitting.                               339
(iii)  Lashing/securing/unlashing/unsecuring of containers to be

performed by shore labour to the satisfaction of the Master and under the
supervision of Officers and Crew. Provided local port regulations permit and
subject to availability of crew, lashing/unlashing/securing/unsecuring may be
performed by ship's crew as Charterers' servants, subject to Masters'
approval, which not to be unreasonably withheld. In such case Charterers
paying as per clause 26. It is understood that the crew will be considered as
Charterers' servants. Charterers paying as per clause 26. The total amount to
be paid to the Vessel's Master.

(e) Liability: Except in respect of the failure of any lashing supplied by the    340
Charterers, the Owners shall be responsible, subject to the provisions of        341
Clause 17., for the consequences of the failure of any lashings or lashing       342
pattern design or execution or the failure to properly service lashings during   343
the voyage.                                                                       344

11. Vessel's Gear                                                                 345
(a) Regulations: The Owners' cargo gear if any, and any other equipment          346
shall comply with the regulations of the countries to which the Vessel will be   347
employed and the Owners shall ensure that the Vessel is at all times during      348
the currency of this Charter Party in possession of valid certificates of effi-  349
ciency to comply with such regulations. If stevedores are not permitted to       350
work due to failure of the Master and/or the Owners and/or the Owners'           351
agents to comply with the aforementioned regulations or because the Ves-         352
sel is not in possession of such valid certificates of efficiency, then the      353
Charterers may suspend hire for the time lost thereby and the Owners shall       354
pay all expenses incurred incidental to and resulting from such failure (see     355
Clause 6 (c)).                                                                   356
(b) Condition: All cargo-handling gear, including derrick(s), crane(s) and        357
winch(es) if any, shall be kept in good working order and the Owners shall       358
maintain, repair and/or replace such gear whenever necessary. In the event       359
of loss of time due to a breakdown of derrick(s), crane(s) or winch(es) for      360
any period by reason of disablement or insufficient power, hire shall be re-     361
duced pro rata for the period of such inefficiency in relation to the number of  362
hatches affected, unless caused by mishandling by the Charterers or their        363
servants. If the Charterers continue working by using shore crane(s) the         364
Owners shall pay such cranage but not exceeding the hire payable for such        365
period, in which case the Vessel shall act be off hire pro rata as stipulated    366
above. The Vessel shall, however, be pro rata off hire if shore cranes are       367
not available during stoppages of derrick(s), crane(s) or winch(es) and all      368
other unavoidable expenses thereby incurred shall be for the Owners' ac-         369
count.                                                                          370
(c) Suez and Panama Canal: The Vessel shall be maintained during the cur-        371
rency of this Charter Party with all necessary fittings for Suez and Panama      372
Canal transit in good working order.                                            373
(d) Refrigeration: The Owners shall ensure that all refrigeration facilities as  374
described in PART III are maintained in good working order throughout the         375
currency of this Charter Party.                                                 376
(e) Lighting: The Owners shall ensure that the Vessel will supply sufficient     377
lighting to deck and holds to permit 24 hour working free of expense to the      378
Charterers and that such lighting will comply with the port regulations at all   379
ports of call throughout the currency of this Charter Party.                     380

12. Bunker Fuel                                                                   381
(a) Quantity at Delivery/Redelivery: The Vessel shall be delivered with ap-      382
proximately the quantity of fuel as indicated in Box 16 and, unless indicated    383
to the contrary in Box 17, the Vessel shall be redelivered with an approxima-    384
tely similar quantity, provided that the quantity of fuel at redelivery is at least 385
sufficient to allow the Vessel to reach safely the nearest port at which fuel of  386
the required type is available.                                                   387
The vessel shall be delivered with approximate the quantity of fuel
indicated in box 16 and Charterers shall redeliver the vessel with minimum
the same quantity, however always sufficient to allow the vessel to reach
safely the nearest port at which fuel of the required type is available.
(b) Pre and Post Charter Bunkering: Provided that it can be accomplished         388
without hindrance to the operation of the Vessel, the Owners shall allow the     389
Charterers to bunker for the account of the Charterers prior to delivery and     390
the Charterers shall allow the Owners to bunker for the account of the Ow-       391
ners prior to redelivery, in both cases by prior arrangement between the          392
parties.                                                                        393
(c) Purchase Price: Unless otherwise stated in Boxes 16 and 17, the Charter-     394
ers shall purchase the fuel on board at delivery and the Owners shall pur-       395
chase the fuel on board at redelivery at the Platts Oil Gram mean prices at       396
the ports and dates of delivery and redelivery, respectively, or the nearest     397
bunkering port thereto. Charterers not to pay for the bunkers onboard on         398
delivery. Owners shall purchase the fuel onboard on redelivery at the
Platts Oil Gram mean prices at the port and date of redelivery or the
nearest bunkering port thereto.
(d) Fuel Oil Specification: As per ISO standard 8217, fuel standard,
revision 2010 and any subsequent revision thereof. Diesel Oil
Specification: ISO 8217, Fuel Standard revision 2010 and any subsequent

This document is a computer generated BOXTIME form printed by authority of BIMCO. Any insertion or deletion to this form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

PART II
"BOXTIME" Charter Party

revision thereof. The specific fuel grade to be supplied in accordance with the Vessel Description PART III and box 14. Charterers and Owners are aware of the MARPOL ANNEX VI Rules and will comply with same including any amendments that may come into force during the duration of this Charter Party in connection with bunkering wherever applicable. Charterers and Owners are aware on new EU Sulphur regulation, i.e. directives 2005/33/EC amending directive 1999/32/EC coming into force 01ˢᵗ January 2010 regulates all fuels used at EU berth and will comply with same including any amendments that may come into force during the duration of this Charter Party when ordering bunker.

Owners/Vessel will allow Charterers to fill the tanks upto 95 per cent capacity. Futhermore, the Owners/vessel will allow commingaling of different fuels, provided that adequate spot test has been carried out before mixing in the tanks is done. Charterers to provide spot test kits to the vessel for this purpose.

(e) Consumption: The Vessel's fuel consumption in port and at sea shall not exceed the amounts shown in PART III, as per vessel's specification. In case of dispute Owners and Charterers should settle the matter reasonably and amicably, however, if they fail to do so, the dispute should be referred to a mutually agreed independent third party expert.

(f) Bunkering:

(i)    The Charterers shall supply fuels of the specification and grades staed in box 14. The Chief Engineer shall co-operate with the Charterers' bunkering agents and fuel suppliers and comply with their requirements during bunkering, including but not limited to checking, verifying and acknowledging sampling, reading or soundings, meters, etc. before, during and/or after delivery of fuels.

(ii)    During delivery a representative sample of each grade of fuels shall be drawn throughout the entire bunkering operation and that sample shall be thoroughly mixed and carefully divided into five (5) identical samples. The sample shall be drawn by continuous dripping at receiving vessels bunkering manifold.

(iii)    The five (5) identical samples shall be securely sealed and provided with labels showing the Vessel's name, identity of delivery facility, product name, delivery date and place and point of sampling and seal number, authenticated with the Vessel's stamp and signed by the supplier's representative and the Master of the Vessel or his authorized representative, 3 samples shall be retained by the Vessel of which one shall be retained on board for future possible Marpol requirements, two samples to be handed over to the barge. Samples including potential samples received from the bunker barge are to be retained onboard in accordance with Marpol guidelines until fuel has been used, however, always for a minimum period of 12 months.

(iv)    The Vessel will participate in the DNV, Lintec or similar fuel quality testing programme. Fuel analysis to be carried out after each bunkering and results to be shared between Owners and Charterers. Fuel bunkering not to be burned prior test results known. If the test results show fuel being off-spec, bunkers not to be burned without consent of the Owners & Charterers. If any claim should arise in respect of the quality or specification of the fuel supplied, the Owners and the Charterers agree to have a second sample from the vessel analysed by a mutually agreed qualified analyst Det Norske Veritas, Lintec or similar fuel testing programme.

If the Vessel is already signed up with a fuel quality testing programme as above, Charterers to compensate Owners according to Clause 26 per month pro rata. If the Vessel is not signed up, Charterers will sign the vessel up and deduct a monthly contribution according to Clause 26 per month pro rata from each monthly hire payment.

The results to be forwarded to the following e-mail addresses;

MOTBUNKER@MAERSK.COM
CPHFUEL@MAERSK.COM
MMTSEPOC@MAERSK.COM
CENOPSBNK@MAERSK.COM

(V)    Sludge removal. if any, is always to be for Charterers' account and in Charterers' time. Master is to follow directions from Charterers regarding landing of sludge including, but not limited to any relevant procedures required by Charterers in terms of reporting, documentation

and registration of sludge onboard/landed. Sludge is only to be landed to facilities and companies duly approved by Charterers. Earings from sludge removal should be documented and reported to Charterers, which Charterers are entitled to deduct from any subsequent hire payment.

~~(d) Specification: The Charterers shall supply fuel of the B.S.M.A. 100:1989 specification or any amendment thereto as indicated in Box 14.~~ — 399 / 400
~~(e) Consumption: The Vessel's fuel consumption in port and at sea shall not exceed the amounts shown in PART III, at all times for port consumption and in smooth water with winds not exceeding Beaufort Scale 4 for consumption at sea.~~ — 401 / 402 / 403 / 404
~~(f) Bunkering: The Chief Engineer shall co-operate with the Charterers' bunkering agents and fuel suppliers and comply with their requirements during bunkering, including, but not limited to, checking, verifying and acknowledging readings or soundings, meters etc. before, during and/or after delivery of fuel.~~ — 405 / 406 / 407 / 408 / 409
~~Three (3) samples of all fuel shall be taken during delivery, sealed and signed by suppliers, Chief Engineer and the Charterers' agent, each of whom should retain one sample. If any claim should arise in respect of the quality or specification of the fuel supplied, the Owners and the Charterers agree to have samples of the fuel analysed by a mutually agreed qualified analyst.~~ — 410 / 411 / 412 / 413 / 414 / 415

**13. Charterers' Requirements** — 416
(a) Plans: On-signing Before commencing and during the period of this Charter Party the Owners shall, if the Charterers so — 417
request, furnish the Charterers with the following documents in English: — 418
(i)    General Arrangement Plan — 419
(ii)    Capacity Plan — 420
(iii)    Container Stowage Plan — 421
(iv)    Plan of Deck and (where the Vessel not cellular) Under-Deck Container Lashing Plan approved by the Vessel's Classification Society. — 422 / 423
(v)    Trim and Stability Book — 424
(vi)    Hydrostatic Curves Plan — 425
(vii)    Loading Scale — 426
(viii)    Tank Plan — 427
and any other operational documents that the Charterers may reasonably request and which are necessary for the safe and efficient operation of the Vessel. ~~All documents received by the Charterers shall be returned to the Owners on redelivery.~~ — 428 / 429 / 430 / 431
(b) Flag, Funnel, Name and Configuration: The Charterers, if required, shall be allowed to by their house flag, paint the funnel in the Charterers' colours and/or the name of the Line on the Vessel's side, change the Vessel's name, subject to the authorities' approval, and/or change the Vessel's container stowage configuration provided Owners' approval has been obtained to carry different sized containers, all during the cur- — 432 / 433 / 434 / 435 / 436
rency of this Charter Party. If the Charterers elect to exercise any or all of these options all alterations necessary shall be effected during the Charter-ers' time and at the Charterers' expense. Unless the Owners elect to waive this requirement or enter into an alternative agreement with the Charterers, the Vessel shall be returned to its condition prior to the commencement of the Charter Party at the Charterers' expense before redelivery. — 437 / 438 / 439 / 440 / 441 / 442
(c) Ballast Warranty: The Owners warrant that the Vessel is capable of operating under this Charter Party in ballast without requiring any solid ballast and using fuel and water ballast only. — 443 / 444 / 445
(d) Weather Routing: The Charterers may supply the Master with weather routing information during the currency of this Charter Party. In this event the Master shall comply with the reporting procedure of the Charterers' weather routing service. — 446 / 447 / 448 / 449
(e) Communications Facilities: The Owners shall permit the Charterers use of the Vessel's communication facilities at cost during the currency of this Charter Party. Should the Charterers request the Vessel to be entered into a satellite tracking programme same will be accepted by Owners. All expenses in this respect are to be borne by Charterers. — 450 / 451 / 452
(f) Logs and Witnesses: The Owners shall maintain full deck, engine room and, where appropriate, refrigeration logs during the currency of this Charter Party and the Charterers shall have full access to all the Vessel's logs, rough and official, covering this period. The Owners undertake to produce all such documentation promptly upon request of the Charterers. — 453 / 454 / 455 / 456 / 457
The Owners also undertake to endeavour to assist the Charterers by producing or assisting the Charterers to trace the Vessel's witnesses as may be requested by the Charterers to give testimony in connection with matters arising in relation to this Charter Party and such expenses as may be incurred shall be for the Charterers' account. — 458 / 459 / 460 / 461 / 462
(g) Replacement of Master and Officers: If the Charterers shall have reason to be dissatisfied with the conduct of the Master or Officers, the Owners shall, on receiving particulars of the complaint, investigate same and, if confirmed, replace the offending party(ies) at the Owners' expense. — 463 / 464 / 465 / 466

