# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### NORTHERN DIVISION

In the Matter of the Petition

of

GRACE OCEAN PTE LTD., as Owner of the M/V DALI,

and

SYNERGY MARINE PTE LTD, as Manager of the M/V DALI,

for Exoneration from or Limitation of Liability.

Docket No. JKB 24-cv-941

*IN ADMIRALTY*

## PETITIONERS' OPPOSITION TO CLAIMANTS' MOTION FOR SUMMARY JUDGMENT TO DISMISS <u>SYNERGY MARINE PTE LTD'S PETITION FOR LIMITATION</u>

## TABLE OF CONTENTS

**Page**

SUMMARY OF OPPOSITION .................................................................................1

SUMMARY JUDGMENT STANDARD...................................................................2

ARGUMENT .............................................................................................................3

    A.    Legal Standard – "Owner" Status Under the Limitation of Liability Act ..............3

        1.    Legal Interpretation of the Limitation Act....................................4

        2.    International and U.S. Law Defining an "Owner"........................6

    B.    At a Minimum, there are Disputed Issues of Fact as to Whether Synergy Should be Entitled to the Protections of the Limitation Act. ...............................................7

        1.    Synergy, and not Grace Ocean, had daily oversight and control over the Vessel. .........................................................................................8

        2.    Grace Ocean paid the crew but did not vet, hire, train, or communicate with them. ................................................................................11

        3.    Maersk had no operational oversight of the Vessel. ..................13

        4.    Synergy Marine did not keep any of the operating expenses provided by Grace Ocean for the Vessel and had no financial incentive to avoid spending working capital. ..........................................................13

    C.    Claimants' Characterization of Existing Case Law is Inaccurate and Incomplete 15

        1.    Claimants' "Cases Finding Eligibility" ....................................15

        2.    More Cases Finding Eligibility...................................................18

        3.    Claimants' "Cases Rejecting Eligibility".................................22

    D.    Disputed Legal Analysis .........................................................................27

        1.    Insurance Coverage Status.........................................................27

        2.    Agency .......................................................................................28

    E.    Synergy Qualifies as an "Owner Pro Hac Vice" of the DALI.............................29

REQUEST FOR HEARING.....................................................................................30

CONCLUSION.........................................................................................................30

# **TABLE OF AUTHORITIES**

**Cases**                                                                                                    **Page(s)**

*In re Amoco Transp. Co.*,
   1979 WL 6504602 (N.D. Ill. Apr. 17, 1979) ..........................................................................24

*Anderson v. Liberty Lobby*,
   477 U.S. 242 (1986)........................................................................................................................2

*Archer Daniels Midland, Co. v. M/T AMERICAN LIBERTY*,
   No. CV 19-10525, 2021 WL 1951217 (E.D. La. May 14, 2021) ..............................................6

*In re Barracuda Tanker Corp.*,
   281 F. Supp. 228 (S.D.N.Y. 1968)............................................................................... *passim*

*Birmingham Southeast v. M/V Merchant Patriot*,
   124 F. Supp. 2d 1327 (S.D. Ga. 2000)........................................................................3, 24, 25

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)........................................................................................................................2

*In re CF, LLC*,
   No. 2:19-00154, 2020 WL 557720 (W.D. La. Feb. 3, 2020) ............................................3, 25

*In re Chesapeake Shipping*,
   803 F. Supp. 872 (S.D.N.Y. 1992).............................................................................. *passim*

*Complaint of Chesapeake Shipping, Inc.*,
   *778 F.Supp. 153, 155 (S.D.N.Y.1991)*...................................................................................18

*In re Complaint for Exoneration of or Limitation of Liab. of Shell Oil Co., et al.*,
   780 F. Supp. 1086, 1089 (E.D. La. 1991) ................................................................................5

*Complaint of B.F.T. No. Two Corp.*,

   433 F. Supp. 854, 872-73 (E.D. Pa. 1977)........................................................................21, 29

*In re David & Colleen, Inc.*,
   No 04-1176, 2006 WL 2092445 (S.D. Tex. 2006) ............................................................3, 26

*Dick v. U.S.*,
   671 F.2d 724 (2d Cir. 1982).....................................................................................................4, 5

*Flink v. Paladini*,
   279 U.S. 59 (1929)........................................................................................................................4

*Matter of Grace Ocean Pvt Ltd.*,
   765 F. Supp. 3d 461 (D. Md. 2025) ..................................................................................3

*In re Houseboat Starship II*,
   2005 WL 3440788 (M.D. Tenn. Dec.12, 2005) ................................................5, 18, 29

*Isquith v. Middle South Utilities, Inc.*,
   847 F. 2d 186 (5th Cir. 1988) ......................................................................................2

*Leco Corp. v. Grams*,
   1992 WL 158875 (6th Cir. 1992) ...............................................................................4

*Lewis v. Lewis & Clark Marine, Inc.*,
   531 U.S. 438 (2001) .....................................................................................................4

*Libertarian Party of Va. v. Judd*,
   718 F.3d 308 (4th Cir. 2013) ......................................................................................2

*In re M/V Seaboard Spirit*,
   No. 11-23841-CIV-MORENO, 2014 WL 3673323 (S.D. Fla. July 23, 2014) ............... *passim*

*Marine Recreational Opportunities, Inc. v. Berman*,
   15 F.3d 270 (2d Cir. 1994) ..........................................................................................5

*Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) .....................................................................................................2

*In re Nat'l Shipping Co. of Saudi Arabia*,
   147 F. Supp. 2d 425 (E.D. Va. 2000) ........................................................................20

*Norfolk Dredging Co. v. M/V A.V. Kastner*,
   264 F. Supp. 2d 265 (D. Md. 2003) ............................................................... *passim*

*Matter of Oil Spill by Amoco Cadiz Off Coast of France on March 16, 1978*,
   954 F.2d 1279 (7th Cir. 1992) .........................................................................3, 23, 24

*In re Petition of United States*,
   259 F.2d 608 (3d. Cir. 1958) ...................................................................................4, 27

*SCF Waxler Marine LLC v. M/V Aris T*,
   427 F. Supp. 3d 728 (E.D. La. 2019) *aff'd* 24 F. 4th 458 (2022) .....................19, 20

*Matter of Seacor Marine, LLC*,
   2011 WL 13579651 (E.D. Tex. Nov. 2, 2011) ................................................ *passim*

*Tennessee Gas Pipeline v. Rowan Companies*,
   1996 WL 210709 (E.D. La. April 25, 1996) ..........................................................20, 21

*In the Matter of the American Milling Co.*,
    409 F.3d 1005 (8th Cir. 2005) ...................................................................................3, 19, 23

*In re Tourtellotte*,
    No. CIV.A. 09-2787 MLC, 2010 WL 5140000 (D.N.J. Dec. 9, 2010) ......................... *passim*

*Matter of Wilson Yachts, LLC*,
    605 F. Supp. 3d 695 (D. Md. 2022) ......................................................................................28

**Statutes**

46 U.S.C. § 3201 *et seq.*......................................................................................................................7

Shipowners Limitation of Liability Act of 1851, 46 U.S.C. §§ 30501 *et seq.*...................... *passim*

**Other Authorities**

33 C.F.R. Part 96...............................................................................................................................7

Fed. R. Civ. P. 56 .............................................................................................................................2

Local Rule 105.6 ..............................................................................................................................30

# INDEX OF EXHIBITS

Exhibit 1: ISM CODE, 2018 Ed ................................................................................ 6-8

Exhibit 2: *Petitioners' Response to Order to Show Cause*, Case 1:11-cv-23841 RLR, ECF No. 147 (S.D. Fla. May 16, 2014) ...................................................................17

Exhibit 3: Rule 30(b)(6) Deposition of Grace Ocean Private Ltd. through Yoko Nakagawa ("Grace Ocean Tr.") .........................................................8, 9, 12

Exhibit 4: Rule 30(b)(6) Deposition of Synergy Marine Pte Ltd. through Ajith Kumar ("Synergy Tr.") ...........................................................9, 11, 12, 14

Exhibit 5: Declaration of Oliver Espino ("Espino Decl.") ................................... *passim*

Exhibit 6: Declaration of Ajith Kumar ("Kumar Decl.") ..................................... *passim*

Petitioners, through undersigned counsel BLANK ROME LLP and DUANE MORRIS LLP, submit this Memorandum in Opposition to Claimants' Motion for Summary Judgment to Dismiss Synergy Marine's Petition for Limitation Due to its Lack of Standing and Memorandum of Law in Support thereof ("Brief") (ECF No. 605).

