## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

<table>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>In the Matter of the Petition of GRACE</td><td>*</td><td rowspan="2">Civ. No. 24-0941-JKB</td></tr>
<tr><td>OCEAN PRIVATE LIMITED, <em>et al.</em>,</td><td>*</td></tr>
<tr><td>for Exoneration from or Limitation of</td><td>*</td><td><em>IN ADMIRALTY</em></td></tr>
<tr><td>Liability</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
</table>

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

### MEMORANDUM

### I.    Background

This action relates to the allision of the M/V Dali ("the Dali" or "the Vessel") with the Francis Scott Key Bridge on March 26, 2024. (ECF No. 1.) On April 1, 2024, Petitioners Grace Ocean Private Limited ("Grace Ocean") and Synergy Marine Pte Ltd ("Synergy")—the alleged owner and manager of the Dali, respectively—filed suit, seeking the protections of the Shipowners' Limitation of Liability Act of 1851, 46 U.S.C. §§ 30501–30 ("the Limitation Act" or "the Act"). (*Id.*) Pursuant to the Act, "a shipowner's liability for a maritime loss or mishap is limited to the value of the ship and her pending freight if the mishap occurred 'without the privity or knowledge' of the owner." *Pickle v. Char Lee Seafood, Inc.*, 174 F.3d 444, 448 (4th Cir. 1999).

The same day Petitioners filed suit, the Court accepted Petitioners' security of $43,671,000 (the interim stipulated value of the Vessel and her pending freight), enjoined the prosecution of claims against Petitioners arising out of the allision except in this action, and established a "monitions period" during which such claims were required to be filed herein. (ECF Nos. 7, 8.) The monitions period has now closed, dozens of claims have been filed, fact discovery has been completed, and expert discovery is ongoing. (ECF Nos. 438, 510.) A "Phase 1" bench trial on the

question of Petitioners' entitlement to limitation of or exoneration from liability is set to begin on June 1, 2026. (*Id.*)

Now pending before the Court is Claimants' Motion for Summary Judgment to Dismiss Synergy Marine's Petition for Limitation Due to its Lack of Standing. (ECF No. 605.) Claimants seek judgment as a matter of law that Synergy is not entitled to the protections of the Limitations Act because it is not an "owner pro hac vice" of the Dali. (*See generally* ECF No. 605-1.) The Motion is fully briefed (*see* ECF Nos. 616, 625), and no hearing is required. *See* Local Rule 105.6 (D. Md. 2025). The Motion will be denied.

## II.    Legal Standards

### A.    Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, "[t]he court shall grant [a motion for] summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The moving party has the burden of demonstrating the absence of any genuine dispute of material fact. *Celotex,* 477 U.S. at 325. Where a motion for summary judgment concerns an issue on which the nonmoving party will bear the burden of proof at trial, the moving party satisfies its burden by showing that there is insufficient proof of an essential element of the nonmoving party's claim; the nonmoving party defeats this showing by identifying specific facts that demonstrate the existence of a genuine issue for trial. *Id.* at 322–25.

In proving the presence or absence of a genuine dispute of material fact, either party may point to materials in the record, such as admissions, stipulations, depositions, documents, and electronically stored information. Fed. R. Civ. P. 56(c). The Court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor.

*Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986); *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam).

## B. The Limitations Act

Petitioners ultimately bear the burden of establishing their entitlement to the protections of the Limitations Act. *Norfolk Dredging Co. v. M/V A.V. Kastner*, 264 F. Supp. 2d 265, 267 (D. Md. 2003); *In re CF, LLC*, No. 19-cv-00154, 2020 WL 557720, at *3 (W.D. La. Feb. 3, 2020). "To invoke the benefits of [the Act], an entity must be either an actual owner or owner pro hac vice of the vessel at issue." *Norfolk Dredging*, 264 F. Supp. 2d at 267; *see also* 46 U.S.C. §§ 30501, 30529 (providing "[t]he owner of a vessel may bring a civil action . . . for limitation of liability," and that "[t]he term 'owner' includes a charterer that mans, supplies, and navigates a vessel at the charterer's own expense or by the charterer's own procurement").

