**Exhibit A: Claimants' Statement of Facts and Legal Theories**

On March 26, 2024, at approximately 1:29 AM ET, the *M/V Dali* allided with the Francis Scott Key Bridge, destroying the bridge, killing six road workers, and injuring two others.

At the time of this disaster, the *Dali* was owned by Petitioner Grace Ocean Private Limited ("Grace Ocean") and managed by Petitioner Synergy Marine PTE, LTD ("Synergy").  Petitioners and their agents were responsible for the safe conduct of the voyage including overseeing and training the crew, as well as the operation and maintenance of the vessel. The Master, Chandrashekar Sabhpabathy, and his crew onboard the vessel were employees of Grace Ocean and agents of Synergy. The allision was caused by the negligence and fault of the Master, crew and Petitioners, and the *Dali's* unseaworthiness, all of which were in the actual, constructive and/or imputed privity and knowledge of Petitioners.

## A.  The *Dali's* Electrical and Propulsion Systems: a Brief Overview

The allision was caused by losses of power and propulsion. The *Dali* is electrically powered by four diesel generators ("DG1, DG2, DG3, and DG4"). These generators were originally designed and constructed with their own dedicated fuel oil pumps. Critically, in the event of an electrical power loss, these fuel pumps were designed to automatically restart after electrical power is restored. The DGs supply power to a 6600 V switchboard (the "High Voltage Switchboard" or "HV Switchboard") and to a 440 V switchboard (the "Low Voltage switchboard" of "LV Switchboard"). The HV and LV Switchboards are connected by two step-down transformers that reduce the voltage from 6600 V to 440 V. The HV Switchboard powers certain equipment including the bow thruster motor (used to assist in maneuvering the *Dali*) and refrigeration systems on board the *Dali* container ship. The LV Switchboard provides power to certain equipment including fuel oil pumps needed to run the DGs and main engine, lube oil pumps, cooling water pumps and steering gear.

The *Dali* is also equipped with an emergency diesel generator ("EDG") that powers an emergency switchboard (the "Emergency Switchboard"). The Emergency Switchboard powers certain equipment such as one of three steering pumps. By regulation, the EDG was required to come online within 45 seconds after a power outage. Prior to the allision, it was known to *Dali's* crew that the EDG's offload switch (which automatically shuts off the EDG once power is restored) was defective and needed to be replaced. Due to this defective switch, the EDG had to be manually stopped once power was restored after an outage.

Both the steering and propulsion systems rely on the power supplied by the *Dali's* DGs. Specifically, critical components of the *Dali's* Main Engine rely on low-voltage electricity. To protect itself from damage, the engine is designed to shut down when these components stop working, a fact well-known to Petitioners before the allision. At the same time, because it is critical to sustain engine power in certain scenarios, such as navigating near major infrastructure, the automatic shutdown can be cancelled by the vessel's crew within six seconds, a time period selected by Petitioners. Once shut down, however, the vessel's engine will need to re-start once power is restored. To do this, however, the engine telegraph (throttle) needs to be set to the Stop position to permit restart.

## B. The Four Blackouts

On March 25 and 26, 2024, the *Dali* suffered four blackouts, two on each day. The cause of the second blackout while the vessel was at Seagirt Terminal on the 25th and the cause of the second blackout on the 26th when the vessel was underway, are identical.

### 1. *Blackout Number One*

Approximately 12 hours before the allision, on the day before the allision, the *Dali* was pier side at the Seagirt Marine Terminal and was being powered by DG2. One of the crew members

carelessly closed an exhaust damper which caused DG2 to trip offline causing a complete blackout. The *Dali's* power management system ("PMS") then automatically placed DG3, which had been on standby, online thereby restoring power to the vessel. In the meantime, the vessel's unlicensed electrician (who was not a certified electro-technical officer as required under the STCW) manually changed over to Transformer 1, which had not been used for several months, thereby restoring power. At the time of the power loss, the vessel's "Smartship" notification sent an email to Synergy's shoreside personnel advising them of DG2's trip. Although an email was sent to all designated recipients of the trip, including several shoreside managers, no one at Synergy was monitoring the group email account to which those SmartShip alerts were sent. Notably, the vessel's technical superintendent, Karthik Nair, was on vacation.

  2. *Blackout Number Two*

The *Dali* suffered a second blackout on March 25 when the online DG, DG3, ran out of fuel because it was operating *improperly* on a flushing pump. In 2020, the dedicated fuel pumps for DGs 3 and 4, which were designed to automatically restart upon power restoration, had been taken out of service. Instead, DGs 3 and 4 had been reconfigured to receive their fuel from a flushing pump that required a manual restart upon restoration of electrical power to continue operating. Consequently, when the vessel first lost power on March 25, the crewmembers had to manually restart the flushing pump but failed to do so. Shortly thereafter, starved of fuel, DG3 tripped offline causing the second blackout. Low-voltage power to the vessel was restored when the crew closed the open breakers in Transformer 1 and DG 2 came back online. Synergy's use of the flushing pump as the primary fuel source for DG3 and DG4 violated the International Convention for the Safety of Life at Sea (SOLAS) requirements that electrically driven equipment

needed for propulsion and steering must be capable of automatically restarting after a restoration of vessel power, as well as relevant Class NK Certification standards.

### 3.  *Blackout Number Three*

Undeterred by these critical power losses, and determined to maintain its schedule, the *Dali* departed Seagirt Marine Terminal shortly after midnight on March 26, running on DGs 3 and 4 with DG2 in standby mode. The crew attempted to start DG1 six times before departure but it would not start.  No risk assessment was conducted nor was a required "team huddle" with the crew conducted regarding any of these conditions.

At approximately 1:25 AM, a low voltage power loss blackout occurred.  It was subsequently determined (months later) that a loose signal wire in the vessel's high-voltage switchboard caused a loss of low-voltage power. After the first power loss, the Master and his crew failed to cancel the Main Engine shutdown. They then failed to make any attempt to restart the main engine. The *Dali* recovered low-voltage power about fifty-eight seconds after the first power loss, as it did the day before.

