**PTO EXHIBIT B**

**PETITIONERS' STATEMENT OF FACTS AND LEGAL THEORIES**

### A. Introduction

At the time of the events of March 26, 2024, the DALI was in full compliance with all relevant international conventions and applicable U.S. laws and regulations that govern her operation. The regulatory bodies that govern the DALI operations are (1) the Maritime and Port Authority of Singapore, known as the MPA or the Flag State; (2) Nippon Kaiji Kyokai, known as ClassNK, or the ship classification society, which in certain respects acts on behalf of the Flag State; and, (3) the U.S. Coast Guard (USCG) when she is in U.S. waters. These regulatory bodies, starting primarily with the Flag State and ClassNK acting on the Flag State's behalf, conducted numerous regular inspections and surveys on an ongoing basis, and routinely certified the DALI's compliance with all applicable international safety regulations. The DALI also exceeded required international manning standards and had experienced, appropriately credentialed crew. Similarly, the DALI, and other vessels managed by Synergy Marine, had a near flawless Port State Control ("PSC") record in the U.S. through inspections conducted by the USCG.[1] The evidence shows that the DALI was in full compliance with all applicable regulations when it arrived and departed Baltimore.

Similarly, the DALI was not operated in a manner inconsistent with any recommendation by Hyundai Heavy Industries Co., Ltd ("HHI"), its builder and defendant in the Petitioners' products liability claim pending in District Court for the Eastern District of Pennsylvania.

---

[1] PSC is the means by which a port State inspects ships calling on its ports, to ensure compliance with international regulations developed by the International Maritime Organization ("IMO"). The IMO is the United Nations specialized agency with responsibility for developing regulations governing safety and other aspects of international shipping. The Flag State and classification societies inspect and survey vessels and, when in compliance with these IMO regulations, certify that the vessel is in compliance. These IMO regulations, along with certain U.S. laws and regulations, are also enforced by the USCG when foreign flag ships calling on U.S. ports.

Moreover, the facts set out below are consistent with and supported by the National Transportation Safety Board's ("NTSB") factual reporting. After an 18-month long exhaustive and comprehensive investigation, which included the MPA and HHI as parties, the NTSB factual reports do not indicate that the DALI was out of compliance with any code, law, regulation or rule governing her operation or HHI's recommendations at the time of the allision.

The Claimants ask this Court to ignore the hundreds of years of maritime safety experience that contributed to the development of the conventions, laws, regulations or rules promulgated by the international maritime organizations that govern international shipping. For example, the Claimants will ask this Court to find that the Vessel's transformers should have been in automatic mode and not manual mode; yet, the record is clear that there is no convention, law, regulation or rule, or HHI recommendation, that the transformers must be operated in automatic mode. Even to this day, more than two years after the events of March 26, 2024, no such requirement exists. And, at trial, Petitioners will establish that the issue of how a transformer should be operated is an issue that was, and continues to be, discussed and analyzed by the IMO since the mid-1970s.

The Court should reject Claimants' request that the Court substitute their judgment for that of the various international regulatory bodies which have developed and implemented the relevant conventions and regulations governing maritime organizations.

### B. The Petitioners

Petitioner Grace Ocean Private Limited ("Grace Ocean") is a corporation organized and existing under the laws of Singapore with its registered office in Singapore. At all relevant times, Grace Ocean was the registered owner of the DALI.

Petitioner Synergy Marine Pte Ltd. ("Synergy Marine") is a corporation organized and existing under the laws of Singapore with its registered office in Singapore. At all relevant times,

Synergy Marine was the manager of the DALI. At all relevant times, Synergy Marine had substantial control of and exercised dominion over the Vessel.

The DALI (IMO No. 9697428) (the "Vessel") is a 10-000 TEU-class containership of 95,128 gross metric tons, with a length of 299.92 meters, a moulded breadth of 48.2 meters and a summer draft of 15.021 meters. The Vessel is registered under the laws of Singapore. The Vessel was built by HHI, with construction beginning in July 2014 and delivery in March 2015.

**C.  The Events of March 26, 2024**

The events of March 26, 2024, were tragic, but they were not caused by the negligent operation or management of the Vessel, but rather by a defective wire buried deep in an electrical switchboard, as explained below.

On March 26, 2024, the Vessel departed Baltimore, Maryland on a voyage that commenced at Newark, New Jersey, bound for Colombo, Sri Lanka, with an ultimate destination of Yantian, China. The Vessel had a cargo of 4679 containers on board.

The Vessel is propelled by a single, slow-speed diesel engine rated for 55,626 hp (41,480 kW) at 82.5 RPM, manufactured by HHI under license from MAN B&W. The engine is directly connected to a single, right-turning propeller.

The Vessel has four Himsen diesel generators. Diesel generators No. 1 and No. 4 are rated at 4,580 kW and diesel generators No. 2 and No. 3 DGs are rated at 4,000 kW. The Vessel also has one emergency diesel generator which is rated at 200 kW.[2]

---

[2] A diesel generator is a diesel engine coupled to an electric alternator. The engine provides mechanical energy that is converted to electrical energy by the alternator.

