**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| In the Matter of the Petition<br><br>of<br><br>GRACE OCEAN PTE LTD., as Owner of the M/V DALI,<br><br>and<br><br>SYNERGY MARINE PTE LTD, as Manager of the M/V DALI,<br><br>for Exoneration from or Limitation of Liability. | Docket No. JKB 24-cv-941<br><br>*IN ADMIRALTY* |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PETITIONERS' MOTION FOR JUDGMENT ON THE PLEADINGS**
**AS TO ALL PURELY ECONOMIC LOSS CLAIMS**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

SUMMARY OF THE CLAIMS................................................................................................. 2

LEGAL STANDARD................................................................................................................ 3

ARGUMENT AND AUTHORITY .......................................................................................... 4

1.    *Robins Dry Dock* Bars Claims for Pure Economic Losses ..................................... 4

    a.    Claimants Do Not Plausibly Allege a Proprietary Interest in the Key Bridge or the Existence of Other Damaged Property ................................ 9

    b.    Claimants' Suggestions of an "Intentional" Tort Do Not Change the Outcome ...................................................................................... 11

    c.    Claimants' Allegations of "Public Nuisance" Do Not Change the Outcome ...................................................................................... 16

    d.    Economic Loss Claimants' CERCLA and OPA Claims Fail as a Matter of Law ...................................................................................... 18

        i.    The R.E. West Class's Claim under CERCLA............................ 18

        ii.    Star Bulk's Claim under OPA........................................................ 19

2.    The Purported Class Actions Cannot Stand........................................................... 20

CONCLUSION....................................................................................................................... 21

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aikens v. Debow,*
541 S.E.2d 576 (W. Va. 2000)................................................................................9

*Am. Petroleum and Transp., Inc. v. City of New York,*
737 F.3d 185 (2nd Cir. 2013)....................................................................5, 6, 7, 8

*Amoco Transp. Co. v. S/S Mason Lykes,*
768 F.2d 659 (5th Cir. 1985) ................................................................................12

*Ascon Props. v. Mobil Oil Co.,*
866 F.2d 1149 (9th Cir. 1989) ..............................................................................19

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)................................................................................................3

*Ballard Shipping Co. v. Beach Shellfish,*
32 F.3d 623 (9th Cir. 1994) ............................................................................11, 12

*Barber Lines, A/S v. M/V Donau Maru,*
764 F.2d 50 (1st Cir. 1985)..............................................................7, 11, 12, 18

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)................................................................................................3

*In re Bertucci Contracting Co., LLC,*
712 F.3d 245 (5th Cir. 2013) ..................................................................................6

*Butler v. United States,*
702 F.3d 749 (4th Cir. 2012) ..................................................................................3

*California v. Sierra Club,*
451 U.S. 287 (1981)..............................................................................................17

*Carson Harbor Vill., Ltd. v. County of Los Angeles,*
433 F.3d 1260 (9th Cir. 2006) ........................................................................18, 19

*Channel Star Excursions, Inc. v. S. Pac. Transp. Co.,*
77 F.3d 1135 (9th Cir. 1996) ..................................................................................8

*Com. of Puerto Rico v. The M/V Emily S,*
158 F.R.D. 9 (D.P.R. 1994) ..................................................................................20

*Complaint of Great Lakes Dredge & Dock Co.*, 1996 U.S. Dist. LEXIS 5553, at
    *20 (N.D. Ill. Apr. 25, 1996) ........................................................................20

*Complaint of Marine Nav. Sulphur Carriers, Inc.*, 507 F. Supp. 205, 209 (E.D.
    Va. 1980), *aff'd* 638 F.2d 700 (4th Cir. 1981) ...............................................2, 6, 17

*Consol. Edison Co. of N.Y., Inc. v. UGI Utils., Inc.*,
    423 F.3d 90 (2d Cir. 2005)..........................................................................18

*Consolidated Rail Corp. v. M/T HOEGH FORUM*,
    630 F.Supp. 83 (E.D. Pa. 1985) ...................................................................13

*In re Deepwater Horizon*,
    784 F.3d 1019 (5th Cir. 2015) ...................................................................12, 14

*Dick Meyers Towing Serv., Inc. v. U.S.*,
    577 F.2d 1023 (5th Cir. 1978) ...........................................................12, 14, 17, 18

*Dunham-Price Grp., L.L.C. v. Port Aggregates, Inc.*,
    2006 WL 2112953 (W.D. La. 2006)................................................................15

*Gabarick v. Laurin Mar. (Am.), Inc.*,
    2009 U.S. Dist. LEXIS 27180 (E.D. La. Jan. 12, 2009)..........................................20

*General Foods Corp. v. U.S.*,
    448 F. Supp. 111 (D. Md. 1978) .....................................................................7

*Getty Ref.& Mktg. Co. v. MT FADI B*,
    766 F.2d 829 (3d Cir. 1985)........................................................................8, 14

*Henderson v. Arundel Corp.*,
    384 F.2d 998 (4th Cir. 1967), (D. Md. 1966) ......................................................7

*Kaiser Aluminum v. Marshland Dredging Co.*,
    455 F.2d 957 (5th Cir. 1972) ........................................................................14

*King v. Rubenstein*,
    825 F.3d 206 (4th Cir. 2016) ..........................................................................3

*Kingston Shipping Co. v. Roberts*,
    667 F.2d 34 (11th Cir. 1982), *cert denied*, 458 U.S. 1108 (1982)..............................8

*Lloyd's Leasing Ltd. v. Bates*,
    902 F.2d 368 (5th Cir. 1990) ........................................................................20

*Louisville & N. R. Co. v. Arrow Transp. Co.*,
    170 F.Supp. 597 (N.D. Ala. 1959)....................................................................6

iii

*Marine Nav. Sulphur Carriers, Inc. v. Lone Star Indus. Inc.*,
    638 F.2d 700 (4th Cir. 1981) ...................................................................................7

*Massey v. Ojaniit*,
    759 F.3d 343 (4th Cir. 2014) ...................................................................................4

*McLean Contracting Co. v. Waterman S.S. Corp.*,
    131 F. Supp. 2d 817, 821 (E.D. Va. 2001) .............................................................9

*McLean Contracting Co. v. Waterman Steamship Corp.*,
    277 F.3d 477 (4th Cir. 2002) ...................................................................................9

*Nautilus Marine, Inc. v. Niemela*,
    170 F.3d 1195 (9th Cir. 1999) .......................................................................5, 13, 14

*Naviera Maersk Espana, S.A. v. Cho-Me Towing, Inc.*,
    782 F. Supp. 317 (E.D. La. 1992) ............................................................................9

*Norwegian Bulk Transp. A/S v. International Marine Terminals P'ship*,
    520 F.3d 409 (5th Cir. 2008) .................................................................................12

