**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| In the Matter of the Petition<br><br>of<br><br>GRACE OCEAN PTE LTD., as Owner of the M/V DALI,<br><br>and<br><br>SYNERGY MARINE PTE LTD, as Manager of the M/V DALI,<br><br>for Exoneration from or Limitation of Liability. | Docket No. JKB 24-cv-941<br><br>*IN ADMIRALTY* |

**DECLARATION OF THOMAS H. BELKNAP, JR.**

I, Thomas H. Belknap, Jr., pursuant to 28 U.S.C. § 1746, declare as follows:

1.  I am a partner with Blank Rome LLP, based in the firm's New York office, and am admitted *pro hac vice* to practice before this Court. We represent Petitioners Grace Ocean Private Limited and Synergy Marine Pte Ltd. (collectively "Petitioners") in the above-captioned matter.

2.  The statements made in this Declaration are based upon my personal knowledge and my review of the documents discussed herein.

3.  I respectfully submit this Declaration in support of Petitioners' Motion for Judgment on the Pleadings in respect of claims filed in this action brought by the Local Government and Private Economic Loss Claimants (collectively "Economic Loss Claimants").

4.  A summary of each of the Economic Loss Claimants' claims is as follows:

1

A. <u>**Underwood Energy Inc. ("Underwood Energy") (ECF No. 78):**</u>

a. **Nature of Damages Alleged**

Underwood Energy is a supplier of propane and other hazardous materials for residential and commercial use. ECF No. 78 at ¶ 41. Underwood Energy alleges economic loss damages in the form of lost profits and lost business because its route to cross the Patapsco River is 30 miles longer now that it can no longer utilize the Key Bridge. ECF No. 78 at ¶¶ 45-46.

b. **Claim of Proprietary Interest**

Underwood Energy's claim does not allege any proprietary interest in the Key Bridge. Moreover, in its responses to Petitioners' Interrogatory No. 2,[1] Underwood Energy expressly states, in relevant part:

> 2. State whether You contend that Underwood Energy had a proprietary interest in the Key Bridge at the time of the Incident, and, if so, identify and state with specificity the nature, basis, and extent of such proprietary interest, and the facts and documents concerning Your contention.
>
> **Response:** Claimant does not contend that it held any proprietary interest in the Francis Scott Key Bridge at the time of the Incident.
>
> Claimant is a private commercial entity that operates a propane terminal in Baltimore, Maryland. The Key Bridge served as a critical component of the regional transportation infrastructure that Claimant lawfully relied upon for the transport of hazardous materials, which are prohibited from transit through the nearby Baltimore Harbor and Fort McHenry tunnels. However, such reliance does not constitute a proprietary or ownership interest in the bridge itself.
>
> Claimant's claims arise solely from the economic harm and business interruption resulting from the loss of access caused by the physical destruction of the bridge and the resulting disruption to lawful and necessary transportation routes. Claimant asserts no ownership, leasehold, easement, or other legal title or proprietary interest in the Key Bridge.

---

[1] Petitioners acknowledge that Interrogatory Responses are not part of the pleadings on which judgment should be rendered under Fed.R. Civ.P 12(c). However, Petitioners offer Economic Loss Claimants' Interrogatory Responses and certain other documents as party admissions concerning the absence of any proprietary interest in the Key Bridge.

A copy of Underwood Energy's May 16, 2025 Responses to Petitioners' Interrogatories is attached as **Exhibit A**.

### c. Causes of Action

While it does not enumerate its causes of action, Underwood Energy appears to allege that Petitioners were careless, reckless, negligent, and/or grossly negligent and that the Vessel was unseaworthy at the time of the Casualty. Underwood Energy's claim does not allege any intentional act or public nuisance and does not allege intentional interference with any contract.

### B. The Mayor and City Council of Baltimore ("City of Baltimore") (ECF No. 142[2]):

### a. Nature of Damages Alleged

The City of Baltimore's claim relies on a 2023 Economic Impact Study to identify the number of jobs that are tied to Port of Baltimore activities. ECF No. 142 at ¶¶ 40-44. The City of Baltimore summarizes its damages as:

a. The cost associated with loss of use, repair, and reactivation of the 72" diameter submerged water main which was damaged by the combination of the Dali's evasive maneuvers necessitated by its sudden loss of power, and the collapse of the Key Bridge;

b. The cost of replacement of the Key Bridge and the Key Bridge's approaches, including costs associated with the design, development, and construction of the Bridge and its approaches and connecting roads;

c. Costs associated with the obstruction of the Patapsco River, which directly resulted from the allision;

d. Costs associated with the interruption of transportation through the City of Baltimore;

e. Costs associated with an increased need for road maintenance and traffic management, to account for the increased traffic traveling through the City which previously would have traveled over the Key Bridge;

