**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

In the Matter of the Petition

Of

GRACE OCEAN PRIVATE LIMITED,                        Docket No. JKB 24-cv-941
as Owner of the M/V Dali,

                                                    *IN ADMIRALTY*

And

SYNERGY MARINE PTE LTD, as
Manager of the M/V Dali,

for Exoneration from or Limitation of Liability

**CLAIMANT BALTIMORE COUNTY'S MEMORANDUM OF LAW IN OPPOSITION**
**TO PETITIONERS' MOTION FOR JUDGEMENT ON THE PLEADINGS**
**AS TO ALL PURELY ECONOMIC LOSS CLAIMS**

| | |
|---|---|
| **BALTIMORE COUNTY OFFICE OF LAW** | **GRANT & EISENHOFER P.A.** |
| James R. Benjamin, Jr. (Bar No. 27056) | Kyle J. McGee (*pro hac vice*) |
| jrbenjamin@baltimorecountymd.gov | kmcgee@gelaw.com |
| Jennifer R. Frankovich (Bar No. 26052) | 123 S. Justison Street |
| jfrankovich@baltimorecountymd.gov | Wilmington, DE 19801 |
| 401 Washington Avenue, Suite 219 | Tel.: (302) 622-7000 |
| Towson, Maryland 21204 | Fax.: (302) 622-7100 |
| Tel. (410) 887-4420 | |
| Fax. (410) 296-0931 | *Attorneys for Claimant Baltimore County* |

**BEKMAN, MARDER, HOPPER,**
**MOORE & QUINN, L.L.C.**
Paul D. Bekman (Bar No. 00019)
bekman@mdtrialfirm.com
1829 Reisterstown Road, Suite 200
Baltimore, MD 21208
Tel. (410) 539-6633
Fax.: (410) 625-9554

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT.............................................................................................. 1

SUMMARY OF THE CLAIMS ............................................................................................. 5

LEGAL STANDARD .............................................................................................................. 5

ARGUMENTS AND AUTHORITY ..................................................................................... 7

    I.  The County's claims for damages are permitted under loss-shifting and search-and-rescue doctrines. ............................................................................................................... 7

        a. The County's claims related to response costs arising from the Casualty fall within exceptions and/or exclusions to *Robins Dry Dock*. ............................................. 8

        b. The County's damage claims are compensable under the OPA and the Maryland Environmental Code. ................................................................................. 15

    II.   The County has suffered damage to its proprietary interests............................................ 17

    III.  The County's claims for relief sounding in public nuisance are not foreclosed by *Robins Dry Dock*. ...................................................................................................................... 21

    IV.  The County joins and incorporates by reference certain additional arguments set forth in the City's opposition brief. ................................................................................. 22

CONCLUSION.......................................................................................................................... 23

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Amoco Transp. Co. v. S/S Mason Lykes*,
    768 F.2d 659 (5th Cir. 1985) ...................................................................................10, 11

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..............................................................................................................7

*Blessey Enterprises v. M/V James E. Philpott*,
    1996 WL 267997 (E.D. La. 1996) ...............................................................20, 21, 22

*Matter of Bruce Oakley, Inc.*,
    No. CV-19-184-RAW-JAR, 2025 WL 1090964 (E.D. Okla. Mar. 3, 2025)..........................20

*Catalyst Old River Hydroelectric Ltd. v. Ingram Barge Co.*,
    639 F.3d 207 (5th Cir.2011) ...............................................................................17, 19, 20

*City of Sausalito v. O'Neill*,
    386 F.3d 1186 (9th Cir. 2004) ...........................................................................................17

*D.C. v. Air Fla., Inc.*,
    750 F.2d 1077 (D.C. Cir. 1984)..........................................................................................15

*In re Deepwater Horizon*,
    784 F.3d 1019 (5th Cir. 2015) ........................................................................................7, 8

*Domar Ocean Transp., Ltd., Div. of Lee-Vac, Ltd. v. M/V Andrew Martin*,
    754 F.2d 616 (5th Cir. 1985) ............................................................................................20

*Gale-Ebanks v. Chesapeake Crewing, LLC*,
    525 F. Supp. 3d 620 (D. Md. 2021)......................................................................................6

*Gatlin Oil Co. v. United States*,
    169 F.3d 207 (4th Cir. 1999) .............................................................................................15

*Gregg Neck Yacht Club, Inc. v. Cnty. Comm'rs of Kent Cnty.*,
    769 A.2d 982 (Md. Ct. Spec. App., 2001)...........................................................................17

*State of La. ex rel. Guste v. M/V Testbank*,
    752 F.2d 1019 (5th Cir. 1985) ..................................................................................7, 10, 21

*Icelandic Coast Guard v. United Technologies Corp.*,
    722 F. Supp. 942 (D. Conn. 1989)................................................................................12, 15

*Lacks v. Ultragenyx Pharm., Inc.*,
    768 F. Supp. 3d 705 (D. Md. 2025) ....................................................................6

*In re Marquette Transportation Gulf-Inland, LLC*,
    Civil Action No. 14-1961, 2015 WL 2341653 (E.D. La. May 14, 2015) ................................11

*McLean Contracting Co. v. Waterman S.S. Corp.*,
    131 F. Supp. 2d 817 (E.D. Va. 2001), *aff'd sub nom. McLean Contracting Co.
    v. Waterman Steamship Corp.*, 277 F.3d 477 (4th Cir. 2002) ...................................................9

*Montgomery Cnty. v. Maryland-Washington Metro. Dist.*,
    96 A.2d 353 (Md., 1953) .......................................................................17

*Nexen Petroleum U.S.A., Inc. v. Sea Mar Div. of Pool Well Servs. Co.*,
    497 F. Supp. 2d 787 (E.D. La. 2007) ...................................................11

*Robins Dry Dock & Repair Co. v. Flint*,
    275 U.S. 303 (1927) .................................................................. *passim*

*Sager v. Hous. Comm'n of Anne Arundel Cnty.*,
    855 F. Supp. 2d 524 (D. Md. 2012) ....................................................6