This document is a computer generated BOXTIME form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**"BOXTIME" Charter Party**

(h) *Supercargo and/or representative:* The Owners shall provide and maintain 467
a clean and ade- 468
quate room for the Charterers' supercargo and/or representative if any,
furnished to the same
standard as officers' accommodation. Supercargo and/or representative shall 469
be victualled with
the Vessel's officers. The Charterers shall pay for accommodation and vic- 470
tualling of any supercargo at the daily rate as indicated in Box 28. 471
(i) *Victualling:* The Owners, when requested and authorised by the Charter- 472
ers or their agents, shall victual other officials and servants of the Charter- 473
ers at the monthly lumpsum rate per person per meal as indicated in Box 29. 474
(k) *Sub-Letting:* The Charterers shall have the right to sub-let all or part of 475
the Vessel with the prior consent of the Owners, which shall not be unrea- 476
sonably withheld, whilst still remaining responsible to the Owners for the 477
performance of this Charter Party. Sub-letting to Charterers in countries 478
stated in the trading exclusion and any other countries which are subject
to United States, United Nations and/or European Union and/or Vessel's
flag state boycott are specifically excluded.
(l) *Inspections:* The Charterers or their representative have the right to 479
inspect or survey the Vessel's hull, engine room and bunker onboard as
well as her books and documentation at any time. The Owners and Master
shall provide all facilities and assistance to meet Charterers' requirements.
The cost for such inspections shall be borne by Charterers. Prior to
inspection Charterers to notify Owners and Charterers / Charterers'
surveyor to sign a LOI acceptable to Owners.

Repairs or maintenance work which shall be shown to be required by such
inspection shall be carried out at Owners' expense and shall be
commenced immediately or, if otherwise agreed by Owners and
Charterers, within three months of Owners being notified in writing by
Charterers of their request to carry out such repairs. Should Owners and
Charterers not be able to agree on any of the repairs or maintenance work
required by the Charterers, the final decision to be taken in accordance
with a surveyor from Vessel's Classification Society with due regard to
such customary practive for first class ship operation and maintenance.
Prior to inspection, Charerters to notify Owners and Charterers' surveyor
to sign a Letter of Indemnity acceptable to Owners.

~~The Owners shall co-operate with the Charterers to facilitate~~ 480
~~the Charterers' inspection of the Vessel at any time, upon receipt of reason-~~ 481
~~able notice, in the Charterers' time.~~ 482
(m) *Substitution and Sub-Contracting:* Unless the Charterers' prior consent 483
be obtained in writing, ~~which shall not be unreasonably withheld,~~ the Ow- 484
ners may not:-
(i)    substitute any other vessel for that named herein, even though it might 485
       be of identical specification, before, at the beginning of or throughout 486
       the currency of this Charter Party or, 487
(ii)   sub-contract any of their obligations including the management of the 488
       Vessel. In the event of any sub-contracting the Owners shall remain 489
       responsible for the performance of this Charter Party or, 490
(iii)  change the flag of the Vessel. 491
(n) *Laid-Up Returns:* The Charterers shall have the right to order the laying- 492
up of the Vessel at any time and for any period of time at a safe berth or place 493
and in the event of such laying-up the Owners shall promptly take steps to 494
effect all the economies in operating costs, including insurance, which may 495
be possible and give prompt credit to the Charterers in respect of all such 496
economies. At the request of the Charterers, the Owners shall at any time 497
provide an estimate of the economies which would be possible in the event 498
of the laying-up of the Vessel. The laying-up port or place shall be at the 499
Charterers' option but shall always be safe and acceptable to the Owners' 500
insurers. Should the Charterers in liaison with the Owners decide that the 501
Master, Officers and crew should be paid off, then the cost of repatriation 502
and, later, cost of rejoining, including laying-up preparation and reactiva- 503
tion cost, and all expenses incurred shall be for the Charterers' account. 504
The Charterers shall give sufficient notice of their intention in this respect to 505
enable the Owners to make necessary arrangements for decommissioning 506
and recommissioning. 507
Any returns of premium or calls payable to the Owners by reason of the Ves- 508
sel remaining within the confines of any port area in excess of any minimum 509
period provided for in the Owners' insurance policies shall be remitted to 510
the Charterers upon receipt by the Owners, provided the Vessel was on hire 511
for the full period, otherwise such return shall be shared pro rata between 512
the Owners and the Charterers according to the proportion of qualifying 513
time on and off hire. 514
(o) *Signing Bills of Lading:* If required, the Master shall sign bills of lading as 515
presented by the Charterers. If required, the Charterers and/or their agents 516
are hereby authorised by the Owners to sign bills of lading on the Owners' 517
and/or the Master's behalf (See Clauses 16 (a), (b) and (c)). The Charterers 518

shall indemnify the Owners and the Master against all consequences or lia- 519
bilities arising therefrom. 520

**14.  Owners' Requirements** 521
(a) *Maintenance Emergency Repairs:* The Owners shall have the right to take 522
the Vessel out of
service for emergency repairs ~~at any time and for routine maintenance by~~ 523
~~prior arrangement with the Charterers.~~ The Owners shall endeavour to ac- 524
commodate the Charterers' requirements in determining the timing and location 525
for repairs unless alternative arrangements are necessary due to class
requirements ~~of such~~
~~maintenance and the Charterers shall endeavour to accommodate the Ow-~~ 526
~~ners' choice of location for maintenance (See Clause 8(a)(i)).~~ 527
(b) *Bills of Lading:* The Charterers warrant that bills of lading issued in res- 528
pect of the carriage of goods and containers under this Charter Party shall 529
contain the following clauses: 530
(i)    A clause paramount applying the Hague or Hague-Visby Rules or a 531
       carriage of goods by sea statute making either of these mandatorily 532
       applicable, in either case according to the practice prevalent at the 533
       port(s) of loading. 534
(ii)   A 'New Jason' clause. 535
(iii)  A 'General Average' clause providing for adjustment at a port or place 536
       at the option of the Carrier according to the York-Antwerp Rules 1994 537
       ~~1974~~
       ~~or any amendment thereto.~~ 538
(iv)   A 'Himalaya' or 'Circular Indemnity' clause giving the Owners the be- 539
       nefit of the bill of lading terms and conditions and/or protection from 540
       tortious claims by third parties. 541
(v)    A 'Sister Ship Salvage' clause. 542
(vi)   A 'Both-to-Blame Collision' clause. 543
(c) *General Average:* General average shall be adjusted at the place as indi- 544
cated in Box 33 according to the York-Antwerp Rules 1994 ~~1974 or any amend-~~ 545
~~ment hereto~~ by an adjuster appointed by the Owners. In the event of general 546
average or salvage, the Charterers shall may provide an acceptable temporary 547
security covering the all goods and containers to avoid delay and secure their 548
release so that transit/delivery may continue. The Owners agree that the 549
Charterers temporary guarantee may be exchanged in due course for a full 550
set of securities from the appropriate interested parties covering all goods 551
and containers. The Charterers agree to co-operate with the Owners and 552
the Owners' appointed adjusters, to assist by supplying manifest and other 553
information and, where required, to endeavour to secure the assistance of 554
the Charterers' local agents in the collection of security, at the Owners' ex- 555
pense. 556
All goods and containers shall contribute in general average, whether ship- 557
ped on or under deck. Charter hire shall not contribute. 558
General average shall be adjusted in any currency at the sole option of the 559
Owners. Exchange into the currency of adjustment shall be calculated at the 560
rate prevailing on the date of payment for disbursements and on the date of 561
completion of discharge of the Vessel for allowances, contributory values, 562
etc. 563
(d) *Salvage:* All time lost and all legal and other expenses (excluding any 564
damage to the Vessel) incurred in saving or attempting to save life or pro- 565
perty shall be borne equally by the Owners and the Charterers. All salvage 566
and proceeds from derelicts shall be divided equally between the Owners 567
and the Charterers after deducting the Master's, Officers' and crew's share. 568
The Charterers shall be bound by all reasonable measures taken by the 569
Owners in order
to secure payment of salvage and to settle its amount. 570
(e) *Liens:* The Charterers warrant that they will not suffer, nor permit to be 571
continued, any lien or encumbrance incurred by them or their agents, which 572
might have priority over the title and interest of the Owners in the Vessel. In 573
no event shall the Charterers procure, nor permit to be procured, for the 574
Vessel any supplies, necessaries or services without previously obtaining a 575
statement, signed by an authorised representative of the furnisher thereof, 576
acknowledging that such supplies, necessaries or services are being furni- 577
shed on the credit of the Charterers and not on the credit of the Vessel or of 578
the Owners and that the furnisher claims no maritime lien on the Vessel 579
therefor. 580
The Owners shall have a lien on the Charterers' goods and containers and 581
upon all cargoes and sub-freights and/or sub-hire belonging to the Charterers 582
for unpaid charter hire, unreimbursed
Charterers' expenses initially paid by the Owners and contributions in gen- 583
eral average properly due, unless the Charterers or Charterers' P&I Club 584
provide a bank guarantee acceptable to Owners as well as Owners'
underwriters and P&I Club.