## SUMMARY OF OPPOSITION

Claimants, through court-appointed lead counsel[1] (collectively "Claimants"), have moved to challenge Petitioner Synergy Marine Pte Ltd's ("Synergy") right to seek the protections of the Shipowners Limitation of Liability Act of 1851, 46 U.S.C. §§ 30501, *et seq.* ("Limitation Act" or the "Act"). (ECF No. 605). Claimants argue that the text of the Act references only an "owner of a vessel" as the party potentially having the right to limit its liability and Synergy is, admittedly, not the registered owner of the M/V DALI (the "Vessel"). The registered owner is Petitioner Grace Ocean Private Limited ("Grace Ocean"). But ownership is not the determinative factor when analyzing the right to limit under the Limitation Act.

In its capacity as the manager and operator of the Vessel, Synergy exercised more than sufficient control over the Vessel to fall within the Act's broadly-interpreted scope and is entitled to limit its liability. As discussed below, courts have considered that a party is entitled to avail itself of the protections of the Limitation Act where it is a likely target of direct claims. Here, the facts are clear that that party is Synergy.[2]

The record is clear that Synergy, as operator and manager, had a sufficient degree of autonomy over the Vessel so as to meet the "broad" interpretation of "Owner" within the meaning

---

[1] Additional cargo interest claimants adopted ECF No. 605 by reference. (ECF No. 606).

[2] In fact, were Synergy to be dismissed from this action as Claimants plead, there is no doubt that it would immediately face claims in any number of state courts in any number of jurisdictions, because that is what Claimants are seeking to do: break Synergy out of the limitation action so that the Claimants can pursue unlimited claims against Synergy on the basis of its alleged direct fault or negligence.

of the Act, which has been interpreted "in a liberal way" by courts. In support of their position, Claimants have downplayed Synergy's daily operational oversight, incorrectly attributed certain elements of control to the Vessel's time charterer, and mischaracterized witness testimony regarding the financial relationship between Grace Ocean and Synergy as it relates to Synergy's management of the Vessel. Claimants also have vastly overstated the weight of the case law they consider to be in their favor, and grossly understated the weight of authority in support of Petitioners' position.

## SUMMARY JUDGMENT STANDARD

A party moving for summary judgment must demonstrate to the Court that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (internal cites omitted). Ultimately, all reasonable inferences must be drawn in favor of the nonmoving party (Petitioners). *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (internal citations omitted). As the party opposing a motion for summary judgment, Petitioners do not need to present additional evidence but may identify genuine issues of fact extant in the summary judgment evidence produced by Claimants. *Isquith v. Middle S. Utils., Inc.*, 847 F. 2d 186, 198–200 (5th Cir. 1988). There is a "genuine" issue of material fact "if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

This case is particularly unsuited for summary judgment. Apart from the relevant facts being complex and in significant dispute, there are equitable factors that weigh strongly in favor of retaining concursus jurisdiction in this matter through trial on the Petitioners' alleged fault and right to limitation. Indeed, it is notable that of the six cases cited by Claimants at page 12 of their

Brief ostensibly in support of their position, only two were decided applying a summary judgment standard.[3]

Moreover, this Court has already recognized the importance of maintaining the concursus in its February 7, 2025 ruling denying Claimants' motion seeking relief from the injunction so they could pursue certain claims allegedly not subject to limitation in state court. *Matter of Grace Ocean Pvt Ltd.*, 765 F. Supp. 3d 461 (D. Md. 2025). This Court noted as follows:

> The Court has carefully considered the arguments of the State and Ace, and finds many of their contentions to be well-taken. Nevertheless, the Court declines to exercise its discretion to modify the terms of the injunction, because any such modification would frustrate the purpose of the Limitation Act, would risk creating inconsistent judgments with respect to core issues pertaining to the question of whether Petitioners are entitled to limitation of liability, and would be contrary to the interests of judicial economy and fairness.

*Id.* at 469. *See also In re Barracuda Tanker Corp.*, 281 F. Supp. 228, 232 (S.D.N.Y. 1968)(denying summary judgment and finding that "[e]ven if Union should ultimately fail to establish its right to limit, this court may retain jurisdiction to dispose of the 'concourse' of claims asserted against it.")(citing *Hartford Acc. & Indem. Co. v. Southern Pacific Co.*, 273 U.S. 207 (1927)).

## ARGUMENT

### A.    Legal Standard – "Owner" Status Under the Limitation of Liability Act

The Limitation Act provides, in pertinent part, that "[t]he owner of a vessel may bring a civil action in a district court of the United States for limitation of liability" up to the value of the

---

[3] *In re CF, LLC*, No. 2:19-00154, 2020 WL 557720 (W.D. La. Feb. 3, 2020) and *In re David & Colleen, Inc.*, No 04-1176, 2006 WL 2092445, at *1 (S.D. Tex. 2006), aff 'd, 234 Fed. Appx. 211 (5th Cir. 2007) (ruling on a motion for the entry of final judgment which the court noted was, in essence, a motion for summary judgment). The other cases are *Matter of Oil Spill by Amoco Cadiz Off Coast of France on March 16, 1978*, 954 F.2d 1279 (7th Cir. 1992) (Seventh Circuit reviewing the district court's decision on a motion to dismiss the petition to limit liability of certain parties); *In the Matter of the American Milling Co.*, 409 F.3d 1005 (8th Cir. 2005) (Eighth Circuit overturning district court's post-trial ruling regarding manager's owner *pro hac vice* status); *Birmingham Southeast v. M/V Merchant Patriot*, 124 F. Supp. 2d 1327 (S.D. Ga. 2000) (district court ruling on liability issues after a bench trial); *Norfolk Dredging Co. v. M/V A.V. Kastner*, 264 F. Supp. 2d 265 (D. Md. 2003) (district court ruling on a motion to dismiss).

vessel and its freight or the owner's interest in the vessel with respect to maritime casualties that occur without the privity or knowledge of the owner. 46 U.S.C. §§ 30529(a), 30523. Thus, the Act serves to limit a vessel's liability when claimants' claims exceed the value of the vessel and its pending freight. *See Lewis v. Lewis & Clark Marine, Inc*., 531 U.S. 438, 450 (2001).

### 1.     Legal Interpretation of the Limitation Act

Limitation of liability under the Act generally applies to the owner of the vessel. *See* § 30523(a) ("the liability of the owner of a vessel . . . shall not exceed the value of the vessel and pending freight.") The Supreme Court has instructed that the term "owner" is an "untechnical word" which should be interpreted in a "liberal way." *Flink v. Paladini*, 279 U.S. 59, 63 (1929).[4]

In contrast to Claimants' unsupported implication that *Flink*'s broad read of the term "owner" must be narrowed "in pari materia" with an observation made by the Supreme Court in 1894 (C. Br. at 2 n. 2), "[m]ost courts have settled on the notion that an owner, for purposes of the Limitation Act, is one who has the type of relationship to the vessel that could subject the person to liability as a shipowner." *Leco Corp. v. Grams*, 1992 WL 158875, at *3 (6th Cir. 1992) (collecting cases).[5] As the Second Circuit put it, "[a]s a general rule, one who is subjected to a shipowner's liability because of his exercise of his dominion over a vessel should be able to limit his liability to that of an owner." *Dick v. U.S.*, 671 F.2d 724, 727 (2d Cir. 1982). "More succinctly

---

[4] See *Flink*, 279 U.S. at 63 ("We are of opinion that the words of the acts must be taken in a broad and popular sense in order not to defeat the manifest intent. This is not to ignore the distinction between a corporation and its members, a distinction that cannot be overlooked even in extreme cases, but to interpret an untechnical word in the liberal way in which we believe it to have been used-as has been done in other cases." (internal citation omitted)).

[5] See also *In re Petition of United States*, 259 F.2d 608, 610 (3d. Cir. 1958) ("[W]hether or not one is to be deemed an 'owner' depends largely upon the possibility that he may be subjected to a liability which ordinarily is assertable against one having, or claiming to have, proprietorship or dominion over the subject of the proceeding."). Claimants' are incorrect in their assertion that *Petition of United States* is outdated because it predates the existence of a "definitional" section in the Limitation Act. Numerous modern cases have cited to *Petition of United States*. *See, e.g.*, *Matter of Seacor Marine, LLC*, No. 1:11-CV-108, 2011 WL 13579651, at * 4 (E.D. Tex. Nov. 2, 2011); *In re Tourtellotte*, No. CIV.A. 09-2787 MLC, 2010 WL 5140000, at *2 (D.N.J. Dec. 9, 2010).

stated, the [A]ct is designed to cover one who is a 'likely target' for liability claims predicated on his status as the person perhaps ultimately responsible for the vessel's maintenance and operation." *In re Complaint for Exoneration of or Limitation of Liab. of Shell Oil Co., et al*., 780 F. Supp. 1086, 1089 (E.D. La. 1991). *See also In re Houseboat Starship II*, No. 2:05-0086, 2005 WL 3440788, at *3 (M.D. Tenn. Dec. 12, 2005) (same premise); *Marine Recreational Opportunities, Inc. v. Berman*, 15 F.3d 270, 271 (2d Cir. 1994) (same).