"Most courts have settled on the notion that an owner, for purposes of the Limitation Act, is one who has the type of relationship to the vessel that could subject the person to liability as a shipowner." *Leco Corp. v. Grams*, No. 91-1860, 1992 WL 158875, at *3 (6th Cir. 1992) (unpublished table decision); *see also Dick v. United States*, 671 F.2d 724, 727 (2d Cir. 1982) ("As a general rule, one who is subjected to a shipowner's liability because of his exercise of his dominion over a vessel should be able to limit his liability to that of an owner."); *In re Complaint for Exoneration of or Limitation of Liab. of Shell Oil Co., et al.,* 780 F. Supp. 1086, 1098 (E.D. La. 1991) ("[T]he [A]ct is designed to cover one who is a 'likely target' for liability claims predicated on his status as the person perhaps ultimately responsible for the vessel's maintenance and operation."); *In re Tourtellotte*, No. CIV.A. 09-2787 MLC, 2010 WL 5140000, at *2 (D.N.J. Dec. 9, 2010) ("[W]hether or not one is to be deemed an 'owner' depends largely upon the possibility

3

that he may be subjected to a liability which ordinarily is assertable against one having, or claiming to have, proprietorship or dominion over the [vessel].").

The phrase "owner pro hac vice" is synonymous with "bareboat charterer." *Reed v. The Yaka*, 373 U.S. 410, 412 (1963). A bareboat charter, also called a demise, is a contract for use of a vessel in which a "complete transfer of possession, command, and navigation of the vessel from the owner" to the charterer is effectuated. *Agrico Chem. Co. v. M/V Ben W. Martin*, 664 F.2d 85, 91 (5th Cir. 1981); *see also Guzman v. Pichirilo*, 369 U.S. 698, 699–70 (1962) ("To create a demise the owner of the vessel must completely and exclusively relinquish 'possession, command, and navigation' thereof to the demisee . . . tantamount to, though just short of, an outright transfer of ownership."). Bareboat charters are contrasted with time charters and voyage charters, which entail use of a vessel for a fixed time period, or for a voyage, during which the owner typically remains in control and provides the master and crew. *Agrico Chemical*, 664 F.2d at 91.

Consistent with the requirement of transferring "possession, command, and navigation," courts have extended owner pro hac vice status to ship management companies that display a high degree of "dominion and control" over the vessel. For example:

> Cases which have found managing agents to be entitled to owner pro hac vice status have done so where the management company has responsibilities including "[m]anning the vessels; victualing the vessels, providing for navigation, which involved procuring and providing deck, engine and cabin stores; maintenance and repairs for hull and machinery; providing spare parts, maintenance and repairs for communication and navigation equipment . . . , and communicating with [the owner] and the vessel's time charterers."

*Norfolk Dredging*, 264 F. Supp. 2d at 267 (quoting *In re Complaint of Chesapeake Shipping, Inc. & Gleneagle Ship Mgmt. Co., Inc.*, 803 F. Supp. 872, 874 (S.D.N.Y. 1992)). Courts have denied owner pro hac vice status to ship management companies alleged only to have been a "technical manager" of the vessel, without any further description of responsibilities. *Id.*

In deciding whether Synergy had sufficient dominion and control over the Dali to qualify as an owner pro hac vice, Claimants encourage the Court to evaluate several factors, including: (1) Synergy's financial relationship to the operation of the Vessel, *see, e.g., Agrico Chemical,* 664 F.2d at 92 (specifying that a bareboat charterer "typically is required to carry insurance on the vessel as well as protection and indemnity insurance and crew insurance"); (2) Synergy's relationship to the Vessel's crew, *see, e.g., In re David & Colleen, Inc.,* No. 04-1176, 2006 WL 2092445, at *2 (S.D. Tex. 2006), *aff'd,* 234 F. Appx. 211 (5th Cir. 2007) (treating employment of the crew as dispositive of owner pro hac vice status); *In re M/V Seaboard Spirit,* No. 11-23841, 2014 WL 3673323, at *3 (S.D. Fl. July 23, 2014) (treating crew hiring authority as persuasive); *In re The Am. Milling Co.,* 409 F.3d 1005, 1016 (8th Cir. 2005) (treating the right to approve or disapprove officers as persuasive); and (3) the degree of autonomy Synergy exhibited in its relationship to the Vessel, *see, e.g., Birmingham Se. v. M/V Merch. Patriot,* 124 F. Supp. 2d 1327, 1339 (S.D. Ga. 2000) (treating autonomous, ultimate control of vessel operation as persuasive); *Chesapeake Shipping,* 803 F. Supp. at 874 (treating an autonomous managerial role as persuasive).

Indeed, cases evaluating whether ship managers qualify as owners pro hac vice entitled to the protections of the Act look to quite a wide variety of factors pertinent to dominion and control. Very few of the cases hold any one factor to be dispositive, and the parties have not identified any binding authority that clearly specifies how the various factors may (or must) be weighed against one another. Rather, the case law cited by the parties, taken as a whole, suggests a totality-of-the-circumstances type test, in which the Court takes a holistic view of the ship manager's relationship to the vessel in determining whether there was a transfer of "possession, command, and navigation" sufficient to generate owner pro hac vice status on the part of the manager.