It should not have taken this long. The vessel's electrical system has two redundant step-down transformers. As noted above, these transformers convert high-voltage electricity, used to operate large equipment on board, to low-voltage electricity, used for smaller equipment. In the event one transformer loses power, the system has automation that is designed to switch to the alternate transformer, restoring power within approximately **eleven seconds**. As configured on March 25, however, the *Dali*'s transformers were set in Manual mode, requiring the crewmembers to physically restore power by manually closing open circuit breakers on the transformer. Operating the transformers in manual mode on a vessel equipped with a power management system was inconsistent with the *Dali's* electrical design. A vital safety feature, automation, went

unused, for no rational purpose. If the system was set to automatic mode at the time of the first power loss on the 26th, the vessel's power management system would have automatically restored power through Transformer 2 and the vessel would have regained power in just eleven seconds. Instead, manual transfer to Transformer 2 by the vessel's electrician was required, needlessly delaying power recovery, which was only temporary.

### 4. *Blackout Number Four*

The cause of the final blackout on the *Dali* was identical to the second blackout at the pier the day before. Just as twelve hours prior, none of the crewmembers manually started the flushing pump after the power loss. And just like on March 25, DGs 3 and 4 became starved of fuel and tripped offline thereby causing the final blackout before the allision. Furthermore, the EDG failed to power the Emergency Switchboard within the mandated 45 second interval and instead took 70 seconds to come online. This delay was caused by the crew's failure to reset EDG to automatic mode after the blackouts on the prior day. The final power loss caused by the use of the flushing pump sealed the vessel's fate, further distracting the crew and exacerbating the unorganized and chaotic response to the initial blackout.

While the *Dali* was making way toward the bridge, the Senior Pilot and Master attempted to steer the vessel away by using port rudder, the bow thruster, and the port anchor. Those measures failed. The bow thruster to everyone's surprise was unavailable, and intermittent and degraded steering did not bring the vessel sufficiently to port. Finally, the port anchor was not deployed in time because the hydraulic anchor brake control was rendered inoperable weeks earlier and never fixed nor properly manned with two men. Shortly after 1:29 AM, the *Dali* struck Pier 17 on the Key Bridge, causing it to collapse.

### C. Operational Failings

### 1.  No Pre-Departure Investigation, Notification or Adequate Risk Assessment

The *Dali* should have never left Seagirt Terminal. An adequate pre-departure investigation would have prevented the allision. When questioned about the same, the Master and the entire engineering department invoked their Fifth Amendment rights against self-incrimination.[1] But it is nonetheless clear that the Master did not conduct any meaningful investigation into the March 25 blackouts when he returned to the vessel. Nor did he alert the Coast Guard of the casualty, in violation of Coast Guard regulations. Nor did anyone notify Class NK of those blackouts before the *Dali* sailed. (Notably, after the allision, the Coast Guard would not let the *Dali* sail until it restored the primary fuel delivery system for DG3 and DG4).

The Master also failed to alert and discuss with Synergy shoreside management the power losses, something that Synergy Managing Director Ajith Kumar acknowledged he should have done. Had such notification and even a rudimentary investigation taken place, the dangers of running DG3 and DG4 on a flushing pump would have been identified. As Synergy's own corporate representative testified, that condition would have to be corrected before the *Dali* was permitted to sail again. This would have prevented the allision.

What is more, according to documents found on the vessel after the allision, Captain Sabhpathy did conduct a pre-departure risk assessment for the planned departure on March 26. According to the document, the risk assessment was completed on March 24 – two days earlier. It

---

[1] The following witnesses invoked their Fifth Amendment privilege against self-incrimination in response to substantive questions about the condition, operation, crewing, and maintenance of the *Dali* before, during, and after the allision: Chandrashekar Sabhapathy (Master); Karthikeyan Deenadayalan (Chief Engineer); Kumararaja Kuppuswamy (Second Engineer); Antony Goodwin (Third Engineer); Nishanth Pitchaiah (Fourth Engineer); Chaminda Kariyawasam (Electrician); and Karthik Nair (Technical Superintendent). The parties have agreed that Claimants may seek adverse inferences against Petitioners arising from those invocations through requests at trial and/or through findings of fact and conclusions of law, without prejudice to Petitioners' right to contest the application of the requested inferences. Claimants intend to seek those inferences in at least six categories: (1) crewing and qualifications; (2) training and procedures; (3) maintenance and the fraudulent certificate scheme; (4) the March 25 blackouts; (5) manning; and (6) pre-departure preparation on March 26.

was signed by the Master, Chief Engineer, Second Officer and Third Officer. The Master, however, did not modify or review this risk assessment after suffering two dockside blackouts. And the Master took no additional precautions as a result of the events on March 25. And, again, he did not engage in the mandatory "team huddle" with his deck and engineering teams before departure, at least to discuss contingency measures to avoid or respond to another loss of power.

### 2. Poor Procedures and Equipment

Still, the *Dali* should have been able to avoid the Key Bridge notwithstanding the losses of power. Critical errors were made that caused or contributed to the allision after the initial loss of power on March 26th.

First, the Master and his crew made no effort to try to restart the main engine. Loss of propulsion could have been prevented if the shutdown was cancelled in a timely manner. And propulsion could have been quickly regained if the *Dali's* electrical and fuel systems were appropriately configured and the Master had moved the telegraph to the "STOP" position. These essentials step were not in Synergy's power loss checklist.

Second, the bow thruster should have been available, which would have provided sideward thrust to the bow away from the bridge's pier. However, when the vessel first lost power, the bow-thruster interlock, which had been intentionally bypassed at departure, reset without any responding action of the crew, rendering the bow thruster unavailable and depriving the vessel of a means of pushing the bow to port as it proceeded toward the Francis Scott Key Bridge. The vessel's manufacturer designed the vessel to require three generators online to operate the bow thruster safely. Synergy's Technical Bulletin No. 19 of 2021 likewise required three diesel generators when starting the bow thruster. At the time the *Dali* departed Seagirt Terminal, it was

only running on two generators, in violation of the rules promulgated by the vessel's Classification Society, Class NK.