To run the main engine, one of the Vessel's four diesel generators must be operating and supplying the Vessel with electrical power. The emergency generator alone cannot be used to restart or run the main engine.

The Vessel's electrical system is powered by the four diesel generators, which supply alternating current at 6,600 volts. The diesel generators are connected to a 6,600-volt high-voltage ("HV") main electrical bus[3] contained within the HV switchboard via vacuum circuit breakers ("VCB").[4]



*Fig. 1. Schematic diagram of the Vessel's electrical power distribution system.*

---

[3] An electrical bus is a physical part of an electrical switchboard. (The term bus is a shortened form of "bus bars," which are the metal bars physically located within the switchboard.) The bus distributes the power produced by the generators to systems/devices that require electrical power.

[4] A circuit breaker is a switch that can close (to facilitate the flow of electricity) or open (to stop the flow of electricity). A circuit breaker connects the electrical power on a bus to the systems or devices that require electrical power. A vacuum circuit breaker is a specific type of circuit breaker that interrupts the current in a vacuum.

4

The main engine lubricating oil pumps, bow thruster (a propulsor on the bow that is used to assist with the vessel's maneuverability when docking and undocking), and the refrigerated containers that cool temperature-sensitive cargo are powered directly from the HV switchboard.



*Fig. 2. The Vessel's HV switchboard (located in the Engine Control Room).*

The Vessel has a Power Management System ("PMS") computer that monitors the diesel generators' operating state and electrical output, among other functions. The PMS is designed to automatically disconnect a diesel generator from the switchboard when it detects an abnormal condition with that generator, such as low voltage or low frequency.

A 440-volt low-voltage (LV) electrical bus is connected to the HV bus via two 6.6 kV / 440 V step down transformers designated "TR-1" and "TR-2".[5] The HV bus is connected to the

---

[5] A step-down transformer converts high voltage to a lower voltage, which then supplies electrical power to equipment throughout the Vessel.

transformers with VCBs labeled "HR-1" and "HR-2." The transformers are connected to the LV bus with air circuit breakers ("ACB") labeled "LR-1" and "LR-2." The LV bus provides power for Vessel lighting and other equipment, including steering gear pumps and the main engine cooling water pumps.

Circuit breakers in the Vessel's electrical system also are used to protect electrical equipment by disconnecting the power supply when an abnormal condition is detected in a circuit or system. Abnormal conditions are detected by protection devices, which act on a series of control relays or devices that will "open" or "trip" the breaker, interrupting the electrical power to the circuit.[6]

One such protective device used in the control and monitoring of the transformer high voltage circuit breakers HR-1 and HR-2 is the Hyundai Intelligent Measuring and Protection – Transformer ("HIMAP-T"). The HIMAP-T monitors the amount and direction of electrical current flowing to the transformer and acts on a device called an under-voltage release ("UVR"). The UVR is a device with a spring-loaded electrical coil inside the VCB that activates and opens the breaker when its control voltage (110 volts DC) is interrupted by a signal from the HIMAP-T or otherwise from the breaker control circuit. For the HR-1 or HR-2 circuit breakers to successfully close or remain closed, the UVR control circuit must be supplied with control voltage within an allowable range. If the breaker's UVR control circuit loses voltage or senses a drop in voltage below the allowable limit, the HR-1 or HR-2 circuit breaker will open, disconnecting TR-1 or TR-2 from the HV switchboard, resulting in a loss of power supply to the LV switchboard.

---

[6] A relay is an electrically operated switch. They commonly use an electromagnetic coil to operate their internal mechanical switching mechanism (i.e., contacts).

The circuit breaker control relays are contained within the control section of the switchboard, adjacent to the enclosures housing the electrical generator and transformer VCB. Wires running between the individual relays and a series of "terminal blocks" connect the relays into their respective control circuits.



*Fig. 3. Terminal block arrangement inside of the circuit breaker control enclosure.*



*Fig. 4. An exemplar terminal block identical to the model used in the Vessel. (Source WAGO.com.)*

At about 01:25 local time on March 26, while the Vessel was transiting out of Baltimore Harbor, circuit breakers HR-1 and LR-1, which fed most of the Vessel's equipment and lighting unexpectedly opened, causing a loss of electrical power to the LV Switchboard. At this time, the Vessel was operating on diesel generators No. 3 and No. 4, and the LV Switchboard was powered by TR-1.

At the time of this power loss, the Vessel was approximately three ship lengths, or just under 1,000 yards, from passing under the Francis Scott Key Bridge ("Key Bridge"). The Vessel was heading 141 degrees down the channel centerline and was traveling at approximately 8.5 knots.

When the LV switchboard experienced a loss of electrical power, various main engine auxiliary systems shut down, causing the main engine to shut down. The loss of electrical power also stopped all three steering pumps, making the rudder unable to be moved hydraulically.