*United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*,
    745 F.3d 131 (4th Cir. 2014) ...................................................................................3

*Rederi A/B Soya v. Evergreen Marine Corp.*,
    1972 A.M.C. 538 (4th Cir. 1972), (E.D. Va. 1971)..................................................7

*Robins Dry Dock & Repair Co. v. Flint*,
    275 U.S. 303 (1927)...................................................................................... *passim*

*Schaeffer v. Tsakos Shipping & Trading S.A.*,
    2006 U.S. Dist. LEXIS 25304 (E.D. Pa. May 2, 2006) .........................................20

*Sekco Energy, Inc. v. M/V MARGARET CHOUEST*,
    820 F. Supp. 1008 (E.D. La. 1993).................................................................13, 17

*Showa Line, Ltd. v. Diversified Fuels, Inc.*,
    1991 WL 211527 (E.D. La. Oct. 1, 1991) .............................................................12

*Slaven v. BP America, Inc.*,
    190 F.R.D. 649 (C.D. Ca. 2000) ...........................................................................20

*State of Louisiana v. M/V Testbank*,
    752 F.2d 1019 (5th Cir. 1985) (en banc), *cert. den.*, 477 U.S. 903 (1986)...................5, 16, 17

*In re Taira Lynn Marine Ltd. No. 5, LLC*,
    444 F.3d 371 (5th Cir. 2006) ...................................................................................8

iv

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ..................................................................................................4

*Texas Eastern Trans. v. McMoran Offshore Expl. Co.*,
    877 F.2d 1214 (5th Cir. 1989), *cert. denied,* 493 U.S. 937 (1989) ...........................9

*W.C. & A.N. Miller Dev. Co. v. Cont'l Cas. Co.*,
    814 F.3d 171 (4th Cir. 2016) ...................................................................................3

*Yarmouth Sea Prods. Ltd. v. Scully*,
    131 F.3d 389 (4th Cir. 1997) ...................................................................................2

**Statutes**

33 U.S.C.
    §§ 2700 *et seq.* ......................................................................................................19
    § 2702(a) ...............................................................................................................19

42 U.S.C.
    § 9601(25) .............................................................................................................19
    § 9607 ....................................................................................................................18

CERCLA
    § 107(a) .................................................................................................................18
    § 310(a) .................................................................................................................19

T. Schoenbaum, 2 Admiralty & Maritime Law, § 14-8 (7th ed.) ...................................5

**Other Authorities**

40 C.F.R. § 374.2 ..........................................................................................................19

Fed. R. Civ. P.
    10(c) .......................................................................................................................4
    12(b)(6) ...................................................................................................................3
    12(c) ...............................................................................................................1, 3, 4
    12(d) .......................................................................................................................3
    56 ............................................................................................................................1

Petitioners Grace Ocean Private Limited and Synergy Marine Pte Ltd (collectively "Petitioners") submit this Memorandum of Law in Support of their Motion for Judgment on the Pleadings[1] in respect of claims filed in this action brought by the Local Government and Private Economic Loss Claimants (collectively "Economic Loss Claimants").

**<u>PRELIMINARY STATEMENT</u>**

On March 26, 2024, the M/V Dali (the "Vessel") allided with the Francis Scott Key Bridge ("Key Bridge"), leading to the collapse of the Key Bridge (the "Casualty"). After Petitioners commenced this limitation action on April 1, 2024, over fifty claims were filed herein. Between October 24, 2024 and May 29, 2026, Petitioners settled with 32 claimants.[2] The remaining claims in this case consist of Public Entity Claimants the Mayor and City Council of Baltimore ("City of Baltimore") (ECF No. 142) and Baltimore County (ECF No. 171); and Private Economic Damages claimants Underwood Energy Inc. (ECF No. 78); a purported class consisting of R.E. West, Inc., E. Marine Motor Yacht Sales Pty Ltd., Captain Logistics LLC, American Publishing LLC, B&R Construction Services, Inc., International Trade Solutions, Inc., Penn Manufacturing Industries, LLC, PMI Eng. Exports Private Ltd., and PMI Global Technologies Pvt. Ltd. ("R.E. West Class," ECF No. 222); Consol Energy Inc. (ECF No. 395); Star Bulk (Singapore) Pte. Ltd. (ECF No. 188); American Sugar Refining, Inc. and Florida Sugar & Molasses Exchange, Inc. (ECF No. 189); a purported class consisting of Gerald Barney, Thomas Crawley, Ryan Hale, Tulani Hasan, Donny Jackson, Alonzo Key, Charles Peacock, and Douglas Ramos ("Longshoremen Class," ECF No.

---

[1] This Motion is styled as one for Judgment on the Pleadings pursuant to Federal Rule of Civil Procedure 12(c). However, in the event the Court does not see fit to dismiss any claims on that basis, Petitioners respectfully request the Court convert the Motion for any such claims to one for Summary Judgment pursuant to Federal Rule of Civil Procedure 56.

[2] Four claims were voluntarily dismissed.

1

239); Assignees and Subrogees of Ports America Chesapeake, LLC (ECF No. 241); and Mukesh Desai on behalf of R.M. Metals (ECF No. 344)[3].

Put simply, all claims brought by the Economic Loss Claimants are foreclosed by the rule of *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927) and progeny, which precludes recovery for economic loss resulting from physical damage to property in which the claimant possessed no proprietary interest. "Without question, the *Robins Dry Dock* principle is alive and well in the Fourth Circuit." *Yarmouth Sea Prods. Ltd. v. Scully*, 131 F.3d 389, 398 (4th Cir. 1997). See also *Complaint of Marine Nav. Sulphur Carriers, Inc.*, 507 F. Supp. 205, 209 (E.D. Va. 1980), *aff'd* 638 F.2d 700 (4th Cir. 1981) ("[A] person who suffers only an indirect economic loss based on business expectations may not recover damages against a tortfeasor who prevents passage on a shipping lane or on a land road."). Accordingly, because the Economic Loss Claimants did not have an ownership interest in the Key Bridge, and have failed to allege or identify a recognizable interest in any other property which purportedly sustained physical damage as a result of the Casualty, their pending economic loss claims asserted against Petitioners must all be dismissed as a matter of law.

## **SUMMARY OF THE CLAIMS**

A detailed summary of each of the Economic Loss Claims is set forth in the Declaration of Thomas H. Belknap, Jr., attached hereto as Exhibit 1 ("Belknap Declaration"). Petitioners respectfully submit that each of the Economic Loss Claims fails to state a cause of action for which relief may be granted, in that they are barred by the rule of *Robins Dry Dock*. Further, class actions are expressly barred in limitation proceedings, so the two purported class actions must be limited

---

[3] During the pendency of this case, this claim has been characterized as a cargo claim; however, the claim does not involve the carriage of cargo aboard DALI but rather alleged economic loss resulting from the inability to ship cargo aboard other vessels as a result of the incident.

to the claimants identified therein, which also are barred by *Robins Dry Dock*. Accordingly, judgment should be granted against all of the remaining claims[4] in this action, which fail as a matter of law.