---

[2] The Mayor and City Council of Baltimore filed its initial Claim on April 22, 2024 (ECF No. 17) and its amended claim on September 23, 2024 (ECF No. 142).

f.  Costs associated with the need to repair and/or replace vital infrastructure, including but not limited to roads and bridges within Baltimore, as a direct result of the additional stress caused to that infrastructure by increased traffic resulting from the destruction of the Key Bridge;

g.  Costs associated with increased and substantial expenditures relating to the protection of public welfare, including but not limited to increased expenditures on police, fire, and other public employees' overtime;

h.  Costs associated with the loss of taxes and fees levied on the business, including the import and export of trade goods, the loading and unloading of cargo from vessels, and in general, the operation of trade at the Port of Baltimore, which has been significantly curtailed and reduced by the inability of ships to move in and out of the Port of Baltimore;

i.  Costs associated with the City's loss of property and income tax revenue due to the substantial and foreseeable economic interruption caused by the allision;

j.  Costs associated with the monitoring and cleanup of hazardous substances and/or other debris that have been or will be deposited into the environment and on property owned by the Claimant as a result of the allision;

k.  Costs associated with abating the nuisance caused by the damage from the allision and the depositing of significant known and unknown materials into the Patapsco River;

l.  Costs associated with removing the foreign materials deposited onto City property as a direct result of the allision;

m.  Costs associated with monitoring, abating, and otherwise suffering the presence of hazardous substances and other potential pollutants that have been stockpiled as a direct result of the closure of the Port of Baltimore, resulting in the release of hazardous substances, fugitive dust, and other contaminants into the environment and on property owned by the Claimant, resulting in a nuisance and trespass;

n.  Costs associated with the public nuisance suffered by the City of Baltimore and its citizens, who have had interrupted their enjoyment and use of the Key Bridge, the Patapsco River, the Baltimore Harbor and associated waterways;

and

o.  Other damages and losses to Claimant's proprietary interests that are daily accruing as a direct and proximate result of the allision.

ECF No. 142 at ¶ 47. With the exception of (a) and (b), which are discussed further below, none of these claimed damages involve alleged damage to a proprietary interest.

4

### b. Claim of Proprietary Interest

As a starting point, although the City of Baltimore alleges at paragraph 23 of its claim that "it has had a proprietary interest in the Key Bridge since the Key Bridge's construction" and at paragraph 47(b) that it seeks damages for the cost of *replacement* of "the Key Bridge and its approaches," it alleges **no facts** anywhere in its amended Claim to support what is, essentially, a legal conclusion.[3] To date, the City of Baltimore has failed to substantiate its bare conclusory assertion of a proprietary interest in the Key Bridge with any evidence to that effect. Notably, in its responses to Petitioners' Interrogatory No. 2, the City of Baltimore states, in relevant part:

> **INTERROGATORY 2**
>
> State whether You contend that the City of Baltimore had a proprietary interest in the Key Bridge at the time of the Incident, and, if so, identify and state with specificity the nature, basis, and extent of such proprietary interest, and the facts and documents concerning Your contention.
>
> **RESPONSE TO INTERROGATORY 2:**
>
> Claimant objects to the term "proprietary interest" as vague and ambiguous for the reasons stated in the General Objections, and for the additional reason that with its application here Petitioners plainly seek Claimant's contentions respecting a legal conclusion regarding the ultimate scope of damages in this action. Such a contention interrogatory is improper and contradicts a long line of decisions rejecting contention interrogatories at this stage in the litigation. See, *e.g.*, *In re: Smith & Nephew Birmingham Hip Resurfacing Hip Implant Prods. Liab. Litigation.*, No. 1:17-MD-2775, 2020 WL 3469671, at *1 (D. Md. June 25, 2020) (The Federal Rules provide that '"the court may order that the [opinion or contention] interrogatory need not be answered until designated discovery is complete, or until a pretrial conference or some other time.'"). Contention interrogatories are particularly inappropriate in this matter since expert disclosures respecting damages have not occurred, damages continue to accrue, and discovery has been bifurcated, and will be reopened following the conclusion of the limitation action, *see* Dkt. 438 at *4.

---

[3] Notably, by letter dated May 15, 2024, Petitioners put counsel for the City of Baltimore on written notice that its claim as originally filed failed to allege facts sufficient to support a finding that it had a proprietary interest in the Key Bridge. (See **Exhibit B**). By return letter dated the same day, the City of Baltimore elected to ignore such warning. (See **Exhibit C**). Its amended claim failed to correct its error in this regard.

Claimant also objects on the grounds that this Interrogatory is overbroad, unduly burdensome, and compound.

Subject to these objections, Claimant reserves all rights to supplement this response pursuant to Federal Rule of Civil Procedure 33, and responds that Claimant, the intended beneficiary of the Key Bridge, did have a legally cognizable interest in the Key Bridge at the time of the Incident.