*Sherman v. Johnson & Towers Baltimore, Inc.*,
    760 F. Supp. 499 (D. Md. 1990) ...............................................................9

*Vaughn v. Atkinson*,
    369 U.S. 527 (1962) ......................................................................22

*Venore Transp. Co. v. M/V Struma*,
    583 F.2d 708 (4th Cir. 1978) ....................................................... *passim*

**Statutes**

33 U.S.C.A. § 2702 ...............................................................................15

33 U.S.C.A. § 2702(a) ..........................................................................15

33 U.S.C.A. § 2702(b)(2)(F) ..............................................................15, 16

28 U.S.C. § 1333 .................................................................................22

46 U.S.C. § 2304 ............................................................................13, 14

**Other Authorities**

Fed. R. Civ. P. 12(c) ..............................................................................6

Fed. R. Civ. P. 12(d) ..............................................................................6

Rule 12(b)(6)........................................................................................................................6

Rule 56................................................................................................................................6

Rule A(1)(C) .......................................................................................................................6

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

In the Matter of the Petition

Of

GRACE OCEAN PRIVATE LIMITED,                    Docket No. JKB 24-cv-941
as Owner of the M/V Dali,

                                                *IN ADMIRALTY*

And

SYNERGY MARINE PTE LTD, as
Manager of the M/V Dali,

for Exoneration from or Limitation of Liability

---

### CLAIMANT BALTIMORE COUNTY'S MEMORANDUM OF LAW IN OPPOSITION TO PETITIONERS' MOTION FOR JUDGEMENT ON THE PLEADINGS AS TO ALL PURELY ECONOMIC LOSS CLAIMS

Claimant Baltimore County ("Claimant" or "the County"), through undersigned counsel, respectfully submits its Memorandum of Law in Opposition to Petitioners' Motion for Judgement on the Pleadings As To All Purely Economic Loss Claims ("Motion"), filed on June 15, 2026.

### PRELIMINARY STATEMENT

At approximately 1:29 a.m. on March 26, 2024, the *M/V Dali* experienced a power outage which resulted in the vessel striking a support pier of the nearby Francis Scott Key Bridge ("Key Bridge" or "the Bridge").[1]  Following this allision (or "Casualty"), the Key Bridge collapsed,

---

[1] National Transportation Safety Board, *Contact of Containership Dali with Francis Scott Key Bridge and Subsequent Bridge Collapse*, Marine Investigation Report MIR-25-40 at xii (Nov. 18, 2025).

bringing with it a seven-person road maintenance crew conducting repairs on the Bridge at the time of the Casualty who had been unable to evacuate prior to the allision.[2]  Since its construction and opening in the 1970s, the Bridge has played a critical role in the County's transportation system, facilitating the safe and convenient movement of County residents into and out of the County.  Baltimore County played an essential and authoritative role in the response to the collapse pursuant to requests made to the County by both the U.S. Coast Guard and the State of Maryland, including pursuant to its Memorandum of Understanding (MOU) with the Maryland State Police, in both the immediate aftermath of the allision and in the weeks and months to follow.  Moreover, County property was damaged or lost as a direct result of the Casualty.  Such property includes costly equipment utilized, damaged, and/or lost in the search-and-rescue operations necessitated by the allision, such as vitally important buoyancy control devices, as well as waterway components (principally, Patapsco River waters and sediments) impacted by the unlawful release of concrete, steel, automobiles, and petroleum substances due to the allision.  The County is entitled to compensation and relief under relevant law, including *Robins Dry Dock* and its progeny.

Upon being notified by the State of the Key Bridge collapse and likely persons in the water, the County launched an immediate emergency response pursuant to its MOU with the State Police, which expressly delegates the responsibility for the provision of emergency services to the County in the event of "[c]atastrophic incidents" like the Casualty.  Exhibit A at 5.[3]  The County also received a request for assistance in the Casualty response from the United States Coast Guard (USCG).

---

[2] National Transportation Safety Board, *Contact of Containership Dali with Francis Scott Key Bridge and Subsequent Bridge Collapse*, Marine Investigation Report MIR-25-40 at xii (Nov. 18, 2025).
[3] Exhibits are attached to the Declaration of Kyle J. McGee.

In connection with this response, the County Police Department's Operation Support Command deployed command staff, an Incident Manager, at least a dozen divers conducting search and rescue efforts, and more than 40 additional personnel, as well as marine vessels, helicopters, a mobile command post, and at least 13 vehicles to assist with the emergency response. The County additionally deployed 40 Fire Department units and 67 volunteer Fire Department units to the Casualty scene on the day of the allision. Altogether, the County directed and provided comprehensive emergency services and equipment pertaining in particular to the search and rescue of the Casualty victims in the immediate aftermath of the Bridge collapse pursuant to its agreements with the Maryland State Police and incurred significant expenses as a result.

Baltimore County continued to contribute to the ongoing Casualty response efforts, and especially those related to the search and rescue or recovery of persons in the water as a result of the allision, in the days, weeks, and months that followed. *See* Exhibits B - C (providing an in-depth first-hand account of the County's response to the Casualty). In addition to the resources expended on the day of the Casualty, the County Police Department continued to provide its Marine, Dive, and Underwater Recovery Team personnel and equipment to ongoing search, rescue, and recovery efforts through at least mid-May 2024. *See* Exhibit B at ¶¶ 5-6, 9; Exhibit C. From here, not only did the County meet with stakeholders, including the Governor, Lieutenant Governor, Mayor of Baltimore City, and administrative members of the U.S. Coast Guard in the aftermath of the Bridge collapse regarding response planning and strategy coordination, but from March 29, 2024, through at least April 17, 2024, the County also provided consistent coverage for the short-term safety zone established around the Bridge site with the use of County boats and corresponding personnel to ensure the seamless execution of the emergency response and search and rescue efforts. The County's Police Marine Unit further contributed a boat and personnel to

the monitoring and enforcement of the long-term safety zone established by the Coast Guard, as well as approximately 20 members of its Marine and Diver Teams in support of emergency response efforts. *See, e.g.*, Exhibit C at ¶¶ 2, 10.