**15.  Sundry Matters** 585
(a) *Pilotage/Towage:* Although engaged by the Charterers or their agents 586
and paid by the Charterers, all pilotage, towage, linesmen, and other such 587

This document is a computer generated BOXTIME form printed by authority of BIMCO.  Any insertion or deletion to the form must be clearly visible.  In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply.  BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



## PART II
## "BOXTIME" Charter Party

services to
the Vessel to assist with navigation shall be engaged as agents of the Owners who, for the purposes of this Charter Party, shall remain responsible for the due performance thereof. Nothing contained in this Charter Party shall be construed as a demise of the Vessel to the Charterers and the Owners remain responsible for the navigation thereof at all times. 588-592

(b) *Watchmen:* The cost of compulsory shore gangway watchmen shall be borne equally between the Owners and by the Charterers throughout the currency of this Charter Party. 593-595

(c) *Stowaways:* Any costs incurred in respect of stowaways shall be for the Owners' account, unless it can be established that the means by which the stowaway gained access to the Vessel was by secreting away in the Charterers' goods and containers prior to loading, in which case all such costs shall be for the Charterers' account. 595-600

(d) *On / Off Hire Surveys:* Joint on and off hire surveys shall be conducted by mutually acceptable surveyors at the Places of Delivery and Redelivery, respectively. The on hire survey shall be conducted in the Owners Charterers' time/expense unless 601-603

the Vessel has commenced loading. The off hire survey shall be conducted in the Charterers Owners' time/expense. The on/off hire survey shall be conducted simultaneously to the loading/discharging operation, if possible and provided not hindering the working of the Vessel. 604-605

Both surveys shall cover condition of the Vessel and amounts of fuel on board and the Owners shall procure that the Master, Chief Engineer, Officers and crew shall co-operate with the surveyors in conducting such surveys. 606-609

(e) *Sub-Contractors:* In this Charter Party the term "sub-contractor" shall include sub-contractors and their respective servants, agents and sub-contractors. 610-612

### 16. Charterers' Responsibilities/Liabilities 613

(a) *Charterers' Responsibilities:* Except as elsewhere provided in this Charter Party and without prejudice to the Charterers' right to initiate recovery against the Owners under Clause 17, the Charterers shall be responsible for all claims in respect of any liability or expense whatsoever or howsoever arising in connection with the goods and containers carried pursuant to this Charter Party or their carriage (even if such liability arises wholly or in part by reason of the act, neglect or default of the Owners or of such servant, agent or sub-contractor). 614-621

(b) *Claims Handling:* If any such claim or allegation as described in Clause 16(a) shall be made against the Owners or against any vessel owned by any of them, the Charterers will:- 622-624

(i)   take over the conduct and defence of such claim or allegation and settle same at their own expense obtaining, where appropriate, releases in joint names or, should the Owners so request, 625-627

(ii)  put the Owners in funds to meet legal fees, witness and third party expenses and settlement funds, excluding the Owners' own office expenses, to deal with such claim or allegation themselves. 628-630

(c) *General Indemnity:* If in spite of <u>Clause 16(a)</u> any claims as therein described are nevertheless made, the Charterers shall indemnify the Owners and such servant, agent or sub-contractor against all consequences whatsoever thereof, without prejudice to the Charterers' right subsequently to initiate action against the Owners. 631-635

(d) *Fines etc.. Indemnity:* The Charterers shall indemnify the Owners against any expenses, fines, liabilities, losses, damages, claims or demands which the Owners may incur or suffer by reason of any failure of the goods or containers or the documentation relating thereto to comply with any relevant laws, regulations, directions or notices of customs, port and other authorities, or by reasons of any infestation, contamination or condemnation of goods or containers or infestation, damage or contamination of the Vessel by the Charterers' goods or containers. 636-643

(e) *Time Limit:* The Charterers shall be discharged from all liability under this Charter Party unless notice of arbitration in accordance with Clause 20 is given within 15-24 months of redelivery. 644-646

(f) *Agency:* Without prejudice to <u>sub-clause 16(a)</u> the Owners authorise and empower the Charterers to act as the Owners' agents and/or trustees to stipulate for the Charterers to have as against other persons the benefit of any immunities, exemptions or liberties regarding the goods and containers the subject of this Charter Party or their carriage but the Charterers shall have no authority to make any contracts imposing any obligations upon the Owners in connection with the goods and containers or their carriage. 647-653

(g) *General Average Exclusion:* Nothing in this <u>Clause 16</u> shall apply to preclude any claim made by the owners of any property on board the Vessel for general average contribution in accordance with the York-Antwerp Rules 1974 1994. or any amendment thereto. 654-657

(h) *Claims Authority:* The Charterers shall make no payment in excess of the amount as stated in <u>Box 32</u> in settlement of a claim for which they intend to 658-659

seek recovery from the Owners without prior consultation with consent of the Owners, such consent not to be unreasonably withheld. Supporting documents to be provided by Charterers for such deductions. 660

The Owners authorise the Charterers to grant extensions of time in respect of such claims provided the Charterers give the Owners immediate notice thereof. 661-663

### 17. Owners' Responsibilities/Liabilities 664

Except as elsewhere provided in this Charter Party, the responsibilities and liabilities of the Owners shall be as follows: 665-666

(a) *For Goods and Containers:* The Owners shall be liable for loss, damage or expense in respect of goods and containers arising or resulting from:- 667-668

(i)   lack of due diligence on their part before and at the beginning of each voyage to make the Vessel seaworthy and to properly man, equip and supply it and make all parts of the Vessel in which goods and containers are carried fit and safe for their reception, carriage and preservation, unless the Charterers consent to load containers in parts of the Vessel which the Master considers to be unfit, in which case the Charterers shall indemnify the Owners. 669-675

(ii)  failure on their part properly and carefully to, keep and care for the goods and containers while on board, or 676-677

(iii) unreasonable deviation from the voyage ordered or approved by the Charterers. 678-679

(b) *For Refrigerated Goods:* In respect of blown-air containers, the Owners shall be responsible only to maintain the supply of air at the required temperature to the containers, provided proper instructions are given to the Master by the Charterers and the containers are presented at the carriage temperatures. 680-684

In respect of integral refrigerated containers or blown-air containers with a marine refrigeration unit not attached or any containers with any machinery for temperature/atmosphere control containing goods, the Owners shall be responsible for the provision of adequate electrical power as per Vessel's description. only. The Owners 685-688

shall endeavour to monitor and record the performance minimum once daily of all such units 689

whilst on board in accordance with the Charterers' instructions and endeavour to re- 690

pair and rectify any breakdown, fault or deficiency which may occur in respect of such units, using the resources on board the Vessel. If repair works are performed, all additional documented expenses reasonably incurred by the Owners, including, 691-693

spare parts, shall be for the account of the Charterers and the Vessel's crew shall always be considered the Charterers servants. If such resources are insufficient, the Owners shall immediately notify the Charterers so they may take action to obtain any required spares or specialised repair facilities. 694-697

Owners confirm that Vessel and crew are qualified, have the necessary standard tools including environmentally friendly refrigerant recovery equipment and will use best endeavours to provide emergency repairs on all reefer containers and equipment loaded onboard the Vessel. Charterers will provide reefer spare parts, repair kits and non-standard tools and relevant manuals, as necessary.

Except as provided above, the Owners shall not be liable for malfunctioning of integral refrigerated containers and power packs put on board by the Charterers. 698-700

The Owners shall be entitled to reject and require the Charterers to discharge any container loaded at a temperature not within the required carriage temperature or meeting the Charterers' procedures for hot stuffing subject to Owners reviewing Charterers' procedures for hot stuffing. range, if, at the Charterers' request, the Owners consent to 701-703

receive and carry such container(s), the Charterers shall indemnify the Owners against all consequences thereof. 704

Subject to Charterers' prior consent, Charterers shall have the right to: 705

(i)   utilise container positions not originally intended for reefer containers provided that power, ventilation, safe stowage and monitoring/repair access can be provided; and/or,

(ii)  install a remote reefer container monitoring system on-board the Vessel, Owners and Charterers shall agree in good faith on a reasonable share of any additional costs of such installation.

(c) *Limitation of Liability:* Subject always to the Owners' right to limit liability under the applicable limitation convention, the -The liability of the Owners to the Charterers for 706

loss, damage or expense in respect of goods and containers as herein provided shall be limited as follows: 707-708

(i)   In respect of goods liability shall be on the same basis as applicable under mandatory law between the Charterers and a third party by reason of the Charterers having issued a bill of lading or similar contract of carriage, provided that such Bill of Lading contains no declaration of value. Where no mandatory law so applies, liability shall be limited to 709-713

This document is a computer generated BOXTIME form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

Petitioner_0271906

**PART II**
**"BOXTIME" Charter Party**

SDR 666.67 per package or unit or 2 SDR per kilo of gross weight of 714
the goods lost or damaged, whichever is the higher.
~~GB-Pounds 100 per package.~~

(ii) In respect of containers, liability shall be the reasonable cost of repair 715
or the value of the container at the time of such loss or damage, which- 716
ever is the lesser. The value of a leased container is the value stated in 717
the lease agreement and for an owned container it is its market value. 718
For the purpose of this Charter Party containers not owned or leased 719
by the Charterers shall be regarded as goods for liability purposes. 720

(d) *Time Limit:* Except as provided in Clause 16(h), the Owners shall be dis- 721
charged from all liability under this Charter Party in respect of claims for 722
which extensions of time have not been sought and obtained by the Charter- 723
ers unless notice of arbitration in accordance with Clause 20 is given within 724
45·24 months of the delivery of goods or the date when the goods should 725
have been delivered, if the claim relates to goods, or the date 726
when the Charterers become aware of the incident giving rise to the claim 726
for all other claims. When the Hamburg rules apply compulsorily the above 727
time bar shall be extended to 36 months. 727

(e) *For Personal Injury:* The Owners shall remain responsible for and shall 728
indemnify the Charterers against any claims for personal injury,
however caused, incurred on or about the Vessel unless caused by the
negligence of the Charterers, their servants, agents or sub-contractors or
any defect in the Charterers' goods and/or containers save that, where the
Vessel's crew, under this Charter Party, are to be considered the
Charterers' servants (including but not limited to lashing/unlashing, crane
driving, plugging/unplugging of reefers), and any injury or any nature is
caused by any person (including crew members) by the negligent act or
omission of any crew member or crew members, then the Owners are to
remain responsible and shall indemnify the Charterers against any such
claim.

~~The Owners shall indemnify the Charterers against~~ 729
~~any claims for personal injury incurred on or about the Vessel unless~~ 730
~~caused by the negligence of the Charterers, their servants, agents or sub-~~ 731
~~contractors or any defect in the Charterers' goods and/or containers.~~ 731

(f) *Limitation Proceedings:* The Owners shall have the control and conduct of 732
any limitation proceedings on the joint behalf of the Owners and the Char- 733
terers. If successful, any unrecovered costs of such proceedings shall be 734
borne equally between the Owners and the Charterers. If unsuccessful, the 735
costs shall be borne by the party responsible under the terms of this Charter 736
Party for the factor which caused the proceedings to fail. If more than one 737
factor contributed and the Owners and the Charterers were each respons- 738
ible for at least one factor the costs shall be borne equally. 739

(g) *Consequential Loss:* Under no circumstances shall the Owners be res- 740
ponsible for any indirect or consequential loss arising from loss, damage or 741
delay to goods and containers, howsoever caused. 742

(h) Notwithstanding anything herein to the contrary, neither the Owners
nor the Ship shall be entitled to the benefit of any limitation of liability if it
is proved that the loss or damage resulted from an act or omission of the
Owners, done with intent to cause loss or damage, or recklessly and with
knowledge that loss or damage would probably result.