"'The rule that has emerged from [the cases considering ownership status] appears to be that, if the petitioner may be held liable because of his ownership or control of the vessel, he can maintain a petition to limit his liability.'" *Matter of Seacor Marine, LLC*, No. 1:11-CV-108, 2011 WL 13579651, at *4 (E.D. Tex. Nov. 2, 2011) (quoting *In re Barracuda Tanker Corp.*, 281 F. Supp. 228, 231 (S.D.N.Y. 1968)); *see Dick*, 671 F.2d at 727 ("As a general rule, one who is subjected to a shipowner's liability because of his exercise of dominion over a vessel should be able to limit his liability to that of an owner."); *In re Tourtellotte*, 2010 WL 5140000, at *2 ("whether or not one is to be deemed an 'owner' depends largely upon the possibility that he may be subjected to a liability which ordinarily is assertable against one having, or claiming to have, proprietorship or dominion over the subject of the proceeding" (citation omitted)).

On this basis, courts have routinely extended "owner *pro hac vice*" status to ship management companies, provided the company displayed a sufficient degree of control over the vessel. Cases that have found managing agents entitled to owner *pro hac vice* status have done so where the management company has responsibilities including:

> Manning the vessels; victualing the vessels, providing for navigation, which involved procuring and providing deck, engine and cabin stores; maintenance and repairs for hull and machinery; providing spare parts, maintenance and repairs for communication and navigation equipment ..., and communicating with [the owner] and the vessels' time charterers.

*Norfolk Dredging Co.*, 264 F. Supp. 2d at 267, (quoting *In re Complaint of Chesapeake Shipping*, 803 F. Supp. 872, 873-74 (S.D.N.Y. 1992)). *See also In re M/V Seaboard Spirit*, No. 11-23841-CIV-MORENO, 2014 WL 3673323, at *2 (S.D. Fla. July 23, 2014) (management company was entitled to limit where its role included "(a) manning the vessel; victualing and insuring the crew, [ ]; (b) providing and supervising maintenance and repairs to the vessel [ ]; (c) arranging for the supply to the vessel of various parts and services [ ]; and (d) maintaining appropriate and adequate financial records."); *Archer Daniels Midland, Co. v. M/T AMERICAN LIBERTY*, No. CV 19-10525, 2021 WL 1951217, at *4 (E.D. La. May 14, 2021) ("[Manager] avers that it has exclusive control over the [vessel], as it employs all members of the crew of the [vessel], who are entirely responsible for operating the [vessel]; sets the standards for training of the crew; dispatches the [vessel] to any and all jobs; provides food, water, and other victuals to the [vessel] and its crew, provides any and all administrative support and all necessary repairs to the hull and machinery; and generates invoices related to the use of [vessel], among other things. . . . These facts, taken together, are sufficient to survive summary judgment on the issue of whether [Manager] is an owner *pro hac vice* of the [vessel]." [6]

## 2.    International and U.S. Law Defining an "Owner"

The International Safety Management ("ISM") Code,[7] which sets international standard for ships and applies to all large cargo vessels engaged in international trade, sets forth the following definitions:

> **1.1.2** *Company* means the owner of the ship or any other organization or person such as the manager, or the bareboat charterer, who has assumed the responsibility for operation of the ship from the owner of the ship and who

---

[6] See also *Matter of Seacor Marine, LLC*, 2011 WL 13579651; *In re Barracuda Tanker Corp.*, 281 F. Supp. 228; *In re Tourtellotte*, 2010 WL 5140000, discussed *passim*.

[7] Relevant pages from the 2018 Edition of the ISM Code are attached as Exhibit 1.

on assuming such responsibility has agreed to take over all the duties and
responsibilities imposed by the International Safety Management Code.

**1.1.3** *Administration* means the Government of the State whose flag the ship
is entitled to fly.[8]

**1.1.5** *Document of Compliance* means a document issued to a company
which complies with the requirements of this code.

**1.1.6** *Safety Management Certificate* means a document issued to a ship
which signifies that the company and its shipboard management operate in
accordance with the approved safety management system.

The ISM Code further provides that, "[i]f the entity who is responsible for the operation of the ship
is other than the owner, the owner must report the full name and details of such entity to the
Administration." *Id.* at § 3.1. With respect to "Certification and Periodical Verification," the ISM
Code requires that "[t]he ship should be operated by a company which has been issued with a
Document of Compliance . . . relevant to that ship." *Id.* at § 13.1. Synergy is designated as the
Document of Compliance ("DOC") holder and the holder of the Safety Management Certificate
for the Vessel which, together, certifies compliance with the ISM Code for the Vessel.[9]

> **B.    At a Minimum, there are Disputed Issues of Fact as to Whether Synergy Should
> be Entitled to the Protections of the Limitation Act.**

Claimants readily acknowledge that the analysis of a petitioner's eligibility under the Act
is "necessarily fact specific." Cl. Br. at 11. Claimants contend that the undisputed facts of the case
support their argument that Synergy, as the Vessel's manager, should not be entitled to rely on the
Limitation Act; however, Claimants misstate, mischaracterize and omit relevant facts that bear
directly on their application. Claimants' Brief does not specifically articulate their factual

---

[8] Here, the "Administration" or Flag state of the vessel is the Maritime & Port Authority of Singapore ("Singapore
MPA").

[9] Pursuant to 46 U.S.C. § 3201 *et seq.*, the ISM Code is codified into U.S. law as 33 C.F.R. Part 96, and applies to all
U.S.-flagged vessels and foreign vessels calling at U.S. ports.

allegations,[10] but Petitioners summarize the main disputed issues below. Petitioners also offer the Declarations of Oliver Espino of Grace Ocean ("Espino Declaration") and Captain Ajith Kumar of Synergy ("Kumar Declaration") in support of this Opposition. The disputed facts can be distilled as follows:

### 1.    Synergy, and not Grace Ocean, had daily oversight and control over the Vessel.

As testified to by Grace Ocean's corporate designee, Yoko Nakagawa, and explained in the Espino and Kumar Declarations, Synergy, and not Grace Ocean, is the DOC holder and ISM Manager for the Vessel. Grace Ocean Tr. at 45:8-46:5; Espino Decl. ¶¶ 5, 6; Kumar Decl. ¶¶ 3, 6. In compliance with the ISM Code, Grace Ocean identified Synergy as the operator of the Vessel to the Singapore MPA. Espino Decl. ¶ 5; Kumar Decl. ¶ 4. Thus Synergy is deemed, pursuant to the ISM Code and in the eyes of the Singapore MPA and under U.S. law, to have "assumed the responsibility for operation of the ship from the owner of the ship and . . . agreed to take over all the duties and responsibilities imposed by the International Safety Management Code." Pet. Ex. 1. Indeed, Grace Ocean could not legally operate its own vessel even if it wanted to. Grace Ocean is not a DOC holder and does not have an approved SMS, both of which are required for an operator under the ISM Code. This is why Grace Ocean relies solely on Synergy for the daily oversight and control of the Vessel.

Claimants allege that "Synergy Marine's management of the DALI was not autonomous enough to confer ownership status" and that "Grace Ocean exercised daily oversight of the DALI." Cl. Br. at 11; *See also* Cl. Br. at 19 ("In their corporate depositions, Grace Ocean and Synergy

---

[10] While this District does not require a separate Statement of Material Facts in support of a Summary Judgment motion, the format of Claimants' Brief makes it challenging for Synergy to directly respond to each of the "undisputed material facts" proffered by Claimants in support of their position. Unless specifically admitted by Synergy, therefore, such facts are disputed.

Marine confirmed that Grace Ocean retained detailed oversight of the Dali"). While, as discussed below, Petitioners dispute the relevance of Claimants' reliance on "full possession and control" as the standard for eligibility, it is clear that Claimants have mischaracterized the testimony of Petitioners' corporate witnesses regarding the scope of Grace Ocean's "daily oversight" because both Synergy and Grace Ocean have confirmed that Synergy, and not Grace Ocean, bears exclusive daily oversight responsibility for nearly every aspect of the Vessel's operation.