Given this, Claimants' burden on summary judgment is substantial—they must show that the undisputed facts favor them and that there are *no* genuine disputes of material fact that could cause a reasonable finder of fact applying this broad-view test to determine that Synergy had sufficient dominion and control over the Dali. Few courts have so held in this posture.[1] Rather, the fact-specific and fact-intensive nature of the relevant analysis militates against determining owner pro hac vice status on summary judgment.

Ultimately, the Court must evaluate owner pro hac vice status with an eye to the purpose the Limitation Act is meant to serve. As this Court, among others, has previously noted: "Congress's purpose in enacting the Act was to encourage shipbuilding and to induce the investment of money in the maritime industry by limiting the venture to those who build the ships . . . ." (ECF No. 479 at 3 (citations omitted).)  This explains why courts have evaluated the factors they have in determining who is eligible to pursue limitation. It is exactly because factors such as a ship manager's financial relationship to a vessel, its relationship to the crew, and its degree of operational autonomy bear on the risks it accepts managing the vessel—its "venture"—that such factors are relevant to eligibility for the Act's protections. Accordingly, the Court will evaluate these factors here.

## III.    Discussion

Claimants' Motion identifies certain undisputed facts in support of their assertion that Synergy lacked sufficient dominion and control over the Dali to qualify as an owner pro hac vice. But Petitioners' Response[2] identifies other undisputed facts that lean in Synergy's favor, in addition

---

[1] *In re CF*, 2020 WL 557720, and *In re David & Colleen,* 2006 WL 2092445, are exceptions.
[2] Synergy's Opposition to Claimants' Motion is framed as "Petitioners' Opposition" without any explanation of why Grace Ocean has standing to respond to Claimants' challenge. (ECF No. 616.) The Court construes the response as having been filed on Synergy's behalf.

to disputed facts that the Court finds to be material. Viewing the evidence in the light most favorable to the Petitioners and drawing all reasonable inferences in their favor, Claimants are not entitled to summary judgment.

### A.    Management and Operation of the Dali

Three companies were involved in the management and operation of the Dali at the time of the allision: Grace Ocean, the owner; Synergy, the manager; and Maersk Line A/S ("Maersk"), the time charterer. Claimants attach two contracts to their Motion—a Ship Management Agreement between Grace Ocean and Synergy (ECF No. 605-3) and a Time Charter Party Agreement between Grace Ocean and Maersk (ECF No. 605-2)—and assert that these contracts, along with Rule 30(b)(6) testimony from Grace Ocean and Synergy (ECF Nos. 605-4, 605-5), establish that the three companies had performance responsibility for the following tasks or attributes of the Dali's operation:

| Grace Ocean | Synergy | Maersk |
|---|---|---|
| • Ownership | • Manning (arranging) | • Fuel |
| • Insurance (hull) | • Supplies | • Soliciting Cargo |
| • Insurance (liability) | • Routine Maintenance | • Cargo Stowage Plan |
| • Manning (employment) | • Repairs | • Port Agents |
| • Navigation (shared with Maersk) | • Dry Docking | • Stevedoring |
| | | • Customs |
| | | • Ports of Call |
| | | • Schedule |
| | | • Tugs |
| | | • Pilots |
| | | • Navigation (shared with Grace Ocean) |

(ECF No. 605-1 at 10–12.) Claimants further assert that for each of the tasks or attributes for which Synergy had performance responsibility, it was Grace Ocean, not Synergy, who had *financial* responsibility. (*Id.*) Indeed, Claimants emphasize that "Grace Ocean . . . bears all financial risk from the Dali's operations" because it agreed, pursuant to the Ship Management

Agreement, to defend and indemnify Synergy and to insure Synergy against hull/machinery losses and protection/indemnity risks. (*Id.* at 12–13.)