Third, the vessel should have been capable of being steered under the Key Bridge's main span. After the first underway power loss, the helmsman was instructed to maintain that heading. Over the course of the incident, however, the vessel moved to starboard approximately 20 degrees, eventually striking Pier 17. This occurred even though the helmsman never attempted to move the vessel starboard and, in fact, attempted to move the rudder "hard to port." Hydrodynamic interaction, e.g., "bank effect", alone cannot explain the vessel's dramatic starboard turn. The only explanation for why the vessel moved starboard contrary to Helmsman's control inputs is that the *rudder* made an uncommanded moved starboard. *See* Section D.

A likely cause of this starboard movement was the failure of the vessel's steering gear components to hydraulically lock the rudder in place when the vessel lost power. Analyses of the steering gear hydraulic oil repeatedly indicated high levels of iron from internal wear of metal components, which were sent to the Synergy home office. Further, post-allision vessel inspections revealed leaking hydraulic fluid under the steering gear unit. The steering gear had not been overhauled in accordance with manufacturer requirements. Maintenance documents from the year prior to the allision also indicated observations of leaking hydraulic fluid and a report of abnormal noise coming from the steering gear. Consequently, when the vessel lost power, the steering gear failed to lock the rudder in place. This led to wash over the rudder to cause it to turn to starboard.

Relatedly, the vessel's steering gear was improperly tested before departure by the *Dali*'s crew. Under SOLAS requirement and federal regulations, the steering gear must be visually and functionally tested before departure. 33 C.F.R. § 164.25. Yet the steering gear test took about one minute, which is physically insufficient time to fully test and inspect the steering gear in

accordance with the regulations. Furthermore, Synergy's own safety management system required that an officer be present in the steering gear flat to observe the test. This was not done: the observation was completed by a trainee engineer.

Fourth, Petitioner did not conduct a risk assessment or take any contingency measures regarding defects in the *Dali*'s portside anchor. About two weeks prior to the allision, while the vessel was in the Panama Canal, the push-button electronic control for the vessel's portside anchor brake broke. As a result, the anchor had to be released manually by turning a wheel. Lowering an anchor by pushing a button is much quicker and much easier than releasing it manually by turning a wheel. When the electronic control for the anchor brake stopped working in Panama, the Master should have conducted a risk assessment and drilling to ensure that his equipment and crew would be ready for emergency anchorage without an electronic brake control.

The Master took no precautions in manning the anchor with an additional man, despite the dockside power losses and broken brake control. As the vessel was departing Baltimore, he kept only one man forward, the Bosun, on the bow. When catastrophe struck and the Master called to drop the anchor to slow the vessel or alter its course, the Bosun could not turn the manual wheel himself to release the brake and drop the anchor. According to the bosun, two crewmembers are needed to open the anchor brake manually. It was the Master's responsibility to determine how many crewmembers he needed to drop the anchor *before* catastrophe struck. And Synergy shoreside management, which was alerted of the anchor issues via text message while the vessel was in Panama, should have ensured this was done.

The anchor was ultimately dropped nearly two minutes after it was initially called for when a crewmember arrived from the vessel's stern to assist the bosun in opening the brake. The delay in letting the anchor go was a needless distraction to the Master and the crew. When it finally

released, the vessel hit the Key Bridge. Given the state of the manual release on the portside anchor and the undermanned bow, the *Dali*'s anchors were not ready for letting go at departure, in violation of 33 C.F.R. § 164.11(o).  Importantly, Synergy's own safety management system recommends that the Master consider dropping *both* anchors in an emergency.

Fifth, critical information was withheld from the Pilot prior to departure from Seagirt Terminal. Federal regulations require a Master to inform a pilot, who is not a member of the crew, of any abnormal circumstances on the vessel "that may affect its safe navigation." 33 C.F.R. § 164.11(k). A Master and Pilot must engage in a "Master-Pilot Exchange" in which details regarding the vessel and its fitness are disclosed to the Pilot. During the Master-Pilot Exchange, the Master never told the Pilot, Kenneth Riffle, anything about the dockside blackouts on March 25, the fact that DGs 3 and 4 were running on a flushing pump, the anchor control issue, or the inoperable DG. The Master also did not tell the Pilot that the *Dali* was going to depart with only two online generators, potentially rendering the bow thruster unavailable for use. To the contrary, the Master informed the Pilot that "everything is in order." This was false.

Finally, although the vessel was required to have a horn capable of being heard within two nautical miles, at no time did the Master sound the horn to warn anyone, including the workers on the Key Bridge, that the vessel was at risk of striking the bridge, something the Second Officer conceded should have been done. Sounding the horn would have been the quickest way to alert workers on the bridge of the potential allision. The Master and Crew's failure underscore their lack of bridge resource management skills and preparation by Synergy.

### D. Claimants' Simulation

Petitioners insist that, despite all of the above, the allision was inevitable, but this is not true. The *Dali's* allision with the Francis Scott Bridge was reconstructed by Claimants using Sea

School's full-mission bridge simulator using two versions of VSTEP software that each included a different method of computing "bank effect."[2] Nominal inputs in both versions of the software were insufficient to recreate the allision. In other words, simulations in both versions of the software programmed with all known environmental data, including bank effect and the ship's positional and maneuvering data, failed to cause the *Dali* to allide with the Bridge. Instead, the *Dali* safely passed under the Bridge on the channel side of Pier 17 in both software versions. Sea School ran additional simulations and determined that somewhere between 7 and 35 degrees of starboard rudder were needed to reproduce the *Dali's* track in the moments leading up to the allision.

The need for additional, unrecorded forces, was not unique to Sea School's simulation. The simulations run for the State of Maryland by MITAGS required 20 degrees of starboard rudder to cause the allision. Even the Petitioners' simulations run by RISE failed to recreate allision using nominal inputs. Instead of using starboard rudder to provide the necessary force to track the *Dali's* recorded course leading up to the allision, RISE artificially increased the bank effect.

In addition to confirming that the *Dali* would have safely passed under the Francis Scott Bridge in absence of the additional starboard rudder forces, Sea School's testing demonstrated that even with the additional rudder forces, the *Dali* would have avoided the allision if the anchor was dropped when initially called for and the bow thruster was engaged when called for.