The crew recovered the LV Switchboard by manually closing breakers HR-2 and LR-2 which switched transformers from TR-1 to TR-2. This reconnected diesel generators No. 3 and No. 4, restoring electrical power to the LV bus. This also restarted the steering pumps, restoring the Vessel's steering capabilities; however, it takes approximately 120 seconds to restart the main engine following a shutdown, and the crew was not able to restart the main engine at this time.

At about 01:27 local time, an electrical blackout occurred when the circuit breakers connecting diesel generators No. 3 and No. 4 to the HV bus opened, causing a total loss of Vessel electrical power to the HV and LV buses. Meanwhile, the Vessel's course started drifting to starboard towards Pier 17 of the Key Bridge. By this time, the emergency generator was running such that the Vessel continued to have rudder control. Although the crew made various port helm

8

maneuvers to attempt to steer away from the Key Bridge, however, without propulsion the rudder was unable to overcome the hydrodynamic forces that caused the Vessel to veer to starboard towards Pier 17.

The crew deployed the port anchor in a desperate attempt to either slow or turn the Vessel; however, given the short time and distance available, and given the small holding power of the anchor relative to the massive momentum of a large container ship traveling at 8 knots, the anchor did not – and could not have – arrested or altered the course and speed of the Vessel in any meaningful way.

At about 01:29 local time, the Vessel allided with the Key Bridge, causing several sections of the bridge to collapse into the water.

### D.  The Investigation

Shortly after the incident, the NTSB and HHI undertook an investigation of the Vessel and its electrical components to determine the cause of the initial loss of the power to the LV Switchboard. After hundreds of investigative hours of HHI and NTSB specialists, it was determined that the UVR coil for circuit breaker HR-1 was not receiving control voltage as it should, and that one of the control signal wires in the UVR control circuit at node 381, was not securely connected to its terminal block. The unsecure control signal wire was part of a control circuit that opens HR-1 VCB. This circuit removes control voltage to the UVR, which causes HR-1 VCB to open when commanded to do so by the HIMAP-T protection device or breaker control switch on the HV switchboard.

The signal wire was not securely connected to the terminal block because the labeling band identifying the wire was installed too close to the ferrule crimped on the end of the wire. (See Figures 5 and 6 comparing the labeled and unlabeled signal wire.) As a result of this and other

defects, the signal wire could not be inserted fully into the terminal block's spring clamp gate. (See Figure 7.)



*Figure 5. Signal wire from node 381 removed from the terminal block connection point 1. (Source NTSB.gov.)*



*Figure 6. Signal wire from node 381 removed from the terminal block connection point 3. (Source NTSB.gov.)*

10



*Figure 7. Wires 1 and 3 from Terminal Block 381 inserted to the maximum possible depth inside the corresponding connection points in a disassembled exemplar terminal block. (Source NTSB.gov.)*

Because this signal wire was not securely connected to the terminal block, the insufficient contact created an open circuit between the signal wire and the terminal block. The UVR control voltage, necessary for the HR-1 VCB to close or remain closed, was lost because of this open circuit. This open circuit subsequently caused HR-1 circuit breaker to open, disconnecting transformer TR-1 from the HV Switchboard, and subsequently causing the initial loss of power to at the LV Switchboard.

The loss of the UVR control voltage was not recorded by the HIMAP-T. Further, there was no alarm to the crew before or at the time of the loss of power to alert them to the problem or its cause.

The immediate consequence of the loss of LV power was that the main engine automatically commenced a shutdown sequence to protect itself from serious damage with the loss of lubrication and cooling. There is a "shutdown override" button on the bridge that can be used

to stop the engine from shutting down; however, by manufacturer design this must be depressed within the incredibly short time of six seconds following the loss of power. And even if the shutdown override is initiated, the engine would shut down due to low hydraulic pressure and fuel starvation approximately 30 seconds after a power loss, at which point the shutdown is inevitable and uncancelable in any event.

Restarting a ship's main engine after restoration of power is not the same as starting the engine on a car. Several steps must occur over a period of time before the engine can be restarted. Once electrical power is restored, the sequential start of various motors and pumps commences based on a predetermined timed sequence so as not to overload the generators once they are back on line. These are defined times as set out by the builder, HHI. Controlling the time for the main engine on this sequential start is the main engine jacket cooling fresh water pump, which has a defined recovery time of 45 seconds after successfully starting and placing a generator online. In addition to the above, the Kongsberg system will have certain alarms that must be acknowledged and accepted by the crew in the Engine Control Room. The main engine and Kongsberg systems then have to go through their logic sequence and verification that the main engine may reset and be placed in "prepare to start" mode.

Once the main engine is ready, the sequence of preparing the starting of the main engine can commence. This activates two electrically driven hydraulic power system ("HPS") pumps, which supply hydraulic pressure for the operation of the HPS system. The HPS pumps have to reach a hydraulic pressure of 225 bar. This process, depending on the prevailing condition, can take approximately 40 seconds to achieve. Only after all this has occurred can the engine telegraph control be operated to engage the engine.