## LEGAL STANDARD

Fed. R. Civ. P. 12(c) provides that, "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). The standard of review for a motion under Rule 12(c) is the same as the standard for a motion to dismiss under Rule 12(b)(6). *See Butler v. United States*, 702 F.3d 749, 751-52 (4th Cir. 2012); *W.C. & A.N. Miller Dev. Co. v. Cont'l Cas. Co*., 814 F.3d 171, 175-76 (4th Cir. 2016). A motion made under either rule tests the sufficiency of the opposing party's pleading. A plaintiff must plead enough factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When ruling on a motion to dismiss a complaint for insufficient pleading, a court must take the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016).

Ordinarily a court may not consider matters outside the pleadings when reviewing a motion to dismiss without converting it into a motion for summary judgment. *United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); Fed. R. Civ. P. 12(d). The Court must, however, consider the entirety of the pleadings when reviewing a motion to for judgment on the pleadings, including documents incorporated by reference and attached as

---

[4] A motion to dismiss for failure to prosecute related to ECF No. 206 is being filed simultaneously with this motion.

exhibits. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); Fed. R. Civ. P. 10(c). The Court may also consider exhibits to the Answer and Rule 12(c) motions when their accuracy and authenticity are undisputed. *Massey v. Ojaniit*, 759 F.3d 343, 353 (4th Cir. 2014).

<u>**ARGUMENT AND AUTHORITY**</u>

**1.       *Robins Dry Dock* Bars Claims for Pure Economic Losses**

The Economic Loss Claimants seek damages for alleged economic losses which they claim were incurred as a result of the Casualty—claims that include items like business interruption, drops in advertisement and directory revenue, increased shipment costs, lost taxes and economic revenue, etc. These claims are precluded as a matter of law by *Robins Dry Dock* and the nearly century-worth of Circuit and District court decisions that have followed.

In *Robins Dry Dock*, a dry-docking company inadvertently damaged a propeller on a steamship during a planned dry-docking, rendering the vessel unusable for two weeks longer than anticipated. 275 U.S. at 307. The vessel's time charterer sued the dry dock company to recover its lost profits resulting from the delay while the propeller was repaired. *Id*. The Supreme Court denied recovery, *id*. at 308-10, rejecting the argument that the charterer was a third-party beneficiary of the dry dock contract and rejecting tort liability as follows:

> The injury to the propeller was no wrong to the respondents but only to those to whom it belonged. But suppose that the respondent's loss flowed directly from that source. Their loss arose only through their contract with the owners – and while intentionally to bring about a breach of contract may give rise to a cause of action … no authority need be cited to show that, as a general rule, at least, ***a tort to the person or property of one man does not make the tort-feasor liable to another merely because the injured party was under a contract with that other unknown to the doer of the wrong. The law does not spread its protection so far.***

*Id*. at 308-309 (emphasis added).

4

As the Fifth Circuit aptly summarized in *State of Louisiana v. M/V Testbank*, 752 F.2d 1019 (5th Cir. 1985) (en banc), *cert. den.*, 477 U.S. 903 (1986):

> *Robins* broke no new ground but instead applied a principle, then settled both in the United States and England, which refused recovery for negligent interference with "contractual rights." Stated more broadly, the prevailing rule denied a plaintiff recovery for economic loss if that loss resulted from physical damage to property in which he had no proprietary interest.

*Id*. at 1022 (citing cases). The *Testbank* court further noted that the rule:

> … is a pragmatic one: the physical consequences of negligence usually have been limited, but the indirect economic repercussions of negligence may be far wider, indeed virtually open ended.

*Id*. (citation omitted). This observation by the *Testbank* court—*i.e.*, the need for some limitations on recoverable damages in marine casualty cases given the inherent and nearly limitless potential damages—is mirrored in the relevant admiralty treaties. *See, e.g.*, T. Schoenbaum, 2 Admiralty & Maritime Law, § 14-8 (7th ed.), which states, "[a] disaster such as oil spill, the ramming of a bridge, or a collision blocking a channel, may have extremely broad economic repercussions, causing delays, inconvenience, and other harm to a wide variety of interests and persons. Reasonable limits on a tortfeasor's responsibility are necessary both to facilitate the judicial administration of compensation for claims and to avoid stretching the third party system of liability insurance to the breaking point." *Id*.

The *Robins Dry Dock* rule has been upheld time and time again, across the various federal circuits. *See, e.g.*, *Nautilus Marine, Inc. v. Niemela*, 170 F.3d 1195, 1196 (9th Cir. 1999) ("Thus, *Robins Dry Dock* established a general rule, which retains its vitality, against recovery of economic loss caused by a maritime tort to the person or property of another"); *Am. Petroleum and Transp., Inc. v. City of New York*, 737 F.3d 185 (2nd Cir. 2013) (noting that the *Robins Dry Dock* rule "has

5

been so consistently applied in admiralty that it should continue to be applied unless and until altered by Congress or the Supreme Court").

Given the Fourth Circuit's clear and unequivocal endorsement, it is no surprise that district courts within this Circuit have consistently applied *Robins Dry Dock* to deny purely economic loss claims, including cases with facts highly analogous to those presented in this matter.[5] For example, in *Complaint of Marine Nav. Sulphur Carriers, Inc.*, 507 F. Supp. 205 (E.D. Va. 1980), *aff'd*, 638 F.2d 700 (4th Cir. 1981), numerous claimants filed claims in a vessel owner's limitation of liability action initiated after its vessel struck a bridge owned by the Commonwealth of Virginia. *Id*. at 206. Claimants alleged economic loss damages arising out of their inability to traverse the bridge or to navigate underneath the bridge. *Id*. at 206-08. As the district court summarized: "[t]he various claims at issue here all allege indirect harm in the nature of the interference of contractual obligations, the loss of business expectancies, or the added costs of doing business. None of these claimants allege any physical damage to their property or persons." *Id.* at 209.

The vessel owners moved to dismiss the economic loss claims on the grounds that claimants' claims were too remote to be compensable under the law. *Id.* at 209. The district court granted the motion, dismissing all of claimants' economic loss claims, noting that:

> … the existing caselaw is entirely consistent with the principle that claimants are not entitled to recover damages for indirect business losses and expenses due to the public's loss of use of a highway and waterway arising out of the negligent destruction of a bridge.