A copy of the City of Baltimore's July 14, 2025 Responses to Petitioners' Interrogatories is attached as **Exhibit D**. This non-responsive and deliberately misleading response does not allege a proprietary interest in the Key Bridge. Rather, it attempts to skirt the requirement of a proprietary interest by asserting that it is an "intended beneficiary" of the Key Bridge, entitling it to recovery. However, if that were sufficient to warrant a proprietary interest, every person in the world would arguably have a claim on this same basis.

With respect to its allegation at paragraph 47(a), the only allegations of physical damage made by the City of Baltimore to property owned by the City are found at paragraphs 30-32 of its Amended Claim, which generally allege that the DALI's anchor caused "significant damage to submerged pipes, including a 72-inch diameter water main owned and operated by the City of Baltimore" and that "[a]fter the allision damaged the water main in question, the City of Baltimore was forced to close the water main." However, in the years since the incident, the City of Baltimore has failed to produce *any* documentary evidence during discovery that would establish that either bridge debris or the DALI's anchor physically struck, crushed, or otherwise directly impacted the water main as a result of the Casualty. Indeed, the relevant available evidence indicates the contrary. Further, publicly available documents have called into question the validity of the City of Baltimore's claim that the water pipe was damaged. *See* **Exhibit E**.[4]

---

[4] Hayes Gardner, *Did the Dali damage an important pipeline under the Key Bridge? Baltimore's account has evolved*, The Balt. Sun, Oct. 4, 2024, at 5:

The Baltimore City Department of Public Works initially said in a statement April April 2 to The Sun that the city water main running parallel to the Key Bridge was "inactive" and had "not been

### c. Causes of Action

The City of Baltimore's claim does not enumerate its causes of action but generally alleges negligence and recklessness. The City of Baltimore's claim does not specifically allege "public nuisance" apart from some generalized references to "nuisance" at paragraphs 15 and 47 (k), (m), and (n). The City of Baltimore does not allege any intentional act and does not allege intentional interference with contract.

### C. **Baltimore County (ECF No. 171):**

#### a. **Nature of Damages Alleged**

Baltimore County summarizes its alleged damages as follows:

a. Costs associated with the obstruction of the Patapsco River, which directly resulted from the Allision;

b. Costs associated with the interruption of transportation through the County;

c. Costs associated with an increased need for road maintenance and traffic management, to account for the increased traffic traveling through the County which previously would have traveled over the Key Bridge;

d. Costs associated with increased and substantial expenditures relating to the protection of public welfare, including but not limited to increased expenditures on police, fire, and other public employees' overtime;

e. Costs associated with increased and substantial expenditures relating to the County's role in the search-and-rescue efforts following the Collapse;

f. Costs associated with increased and substantial expenditures relating to the County's role in monitoring and securing the location of the Collapse;

g. Costs associated with the loss of taxes and fees levied on businesses, including the import and export of trade goods, the loading and unloading of cargo from vessels, and in general, the operation of trade at the Port, which has been significantly curtailed and reduced by the inability of ships to move in and out of the Port;

---

used for water transmission for several years." The pipe had serviced Anne Arundel County, which no longer receives water from the city, the department explained at the time. "The main will not impact water service to residents, businesses, or hydrants," the department said in April.

h.  Costs associated with the County's loss of property and income tax revenue due to the substantial and foreseeable economic interruption caused by the allision;

i.  Costs associated with the monitoring and cleanup of debris and other substances that has been or will be deposited into the environment and on property, waterways, and shorelines maintained by the County and in which the County possesses a proprietary interest as a result of the Allision;

j.  Costs associated with the monitoring and cleanup of debris and other substances that has been or will be deposited into the environment and on property, waterways, and shorelines maintained by the County and in which the County possesses a proprietary interest as a result of the efforts to rebuild the Key Bridge.

k.  Costs associated with monitoring, abating, and otherwise suffering the presence of potentially hazardous substances and other potential pollutants that have been stockpiled as a direct result of the closure of the Port, resulting in the release or threatened release of hazardous substances, fugitive dust, and other contaminants into the environment and on property, waterways, and shorelines maintained by the County and in which the County possesses a proprietary interest, resulting in a public nuisance and trespass;

l.  Costs associated with the public nuisance suffered by the County and its residents, who have had their enjoyment and free and safe use of public resources, including the Patapsco River, Jones Creek, and associated waterways and shorelines interrupted; and

m.  Other damages and losses to the County's legal and proprietary interests that are daily accruing as a direct and proximate result of the Allision and Collapse.

### b. Claim of Proprietary Interest

Baltimore County's claim does not allege any proprietary interest in the Key Bridge. In its responses to Petitioners' Interrogatory No. 2, Baltimore County states, in relevant part:

**INTERROGATORY NO. 2:**

State whether You contend that the County had a proprietary interest in the Key Bridge at the time of the Incident, and, if so, identify and state with specificity each of the County's proprietary interests in the Bridge, the nature, basis, and extent of such proprietary interest, and the facts and documents concerning Your contention.