The Operations Bureau of the County Police Department additionally assigned personnel to various Command Posts supporting collective response efforts, including the Support Operations Division and the Eastern Division Patrol Command. The Baltimore County Fire Department further provided ambulance services (in coordination with the County's 911 operations) as a part of the medical response efforts initiated after the Bridge collapse, and County liaisons managed media contacts in light of the Casualty, including to protect victims' family members from press attention. In short, the extensive nature of the County's contribution to ongoing Casualty response efforts, and especially search, rescue, and recovery efforts for the victims of the collapse, as well as the ongoing harms to County property flowing directly from the Casualty, have had a substantial financial and public-safety impact on the County the full scope of which is still being determined but already amounts into the millions of dollars.

Beyond the costs and losses associated with its extensive investigative, search-and-rescue, and recovery operations, the County sustained damages and harms to other property as a direct result of the Casualty, including substantial damage to roadways forming an integrated part of the County's transportation system (of which the Bridge was an essential component), and to the quality of waterways and waterway components impacted by the Casualty, in which the County holds proprietary interests. The ongoing nature of the Casualty's significant interference with the County's rights and property interests owing to the absence of the Bridge and the projected reconstruction project further entitles the County to relief.

**SUMMARY OF THE CLAIMS**

As a threshold matter, Petitioners' Motion is premature, as there has been no meaningful opportunity to engage in fact discovery as it relates to the County's claims, and, accordingly, the record has not yet been adequately developed for dispositive motion practice.

The County has suffered harms and sustained damages (summarized in its *Claim Pursuant to Supplemental Federal Rule F(5) In Relation to The Francis Scott Key Bridge*,1:24-cv-00941-JKB, Doc. 171 (Sept. 24, 2024) and incorporated herein) as a direct result of the Casualty and Petitioners' conduct.  The County's damages include, without limitation, costs incurred by the County in conducting search, rescue, and recovery operations, and in particular the personnel, equipment, vessels, and vehicles deployed for emergency and long-term response and response management efforts.  These costs arise from, *inter alia*, the County's contractual responsibilities under its MOU with the Maryland State Police and, as such, are compensable under the Fourth Circuit's established understanding of *Robins Dry Dock*.  Independent of *Robins Dry Dock*, the response costs incurred by the County in the instant matter are also expressly recoverable under the Oil Pollution Act ("OPA" or "the Act") and Md. Code Ann., Envt. § 4-401(c)(2)(vii).  Other harms or losses, including injury to waterway components and roadways in which the County has proprietary interests, are expressly recoverable under *Robins Dry Dock*'s reasoning.  Non-economic harms, including the ongoing nuisance condition created by the allision, continue to impact the County and the public in the County, and warrant equitable relief not foreclosed by *Robins Dry Dock* or other authorities.

**LEGAL STANDARD**

The Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions provide that the Federal Rules of Civil Procedure apply to admiralty and maritime claims brought

pursuant to a request for "actions for exoneration from or limitation of liability . . . . except to the extent that they are inconsistent with the[] Supplemental Rules." Fed. R. Civ. P. Supp. Admiralty Rule A(1)(C) - (2). Fed. R. Civ. P. 12(d) additionally establishes that "[i]f, on a motion under . . . 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56" and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *See also Sager v. Hous. Comm'n of Anne Arundel Cnty*., 855 F. Supp. 2d 524, 542 (D. Md. 2012). "[A] district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." *Id.* at 542 (internal citation omitted). In such instances, a presiding court may consider extraneous materials to inform its decision-making on the parties' motion practice where the "consideration of extraneous material is likely to facilitate the disposition" of the underlying action. *Id*.

When considering a motion under Fed. R. Civ. P. 12(c) "the Court must accept as true all well-pleaded allegations and view the complaint in the light most favorable to the" non-moving party. *Gale-Ebanks v. Chesapeake Crewing, LLC*, 525 F. Supp. 3d 620, 624 (D. Md. 2021) (internal quotations and citations omitted). "A 12(c) motion should only be granted if, after accepting all well-pleaded allegations in the [claimant]'s complaint as true and drawing all reasonable factual inferences from those facts in the [non-moving party]'s favor, it appears certain that the [claimant] cannot prove any set of facts in support of his claim entitling him to relief." *Lacks v. Ultragenyx Pharm., Inc.*, 768 F. Supp. 3d 705, 715 (D. Md. 2025) (internal quotations and citations omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Gale-Ebanks v.*

6

*Chesapeake Crewing, LLC*, 525 F. Supp. 3d 620, 624 (D. Md. 2021) citing to *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotations omitted).  To this end, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## ARGUMENTS AND AUTHORITY

I.  **The County's claims for damages are permitted under loss-shifting and search-and-rescue doctrines.**

Petitioners maintain in their Motion that the County's claims for economic losses are categorically barred under the seminal maritime decision of *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927).  As Petitioners note, the *Robins Dry Dock* holding has been understood by federal courts for nearly century as "den[ying] a plaintiff recovery for economic loss if that loss resulted from physical damage to property in which he had no proprietary interest." *State of La. ex rel. Guste v. M/V Testbank*, 752 F.2d 1019, 1022 (5th Cir. 1985).  Parties lacking such a property interest (such as businesses losing profits as a result of closed waterways) are thus barred from recovering pure economic losses.  *See, e.g.*, *State of La. ex rel. Guste v. M/V Testbank*, 752 F.2d 1019, 1032 (5th Cir. 1985).  To this end, courts have resoundingly concluded that "[t]he rule's purpose is to limit the consequences of negligence and exclude indirect economic repercussions, which can be widespread and open-ended." *See, e.g. In re Deepwater Horizon*, 784 F.3d 1019, 1024 (5th Cir. 2015) (citing to *Catalyst Old River Hydroelectric Ltd. v. Ingram Barge Co.,* 639 F.3d 207, 210 (5th Cir.2011)).  However, Petitioners' understanding of *Robins Dry Dock* does not align with this foundational comprehension of *Robins Dry Dock* in the relevant caselaw and is fundamentally incomplete as it applies both within the Fourth Circuit and to the County in

particular.  As such, Petitioners' Motion as to the applicability of *Robins Dry Dock* to the County's claims should be denied.