**18. Insurances** 743

(a) *Hull and Machinery:* The Owners warrant that the Vessel is insured under 744
Institute Time Clauses or similar clauses for IWL trading against loss, dam- 745
age and collision liabilities for the value as indicated in Box 27 which cover 746
will be maintained throughout the currency of this Charter Party. Upon 10 747
days notice to the Charterers, the Owners shall be entitled to effect any rea- 748
sonable change to this value. The Owners agree that their insured value for 749
the purpose of this Clause shall represent the Charterers maximum liability 750
to the Owners for damage to the Vessel in accordance with Clause 6 (i), in- 751
cluding time spent on repairs. 752

(b) *Protection and Indemnity (P & I):* The Owners and the Charterers warrant 753
that the Vessel is entered on full terms with their respective P & I Clubs as in- 754
dicated in Boxes 30 and 31 and that such entries will be maintained with all 755
calls paid up to date throughout the currency of this Charter Party. 756

(c) *War Risks:* The Owners warrant that the Vessel is insured against loss of 757
the Vessel by War Risks and War P & I Risks for IWL trading excluding addi- 758
tional premium/restricted/ prohibited areas, which cover will be maintained 759
throughout the currency of this Charter Party. 760

**19. War** 761

(a) Unless the consent of the Owners be first obtained, the Vessel shall not 762
be ordered to nor obliged to:- 763

(i) remain in or pass through any area which is dangerous or is likely to 764
become dangerous as a result of war, hostilities, warlike action or pi- 765
racy, actual or threatened, nor 766

(ii) call at any port where there is any revolution, civil war, civil commotion 767
or any threat thereof, nor 768

(iii) carry any goods that may in any way expose her to any risk of seizure, 769
capture or detention. 770

(b) However, should the Owners consent to allowing the Vessel to proceed, 771
notwithstanding the existence or threat of the danger(s) outlined in Clause 772
19 (a), the Owners agree that the Vessel proceeds at their own risk in con- 773
sideration of the Charterers agreeing that the Owners may effect the follow- 774
ing insurances for which the Charterers will reimburse the Owners the net 775
cost of premium/calls therefor: (See Clause 6 (n)) 776

(i) Reinstatement of the War Risks cover on Hull and P & I for trading to the 777
required area. 778

(ii) Any further additional premia necessary to maintain Hull cover whilst 779
blocked or trapped pending release of the Vessel, acceptance of con- 780
structive total loss by Insurers or trapped for 365 consecutive days, 781
whichever shall first occur. 782

(iii) Insurance of hire on the Vessel for not exceeding 365 days. 783

(c) In the event of the wages of the Master, Officers and/or crew and/or other 784
of the Vessel's operating expenses are affected by any of the factors men- 785
tioned in (a) above, the amount of any increase shall be added to the hire 786
due upon production of the Owners' account therefor together with appro- 787
priate receipts and paid by the Charterers to the Owners with the next hire 788
payment. 789

(d) The Vessel shall have the liberty to comply with any orders or directions 790
of whatsoever nature given by the government of the nation where the Ow- 791
ners are domiciled or whose flag the Vessel flies or any other government or 792
person or body acting, or purporting to act, with the authority of such gov- 793
ernment or by any party having, under the terms of the war risk insurance on 794
the Vessel, the right to give such orders or directions. 795

(e) In the event of the outbreak of war, whether there be a declaration of war 796
or not, between any two or more of the following countries: the Nations of 797
Owners' domicile and Vessel's flag. If the Vessel's flag state is affected as
described above, Charterers to grant the Owners the option to re-flag the
Vessel. In such case the Vessel not to be cancelled due to the previous
flag, or involving the

~~nation where the Owners are domiciled or whose flag the Vessel flies:~~ 798
~~People's Republic of China, Denmark, France, Federal Republic of Germany,~~ 799
United
States of America, United Kingdom, ~~Union of Soviet Socialist Republics,~~ 800
Russia, and which causes a disturbance of Vessel's trade, 801
either the Owners or the Charterers may cancel this Charter Party and, un-
less otherwise agreed, the Vessel shall be redelivered to the Owners at the 802
port of destination in accordance with Charter terms, or, if debarred under this 803
Clause from reaching or enter-
ing it, at a near open and safe port at the Owners' option after discharge of 804
any goods and containers on board. 805

(f) If in compliance with the provisions of this Clause anything is done or is 806
not done, such shall not be deemed a deviation. 807

**20. Law and Arbitration** 808

\*) (a) *London:* This Charter Party shall be governed by English law and any dis- 809
pute arising out of this Charter Party shall be referred to arbitration in Lon- 810
don, one arbitrator being appointed by each party, in accordance with the 811
Arbitration Acts 1996 ~~1950 and 1979~~ or any statutory modification or re-enact- 812
ment thereof for the time being in force. On the receipt by one party of the 813
nomination in writing of the other party's arbitrator, that party shall appoint 814
their arbitrator within fourteen days, failing which the decision of the single 815
Arbitrator appointed shall apply. If two Arbitrators properly appointed shall 816
not agree they shall appoint an umpire whose decision shall be final. 817

Small Claims Procedure

(a) In cases where neither the claim nor any counterclaim exceeds the sum
of USD 50,000.- (or such other sum as the parties may agree) the arbitration
shall be conducted in accordance with the LMAA Small Claims Procedure
current at the time when the arbitration proceedings are commenced.

(b) The Parties, the Tribunal and the LMAA shall keep confidential all
awards made, together with all materials in the proceedings created for the
purpose of the arbitration, and all other documents produced by another
party in the proceedings not otherwise in the public domain – save and to
the extent that disclosure may be required of a party by legal duty, to
protect or pursue a legal right or to enforce or challenge an award in bona
fide legal proceedings before a court or other competent judicial authority.

\*) (b) ~~New York: Should any dispute arise out of this Charter Party, the matter in~~ 818
~~dispute shall be referred to three persons in New York, one to be appointed~~ 819
~~by each of the parties hereto, and the third by the two so chosen; their deci-~~ 820

This document is a computer generated BOXTIME form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

Petitioner_0271907

## PART II
## "BOXTIME" Charter Party

~~sion or that any two of them shall be final, and for the purpose of enforcing~~ 821
~~any award, this agreement may be made a rule of the Court. The arbitrators~~ 822
~~shall be members of the Society of Maritime Arbitrators, Inc. of New York~~ 823
~~and the proceedings shall be conducted in accordance with the rules of the~~ 824
~~Society.~~ 825

~~*) (c) Alternative: Any dispute arising out of this Charter Party shall be referred~~ 826
~~to arbitration at the place indicated in Box 34, subject to the law and proce-~~ 827
~~dures applicable there.)~~ 828

If Box 34 in PART I is not filled in, sub-clause (a) of this Clause shall apply. 829

~~*) (a), (b) and (c) are alternatives; indicate alternative agreed in Box 34.~~ 830

21. **Commission** 831
The Owners shall pay a commission at the rate stated in <u>Box 35</u> to the party 832

mentioned in Box 35 on any hire paid under this Charter Party but in no case 833
less than is necessary to cover the actual expenses of the Brokers. If the full 834
hire is not paid owing to breach of Charter Party by either of the parties the 835
party liable therefor shall indemnify the Brokers against their loss of com- 836
mission. 837

Should the parties agree to cancel this Charter Party, the Owners shall in- 838
demnify the Brokers against any loss of commission but in such case the 839
commission shall not exceed the brokerage on one year's hire. 840

22. **Notices** 841
Any notice to the Owners shall be sent to ~~the address as indicated in Box 3~~ 842
T.B.A. 
Any notice to the Charterers shall be sent to ~~the address as indicated in~~ 843
~~Box 4.~~ 844

This document is a computer generated BOXTIME form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

Petitioner_0271908

# CONTENTS

Clause 23    U.S. Anti-Drug Abuse Act 1986 Clause for Time Charterers

Clause 24    Dry-docking

Clause 25    Oil Pollution Clause for Non-Tank Vessels

Clause 26    Lump Sum Settlements

Clause 27    Rules about Drugs and Alcohol

Clause 28    Guidelines for Treating Stowaways

Clause 29    Uniforms

Clause 30    Passenger Clause

Clause 31    Performance

Clause 32    Extended Port Stays

Clause 33    U.S. Trade Unique Bill of Lading Identifier Clause

Clause 34    Sales Clause

Clause 35    Foul Bottom

Clause 36    Charterers' Servants

Clause 37    C-TPAT Clause

Clause 38    ISPS/MTSA Clause

Clause 39    Deleted

Clause 40    ITF

Clause 41    Exceptions

Clause 42    Termination on Bankruptcy

Clause 43    Quiet Enjoyment

Clause 44    Export control - Prohibited Parties

Clause 45    Deleted

Clause 46    Hamburg Rules

Clause 47    Supercargo Letter of Indemnity

Clause 48    Epidemics Clause

Clause 49    BIMCO U.S. Security Clause for Time Chartering

Clause 50    Piracy Clause

M.V. 'DALI' / CP DATED 1st September, 2016

Petitioner_0271909

Clause 51     Asian Gypsy Moth

Clause 52     Israel Trading Clause

Clause 53     Deleted

Clause 54     Deleted

Clause 55     Deleted

Clause 56     SECA Clause

Clause 57     Deleted

Clause 58     Purchase Option

Clause 59     Future Change in Rules

Clause 60     Replacement Option

Clause 61     Change of Registered Owners Option

Clause 62     Classification

Clause 63     Structure / Condition Precedent

Clause 64     Financial Data

M.V. 'DALI' / CP DATED 1st September, 2016

Petitioner_0271910

- 3 -

**PART II**

**R I D E R   C L A U S E S**

**to**

**Charter Party dated 1ˢᵗ September, 2016**

**for**

**M.V. 'DALI' - IMO No.: 9697428**

---

**Clause 23**     **U.S. Anti-Drug Abuse Act 1986 Clause for Time Charterers**

In pursuance of the provisions of the U.S. Anti-Drug Abuse Act 1986, or any re-enactment thereof, the Charterers warrant to exercise care and diligence in preventing un-manifested narcotic drugs and marijuana to be loaded or concealed on board the Vessel.

**Clause 24**     **Dry-docking**

Vessel is on a 5 year dry and class renewal schedule, and shall only dry dock every 5 years except in case of emergency and/or shipyard guarantee dry docking or as required by vessel's classification society which cannot be avoided or postponed. In case Owners need to dry dock the vessel (except in case of emergency) then Owners are to tender 90 days prior notice of suggested place and date of dry docking to Charterers, and such is to be mutually agreed between Owners and Charterers. Dry docking as well as phase-out place and timing is to be convenient to Charterers, but approval is not to be unreasonably withheld by Charterers. Vessel is to phase-in and be on-hire at the same place vessel phased out, or at place in equivalent distance to the dry dock, as mutually agreed between Owners and Charterers, i.e. no waiting time for Owners. For regular docking Charterers to place the Vessel at Owners disposal without cargo on board but Owners will endeavour to dry dock the Vessel with maximum permissible cargo on board in which case Charterers are allowed to keep such cargo also on board at their risk and expense.

**Clause 25**     **Oil Pollution Clause for Non-Tank Vessels**

Financial responsibility in respect of oil pollution (all ships other than self propelled tank vessels and non self propelled tank vessels carrying more than 2,000 tons of persistent oil in bulk as cargo)

(1) Owners warrant that throughout the currency of this charter they will provide the vessel with the following certificates:

Petitioner_0271911

Certificates issued pursuant to Section 1016 (a) of the Oil Pollution Act 1990, and Section 108 (a) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended, in accordance with Part 138 of Coast Guard Regulations 33 CFR, from (indicate the earliest date upon which the Owners may be required to deliver the vessel into the charter or, if later, the date inserted in sub-paragraph (a) above), so long as these can be obtained by the Owners from or by (identify the applicable scheme or schemes).

(2) Notwithstanding anything whether printed or typed herein to the contrary,

(a) save as required for compliance with paragraph (1) hereof, Owners shall not be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this charter.

(b) Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expense (including but not    limited to the costs of any delay incurred by the vessel as a result    of any failure by the Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

(c) Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which Charterers and/or the holders of any bill of lading issued pursuant to this charter may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

M.V. 'DALI' / CP DATED 1st September, 2016

Petitioner_0271912

(3) Charterers warrant that the terms of this clause will be incorporated effectively into any bill of lading issued pursuant to this charter.

**Clause 26   Lump Sum Settlements**

Charterers are to pay the Owners their outlays in the following lump sum amounts and to be paid monthly together with hire payments:

| | |
|---|---|
| - Lashing | USD 5.- per container paid to crew directly |
| - Cables/Communication | USD 1,000.- per month pro rata |
| - Representation/entertainment | USD 800.- per month pro rata |
| - Super cargo | USD 10.- per day |
| - Meals | USD 100.- per month pro rata |
| - Fuel testing | USD 400.- per month pro rata |
| - Lost/damaged lashing m. | USD 3,000 per month pro rata |
| - Repair of stevedore damages | USD 15.- per hour plus materials |
| - Repair of reefers | USD 15. per hour plus materials |

No further additional charges will be levied apart from the extra cost agreed for the paints and to be paid by Charterers along with the first hire invoice.