The deposition transcript of Grace Ocean's corporate witness directly addresses some of these points. In particular, Ms. Nakagawa testified that Grace Ocean does not manage any of its own vessels (Grace Ocean Tr. at 41:2-4); and that Synergy has "absolute discretion" to allocate supplies, manpower and services. *Id*. at 114:2-21. She also confirmed that among other responsibilities, Grace Ocean delegates authority to Synergy to maintain the Vessel in class and ensure the safety and security of the Vessel. *See* Grace Ocean Tr. at 44:18-45:10; 46:6-9; 181:7-182:1. Ms. Nakagawa and Capt. Kumar also both testified that Synergy manages and Grace Ocean does not take an active role in the drydocking of its vessels (*id*. at 82:19-83:3; 83:11-14; Synergy Tr. at 61:24-62:3). Further, Captain Kumar and Ms. Nakagawa both testified that Grace Ocean does not ask for copies of Synergy's vessel inspection reports ("VIR") (Synergy Tr. at 61:9-17; Grace Ocean Tr. at 139:6-140:11). Capt. Kumar also stated in his declaration that Grace Ocean also does not have access to Synergy's planned maintenance system software ("PMS") or its inspection tracking software, ShipPalm, which Synergy uses to maintain and assist in overseeing the operation of the Vessel. Kumar Decl. ¶¶ 11, 12. Capt. Kumar further stated that Synergy is responsible for audits and inspections of the Vessel and arranges and tracks the need for spare parts and maintenance and repairs for the Vessel. Kumar Decl. ¶¶ 13-15.

In particular, Claimants contend that the transmission by the Vessel to Grace Ocean of a daily noon report is indicative of "daily oversight" by Grace Ocean. Cl. Br. at 19. However, as explained by Oliver Espino, Director of Grace Ocean,[11] the daily noon report sent by the Vessel to the owners, as a matter of standard industry practice, contains only the most basic information about the Vessel's current position and status. Espino Decl. ¶ 13. Further, Espino clarifies that the "regular review" of financial and technical reports referred to by Claimants is not indicative of daily oversight of vessel operations and that his "daily review" of the ClassNK website as discussed by Ms. Nakagawa was merely a quick check regarding *all of* Grace Ocean's ClassNK-classed vessels, and is not specific to the Dali. Espino Decl. ¶ 13. Mr. Espino specifically confirmed that:

> Grace Ocean relies on Synergy to maintain a proper SMS for the Vessel; Synergy is responsible for conducting and handling vessel inspections; there is no Grace Ocean employee specifically assigned to the Vessel for its technical management or operation; no one from Grace Ocean has ever been aboard the Vessel; Synergy, and not Grace Ocean, supplies food (victuals), provisions and other supplies for the Vessel; Synergy, and not Grace Ocean, arranges maintenance and repairs for the Vessel's hull & machinery; Synergy, and not Grace Ocean, arranges the storage of spare parts or the provision of stores for the Vessel; Synergy, and not Grace Ocean oversees the maintenance and repair of any machinery or equipment aboard the Vessel; Synergy, and not Grace Ocean, is responsible for periodic audits or inspections of the Vessel; Grace Ocean does not have access to Synergy's planned maintenance system ("PMS"); and Grace Ocean does not have access to ShipPalm, which is Synergy's proprietary ship management software tool.

Espino Decl. ¶¶ 6-7, 9-11, 14-18, 21.

Significantly, the Management Agreement between Grace Ocean and Synergy is **clear on its face** that "Manager [Synergy] shall **have the authority to take decisions and actions** as they may from time to time **in their absolute discretion** consider being necessary to enable them to

---

[11] Tellingly in the context of this motion, although Mr. Espino was identified by Petitioners in their discovery responses as a person likely to possess relevant information, Claimants chose not to take the deposition of Mr. Espino. Indeed, Claimants chose not to take the deposition of even a single Grace Ocean fact witness. That fact speaks volumes as to who the Claimants actually believe had operational control of the Vessel.

perform the Basic Services." Cl. Ex. 2 at ¶ 3.3 (emphasis added). Those "Basic Services" include: "Crewing, Technical Management, Purchasing, Accounting, Operations," all of which naturally require daily oversight and control. Cl. Ex. 2 at ¶ 1.3. Annex 1 of the Management Agreement sets forth Synergy's responsibilities for the provision of "Basic Services" in greater detail. With respect to "Technical Services," Annex 1 provides that Synergy "shall . . . **supervise the maintenance and co-ordinate daily operations** with shipboard management team and general efficiency of the vessel." *Id.* at Annex 1 (emphasis added). Indeed, Mr. Espino confirmed that "Synergy bears a significant degree of autonomy from Grace Ocean in its operation of the Vessel." Espino Decl. ¶ 23.

Claimants have cherrypicked statements from Petitioners' corporate witnesses regarding Grace Ocean's limited role and attempted to spin those facts to mean Grace Ocean maintains daily oversight and control over the Vessel. That is simply not true.

> **2.      Grace Ocean paid the crew but did not vet, hire, train, or communicate with them.**

Claimants contend that Synergy Marine lacks "possession" of the DALI because the ship is crewed by employees of Grace Ocean" and that it lacks "command" or "navigation" of the DALI for the same reason. Cl. Br. at 13; *See also* Cl. Br. at 10.

Again, it is clear on the face of the Management Agreement that Synergy is responsible for providing the crew. Annex 1's "Crew Employment and Management" section provides that Synergy "shall **provide suitably qualified crew for the vessel** as required by the company," and details Synergy's responsible functions as including: "**selecting and engaging** the vessel's crew" and "on board training of crew." Cl. Ex. 2 at Annex 1 (emphasis added). With respect to those obligations, Mr. Kumar testified as follows:

> Q: . . . it says that the manager shall be entitled to allocate available supplies, manpower and services in its discretion. Do you see that?

A: That's correct.

Q: What does that mean, manpower? Is that talking about shipboard crew, or is that talking about shoreside support?

A: What is my understanding is that it is for the ship's crew and also necessary assistance from shore.

Synergy Tr. at 33:23-34:9. When asked further about Synergy's responsibility under the Management Agreement to "provide suitably qualified crew for the vessel as required by the company," Capt. Kumar explained that Synergy's ship management team was responsible for: "providing safe operation of ships," "providing a safe and healthy working environment," "examining the work practices to identify risks," "ensuring that all vessels comply with rules and regulations," "assuring there's adequate resources and shore-based support," "ensur[ing] they're employing competent and qualified personnel," and "regular reviewing and continual improvement of the management system." Synergy Tr. at 302:6-303:20. Capt. Kumar reiterated Synergy's responsibility for providing the crew in his declaration. Kumar Decl. ¶ 8.

Ms. Nakagawa also confirmed that Grace Ocean had no policies with respect to the selection of the Vessel's senior officers (Grace Ocean Tr. at 129:1-130:8); no requirement with respect to on-board training of the Vessel's crew (Grace Ocean Tr. at 132:6-133:4); and did not receive (and did not ask for) crew licensure information (Grace Ocean Tr. at 132:2-5) or crew appraisals conducted by Synergy of the Vessel's crew (Grace Ocean Tr. at 135:3-15). While Claimants contend that Grace Ocean's ultimate control over the Vessel is evident "through its authority to accept or reject the officers that Synergy Marine proposes for service aboard the DALI," Cl. Br. at 20, there is nothing in the Management Agreement that allocates to Grace Ocean any such "veto power," and, in any event, Ms. Nakagawa and Capt. Kumar both testified that Grace Ocean never exercised any such "veto" with respect to the Vessel's crew. (Grace Ocean Tr. at 131:7-15; Synergy Tr. at 45:8-16).

12

### 3. Maersk had no operational oversight of the Vessel.

Claimants' attempt to make something of Maersk's role in the operation of the Vessel (Cl. Br. at 19-20) is entirely misguided.[12] While Maersk, as time charterer, determines which ports at which the Vessel will load and discharge cargo and arranges for fuel, the Master of the Vessel always is in control of the Vessel and would rely on Synergy, and not Maersk, for guidance if the crew needed to divert the Vessel in the event of weather or crew issues, or to ensure safe navigation. *See* Kumar Decl. ¶ 10; Espino Decl. ¶ 13 ("[i]f the Vessel's crew had any concerns about safe navigation or compliance with international law or regulations, they would contact Synergy—not Grace Ocean or Maersk—for guidance.").

### 4. Synergy Marine did not keep any of the operating expenses provided by Grace Ocean for the Vessel and had no financial incentive to avoid spending working capital.

Petitioners' corporate witnesses gave extensive testimony regarding the financial arrangement between Grace Ocean and Synergy regarding the management of the Vessel. While the payment obligations of the parties are not a persuasive factor considered by most courts in the analysis of a party's eligibility under the Limitation Act, Claimants went to great effort to mischaracterize the testimony of both witnesses on this point. In particular, Claimants repeatedly assert that "Synergy Marine keeps as profit any funds not expended from working capital." Cl. Br. at 14; *see also* Cl. Br. at 15. Not true. As explained by both corporate witnesses and as further clarified in the Espino and Kumar declarations, the Management Agreement requires Grace Ocean to pay Synergy (1) a monthly management fee; (2) a monthly lump sum working capital; and (3) fees for costs, expenses, and fees for any additional services. Cl. Ex. 2 at ¶ 4.1; Kumar Decl. ¶ 21.