Petitioners largely concede this characterization of each company's responsibilities, with certain exceptions that are discussed further below. However, significantly, Petitioners add that Synergy alone held the Document of Compliance ("DOC") and the Safety Management Certificate for the Dali, which together certify compliance with the International Safety Management Code ("ISM Code"). (ECF No. 616 at 12–13.) Per ISM Code definitions, which are incorporated into U.S. law at 33 C.F.R. Part 96, these documents are issued to "the owner of the ship or any other organization or person such as the manager, or the bareboat charterer, *who has assumed the responsibility for the operation of the ship from the owner of the ship* and who on assuming such responsibility has agreed to take over all the duties and responsibilities imposed by the [ISM] Code." (*Id.* (emphasis added).) Relying on Grace Ocean's 30(b)(6) testimony along with Declarations from Grace Ocean and Synergy employees (ECF Nos. 616-3, 616-5, 616-6), Petitioners assert that Grace Ocean identified Synergy as the ISM operator of the Vessel to the Maritime & Port Authority of Singapore (the Dali's flag state), which demonstrates that it "relie[d] solely on Synergy for the daily oversight and control of the Vessel." (*Id.* at 14.) Claimants, for their part, do not dispute that Synergy was the DOC holder and ISM Manager for the Dali.

### B.    Synergy's Financial Relationship to Operation of the Dali

One of Claimants' central arguments that Synergy was not an owner pro hac vice is that Synergy "lacks any financial risk, which is both a key attribute of ownership and the *raison d'etre* for the Limitation Act." (ECF No. 605-1 at 14, 19–22.)

As noted above, "Congress's purpose in enacting the [Limitation] Act was to encourage shipbuilding and to induce the investment of money in the maritime industry by limiting the

venture to those who build the ships to the loss of the ship itself and her freight then pending."
(ECF No. 479 at 3 (citations omitted).) Claimants argue that "Synergy does not need access to the
Limitation Act to shield its investment or its exposure [because] it has obtained equivalent (even
superior) protection by means of its contractual arrangement with Grace Ocean," which
indemnifies Synergy for any liability it may face in relation to the Dali. (ECF No. 625 at 5–6.)
Given this, Claimants conclude, "extending the benefits of the Limitation Act to Synergy would
be inconsistent with Congress's intent." (*Id.*)

But this conclusion does not follow. The Court finds nothing in the Limitation Act to
prohibit vessel managers like Synergy from taking a belt and suspenders approach to their risk. In
other words, even if the Petitioners' contractual arrangement is valid and enforceable exactly as
Claimants assert, this does not extinguish the protection provided by the Act—Congress's purpose
to induce investment in the maritime industry may still be advanced by providing statutory
protection against liability even where such protection is redundant of independent contractual
protection. Further, while Petitioners do not contest Claimants' characterization of the
indemnification clause in their Ship Management Agreement—and without intending to suggest
that the Court has identified any defects therein—it remains to be seen whether that clause does
indeed provide the protection Claimants assert that it will. For these reasons, the mere existence
of the indemnification clause does not deprive Synergy of the protection of the Limitation Act.

Nor is the Court persuaded by Claimants' contention that Synergy's financial risk profile
vis-à-vis the Dali prohibits a reasonable finder of fact from concluding that it was an owner pro
hac vice. Claimants emphasize that the Limitations Act defines an owner as one who "mans,
supplies, and navigates a vessel *at [its] own expense*," 46 U.S.C. § 30501(2) (emphasis added),
and they cite cases purportedly holding that a vessel manager's status as an owner pro hac vice is

9

dependent on its financial interest in the vessel. (ECF No. 605-1 at 19–22.) In addition to the indemnification clause discussed above, Claimants emphasize (1) that Grace Ocean, not Synergy, insured the Dali, and (2) that even the tasks Synergy was responsible for *performing* were ones for which Grace Ocean had ultimate *financial* responsibility. (*Id.*) "This financial arrangement," Claimants argue, "precludes [Synergy's] standing under the Limitation Act." (*Id.* at 20.)

Considering first Synergy's lack of insurance responsibilities, Petitioners do not dispute that Grace Ocean, not Synergy, insured the Dali. (*See* ECF No. 616 at 33.) However, Petitioners argue this is not dispositive as a matter of law: "[N]one of the cases cited by Claimants actually analyze why this factor should weigh one way or the other," and if anything, Petitioners assert, Synergy's status as an owner pro hac vice is supported, rather than undermined, by the undisputed fact that Grace Ocean included Synergy as an additional insured on Grace Ocean's policies. (*Id.* at 33–34.) Petitioners contend that such coverage was necessary exactly because Synergy's control over the Dali was sufficiently substantial to expose it to an owner's risk of liability, and the existence of this risk renders Synergy eligible for limitation. (*Id.*)

Petitioners have the better of the argument. As a preliminary matter, the Court acknowledges Claimants' quoted language from *Agrico Chemical* that a "bareboat charterer typically is required to carry insurance on the vessel as well as protection and indemnity insurance and crew insurance." 664 F.2d at 92. But between the inclusion of "typically" and the fact that *Agrico Chemical* did not evaluate entitlement to the protection of the Limitation Act, the Court finds this language only minimally significant.