### E. Privity and Knowledge

---

[2] Bank effect refers to a phenomenon that occurs when water constriction between a vessel's hull and the bank causes a water pressure differential that can alter a ship's heading. Petitioners assert that Bank Effect alone caused the *Dali's* uncommanded starboard turn.

Issues with the use of a flushing pump,  the poor seamanship of the Master of the *Dali*, and the conditions giving rise to the loose wire that caused Blackout Number 3, were, or should have been, known to Petitioners.

In January of 2024, for example, Synergy dispatched Quality, Health, Safety and Environment supervisor Vishal Prabhu to the *Dali* to conduct a technical inspection of the vessel. Mr. Prabhu was asked to do this because the vessel's Technical Superintendent, Karthik Nair, who had been delaying conducting the inspection for months, was not available. Mr. Prabhu was not qualified to conduct a technical audit of the *Dali*, something he told Synergy shoreside management when he received his assignment. During the inspection, Mr. Prabhu observed the vessel's flushing pump used as a dedicated fuel source for DG3 and DG4, as evidenced in the photographs he took. (Not coincidentally, the *Dali*'s sister vessels at Synergy, *Cezanne* and *Maersk Saltoro*, also operated their DGs on flushing pumps).

Under Synergy's safety management system, a Vessel Inspection Report is due within two weeks of the technical inspection. By the time the *Dali* destroyed the Key Bridge, it had not been completed, months later. Accordingly, Synergy Shoreside asked Technical Superintendent Nair to complete the report. In response, Mr. Nair solicited input on Mr. Prabhu's assessment of Captain Sabhpathy during his time on the vessel. In response, Mr. Prabhu reported that Captain Sabhapathy "lacks command/leadership qualities required by a captain of the vessel." The Master was too "involved in shipboard politics" and, throughout the audit, was "restricting himself to his cabin & bridge." Mr. Prabhu further noted that he needed a "de-briefing with regards to onboard management/company reporting procedures."  No action was taken as a result of these observations before the allision.

The Master's poor seamanship is also evident by his failure to conduct the last scheduled "Black out / Auxiliary Engine Failure" training session in accordance with Synergy procedures. That training was scheduled for November of 2023. When this training is done, a Form SF-21 is completed and placed in the vessel's training binder. No form from 2023 is in the binder recovered from the vessel. Further, the entry for the 2023 "Black out / Auxiliary Engine Failure" training session in the Drill and Training Planner found on the vessel is blank.

The need to adequately train a bridge crew to respond to a blackout was also known to Synergy. In May of 2023, prior to Captain Sabhapathy's tenure on the vessel, Synergy issued a Fleet Alert in which it instructed the crew on the *Dali* regarding the procedures for cancelling the Main Engine Shutdown. There is no evidence, however, that such procedures were implemented into *Dali*-specific technical documents. The Checklist for Electrical Power Failure on the vessel, for example, contains no instructions on cancelling the shutdown of the Main Engine. Furthermore, the checklist does not advise the Master to move the telegraph to the stop position so as to allow the Main Engine to restart in the event of a restoration of power. During the more than four minutes between the first loss of power and the allision, neither the Master nor his crew attempted to restart the Main Engine. This was not only the crew's failure, but Synergy's.

Unfortunately, such failures are consistent with Synergy's safety culture, as most startlingly shown by the conduct of Synergy Technical Superintendent Nair during the *Dali*'s 2020 drydock inspection.  During that inspection, the *Dali's* vacuum circuit breakers and air circuit breakers required inspection and testing. Grace Ocean directed that the work not be performed. Rather than have the circuit breakers tested, Synergy asked contractors to issue test reports without performing the actual testing. Mr. Nair was involved with these discussions and Synergy was ultimately successful in obtaining the false certificates, which were submitted to the vessel's

classification society. Had the required inspection and testing been performed, the loose wire that caused the first blackout on March 26 would have been identified and corrected. Consequently, Petitioners knew or should have known of the conditions leading to all four blackouts on the *Dali*.

Indeed, the loose wire that caused the first March 26 blackout likely became loose because of vessel vibration, something that plagued the vessel since its construction. The vibration issue was noted in vessel documents, including the Master's handover notes. The vessel vibration was so intense that the crew fabricated a ship-made brace to reduce vibration on a step-down transformer. Shoreside management knew about the vibration problem, made a successful warranty claim to HHI that included the vibration issues for which it was monetarily compensated, but never corrected the problem.

### F. Conclusion

The above-described failures all caused or contributed to the allision. And the acts and omissions involved numerous violations of the *minimum* standards to which Petitioners were required to abide. These include: failure to immediately notify the Coast Guard of a reportable marine casualty, 46 C.F.R. § 4-05.1, or a hazardous condition 33 CFR § 160.216; use of a fuel pump without automatic restart capability, in violation of SOLAS, Chapter II-1, Regulation 41.5.1.1; tasking an unlicensed electrician to operate critical electrical components on the *Dali*, in violation of Regulation III/7 of the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers (STCW); a delayed restart of the vessel's emergency generator, in violation of 46 C.F.R. § 112.25-10(a); performing an incomplete pre-departure steering gear test with unqualified personnel, in violation of 33 C.F.R. § 164.25(a)(1); failing to adequately advise the pilot of abnormal conditions on board the vessel, in violation of 33 C.F.R. § 164.11(k); failing to have the vessel's anchors ready for letting go, in violation of 33 C.F.R. §

164.11(o); failing to have proper power loss procedures, in violation of the International Safety Management Code, 46 U.S.C 3203(a)(7) and 33 C.F.R. § 96.240(e) negligent operation of a vessel, 46 U.S. Code § 2302; and other violations and negligent acts and/or omissions to be established over the course of trial.

## Legal Theories Relied Upon

## Eligibility Under the Limitation of Liability Act

1.      Under the Limitation of Liability Act, 46 U.S.C. §§ 30501, *et seq.* (the "Limitation Act"), the owner or owner pro hac vice of a vessel may only limit its liability for any loss or injury involving the vessel to the value of the vessel and its freight if it is "without privity or knowledge" of the cause of the loss.[3]

2.      Petitioners are not entitled to exoneration or limitation of liability under the Limitation Act because they had privity or knowledge of the existence of an unseaworthy condition or negligence that caused a loss.