In sum, it takes approximately 100 seconds after electric power is restored before the main engine can be restarted. And that is without accounting for any human factors, such as responding to and cancelling alarms, attempting to diagnose the cause of the power loss, and generally reacting and responding to an urgent emergency situation. Once engaged, it takes an additional 60 seconds for the main engine to get up to rpms sufficient to drive the Vessel to half ahead so that the propeller can provide sufficient thrust to allow the Vessel to make emergency maneuvers.

Both Petitioners and Claimants engaged ship modeling experts to model the Vessel and surrounding environment and to model whether and to what extent the Vessel could avoid the allision by some combination of rudder maneuvers. These experts agree that without the main engine, it was impossible as a matter of physics and engineering for the Vessel to steer to avoid the allision. They also agree that even with deployment of the anchor at the time called for by the Pilot, the Vessel would still have hit the bridge.

Petitioners further modeled the question of when was the last time the Vessel could have avoided the allision if the crew had been able to restore the engine and accelerate to half-ahead. That modeling demonstrates that, after factoring in the time required to restart the engine and get it up to half ahead, and after accounting for basic human factors that would impact a well-trained crew's response time, it would not reasonably have been possible for the Vessel avoid the allision with any combination of helm and engine orders.

### E. Claimants' Contentions

Claimants expend great effort in this litigation to distract the Court from the clear and obvious cause of this tragic event – *to wit*, a latent defect buried deep in an electrical switchboard which caused a loss of power just four minutes and three ship-lengths away from the Key Bridge, which neither the crew nor shore management could possibly have identified prior to departure on

the voyage. None of the Claimants' theories hold water, however, and at trial Petitioners will show that the sole and proximate cause of the allision was the sudden and unexpected loss of power that caused the Vessel's main engine to shut down without time to restart in order to steer the Vessel away from Pier 17 of the Key Bridge. In short, the allision was an unavoidable accident.

Claimants criticize the crew for keeping the transformers in manual mode rather than automatic; however, there was no regulation or requirement of the classification society, the Flag State, IMO, or any other regulatory body that required this equipment to be in automatic mode. HHI, the manufacturerof the equipment, provided no instruction or guidance that recommended that this equipment be maintained in automatic mode. Moreover, the crew's restoration of power within 58 seconds was both highly professional and timely. Further, given the very short time available between the loss of power and the time after which it would be impossible as a matter of physics and engineering to power the Vessel away from the bridge, this decision did not in any way cause or contribute to the allision. In any event, this was a decision made by a competent and well-trained crew, and neither Synergy Marine, Grace Ocean nor the Master had privity or knowledge of the engine crew's decision to operate the Vessel's transformers in this manner.

Claimants also criticize the crew for not repairing a component on the emergency generator prior to departure from Baltimore, but they ignore that the damaged component was designed to automatically turn *off* the generator after power was restored. It had nothing to do with the generator's automatically starting after a loss of power. Claimants contend that the crew may have failed to set the generator to automatic mode following the blackouts on March 25, but this argument ignores the evidence that the generator did automatically start on the 26th, just not within the 45 seconds that is required. In any event, the crew restored electrical power and steering control before the Pilot called for any helm order to attempt to correct the course of the Vessel, and thus

14

any issue with the generator is entirely a red herring and played no role in the casualty. And even if it were true that the crew failed to put the emergency generator into automatic restart mode following the blackouts on March 25, it would be crew error that was outside the privity and knowledge of Synergy Marine, Grace Ocean and/or the Master.

Claimants criticize the crew for operating the Vessel's No. 3 and 4 generators using the "flushing pump," which lacks an automatic start feature following a loss of power; however, they entirely ignore the fact that by the time of this second loss of power it was already too late for the Vessel to avoid the allision by any combination of engine and helm orders. And in any event, neither Synergy Marine, Grace Ocean or the Master had privity or knowledge of how the engine crew were operating the Vessel's generators when they commenced the voyage.

Claimants criticize the crew for not having enough personnel on the bow of the Vessel to deploy the port anchor after the Pilot called for it, arguing that the electric actuator which controlled the brake was defective, requiring the crew to use the manual handwheel to release the brake. They ignore, however, that the manual handwheel is the customary manner in which the anchor is deployed on cargo vessels and that it actually takes virtually the same amount of time to deploy the anchor with the electric release and with the handwheel. Claimants also ignore the fact that their own simulation expert fully concedes that even if the anchor had been deployed at the time the Pilot had called for it, the Vessel would still have hit the Key Bridge.

Claimants contend that the crew improperly tested and operated the Vessel's steering gear and bow thruster, but they ignore evidence establishing that both fully functioned as designed on the morning of the casualty and played no role in causing the allision.

Claimants criticize the crew for failing to report the pier-side blackouts on March 25 to the USCG or to Synergy Marine prior to departure, but the evidence overwhelmingly confirms that

these were not reportable incidents within the meaning of any applicable regulation. Moreover, even if they were reportable, the crew were still well within the reporting timeline outlined in Synergy Marine's SMS and acted reasonably in waiting to report the blackouts to Synergy Marine's technical superintendent until after they departed Baltimore.