---

[5] Courts outside this circuit have also reached similar results on similar facts. *See, e.g.*, *In re Bertucci Contracting Co., LLC*, 712 F.3d 245 (5th Cir. 2013) (barring residents of community from recovering economic damages from vessel owner, where vessel collided with a bridge and caused it to close for a period of time); *Louisville & N. R. Co. v. Arrow Transp. Co.*, 170 F. Supp. 597 (N.D. Ala. 1959) (dismissing plaintiff railroad's claims against defendant whose vessel struck and damaged a drawbridge, allegedly resulting in economic losses during the period of time the railroad was forced to reroute its trains while the bridge was being repaired).

*Id.* at 210 (citing *Rederi A/B Soya v. Evergreen Marine Corp.*, 1972 A.M.C. 538 (4th Cir. 1972), *aff'g* 1972 A.M.C. 1555 (E.D. Va. 1971); *Henderson v. Arundel Corp.*, 384 F.2d 998 (4th Cir. 1967), *aff'g* 262 F. Supp. 152 (D. Md. 1966)). This ruling was affirmed by the Fourth Circuit "for the reasons set forth in the [District Court's] opinion." *Marine Nav. Sulphur Carriers, Inc. v. Lone Star Indus. Inc.*, 638 F.2d 700 (4th Cir. 1981).

Similarly, the District of Maryland in *General Foods Corp. v. U.S.*, 448 F. Supp. 111 (D. Md. 1978), dismissed the claim filed by General Foods seeking to recover damages arising out of an allision between a vessel and the Penn Central Railroad Bridge over the Chesapeake and Delaware Canal, which forced General Foods to ship goods by truck involving additional costs and other unliquidated damages. *Id*. at 112. The court stated:

> By the well-established general rule, a plaintiff who has suffered only the loss of an economic advantage due to negligence has not been injured in a manner which is legally cognizable or compensable. No cause of action will lie for negligent, as opposed to intentional, interference with contract or business rights. Courts which have addressed this issue have repeatedly expressed concern that a contrary rule would open the door to virtually limitless suits, often of a highly speculative and remote nature. Such suits would expose the negligent defendant to a severe penalty, and would produce serious problems in litigation, particularly in the areas of proof and apportionment of damages.

*Id*. at 112-13 (internal citation omitted).

All other Circuits to directly consider the issue have likewise affirmed *Robins Dry Dock* as a broad rule barring downstream economic losses for unintentional maritime torts in the absence of physical injury to property belonging to the claimant. *See, e.g.*, *Barber Lines, A/S v. M/V Donau Maru*, 764 F.2d 50 (1st Cir. 1985) (holding *Robins Dry Dock* precluded tort action for negligently caused, purely financial harm arising out of fuel oil spill from one ship into harbor which prevented

7

a different ship from docking at nearby berth); *Am. Petroleum and Transp., Inc.*, 737 F.3d at 195-96 ("[W]e now explicitly accept the broad rule attributed to *Robins Dry Dock* that economic losses are not recoverable for an unintentional maritime tort in the absence of physical injury…."); *Getty Ref.& Mktg. Co. v. MT FADI B,* 766 F.2d 829, 833 (3d Cir. 1985) (" … we will adhere to the rule defined by Justice Holmes in *Robins*, incorporated in the Restatement of Torts (Second) § 766C, and embraced by the leading commentators that where the negligence does not result in physical harm, thereby providing no basis for an independent tort, and the plaintiff suffers only pecuniary loss, he many not recover for the loss of the financial benefits of a contract or prospective trade. By so holding we align ourselves with numerous other courts that have interpreted and applied the teachings of *Robins*."); *In re Taira Lynn Marine Ltd. No. 5, LLC*, 444 F.3d 371, 377 (5th Cir. 2006) ("It is unmistakable that the law of this circuit does not allow recovery of purely economic claims absent physical injury to a proprietary interest in a maritime negligence suit."); *Channel Star Excursions, Inc. v. S. Pac. Transp. Co.*, 77 F.3d 1135, 1137 (9th Cir. 1996) ("Channel Star also asserts that maritime tort law provides a claim to remedy its injuries. This assertion, however, runs afoul of an established doctrine in maritime tort law that disallows recovery in tort for economic damages without actual physical injury to person or property."); *Kingston Shipping Co. v. Roberts,* 667 F.2d 34, 35 (11th Cir. 1982), *cert denied*, 458 U.S. 1108 (1982) (denying "delayed-vessel" claims resulting from sinking of vessel in navigable channel, finding that "[t]his case is governed by the rule set down in *Robins Dry Dock* …."). Notably, no Circuit has reached a contrary decision—the Circuit Courts absent from the forgoing list simply have not yet had a case that considered the applicability of the *Robins Dry Dock* rule.

### a.      Claimants Do Not Plausibly Allege a Proprietary Interest in the Key Bridge or the Existence of Other Damaged Property

Three factors determine whether a party who is not the title owner nevertheless has the requisite proprietary interest to support a claim: (1) actual possession or control, (2) responsibility for repair and (3) responsibility for maintenance. *Texas Eastern Trans. v. McMoran Offshore Expl. Co.*, 877 F.2d 1214, 1225 (5th Cir. 1989), *cert. denied,* 493 U.S. 937 (1989). *See also McLean Contracting Co. v. Waterman S.S. Corp.*, 131 F. Supp. 2d 817, 821 (E.D. Va. 2001) (same premise, citing *Texas Eastern*, 877 F.2d at 1225), *aff'd sub nom. McLean Contracting Co. v. Waterman Steamship Corp.*, 277 F.3d 477 (4th Cir. 2002). Courts have found that a party must show that it has "control over the property tantamount to full ownership." *Naviera Maersk Espana, S.A. v. Cho-Me Towing, Inc.*, 782 F. Supp. 317, 320 (E.D. La. 1992); *see also McLean*, 131 F. Supp. 2d at 821 ("Actual title, or ownership of record, is not required to have standing to sue as long as [Plaintiff] has an actual proprietary interest." (citing *Texas Eastern*, 877 F.2d at 1224-25). To hold otherwise would be to open the courts to a limitless recovery of economic injury. *See Aikens v. Debow*, 541 S.E.2d 576 (W. Va. 2000) (finding no duty by truck driver and employer to operator of motel and restaurant who sought damages for loss of income allegedly resulting from bridge closure caused by accident involving a truck).

Here, with the exception of the City of Baltimore (discussed below), none of the Economic Loss Claimants even attempt to allege that they owned or otherwise had a proprietary interest in the Key Bridge. Their respective Claims and Responses to Interrogatories (if served), which are summarized in the enclosed Belknap Declaration, make clear that none of the Economic Loss Claimants has standing to assert a claim. That failure alone is fatal to their economic loss claims, and they should be dismissed.