**RESPONSE TO INTERROGATORY 2:**

Claimant objects to this Interrogatory as calling for a legal conclusion, such that no response is required. Claimant objects to this Interrogatory as premature in that it

requests for Claimant to identify "with specificity" factual information and documents supporting Claimant's claims in the Action prior to the close of fact discovery. Claimant's investigation of the relevant facts is ongoing, and Claimant is unable to respond completely to this Interrogatory without the benefit of completed fact and expert discovery. Claimant further objects to this Interrogatory as overbroad and unduly burdensome to the extent that it seeks information which is already in the public domain or is readily available from a source other than Claimant in a manner that is more convenient, less burdensome, and less expensive. Claimant further objects to this Interrogatory as an unduly burdensome contention interrogatory inconsistent with Fed. R. Civ. P. 33(a)(2) and more appropriately answered at the close of fact and expert discovery.

Subject to and without waiver of the foregoing general and specific objections, Claimant states that at the time of the Incident, Claimant had a proprietary interest in properties and resources adversely impacted by the Incident, including portions of the Patapsco River, which forms part of the County's stormwater system, Jones Creek, and County shoreline, all of which were or may be impacted by the release of debris, surface contaminants, trash, and other substances resulting from the Incident. The County possesses a strong legal interest in the integrity, safety, health, and accessibility of the public waterways within its jurisdiction, including the Patapsco River and Jones Creek, and invests significant financial resources and staff resources in the protection and maintenance of the quality of such waterways. Additionally, at the request of the State of Maryland and U.S. Coast Guard, which coordinated the response to the Incident, County resources were deployed to assist in search-and-rescue operations, security operations, monitoring operations, and other response measures. The County possesses strong legal interests in the safety, health, and well-being of the population within its jurisdiction and invests significant financial resources and staff resources in the protection of the public health and safety. Similarly, the County invests significant financial resources and staff resources in the maintenance and repair of public roads, which were and are subject to additional stresses, damage, and wear-and-tear by virtue of traffic redirection and detours necessitated by the Incident. By virtue of its responsibility and authority to protect the public health and safety and to maintain the quality and integrity of public waterways within the County, including the Patapsco River and Jones Creek, the County possesses a proprietary interest in such waterways and associated shorelines that have been or may be damaged as a result of the Incident. Rebuilding efforts are anticipated to further adversely impact County interests, including the waterways and shoreline concerning which the County possesses proprietary interests. . . .

A copy of Baltimore County's August 4, 2025 Responses to Petitioners' Interrogatories is attached as **Exhibit F**. In short, Baltimore County alleges only that it has a proprietary interest in certain

waterways that allegedly sustained damage—and even that without any specific factual allegations to support that legal conclusion. Like the City of Baltimore, moreover, Baltimore County attempts to tie economic losses stemming from the loss of the Key Bridge to alleged damage to the waterways and associated shorelines in which it claims a proprietary interest. However, virtually all (if not all) of its alleged damages flow from the loss of the Key Bridge, and not from any alleged damage to the waterways and shorelines.

### c. Causes of Action

Baltimore County alleges (1) Negligence (¶¶ 105-118) and (2) Public Nuisance (¶¶ 119-122). Baltimore County does not allege any intentional act and does not allege intentional interference with contract.

### D. Star Bulk (Singapore) Pte. Ltd. ("Star Bulk") (ECF No. 188):

### a. Nature of Damages Alleged

Star Bulk is the owner of a vessel that arrived in Baltimore Harbor on March 24, 2024, and that was unable to reach its intended load berth because the channel was closed. Star Bulk claims that, as a result of the Casualty, its vessel's earning compacity was "impaired" and it lost profits. ECF No. 188 at ¶¶ 13-16.

### b. Claim of Proprietary Interest

Star Bulk's claim does not allege any proprietary interest in the Key Bridge. Moreover, in its responses to Petitioners' Interrogatory No. 3, Star Bulk expressly states, in relevant part:

**INTERROGATORY 3**

Identify all real property and/or personal property owned or leased by Star Bulk which You contend was physically damaged or injured as a direct result of the Incident, providing the location of each property by address, lot and block number, parcel number and/or any other unique identifier assigned to such property and the

10

date the property was purchased or leased, and state the facts and identify the documents concerning Your contention.

**ANSWER:**

Claimant does not contend that it owned or leased any real property or non-commercial "personal property"—an undefined term—that was physically damaged or injured as a direct result of the Incident, as described in the Petition. If further investigation reveals any such property interests or responsive documents, Claimant will supplement this response in accordance with Rule 26(e).