### a.  The County's claims related to response costs arising from the Casualty fall within exceptions and/or exclusions to *Robins Dry Dock*.

Petitioners' arguments regarding *Robins Dry Dock* and its legal effect on the economic damages pursued by the County in this litigation neglect to consider not only the underlying rationale of *Robins Dry Dock* itself, but the full extent of the Fourth Circuit's and other courts' treatment of the holding.  Petitioners' Motion fails to adequately contend with the longstanding understanding among federal courts that the *Robins Dry Dock* rule on economic damages is not a bright line developed and applied in a vacuum, but, rather, a presumptive position on damage recovery animated by policy concerns over the potential for boundless, indirect damage claims arising from maritime torts.  *See, e.g. In re Deepwater Horizon*, 784 F.3d 1019, 1024 (5th Cir. 2015).  Petitioners' Motion likewise suffers from an incomplete apprehension of exceptions or exemptions recognized by the Fourth Circuit and other courts, and the ways in which they apply to the facts at hand.  *See, e.g.*, *Venore Transp. Co. v. M/V Struma*, 583 F.2d 708 (4th Cir. 1978).  In particular, Petitioners ignore the loss-shifting exemption and the exception (or exemption) for claims tied to personal injuries, both of which are directly relevant to the County's claims here.

In *Venore Transp. Co. v. M/V Struma*, the Fourth Circuit held that a time charterer in possession of a vessel impacted by a collision could recover for damages relating to the lost use of the vessel resulting from the collision despite not having a property interest in the vessel itself on the grounds that the time charterer had been "transferred the risk of loss of use from the owner." 583 F.2d 708, 710 (4th Cir. 1978).  Thus, as a party immediately affected by the damage resulting from the collision due to a contractual risk-sharing arrangement, the *Venore* court held that the time charterer was entitled to recover damages notwithstanding *Robins Dry Dock*.  In that case,

8

the application of this loss-shifting doctrine prevented an unjust windfall for the tortfeasor, with the Court further grounding its decision in the fact that the recovery at issue was for "a conventional item of recovery, and the fact that the charter party has transferred the risk of loss of use from the owner to the time charterer should not extinguish the right to a recovery of a traditional item of damages." *Id.* at 711. As the *Venore* court recognized, this loss-shifting doctrine is consistent with *Robins Dry Dock*'s objective of imposing rational limits on remote damages and is necessary to prevent unwarranted excusal from liability for maritime tortfeasors.

Courts within the Fourth Circuit have consistently reaffirmed and invoked *Venore* for both its careful, fact-specific approach to *Robins Dry Dock* and its formulation of the loss-shifting doctrine. *See, e.g.*, *Complaint of Marine Nav. Sulphur Carriers, Inc.*, 507 F. Supp. 205, 210 (E.D. Va. 1980), *aff'd sub nom. Marine Nav. Sulphur Carriers, Inc. v. Lone Star Indus., Inc.*, 638 F.2d 700 (4th Cir. 1981) (internal quotations omitted) (clarifying that the applicability of the *Venore* loss-shifting doctrine to economic damages did not extend to claims which "intend to enlarge in any way the types of damages which have been traditionally recoverable" under established tort theories); *see also Sherman v. Johnson & Towers Baltimore, Inc.*, 760 F. Supp. 499, 502 (D. Md. 1990). As the District Court for the Eastern District of Virginia has noted, "the Fourth Circuit has not always applied the rule of *Robins Dry Dock* in a mechanical fashion, but rather has carved out exceptions where appropriate." *McLean Contracting Co. v. Waterman S.S. Corp.*, 131 F. Supp. 2d 817, 820 (E.D. Va. 2001), *aff'd sub nom. McLean Contracting Co. v. Waterman Steamship Corp.*, 277 F.3d 477 (4th Cir. 2002).

While the Fourth Circuit, in *Yarmouth Sea Products Ltd. v. Scully*, observed that "the *Robins Dry Dock* principle is alive and well in the Fourth Circuit," 131 F.3d 389, 398 (4th Cir. 1997), it also expressly "embrace[d] the pragmatic considerations identified" and advanced by the

9

*Venore* court to determine that the economic damages pursued by fisherman claimants were not barred by *Robins Dry Dock* on the grounds that "fishermen on a lay and bound to the vessel … with their livelihoods at stake, should be allowed to recover for the tortious acts of third persons causing the premature cessation of the undertaking, provided their losses, like any plaintiff's losses, are proved to a reasonable certainty." *Id*. at 399 (internal quotations omitted). In effect, the *Yarmouth* court built on *Venore* to not only reject a bright-line application of *Robins Dry Dock,* but to solidify the notion that the nature of the economic damages sought in relation to a maritime tort claim, along with a claimant's ability to demonstrate such damages, are paramount in assessments as to whether *Robins Dry Dock* precludes recovery. *Id*.

Relatedly, the Fifth Circuit has built on *Venore*'s loss-shifting doctrine to hold that where a property owner's economic losses have been contractually shifted to a non-owner in the event of a maritime tort, the non-owning party to whom the losses have been transferred may recover those losses from the tortfeasor. *Amoco Transp. Co. v. S/S Mason Lykes*, 768 F.2d 659, 668 (5th Cir. 1985). Indeed, in creating this doctrinal exclusion, the *Amoco* court expressly recognized that "[n]othing in the *Robins Dry Dock* or the *Testbank* holding or rationale prohibits recovery in tort by the person to whom the economic losses suffered by the owner of physically damaged property have been shifted[;]" thus, where a party whose property interests have been affected by a negligently committed maritime tort "contractually shifts the risk of economic loss, which would normally fall upon the property owner, to a third party[,]" "[t]hat third party is entitled to recover those losses" despite *Robins Dry Dock¸* as the "risk of double recovery from the tortfeasor is not extant." *Id*. The *Amoco* exclusion is fully consistent with *Venore*.