Payment of monthly lumpsum for fuel testing is subject to the following addresses being copied on fuel test directly, and immediately upon finalization of analysis:

motbunker@maersk.com
cphfuel@maersk.com
mmtsepoc@maersk.com
cenopsbnk@maersk.com

Petitioner_0271913

**Clause 27    Rules about Drugs and Alcohol**

Alcohol ( Beer, wine and spirits/liquors)

1.    Neither the crew nor anyone else on board the vessel shall be intoxicated at any time. Under this policy, a blood alcohol content of 40 mg / 100ml or greater is considered as non-compliance.

2.    Alcohol must not be consumed
-    Within the last 4 hours prior to watch duty and during watch duty no matter the level of alcohol concentration.
-    Within the last 24 hours prior to arrival at a country's territorial waters and until the territorial waters have been left (by anyone on board) no matter the level of alcohol concentration

3.    All purchases of alcohol are for the Owners account, to be handled by the master only.

4.    Purchase of alcohol at sea is only allowed outside territorial waters.

Drugs ( narcotics and similar substances)

Charterers do not accept that members of the crew and/or other persons on board the vessel consume unauthorised drugs or that any kind of drugs is brought or exists on board the vessels (apart from medicine narcotics) or that drugs have been taken in such a time that remains of drugs, however small, occur in the urine. Attention is drawn to the fact that such remains may occur long time after drugs have been taken.

Control

Owners undertake to perform unannounced drug / alcohol testing and screenings. An objective of this policy should be that the frequency of the unannounced testing to be adequate to act as an effective abuse deterrent, and that all officers be tested at least once a year through unannounced testing. Unannounced test of all officers and ratings for alcohol, alcohol concentrations, drugs and drug remains may be arranged for vessels chartered by Maersk Line, on the Charterers' account.

Owners will take immediate action towards any crewmember in violation with this policy, replacing him/her at first given opportunity.

Owners further warrant that the policy will remain in effect during the term of this charter and that owner shall exercise due diligence to ensure that

M.V. 'DALI' / CP DATED 1st September, 2016

the policy is complied with. It is understood that an actual non-compliance shall not in and of itself mean that the owner has failed to show due diligence.

**Clause 28    <u>Guidelines for Treating Stowaways</u>**

Owners confirm that they and the Vessel's Officers/crew are familiar with the proposed IMO "Guidelines on the Allocation of Responsibilities to Seek the Successful Resolution of Stowaway Cases" dated 27th November, 1997 and as far as responsibilities on behalf of Owners and Vessel's Officers/crew are concerned will follow these guidelines for the duration of this charter even though these guidelines are not yet ratified.

**Clause 29    <u>Uniforms</u>**

Officers as well as other crew members are required to wear uniform (or company issue boiler suits) dress when on duty in port.

It must be ensured that all on board ship always keep their uniforms clean and tidy, and that they conduct themselves so as to represent their Owners as well as their Charterers in a dignified manner.

**Clause 30    <u>Passenger Clause</u>**

Fare paying passengers are under no circumstances allowed to be carried unless Charterers' prior written agreement has been obtained.

**Clause 31    <u>Performance</u>**

<u>Slowsteaming and Performance Clause - 2 stroke</u>

Owners are to exercise due diligence to maintain a performance of the vessel in relation to speed and consumption corresponding with the description of the Vessel throughout the period of this Charter Party.

At the same time Owners to ensure the Vessel is being manoeuvred and voyages are planned with the aim of achieving the most optimal economic use of the Vessel, main engine and auxiliary engines in order to ensure a minimal consumption - at all times with the most economical trim. Owners will ensure master is making optimal use of weather routing tools as well as any voyage optimisation and performance systems provided by Charterers in order to execute voyage in the most efficient economic fashion, with due consideration to safety of crew, ship and cargo. Owners

M.V. 'DALI' / CP DATED 1st September, 2016

Petitioner_0271915

agree to install any vessel performance software that Charterers may request in Charterers time and expense, and will direct the master to report any data that Charterers may reasonably request for a performance measurement system.

Owners agree that from day one, vessel can perform low load operation to save on bunker consumption i.e. operate the engine at a MCR load on or about 10 percent, or at any lower continuous rating that engine manufacturers may recommend, except in cases where safe navigation of the vessel requires a higher speed. In as far as Owners may so desire then Charterers shall assist with sharing of technical know-how on potential modifications allowing the vessel to slow steam as described above.

It is recognized that low load engine operation shall result in savings on cylinder as well as system lubrication oils. It is however also acknowledged by Charterers that low load engine operation may necessitate more frequent cleaning of turbo chargers, the vessels exhaust system as well as the economizer and will result in more wear and tear of auxiliary blowers necessitating that Owners keep an extra piece of auxiliary blower incl. impeller, gasket and electronic motor onboard. Charterers shall reimburse Owners directly related and documented extra cost and time incurred due to additional maintenance and/or excessive wear and tear resulting from low load operation, provided that the recommendations and procedures of the engine manufacturers have been followed at all times.

The Owners agree to take part in any studies that Charterers may deem necessary with an aim of improving the economic performance of the vessel, and Owners also agree on an ongoing basis to share with Charterers any findings and best practices that Owners may have identified on potential savings on economic operation of the vessel incl. low load operation.

Reporting of performance data
The vessel must report high quality performance data into Charterers' MSPS performance system on a daily basis.

**Clause 32    Extended Port Stays**

For Vessel in a service where no port stay is scheduled to last 24 hours or longer, Charterers agree to extend the longest scheduled port stay up to a total duration of 24 hours (from 'all fast') to perform necessary maintenance / overhaul to maintain the efficiency of the Vessel. Charterers will allow for one extended port stay per month as above against a two weeks written notice from Owners. If Owners' proposed date/port is unacceptable for Charterers, Charterers to nominate an alternative date/port for such extended port stay, to take place within 7 days after Owners' proposed date.

**Clause 33    U.S. Trade Unique Bill of Lading Identifier Clause**

The Charterers warrant that each transport document accompanying a shipment of cargo destined to a port or place in the U.S.A. shall have been endorsed with a unique bill of lading identifier as required by the U.S. customs regulations (19 crf part 4 section 4. 7a) incl. subsequent changes, amendments or modifications thereto, not later than the first port of call. Non compliance with the provisions of this clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them. Furthermore all time lost and all expenses incurred incl. fines as a result of the Charterers breach of the provisions of this clause shall be for the Charterers account.

**Clause 34    Sales Clause**

Subject to the Charterers prior approval, which is not to be unreasonably withheld, Owners have the right to sell the vessel to an Owner acceptable to Charterers with a proven performance record in container liner trades or an alternative record acceptable to Charterers.

Charterers to declare such approval or their reasons for declining same, within 15 working days after an official request is made. Upon approval, the Charter Party is to be transferred to the new Owners, and a novation agreement is to be prepared on terms acceptable to the Parties. Charterers are to be compensated USD 10,000 from the old Owners for their expenses in connection with the change of Ownership. The vessel is not to be delayed and Charterers' schedule is to remain unaffected by the

Petitioner_0271917

change in Ownership. The Owner and Charterer shall provide their fullest cooperation to the new Owner in this regard.

**Clause 35**    **Foul Bottom**

If the vessel speed is reduced as a result of the bottom becoming fouled by reason of the vessel being in port/anchorage for an uninterrupted period in excess of 15 days on-hire, then Owners are not to be responsible for reduction of speed and increased consumption due to the fouled bottom. Charterers may ask Owners to arrange for a bottom cleaning, for which time and expenses to be for Charterers' account

**Clause 36**    **Charterers' Servants**

Any reference in this Charter to crew being considered as Charterers' servants shall be construed as a reference to their being Charterers' servants only as regards liability for the cargo and containers themselves and stevedore damage to the Vessel and, save in respect of personal injury which shall be subject to the provisions thereon in Clause 17, in all other respects shall remain the servants of the Owners who will remain responsible for their actions the same as when trading for their own account.

**Clause 37**    **C-TPAT Clause**

Charterers are a validated member of the U.S. C-TPAT (Customs-Trade Partnership Against Terrorism), and will enrol into similar frameworks under development, amongst others currently in the EU based on the WCO (World Customs Organisation) Framework of Standards. It is Charterers' obligation to communicate their cargo custodial responsibilities under C-TPAT and other customs-to-business supply chain security partnerships to Owners.

Where relevant to Owners' obligations under this Charter Party, and in compliance with applicable laws and regulations, Owners must have processes in place to screen prospective employees and to periodically check current employees, as appropriate.

Owners will periodically be requested to confirm their commitment to Charterers' security expectations. For further information regarding the C-

Petitioner_0271918

TPAT security commitment, Owners are asked to consult the U.S. Customs and Border Patrol (CBP) website for the appropriate security criteria for Sea Carriers at:

http://www.customs.gov

**Clause 38    ISPS/MTSA Clause**

(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all Sub-Charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the Charter

M.V. 'DALI' / CP DATED 1st September, 2016

Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners".

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' Account, except to the extent, fully or partly, such delay, costs and expenses result from the negligence, error or omission or wilful acts of the Owners, the Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

**Clause 39    Deleted**

**Clause 40    ITF**

Owners warrant that at the time of delivery and as a continuing warranty throughout the period of the charter, the vessel / crew is and will at all times be covered by an ITF agreement or a similar union agreement acceptable to ITF and will carry a Blue or Green card as evidence of that coverage.

**Clause 41    Exceptions**

As between the Owners and the Charterers, responsibility for any loss, damage, delay or failure of performance under this Charter Party not dealt with in Clauses 16 and 17 shall be subject to the following exceptions:

M.V. 'DALI' / CP DATED 1st September, 2016

Petitioner_0271920

Act of God, act of war, act of terrorism, civil commotions, strikes and lockouts beyond the reasonable control of the Owners or Charterers as the case may be, restraint of princes and rulers, quarantine restrictions and saving or attempting to save life or property at sea.

In addition, any responsibility of the Owners not dealt with in Clause 17 shall be subject to the following exceptions:

(a) Any act, neglect or default of the Master, pilots or other servants of the Owners in the navigation or management of the Vessel or

(b) fire not due to the fault or privity of the Owners or their manager  or

(c) any latent defect in the Vessel's hull, equipment or machinery not discoverable by due diligence.

The above provisions shall in no way affect the provisions as to off-hire in this Charter Party.

**Clause 42**    **Termination on Bankruptcy**

(a) Charterers have the option to cancel this Charter Party and redeliver the Vessel at any time and place if the Owners or the Managers:

(i) Cease to carry on business;

(ii) File for bankruptcy or measures to protect the Vessel and/or Owners from creditors; or if

(iii) Any step is taken by a mortgagee to take possession, control or dispose of the whole or part of their assets, operations or business.

(b) Owners shall notify the Charterers immediately in the event that they commence any proceedings analogous to winding-up in any jurisdiction, or are unable to pay their debts in general as they fall due, or make any special arrangement or composition with creditors generally or any class of its creditors, or commence any proceedings analogous to winding-up in any jurisdiction

**Clause 43**    **Quiet Enjoyment**

A.P. Moller – Maersk A/S
50, Esplanaden
DK – 1098 Copenhagen K
Denmark

M.V. 'DALI' / CP DATED 1st September, 2016

Re: [●] dated [●] and [●] (the "**Time Charter**")

We, [●] as mortgagee and assignee, refer to the above mentioned Time Charter between yourselves and [●] (the "**Owners**"). By a mortgage, dated [●] the Owners have granted a first [preferred][priority] mortgage in the vessel to ourselves as security trustee for certain lenders (the "**Mortgage**") and by an assignment dated [●] the Owners have assigned ourselves as security trustee for those lenders in full their rights, title and interests in the Time Charter (the "**Assignment**"), each granted as security for the obligations of (amongst others) the Owners under a loan agreement dated [●] (the "**Loan Agreement**").