---

[12] Petitioners are perplexed by Claimants' implication that the Bates numbering of its production was relevant in the context of the Maersk charter party. Cl. Br. at n. 4 (*see also* n. 8). As expressly stated in Petitioners' Responses to Claimants' Requests for the Production of Documents: "Documents are being produced using the prefix 'Petitioner' and do not distinguish between Synergy and Grace Ocean."

Since the operating budget is an estimate, costs may be over- or underestimated. If costs are underestimated, Synergy puts in a request for additional funds from Grace Ocean. If costs are overestimated, which is more common, Grace Ocean decides how it would like to allocate the excess funds. Grace Ocean has routinely asked Synergy to retain possession of the funds and reallocate the funds to other expenses, *i.e.*, non-budget or budgeted expenses. Espino Decl. ¶ 19; Kumar Decl. ¶ 23. When Grace Ocean decides to reallocate excess funds from unused operating budget dollars, those funds remain on account with Synergy and are used only on budget or non-budget items for Grace Ocean. The excess funds belong to Grace Ocean and are not profit for Synergy. Espino Decl. ¶ 19; Kumar Decl. ¶ 24. In terms of being paid for rendering services, the only profit or financial gain Synergy receives is the mutually agreed "monthly management fee" and payment for "additional services" as mutually agreed. Synergy Tr. at 30:24 - 31:17; Kumar Decl. ¶ 25. Synergy does not "keep" any "surplus;" such overages are held in Synergy's account for Grace Ocean for use by Synergy as requested by Owner. Synergy Tr. at 67:17 - 69:7; Kumar Decl. ¶¶ 28-30.

The disputed nature of these key facts inherently renders this an issue that is not appropriate for summary judgment (notwithstanding Petitioners' position that Synergy should qualify as an owner *pro hac vice*). Finally, if the Court is not inclined to deny Claimants' motion outright and affirm Synergy's status, then the more appropriate course is to hold the issue for resolution during trial. *See* Claimants' Motion at 12 n. 14; *In re Barracuda Tanker Corp*., 281 F. Supp. At 230-232 (S.D.N.Y. 1968) (holding that disputed facts meant that summary judgment request would be held for resolution during trial.)

C.  **Claimants' Characterization of Existing Case Law is Inaccurate and Incomplete**

1.  **Claimants' "Cases Finding Eligibility"**

Claimants acknowledge six "Cases Finding Eligibility,"[13] but then make the blanket statement that those cases are all distinguishable because they involved the manager acting "autonomously" (in quotes) from the vessel owner and then asserting that is not the case here.[14] Cl. Br. at 12. Upon scrutiny, however, it is clear the cases acknowledged by Claimants fully support Synergy's position. In particular:

■  *In re Complaint of Chesapeake Shipping, Inc.*, 803 F. Supp. 872 (S.D.N.Y. 1992) originates the factors that are later relied upon in this District's holding in *Norfolk Dredging Co.* and numerous other cases. There, the court considered whether a ship management company and operator of the vessel, Gleneagle, was entitled to limit its liability after the vessel it was managing suffered fires and explosions and was abandoned by its crew, resulting in deaths, injuries, and cargo loss and damage. Of note, the court summarized Gleneagle's role as:

> manning the vessels; victualing the vessels; providing for navigation, which involved procuring and providing deck, engine and cabin stores; maintenance and repairs for hull and machinery; providing spare parts, maintenance and repairs for communication and navigation equipment; arranging for United States Coast Guard and classification society (American Bureau of Shipping) technical surveys; and communicating with [owner] and the vessels' time charterers.

The court concluded:

> Gleneagle's managerial role was autonomous. At the beginning of each month it requested and received funds from Chesapeake to meet budgeted expenses. The accounts were reconciled and trial balances stated at the end of each month.

---

[13] As discussed further below, Claimants' table is grossly incomplete and fails to disclose numerous other cases where a ship manager was found eligible (or, at least, not ineligible) to rely on the Limitation Act.

[14] In fact, only two of those cases even use any derivative of the term "autonomous" and, notably, the *In re M/V Seaboard Spirit* court specifically qualified that reference, noting that courts look to the "*degree* of autonomy from the actual owners" that the managers exercise. 2014 WL 3673323, at *2 (emphasis added) (citing *In re Tourtellotte*, 2010 WL 5140000, at *3).

> Gleneagle's accounts for Chesapeake were audited by the latter's certified public accountants at the end of each fiscal year.

*Id.* at 873-74. Here, Synergy's role is: manning the Vessel; victualing the Vessel; providing for navigation, which involves procuring and providing deck, engine and cabin stores; maintenance and repairs for hull and machinery; providing spare parts; maintenance and repairs for communication and navigation equipment; arranging for port state and classification society technical surveys; and communicating with Maersk. In comparison to the *Chesapeake Shipping* facts, Synergy's role was at least as autonomous, if not more so. At the beginning of each month, it received funds from Grace Ocean to meet its budgeted expenses. The accounts were periodically reviewed and reconciled and rolled over for future use on Grace Ocean's account.

Claimants assert that the *Chesapeake Shipping* court "permitted . . . limitation in part because the agreement between the owner and manager specified that only the manager would have liability for the claims at issue." Cl. Br. at 16. That is incorrect. First, the "claims at issue" only related to personal injury of the ship's crew. Here, under the Management Agreement, Synergy is responsible for procuring crew insurance[15] so, it would not be a "180-degree opposite situation" as Claimants' contend. Synergy's Management Agreement, if applied to *Chesapeake Shipping*, actually would cover the "claims at issue." Further, the court does not even conclude that the ship manager in *Chesapeake Shipping* bore responsibility for the claims at issue. Rather, the court notes that the management company had hired a "crew P&I (protection and indemnity) claims *agent*, and other management staff, who devoted their efforts to the Chesapeake fleet." 803 F. Supp. at 872. (emphasis added). There was no discussion of which party bore ultimate responsibility.

---

[15] Cl. Ex. 2 at Annex 1, Crew Employment and Management ¶ (i).

- In *In re M/V Seaboard Spirit,* on facts closely analogous to those in the present case, the court considered petitioners' response to an order to show cause with respect to the ship management company's right to petitioner status under the Act. As discussed above, the court noted that applicable management agreement provided that the manager bore responsibility for: "(a) manning the vessel; victualing and insuring the crew, [ ]; (b) providing and supervising maintenance and repairs to the vessel [ ]; (c) arranging for the supply to the vessel of various parts and services [ ]; and (d) maintaining appropriate and adequate financial records." 2014 WL 3673323, at *2. Moreover,

> [i]n addition, Petitioners cite sworn testimony of various 'high ranking members' of Seaboard Ship Management to confirm the aforementioned contractual responsibilities as well as others. For example, these individuals testified that Seaboard Ship Management was entirely responsible for handling 'operations, crewing, and accounting,' 'purchasing whatever was required,' 'making sure the maintenance was carried out on a routine schedule,' 'the technical operation of the vessel,' and hiring the captain and chief officer of the vessel.

*Id*.

The similarity between the ship manager's role in *Seaboard Spirit* and Synergy in the present case is further evident upon review of *Petitioners' Response to Order to Show Cause* filed in the *Seaboard Spirit* case. Case 1:11-cv-23841-RLR, ECF No. 147 (S.D. Fla. May 16, 2014), and the ship management agreement annexed thereto (ECF Bo. 147-1) (copies provided as Exhibit 2). Contrary to Claimants' mischaracterization of that case as involving "a ship manager [being] permitted to pursue limitation where it hired the crew and insured the vessel," (Cl. Br. at 14), the actual record shows that there, as here, the ship manager *arranged* to hire the crew,[16] was an

---

[16] "All Crew provided by Manager are contracted by Manager *on behalf of and as agent of Owner*, and are contracted *Crew of Owner*." Pet. Ex. 2, ECF No. 147-1, at ¶ 2.1(a). (Emphasis added).

additional assured on the owner's P&I policy for the vessel,[17] with owner undertaking to indemnify the manager for any claims.[18]

The role of the vessel's manager in *Seaboard Spirit* as a target of claims also is instructive. Notably, the *Seaboard Spirit* court concluded that: "Claimants have nonetheless failed to refute, or even address, the abundance of case law finding that a vessel manager can be covered under the Act: (a) due to its 'ownership or control of the vessel;' (b) where it is a 'likely target' for liability claims stemming from the vessel's maintenance and operation; or (c) where its duties consist of, *inter alia*, manning the vessels, victualing the vessels, providing for navigation, maintenance and repairs for hull and machinery, and providing spare parts." 2014 WL 3673323, at *9 (internal case cites omitted) (citing *Complaint of Chesapeake Shipping*, 778 F. Supp. 153, 156 (S.D.N.Y. 1991); *Houseboat Starship II*, 2005 WL 3440788, at *3; *Chesapeake Shipping*, 803 F. Supp. at 873-74).