Claimants' other cited cases—*Chesapeake Shipping,* 803 F. Supp. at 873, and *In re Petition of the United States*, 259 F.2d 608, 609 (3d Cir. 1958)—come closer to the point, but still fail to persuade the Court that insurance coverage is particularly weighty here. Claimants are correct that

10

in *Chesapeake Shipping*, the court denied a motion to dismiss a ship manager's limitation action where the complaint alleged, *inter alia*, that the manager "handled and settled insurance," 803 F. Supp. at 872, and that such allegations are absent here. But as Petitioners point out, the only *specific* allegation concerning insurance in *Chesapeake Shipping* was that the ship manager employed "a crew P & I (protection and indemnity insurance) claims agent, and other management staff, who devoted their efforts to the [fleet]"—not that the manager itself "carried" the insurance— and more significantly, the court's reasoning does not reflect any reliance on this fact. *Id.* at 873– 74. Similarly, in *Petition of United States*, the court affirmed denial of a motion to dismiss a ship manager's limitation action where the complaint alleged, *inter alia*, that the manager was required to procure insurance, but there was no clear indication that the manager was to procure insurance *for itself* rather than for the owner. 259 F.2d at 609 ("[Manager] shall procure from and maintain with a reputable carrier, approved by [Owner], such available insurance as [Owner] shall direct.") There too, the court's reasoning, *id.* at 610–11, made no specific reference to the facts concerning insurance.

Further, the factual picture concerning the Dali's insurance status is more complicated than Claimants' Motion suggests. Claimants admit that while Grace Ocean carried hull and liability insurance for the Dali, Grace Ocean covered Synergy as an insured party on those contracts (ECF No. 605-1 at 21), and Claimants do not dispute that it was Synergy, rather than Grace Ocean, who insured the Dali's crew (ECF No. 616 at 22). These circumstances do not yield a clear overall picture of Synergy lacking the attributes that "could subject [it] to liability as a shipowner." *Leco Corp.*, 1992 WL 158875, at *3. As such, they are insufficient to preclude a finding that Synergy was an owner pro hac vice.

11

Turning to Grace Ocean's ultimate financial responsibility for the tasks Synergy performed, the Court is again unpersuaded that such factors are dispositive. Claimants assert that "Grace Ocean provides the funds that [Synergy] uses to manage the Dali," providing a monthly "lump sum of working capital to cover . . . wages, repairs, and maintenance," with Synergy "keep[ing] as profit any funds not expended from working capital." (ECF No. 605-1 at 19.) This arrangement, Claimants argue, shows that Synergy was not operating the Dali as an owner "at its own expense." *See* 46 U.S.C. § 30501(2). But as Claimants acknowledge (ECF No. 605-1 at 20, n.21), there are cases permitting a ship manager to pursue limitation despite being reimbursed by the owner for operating expenses. *See, e.g., Petition of the United States*, 259 F.2d at 610; *Chesapeake Shipping*, 803 F. Supp. at 873. Claimants do not cite any cases that rely heavily on reimbursement in determining that a ship manager did not qualify for owner pro hac vice status. Thus, Claimants' arguments about Synergy's lack of financial risk fail.[3]

### C.    Synergy's Relationship to the Dali's Crew

Claimants also argue that Synergy lacked sufficient dominion and control over the Dali to qualify as an owner pro hac vice because it did not employ the Dali's crew—to obtain a vessel's "possession, command, and navigation . . . necessarily require[s] that the owner pro hac vice

---

[3] The Court is puzzled by the parties' dispute over whether Synergy is entitled to keep any over-budgeted operating expenses it receives from Grace Ocean or whether Grace Ocean is entitled to reallocate such funds to other expenses. (*Compare* ECF No. 605-1 at 20 *with* ECF No. 616 at 20.) In particular, Claimants' position that Synergy is entitled to "keep[] as profit any funds not expended from working capital" (ECF No. 605-1 at 19) seems, if anything, to support the position that Synergy *was* operating the Dali "at its own expense" and *did* have a financial stake in the Vessel, thus supporting owner pro hac vice status rather than undermining it. Vice versa for Petitioners' position to the contrary. In any event, Claimants' own Motion makes clear, and Petitioners' response demonstrates further, that the facts here are plainly disputed (ECF No. 605-1 at 19, n. 19; ECF No. 616 at 20), making reliance on this issue inapt in this posture. To the extent the parties continue to assert these positions at trial, the Court encourages them to provide greater clarity as to the logic and the law that supports them.

employ the crew." (ECF No. 605-1 at 18.) While Claimants admit that Synergy was responsible for *recruiting* crew, they argue that the crew's execution of employment contracts with Grace Ocean—which Synergy does not dispute—is dispositive. (*Id.*) This argument also fails.