3.      Additionally, Synergy does not have standing to invoke the Limitation Act, because it is not the "owner" or "owner pro hac vice" of the DALI. Only "[a]ctual owners or owners pro hac vice can invoke the benefits of the [Limitation] Act."[4] Synergy, as the party seeking to invoke the Limitation Act, bears the burden of proving its eligibility for the Limitation Act's protections.[5]

---

[3] 46 U.S.C. § 30523(b); *Norfolk Dredging Co. v. M/V A.V. Kastner*, 264 F. Supp. 2d 265, 267 (D. Md. 2003) ("To invoke the benefits of [the Act], an entity must be either an actual owner or owner pro hac vice of the vessel at issue.")
[4] *Norfolk Dredging Co.*, 264 F. Supp. 2d at 267.
[5] *Norfolk Dredging*, 264 F. Supp. 2d at 267.

4.     An "owner pro hac vice" is synonymous with "bareboat charterer."[6] A bareboat charterer arrangement is a "complete transfer of possession, command, and navigation of the vessel from the owner."[7] It is "tantamount to, though just short of, an outright transfer of ownership."[8]

5.     A vessel manager who contracts to act as "an agent of [the owner], and not the owner itself," is not an owner pro hac vice.[9]

6.     A vessel manager does not exercise "sufficient dominion and control over the vessel to be an owner pro hac vice" where the vessel owner or time charterer retains the authority to approve the crew; is in regular contact with the vessel; pays for the vessel's insurance; pays for major repairs and drydocking; and controls the vessel's destinations and provides the vessel's fuel.[10]

7.     Synergy does not qualify as an owner pro hac vice, and it is undisputed it is not the owner of the M/V Dali.

**Imputation: Personal Injury and Wrongful Death**

8.     "[T]he privity or knowledge of the master or the owner's superintendent or managing agent, at or before the beginning of each voyage, is imputed to the owner."[11] The effect of the imputation clause is that any negligent acts that occur at or before the beginning of the vessel's voyage, which are known to the master, owner's superintendent, or managing agent, are imputed onto the owner of the vessel.

---

[6] *Reed v. The Yaka*, 373 U.S. 410, 412 (1963).
[7] *Agrico Chemical Co. v. M/V Ben W. Martin*, 664 F.2d 85, 91 (5th Cir. 1981)
[8] *Guzman v. Pichirilo*, 369 U.S. 698, 699-700 (1962) ("To create a demise the owner of the vessel must completely and exclusively relinquish 'possession, command, and navigation' thereof to the demisee . . . tantamount to, though just short of, an outright transfer of ownership.").
[9] *Matter of Oil Spill by Amoco Cadiz Off Coast of France on March 16, 1978*, 954 F.2d 1279, 1303 (7th Cir. 1992) (denying tanker manager's eligibility under the Limitation Act).
[10] *In the Matter of the American Milling Co.*, 409 F.3d 1005, 1007 and 1008 and 1016-17 (8th Cir. 2005).
[11] 46 U.S.C. § 30524(e).

9.      The DALI was at the beginning of her voyage at the time of the allision, or, alternatively, no later than the time the vessel left her berth at Seagirt Terminal.

10.     Upon a finding that the Master was negligent at or before the beginning of the voyage, the Petitioner's right to exoneration or limitation vanishes.[12]   The Master's actions specifically violated 46 U.S.C. 2302.

11.     Petitioners cannot overcome the presumption of fault under the *Oregon* and *Louisiana* rules because the Master will not testify.

### The M/V Dali was "Unseaworthy"

12.     Vessel owners have a "non-delegable" duty "to ensure that the vessel is reasonably fit to be at sea."[13] This duty "is 'predicated without regard to fault or the use of due care.'"[14] The vessel owner's duty is "absolute," and "require[es] no knowledge on the part of the shipowner."[15]

13.     A vessel is unseaworthy when it suffers from a defect that renders the vessel unfit for its intended purpose: "Nothing more need be shown except that the device in question failed under conditions when it should have functioned properly."[16]

14.     The "unseaworthy condition need not be a permanent fixture of the vessel but may be merely a transitory or momentary unfitness."[17]

---

[12] *See In re Arntz*, 380 F. Supp. 2d 1156, 1158 (C.D. Cal. 2005) ("[T]he developed case law permits an attack on a shipowner's claim for limitation prior to determination of liability because if the shipowner is not entitled to limitation, the saving to suitors clause, 28 U.S.C. § 1333, entitles the claimants to resolve the issue of liability in state court with the benefit of a jury.").

[13] *In re Hilcorp Energy Co.*, No. CV 22-2686, 2023 WL 8558078, at *6 (E.D. La. Dec. 11, 2023) (quoting *Beech v. Hercules Drilling Co., L.L.C.*, 691 F.3d 566, 570 (5th Cir. 2012) (quoting *Lewis v. Lewis & Clark Marine, Inc.,* 531 U.S. 438, 441 (2001)).

[14] *Brister v. A.W.I., Inc.*, 946 F.2d 350, 355 (5th Cir. 1991).

[15] *Dise v. Express Marine, Inc.*, 476 F. App'x 514, 519 (4th Cir. 2011) (citing *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 548-49 (1960)).

[16] *Oliveras v. American Export Isbrandtsen Lines, Inc*., 431 F.2d 814, 816 (2d Cir. 1970).

[17] *Hogge v. SS Yorkmar*, 434 F. Supp. 715, 736 (D. Md. 1977) (citing to *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539 (1960) as an example of a transitory condition that rendered a vessel unseaworthy).