Claimants more broadly criticize the Vessel's SMS as being inadequate, but the record is clear that the SMS was fully approved by ClassNK and the Flag State and, in fact, significantly exceeded the requirements of the IMO's International Safety Management Code ("ISM Code") in many respects.

Claimants criticize the crew for failing to have proper blackout recovery procedures, but the evidence is that the crew were professional, were regularly trained on responding to blackouts, and acted timely in all respects in responding to the casualty.

To the extent the Court finds that any of the above issues (or any other issue) caused or contributed to the casualty, Synergy Marine, Grace Ocean and the Master lacked privity and knowledge of such issue and should be entitled to limit their liability in this matter.

### F.  Legal Theories Relied Upon by Petitioners

*Jurisdiction, Venue and Governing Law*

1. The Court has subject matter jurisdiction over this admiralty action pursuant to 28 U.S.C. § 1333, and this matter has been designated by Petitioners as being within the Court's admiralty jurisdiction pursuant to the Limitation of Liability Act, 46 U.S.C. § 30501 *et seq.* (the "Limitation Act") and Rule 9(h) of the Federal Rules of Civil Procedure.

2. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

3.  Because the events at issue occurred on navigable waters of the United States and involve traditional maritime activity that had a substantial impact on maritime commerce, the maritime law of the United States governs the parties' dispute. *See* 46 U.S.C. § 30101; *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249 (1973); *see also East River S.S. Corp. v. Transamerica Delaval, Inc*., 476 U.S. 858, 864 (1986) ("With admiralty jurisdiction comes the application of substantive admiralty law.").

4.  "The body of substantive admiralty law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules, developed in service of the overriding principles of harmony and uniformity that form a primary rationale for federal admiralty jurisdiction." *Parker v. Motor Boat Sales, Inc.*, 314 U.S. 244, 248 (1941) (cleaned up; internal quotations and citations omitted).

### *Exoneration/Limitation of Liability*

5.  Pursuant to the Limitation Act, an owner of a vessel that was involved in an accident may bring an action in federal court to determine whether the vessel is liable for the loss and whether the vessel owner's liability should be limited. 46 U.S.C. § 30501 *et seq*.

6.  A vessel owner may limit his liability to the post-incident value of his interest in the vessel plus pending freight upon a showing that the cause of the accident was not within his privity or knowledge. 46 U.S.C. § 30523.

7.  The Limitation Act defines "owner" as including a "charterer that mans, supplies, and navigates a vessel at the charterer's own expense or by the charterer's own procurement." 46 U.S.C. § 30501(2). Courts have expanded the definition of owner to encompass parties in analogous situations who exercise dominion and control over a vessel and are, therefore, owners *pro hac vice*, even if not technically charterers. *See Dick v. United States*, 671 F.2d

724, 727 (2d Cir. 1982) ("The term 'owner' is to be interpreted in a 'liberal way.'"). Thus, "if the petitioner may be held liable because of his ownership or control of the vessel," he is an owner for purposes of the Limitation Act. *Complaint of Chesapeake Shipping, Inc.*, 778 F. Supp. 153, 156 (S.D.N.Y. 1991). *See also Dick*, 671 F.2d at 727 ("As a general rule, one who is subjected to a shipowner's liability because of his exercise of his dominion over a vessel should be able to limit his liability to that of an owner."); *In re Houseboat Starship II*, 2005 WL 3440788, at * 3 (M.D. Tenn. Dec. 12, 2005) ("[T]he act is designed to cover one who is a 'likely target' for liability claims" predicated on its status as the entity "perhaps ultimately responsible for the vessel's maintenance and operation."); *In re Shell Oil Co.*, 780 F. Supp. 1086, 1089–90 (E.D. La. 1991) ("The rule that emerges from all of the cases interpreting ownership ... is that if the plaintiff in limitation may be held liable because of his ownership or control of the vessel, then he can maintain a limitation action.").

8.  Here, Grace Ocean, as owner of the DALI, and Synergy Marine, as manager of the DALI, are both within the category of parties entitled to invoke the protections of the Limitation Act.

9.  In deciding a limitation action, the Court engages in a two-step analysis to determine (1) whether the accident was caused by the negligence or unseaworthiness of the vessel and (2) whether the vessel owner had knowledge of the negligent acts or unseaworthy conditions which caused the accident. *See, e.g.*, *Empresas Lineas Maritimas Argentinas S.A. v. United States*, 730 F.2d 153, 155 (4th Cir. 1983); *Farrell Lines, Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir. 1976).

10. Causation is a key factor. If the accident was not caused by negligence associated with the shipowner's vessel, then the shipowner is exonerated from all liability. *See, e.g.*, *Am. Dredging Co. v. Lambert*, 81 F.3d 127, 129 (11th Cir. 1996); *In re Cent. Gulf Lines, Inc.*, No. 01-31028,

2003 WL 1202793, *10 (5th Cir. Mar. 3, 2003) ("A shipowner free from fault will be exonerated.") (citing *Tittle v. Aldacosta*, 544 F.2d 752, 755 (5th Cir. 1977)).