9

The City of Baltimore's Amended Claim (ECF No. 142) vaguely alleges a "proprietary interest" in the Key Bridge but alleges no facts that would support such a finding.[6] ECF No. 142 at ¶ 23. In particular, the City of Baltimore does not—and cannot—allege that it owns the Key Bridge, and it does not—and cannot—allege that it has actual possession and control of the Key Bridge, nor that it is responsible for the repair or maintenance of the Key Bridge. Indeed, it must be noted that the State of Maryland filed its own claim in which the State alleged that ***it*** owns the Key Bridge (ECF No. 157 at ¶ 7), provided evidence of such ownership, and the State of Maryland and Petitioners have since reached a settlement on that claim.

The City of Baltimore also alleges a proprietary interest in a nearby water main pipeline (ECF No. 142 at ¶¶ 30-32), but alleges no facts that substantiate its bare claim that the water main was actually damaged as a result of the Casualty. As noted in the Summary of Claims at Exhibit 1, the City of Baltimore has wholly failed to produce *any* evidence of physical damage to the water main, and the evidence available both publicly and obtained through discovery actually indicates

---

[6] In fact, counsel for the City of Baltimore described the City's alleged proprietary interest at the Court's June 1, 2026 Motion Hearing:

> **MR. GOODMAN:** And additionally, Your Honor, despite what petitioners represented where they said the city has not asserted a proprietary interest in the bridge, we have specifically pled that.
>
> As a municipality, we are in a different situation than most private economic claims. **We police the bridge. We are involved in elements of it.** And we have asserted a claim – I expect they'll challenge it at the appropriate time -- as to a proprietary interest in the bridge that would be a threshold matter to *Robins* as well.
>
> But the key issue, Your Honor --
>
> **THE COURT:** That somehow the City of Baltimore had some kind of a proprietary -- which to most people translates to an ownership interest -- in the Francis Scott Key Bridge.
>
> **MR. GOODMAN:** All we're suggesting, Your Honor, is that that is an issue that's going to need to be briefed and analyzed as part of *Robins*. We're not suggesting that is an issue for today.
>
> **THE COURT: Yeah. I think that might be news to the state.**
>
> **MR. GOODMAN:** Point taken, Your Honor.

ECF No. 844, Jun. 1, 2026 Hearing Tr. at 25:5-25 (emphasis added).

10

the contrary. In any event, even if there were damage to the water pipe, which is denied, such damage does not permit the City of Baltimore to recover for economic losses flowing from damage to the Key Bridge. The City cannot bootstrap damage to property it allegedly owns as a basis to recover economic loss caused by damage to property in which it has no proprietary interest.

Baltimore County has an even more attenuated allegation that it has a proprietary interest in "waterways and associated shorelines" such as the Patapsco River and Jones Creek, which it alleges "have been damaged as a result of the Allision and Collapse." ECF No. 171 at ¶ 84 but even if true—which is far from established—the existence of such damage does not permit Baltimore County to bring claims for economic losses flowing from damage to the Key Bridge, in which it claims no proprietary interest.

b.        **Claimants' Suggestions of an "Intentional" Tort Do Not Change the Outcome**

Certain Economic Loss Claimants have asserted that their claims arise as a result of Petitioners' alleged "intentional and reckless acts" (*see*, *e.g.*, ECF No. 222 ¶ 175), and therefore should fall into an exception to the *Robins Dry Dock* rule for cases of intentional torts.[7] In particular, two Economic Loss claims (ECF Nos. 222, 395) attempt to expressly disclaim the application of *Robins Dry Dock* and its progeny. *See* ECF No. 222 at ¶¶ 175-76; ECF No. 395 at ¶¶ 74-79. Those claimants cite a number of cases they contend recognize an "intentional torts exception" to *Robins Dry Dock* (specifically *Barber Lines*;[8] *Ballard Shipping Co. v. Beach*

---

[7] ECF Nos. 222, 239, 241 and 395 alleged intentional conduct by Petitioners. While Petitioners deny that any "intentional conduct exception" exists or that one should apply here, if the Court is inclined to entertain the existence of such exception, it should not consider such exception with respect to ECF Nos. 78, 142, 171, 188, 189 and 344.

[8] Claimants assert that this case "explicitly recogniz[es] an intentional torts exception to *Robins Dry Dock* by holding that plaintiffs who cannot recover for foreseeable economic loss based on a negligently caused oil spill could recover if the oil spill was intentional." This misrepresents *dicta* as the holding of the case and overstates any "explicit" recognition of a clear exception to the *Robins Dry Dock* rule. In fact, the holding of the case explicitly barred recovery for economic losses.

11

*Shellfish*, 32 F.3d 623 (9th Cir. 1994); *Dick Meyers Towing Serv., Inc. v. U.S.*, 577 F.2d 1023 (5th Cir. 1978); [9] *In re Deepwater Horizon,* 784 F.3d 1019 (5th Cir. 2015); [10] *Amoco Transp. Co. v. S/S Mason Lykes*, 768 F.2d 659, 666 (5th Cir. 1985); *Showa Line, Ltd. v. Diversified Fuels, Inc.,* 1991 WL 211527 (E.D. La. Oct. 1, 1991);[11] and *Norwegian Bulk Transp. A/S v. International Marine Terminals P'ship*, 520 F.3d 409 (5th Cir. 2008)).[12] None of them do.

To be clear, Petitioners vehemently deny any allegation that any negligent act on their part was reckless or intentional. But even assuming *arguendo* that Petitioners did act in all respects as alleged in the various claims, that would still not suffice to overcome the clear bar to purely economic loss claims under *Robins Dry Dock* and its progeny.

As a starting point, Claimants misconstrue *Robins Dry Dock*. As detailed above, that case involved a claim by a vessel charterer that the shipyard's negligence had damaged the vessel's propeller which had caused the charterer to suffer economic losses under its charter with the vessel

---

[9] Here, the court found no showing of "intentional interference with contract," which makes clear that the "intent" in question must be to interfere with a *contract*, which is akin to intentionally blocking a tunnel (like in *Barber*) or intentionally destroying a bridge, of which there is no allegation here.

[10] Claimants misrepresent *dicta* as the holding of the case. Notably, here the court summarizes the holding of *Ballard* as "criminal negligence did not bar the application of *Robins Dry Dock*." *Id.* at 1024. The court also concluded that "there is no principled reason to distinguish between civil and criminal negligence." *Id.*

[11] Claimants cite to a one-page summary order that contains no explanation of the facts of the case. Based on a parallel ruling issued on the same date at 1991 WL 211536 (E.D. La. Oct. 1, 1991), the case involved a cargo of coal that overheated during a voyage. The vessel interests alleged the supplier misrepresented the source and properties of the coal and alleged "fraud and intentional tort because P&C allegedly purposefully did not reveal the true origin and nature of the coal." 1991 WL 211536, at *1. Thus, the intentional act related to the contract between the two parties, and is entirely distinguishable from the facts here.