A copy of Star Bulk's June 3, 2025 Responses to Petitioners' Interrogatories is attached as **Exhibit G**.

### c. Causes of Action

In its claim, Star Bulk pleads (1) Negligence (¶¶ 19-29); (2) violation of the Oil Pollution Act (¶¶ 30-35); and (3) Public Nuisance (¶¶ 36-38). Star Bulk does not allege any intentional act and does not allege intentional interference with contract.

**E.    American Sugar Refining, Inc. and Florida Sugar & Molasses Exchange, Inc. (ECF No. 189):**

### a. Nature of Damages Alleged

American Sugar Refining, Inc. ("ASR") is an importer and manufacturer and distributor of sugar and other products and Florida Sugar & Molasses Exchange, Inc. ("FSME") is a marketer and shipper of raw sugar and molasses. ECF No. 189 at ¶ 1. ASR and FSME allege generally that "[a]s a result of the destruction of the Key Bridge, [ASR and FSME] have suffered significant damages arising from the closure of the Port of Baltimore," (ECF No. 189 at ¶8) but do not actually specify what such damages entailed.

### b. Claim of Proprietary Interest

ASR and FSME's claim does not allege any proprietary interest in the Key Bridge. ASR and FSME did not respond to Petitioners' Interrogatories or provide written responses to

Petitioners' Requests for Production of documents.[5] ASR and FSME did make a production of 56 pages, none of which support a claim of proprietary interest in the Key Bridge or any damaged property.

### c. Causes of Action

In their claim, ASR and FSME plead (1) Negligence (¶¶ 85-90); and (2) Unseaworthiness (¶¶ 91-115). ASR and FSME's claim contains two vague references to intentional acts (*see* (¶¶ 74-75) but does not plead a specific "intentional" cause of action, does not include a claim for public nuisance, and does not allege intentional interference with contract.

### F.    "R.E. West Class" (ECF No. 222):[6]

A purported class consisting of R.E. West, Inc., E. Marine Motor Yacht Sales Pty Ltd., Captain Logistics LLC, American Publishing LLC, B&R Construction Services, Inc., International Trade Solutions, Inc., Penn Manufacturing Industries, LLC, PMI Eng. Exports Private Ltd., and PMI Global Technologies Pvt. Ltd. (collectively "R.E. West Class").

### a. Nature of Damages Alleged

As described at pages 27-38 of the amended claim, each of the named purported class members allegedly suffered "Economic Losses and Costs." The gist of each of the R.E. West Class claims is stated in the amended claim statement as follows:

- R.E. West, Inc.: "R.E. West was forced to stop using their truck yard at Dundalk and reroute much of their business through the Ports of Newark, Wilmington, and Norfolk, at a significant expense of time and money. The operating cost of a truck such as those

---

[5] Claimants ASR and FSME failed to respond to Petitioners' propounded Interrogatories within 30 days. Pursuant to Federal Rule of Civil Procedure 33(b)(4), ASR and FSME have waived any objections to Interrogatories and Petitioners reserve the right to seek any and all appropriate remedies.

[6] The R.E. West Class filed their initial Claim on September 23, 2024 (ECF No. 145) and their amended claim on September 24, 2024 (ECF No. 222).

belonging to R.E. West is more than $100 an hour, and this rerouting forced it to spend hundreds of additional hours operating their trucks to distant ports. The delays and delivery failures have, and continue to, cost R.E. West hundreds of thousands of dollars as a result of the closure of the Port of Baltimore." ECF No. 222 at ¶ 117.

- E. Marine Motor Yacht Sales Pty Ltd. ("E. Marine"): "in the immediate aftermath of the blockage of the Channel and destruction of the Bridge, there was an immediate stop on cargo exiting the Port of Baltimore. E. Marine was forced to store his yacht at the Port of Baltimore indefinitely at a daily cost. Additionally, E. Marine has had to pay extended storage and capital costs associated with having to store his property at the Port of Baltimore. E. Marine has finally shipped his yacht through the Port of Baltimore in June, and the costs associated with the storage of his yacht at the Port of Baltimore have yet to be fully calculated." ECF No. 222 at ¶ 127.

- Captain Logistics LLC ("CCL"): ". . . the immediate aftermath of the blockage and destruction saw a dramatic halt in business activities. CCL was forced to shut their business down for a month to recalibrate their approach. Upon reopening, they had to reroute much of their business through the Port of Norfolk, at a significant expense of time and money." ECF No. 222 at ¶ 137.

- American Publishing LLC: ". . . The immediate aftermath of the channel blockage and Bridge destruction, however, was a dramatic halt in business activities. The local business community, stunned by the event, ceased communications, resulting in a sharp decline in service calls and sales for American Publishing. As a result, American Publishing experienced a significant increase in business costs, without any income to

pay them. Upon information and belief, the increased costs caused over one million dollars in damages for American Publishing." ECF No. 222 at ¶ 148.