Courts sometimes distinguish the "*Amoco* exception" and the "*Amoco* exclusion." The former (which does not apply in the instant case) has been understood by the Fifth Circuit as

10

"effectively recogniz[ing] an exception to the *Robins Dry Dock* rule in the case of a **collision** between two vessels not in privity of contract." *In re Marquette Transportation Gulf-Inland, LLC*, Civil Action No. 14-1961, 2015 WL 2341653, at *5 (E.D. La. May 14, 2015) (emphasis added). By contrast, the exemption "recognize[s] the inapplicability of *Robins Dry Dock* (or perhaps more accurately the lack of proscription in *Robins Dry Dock* to allowing recovery) in situations ***where the loss sought to be recovered is a loss properly recoverable by the real party in interest, the right to recovery having merely been shifted to a third party***." *Id.* (emphasis added). Furthermore, the *Amoco* exemption comports with relevant precedent, given that "[u]nder such circumstances there is no risk of double recovery, [and] there is no risk of extending foreseeable damages *ad infinitum,* put simply: such a case is not within the parameters of the evil to be remedied by *Robins Dry Dock.*" *Id.* at *5 (internal quotations omitted).

Additional caselaw further illustrates the applicability of the loss-shifting doctrine to *Robins Dry Dock*'s rule on economic damages. For example, a contractual agreement requiring the payment of a daily repair rate for a vessel in dry dock has been deemed to qualify as loss-shifting, as the agreement contractually shifted the burden of a loss resulting from an unintentional maritime tort to a non-owner claimant sufficient to justify recovery for economic damage. *Nexen Petroleum U.S.A., Inc. v. Sea Mar Div. of Pool Well Servs. Co.*, 497 F. Supp. 2d 787, 794 (E.D. La. 2007). Notably, the court in this case applied the loss-shifting doctrine despite that the operative agreement between the affected parties had been established *after* the marine tort in question had already occurred. *Id.* at 794–96. In the court's view, "[w]hether the parties did so *ex ante* or *ex post,* the [economic] claim is in the nature of an equitable subrogation [of] rights" which presented "no threat of double recovery" in a manner contrary to *Robins Dry Dock*. *Id.* at 794.

11

The foregoing authorities pertain to loss-shifting or risk-spreading and permit recovery of economic damages by non-owners, notwithstanding *Robins Dry Dock*, where the non-owner has undertaken the risk or loss caused by the maritime tortfeasor.  There are yet other exceptions or exemptions to the *Robins Dry Dock* rule that are pertinent here.  In *Icelandic Coast Guard v. United Technologies Corp.*, 722 F. Supp. 942 (D. Conn. 1989), which arose from a helicopter crash that killed four Icelandic Coast Guard (ICG) crew members, the court granted summary judgment dismissing ICG's commercial economic loss claims but denied summary judgment on its claims relating to the costs incurred by searching for and recovering the crew's bodies.  *Id*.  The court found that the search and recovery expenses were "attributable … and inextricably tied to" the personal injuries suffered by the ICG crew members as a result of the alleged defects in the helicopter precipitating the fatal crash (i.e., the underlying tort from which the claims at issue arose).  *Id.* at 948 ("[T]he claims for the costs of searching for the helicopter's crew (and, impliedly, the costs of recovering the two [crew members'] bodies that were found) arise out of 'personal injury' claims and are distinguishable from plaintiff's other claims on that basis.").  Accordingly, the search and recovery costs were cognizable in admiralty despite the plaintiff suffering no cognizable property damage.

The loss-shifting doctrine recognized in *Venore* and its progeny and the search-and-recovery doctrine recognized in *Icelandic Coast Guard* each independently support the County's damages claims here.  The County incurred significant costs in responding to the Casualty in both immediate and longer-term time frames pursuant to requests for assistance made to the County by the State (the owner of the Bridge) and the federal government, and pursuant to the County's MOU with the Maryland State Police, which expressly transfers authority (and, thus, related risks and losses) to the County in the event of emergencies like the Casualty.  And because the search-and-

12

rescue operations arose directly out of threats to life and limb suffered by numerous individuals on the Bridge at the time of the allision, the County's claims for these damages relate to "personal injury" and are cognizable in admiralty.

For similar but distinct reasons, the County's search, rescue, and recovery costs are recoverable due to the "special relationships" between the County and the DALI vessel and between the County and the State. Under federal law, the "master or individual in charge of a vessel **shall** render assistance to any individual found at sea in danger of being lost[.]" 46 U.S.C. § 2304 (emphasis added). The vessel failed to fulfill its duties to (1) be seaworthy before leaving the port, (2) provide warning signals once the crew realized they were no longer in control of the vessel, and (3) rescue individuals in peril at sea. Consequently, the County responded pursuant to its official, professional, and public-safety obligations to provide search and rescue services, as well as other response efforts related to the Casualty. The existence of the vessel's mandatory duty to render assistance creates a strong, and unrebutted, presumption that when the vessel was unable to undertake the rescue operations, and the County stepped in to carry out those operations, a special relationship extending from the vessel to the County was established. Notably, when Petitioners argued that economic loss claims should be dismissed in accordance with *General Foods Corp. v. U.S.*, they neglected to include the language, as recognized by Judge Young, that "[a] right to recover for pure economic loss in negligence has been allowed in limited situations where there is 'some special relationship between parties.'" 448 F. Supp. 111, 115 (D. 1978). Therefore, the County should be permitted to recover its economic losses given the special relationship between (1) the vessel and the County due to foreseeable substitution of rescue and response workers undertaking the vessel's duty to rescue individuals at risk of being lost at sea; and (2) the County and Maryland (the Bridge owner) based on the MOU.