Accordingly we refer to Clause 43 of the Time Charter and hereby undertake that we will not prejudice in any way, disturb in any circumstances or interfere with your quiet and peaceful possession, use and enjoyment of the vessel as a consequence of the existence or enforcement of the Mortga ge, **provided that** and for as long as you are not in breach of your obligations under the Time Charter. Any vacating of possession of the vessel by yourselves in connection with such breach shall not in any way render us mortgagee-in-possession of the vessel.

By your counter-signature of this letter, you hereby undertake that if we as mortgagee notify you that there is an event of default or other breach of the Loan Agreement which gives us such a right, we may transfer ownership of the Vessel and/or execute a novation of the Time Charter, such novation to be made on terms acceptable to you, (in each case a "**Transfer**") to a company nominated by us and acceptable to you, such acceptances not to be unreasonably withheld. Where a Transfer occurs we undertake that your rights, including both future and pre-existing rights, under the Time Charter shall be fully preserved and protected irrespective of the Transfer.

This letter shall be legally enforceable against the undersigned.

This letter shall be governed by and construed in accordance with English law and any disputes under or in connection with this letter shall be subject to the exclusive jurisdiction of the English courts.

**Clause 44**    **Export control – Prohibited Parties**

(a) The Owner shall prior to entering into this Charter Party notify Charterers of any limitations in regards to the Charterer's use of the Vessel

M.V. 'DALI' / CP DATED 1st September, 2016

due to applicable trade sanctions or prohibitions which may have application due to the Vessels nationality or the nationality of the Owners, managers, crew, the Vessel's insurers, or their re-insurers.

(b) The Owners shall not be obliged to comply with any orders for the employment of the Vessel which is, or could result in a sanctioned transaction i.e. sanctions, prohibitions or restrictions under United Nation Resolutions or trade or economic sanctions, laws or regulations of the European Union or the United States of America. If the vessel is performing a voyage, operation or service which becomes or could result in a sanctioned transaction, the Owners may, by notice to the Charterer, refuse to proceed with the employment, or the voyage, operation or service requested. No act or omission of the Owners, master or managers of the vessel shall at any time constitute a waiver of this provision.

(c) Owner warrants that it, or any of its subsidiaries or affiliates, its parent company, are not a party identified on the U.S. Commerce Department's Denied Persons List or Entity List; the U.S. Treasury Department's list of Specially Designated Nationals and Blocked Persons; The U.S. State Department's Debarred List or any other similar list of prohibited or denied parties in relation to suspected acts of terrorism, human rights violations, weapon or nuclear proliferation activities and/or weapons of mass destruction, maintained by any other country including the EU and the UN. In the event that Owner, a subsidiary, affiliate, or parent company, is included on any such list during the Charter Party period, Charterers shall have the option to cancel this Charter Party and redeliver the Vessel at any time and place should the Vessel's ability to trade within the agreed limits and/or Charterers' use of the vessel be affected in any way.

**Clause 45   Deleted**

**Clause 46   Hamburg Rules**

Neither the Charterers nor their agents shall permit the issue of any Bills of Lading or waybills whether or not signed on their behalf or on behalf of the Owners voluntarily incorporating the Hamburg Rules or any legislation under which the Hamburg Rules are compulsorily applicable in
respect of any contract of carriage under or during the period of this Charter Party or any sub-charter.

M.V. 'DALI' / CP DATED 1st September, 2016

Petitioner_0271923

In the event that the Owners sustain a liability arising from the application of the Hamburg Rules in circumstances where those Rules were not compulsorily applicable and where the Owners would not otherwise have sustained a liability then the Charterers shall indemnify the Owners for all loss and damage sustained thereby. Should the Charterers direct the Vessel to countries where the Hamburg Rules are compulsorily applicable or otherwise cause the contract of carriage under Bills of Lading or waybills to be subject to the Hamburg Rules and should the Owners thereby sustain a liability, then the Charterers shall indemnify the Owners for all loss and damage in excess of the loss and damage which the Owners would have sustained if the Hague or Hague Visby Rules had applied.

**Clause 47**     **Supercargo Letter of Indemnity**

To be provided by Charterers with wording as per Owners P+I club requirement

**Clause 48**     **Epidemics Clause**

The vessel not to be ordered to nor bound to enter any place which World Health Organization defines dangerous due to fever or epidemics.

**Clause 49**     **BIMCO U.S. Security Clause for Time Chartering**

If the Vessel calls in the United States, including any U.S. territory, the following provisions shall apply with respect to any applicable security regulations or measures:

Notwithstanding anything else contained in this Charter Party all costs or expenses arising out of or related to security regulations or measures required by any U.S. authority including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers account, unless such costs or expenses result solely from the Owners negligence.

**Clause 50**     **Piracy Clause**

HRA Trading

A. The Vessel shall follow schedule and instructions regarding speed and direction as required by Charterers through the Indian Ocean high risk piracy areas defined by the "Best Management Practise 4 (BMP 4)" or later amendments thereto following a routing as direct as possible but

Petitioner_0271924

always respecting flag state / P&I club recommendations and Owners risk assessment – same agreement shall not restrict Master's authority to take such action as necessary in the event Master, in his reasonable opinion, believes the Vessel is or will be under an immediate threat of a piracy attack or other imminent danger. Charterers to cover cost of relevant safety measures.

Under the present situation in the HRA zone Indian Ocean / Gulf of Aden Owners are prepared to sail through the HRA without armed guards on board and with a speed down to 12 knots in line with Charterers' schedule/speed instructions, but speed always to be at Master's discretion and Master to have the right to adjust speed in case in his reasonable opinion he believes that the vessel is or will be in danger or under imminent threat of a piracy attack. Additional bunkers consumed to always be for Charterers' account. The risk to be assessed by Owners on a regular basis and the safety measures to be adjusted to match any changes in the risk/security situation in the area. If it is decided by Owners that armed guards become necessary due to increased risk of piracy in the area, sub para B to apply.

B. If Charterers decide to order the Vessel to sail through the high risk area with a speed down to minimum 12 knots, i.e. a lower speed than recommended by BMP 4 and flag state / P&I club, then Charterers acknowledge that Owners will require two armed guards in order to follow such speed instruction. Between Owners and Charterers it is understood that:

1. Owners will arrange for the armed guards to attend on board at an appropriate location (intention from Colombo to Suez and vice versa). Charterers to endeavour to give Owners a 30 days Notice – together with their proposed schedule – that the respective armed guards assistance shall be arranged for.

2. Charterers to pay, in addition to the safety measures as stipulated in the Charter Party, all costs incurred relating to the employment of armed guards including but not limited to armed guards hire carriage/transport of guards weapons, launch fees, licenses, custom charges, meals, additional insurance's and other relevant safety measurements and equipment all arranged at best possible competitive terms.

3. Any reasonable deviation and waiting time to embark respectively to disembark the armed guards to be for Charterers account.

M.V. 'DALI' / CP DATED 1st September, 2016

4. The Master is and remains the highest authority on board and has always 'overriding authority'. In case, his reasonable opinion, he believes that the Vessel is or will be in danger or under imminent threat of a piracy attack, he is entitled to take immediate counter-measures including but not only to sail with increased speed without any right for Charterers to claim additional bunkers or any other cost/expenses resulting therefrom. In case Master increases speed in line with above Charterers will be informed about same soonest possible.

5. Charterers to supply the Vessel with sufficient bunkers, enabling the Vessel to proceed with increased / high speed as requested by Vessels' command. Speed deviating from Charterers orders, only as stipulated under item no. 4.

6. In case that – although Owners endeavours to employ armed guards – no guards are available, the Master is entitled to perform the voyage in accordance with Paragraph (A).

**Clause 51**   **Asian Gypsy Moth**

The Charterers shall be responsible for the risks associated with and the consequences of trading the vessel during the currency of the Charter, to ports or places designated by any competent authority as a risk in respect of contamination by Gypsy Moth larvae/eggs/insects or other (Gypsy Moth Area) In case the Vessel is ordered by Charterers to call at Vostochny or Vladivostock or any other Asian Gypsy Moth port during the specific dates declared as high risk, Owners to use best endeavours to take all necessary precautions/measures prior to calling ports in USA, Canada, New Zealand and Australia or other applicable discharge ports to ensure the Vessel has fully complied with all applicable Regulations. Necessary precautions/measures shall include but not be limited to obtaining certification that the Vessel is free of AGM life stages prior to departure or performing a comprehensive self-inspection of the Vessel well in advance to entering ports in USA, Canada, New Zealand and Australia or other applicable ports to confirm the Vessel is free of AGM egg masses and larvae. Charterers shall reimburse any directly related, documented costs incurred by Owners in obtaining the relevant certification or complying with necessary precautions/measures and the vessel shall remain on-hire during any period of delay or detention suffered by the vessel as a consequence of Charterers trading the vessel to a Gypsy Moth Area.



**Clause 52**    **Israel Trading Clause**

In case the vessel is placed on an Arab Boycott list due to trading Israel under this Charter Party, Charterers agree to cover all related expenses/costs to Owners in order to remove the Vessel from such li prior to redelivery. Charterers agree that once the vessel has called Israel during this charter and as a consequence has been blacklisted the vessel will not be able to call any Arab ports before vessel has             been removed from such blacklist as mentioned above. The Vessel is not to call at any Israeli Ports or places during the last six months of the Charter.

**Clause 53**    **Deleted**

**Clause 54**    **Deleted**

**Clause 55**    **Deleted**

**Clause 56**    **SECA**

Below SECA Clause to apply:

SECA Clause:
(1) Charterers and Owners are aware of Sulphur Oxides (SOx) requirements for fuel oils used within Emission Control Areas ("ECA") as set out in MARPOL Annex VI – Regulation 14.

(2) Owners warrant that, on delivery and as a continuing warranty throughout the term of this charter party, the Vessel will comply with the requirements of MARPOL Annexe VI without any disruption to operations and/or cost to the Charterers. For the avoidance of doubt, in the event that any modifications to the Vessel, her equipment or machinery is required in order to meet the requirements of MARPOL and/or this clause the cost and/or time involved to effect such modifications shall be for Owners' account.

(3) Without prejudice to the generality of paragraph (2) above, when using low sulphur fuel oils, including low sulphur marine gas oil, not exceeding the relevant limit ("ULSFO") to meet the requirements of MARPOL:

M.V. 'DALI' / CP DATED 1ˢᵗ September, 2016

a. Owners warrant on a continuing basis that the Vessel:

i. is capable of burning ULSFO in its main engine;
ii. has capacity to hold sufficient ULSFO for 14 days continuous steaming at 50% MCR without bunkering;
iii. is capable of bunkering and transferring ULSFO without contamination from higher sulphur fuels
iv. at no point will flush bunkers or transfer system with ULSFO and consequently downgrade product to HFO due to sulphur limit.
v. will, if not already burning ULSFO, complete a full change-over to ULSFO prior to entry into an ECA;
vi. will maintain and implement written procedures with regard to the change-over to ULSFO on entry to an ECA; and
vii. will maintain full written records regarding the bunkering and use of ULSFO, which shall meet at least the MARPOL requirements in that regard.

b. Owners shall ensure that any ULSFO on board does not become mixed with other, higher sulphur content fuel oils.

c. In the event that ULSFO becomes contaminated with higher sulphur oil(s), Owners shall be responsible for the consequences thereof including, but not limited to, cost of replacement bunkers and/or any resulting delays, fines or penalties.