### 2.    *More* Cases Finding Eligibility

Claimants assert at page 11 of their Brief that they are "aware of no case where a manager was found eligible under the Act on facts similar to those present here." But, as noted above, *Seaboard Spirit* is closely analogous to the present case and found the manager eligible under the Limitation Act. Moreover, Claimants' table of cases comes nowhere close to describing the universe of relevant cases supporting Synergy's position. In this respect, the following cases (which were not included in Claimants' table) are instructive:

▪ In *Matter of Seacor Marine, LLC*, 2011 WL 13579651 (E.D. Tex. Nov. 2, 2011), the court reversed its prior summary judgment ruling finding that a petitioner did not qualify as an owner

---

[17] "Ensure that all insurance policies shall be taken out in the name of the Owner, and that the Manager and Seaboard Marine Ltd. Are listed on all such policies as additional named insureds." Pet. Ex. 2, ECF No. 147-1, at ¶ 2.4(b).

[18] "Owner shall indemnify and hold harmless and defend Manager against any and all claims and demands for injury to persons or property or other loss or liability arising directly or indirectly out of the management of the Vessel or the performance of the Manager of its obligations under this Agreement other than gross negligence or willful misconduct of the Manager." Pet. Ex. 2, ECF No. 147-1, at ¶ 2.5.

of a vessel after being presented with additional evidence regarding the petitioner's operational control of the vessel. The court conducted a detailed analysis of what constitutes an "owner" pursuant to the Limitation Act, noting that "[c]ourts have adopted a 'liberal approach' in determining who may maintain an action under the Act as a vessel 'owner.'" *Id.* at *4 (citing cases). Quoting *In re Barracuda Tanker Corp.*, 281 F. Supp. at 231 (discussed below) and citing other cases, the court noted that, "'[t]he rule that has emerged from the cases considering ownership status appears to be that, if the petitioner may be held liable because of his ownership or control of the vessel, he can maintain a petition to limit his liability.'" *In re Matter of Seacor Marine, LLC*, 2011 WL 13579651 at *4. The court determined that the issue, therefore, is "'whether a party who claims the status of owner exercised sufficient dominion and control over the vessel to be an owner *pro hac vice* even though neither technically a title-holding owner nor a charterer.'" *Id.* (citing *In re Am. Milling Co., Ltd.*, 409 F.3d at 1014). Of the facts in question, the court noted that the petitioner ship manager had presented an affidavit stating that the petitioner was responsible for "(1) providing the vessel's crew; (2) providing deck and engine supplies; (3) provisioning the vessel; (4) providing for the maintenance and repair of the vessel; (5) ensuring that the vessel complied with United States Coast Guard regulations; (6) providing spare parts and equipment; and (7) providing for the navigation and movement of the vessel." *Matter of Seacor Marine, LLC*, 2011 WL 13579651 at *4. The court concluded that "[t]hese responsibilities are adequate to create a fact issue as to whether [petitioner] exerted sufficient dominion and control over the [vessel] to be considered an owner *pro hac vice* entitled to limit its liability." *Id.*

- In *SCF Waxler Marine LLC v. M/V Aris T*, 427 F. Supp. 3d 728, 740 (E.D. La. 2019) *aff'd* 24 F.4th 458 (2022), an ocean-going bulk carrier struck three marine terminals and several other

vessels. Various injured parties sued the vessel, its owner, and its manager and the vessel interests subsequently petitioned for limitation under the Act. *Id.* In relevant part, the vessel's owner was the employer of the crew and the vessel's manager, Marmaras, was the DOC holder for the vessel, and held a safety management certificate for its SMS. *Id.* at 743 (¶¶ 20, 21). After a bench trial on the merits, the court held that: "The Aris T interests are entitled to limit their liability — ARIS T ENE as owner of the Aris T, *see* 46 U.S.C. § 30505, and Marmaras as a vessel operator having significant management and operational control over the Aris T." *Id.* at 776 (¶ 75) (citing *In re Ingram Barge Co.*, 2007 WL 2088369, at *3 (E.D. La. July 19, 2007)).

■ In *In re Nat'l Shipping Co. of Saudi Arabia*, 147 F. Supp. 2d 425, 429 (E.D. Va. 2000), a U.S. Navy ship collided with a commercial vessel, causing significant damage to both vessels and a number of injuries. The commercial vessel's owner and operator, a ship management company, petitioned for limitation under the Act.[19] *Id.* While the court did not expressly summarize its rationale for permitting the management company to limit, it described the operator as "responsible for the maintenance and operation of the vessel, including the crewing." *Id.* at 440. The court conducted a detailed review of the relationship between the parties and, in particular, the ship manager / operator's role in the crew selection process, and the use of the safety management system in use by the ship's operator. *Id.* at 440-41. In permitting the owner and ship manager / operator to limit liability, the court concluded that: "The term 'shipowner,' as used in the statute, has been construed to include a ship management

---

[19] The case explained that the vessel's owner had an ownership interest in the ship operating company, and that the owner of the vessel had an ownership interest in the operating company but also stated that "the companies function as separate and distinct entities." *In re Nat'l Shipping Co. of Saudi* Arabia, 147 F. Supp. 2d at 441.

company responsible for the operation of the vessel." *Id.* at 444 n. 8 (citing *In re Chesapeake Shipping, Inc.*, 803 F. Supp. at 874–75)).

- In *Tennessee Gas Pipeline v. Rowan Companies*, 1996 WL 210709, at *4 (E.D. La. April 25, 1996), the court denied summary judgment because there were disputed issues of law and fact as to whether a party was entitled to limit its liability. The court noted that the petitioner "promulgated the employee manual with which the crew and vessel were required to comply" and "arranged for insurance and was a named insured on the hull, P&I, and collision and tower's policies." *Id.* at *3. Further, the petitioner "administered the safety program including a safety award program." *Id.* The court considered that these factors all "may indicate the kind of dominion which would allow petitioner to limit its liability under the Limitation Act." *Id.*

- In *Complaint of B.F.T. No. Two Corp.*, 433 F. Supp. 854, 872-73 (E.D. Pa. 1977), a tanker collided with a barge on the Delaware Bay in Philadelphia. The owner and operator of the tug that was towing the barge sought to limit their liability under the Act. *Id.* The court stated, in relevant part, that: "[i]t is because of their status as operators that they are potentially liable for the negligence of the vessels, and it is because of their status as operators that they fall within the scope of the limitations statutes." *Id.* at 873 (citing *In re Petition of United States*, 259 F. 2d 608, 610 (3d Cir. 1958)).

- In *In re Barracuda Tanker Corp.*, 281 F. Supp. 228, 229 (S.D.N.Y. 1968),[20] the vessel's owner and long-term time charterer, Union Oil Company ("Union"), petitioned for limitation after a significant stranding and sinking of the vessel off the coast of England. Claimants, all foreign

---

[20] Claimants reference *In re Barracuda* in a footnote to their "Cases Finding Eligibility" column, but conclude that the court "never reached an answer." However, Claimants fail to account for the fact that *Barracuda* was considering whether a *time charterer* was entitled to limit – a much higher bar, and also did not acknowledge the "rule" of the case, set forth above. Moreover, as that Court noted, "[e]ven if Union should ultimately fail to establish its right to limit, this court may retain jurisdiction to dispose of the 'concourse' of claims asserted against it." *In re Barracuda Tanker Corp.*, 281 F.Supp. at 232.

governments, filed claims in the action, but each only against Union. Claimants then challenged Union's right to standing as a petitioner under the Limitation Act. The court conducted a detailed history of the Limitation Act and its application to various entities, noting that, "the courts have always construed the term 'owner' in § 183 very broadly, in order to effectuate the congressional intent." *Id.* at 232 (citing cases). Of the cases it cited, the court noted:

> These cases have held such diverse parties as shareholders, mortgagees, prior vendors, life tenants, trustees and government agencies operating privately owned ships in wartime to be "owners" entitled to limit liability. **The rule that has emerged from these cases appears to be that, if the petitioner may be held liable because of his ownership or control of the vessel, he can maintain a petition to limit his liability**. [] Whether this rule should be extended to the case at bar presents a difficult question.

*Id.* (internal citation omitted) (emphasis added).

### 3.    Claimants' "Cases Rejecting Eligibility"

Claimants identify six cases which they contend "reject eligibility" of managers for application of the Limitation Act. Cl. Br. at 12. None of these cases support their argument.