Claimants cite *In re David & Colleen,* 2006 WL 2092445, at *2, and correctly assert that there, the court treated a ship manager's failure to contractually employ the crew as dispositive of its ineligibility for limitation. Claimants further cite to *Petition of United States*, 259 F.2d at 610, and *Archer Daniels Midland Co. v. M/T AMERICAN LIBERTY*, No. 19-10525, 2021 WL 1951217, at *4 (E.D. La. May 14, 2021), and correctly assert that there, the courts treated a ship manager or operator's employment of the crew as one factor among others militating in favor of their eligibility for limitation. Claimants acknowledge *In re Ingram Barge Co.*, No. 05-4419, 2007 WL 2088369, at *3 (E.D. La. July 19, 2007), which found a non-owner company eligible for limitation *without* having employed the crew, but they assert that "[t]hat conclusion is an anomaly and contrary to the overwhelming weight of authority." (ECF No. 605-1 at 19 n.16.)

In response, Petitioners admit that "Grace Ocean paid the crew" and executed crew employment contracts. (ECF No. 616 at 17.) Nevertheless, Petitioners argue, Grace Ocean "did not vet, hire, train, or communicate with [crew]"—Synergy did. (*Id.*) Petitioners quote the Ship Management Agreement between them as providing that Synergy "shall provide suitably qualified crew for the vessel" and perform functions including "selecting and engaging the vessel's crew" and "on board training of crew." (*Id.*) Petitioners further cite Synergy's 30(b)(6) testimony, providing it was responsible for "ensur[ing] they're employing competent and qualified personnel." (*Id.*) In addition to the employment-related responsibilities they assert Synergy had, Petitioners also highlight the employment-related responsibilities that Grace Ocean lacked: they cite Grace Ocean's 30(b)(6) testimony establishing that it had no policies with respect to the

selection of the Dali's officers, no requirements with respect to on-board training of crew, and did not obtain or review crew licensures or crew performance appraisals, which were conducted by Synergy. (*Id.* at 18.) These facts are undisputed on the record before the Court, and Petitioners argue that they support Synergy's status as an owner pro hac vice.

Two further sets of employment-related facts are arguably disputed. First, Claimants assert that Grace Ocean had "authority to accept or reject the officers that [Synergy] propose[d] for service aboard the Dali," and they provide 30(b)(6) testimony that supports this assertion. (ECF No. 605-1 at 25.) Petitioners seem to challenge this claim, noting that "there is nothing in the Management Agreement that allocates to Grace Ocean any such 'veto power.'" (ECF No. 616 at 18.) Petitioners claim that the testimony shows, at minimum, that Grace Ocean never actually exercised any authority it may have had to accept or reject proposed officers. (*Id.*) Recognizing that Claimants' testimonial evidence is not strictly *contradicted* by Petitioners' assertions, the Court will nevertheless treat as disputed whether Grace Ocean had the right to accept or reject proposed officers, as a reasonable finder of fact could conclude either way based on this evidence.

Second, the parties clearly dispute how much operational guidance and direction—what one might call supervision, or management—Synergy provided to the Dali's crew on a day-to-day basis. On the one hand, Claimants note that Synergy's employees testified they "do not manage [the master, the chief engineer, the ship managers on board] or manage [their] work per se" and are "not the one who's on board to tell the master, do this, tell the chief engineer to do this." (*See* ECF No. 625 at 8.) On the other hand, Petitioners emphasize their Declarations, which state that "Synergy is the party that supports the crew in navigating the Vessel and which is in regular contact with the crew regarding the operation of the Vessel" and that "[i]f the Vessel's crew had any concerns about safe navigation or compliance with international law or regulations, they would

contact Synergy—not Grace Ocean or Maersk—for guidance." (*See* ECF No. 616 at 19.) Given this, the Court would expect to hear further evidence as to who the crew looked to for operational guidance and direction when needed before determining who this factor favors.