15.    A vessel's purported conformance with industry standards is not conclusive of seaworthiness.[18] Nor is approval of the vessel by a classification society.[19]

16.    Unseaworthiness also extends to a vessel's crew: "Because the shipowner has a non-delegable duty to provide a competent master and crew, unseaworthiness can be caused by insufficient manning of the vessel or an incompetent crew."[20] An "inadequate or improperly manned [vessel] is the classic case of an unseaworthy vessel."[21]

17.    The vessel owner also has a duty "to use reasonable means to acquire knowledge calculated to inform [itself] of conditions likely to produce or contribute to unseaworthiness."[22]

18.    Unseaworthiness proximately causes an injury if the unseaworthy condition "played a substantial part in bringing about or actually causing the injury and [] the injury was either a direct result or a reasonably probable consequence of the unseaworthiness."[23]

**Petitioners Were Negligent**

19.    "To establish a negligence claim under admiralty law, claimants must show (1) there was a duty owed to claimants by the defendant; (2) the defendant breached that duty; and (3) the breach caused the claimant's alleged damages."[24] A duty of care exists where the "injury

---

[18] *Bryant v. Partenreederei-Ernest Russ*, 330 F.2d 185 (4th Cir. 1964)

[19] *See In re Eternity Shipping, Ltd., Eurocarriers, S.A. for Exoneration from or Limitation of Liability*, 444 F.Supp.2d 347, 358 (D. Md., 2006) ("In surveying a ship or marine equipment such as cranes, a classification society does not guarantee that the vessel is seaworthy.").

[20] *Hercules Carriers, Inc. v. Claimant State of Fla., Dep't of Transp.*, 768 F.2d 1558, 1565–66 (11th Cir. 1985) (citing *Tug Ocean Prince, Inc. v. U.S.*, 584 F.2d 1151, 1155 (2d Cir.1978)); *see also*, *In re Complaint of Messina*, 574 F.3d 119, 127 (2d Cir. 2009).

[21] *In re Hilcorp Energy Co.*, 2023 WL 8558078, at *6 (quoting *Comeaux v. T. L. James & Co.*, 666 F.2d 294, 299 (5th Cir. 1982) (citation omitted)).

[22] *Brister*, 946 F.2d at 357.

[23] *Gowdy v. Marine Spill Response Corp.*, 925 F.3d 200, 205 (5th Cir. 2019); *Churchwell v. Bluegrass Marine, Inc.*, 444 F.3d 898, 904 (6th Cir. 2006).

[24] *Archer Daniels Midland Co. v. M/T AMERICAN LIBERTY*, 545 F. Supp. 3d, 390, 402–03 (E.D. La. 2021) (citing *In re Mid–S. Towing Co.*, 418 F.3d 526, 531 (5th Cir. 2005)); *Dann Marine Towing, LC v. Gen. Ship Repair Corp.*, No. MJG-12-1610, 2017 WL 3916992, at *13 (D. Md. Sept. 7, 2017).

is foreseeable from the alleged negligent action."[25] The duty owed is "ordinary care under the circumstances."[26]

20.    For allision incidents, the standard of care is derived from "the traditional concepts of prudent seamanship and reasonable care, statutory and regulatory rules, and recognized maritime customs and usages."[27] Violation of a specific regulation is not necessary to establish breach of the duty of reasonable care.[28] The sub-elements of the causation inquiry include cause in fact and legal or proximate cause.[29]

21.    Under the Limitation Act, a "claimant need not demonstrate that the casualty resulted from a single discrete incident; the injury may be shown to be the result of an 'accumulation of acts' set into motion by conduct or conditions known or imputable to the shipowner."[30]

22.    Any fault which contributed to the casualty is sufficient to deny limitation.[31]

---

[25] *Dann Marine Towing, LC*, 2017 WL 3916992, at *13 (quoting *Commercial Union Ins. Co. v. Bohemia River Assocs., Ltd.*, 855 F. Supp. 802, 806 (D. Md. 1991) (citing T. Schoenbaum, Admiralty and Maritime Law, sec. 4–2, at 124 (1987))).

[26] *Dann Marine Towing, LC* 2017 WL 3916992, at *13 (citing *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 211 (5th Cir. 2010)).

[27] *M/T American Liberty*, 545 F. Supp. 3d at 402–03 (quoting *Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*, 447 F.3d 360, 364 (5th Cir. 2006)).

[28] *Nasser v. Port Imperial Ferry Corp.*, 578 F. Supp. 3d 354, 460 (E.D.N.Y. 2022) ("Compliance with a legislative enactment or administrative regulation does not prevent a finding of negligence where a reasonable man would take additional precautions." (Internal quotation marks omitted) (alteration removed)).

[29] *Pittway Corp. v. Collins*, 409 Md. 218, 243–44 (2009); *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 839 (1996) ("courts sitting in admiralty" may look to "the extensive body of state law applying proximate causation requirements" in ruling on liability).

[30] *In re Tradewinds Env't Restoration, Inc.*, No. 05-CV-0815, 2009 WL 10705994, at *8 (E.D.N.Y. Nov. 10, 2009) (accumulation of acts set into motion by action or inaction attributable to shipowner must be deemed causative of the accident); *M/T American Liberty*, 545 F. Supp. 3d at 407 (denying limitation where "The chain of errors that led to this unfortunate incident began shoreside prior to the AMERICAN LIBERTY disembarking the dock," and the shipowner's failure to train the crew contributed to the chain of errors in operation of the vessel.); *Hogge*, 434 F. Supp. at 737 (defect in transmitter "might be deemed the original cause which set in motion the entire chain of circumstances, faults and misunderstandings which resulted in the tragedy.").

[31] *In re Lasala*, 2021 WL 2002503, at *5 (E.D. La. May 19, 2021) ("[T]he Court has found that Lasala engaged in negligent acts that, at least in part, caused the accident. Such acts were within his privity and knowledge. Lasala therefore is not entitled to limitation or exoneration."); *Goodloe Marine, Inc. v. Caillou Island Towing Co.*, 679 F.

23.    "Generally, a finding of negligence indicates complicity in the cause of the accident sufficient to make limitation unavailable."[32]

24.    Maritime law recognizes the doctrine of *respondeat superior*.[33]

25.    Grace Ocean is vicariously liable for the negligent acts of its agent, Synergy.

26.    Grace Ocean and Synergy are vicariously liable for the negligent acts of their employees and agents.

27.    The sweeping and unprecedent invocations of the Fifth Amendment by eight critical witnesses in this matter renders it impossible for Petitioners to meet their burden of proof.