11. "'[P]rivity or knowledge' generally refers to the vessel owner's personal participation in, or actual knowledge of, the specific acts of negligence or conditions of unseaworthiness which caused or contributed to the accident." *Suzuki of Orange Park, Inc. v. Shubert*, 86 F.3d 1060, 1064 (11th Cir. 1996). "Privity and knowledge, in the sense the words are used in this statute, have been construed to mean that a shipowner knew or should have known that a certain condition existed." *Hellenic Lines, Ltd. v. Prudential Lines, Inc.*, 730 F.2d 159, 166 (4th Cir. 1984).

12. A shipowner has privity if he personally participated in the negligent conduct or was responsible for bringing about the unseaworthy condition. *Trico Marine Assets Inc. v. Diamond B Marine Servs Inc.*, 332 F.3d 779, 789 (5th Cir. 2003) (citing *Pennzoil Producing Co. v. Offshore Exp., Inc.*, 943 F.2d 1465, 1473 (5th Cir. 1991)). When a shipowner is a corporation, knowledge is judged by what the corporation's managing officers actually knew and by what they should have known with respect to conditions or actions likely to cause the loss. *Id*. at 789–90.

13. Ordinary errors in navigation or other negligence by an otherwise competent master or crew are not attributable to the shipowner for limitation purposes. *See Petition of Kristie Leigh Enters, Inc.*, 72 F.3d 479, 481 (5th Cir. 1996); *Mac Towing, Inc. v. Am. Commercial Lines*, 670 F.2d 543, 548 (5th Cir. 1982); *see also Matter of Texaco, Inc.*, 570 F. Supp. 1272, 1278 (E.D. La. 1983) ("[I]f the cause is the 'instantaneous negligence' of the crew or master, then the shipowner has generally been allowed to limit his liability...").

14. The claimants bear the initial burden of proving that negligence of either the Owner or Manager or unseaworthiness of the Dali was the cause of the allision. *Hercules Carriers v. Claimant State of Fla., Dep't of Transp.*, 768 F.2d 1558, 1564 (11th Cir. 1985). If, and only if, Claimants can establish the negligence of the Owner or Manager was a cause of the accident, the vessel interests will then have the burden to prove they lacked privity or knowledge of the negligence. *Id.*

15. "For purposes of establishing privity or knowledge regarding limitation as to personal injury and death claimants, the privity or knowledge of the master of the vessel at or before the beginning of each voyage is deemed conclusively the privity or knowledge of the owner." *In re Int'l Marine, LLC*, 614 F. Supp. 2d 733, 740-41 (E.D. La. 2009) (citing 46 U.S.C. § 60506; *see also Trico Marine*, 332 F.3d at 789-90 ("[I]n situations resulting in loss of life or bodily injury, the knowledge of a seagoing vessel's master at the commencement of a voyage is imputed to the vessel's owner.") "The determination of the relevant voyage, however, is a fact-specific inquiry that depends on the particular circumstances of the situation presented." *Collins v. Cottrell Contr. Corp.*, 733 F. Supp. 2d 690, 696 (E.D.N.C. 2010). *See also*, *e.g.*, *In re Caribbean Sea Transport, Ltd.*, 748 F.2d 622, 626 (11th Cir. 1985) ("What constitutes a voyage is a question of fact, which depends on the circumstances of the situation.").

### *Seaworthiness*

16. While the owner of a vessel has a duty to furnish a seaworthy ship, this is "not to suggest that the owner is obligated to furnish an accident-free ship." See *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960). A seaworthy ship is one that is reasonably suited for its intended

use. *Id*. *See also Farrell Lines, Inc. v. Jones*, 530 F.2d at 10 (indicating a shipowner is not required to make the ship "failsafe.").

17. "Reasonable diligence" does not place a burden of perfect knowledge of all pre-voyage vessel conditions on an owner in order to limit liability, and the existence of an unseaworthy condition "at the inception of a voyage [does not] automatically foreclose [the shipowner] from the opportunity to prove an absence of privity or knowledge in the limitation proceeding." *Brister v. A.W.I., Inc*., 946 F.2d 350, 357 (5th Cir. 1991). *See also id*. at n.5.[7]

18. To sustain an unseaworthiness claim, the claimant must establish that the unseaworthy condition was the proximate cause of the injury or damages. *Smith v. Trans-World Drilling Co*., 772 F.2d 157, 162 (5th Cir. 1985). Accordingly, the claimant must show "that (1) the unseaworthiness played a substantial part in bringing about or actually causing the injury and that (2) the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." *Id*.