[12] The *Norwegian Bulk* court granted summary judgment on a *Robins Dry Dock* motion and said, of *Showa*, "[*Showa* and one other case] do not guide the Court's analysis in this case. . . . In *Showa Line*, Judge Arceneaux relies only on collision cases to find that the plaintiff may be able to recover for loss of use. . . . The plaintiff also alleged fraud and an intentional tort, 'taking the claims out of the Robins Dry Dock parameters as well.' Because the Fifth Circuit has not expanded the *Amoco Transport* decision to cases outside of the collision context, the Court finds that this case is governed by the principle of *Robins Dry Dock*." The "exception" referred to in that case is one for collisions, where it logically follows that when two vessels collide, each should bear responsibilities suffered by contractual relationships of the other. Such exception obviously is not relevant here.

owner. *Robins Dry Dock*, 275 U.S. at 135.  In considering the dry dock's liability to the charterer, the Court stated:

> Their loss arose only through their contract with the owners – and ***while intentionally to bring about a breach of contract may give rise to a cause of action*** … no authority need be cited to show that, as a general rule, at least, a tort to the person or property of one man does not make the tort-feasor liable to another merely because the injured person was under a contract with that other unknown to the doers of the wrong. … The law does not spread its protection so far.

*Id*. at 135 (citations omitted; emphasis added). Thus, the Supreme Court distinguished between intentional interference with contract and negligent interference with contract and not, as claimants suggest, between negligent and intentional or reckless conduct.

The case law is littered with similar dubious attempts to cast maritime accidents as "intentional" acts, but the federal courts typically see through such ploys.[13]  The Ninth Circuit case *Nautilus Marine* is particularly instructive, as the Ninth Circuit rejected essentially identical arguments to those advanced by certain Economic Loss Claimants here.

In that case, Nautilus chartered two ships to transport salmon from fishing vessels to shore for processing during the 1994 Prince William Sound fishing season. *Nautilis Marine*, 170 F.3d at 1196. The two ships were moored at a dock when a third vessel, the NORQUEST, allided with them, causing severe damage which prevented Nautilus from carrying out its plans to use the two ships during the 1994 season. *Id*. Nautilus sued the vessel that caused the allision, seeking lost

---

[13] *See, e.g*., *Sekco Energy, Inc. v. M/V MARGARET CHOUEST*, 820 F. Supp. 1009 (E.D. La. 1993) (granting summary judgment and dismissing intentional tort claim where plaintiff failed to set forth specific facts showing that defendants intended to interfere with plaintiff's contract); *Consolidated Rail Corp. v. M/T HOEGH FORUM*, 630 F. Supp. 83 (E.D. Pa. 1985) (granting summary judgment and dismissing economic loss claims related to defendant vessel berthing at plaintiff's pier without plaintiff's consent, thereby interfering with plaintiff's contracts with another vessel to use the pier, based in part on the plaintiff's failure to establish any facts supporting a cause of action for intentional interference with contractual right).

13

profits. *Id*. The trial court granted summary judgment in favor of the owner of the NORQUEST, ruling that Nautilus was not entitled to recover for economic losses pursuant to *Robins Dry Dock*. Because Nautilus was only the charterer of the damaged vessels, it had not suffered any damage to its own property. *Id*. On appeal, Nautilus argued that *Robins Dry Dock* should not apply because the skipper of the NORQUEST had "intentionally or recklessly caused" the allisions. *Id*. at 1197. Nautilus cited precedent from the Third and Fifth Circuits that contemplated an exception to *Robins Dry Dock* for intentional interference with contract relations. *Id*. (citing *Getty*, 766 F.2d at 830 and *Dick Meyers*, 577 F.2d at 1025).[14]

The Ninth Circuit Court of Appeals accepted that evidence in the record supported the contention that the allision was intentional but nevertheless rejected Nautilus's argument, noting that Nautilus was improperly attempting "to convert its claim into one for intentional allision" in order to get around *Robins Dry Dock*. *Nautilus Marine*, 170 F.3d at 1197. The Ninth Circuit noted that even if the allision were intentional, Nautilus would still be precluded from recovering. Instead, Nautilus would need to show that the NORQUEST's skipper "had intentionally allided with [the two vessels] **in order to interfere with Nautilus's contract**." *Id*. (emphasis added). The Court noted that the key to any intentional interference "is not merely that the tort is intentional, **but that the tortfeasor knew of the plaintiff's contractual relation and intended to interfere with it**." *Id*. (emphasis added).[15] Because Nautilus could not show such intentional interference, the Ninth Circuit affirmed the trial court's dismissal on summary judgment.

---

[14] Notably, even where courts have *contemplated* a possible exception to *Robins Dry Dock* for intentional interference, they have not actually granted such relief. *See, e.g., In re Deepwater Horizon*, 784 F.3d 1019 (5th Cir. 2015) (noting that "pronouncements" in other cases regarding an intentional interference exception to Robins Dry Dock are "arguably dicta").

[15] The *Nautilus* court cited to the following cases in support of this proposition. *Getty*, 766 F.2d at 830; *Dick Meyers*, 577 F2d at 1025; *Kaiser Aluminum v. Marshland Dredging Co.*, 455 F.2d 957, 958 (5th Cir. 1972) ("recovery by Kaiser is precluded as a matter of law because there is (1) no contention that the interference with Kaiser's contract rights was intentional; (2) no evidence that Marshland had knowledge of the existence of the contract between Kaiser and Sugar Bowl Gas, and (3) no showing of facts, by affidavit or otherwise, in opposition to the motion for summary

Here, there is no evidence that Petitioners intentionally acted for the purpose of interfering with any of the Economic Loss Claimants' alleged business expectancies.[16] Not only is there no evidence, there is quite simply no rational explanation as to why Petitioners would intentionally run the Vessel into the Key Bridge in order to interfere with the various Economic Loss Claimants' businesses, or to interfere with the City of Baltimore's tax revenues. On the contrary, the evidence shows that certain Economic Loss Claimants are improperly raising an intentional interference claim solely to attempt to evade the longstanding rule of *Robins Dry Dock*.[17] The Court should

---

judgment, sufficient to create a genuine issue for trial, of anything more than merely the negligent interference with contract rights.").

[16] Some of the only published decisions addressing the purported intentional interference exception to *Robins Dry Dock* involve alleged intentional acts by business competitors. *See, e.g.*, *Dunham-Price Grp., L.L.C. v. Port Aggregates, Inc.*, 2006 WL 2112953 (W.D. La. 2006) (allowing plaintiff to file an amended complaint adding an intentional interference claim against defendant based on the two parties' history as competing businesses and where the dispute involved defendant's alleged blocking of plaintiff's access to the parties' adjacent riverfront loading facilities).