- B&R Construction Services, Inc. ("B&R"): "The immediate aftermath of the blockage of the channel and destruction of the Bridge was a dramatic halt in B&R's business activities. The destruction of the Key Bridge by the Petitioners caused a huge loss of productivity, as their workers could no longer conveniently access their jobsites at Sparrow Point, and the blockage of the Patapsco River and destruction of the Key Bridge completely disrupted B&R's supply lines of accessory equipment and materials." ECF No. 222 at ¶ 155.

- International Trading Solutions, Inc. ("ITS"), Penn Manufacturing Industries, LLC, PMI Eng. Exports Private Ltd., and PMI Global Technologies Pvt. Ltd. ("Container Claimants"):

> 162. Similar to International Trading Solutions, Penn Manufacturing, PMI ENG, and PMI LTD delivered to the Petitioners and the Dali cargo shipped within certain modular shipping containers that were laden on board the Dali when it allided with the Key Bridge. As such, like International Trading Solutions, Penn Manufacturing, PMI ENG, and PMI LTD have sustained loss due to damaged, partially damaged, or spoiled cargo property; loss due to delay, demurrage, detention, and/or General Average of cargo property, as well as lost profits and loss of business reputation.
>
> 163. While the Containers have since been delivered, but the Container Claimants have been called upon by Petitioners to guarantee alleged General Average expenses and/or certain salvage claims. . . .

ECF No. 222 at ¶¶ 162-163.

### b. Claim of Proprietary Interest

None of the R.E. West Class claimants allege any proprietary interest in the Key Bridge.

While R.E. West's claim for (7) "Liability for Damage to Cargo Shipped on Board" may appear to allege a proprietary interest, Claimants couch this cause of action by asserting that

claimants within this category have suffered "**one or more of** the following damages:" (a) Loss due to damaged, partially damaged, or spoiled cargo property; (b) Loss due to delay, demurrage, detention, and/or General Average of cargo property; (c) Lost profits, loss of business reputation, and any other economic or non-economic losses to be proven at trial of this matter." ECF No. 222 at ¶ 247 (emphasis added). The named Container Claimants then specifically admit at paragraph 163 that all containers at issue "have since been delivered," and have not alleged any actual specific damage to those containers or that cargo, but rather joint obligations of all cargo interests such as general average and, the more vague and attenuated "loss due to delay, demurrage, detention" and "lost profits, loss of business reputation, and any other economic or non-economic losses . . .." This indicates that the R.E. West Class may have intended to add to the class cargo interests that did have actually damaged cargo on board, but that no such claimants are included as named Container Claimants.

Moreover, in their responses to Petitioners' Interrogatory No. 3, the R.E. West Claimants all state, in relevant part[7]:

**INTERROGATORY 3**

Identify all real property and/or personal property owned or leased by [Claimant] which You contend was physically damaged or injured as a direct result of the Incident, providing the location of each property by address, lot and block number, parcel number and/or any other unique identifier assigned to such property and the date the property was purchased or leased, and state the facts and identify the documents concerning Your contention.

**ANSWER:** . . . [ ] Claimant does not contend that it owned or leased any real property or [ ] personal property—an undefined term—that was physically damaged or injured as a direct result of the Incident, as described in the Petition.[8] If further investigation reveals

---

[7] There are minor differences between responses of each of the R.E. West Class Claimants Responses to Petitioners' Interrogatory No. 3, but other than the exception discussed in FN 8, none are substantive in nature.

[8] One Container Claimant, ITS, includes in its Answer: "For identity of damage[d] commercial goods—see response to First Request for Production of Documents." However, review of ITS's response to Petitioners' First Request for Production of Documents still does not identify any proprietary interest in any damaged property.

15

any such property interests or responsive documents, Claimant will supplement this response in accordance with Rule 26(e).

Copies of the R.E. West Class Claimants' June 3, 2025 Responses to Petitioners' Interrogatories are attached as **Exhibit H**.

### c.  Causes of Action

The R.E. West Class Amended Claim alleges:

(1) Intentional Disregard for Safety (¶¶ 181-188);

(2) Negligence under General Maritime Law (¶¶ 189-208);

(3) Public Nuisance (¶¶ 209-218);

(4) Intentional and Willful Interference with Claimants' Contractual Relations and Business Relationships ¶¶ 219-230);

(5) Punitive Damages (¶¶ 231-235);

(6) Indemnification or Contribution of General Average (¶¶ 236-244); and

(7) Liability for Damage to Cargo Shipped on Board by Claimants (¶¶ 245-247).