13

Given that the County received requests for assistance directly from the owner of the Bridge (the State) as well as the U.S. Coast Guard, and that the County's MOU with Maryland State Police expressly assigns the primary responsibility for emergency response efforts to the County, the County necessarily assumed the risk of bearing response costs that would otherwise have fallen on the vessel itself (under 46 U.S.C. § 2304) and/or Maryland, a party with uncontested proprietary interests in the Bridge. As such, the County's damages arising from its response operations fall squarely in line with precedent from this Circuit and elsewhere excluding such damages from *Robins Dry Dock*'s prohibition on purely economic damages.

In addition, the County's MOU represents precisely the type of contractual or quasi-contractual allocation of responsibility that courts have sought to protect through the loss-shifting doctrine in relevant caselaw. The County's economic claims are non-duplicative, as the County's assistance served to diminish the costs incurred by the State and other responding units. In other words, in the absence of the MOU and the County's assistance, the same or similar costs to those incurred by the County would have been incurred by the State directly. Accordingly, the *Venore* loss-shifting doctrine is applicable to the facts at hand. Indeed, the application of the loss-shifting doctrine to the present circumstances further ensures prevention of an unjust windfall through the avoidance of liability for these damages proximately caused by the tortious misconduct of Petitioners. *See Venore*, 583 F.2d at 710-11.

Moreover, the damages for which the County seeks to recover are anything but arbitrary or abstract. Rather, in line with *Yarmouth*, 131 F.3d at 398, the County's damages relating to its response measures are concrete and calculable, and thus pose no risk of offending the bedrock concern underlying *Robins Dry Dock*, namely, the prevention of boundless recovery for speculative claims to parties not directly affected by a maritime tort. And the fact that the

14

contractual responsibilities underlying the County's argument here does not directly infringe on legislatively determined resource allocations (but, rather, arises from a contract between law enforcement bodies) fully alleviates concerns of judicial overreach expressed in past federal decisions considering the application of the loss-shifting doctrine. See, e.g., *D.C. v. Air Fla., Inc.*, 750 F.2d 1077, 1079-80 (D.C. Cir. 1984).

Finally, the nature of the expenses incurred by the County as a result of the Casualty further entitles it to recovery. As in *Icelandic Coast Guard*, the County's claims are directly linked to the expenses it incurred in its provision of search and rescue efforts related to personal injuries suffered as a result of a maritime tort. Accordingly, the County should be permitted to recover these economic damages notwithstanding *Robins Dry Dock*.

b. **The County's damage claims are compensable under the OPA and the Maryland Environmental Code.**

Independently, the County's damages are recoverable under the OPA, 33 U.S.C.A. § 2702. *See also*, *Gatlin Oil Co. v. United States*, 169 F.3d 207, 210-11 (4th Cir. 1999). The OPA specifically establishes that, "each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) that result from such incident." 33 U.S.C.A. § 2702(a). Among the recoverable damages specified under the OPA are "[d]amages for net costs of providing increased or additional public services during or after removal activities, including protection from fire, safety, or health hazards, caused by a discharge of oil, which shall be recoverable by a State, or a political subdivision of a State." 33 U.S.C.A. § 2702(b)(2)(F). Petitioners cannot credibly dispute that they are responsible for the vessel or that the vessel "discharged" oil or at least "pose[d] the substantial threat of a discharge of oil," nor that the waterway into which such discharge

15

occurred or threatened to occur is "navigable."[4]  Significantly, the OPA's framework in this regard adopts a strict liability approach to damage recovery and does not impose requirements for physical damage to a proprietary interest for claimants to recover for expressly qualified losses under the statute.

Moreover, Maryland has reiterated and augmented the OPA's approach to liability and damage recovery by adopting nearly verbatim provisions within its Code relating to environmental protections.  Specifically, Md. Code Ann., Envt § 4-401 creates, in effect, a state-level OPA to supplement the federal statute and ensure consistent recovery for parties impacted by such disasters in the State.  To this end, the State statute authorizes the recovery of "[d]amages for net costs of providing increased or additional public services during or after removal activities, including protection from fire, safety, or health hazards caused by a discharge of oil, that shall be recoverable by the State or a political subdivision of the State."  Md. Code Ann., Envt § 4-401 (c)(2)(vii).

The straightforward liability and damages recovery provisions of both the OPA and the Maryland Code expressly entitle the County, as a qualifying political subdivision of a State, to recovery for the personnel, equipment, and other related expenses it incurred through its direct provision of "increased or additional public services" in response to the Casualty and the search, rescue, and recovery efforts it necessitated.  *See* 33 U.S.C.A. § 2702(b)(2)(F); Md. Code Ann., Envt § 4-401(c)(2)(vii).  All response costs incurred by the County, including investigative, search-and-rescue, and recovery costs as well as longer-term maintenance, security, and administrative costs and future costs associated with protection of public health, are compensable under the OPA and Maryland statutory law.

---

[4] Indeed, the United States has recently asserted claims under the OPA against Petitioners in separate proceedings on this basis.

16

## II. The County has suffered damage to its proprietary interests.

The County's damages are not exhausted by costs incurred in connection with search, rescue, and recovery operations and related response actions following the Casualty. Although the County makes no claim to ownership of the Bridge itself, the County does have concrete proprietary interests in property injured or damaged by the allision, entitling it to recovery under *Robins Dry Dock*. Such property includes components of the waterway (Patapsco River) and proximate navigational channels into which debris, including tons of steel and concrete, numerous automobiles, and contaminants or pollutants including petroleum, was released and deposited as a direct result of the allision, as well as County roadways and related infrastructure impacted by the Casualty. Moreover, as *Catalyst Old River Hydroelectric Ltd. Partnership v. Ingram Barge Co.*, 639 F.3d 207, 210-11 (5th Cir. 2011) explains, where an allision disrupts a "functional component" of a claimant's property and causes a loss, even in the absence of physical damage to such property, the loss is recoverable as "damage to [a] proprietary interest" under *Robins Dry Dock*.