**Clause 57**    **Deleted**

**Clause 58**    **Purchase Option**

The Charterers have the option to purchase the Vessel at the end of the Firm Period with minimum five month notice in advance at the price of US$58 million.

The Charterers have the option to purchase the Vessel at the end of Optional Period 1 with minimum five month notice in advance at the price of US$24.75 million.

Petitioner_0271928

The Charterers have the option to purchase the Vessel at the end of Optional Period 2 with minimum five month notice in advance at the price of US$20.25 million.

In case the Charterers exercise their option to purchase, the Vessel shall be on hire till delivery on MOA and redelivered to the Owners upon delivery from the Sellers to the Buyers on MOA

Time for divers inspection, including the time for shifting the vessel to the place of divers inspection and/or to the place of delivery under MOA if necessary, shall be counted on hire, however, in case any damage affecting Vessel's class is found during the divers inspection under MOA, the time for repairing including time for shifting to the repair yard shall be off hire.

(Procedure)

1.      When the Charterers consider to purchase the Vessel, they are to give Owners notice in writing of their intention to purchase the Vessel, subject to:

a) Physical inspection of the vessel

b) Inspection of class record

2.      Upon receipt of such notice, the Owners/Charterers are to mutually discuss and agree the earliest possible time/location when the vessel can be inspected by the Charterers in relation to the vessel's itinerary and Owners to allow the Charterers to inspect the vessel's class records as soon as practically possible.

3.      Within 2 weeks after completion of the physical inspection and inspection of the class records, the Charterers are to declare by fax or email whether or not the Charterers' exercise their option to purchase the Vessel.

4.      In the event the Charterers do not exercise/declare the option to purchase the vessel, the vessel shall continue to be traded under the Charter Party as if no intention of the purchase has been declared by Charterers and the Charterers maintain the right to again inspect and exercise the option to purchase the vessel as long as the Charter Party remains in force.

M.V. 'DALI' / CP DATED 1ˢᵗ September, 2016



5.    The purchase once effective shall be governed by the agreed MOA attached hereto.

6.    The Charterers are to mutually discuss and agree a certain delivery range and Lay/Can for the delivery taking into consideration the vessel's itinerary. The place of delivery shall be a safe port or anchorage acceptable to both parties which shall not be unreasonably withheld. It is understood that the delivery shall take place as soon as practically possible after the exercise/declaration of the purchase option.

7.    It is specifically understood that the Lay/can under the MOA is intended to give target range in which the delivery is to take place, and the Charterers are not to withhold taking delivery of the vessel after the MOA was signed, nor can they cancel the MOA when the vessel missed the cancelling date because of Charterers' operation.

The Buyers under the MOA shall be Charterers themselves or their fully guaranteed subsidiary or affiliate directly under the control of the Charterers.

8.    Time for divers inspection, including the time for shifting the vessel to the place of divers inspection and/or to the place of delivery under MOA if necessary, shall be counted on hire, however, in case any damage affecting Vessel's class is found during the divers inspection under MOA, the time for repairing including time for shifting to the repair yard shall be off hire.

MOA for Purchase Option to be agreed based on NSF2012.

**Clause 59**  **Future Change in Rules**

Should the vessel, due to change of rules and regulation by IMO, Class, Flag or any relevant statutory body, be put under inevitable requirement for any additional modification or any arrangement which require additional cost, such shall be done under Charterers time and cost.

However the cost and time for additional modification or any arrangement required by any local or regional authority to be borne by Charterers only if Charterers request the same.

**Clause 60**    **Replacement Option**

During the charter period, Owners have the option to replace the Vessels with exact same type of vessels at Owners' time and expense. Replacement Option to be declared latest by 6 months prior to the replacement.

**Clause 61**    **Change of Registered Owners Option**

During the charter period, Owners have the option to change the registered Owners. Any cost for the change of registered owners will be for Owners account.

**Clause 62**    **Classification**

Owners have an option to change the vessel's Class. (Intention: Class NK)

**Clause 63**    **Structure / Condition Precedent**

This Charter is deemed to be valid only if the vessel is successfully delivered to the Owners accordingly to the MOA between

Lepta Shipping Co.,Ltd guaranteed by Mitsui & CO.LTD, and the Owners, dated 1st September, 2016.

If this Charter should be cancelled and/or terminated prior to delivery hereunder and/or declared null and void for whatever reason the MOA shall be likewise deemed cancelled.

If the MOA should be cancelled and/or terminated and/or deemed null and void for whatever reason prior to delivery of the vessel hereunder, the charter shall be likewise deemed cancelled.

**Clause 64**    **Financial Data**

Charterers to provide financial data anytime during the charter period upon request from Owners.

Petitioner_0271931

**PART I I I**

**V E S S E L   D E S C R I P T I O N**

**to**

**Charter Party dated 1ˢᵗ September, 2016**

**for**

**Hull Number 2678 tbr 'DALI' – IMO No.: 9697428**

<u>**HHI 9,700TEU CONTAINER VESSEL (TWIN ISLAND DESIGN)**</u>

<u>**DESCRIPTION**</u>

Twin Island, 9,700 TEU Container

Flush Deck, Sunken Stem, Raised Forecastle, Bulbous Bow with Transom Stern

Seven Holds with Double Bottom and Full Double Sides and Pipe Duet in DB

Full spade rudder with HHI X-Twisted Leading Edge & Rudder Bulb.

<u>**BUILDER**</u>

Hyundai Heavy Industries Co. Ltd., Ulsan

<u>**HULL / NAME / IMO No.**</u>

H2678 TBN "DALI" -IMO 9697428

<u>**CLASS**</u>

ABS +A1 (E), Container Carrier, +AMS, +ACCU, SH, SHCM, FL(25), BWT, ENVIRO, GP, TCM, UWILD, CPS, RW, CRC, CSC

<u>**FLAG**</u>

SINGAPORE

<u>**COMPLEMENT**</u>

28 persons + 6 Suez Crew

MLC 2006 Compliant

<u>**PRINCIPAL DIMENSIONS**</u>

LOA: abt 300.0 m

LBP: abt 287.0 m

Breadth, moulded: 48.20 m

Depth, moulded: 24.80 m

Design draught, moulded: 12.50 m

Scantling draught, moulded: 15 m

Air Draft (keel to antenna): 65.6 m with fixed type signal post

DWT at design draft, moulded: Abt. 87,342.5 T

DWT at scantling draft, moulded: Appx. 117,175.5 T

Gross Tonnage: 94,730 T

Net Tonnage: 52,150 T

## TANK CAPACITIES:

| | |
|---|---|
| Heavy fuel oil | : abt. 7,000 m3 (HSFO, LSFO Storage, Service & Settling Tanks) |
| Marine diesel oil | : abt. 740 m3 (MGO, MDO Storage & Service) |
| Main Engine LO | : abt. 240 m3 (Sump, Storage & Settling) |
| Main Engine CO | : abt. 132 m3 (LS & HS) |
| Gen Engine LO | : abt. 30 m3 |
| Fresh water | : abt. 500 m3 |
| Ballast water | : abt. 28,200 m3 |

## CONTAINER CAPACITY:

Nominal Max. No. of 20 ft 8'6" Containers based on Solas Visibility:

| | |
|---|---|
| On Deck (10 Tiers): | 6,299 TEU |
| In Holds (9 Tiers'): | 3,672 TEU |
| Total: | 9,971TEU |

Rows in Holds / on Hatches - 17/19 Rows

High Cube (9'6") Containers to be stowed at any Tier in Hold

Homogeneous intake at optional 15m draft basis 14 MT/TEU at 15m draft about 7,446 TEU, based on 50% consumables and container height of 8'6" with VCG at 45%.

## DANGEROUS GOODS

No.1, 2, 3 Holds suitable for carrying dangerous goods with Fixed C02

Vessel can load dangerous cargo in accordance with the vessels Document of Compliance for carriage of dangerous goods.

**REEFER CAPAC1TY**

Based on 9'6" Container with 6kW / FEU and 75m3/hr per FEU mechanical ventilation:

| On Deck: | 1,000 FEU |
|---|---|
| In Holds: | 450 FEU |
| Total: | 1,450 FEU |

CEE Type DIN Sockets 440V / 60 Hz / 17.4 A

Remote Monitoring System

**CONTAINER STOWAGE & LASHING**

Stack Weights in Holds:

27MT for each 20ft container unit

30.5MT for each 40ft container unit

Stack Weights on Deck:

90MT for 20ft container stack

180MT for 40ft container stack

210 MT in case of ISO gap 40' on top of 20'

IMO MSC 1/CIRC. 1352 Amendment to CSS code compliant

ISO Gap (76 mm) and 860 mm Lashing Gap can be used for 20' containers. External lashing for inboard stacks of 40' containers based on Two tier lashing bridges

20' containers

With ISO Gap (76 mm): No Lashing (except outmost row)

With Normal Lashing Gap (860 mm):

Inboard: One (1) short cross internal lashing

Outboard: One (1) short cross internal lashing + One (1) long diagonal lashing

40' containers

Inboard: Two (2) short cross external lashing (parallel lashing)

Outboard: Two (2) short cross internal lashing (parallel lashing) + One (1) long diagonal lashing

Stowage/Loading program: Interschalt "SEACOS MACS.3" program

Owners to apply SeaQuantum Classic paint.

## HATCHCOVERS

MacGregor Pontoon Type with stainless water-coaming on non-tight hatches

Max. panel weight less than 45 T including loose fittings (bottom Twistlocks & turnbuckles).

Approximate Dimensions:

No.IF - 2 panel x 12,600 x 17,900 mm

No.IM - 3 panel 12,600 x 37,900 / 33,020 mm

No.IA - 3 panel 12,600 x 43,400/38,540 mm

N0.2F/A, 3F/A, 4F/A, 5F/A, 6F/A, 7M & 7A - 3 panel 12,600 x 43,400 mm

No.7F (P) - 1 panel 12,600 x 15,270mm

No.7F(S) - 1 panel 12,600 x 12,750mm

Total 46 Panels

## MAIN ENGINE:

HYUNDAI - MAN 9S90ME-C9.2 Part Load Tuning with EGB (Tier II)

NOMINAL: 52,290kW x 84.0 RPM

MCR: 41,480 kW x 82.5 RPM

NCR, 80% MCR: 33,184 kW x 76,6 RPM

5 Blade Optimized Propeller

In addition Owners confirm the following regarding vessel's main engine cleaning procedure which to form part of the recap:

1) Lower the cleaning engine load to 50% (corresponding to approx. 65.5 RPM)

2) Increase the cleaning intervals stepwise from 10 to app 48 hours (every second day)

3) Load the engine up slowly, but keep the 50% load only for the duration of the cleaning (half an hour max)

4) Load the engine down quickly after the cleaning – this is without risk to the engine.

## SPEED & CONSUMPTION:

For firm 7 years

Speed and consumption for optional period to be discussed and agreed before commencement of optional period.

Max speed at design draft (Td), 20% sea margin About 21.0 Knots (for Guarantee)

Daily fuel oil consumption of main engine (D.F.O.C) about 114.5 MT/day based on Fuel of 42,700kJ/kg in LCV at shop test in ISO reference condition with 20% sea margin.

Daily FOC on FIFO 40,600kJ/kg basis as above: about 120.5 t/day (for Guarantee)

The data is based on M/E only, even keel, wind max. BF3, wave & swell max. Douglas 3, no current and not less than 20 m. of water, no negative influence by swell and/or tidal streams, maximum seawater temperature 28 degree Celsius.