In the first place, one of those six cases—*Norfolk Dredging Co.*, 264 F. Supp. 2d 265— actually supports Synergy's position. There, the Court granted a claimant's motion to dismiss the vessel manager's limitation complaint on the basis that it had failed to allege *any* facts about its responsibilities and duties with respect to the owner. *Id.* at 266. The court expressly granted the manager leave to file an amended complaint, however, noting that:

> [c]ases which have found managing agents[21] to be entitled to owner pro hac vice status have done so where the management company has responsibilities including:

---

[21] Notably, Claimants' cite to *Norfolk Dredging Co.* does not include the reference to "managing agents" (Cl. Br. at 4). Which thus ignores the fact that, in this jurisdiction, a court will evaluate a ship manager's actions and not deny eligibility based only on the fact that a manager is contractually referred to as an "agent." Stated differently, in contrast to some cases cited by Claimants, in this District managing agents can be found to be "owners."

> Manning the vessels; victualing the vessels, providing for
> navigation, which involved procuring and providing deck, engine
> and cabin stores; maintenance and repairs for hull and machinery;
> providing spare parts, maintenance and repairs for communication
> and navigation equipment ..., and communicating with [the owner]
> and the vessels' time charterers.

*Id.* at 266 (quoting *Chesapeake Shipping*, 803 F. Supp. at 873-74). This case therefore closely describes the relationship Synergy bears to Grace Ocean and fully supports Synergy's argument that it falls within the category of vessel managers that are entitled to protection under the Limitation Act. The other cases relied on by Claimants are readily distinguishable.

- In *In the Matter of the American Milling Co.*, the Eighth Circuit relied in part on the facts that: (1) Owners met with crew before the season to provide updates on operating policies and procedures; (2) Owners retained substantial control over hiring and authority over the selection of the captain and crew; and (3) Owners had a mechanical crew for overhauls and was ultimately responsibility for all repairs. 409 F.3d at 1016. Here, in contrast, Grace Ocean never met with the Vessel's crew, has no operating policies or procedures to impart on the crew, has effectively no control over hiring the captain and crew, has no mechanical staff, and solely relies on Synergy for all maintenance and repairs. Cl. Ex. 2 at Annex 1; *See* Espino Decl. at ¶¶ 11-13, 15, 17.

- In *In Matter of Oil Spill by Amoco Cadiz Off Coast of France on March 16, 1978*, 954 F.2d 1279 (7th Cir. 1992) ("*Amoco Cadiz*"), a tanker broke apart during a severe storm off the coast of France and released crude oil into the water. Prior to the incident, the vessel's owner, Amoco Transport ("Transport"), had entered into a consulting and chartering agreements with Amoco International Oil Company ("AIOC"). *Id.* at 1302. Amoco Transport was a subsidiary of AIOC and of Standard Oil Company. *Id.* at 1287. The Seventh Circuit noted that AIOC was contracted to "assist and advise Transport with regard to the maintenance and operation of the

23

ship." *Id.* at 1302. Both AIOC and Standard sought exoneration from or limitation of liability as owners of the vessel, but their petitions were dismissed by the district court. *Id.* In denying the petition, the district court found that AIOC and Standard failed to affirmatively demonstrate their status as "owner," rather they relied only on the allegations of the complaints filed against them.[22] *Id. Amoco Cadiz* is factually different from our case and at odds with Fourth Circuit law. In *Amoco Cadiz*, the parties that were dismissed from the petition were the corporate parents of the party determined to be the vessel owner. *Id.* at 1287. Not so here. Synergy and Grace Ocean are distinct and separate corporations with no corporate ties. Additionally, here Synergy's "absolute discretion" is entirely distinguishable from AIOC's role to "assist and advise." *Id.* at 1302; Cl. Ex. 2 ¶ 3.3. Finally, unlike the *Amoco Cadiz* petitioners, Synergy has pled sufficient facts from the outset as to why it is entitled to ownership status. *See* ECF No. 1 ("At all relevant times, Synergy had substantial control of and exercised dominion over the Vessel").[23]

- *Birmingham Southeast v. M/V Merchant Patriot*, 124 F. Supp. 2d 1327 (S.D. Ga. 2000), is also procedurally and factually distinguishable. First, the opinion is post-bench trial and with the

---

[22] The district court in *In re Amoco Transp. Co.*, 1979 WL 6504602, at *4 (N.D. Ill. Apr. 17, 1979), describes this situation in more detail:

> Apparently, Amoco International, Standard, and Claude Phillips seek to establish ownership status based upon the allegations of the complaints filed in the various civil actions in which they are defendants … This strategy cannot succeed. Although it is true that the complaints filed against these plaintiffs contain language which avers some degree of their ownership of and control over the vessel, the limitation plaintiffs must affirmatively demonstrate in the complaint filed in this court their status as owners or charterers. They cannot prove or even effectively allege such status based upon the allegations of others. Such allegations are not incontrovertible admissions of indisputable fact.

(Citations omitted).

[23] Claimants also rely on *Amoco Cadiz* for the premise that being designated as an agent for owner is a reason to deny eligibility. *See* Cl. Br. at 18 (citing *Amoco Cadiz* at 1303). However, as discussed *supra*, this reasoning by the Seventh Circuit is squarely at odds with this District's opinion in *Norfolk Dredging Co.*, 264 F. Supp. 2d 265 (D. Md. 2003).

input of post-trial proposed findings of fact and conclusions of law.[24] *Id.* at 1329. In terms of factual differences, the vessel's owner ("Cenargo") and manager ("V Ships"), did not have a written management agreement. *Id.* at 1330. The principal of Cenargo described himself as a "hands-on owner" who would personally attend and inspect the vessels. *Id.* at 1332. Additionally, the court concluded that "Cenargo was always in ultimate control of the vessel and the crew. The decisions about the direction of the vessel rested with Cenargo." *Id.* at 1339. In contrast, here Grace Ocean transfers virtually all operational control of the Vessel to Synergy Marine. Espino Decl. ¶ 13. Grace Ocean has never performed its own inspection of the Vessel, nor ever even attended on board. Espino Decl. ¶ 11. Further, the Management Agreement at issue delineates clear and thorough responsibilities and affords Synergy the right to perform its duties with "absolute discretion," which is a far cry from the oral contract in *Birmingham Southeast*.

▪ Similarly, *In re CF, LLC*, 19-00154, 2020 WL 557720 (W.D. La. Feb. 3, 2020), is factually distinguishable. There, two parties, LeBlanc and CF, had an oral agreement to share each other's boats and equipment at a construction site with each party having two boats on site. *Id.* at *1. A LeBlanc boat operated by a CF employee ran aground, causing injury to a passenger. *Id.* at *2. CF filed for limitation on the premise that it was operator and *pro hac vice* owner of LeBlanc's boat and the injured party filed for summary judgment to deny CF eligibility. *Id.* at *3. The District Court granted summary judgment and dismissed CF's petition for limitation. *Id.* at *4. Nearly every fact of this case is different from ours. CF was not responsible for supplying the crew for the vessel; Synergy Marine is. Kumar Decl. ¶ 8. CF was not responsible for the repair and maintenance of the vessel unless a CF employee caused damage; Synergy

---

[24] Thus, to the extent this case holds any weight (which is denied), at the very least Claimants' summary judgment request should be held for resolution after trial.

Marine is (regardless of who or what causes the damage). Kumar Decl. ¶ 11, 14, 15. CF's use of the vessel was limited to a short time period, while Synergy Marine operates the Vessel one hundred percent of the time for Grace Ocean and is the DOC holder. Kumar Decl. ¶ 3. Ultimately, the Court in *In re CF* agreed that there was a "total lack of transfer of ownership responsibilities." *Id.* at *4. In our case, there was a near total transfer of ownership responsibilities between from Grace Ocean to Synergy. Espino Decl. ¶¶ 5, 6, 13.

- Lastly, Claimants cite to *In re David & Colleen, Inc.*, No 04-1176, 2006 WL 2092445 (S.D. Tex. 2006), aff'd, 234 Fed. Appx. 211 (5th Cir. 2007). This case arises from the collision of a tugboat with a tanker in the Houston Ship Channel. *Id.* at *1. The court ordered the parties to binding arbitration and the arbitration panel issued an award subject to the operator's potential right to limit its liability. *Id.* Claimant Seariver, the owner of the tanker, moved for an entry of judgment against the operator on the grounds that the operator of the tug was not entitled to limit its liability. *Id.* The tug's owner, David and Colleen, Inc. ("David and Colleen"), and the tug's operator were both wholly owned by the same individuals. *Id.* at *2.

As discussed above, Grace Ocean and Synergy are two distinct companies with different corporate parents and no common shareholders, and there is no allegation otherwise. Kumar Decl. ¶ 1; Espino Decl. ¶ 1. In *David & Colleen*, the tug operator's owner and president testified that the operator "did the jobs that [owner] instructed it to do." *In re David & Colleen*, 2006 WL 2092445 at *2. Not so in our case. Grace Ocean does not instruct Synergy, rather it authorizes and delegates authority to Synergy to safely and effectively manage the operation of the Vessel, with its "absolute discretion." Cl. Ex. 2 at ¶ 3.3. Further, in contrast to *David & Colleen,* Synergy and not Grace Ocean is listed as the "operator" on United States Coast Guard documents. Kumar Decl. ¶ 18.