Addressing first the undisputed evidence in the record, the Court finds that the case law may favor Claimants on this factor, but not so strongly as to justify summary judgment in their favor. The case law considering crew employment as relevant to owner pro hac vice status simply does not make clear which specific employment-related responsibilities are critical. Some cases— *Petition of the United States*, for example—are factually simpler than this one, with a single company possessing all employment-related responsibilities—both the formal contractual relationship here held with Grace Ocean and the recruitment, selection, review, and training responsibilities here held by Synergy. These cases thus provide limited guidance. Other cases more like this one, where such responsibilities are split between the owner and the ship manager, identify distinct employment-related responsibilities as the ones that are pertinent. *See, e.g., In re David & Colleen*, 2006 WL 2092445, at *2 (holding that a manager could not seek limitation and treating the owner's contractual relationship as dispositive); *In re The Am. Milling Co.*, 409 F.3d at 1016 (holding that a manager could not seek limitation and treating the owner's "right to demand crew changes" and to "approve or disapprove the hiring of a captain" as weighty); *In re M/V Seaboard Spirit*, 2014 WL 3673323 at *3 (holding that a manager *could* seek limitation and treating its "hiring authority" as relevant); *In re Ingram Barge Co.*, 2007 WL 2088369, at *3 (holding that a non-owner company could seek limitation and treating its "set[ting] the standards for training her crew" as relevant). Thus, the force of the case law is less than overwhelming in determining which employment-related responsibilities matter. Finally, even without attending to such nuance, the cases do not favor Claimants quite as uniformly as they suggest: not only *In re Ingram Barge*

*Co.*, but also *In re Barracuda Tanker Corp.*, 281 F. Supp. 228 (S.D.N.Y. 1968), finds a company (potentially) eligible for limitation despite clearly lacking the contractual employment relationship that Synergy lacks here.

The Court finds Claimants persuasive in arguing that "possession, command, and navigation" of a vessel requires meaningful control over its crew. But given the state of the case law and the undisputed split responsibilities Grace Ocean and Synergy had here, the Court stops short of a determination that no reasonable factfinder could hold that Synergy had such control. Again, the undisputed evidence establishes that Synergy "provide[d] suitably qualified crew" for the Dali in the sense that it "select[ed] and engag[ed]" them, Grace Ocean had no policies governing their selection, and Grace Ocean never in fact exercised any right it may have had to approve or disapprove of their selection; Synergy performed all "on board training of crew," as to which Grace Ocean had no requirements; and Synergy "ensur[ed] they're employing competent and qualified personnel" by, among other things, obtaining and reviewing crew licensures, and conducting crew performance appraisals, none of which was ever reviewed by Grace Ocean. Without holding that this shows as a matter of law that Synergy *was* an owner pro hac vice, neither can the Court conclude as a matter of law that it *was not* in the face of this evidence.

This conclusion is further buttressed by the Court's finding that the disputed facts discussed above are material. If indeed Grace Ocean retained the right to approve or disapprove of the Dali's crewmembers, and if indeed Synergy had only limited day-to-day contact and control over the crew's operational decisions, these findings would both meaningfully support Claimants' position. Having presented sufficient evidence to create a genuine dispute as to these matters, Petitioners avoid summary judgment.

16

### D.   Synergy's Autonomy Over the Dali's Operations

Claimants' final argument[4] that Synergy lacked the dominion and control of an owner pro hac vice is that Synergy "was not managing the Dali autonomously." (ECF No. 605-1 at 24.) Claimants cite *Birmingham Southeast*, 124 F. Supp. 2d at 1338, which found a ship manager was not an owner pro hac vice, relying heavily on the fact that the manager's "role was not 'autonomous.'" Rather, the ship manager was "in constant contact" with the owners, who "had ultimate control of the operation" of both the vessel and the crew. *Id., see also Chesapeake Shipping,* 803 F. Supp. at 874 (treating an autonomous managerial role as persuasive). Similarly here, Claimants argue, "Grace Ocean retained detailed oversight of the Dali," by "review[ing] operational reports . . . each day at noon, . . . financial reports . . . every month, . . . and technical reports when provided by [Synergy]." (ECF No. 605-1 at 24.) Further, "Grace Ocean decided what repair and maintenance would be performed in dry dock," "it was Grace Ocean's permission—not [Synergy's]—that was necessary whenever Maersk sought to inspect the vessel," and "Maersk—not [Synergy]—decide[d] where the vessel [was] going and when." (*Id.* at 25.)