**Applicable Presumptions**

28.    In a limitation action, first "the court must consider what acts of negligence or conditions of unseaworthiness caused the accident."[34] If claimants meet the initial burden of showing negligence or unseaworthiness, the "shipowner seeking limitation of liability bears the burden of proving that [it] was without privity or knowledge of the condition or negligence responsible for the collision." *Hellenic Lines, Ltd, v. Prudential Lines, Inc.*, 730 F.2d 159, 166 (4th Cir. 1984).

29.    Several well-settled presumptions apply in this case to modify those burdens:

    a.    Under the *Oregon* Rule presumption, and its subset, the *Louisiana* Rule, a moving vessel is presumed to be at fault in a collision with a stationary visible object.  *The Oregon*, 158 U.S. 186 (1895); *The Louisiana*, 70 U.S. (3 Wall.) 164

---

Supp. 3d 1356, 1374 (M.D. Fla. 2023) (granting summary judgment where there was "no genuine dispute of material fact that CIT was at least contributorily negligent in its failure to heed relevant weather warnings").

[32] *Brister*, 946 F.2d at 356.

[33] *Workman v. City of New York*, 179 U.S. 552, 565 (U.S. 1900) ("[U]under the general maritime law, where the relation of master and servant exists, an owner of an offending vessel committing a maritime tort is responsible, under the rule of respondeat superior, is elementary.").

[34] *Empresa Lineas Maritimas Argentinas S.A. v. United States*, 730 F.2d 153, 155 (4th Cir. 1984).

(1865).[35]  This presumption shifts the burden of proof to the vessel, which must prove by a preponderance of the evidence that: (1) the moving vessel was without fault; (2) the collision was the fault of the stationary object; or (3) the accident was inevitable.[36]

b.  Under the *Pennsylvania* Rule presumption, when a vessel violates a statute or regulation intended to promote safe navigation, it is presumed that violation was a contributing cause of the allision.  *The Pennsylvania*, 86 U.S. 125, 135 (1874).  To overcome that presumption, the vessel must prove by clear and convincing evidence "not merely that her fault might not have been one of the causes, or that it probably was not, but that it ***could not have been***."[37]

c.  A violation of United States statutes and regulations triggers the *Pennsylvania* presumption of causation.[38]  A violation of SOLAS (the International Convention for Safety of Life at Sea) also triggers the *Pennsylvania* presumption of causation.[39]

---

[35] *See also*, *McLean Contracting Co. v. Waterman Steamship Corp.*, 277 F.3d 477, 480–81 (4th Cir. 2002).

[36] *Tug Ocean Prince, Inc. v. U.S.*, 584 F.2d 1151, 1159 (2d Cir. 1978), *cert. denied*, 440 U.S. 959 (1979) ("It is hornbook law that when a moving vessel strikes a stationary object an inference of negligence arises and the owner of the vessel then has the burden of rebutting such inference."); *see also, Barnett v. United States*, 650 F. Supp. 3d 412, 439 (D.S.C. 2023) ("[t]o rebut this presumption, [owner] must show that "(1) the moving vessel was without fault; (2) the collision was the fault of the stationary object; or (3) the accident was inevitable." (citation omitted)), *aff'd,* 132 F.4th 299 (4th Cir. 2025), and *aff'd,* 132 F.4th 299 (4th Cir. 2025); *Fischer v. S/Y NERAIDA*, 508 F.3d 586, 593 (11th Cir. 2007) (same); *Matter of Magnolia Fleet, LLC*, No. 2:22-CV-00504, 2024 WL 1253848, at *4–6 (E.D. La. Mar. 25, 2024) (same).

[37] *The Pennsylvania*, 86 U.S. at 136 (emphasis added); *see also*, *Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1472 (5th Cir. 1991); *Barnett*, 650 F. Supp. 3d at 436 (citing *U.S. Fire Ins. Co. v. Allied Towing Corp.*, 966 F.2d 820, 824–25 (4th Cir. 1992)).

[38] *Barnett*, 650 F. Supp. 3d at 436.

[39] *Alkmeon Naviera, S.A. v. M/V Marina L*, 633 F.2d 789, 793 (9th Cir. 1980) ("The guidelines of the 1960 SOLAS represent a uniform set of internationally recognized navigational rules and thus they have the status of general maritime law."); *Cordes v. M/V BALDOCK*, No. 09-11785, 2013 WL 1282842, at *5 (D. Mass. Mar. 29, 2013) (explaining that a violation of SOLAS "constitutes negligence per se and triggers the application of the Pennsylvania Rule").

**Privity or Knowledge**

30.     Once an unseaworthy condition or negligence is shown, the burden shifts to the limitation petitioner to prove that it had no privity or knowledge of the unseaworthy condition or negligent acts.[40]  Either privity *or* knowledge is sufficient to deny limitation.

31.     A petitioner has privity if it personally participated in the negligent conduct or brought about the unseaworthy condition.[41]

32.     Knowledge is defined as "the means of personal cognizance or means of knowledge, of which the shipowner is bound to avail himself, of a contemplated loss or condition likely to cause the loss, unless proper means are adopted to prevent it."[42]  Knowledge "is not only what the shipowner knows but what he is charged with discovering in order to apprise himself of conditions likely to produce or contribute to a loss."[43]  "[A] ship owner is chargeable 'with knowledge of acts or events or conditions of unseaworthiness that could have been discovered through reasonable diligence.'"[44]

33.     Fault is within the privity and knowledge of a limitation petitioner when it owed a duty but failed to discharge it.[45]

---

[40] *Trico Marine Assets Inc. v. Diamond B Marine Services Inc.*, 332 F.3d 779, 786-87 (5th Cir. 2003).

[41] *Trico Marine Assets*, 332 F.3d at 786-87.

[42] *Zeringue v. Gulf Fleet Marine Corp.*, 666 F. Supp. 860, 863 (E.D. La. 1986) (citing 3 BENEDICT ON ADMIRALTY, § 41 (7th ed. 1981)).

[43] *Hercules Carriers*, 768 F.2d at 1564; *see also*, *Pennzoil Producing Co.*, 943 F.2d at 1473-74 (corporate shipowner's knowledge "is judged not only by what the corporation's managing officers actually knew, but also by what they should have known with respect to conditions or actions likely to cause the loss." (citation omitted)).