### *Maritime Negligence*

19. "In order to establish a claim of negligence under maritime law, a claimant must show each of the following elements by a preponderance of evidence: duty, breach, causation, and damages." *Gogel v. Maroulis*, 689 F. Supp. 3d 73, 80 (D. Md. 2023). *See also Franza v. Royal*

---

[7] In *Brister*, the Fifth Circuit observed,

> The facts of each particular case may dictate a different result [concerning whether liability can be limited where the unseaworthy condition existed at the outset of a voyage]. See, e.g*., In re Bankers Trust Co*., [651 F.2d 160, 171 (3d Cir. 1981)] (limiting liability despite finding presence of unseaworthy condition at start of voyage because turbine damage could have been detected only through performance of destructive testing which was not required); *Gibboney* [*v. Wright*, 517 F.2d 1054, 1058 (5th Cir. 1975)] (individual shipowner entitled to limitation despite existence of unseaworthiness at start of voyage due to defectively secured fuel tank because he had received assurances from builder that tank would be properly secured and tank was not accessible for inspection without tearing out metal); *In re Lloyd's Leasing Ltd*., 764 F.Supp. [1114, 1133 (S.D. Tex. 1990)] (limiting liability despite finding that ship was unseaworthy at start of voyage because shipowner could have discovered builder's welding defect only by conducting destructive testing which was not required).

21

*Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1253 (11th Cir. 2014); *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 211 (5th Cir. 2010).

20. The standard of care in maritime negligence cases is "reasonable care under existing circumstances." *Coumou v. United States*, 107 F.3d 290, 295-96 (5th Cir. 1997). "This standard necessarily can be applied only on a case-by-case basis considering the circumstances under which the casualty took place." Thomas J. Schoenbaum, ADMIRALTY & MARITIME LAW, §14:3, at 123 (3rd Ed. 2001). "It is not required that an extreme degree of caution or other more exacting standard of care be used; nor does error of judgment impute fault if it is within the ordinary care standard." *Folkstone Mar., Ltd. v. CSX Corp.*, 64 F.3d 1037, 1046 (7th Cir. 1995).

21. "[E]rrors in navigation or other negligence by master or crew are not attributable to (the vessel owner) for limitation purposes." *Mac Towing*, 670 F.2d at 548.

22. "The mere occurrence of an allision does not automatically impart liability to the vessel or her owner. Liability requires a finding of 'fault' that caused or contributed to the damage incurred." *McAllister Towing of Virginia, Inc. v. United States*, No. 2:10CV595, 2012 WL 1438770, at *8 (E.D. Va. Apr. 25, 2012) (citing *In re Am. Milling Co.*, 270 F. Supp. 2d 1068, 1087 (E.D. Mo. 2003), *rev'd on other grounds by In re Am. Milling Co., Ltd.*, 409 F.3d 1005 (8th Cir. 2005)).

23. "[F]ault which produces liability must be a contributory and proximate cause of the collision, and not merely fault in the abstract." *In re Mid-S. Towing Co.*, 418 F.3d 526, 534 (5th Cir. 2005). "To give rise to liability, a culpable act or omission must have been 'a substantial and material factor causing the collision.'" *Am. River Transp. Co. v. Kavo Kaliakra SS*, 148 F.3d

446, 450 (5th Cir. 1998) (quoting *Inter–Cities Navigation Corp. v. United States*, 608 F.2d 1079, 1081 (5th Cir. 1979)).

***The* Oregon *and* Louisiana *Rules***

24. Two common maritime presumptions of fault are based on the rules articulated in *The Oregon,* 158 U.S. 186 (1895) and *The Louisiana,* 3 Wall. (70 U.S.) (1865).

25. The rule of *The Oregon* creates a rebuttable presumption of fault that shifts the burden of production and persuasion to a moving vessel that, under its own power, allides with a stationary object.[8] *See The Oregon,* 158 U.S. at 192–93; *James v. River Parishes Co.,* 686 F.2d 1129, 1132 n. 2 (5th Cir. 1982).

26. The rule of *The Louisiana* creates the same rebuttable presumption for a vessel that drifts into an allision with a stationary object. *See The Lousiana,* 3 Wall. (70 U.S.) at 173; *James,* 686 F.2d at 1131–32.

27. Although the two presumptions apply to different types of vessels (*i.e.*, powered versus drifting), courts treat them the same. *See Fischer v. S/Y NERAIDA,* 508 F.3d 586, 593 (11th Cir. 2007) (doctrines are the same except the vessels to which they apply); *City of Chicago v. M/V Morgan*, 375 F.3d 563, 572 n. 11 (7th Cir. 2004); *Rodi Yachts, Inc. v. Nat'l Marine, Inc.,* 984 F.2d 880, 886 (7th Cir. 1993); *James,* 686 F.2d at 1132 n. 2.

28. The moving vessel can rebut the presumption by proving, by a preponderance of the evidence, that the allision was the fault of the stationary object, that the moving vessel acted with

---

[8] "An allision is a collision between a moving vessel and a stationary object." *Evergreen Int'l., S.A. v. Norfolk Dredging Co*., 531 F.3d 302, 304 n. 1 (4th Cir. 2008) (citations omitted).