[17] In fact, lead counsel for the Public Economic Loss Claimants admitted as much in the October 29, 2024 Status Conference:

> **Mr. Lochner:** Well, first I think it's important to understand that there are certain claims which we have pled, which are outside of *Robins Dry Dock* already, which is of course the elephant in the room we're discussing.
>
> Specifically, the public nuisance claims are outside of *Robins Dry Dock*. And there's also a state law public nuisance claim which has been discussed in Louisiana before which is different than a public nuisance in the maritime context. And those cases have been allowed to go forward under that basis as well.
>
> In addition, we have a host, including Justice Breyer before he was elevated to his last bench, actually discussed *Robins Dry Dock* and discussed that intentional acts and/or criminal acts, as it was later expanded to, are excluded from *Robins Dry Dock* as well.
>
> And in this case based upon, without going into depth, I can say with assurance based upon that which we have already seen, we think those particular elements will be outside of *Robins* in the first place.
>
> However, should we get to *Robins*, our cases, specifically **even the claimants chosen and agreed to represent are designed for an appellate process and specifically to get the report on the topic**.
>
> **THE COURT:** So the Dali is going to be the vessel by which we rewrite maritime law in this country, is that it?
>
> **MR. LOCHNER:** That is the hope, the plan. . . .

15

follow the numerous examples of federal courts rejecting such improper attempts to avoid black-letter law and dismiss those Economic Loss Claims that allege intentional conduct.

### c.    Claimants' Allegations of "Public Nuisance" Do Not Change the Outcome

Some of the Economic Loss Claimants have characterized their damage claims as arising out of a public nuisance.[18] But admiralty law is clear that this characterization does not take economic loss-only claims outside the scope of *Robins Dry Dock*. In this regard, in disposing of a similar argument, the *en banc* Fifth Circuit explained in *Testbank* as follows:

> Plaintiffs seek to avoid the *Robins* rule by characterizing their claims as damages caused by a public nuisance. . . . **Characterizing the problem as one of public nuisance, however, does not immediately solve the problems with plaintiffs' damage claims for pure economic losses**. As Dean Prosser has explained, "courts have not always found it at all easy to determine what is sufficient 'particular damage' to support [a] private action [for a public nuisance], and some rather fine lines have been drawn in the decisions." **In drawing such lines today we are unconvinced that we should abandon the physical damage limitation as a prerequisite to recovery for economic loss.**
>
> The problem in public nuisance theory of determining when private damages are sufficiently distinct from those suffered by the general public so as to justify recovery is as difficult, if not more so, as determining which foreseeable damages are too remote to justify recovery in negligence. In each case it is a matter of degree, and in each case lines must be drawn. . . . Given the difficulty of this task, **we see no jurisprudential advantage in permitting the use of nuisance theory to skirt the *Robins* rule**.

---

ECF No. 435, Oct. 29, 2024 Conf. Tr. at 50:2-51:2 (emphasis added).

[18] ECF Nos. 171, 188, 222, 239, 241 and 395 allege Public Nuisance. While Petitioners deny that any "public nuisance exception" exists or that one should apply here, if the Court is inclined to entertain the existence of such exception, it should not consider such exception with respect to ECF Nos. 78, 142, 189 and 344.

16

> Were we to allow plaintiffs recovery for their losses under a public nuisance theory we would permit recovery for injury to the type of interest that, as we have already explained, we have consistently declined to protect. **Nuisance, as Dean Prosser has explained, is not a separate tort subject to rules of its own but instead is a type of damage.** Our decisions under *Robins* have emphasized the nature of the interest harmed rather than the theory of recovery. As we noted in *Dick Meyers Towing*, "[r]ephrasing the claim as a public nuisance claim does not change its essential character." Thus we conclude that plaintiffs may not recover for pure economic losses under a public nuisance theory in maritime tort.

*Testbank*, 752 F.2d at 1030-31 (emphasis added) (internal citations omitted).

In a subsequent case, a district court in the Eastern District of Louisiana noted that, while the Fifth Circuit had not "expressly [held] that a party cannot maintain a federal common law cause of action for public nuisance, the *Testbank* court noted that the respondent in that case failed to cite any law which recognized such a cause of action." *Sekco Energy, Inc. v. M/V MARGARET CHOUEST*, 820 F. Supp. 1008, 1014 (E.D. La. 1993). The district court then observed that it had likewise "searched in vain for case law which recognizes a federal cause of action for public nuisance." *Id*. As such, that court "decline[d] to create such a cause of action, particularly considering that the *Testbank* court concluded that the Supreme Court has apparently foreclosed 'a federal cause of action for public nuisance caused by the obstruction of navigable waterways.'" *Id*. (quoting *California v. Sierra Club*, 451 U.S. 287, 296 n. 7 (1981)). And, in the previously-discussed case of *Complaint of Marine Navigation Sulphur Carriers, Inc.*, a district court within the Fourth Circuit presiding over maritime limitation of liability action likewise found that economic loss damages "sought to be recovered are beyond the protection of the law whether the claims are couched in terms of common law negligence or public nuisance." 507 F. Supp. at 210

17

(citing *Dick Meyers*, 577 F.2d at 1025 n. 4). So too did the First Circuit reject the opportunity to carve public nuisance claims from outside the usual *Robins Dry Dock* scope. See *Barber Lines*, 764 F.2d at 56-57 (declining to adopt theory that "particular damages" should be permitted for "particularly damaged plaintiffs" in public nuisance cases).

The Economic Loss Claimants have not cited, and indeed Petitioners also have not found, a single case permitting a claim of public nuisance where, as here, the alleged damages are purely economic losses by a party with no proprietary interest.

        d.        **Economic Loss Claimants' CERCLA and OPA Claims Fail as a Matter of Law**

        i.        *The R.E. West Class's Claim under CERCLA*

The R.E. West Class Economic Loss Claimants have asserted a claim under CERCLA. *See, e.g.*, Dkt. 222 at ¶¶ 25, 111, 175. The Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA")[19] "was designed to promote the 'timely cleanup of hazardous waste sites' and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *Id.* (quoting *Consol. Edison Co. of N.Y., Inc. v. UGI Utils., Inc.*, 423 F.3d 90, 94 (2d Cir. 2005)). To establish a *prima facie* case under CERCLA, a plaintiff must demonstrate that: (1) the property at issue is a "facility"; (2) a "release" or "threatened release" of a "hazardous substance" from the facility has occurred; (3) the "release" or "threatened release" caused the plaintiff to incur response costs that were "necessary" and "consistent with the

---

[19] Under Section 107(a) of CERCLA, a private party may recover cleanup costs from those persons who contributed to the release of hazardous waste at the site. See 42 U.S.C. § 9607. *Carson Harbor Vill., Ltd. v. County of Los Angeles,* 433 F.3d 1260, 1265 (9th Cir. 2006).

national contingency plan"; and (4) the defendant is among the potentially responsible parties ("PRP(s)") subject to liability under Section 9607(a). *Carson Harbor Vill. Ltd.*, 433 F.3d at 1265.