## G.  **"Longshoremen Class" (ECF No. 239):**

The Longshoremen Class claim is a purported class brought by "representative claimants" Gerald Barney, Thomas Crawley, Ryan Hale, Tulani Hasan, Donny Jackson, Alonzo Key, Charles Peacock, and Douglas Ramos (collectively "Longshoremen Class"), who are all members of the International Longshoremen's Association Local 333 (ILA-333), Local 953 and Local 1429. The Longshoremen Class Claim specifically notes that it is not being brought by any of the unions themselves, but only representative claimants and a purported class of other members of one or more of the unions.

### a.  Nature of Damages Alleged

The Longshoremen Class claim alleges that the longshoremen were dependent on the flow of cargo into and out of Baltimore for their livelihood and, after the Casualty, such flow ceased immediately and completely, and had not been restored in the six months since the Casualty

occurred. As a result, the longshoremen claimants allege that they have suffered pecuniary losses, which are described as past and future economic losses, punitive damages, costs of suit and attorneys' fees, and all other damages available under applicable law. *See* ECF No. 239 at ¶¶ 75-79, 83-89, 93-94, 101-102, 114.

### b.  Claim of Proprietary Interest

None of the Longshoremen Class claimants allege any proprietary interest in the Key Bridge. Moreover, in their responses to Petitioners' Interrogatory Nos. 3 and 4, the Longshoremen Class Claimants all state, in relevant part:

**INTERROGATORY 3**

State whether You contend that [Claimant] had a proprietary interest in the Key Bridge at the time of the Incident, and, if so, identify and state with specificity the nature, basis, and extent of such proprietary interest, and the facts and documents concerning Your contention.

**ANSWER 3:**

No.

**INTERROGATORY 4**

Identify all real property and/or personal property owned or leased by [Claimant] which You contend was physically damaged or injured as a direct result of the Incident, providing the location of each property by address, lot and block number, parcel number and/or any other unique identifier assigned to such property and the date the property was purchased or leased, and state the facts and identify the documents concerning Your contention.

**ANSWER 4:**

None.

Copies of the Longshoremen Class Claimants' June 4, 2025 Responses to Petitioners' Interrogatories are attached as **Exhibit I**.

### c.  Causes of Action

The Longshoremen Class claim alleges (1-2) Public Nuisance against each Petitioner (¶¶ 72-79; 80-87); (3-4) Negligence against each Petitioner (¶¶ 88-95; 96-103); and (5-6) Punitive

Damages against each Petitioner (¶¶ 104-107; 108-112). The Longshoremen Class Claim also makes vague references to intentional acts (*see* ECF No. 239 at ¶¶ 41, 44, 105, 106, 109, 110) but does not specifically enumerate an "intentional" cause of action.

**H.    Markel Syndicate (ECF No. 241):**

**a.  Nature of Damages Alleged**

The Markel Syndicate is comprised of insurers as subrogees and assignees of Ports America Chesapeake, LLC ("PAC"), which is a terminal operator and stevedore operating at various terminals within the Port of Baltimore. ECF No. 241 at ¶ 8. The Markel Syndicate alleges that as a result of the Casualty, PAC has suffered more than $40 million in damages and/or business interruption lost, comprised of:

  a.  Costs associated with the obstruction of the Patapsco River;

  b.  Costs associated with the interruption of transportation through the Patapsco River;

  c.  Lost profits;

  d.  Costs associated with the public nuisance suffered by PAC, which has had its enjoyment and use of the Patapsco River, the Baltimore Harbor, and all other associated waterways severely hindered by the Allision; and

  e.  Other damages and losses to PAC's business interests.

ECF No. 241 at ¶ 67.

**a.  Claim of Proprietary Interest**

The Markel Syndicate does not allege any proprietary interest by PAC in the Key Bridge. Moreover, in their responses to Petitioners' Interrogatory No. 2, the Markel Syndicate Claimants state[9], in relevant part:

**INTERROGATORY 2**

---

[9] There are minor differences between responses of each of the Markel Syndicate Claimants to Petitioners' Interrogatory No. 2, but none are material as relevant to this Motion.

State whether You contend that PAC had a proprietary interest in the Key Bridge at the time of the Incident, and, if so, identify and state with specificity the nature, basis, and extent of such proprietary interest, and the facts and documents concerning Your contention.

**RESPONSE TO INTERROGATORY 2**

\* \* \*

Subject to and without waiving any of the foregoing objections, [Claimant] responds that, at this time and after reasonable inquiry, it does not presently have information that PAC had a proprietary interest in the Key Bridge at the time of the Allision.

Copies of the Markel Syndicate Claimants' August 29, 2025 Responses to Petitioners' Interrogatories are attached as **Exhibit J**.

### b. Causes of Action

The Markel Syndicate Claim alleges: (1) Negligence under General Maritime Law (¶¶ 74-79); (2) Public Nuisance (¶¶ 80-82); and (3) Intentional Disregard for Safety (¶¶ 83-88). This claim does not allege intentional interference with contract.