Contrary to Petitioners' description of the County's proprietary interests in waterways as "attenuated" (Motion at 11 ¶2), the County's proprietary interests in the surface waters, sediments, shorelines, and other components of its waterways are demonstrated and supported by, *inter alia*, the millions of dollars expended every year by the County on environmental management, maintenance, pollution controls, and remediation efforts designed to protect and restore the health, safety, and integrity of the Patapsco River system and Jones Creek. *See* Exhibit E; *Montgomery Cnty. v. Maryland-Washington Metro. Dist.*, 96 A.2d 353, 358 (Md., 1953) (recognizing that Maryland counties may hold both public and private property interests); *Gregg Neck Yacht Club, Inc. v. Cnty. Comm'rs of Kent Cnty.*, 769 A.2d 982, 1004 (Md. Ct. Spec. App., 2001) (explaining that Maryland counties hold property interests for resources in the public trust) (internal citations omitted); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004) (holding that "[a

17

municipality] may sue to protect its own proprietary interests that might be congruent with those of its citizens" with the understanding that, "[t]he proprietary interests that a municipality may sue to protect are as varied as a municipality's responsibilities, powers, and assets.") (internal quotations and citations omitted).  Such interests are further demonstrated by the very existence of the County's MOU with the Maryland State Police and its immediate response to the Casualty in real time, as well as its continued dedication to public health and safety in the weeks and months to come.  The Patapsco River is a part of the County's municipal separate storm sewer system (MS4) and the County conducts a variety of watershed restoration projects for the purpose of protecting water quality and, ultimately, public health and safety through its MS4 obligations.  *See* Exhibit E; *see also* Baltimore County Department of Environmental Protection and Sustainability, "Watershed Restoration," *available at*:

https://www.baltimorecountymd.gov/departments/environment/watersheds/restoration

(explaining County programs structuring environmental protection and restoration of County natural resources, including stream restoration and stabilization, shoreline protection and management, and waterway dredging of waterways within County jurisdiction); Exhibit F (2025 NPDES MS4 Annual Report, setting forth principles, authorities, projects, and budgetary information concerning watershed and environmental quality and maintenance efforts undertaken by the County).  The County is, further, investigating the need for dredging or other measures in portions of the Patapsco River and Jones Creek to offset impacts flowing directly from the Casualty.

In addition to the waterways in which the County holds proprietary interests, the County maintains and operates numerous roadways that have been adversely impacted by the Casualty. Because the tens-of-thousands of vehicles, including heavy industrial and HazMat vehicles,

18

previously utilizing the Bridge on a daily basis have had to be redirected to roadways not intended for and not ordinarily utilized to the same extent, the Casualty has caused substantial premature depreciation and increased wear-and-tear on County roadways.  These impacts translate to excess costs necessarily to be borne by the County on roadway maintenance and repair.  Indeed, in the more than two years since the Casualty, the County estimates it has already had to spend millions of dollars on repairs and maintenance work due to traffic diversion, documenting an at least 25% uptick in repair and maintenance work on the roadways most directly impacted by the traffic diversions necessary due to the Casualty.  *See* Exhibit D.

The Fifth Circuit's analysis in *Catalyst Old River* is instructive in this regard.  639 F.3d at 207-211.  There, a hydroelectric plant owner brought suit against a barge interest that owned a vessel which drifted into an intake channel used by the plant.  The barge did not strike or physically damage plant property but disrupted the flow of water, necessitating the plant's reduction of water intake and temporary operational closures.  The Fifth Circuit ruled that the disruption of the intake channel, critical to the plant's operations, impaired the plant's functioning sufficiently to constitute an "invasion of a proprietary interest."  *Id.* at 210.  The intake channel being a "functional component" of the plant, its disruption by the barge "impair[ed] the ability of the facility to operate as designed," which "qualifies as damage to [the plant's] proprietary interest."  *Id.* at 211.  As this analysis shows, disruption or interruption of a "functional component" of a system that "impairs its ability to operate as designed" constitutes a sufficient "proprietary interest" to warrant recovery.

As applied here, the Casualty disrupted or interrupted a functional component of the County's complex municipal transportation system, impairing its ability to operate as designed insofar as necessary traffic diversions have substantially deteriorated its roadways.  *See* Exhibit D.  The centrality of the Bridge to the County transportation system confers on the County a sufficient

19

proprietary interest in the Bridge to warrant recovery of financial costs associated with those impairments.  For similar reasons, the same reasoning applies to the County's interest in its waterways: the Casualty disrupted or interrupted a functional component of the County's comprehensive environmental and watershed management system.  *See* Exhibits E – F.

Nor is *Catalyst Old River* an outlier.  *See, e.g.*, *Matter of Bruce Oakley, Inc.*, No. CV-19-184-RAW-JAR, 2025 WL 1090964, at \*12 (E.D. Okla. Mar. 3, 2025) (allision of barge with dam interfered with hydroelectric facility; allowing recovery for economic loss associated with that facility, since "the allision of the barges with the dam precluded the generation of electricity for a period of time, demonstrating the essential nature of the dam to the hydroelectric facility in carrying out its functions"); *see also Domar Ocean Transp., Ltd., Div. of Lee-Vac, Ltd. v. M/V Andrew Martin*, 754 F.2d 616, 619 (5th Cir. 1985) (awarding consequential economic damages for loss of optimal use of an "integrated unit," recognizing entity's "proprietary interest in the combination," and awarding economic damages where non-damaged portion was used but not to its full capacity); *Blessey Enterprises v. M/V James E. Philpott*, 1996 WL 267997 (E.D. La. 1996) (recognizing right to "recover for loss of use of the unit.").