Other M/E Consumptions below based on FIFO of 40,600 kJ/kg, even keel, wind max. BF3, wave & swell max. Douglas 3, no current and not less than 20 m. of water, no negative influence by swell and/or tidal streams, maximum seawater temperature 28 degree Celsius as below (for reference only, Sea Margin 15%) :

Daily F.O.C. at abt. 12 kn at Td abt. 25.5 T/d
Daily F.O.C. at abt. 13 kn at Td abt. 31.5 T/d
Daily F.O.C. at abt. 14 kn at Td abt. 38.4 T/d
Daily F.O.C. at abt. 15 kn at Td abt. 46.3 T/d
Daily F.O.C. at abt. 16 kn at Td abt. 55 T/d
Daily F.O.C. at abt. 17 kn at Td abt. 64.4 T/d
Daily F.O.C. at abt. 18 kn at Td abt. 74.4 T/d
Daily F.O.C. at abt. 19 kn at Td abt. 85.9 T/d
Daily F.O.C. at abt. 20 kn at Td abt. 98.8 T/d
Daily F.O.C. at abt. 21 kn at Td abt. 113.9 T/d
Daily F.O.C. at abt. 22 kn at Td abt. 135.6 T/d

## POWER SUPPLY / AUXILIARIES

Diesel Generators: 2 Main (M/G) x 4,400kW + 2 Aux. (A/G) x 3,840 kW
Normal sea going excluding Reefers: One (1) A/G
Normal sea going with Full Reefers: Three (3) in parallel (Two (2) M/G & One (1) A/G)

Emcgy Generator: 1 x 200 kW
Transformers: 6 x 3,800 kVA including 2 Spares based on 9.4 kVA/FEU

AMP MV Switchboard, Panel & Sockets 350A / 6,600 V fitted for 8.0 MVA AMP.

## STEAM PLANT
Auxiliary Boiler: 4,500 kg/h @ 7 kg/cm2.
Exhaust Gas Economizer: 2,100 kg/h @ 7 kg/cm2.

## INCINERATOR
Abt. 1,250,000 kcal/h, IMO approved type

## DECK - HULL MACHINERY
Bow Thruster: 1 x 3,000 kW
Steering Gear: One (1) set of electro-hydraulic, 3x50% units, two ram-four cylinder type steering gear
Mooring Winch: Electric, auto tension type, 5 FWD + 5 AFT (Rated Capacity: 30ton x 15m/min each)
(New Panama Canal rules compliant)
Monorail Crane: SWL 12.5 tons at 5m outreach beyond vessel's parallel body
Ballast Water Treatment System Fitted.

## NAVIGATION & COMMUNICATION EQUIPMENT
One (1) X-band & one (1) S-band Radars both with ARPA
Two (2) sets Master Gyro Compass with Auto Pilot
One (1) set Magnetic Compass
One (1) dual axis type speed log
One (1) Echo sounder
VDR
AIS
BNWAS
TWO (2) ECDIS
Two (2) DGPS Navigator
One (1) Weather Facsimile
Two (2) sets of standard-C Satellite communication terminal
Two (2) VHF

'All Details are About'

## TECHNICAL QUESTIONS

**Communication details:** To be reconfirmed after delivery

| Vessel name: | "DALI" | |
|---|---|---|
| IMO number: | 9697428 | |
| Official number: | | |
| Call Sign: | | |
| Sat-A telex Sat A fax | | **TEL:**<br>**FAX:** |
| Sat-B telex; Sat B fax; | | **TEL:**<br>**FAX:** |
| Sat B date; Sat B phone | | |
| Sat C telex, Sat C fax | | **Telex**<br>**Telex** |
| Sat M phone; Sat M fax | | |
| Email; mobile phone | | |

**Charterers technical questions:**

| | | |
|---|---|---|
| 1 | Type of **twistlocks** onboard? | Semi-Automatic mid-lock in ISO gap, Manual twistlock in Bottom Tier |
| 2 | a) Latest date approved by class for class renewal during drydocking (excluding possible extensions) | N/A |
| | b) Earliest possible date for class renewal during drydocking. | N/A |
| | c) LAST drydock date | N/A |
| 3 | **Intake (TEU)** | |
| | a) Max teu (8'6) intake, meeting IMO visibility rules, and with max number of tiers on deck as per lashing manual | Max TEU (8'6") intake will be decided according to the cargo securing manual. |
| | b) The nominal capacity for container vessels is the number of 20' ISO(8'6) container positions, below the IMO sightline | Nominal capacity (8'6" high 20ft |

| | | | |
|---|---|---|---|
| | for summer/scantling draft at even keel, | | container) |
| | | | on deck : 6,299 TEU |
| | | | in hold : 3,672 TEU |
| | | | Total : 9,971 TEU |
| | c) maximum total 20' containers high (in hold and on deck) but not higher than the funnel or the bridge wing | | on deck : 5,917 TEU |
| | | | in hold : 3,672 TEU |
| | | | Total : 9,589 TEU |
| 4 | Intake (FEU) | | |
| | 45ft High Cube intake. | | 1,129 unit on deck |
| | 40ft High Cube on deck. | | 2,604 FEU |
| | 40ft High Cube under deck without 'killing tiers'. | | 496 FEU |
| | 40ft High Cube under deck with 'killing tiers'. | | 1,571 FEU |
| 5 | Lashing: | | |
| | Vessel to be fully fitted w/lashing material for a full load of containers up to vessel's max nominal capacity incl. but not limited to high cubes. | | To be based on MacGregor final calculations & supply |
| 6 | OSHA (Occupational Safety and Health Administration): Vessel including lashing material to fully comply with OSHA 2232 and all relevant revisions thereof and amendments thereto throughout the time charter period. Requirements include but is not restricted to a full supply of semi-automatic twistlocks for on deck stowage, and automatic stacking cones (hanging stackers) for under deck stowage. | | MacGregor Loose Lashing compliant with OSHA |
| 7 | Automatic twistlocks: Owners to confirm the vessel is not and will not be equipped with fully automatic twistlocks whilst the vessel is on charter to charterers. | | Confirm |
| 8 | Reefers: | | |
| | a) Reefer plug type (cee-norm) | | Confirm CEE type |
| | b) Rarth pin pos | | Earth pin position : 3 o'clock |
| | c) Volt/Hz/Amp | | 440V/60Hz/17.4A |
| | d) Max number of 40ft High Cube reefers which can be loaded without the use of extension cables/pigtails. | | Total : 1,450 FEU |
| | | | on deck : 1,000 FEU |



|  |  | in hold : 450 FEU |
|---|---|---|
|  | e) Same number but NOT to include<br>- containers loaded in 3rd tier or 2nd tier outer row each side<br>unless vessel is equipped with lashing bridges for service of<br>containers in 2nd and 3rd tier. | Vessel is equipped<br>with lashing bridge<br>and portable<br>platform for service<br>of containers in 2nd<br>and 3rd tier. |
|  | - containers in first bay | 26 FEU on Bay No.2 |
|  | f) Max number of 40ft High Cube reefers accomodable under<br>deck without the use of extension cables /pig tails. | 450 FEU in hold |
|  | - without killing tiers: | HC FFE: 144 FEU |
|  | - with killing tiers: | HC FFE: 450 FEU |
|  | g) No. of reefer plugs under deck and reefer plugs on deck | 450 EA on deck:<br>1,000EA |
|  | h) Please confirm that reefer sockets comply with isol496-2 | Confirm compliance |
|  | i) Please confirm that reefer sockets are protected by a fuse<br>or Circuit breaker with a rating of not less than 30 amps. | Rating of 32A<br>breaker is used for<br>reefer socket<br>protection. |
|  | j) Please confirm that reefers of all sizes incl. 40ft high<br><br>cube reefers can be monitored and repaired in all reefer<br>positions including, but not confined to change of reefer<br>compressors of up to 150 kilo and dimensions lwh of 350 mm<br>x700 mm x610 mm | Confirmed |
|  | k) total power (kW) available for reefer plugs at sea. | 8.400 kW based on<br>6.0 kW/FEU x 1.400<br>FEU<br>Reefer containers up<br>to 1,450 FEU can be<br>loaded within the<br>specified electric<br>power. |
|  | l) total power (kW) available for reefer plugs during port/cargo<br>operation. | 8.400 kW based on<br>6.0 kW/FEU x 1.400<br>FEU |

| | | |
|---|---|---|
| | (For geared vessels when own cranes are used, for gearless vessels when shore cranes are used). | But, reefer containers up to 1,460 FEU can be loaded within the specified electric power. |
| | m) please confirm ventilation available under deck per reefer position and per40ft high cube reefer expressed in cbm/hr | Confirmed |
| | - per reefer: | 4,500 cbm/hr |
| | - per 40ft Highcube reefer: | 4,500 cbm/hr |
| 9 | Owners to confirm that vessel and crew is able to provide the proper service and maintenance, on all APMM reefer containers and equipment. Required tools for servicing units, shall be available onboard. This includes vacuum pump, service manifolds and wrench for service valve. | Confirmed |
| 10 | **ISM:** Please confirm Expiry Date of ISM certification | N/A |
| | **1SSC:** Please confirm Expiry Date of ISSC certification | N/A |
| 11 | For vessels where Turkey is not mentioned in the trading exclusions and for vessels not flying Cyprus flag. Please confirm that no certificates on board are issued in Cyprus or have references to owners, technical managers etc. being based in Cyprus. | Confirmed |
| 12 | **Fuel testing.** | |
| | Is vessel signed up with an independent fuel testing company, affirmatively which one. Owners to confirm they will continue using this during the currency of the charter party, against being paid the agreed fuel testing lumpsum. | Confirmed (VPS) |
| 13 | Speed/consumption basis 40 pct MCR both at design draft and scantling draft | |
| 14 | Speed/consumption basis 85 pct MCR both at design draft and scantling draft | |
| 15 | Speed/consumption in the below table basis 80 pct MCR **NCR ISO Condition with fuel of 4 2.7 MJ/kg) both** at design draft and scantling draft | |



| | | Design Draft    Scantling Draft | | |
|---|---|---|---|---|
| | | – design speed minus 1 knt: xx.x knt/xx.x mt xx.x knt/xx.x mt | | |
| | | – design speed minus 2 knt: xx.x knt/xx.x mt xx.x knt/xx.x mt | | |
| | | – design speed minus 3 knt: xx.x knt/xx.x mt xx.x knt/xx.x mt | | |
| | | – design speed minus 4 knt: xx.x knt/xx.x mt xx.x knt/xx.x mt | | |
| | | – design speed minus 5 knt: xx.x knt/xx.x mt xx.x knt/xx.x mt | | |
| 16 | | ISO-14001 certification. | TBA | |
| | | – Are Owners certified? (if yes, then from what date?) | | |
| | | – If not, do Owners intend to be certified? | | |
| | | – Have they started the process and when do they expect to be certified? | Expected to be certified on | |
| 17 | | **Owners/managers-** Please confirm full style of: | | |
| | | – Technical manager **TBA** | | |
| | | – Managing owner **TBA** | | |
| | | – Crew manager **TBA** | | |
| 18 | | **Insurance** – Classification H&M Leader Underwriters (for ALL containers): TBA H&M Leader Brokers (for ALL containers): TBA Classification: TBA | | |
| | | – Owners' P+I club **TBA** | | |
| | | – Hull and machinery value | H&M value: TBA IV value: TBA | |
| | | – Total insured value | TBA | |
| | | Owners VAT no.: | TBA | |
| 19 | | **For unifuel vessels** | | |
| | | Owners to confirm no MDO consumption, except in case of emergency where MDO to be for owners account. | Confirmed | |
| 20 | | Is the vessel equipped with slide valves? | Yes | |

Charterers questionnaire and above technical questions will be included as a part of the Charter Party/Fixture Note.