26

### D.    Disputed Legal Analysis

Petitioners also take issue with certain of Claimants' legal arguments that Claimants assert, largely without support, bear on the determination of a ship manager's right to limit under the Limitation Act. In particular:

### 1.    Insurance Coverage Status

Claimants point to the fact that Synergy is jointly insured with Grace Ocean as supportive of their argument that Synergy should not be entitled to limitation. Cl. Br. at 9, 16. However, none of the cases cited by Claimants actually analyze why this factor should weigh one way or the other. Contrary to Claimants' argument, this fact actually underscores that Synergy is assuming risk normally associated with that of a vessel owner and therefore needs to be insured against those risks in the same way that a vessel owner is insured. If Synergy's exposure were asymmetrical to an owner's risk of liability, then an owner's insurance coverage would not be applicable to Synergy's role vis-à-vis the vessel. Certainly, the time charterer, Maersk, has no operational control over the vessel, and so it is unsurprising that the time charterer is not covered under the Vessel owner's insurance. Indeed, there is an entirely different insurance product available in the market to cover a time charterer's third-party liability risks called a "charterer's liability policy."[25] It is entirely logical, on the other hand, that the manager/operator of a vessel would be covered under the vessel's owner's policy where, as here, its control over the vessel is substantial and its exposure to third-party claims arises specifically because of that operational control.

Notably, Claimants mischaracterize the role insurance played in analyzing the status of the managers in *Petition of United States* and *Chesapeake Shipping*, suggesting that those cases are

---

[25] *See* World Insurance, *Charterers Liability Insurance*, https://www.worldinsuranceagency.com/services/charterers-liability/ (last visited Sept. 24, 2025).

distinguishable because in those cases the manager was charged with the role of obtaining insurance. But in *Petition of United States*, the manager was charged under the management agreement with obtaining insurance *for the Government* and not, as Claimants suggest, for itself. 259 F.2d at 609. And Claimants misreading of *Chesapeake Shipping* is even more stark; there, the only evidence[26] relating to insurance was the fact that the manager hired "a crew P&I (protection and indemnity) claims *agent*, and other management staff, who devoted their efforts to the Chesapeake fleet." 803 F.Supp. at 873 (emphasis added). Claimants also cite to *Matter of Wilson Yachts, LLC*, 605 F. Supp. 3d 695 (D. Md. 2022) in an effort to show that no joint venture was in place.[27] But Synergy and Grace Ocean are not arguing there is a joint venture in place; nor is "financial risk" at all a requirement in determining owner *pro hac vice* status under the Limitation Act.

### 2.    Agency

Similarly, Claimants argue that Synergy is merely an agent of the owner and therefore not entitled to limitation (Cl. Br. at 10, 11, 18), but Claimants totally ignore the many cases where vessel managers have been held entitled to limit notwithstanding that they were ultimately acting as agents for the owner. *See In re Seaboard Spirit*, 2014 WL 3673323 at *3 (rejecting argument that manager should not be entitled to limit because it "was not operating [the vessel] for its own account, but solely as manager for the owner" (internal quotations omitted); *In re Tourtellotte*, 2010 WL 5140000, at *2 ("Cases which have found managing agents to be entitled to owner pro

---

[26] The court noted at p. 872 that the manager had *alleged* in its complaint that it "handled and settled insurance," but the court made no such finding and did not point to this as being a relevant factor in its holding that the manager was entitled to the protections of the Limitation Act. *Chesapeake Shipping*, 803. F. Supp at 827.

[27] *Aff'd sub nom. In re Wilson Yachts, LLC*, 22-1766, 2024 WL 1171207 (4th Cir. Mar. 19, 2024). *Wilson Yachts* did involve the Limitation Act, but only the owner of the vessel sought limitation and there was no question about which party was eligible for limitation. 605 F.Supp.3d at 700. The holding of the case centered on whether or not a bareboat charter existed between the ship manager and a third party (which is not a question here) for a single day charter of a recreational vehicle. *Id.* at 701–02. It is wholly distinguishable on its facts.

hac vice status where their responsibilities include: '[m]anning the vessels; victualing the vessels, providing for navigation, which involved procuring and providing deck, engine and cabin stores; maintenance and repairs for hull and machinery; providing spare parts, maintenance and repairs for communication and navigation equipment ... and communicating with [the owner] and the vessels' time charterers.'") (citing *In re Chesapeake Shipping*, 803 F. Supp. 872, 873–74 (S.D.N.Y.1992)); *Matter of Seacor Marine LLC*, 2011 WL 13579651 at *4 ("Courts have bestowed owner pro hac vice status upon operators or operating agents where the entities bore similar responsibilities, such as "[m]anning the vessels; victualing the vessels, providing for navigation; ... procuring and providing deck, engine[,] and cabin stores; maint[aining] and repair[ing] ... hull and machinery; providing spare parts, maint[aining] and repair[ing] ... communication and navigation equipment ..., and communicating with [the owner] and the vessels' time charterers.") (citing, *inter alia, Petition of the United States*, 259 F.2d at 610 and *Complaint of B.F.T. No. Two Corp.*, 433 F. Supp. at 871-73).

Ultimately, the question of whether Synergy is an agent of the vessel owner is not determinative, and nor should it be. The correct question is whether the manager is fulfilling the owner's role and thereby taking on potential liability akin to what an owner would face.

### E.    Synergy Qualifies as an "Owner *Pro Hac Vice*" of the DALI

As noted above, the Limitation Act is designed to cover one who is a "likely target" for liability claims predicated on its status as an entity responsible for the vessel's maintenance and operation. *In re Houseboat Starship II*, 2005 WL 3440788 at * 3. Here, Synergy is not merely a "likely target" – it is an actual and current target that the Claimants herein have alleged should bear full and unlimited liability for the damages arising from the March 26, 2024 allision. Specifically, the Claimants have alleged, among other things, that the allision occurred because the "[t]he DALI's owner *and operator* failed to address [] critical defects in equipment and the

concomitant deficiencies in ship personnel." ECF No. 157 at 4 (emphasis added). *See also id.* at pp. 29-30 (asserting various allegations of operational and management negligence). Thus, there can be no doubt that Claimants' claims concerning the underlying allision rest on the operation, manning, management and control of the Vessel – points on which it is undisputed that Synergy, as the DALI's manager, exercised substantial control. Here again, it is telling that during fact discovery Claimants deposed eleven Synergy shore-based personnel and deposed zero Grace Ocean shore-based personnel. This reveals that Claimants know full well who exercised operational control of the Vessel.

Synergy was contractually-obligated to man the Dali; victual the Dali; and provide for navigation of the Dali, which involved procuring and providing deck, engine and cabin stores. Synergy was contractually obligated to arrange maintenance and repairs for hull and machinery, providing spare parts; maintain and repair communication and navigation equipment; and it was obligated to communicate with Grace Ocean and with Maersk. Synergy did all this and thus meets the standard for what constitutes an owner *pro hac vice* under general maritime law and in this District.

<u>**REQUEST FOR HEARING**</u>

Petitioners respectfully request a hearing on this Opposition and Claimants' Motion pursuant to Local Rule 105.6.

<u>**CONCLUSION**</u>

Petitioners respectfully request that the Court deny Claimants' Motion for Summary Judgment and grant Petitioners such other and further relief that the Court deems just and proper.

Dated: September 30, 2025

/s/ Laurie G. Furshman
Laurie G. Furshman (Bar No. 29604)
Lgfurshman@duanemorris.com
Robert B. Hopkins (Bar No. 06017)
Rbhopkins@duanemorris.com
Duane Morris LLP
1201 Wills Street, Suite 330
Baltimore, MD 21321
(410) 949-2900

BLANK ROME LLP

Luke M. Reid (Bar No. 31228)
Luke.Reid@blankrome.com
125 High Street, 3rd Floor
Boston, MA 02110
617-415-1200

William R. Bennett, III*
William.Bennett@blankrome.com
Thomas H. Belknap, Jr.*
Thomas.Belknap@blankrome.com
Noe S. Hamra
Noe.Hamra@blankrome.com*
Neil P. McMillan
Neil.McMillan@blankrome.com*
1271 Avenue of the Americas
New York, NY 10020
212-885-5000

Kierstan L. Carlson*
Kierstan.Carlson@blankrome.com
Emma C. Jones*
Emma.Jones@blankrome.com
1825 Eye St. NW
Washington, DC 20006
202-420-2200

*Admitted pro hac vice

31

## CERTIFICATE OF SERVICE

I CERTIFY that on this 30th day of September, 2025, the foregoing was filed in the United States District Court for the District of Maryland via the Court's CM/ECF filing system, which will provide notice of this filing to all counsel of record.

*/s/ Laurie G. Furshman*