Petitioners dispute these assertions and/or their significance, arguing that to the contrary, "Synergy, and not Grace Ocean, had daily oversight and control over the Vessel." (ECF No. 616 at 14.) Petitioners first highlight the undisputed fact that Synergy alone held the Document of

---

[4] Claimants' Motion includes one additional major heading, suggesting they intend to assert a fourth argument, namely that Synergy is not an owner pro hac vice because it "acts as an agent" of Grace Ocean. (ECF No. 605-1 at 23.) However, Claimants' articulation of this point is too minimal to constitute a full-throated argument, consisting of little more than a citation to language from *Matter of Oil Spill by Amoco Cadiz Off Coast of France on March 16, 1978*, 954 F.2d 1279, 1302–03 (7th Cir. 1992) to the effect that the ship manager there (like Synergy) was expressly designated to be an agent of the owner. As Petitioners rightly respond, the case law does not generally support the position that this fact is dispositive, or even particularly weighty, as other cases have expressly rejected this argument. *See, e.g., In re M/V Seaboard Spirit*, 2014 WL 3673323, at *3 (rejecting the position that a manager's operating the vessel "solely as a manager for the owner" was disqualifying).

Compliance and the Safety Management Certificate for the Dali, which together certify compliance with the ISM Code. (*Id.*) Given this, they argue, "Synergy is deemed, pursuant to the ISM Code and in the eyes of the Singapore [Maritime & Port Authority] and under U.S. law, to have 'assumed the responsibility for operation of the ship . . . .'" (*Id.*) Claimants' Reply (ECF No. 625) declines to address Petitioners' argument, and the Court agrees with Petitioners that Synergy's status as the DOC holder and ISM Manager supports the position that Synergy was an owner pro hac vice. *See SCF Waxler Marine LLC v. M/V Aris T*, 427 F. Supp. 3d 728 (E.D. La. 2019), *aff'd* 24 F.4th 458 (5th Cir. 2022) (finding ship manager eligible for limitation, post-trial, where it held the DOC and Safety Management Certificate for the vessel).

Further, Petitioners cite Grace Ocean's 30(b)(6) testimony that it does not "manage any of [its] own vessels" (ECF No. 616 at 15), along with provisions of the Ship Management Agreement that provide (1) Synergy "shall have the authority to take decisions and actions as they may from time to time *in their absolute discretion* consider being necessary to enable them to perform the Basic Services" it is contracted to perform, such as "crewing, technical management, purchasing, accounting, [and] operations," and (2) that with respect to "technical services," Synergy "shall . . . supervise the maintenance and *coordinate daily operations* with shipboard management team." (*Id.* at 16–17 (emphasis added).) The Court finds that this undisputed evidence also supports (to at least some extent) a finding that Synergy had the kind of autonomy that is characteristic of an owner pro hac vice.

Finally, Petitioners contest Claimants' more specific allegations concerning autonomy. They dispute the significance of the daily operations reports Grace Ocean reviewed, providing a Declaration from a Grace Ocean employee explaining that "the daily noon report . . . contains only the most basic information about the Vessel's current position and status." (*Id.* at 16.) Petitioners

18

further dispute Grace Ocean's role in determining the repair and maintenance that would be performed in dry dock, citing Grace Ocean's 30(b)(6) testimony that it does not "take an active role in deciding what happens to the dry dock and what doesn't happen." (*See id.* at 15.) While Petitioners do not dispute that "it was Grace Ocean's permission—not [Synergy's]—that was necessary whenever Maersk sought to inspect the vessel" (ECF No. 605-1 at 25), they add that "Synergy [was] responsible for audits and inspections of the Vessel" and that "Grace Ocean [did] not conduct its own vessel inspections," citing a Synergy employee's Declaration. (ECF No. 616 at 15.) Lastly, while Petitioners admit that Maersk, as the time charterer, "determines which ports at which the Vessel will load and discharge cargo" (*id.* at 19), they dispute whether this undermines Synergy's autonomous control of navigation, providing evidence through Declarations that "the Master of the Vessel . . . would rely on Synergy, and not Maersk [or Grace Ocean], for guidance if the crew needed to divert the Vessel in the even of weather or crew issues, or to ensure safe navigation." (*Id.* at 19.) The Court finds that these disputes concern material facts relevant to the degree of autonomy Synergy exercised over the Dali, which is in turn material to its alleged status as an owner pro hac vice. Overall, Petitioners have presented sufficient evidence to create a genuine dispute as to these matters.

## IV.    Conclusion

Claimants have not met their burden on summary judgment. While their Motion identifies certain undisputed facts in support of their assertion that Synergy lacked sufficient dominion and control to qualify as an owner pro hac vice, Petitioners identify other undisputed facts that militate in Synergy's favor and provide sufficient evidence to create factual disputes that the Court finds to be material. Viewing the evidence in the light most favorable to the Petitioners and drawing all

19

reasonable inferences in their favor, Claimants are not entitled to judgment as a matter of law at this juncture. Thus, a separate Order will issue denying Claimants' Motion (ECF No. 605).

DATED this **21** of January, 2026.

BY THE COURT:

James K. Bredar
United States District Judge

20