[44] *Empresa Lineas Maritimas Argentinas S.A. v. United States*, 730 F.2d 153, 155 (4th Cir. 1984); *see also*, *Spencer Kellogg & Sons, Inc. v. Hicks,* 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903 (1932) (deeming owner to have privity or knowledge because owner actually knew vessel was unseaworthy to run through ice and would have known of icy conditions on the river the morning of the accident "if he had used reasonable diligence"); *Verdin v. C & B Boat Co.,* 860 F.2d 150, 156 (5th Cir.1988) (finding that failure to repair safety chains for over two years and to replace nonfunctioning dagger pins breached warranty of seaworthiness and precluded limitation of liability).

[45] *Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1155 (2d Cir. 1978).

34.     "Privity or knowledge is not tantamount to actual knowledge or direct causation. All that is needed to deny limitation is that the shipowner, 'by prior action or inaction set[s] into motion a chain of circumstances which may be a contributing cause even though not the immediate or proximate cause of a casualty….'"[46]

### Managing Agent Privity or Knowledge

35.     "[P]rivity or knowledge includes that of a 'managing agent, officer, or supervising employee' of the vessel."[47]

36.     Courts consider the following non-exhaustive factors to evaluate whether an entity or individual is a "managing agent" of a vessel: (1) the scope of the agent's authority over day-to-day activity in the relevant field of operations; (2) the relative significance of this field of operations to the business of the corporation; (3) the agent's ability to hire and fire other employees; (4) his power to negotiate and enter into contracts on behalf of the company; (5) his authority to set prices; (6) the agent's authority over the payment of expenses; (7) whether the agent's salary is fixed or contingent; and (8) the duration of his authority (i.e. full-time or restricted to a specific shift).[48] However, the dispositive query is whether an employee's scope of authority includes supervision over the field of operations in which the injury or loss occurred.[49]

37.     By engaging Synergy to manage and operate the DALI, Synergy is a managing agent of the DALI such that its privity or knowledge is imputable to Grace Ocean.

---

[46] *In re Oil Spill by Amoco Cadiz Off Coast of France on March 16, 1978*, 954 F.2d 1279, 1303 (7th Cir. 1992) (alteration in original) (quoting *Tug Ocean Prince*, 584 F.2d at 1158); *see also, In re Complaint of Messina*, 574 F.3d 119, 127 (2d Cir. 2009) ("[I]f the owner, 'by prior action or inaction set into motion a chain of circumstances which may be a contributing cause even though not the immediate or proximate cause of a casualty, the right to limitation is properly denied[.]'" (internal quotation omitted)).

[47] *In re Energetic Tank, Inc.*, 607 F. Supp. 3d 328, 370 (S.D.N.Y. 2022), *aff'd*, 110 F.4th 131 (2d Cir. 2024).

[48] *In re Vulcan Materials Co.,* 369 F. Supp. 2d 737, 741 (E.D. Va. 2005) (quoting *In re Hellenic, Inc.*, 252 F.3d 391, 397 (5th Cir. 2001)).

[49] *In re Hellenic*, 252 F.3d at 395 ("[P]rivity or knowledge is imputed to the corporation when the employee is an executive officer, manager or superintendent whose scope of authority includes supervision over the phase of the business out of which the loss or injury occurred." (internal quotation and citation omitted)).

38.     Synergy's onshore Ship Management Team—Managing Director and Head of DOC Ajith Kumar, Marine Manager and Designated Person Ashore Ravi Sekhar, Marine Superintendent Melroy D'Souza, Technical Manager or Fleet Manager Balaji Vanmeekesan, Technical Superintendent Karthik Nair, former Technical Manager/current QHSE Manager Rajesh Inigo, and QHSE Superintendent Vishal Prabhu—are all managing agents for purposes of imputation of privity or knowledge to Petitioners.

## Latent Defect or Unavoidable Accident Defense

39.     To satisfy a "latent defect" or "unavoidable accident" defense, Petitioners must meet the "heavy burden" of proving: (1) the precise cause of the accident, (2) that the defect that caused the accident was latent or undiscoverable with the exercise of reasonable care, and (3) that a reasonable degree of maritime skill was exercised when the defect manifested.[50]  To meet this burden of proof, courts have required evidence that faulty machinery was otherwise in good condition, properly and frequently inspected, and well maintained and serviced.[51]  Petitioners cannot meet this burden.

## The Limitation Act and the DALI

40.     Based on the foregoing facts and legal principles, the Claimants will show that:

   a.  Synergy cannot meet its burden of proving that it is an owner pro hac vice of the DALI.  Synergy is therefore not entitled to exoneration or limitation of liability under the Limitation Act.

---

[50] *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 (5th Cir. 1977); *In re Reichert Towing Line*, 251 F. 214, 217 (2d Cir. 1918); *Cranberry Creek Coal Co. v. Red Star Towing & Transp. Co*., 33 F.2d 272, 274 (2d Cir. 1929); *Oil Transfer Corp. v. Atl. Tankers, Ltd*., 194 F. Supp. 920, 925 (S.D.N.Y. 1960).
[51] *The William E. Reed, Hudson River Shipyards Corp. v. Metropolitan Sand & Gravel Corp*., 104 F.2d 167, 168 (2d Cir. 1939); *The J.N. Gilbert*, 222 F.37, 41 (5th Cir. 1915); *Cranberry Creek Coal Co.*, 33 F.2d at 274.

b. Petitioners cannot meet their burden of proving that they were free from fault, that they had no privity or knowledge of the numerous unseaworthy conditions and negligent acts set forth above, and that those unseaworthy conditions and negligent acts could not have been the cause of the allision. Petitioners are therefore not entitled to exoneration or limitation of liability.

c. As it pertains to the Personal Injury and Wrongful Death claimants, Petitioners cannot meet their burden of proving that the Master was free from fault, that he had no privity or knowledge of the numerous unseaworthy conditions and negligent acts set forth above, and that those unseaworthy conditions and negligent acts could not have been the cause of the allision. Petitioners are therefore not entitled to exoneration or limitation of liability.