23

reasonable care, or that the allision was an unavoidable accident.[9] *Combo Maritime, Inc. v. U.S. United Bulk Terminal, LLC*, 615 F.3d 599, 605-606 (5th Cir. 2010).

29. "Evidentiary presumptions [like the *Oregon* and *Louisiana* Rules] are designed to fill a factual vacuum. Once evidence is presented . . . presumptions become superfluous because the parties have introduced evidence to dispel the mysteries that gave rise to the presumptions." *Rodi Yachts*, 984 F.2d at 887.

30. Here, in light of the substantial evidence presented by the Petitioners as to the cause of the allision, the *Oregon/Louisiana* Rule has no practical applicability.

### *The* Pennsylvania *Rule*

31. The *Pennsylvania* Rule provides that if a vessel or structure involved in a collision or allision was in actual violation of a statutory or regulatory rule that is intended to prevent such incidents, the burden shifts to the non-compliant vessel or structure to show that its violation was not a cause of the incident. *See The Pennsylvania*, 86 U.S. 125, 136 (1873); *Norfolk Dredging Co.*, 531 F.2d at 310.

32. For the *Pennsylvania* Rule to be applied, three factors must be present: "(1) proof by a preponderance of the evidence of violation of a statute or regulation that imposes a mandatory duty; (2) the statute or regulation must involve marine safety or navigation; and (3) the injury suffered must be of a nature that the statute or regulation was intended to prevent." *Union Pac. R. Co. v. Kirby Inland Marine, Inc. of Miss.*, 296 F.3d 671, 674 (8th Cir. 2002) (citing *Folkstone*, 64 F.3d at 1047).

---

[9] "The 'inevitable accident' doctrine applies when 'the cause of the collision was a cause not produced by [the vessel], but a cause of which [the vessel] could not avoid.'" *City of Chicago*, 375 F.3d at 576 (quoting *The Olympia*, 61 F. 120, 123 (6th Cir. 1894)).

33. Here, Claimants can establish no statutory violation that would fall within the ambit of the *Pennsylvania* Rule; accordingly, that rule is inapplicable. And in any event, "[a]s an evidentiary presumption 'designed to fill a factual vacuum,' the *Pennsylvania* Rule, like other presumptions of fault under maritime law, is inapplicable where 'the parties have introduced evidence to dispel the mysteries that gave rise to the presumption[ ].'" *SCF Waxler Marine LLC v. M/V ARIS T*, 427 F. Supp. 3d 728, 760 (E.D. La. 2019) (quoting *In re Mid-South Towing Co.*, 418 F.3d 526, 531 (5th Cir. 2005)), *aff'd* 24 F.4th 458 (5th Cir. 2022). Here, Petitioners will establish by a preponderance of the evidence that they were not at fault for the allision.

### *Latent Defect/Unavoidable Accident*

34. Where, as here, an allision was the result of a latent defect aboard the vessel, the vessel interests will not be found at fault where the defect could not reasonably have been detected by due diligence and where the allision could not have been prevented by reasonable care by the crew. *See, generally e.g.*, *Ark. River Co. v. CSX Transp.*, 780 F. Supp. 1138 (W.D. Ky. 1991) (failure of starboard engine was due to cause of which crew could not have been aware and allision could not have been prevented); *Comm. of Va. v. Bay Towing Corp.*, 44 Va. Cir. 466 (1998) (finding steering failed due to a latent steering arm defect and collision with bridge was inevitable accident).

### *Petitioners' Positions on Liability and Limitation*

35. Based on the foregoing, Petitioners will show at trial as follows:

    a. Grace Ocean and Synergy Marine are both entitled to invoke the protections of the Limitation Act;

    b. The cause of the initial loss of power was a latent defect, to wit a "loose" wire deep in a switchboard which caused the transformer breakers to trip and caused the main engine

25

to shut down within three ship lengths of the Key Bridge while the Vessel was traveling in excess of eight knots;

c.  No amount of due diligence could have allowed the Vessel's crew, managers or owners to detect the "loose" wire in advance of the casualty;

d.  Without the Vessel's engine, which automatically shut down immediately following the initial loss of power caused by the breaker trip, it would have been impossible for the Vessel to avoid alliding with the bridge;

e.  No act by the crew could reasonably have allowed the Vessel to restart her engine and steer to avoid the allision with the bridge within the short time available after the engine shutdown; and

f.  No act of negligence nor condition of unseaworthiness of the Vessel and/or crew caused or contributed to the allision.

36. Accordingly, Petitioners are entitled to a decree of exoneration in respect of the allision;

a.  Alternatively, to the extent there was any act of negligence or condition of unseaworthiness which caused or contributed to the allision, which is denied, such act or condition was not within the privity or knowledge of Synergy Marine or Grace Ocean;

b.  Alternatively or additionally, to the extent there was any act of negligence or condition of unseaworthiness which caused or contributed to the allision, which is denied, such act or condition was not within the privity or knowledge of the Master at the commencement of the voyage.

26