Here, the R.E. West Claim fails to allege, let alone establish, any of the required elements under CERCLA.[20] Further, the R.E. West Class Claimants have failed to allege having incurred **any** "response costs"[21] as required by CERCLA. *See Ascon Props. v. Mobil Oil Co.*, 866 F.2d 1149, 1154 (9th Cir. 1989) (holding that a plaintiff must allege at least one type of "response cost" cognizable under CERCLA that has been incurred to state a prima facie case.")[22] Last, even if assuming the R.E. West Class Claimants have established a *prima facie* claim under CERCLA, which is denied, none of their alleged damages are the type recoverable under a CERCLA claim.

The R.E. West Class Claimants' CERCLA claims must be dismissed.

### ii.    *Star Bulk's Claim under OPA*

Star Bulk alleges generally that Petitioners violated the Oil Pollution Act, 33 U.S.C. §§ 2700 *et seq*. ("OPA"). ECF No. 188 at ¶¶ 30-35. OPA is a strict liability statute that holds "each responsible party for a vessel or facility from which oil was discharged . . . into or upon the navigable waters or adjoining shorelines or the exclusive economic zone . . . liable for the removal costs and damages . . . that result from such incident." 33 U.S.C. § 2702(a).

The United States filed a claim in the Limitation Action that included a cause of action under OPA. ECF No. 82 at ¶¶ 16, 187, 251-258. In particular, the United States alleged that the Coast Guard directed and monitored the response and that the *United States* (not Star Bulk or any

---

[20] There have been no reports of hazardous materials being released from the Vessel from these containers, nor has the Vessel been identified as the source of a hazardous materials release.

[21] Response has been defined to mean "remove, removal, remedy, and remedial action" and all "enforcement activities related thereto". See 42 U.S.C. § 9601(25).

[22] Even if response costs have been alleged by Claimants, which is denied, Claimants have failed to comply with CERCLA's notice requirement for filing a citizen's enforcement action. *See* CERCLA § 310(a) and 40 C.F.R. § 374.2.

other claimant) incurred removal costs for which the responsible party was responsible. ECF No. 82 at ¶¶ 252-255. On October 24, 2026, Petitioners settled with the United States and the Court dismissed the government's claim. ECF Nos. 411, 412.

Star Bulk has not alleged that it paid any portion of removal costs nor identified why Petitioners would be liable to any party other than the United States government for OPA claims. Star Bulk's claim under OPA must be dismissed.

**2.      The Purported Class Actions Cannot Stand**

The law is clear that class actions are not permitted in a limitation proceeding. *See Lloyd's Leasing Ltd. v. Bates*, 902 F.2d 368, 370 (5th Cir. 1990) ("a class action may not be instituted in a limitation proceeding."). *See also, e.g., Gabarick v. Laurin Mar. (Am.), Inc*., 2009 U.S. Dist. LEXIS 27180, at *27 (E.D. La. Jan. 12, 2009) ("In light of this clear precedent, the class action allegations instituted within these consolidated limitation proceedings are stricken"); *Schaeffer v. Tsakos Shipping & Trading S.A*., 2006 U.S. Dist. LEXIS 25304, at *3 (E.D. Pa. May 2, 2006) ("Defendants also are correct that Plaintiffs' claims cannot be pursued as a class action"); *Slaven v. BP America, Inc*., 190 F.R.D. 649, 654 (C.D. Ca. 2000) ("*Lloyd's Leasing* is the leading case and the only appellate decision on point. This Court was unable to locate a single case – reported or not – that disagreed with the holding of *Lloyd's Leasing*"); *Com. of Puerto Rico v. The M/V Emily S*, 158 F.R.D. 9, 16 (D.P.R. 1994) ("The law is clear that class proceedings are incompatible with the procedures of the Limitation of Liability Act . . . and Rule F"); *Complaint of Great Lakes Dredge & Dock Co*., 1996 U.S. Dist. LEXIS 5553, at *20 (N.D. Ill. Apr. 25, 1996) ("we believe that the factors set forth by the Fifth Circuit are sound.").

ECF Nos. 222 and 239,[23] therefore, are improper and should not be permitted to proceed

---

[23] The Longshoremen Class Claim at least acknowledges *Lloyd's Leasing*, but states that claimants "believe it is not controlling in this case for various reasons." ECF No. 239 at n. 1. It does not explain what those reasons are.

as class actions. Rather, to the extent not denied in full for the reasons set forth above, they should be limited to only the named claimants identified in each pleading.

## **CONCLUSION**

For the above reasons, the Court should grant Petitioners' motion and dismiss the remaining claims as a matter of law. Under the rule established by *Robins Dry Dock*, the remaining Economic Loss Claimants are not entitled to recover economic loss damages as a matter of law, because there is no evidence that these Claimants incurred physical damage to a legitimate proprietary interest and there is no evidence that Petitioners intentionally acted to interfere with Claimants' business interests. The Economic Loss Claimants' claims should be dismissed with prejudice.

Dated: June 15, 2026

DUANE MORRIS LLP

*/s/ Laurie G. Furshman*
Laurie G. Furshman (Bar No. 29604)
Lgfurshman@duanemorris.com
Robert B. Hopkins (Bar No. 06017)
Rbhopkins@duanemorris.com
Tristan A. Dietrick (Bar No. 31238)
tdietrick@duanemorris.com
1201 Wills Street, Suite 330
Baltimore, MD 21321
(410) 949-2900
BLANK ROME LLP

Luke M. Reid (Bar No. 31228)
Luke.Reid@blankrome.com
125 High Street, 3rd Floor
Boston, MA 02110
617-415-1200

William R. Bennett, III*
William.Bennett@blankrome.com
Thomas H. Belknap, Jr.*

21

Thomas.Belknap@blankrome.com
Noe S. Hamra
Noe.Hamra@blankrome.com*
Neil P. McMillan
Neil.McMillan@blankrome.com*
1271 Avenue of the Americas
New York, NY 10020
212-885-5000

Kierstan L. Carlson*
Kierstan.Carlson@blankrome.com
Emma C. Jones*
Emma.Jones@blankrome.com
1825 Eye St. NW
Washington, DC 20006
202-420-2200
*Admitted *pro hac vice*

22