### I. Mukesh Desai on behalf of R.M. Metals (ECF No. 344):

#### a. Nature of Damages Alleged

R.M. Metals filed an Answer and Claim and alleges that R.M. Metals is a small business that was harmed as a result of the Casualty. ECF No. 344-1 at ¶ 14. It further alleges that it had "multiple containers on the ship at the time of the allision" and that it had lost "approximately $334,601.50 in damages, as of June 7, 2024." ECF No. 344-1 at ¶ 32. R.M. Metals' claim references a damages spreadsheet, but such spreadsheet is not included as an Exhibit. Such spreadsheet *is*, however, included with R.M. Metals' filing at ECF No. 311, *Motion for Leave to Late-File Answer and Claim*. Based on that document (ECF No. 311-3), all of R.M. Metals' alleged damages are for freight or demurrage and do not relate to any damaged property. More importantly, however, despite R.M. Metals' vague mention of the containers being "on the ship,"

its document production reveals that all of the containers in issues were actually carried aboard other vessels, and its claim is purely for economic loss resulting from delays in transit aboard those other vessels resulting from the loss of the Key Bridge. *See* **Exhibit K**.[10]

### b. Claim of Proprietary Interest

R.M. Metals' claim does not allege any proprietary interest in the Key Bridge. No Interrogatories were served on R.M. Metals.

### c. Causes of Action

While it does not enumerate its causes of action, R.M. Metals appears to allege that Petitioners were careless, reckless, negligent, and/or grossly negligent and that the Vessel was unseaworthy at the time of the Casualty. R.M. Metals' claim does not allege any intentional act or public nuisance and does not allege intentional interference with contract.

## J. Consol Energy Inc. ("Consol Energy") (ECF No. 395): [11]

### a. Nature of Damages Alleged

Consol Energy is a producer and exporter of high-BTU bituminous coal and the owner of the Consol Marine Terminal in Baltimore, MD. ECF No. 395 at ¶¶ 36-37. Consol Energy alleges that it was effectively forced to shut down operations at its Consol Marine Terminal, limiting its ability to ship coal for overseas export. ECF No. 395 at ¶ 45. Consol Energy expressly states that its claim is to "seek compensation for economic losses sustained as a result of the Key Bridge Allision." ECF No. 395 at ¶ 11. It further itemizes such "economic impact" as:

---

[10] An extract from R.M. Metals' document production is attached as **Exhibit K**, which shows that the carrying vessels for R.M. Metals' cargo were ZIM Savannah, the Grete Maersk, the Talos, Toldeo Triumph, and the ZIM Emerald, but not the Dali. Based on that documentation as well as delivery orders, invoices, and other documents submitted in support of the claim, R.M. Metals' cargo was not loaded aboard the Dali, was not being carried pursuant to any bill of lading issued in connection with the Dali, and was not physically damaged as a result of the Casualty. The claimed damages consist entirely of incremental trucking, drayage, chassis rental, fuel surcharge, and demurrage costs allegedly incurred because the cargo was routed through Norfolk rather than Baltimore.

[11] Consol Energy filed its initial Claim on September 24, 2024 (ECF No. 186) and its amended claim on October 16, 2024 (ECF No. 395).

    a. Revenue loss associated with the inability to ship Consol mined coal to their customers through the Consol Marine Terminal;

    b. Loss of revenue of terminal fees for shipping third party coal from the Consol Marine Terminal;

    c. Loss of storage at the Consol Marine Terminal;

    d. Reduced mining operations at the Claimant's Pennsylvania Mining Complex.

ECF No. 395 at ¶ 46.

    **e. Claim of Proprietary Interest**

Consol Energy's claim does not allege any proprietary interest in the Key Bridge. Moreover, in its responses to Petitioners' Interrogatory No. 3, Consol Energy states, in relevant part:

> **INTERROGATORY NO. 3:**
>
> Identify all real property and/or personal property owned or leased by Consol Energy which You contend was physically damaged or injured as a direct result of the Incident, providing the location of each property by address, lot and block number, parcel number and/or any other unique identifier assigned to such property and the date the property was purchased or leased, and state the facts and identify the documents concerning Your contention.
>
> **RESPONSE:**
>
> Subject to and without waiving the foregoing general objections, Consol states that it does not own or lease real property and/or personal property that was physically damaged or injured as a direct result of the Incident.

A copy of Consol Energy's July 17, 2025 Response to Petitioners' Interrogatories is attached as **Exhibit L**.

    **f. Causes of Action**

Consol Energy alleges (1) Negligence (¶¶ 49-53); (2) Intentional Disregard for Safety ((¶¶ 54-60); (3) Public Nuisance (¶¶ 61-69); and (4) Punitive Damages (¶¶ 70-73). Its claim does not allege intentional interference with contract.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: New York, New York
      June 15, 2026

                                         Thomas H. Belknap, Jr.