By their Motion, Petitioners seek judgment on the pleadings.  Discovery concerning the County's claimed proprietary interests in components of the Patapsco River and Jones Creek and other properties has not commenced.  Although the County has produced certain documents to Petitioners concerning these proprietary interests, Petitioners have not engaged with any such documents and the County has not been provided an opportunity to develop the factual record due to the phasing of this litigation to date.  Petitioners seek a summary determination, on an entirely undeveloped record, that the County's proprietary interests are simply nonexistent.  The Motion is, accordingly, premature and unfounded.  At a minimum, the County's alleged proprietary

20

interests preclude entry of judgment on the pleadings because, to properly assess such allegations and the facts on which they are based, the Court requires an evidentiary record. The Motion should be denied and the parties ordered to complete discovery on the nature and extent of proprietary interests held by the County in connection with property damaged or injured by the Casualty.

### III. The County's claims for relief sounding in public nuisance are not foreclosed by *Robins Dry Dock*.

Petitioners' Motion additionally misapprehends the relationship between the County's public nuisance claims and *Robins Dry Dock* in the instant matter. In contrast to Petitioners' characterization of the County's public nuisance claims as an inapplicable "exception" to *Robins Dry Dock* (Motion at 16 n.18), such claims are not economic loss or damages claims at all. They are equitable claims for injunctive relief and, because the County is a public entity or official, it is not required to plead or prove "special damages" to sustain its public nuisance theory. Courts interpreting *Robins Dry Dock* rarely consider public nuisance claims and, when they do, such claims have typically been asserted by private actors bound to make a showing of "special" or "particular" damages that are purely economic in nature, which results in *Robins Dry Dock* barring those claims. That analysis fails in this case. The County's public nuisance claim belongs exclusively to a public entity forced to remedy and manage the nuisance condition created by Petitioners. *Robins Dry Dock* does not foreclose these claims.

Petitioners argue that maritime law does not recognize a cause of action for public nuisance and instead construes a nuisance as "a type of damage" (Motion at 17 (quoting *Testbank*, 752 F.2d at 1030-31)). Relying on the *Testbank* Court's analysis, Petitioners maintain that proving nuisance "damage" is no different than proving pure economic losses. *Id.* *Testbank*, however, did not consider a nuisance theory advanced by a public entity and its reservations were premised expressly on the purported difficulty of establishing "sufficient 'particular damage' to support [a]

21

private action [for a public nuisance]. . . ." *Id.* (modifications in original). Even assuming that nuisance is a "type of damage" rather than a standalone theory of liability, it does not follow that such "damage" is purely economic or of the kind prohibited by Petitioners' reading of *Robins Dry Dock*. Courts sitting in admiralty have equitable powers sufficient to remedy an alleged nuisance. *See, e.g.*, *Vaughn v. Atkinson*, 369 U.S. 527, 530 (1962) ("[E]quity is no stranger in admiralty; admiralty courts are, indeed, authorized to grant equitable relief.").

Here, the Casualty and resulting loss of the Key Bridge has created a significant, unreasonable disruption to public health, safety, infrastructure access, and convenience, and its ongoing absence continues that disruption. Moreover, the forthcoming rebuild of the Bridge will constitute additional and evolving public nuisance conditions for years to come that will be inescapably imposed upon the County and its public. Accordingly, the nuisance conditions resulting from Petitioners' conduct represent an ongoing interference with public interests warranting equitable relief that is squarely within the competence of this Court. At minimum, following discovery and trial, the County will seek an order of abatement requiring Petitioners to eliminate the nuisance conditions they caused to the detriment of the Baltimore County public, independent of any economic recovery. As such, the County's public nuisance claims here do not represent economic damages and do not fall within the purview of *Robins Dry Dock* at all.

## IV. The County joins and incorporates by reference certain additional arguments set forth in the City's opposition brief.

In the interests of judicial economy and to avoid unnecessary repetition, the County joins and incorporates by reference certain additional arguments set forth in the opposition brief of claimant Mayor & City Council of Baltimore ("City Opp."). The County respectfully requests that, to the extent the Court considers the City's arguments concerning the "Saving to Suitors" provision of 28 U.S.C. § 1333 (City Opp. at V.B); the "intentional act exception" to *Robins Dry*

22

*Dock* (City Opp. at V.F); and due process (City Opp. at V.G), the Court consider those arguments as having been presented by the County as well.[5]

## CONCLUSION

For the foregoing reasons, the Court should deny Petitioners' Motion as to Baltimore County.

Date: July 6, 2026

Respectfully submitted,

/s/ *Kyle J. McGee*
Kyle J. McGee

**BALTIMORE COUNTY OFFICE OF LAW**
James R. Benjamin, Jr. (Bar No. 27056)
jrbenjamin@baltimorecountymd.gov
Jennifer R. Frankovich (Bar No. 26052)
jfrankovich@baltimorecountymd.gov
401 Washington Avenue, Suite 219
Towson, Maryland 21204
Tel. (410) 887-4420
Fax. (410) 296-0931

**BEKMAN, MARDER, HOPPER, MOORE & QUINN, L.L.C.**
Paul D. Bekman (Bar No. 00019)
bekman@mdtrialfirm.com
1829 Reisterstown Road, Suite 200
Baltimore, MD 21208
Tel. (410) 539-6633
Fax.: (410) 625-9554

---

[5] The County's references to sections of the City's brief are based on a preliminary draft; section numbers may have changed in the final version.  The County respectfully requests that the Court consider its incorporation by reference to refer to the final section numbers of the referenced portions based on the substance of those arguments as indicated above.

23

**GRANT & EISENHOFER P.A.**

Kyle J. McGee (*pro hac vice*)
kmcgee@gelaw.com
123 S. Justison Street
Wilmington, DE 19801
Tel.: (302) 622-7000
Fax.: (302) 622-7100

*Attorneys for Claimant Baltimore County*

24

## <u>CERTIFICATE OF SERVICE</u>

In compliance with Local Rule 102.1(c), I hereby certify that on the 6th day of July, 2026, I electronically filed the foregoing pleading with the Clerk of Cert by using the CM/ECF system, which will send notice of electronic filing to all counsel who are CM/ECG participants.

<u>/s/ *Kyle J. McGee*        </u>