**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| In the Matter of the Petition<br><br>of<br><br>GRACE OCEAN PRIVATE LIMITED, as Owner of the M/V DALI,<br><br>and<br><br>SYNERGY MARINE PTE LTD, as Manager of the M/V DALI,<br><br>for Exoneration from or Limitation of Liability, | Docket No. JKB 24-cv-941<br><br>*IN ADMIRALTY* |

**THE PRIVATE ECONOMIC LOSS CLAIMANTS' OMNIBUS RESPONSE IN OPPOSITION TO PETITIONERS' MOTION FOR JUDGMENT ON THE PLEADINGS**

1

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ........................................................................................................1

II.    STATEMENT OF FACTS ........................................................................................3

III.   STATEMENT OF PROCEDURE............................................................................4

IV.    LEGAL STANDARD................................................................................................5

   A.    Judgment on the Pleadings....................................................................................5

   B.    Conversion to Summary Judgment........................................................................5

V.     ARGUMENT..............................................................................................................6

   A.    THIS COURT SHOULD NOT ADJUDICATE PETITIONERS' MOTION BEFORE
A DETERMINATION ON LIMITATION OF LIABILITY AND WITHOUT
AFFORDING PEL CLAIMANTS THEIR RIGHTS UNDER THE SAVING TO
SUITORS CLAUSE ................................................................................................6

     i.    The Limitation Act Does Not Override the Saving to Suitors Clause........................7

     ii.   This Court Should Not Decide The Applicability of *Robins* in a Limitations
Proceeding...........................................................................................................8

   B.    *ROBINS* DOES NOT PREEMPT MARYLAND LAW ON ECONOMIC LOSS AND
PUBLIC NUISANCE. ...........................................................................................11

   C.    *ROBINS* DOES NOT BAR THE CLAIMS ................................................................14

     i.    *Robins* Does Not Bar Economic Losses Arising From Intentional Conduct.............16

     ii.   PEL Claimants Suffered Harm From the Allision That Was Foreseeable, And
Therefore Recoverable.........................................................................................18

     iii.  PEL Claimants Who Have a Contractual Relationship With Petitioners Can Recover
Economic Losses Arising From the Allision Because They Fall Within the Well-
Established Privity Exception to *Robins*...................................................................19

       a.   The Privity Exception to *Robins* Is Well-Established In the Fourth Circuit and
Elsewhere .......................................................................................................20

       b.   The Contract Between Privity Claimants and Petitioners Renders *Robins*
Inapplicable to Those Claims...............................................................................21

       c.   Longshoremen Labor Under the Same BMTA Contract that Binds PAC And
Petitioners, and Thus Are Also Subject to the Same Privity Exception to *Robins*.
.......................................................................................................................25

i

    iv.    PEL Claimants May Recover for Pollution-Related Economic Losses Because Congress Abrogated *Robins* for Such Claims...........................................................26

    v.    Claimant Star Bulk Has Properly Alleged A Claim Under the Oil Pollution Act.....28

  D.    THE CLASS ACTION CLAIMANTS ADEQUATELY ALLEGE CLASS CLAIMS29

  E.    THE NATURE OF RULE F(5) CLAIMS AND THE CIRCUMSTANCES OF FILING IN THIS PROCEEDING INDEPENDENTLY WARRANT LEAVE TO AMEND....31

  F.    PETITIONERS' REQUEST THAT THE MOTION BE CONSIDERED UNDER RULE 56 SHOULD BE DENIED................................................................................34

VI.    CONCLUSION...........................................................................................................35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Petroleum and Transport, Inc. v. City of New York*,
   737 F.3d 185 (2d Cir. 2013)................................................................................16

*Amoco Transport Co. v. S/S Mason Lykes*,
   768 F.2d 659 (5th Cir. 1985) ........................................................................15, 19

*Ballard Shipping Co. v. Beach Shellfish*,
   32 F.3d 623 (1st Cir. 1994)......................................................................12, 13, 17

*Barber Lines A/S v. M/V Donau Maru*,
   764 F.2d 50 (1985)............................................................................................21

*Beiswenger Enterprises Corp. v. Carletta*,
   86 F.3d 1032 (11th Cir. 1996) ...........................................................................32

*In re Bethlehem Steel*,
   631 F.2d 441 (6th Cir. 1980) .............................................................................19

*Bryant v. Koppers, Inc.*,
   627 F. Supp. 3d 466 (D. Md. 2022), *aff'd,* 2023 WL 3053017 (4th Cir. Apr.
   24, 2023) ........................................................................................................14

*Butler v. United States*,
   702 F.3d 749 (4th Cir. 2012) ..............................................................................5

*Cassidy v. Murray*,
   34 F. Supp. 3d 579 (D. Md. 2014).....................................................................13

*Christianson v. Colt Indus. Operating Corp.*,
   486 U.S. 800 (1988)...........................................................................................6

*In re Complaint of Marine Nav. Sulphur Carriers, Inc.*,
   507 F. Supp. 205 (E.D. Va. 1980), *aff'd* 638 F.2d 700 (4th Cir. 1981)..................16

*In re Complaint of Nautilus Motor Tanker Co., Ltd.*,
   900 F. Supp. 697 (D.N.J. 1995) .........................................................................13

*In re Deepwater Horizon*,
   784 F.3d 1019 (5th Cir. 2015).............................................................................17

*Edwards v. City of Goldsboro*,
   178 F.3d 231 (4th Cir. 1999) ..............................................................................5

*Erie R. Co. v. Tompkins*,
304 U.S. 64 (1938)..................................................................................................14

*In re Exxon Valdez*,
270 F.3d 1215 (9th Cir. 2001) ...............................................................................13

*Foman v. Davis*,
371 U.S. 178 (1962)................................................................................................33

*Matter of G&J Fisheries, Inc.*,
67 F.4th 20 (1st Cir. 2023)......................................................................................32

*Gay v. Wall*,
761 F.2d 175 (4th Cir. 1985) ....................................................................................5

*Matter of Grace Ocean Private Ltd.*,
765 F. Supp. 3d 461 (D. Md. 2025).................................................................. *passim*

*State of Louisiana ex rel. Guste v. M/V Testbank*,
752 F.2d 1019 (5th Cir. 1985) ................................................................................16

*Herrera v. Charlotte School of Law, LLC*,
818 F. App'x 165 (4th Cir. 2020) ...........................................................................31

*Jacques v. First Nat. Bank of Maryland*,
515 A.2d 756 (Md. 1986) ........................................................................................14

*King v. Rubenstein*,
825 F.3d 206 (4th Cir. 2016) ....................................................................................5

*Kingston Shipping Co., Inc. v. Roberts*,
667 F.2d 34 (11th Cir. 1982) ..................................................................................17

*Petition of Kinsman Transit Co.*,
338 F.2d 708 (2d Cir. 1964)................................................................................... 18

*Lake Tankers Corp. v. Henn*,
354 U.S. 147 (1957)..............................................................................................8, 9

*Lewis v. Lewis & Clark Marine, Inc.*,
531 U.S. 438 (2001)........................................................................................ *passim*

*Lloyd's Leasing Ltd. v. Bates*,
902 F.2d 368 (5th Cir. 1990) ..................................................................................29

*Louisville & N. R. Co. v. M/V Bayou Lacombe*,
597 F.2d 469 (5th Cir. 1979) ..................................................................................17

*MTA Metro-North R.R. v. Buchanan Marine, L.P.*,
  2006 WL 3655244 (D. Conn. Dec. 12, 2006)................................................................18

*In re Muer*,
  146 F.3d 410 (6th Cir. 1998) ......................................................................................10

*National Steel Corp. v. Great Lakes Towing Co.*,
  574 F.2d 339 (6th Cir. 1978) ......................................................................................19

*Nautilus Marine, Inc. v. Niemela*,
  170 F.3d 1195 (9th Cir. 1999) ....................................................................................18

*Nexen Petroleum U.S.A., Inc. v. Sea Mar Division of Pool Well Services Co.*,
  497 F. Supp. 2d 787 (E.D. La. 2007)..........................................................................20

*In re Oil Spill*,
  970 F. Supp. 2d 524 (E.D. La. 2013)...........................................................................17

*Ortiz v. Fibreboard Corp.*,
  527 U.S. 815 (1999)................................................................................................29, 30

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
  861 F.3d 502 (4th Cir. 2017) ........................................................................................5

*Pickle v. Char Lee Seafood, Inc.*,
  174 F.3d 444 (4th Cir. 1999) ....................................................................................7, 8

*Price v. Atl. Ro-Ro Carriers*,
  45 F. Supp. 3d 494 (D. Md. 2014)...............................................................................11

*Robins Dry Dock & Repair Co. v. Flint*,
  275 U.S. 303 (1927)............................................................................................. *passim*

*Skanska USA Civil Se. Inc. v. Bagelheads, Inc.*
  75 F.4th 1290 (11th Cir. 2023) ..............................................................................9, 10

*Sol v. M&T Bank*,
  713 F. Supp. 3d 89 (D. Md. 2024).................................................................................5

*Southern Pacific Co. v. Jensen*,
  244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917)....................................................11

*Standard Navigazione v. K.Z. Michalos*,
  1981 A.M.C. 748 (S.D.Tex.1981) ...............................................................................20

*Matter of Tappan Zee Constructors, LLC*,
  2018 WL 1183711 (N.D.N.Y. Mar. 6, 2018) ..............................................................32

*In re Tetra Applied Technologies, L.P.*,
   362 F.3d 338 (5th Cir. 2004) ....................................................................................9

*In re Tidewater Inc.*,
   249 F.3d 342 (5th Cir. 2001) ...............................................................................9, 10

*United States v. Aramony*,
   166 F.3d 655 (4th Cir. 1999) ....................................................................................6

*Venore Transp. Co. v. M/V Struma*,
   583 F.2d 708 (4th Cir. 1978) ............................................................................ *passim*

*W.C. & A.N. Miller Dev. Co. v. Cont'l Cas. Co.*,
   814 F.3d 171 (4th Cir. 2016) ....................................................................................5

*Walker v. Mead*,
   2014 WL 12726434 (W.D. Ark. 2014)...................................................................32

*Wheeler v. Marine Navigation Sulphur Carriers, Inc.*,
   764 F.2d 1008 (4th Cir. 1985) ..................................................................................6

*Yarmouth Sea Products, Ltd. v. Scully*,
   131 F.3d 389 (4th Cir. 1997) ..................................................................................16

**Statutes**

28 U.S.C. § 1333(1) ..........................................................................................6, 8, 13

33 U.S.C. § 2702(b)(2)(E) ....................................................................................28

42 U.S.C. § 9601(14) .............................................................................................27

42 U.S.C. § 9607(a) ...............................................................................................27

42 U.S.C. § 9607(h) ..........................................................................................26, 27

46 U.S.C. §§ 30501 *et seq.*.............................................................................. *passim*

Oil Pollution Act of 1990.......................................................................................28

**Other Authorities**

33 C.F.R. § 164.11(k) .............................................................................................23

40 C.F.R. § 302.4, Table 302.4..............................................................................27

46 C.F.R. § 4.05-1..................................................................................................23

Fed. R. Civ. P. 8....................................................................................................16, 31

vi

Fed. R. Civ. P. 12 .......................................................................................................... *passim*

Fed. R. Civ. P. 15 ....................................................................................................................33

Fed. R. Civ. P. 23 ...............................................................................................................29, 30

Fed. R. Civ. P. 56 .......................................................................................................... *passim*

Fed. R. Civ. P. Supp. R. F(5) ........................................................................................ *passim*

Restatement 2d of Torts § 281 ..............................................................................................19, 20

5C Wright & Miller, Federal Practice & Procedure § 1366 (3d ed.2004, 2011
    Supp.) ....................................................................................................................................6

## I.    INTRODUCTION

Through a Motion for Judgment on the Pleadings ("Petitioners' Motion"), Petitioners Grace Ocean Private Limited and Synergy Marine Pte Ltd (collectively, "Petitioners") seek to evade accountability for the intentional conduct that caused the M/V Dali's ("M/V Dali" or "Vessel") allision with the Francis Scott Key Bridge (the "Allision"), which caused the bridge to collapse into the Patapsco River and closed the Port of Baltimore for 78 days. Petitioners' Motion is based on one nearly century-old Supreme Court case: *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927). But at this stage in this litigation, there is simply no "Get Out of Jail Free Card" that allows Petitioners to duck liability for triggering one of the greatest catastrophes in the history of Baltimore.

Above all else, Petitioners' Motion must be denied as premature. The existence of a Limitation of Liability Act ("Limitation Act") proceeding does not override the rights of the Private Economic Loss Claimants ("PEL Claimants")[1] under the Saving to Suitors Clause to choose the forum in which to have their claims heard—and therefore this Court may not dispose of PEL Claimants' claims before resolving the threshold limitations question and allowing PEL Claimants to decide the forum in which they want the merits of their claims to be adjudicated. This is particularly significant because federal courts have consistently held that *Robins* is not federal maritime law and thus does not preempt Maryland state law on economic loss under clear Supreme

---

[1]Pursuant to this Court's Case Management Orders, the claimants in this matter were organized into seven different groups or silos. The Private Economic Loss Claimant group is comprised of the following claimants: (1) Alonzo Key; (2) American Publishing LLC; (3) American Sugar Refining, Inc.; (4) Markel Syndicate Management Limited et al., as Assignees and Subrogees of Ports America Chesapeake, LLC; (5) B&R Construction Services, Inc.; (6) Captain Logistics LLC; (7) Charles Peacock; (8) Consol Energy Inc.; (9) Donny Jackson; (10) Douglas Ramos; (11) E. Marine Motor Yacht Sales Pty Ltd.; (12) Florida Sugar & Molasses Exchange, Inc.; (13) Gerald Barney; (14) International Trade Solutions, Inc.; (15) Mukesh Desai on behalf of R.M. Metals; (16) Penn Manufacturing Industries, LLC; (17) PMI Eng. Exports Private Ltd.; (18) PMI Global Technologies Pvt. Ltd.; (19) R.E. West, Inc.; (20) Ryan Hale; (21) Star Bulk (Singapore) Pte. Ltd.; (22) Thomas Crawley; (23) Tulani Hasan; and (24) Underwood Energy, Inc.  Many of these claimants are organized into classes and will be discussed as such below. But for purposes of this Opposition all will be collectively referred to as the Private Economic Loss Claimants or PEL Claimants.

Court precedent. As a result, *Robins* would not apply to PEL Claimants' claims if and when they choose to bring them under Maryland law—either in Maryland state court or in this Court applying Maryland law. These issues unequivocally dispose of Petitioners' motion without even reaching the question of whether *Robins* would bar PEL Claimants' claims.

But even if this Court were inclined to disregard these barriers and rule on the merits of Petitioners' Motion, PEL Claimants have pled facts that meet numerous recognized exceptions to *Robins'* bar on recovery of economic losses. First, *Robins* applies only to negligent conduct, and PEL Claimants have alleged intentional acts by Petitioners—including, but not limited to, the willful failure to report power losses in the days and hours leading up to the disaster— that led directly to the M/V Dali losing power and alliding with the Key Bridge.  Second, PEL Claimants' economic losses were a foreseeable consequence of Petitioners' conduct such that they are exempt from the concerns in *Robins* about protecting tortfeasors from limitless liability. Third, certain PEL Claimants have a direct contractual relationship with Petitioners, creating a special duty that overrides *Robins.* Lastly, PEL Claimants have pled pollution-related harm that is exempt from *Robins* under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and the Oil Pollution Act ("OPA"). For these reasons, this Court should deny outright Petitioners' simplistic and hasty effort to avoid the direct economic consequences of the disaster caused by their intentionally tortious acts.

Additionally, a subset of PEL Claimants has appropriately alleged class claims, which are—contrary to Petitioners' Motion—entirely compatible with a limitations proceeding.

Finally, the inherently premature nature of Petitioners' Motion entitles PEL Claimants to preliminary relief should this Court nonetheless decide to rule on the merits of the Motion. First, to the extent it finds PEL Claimants' facts insufficiently pled, this Court should grant PEL

Claimants leave to amend their pleadings in light of the fact that their claims were made before they could fully investigate the underlying facts and in reliance on the assumption that a limitation proceeding would not adjudicate the merits of their claims. And second, while this Court should *not* convert Petitioners' Motion into a Motion for Summary Judgment given the amount of discovery still left to conduct, if it is nonetheless inclined to do so, it should allow for supplemental briefing in order to permit PEL Claimants to put the full weight of evidence demonstrating Petitioners' intentional conduct leading to the Allision before this Court.

## II.    STATEMENT OF FACTS

The Court is intimately familiar with the facts of this case, including the events leading to the Allision and its aftermath. Given the early timing of the claims due to the nature of the Limitations Act proceedings, the "pleadings" upon which this motion is based were filed far earlier than might have otherwise been made in the ordinary course of litigation. Many more material facts have been adduced since then, through discovery and otherwise. The pled facts, which are largely summarized in Exhibit 1 and applied to the legal arguments made in this brief, are more than sufficient to deny Petitioners' Motion. Substantively, PEL Claimants have pled fraud, illegality, and intentional conduct in various manners discussed specifically *infra*. The record contains facts sufficient to prove no less than eighteen acts of negligence and seven instances of the M/V Dali's unseaworthiness on the night of the Allision.

Should this Court convert the Motion into a Motion for Summary Judgment, however, PEL Claimants request that the Court consider the Pretrial Order Claimants' Statement of Facts, ECF No. 723-1, as incorporated herein and attached as Exhibit 2, as well as the admissions of the M/V

3

Dali's Chief Engineer, Karthikeyan Deenadayalan, contained in his deferred prosecution agreement, attached hereto as Exhibit 3.[2]

### III.    STATEMENT OF PROCEDURE

On April 1, 2024, six days after the Allision, Petitioners raced to this Court to invoke the Limitation Act and secure an automatic stay of all other proceedings. *See* ECF No. 1; *Matter of Grace Ocean Private Ltd.*, 765 F. Supp. 3d 461, 465 (D. Md. 2025) ("*Grace Ocean*"). Claimants immediately and consistently preserved their rights under the Saving to Suitors Clause. *See e.g.* ECF No. 406, Joint Status Report at 9 (Oct. 22, 2024) (expressly raising the interplay between the Saving to Suitors Clause and *Robins* while reserving all rights thereunder); ECF No. 240, Markel Answer (Fourteenth Affirmative Defense stating "Claimants specifically reserve the right to pursue all available claim in State Court …."). Case Management Order No. 3 then established the framework of this proceeding, confining Phase 1 to the limitation question and rejecting Petitioners' request to litigate ultimate liability issues at the same time, guided by "(1) the purposes and limitations of a limitation action; and (2) the Court's intent to bring a practical, pragmatic perspective to the case." *Grace Ocean*, 765 F. Supp. 3d at 471–72. The parties proceeded in reliance on that framework, conducting discovery, retaining experts, and preparing for trial, all with the understanding that *Robins* was a Phase 2 issue to be addressed, if at all, only after the threshold limitation question was resolved. Just before beginning trial, Petitioners moved to stay proceedings on the ground that the rush of recent settlements had left only economic loss claims pending. *See* June 1, 2026, Transcript at 5:2–11:11, attached as Exhibit 4. The Court granted the stay and directed briefing on the applicability of *Robins*. *Id.* at 49:23–50:20.

---

[2] PEL Claimants note that if the Court were inclined to address a motion for summary judgment on Privity and Knowledge, these admissions alone are sufficient to warrant dismissal of the Petition for Limitation.

## IV.   LEGAL STANDARD

### A.   Judgment on the Pleadings

A Rule 12(c) motion for judgment on the pleadings is assessed under the same standard as a Rule 12(b)(6) motion to dismiss. *Butler v. United States*, 702 F.3d 749, 751-52 (4th Cir. 2012); *W.C. & A.N. Miller Dev. Co. v. Cont'l Cas. Co.*, 814 F.3d 171, 175-76 (4th Cir. 2016). The Court must take all factual allegations in the pleadings as true and draw all reasonable inferences in favor of the non-moving party. *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). Critically, a Rule 12(c) motion "should only be granted if it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 861 F.3d 502, 506 (4th Cir. 2017), (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)).

### B.   Conversion to Summary Judgment

Courts should exercise "great caution and attention to the parties' procedural rights" 5C Wright & Miller, Federal Practice & Procedure § 1366, at 149 (3d ed.2004, 2011 Supp.) when deciding whether to convert to summary judgment under Rule 56 any claims not dismissed on 12(c) grounds. A court's conversion of a motion to dismiss to a motion for summary judgment "is not appropriate when the parties have not had an opportunity to conduct reasonable discovery." *Id.; see also Gay v. Wall*, 761 F.2d 175, 177-78 (4th Cir. 1985) (holding that the district court abused its discretion by converting the motion to dismiss into one for summary judgment because the plaintiff had not had a reasonable opportunity to complete discovery); *Sol v. M&T Bank*, 713 F. Supp. 3d 89, 100 (D. Md. 2024).

## V.    ARGUMENT

### A.    THIS COURT SHOULD NOT ADJUDICATE PETITIONERS' MOTION BEFORE A DETERMINATION ON LIMITATION OF LIABILITY AND WITHOUT AFFORDING PEL CLAIMANTS THEIR RIGHTS UNDER THE SAVING TO SUITORS CLAUSE

This Court should deny Petitioners' Motion due to the well-established interplay between the Limitation Act, 46 U.S.C. §§ 30501 *et seq.*, and the Saving to Suitors Clause, 28 U.S.C. § 1333(1), which bars the merits ruling that Petitioners' Motion seeks.

This Court recognized early in this litigation that the "limited purpose" of a limitation action is "deciding whether vessel owners are entitled to limitation" and that it "is not intended to provide a single forum to decide ultimate questions of liability." *Grace Ocean*, 765 F. Supp. 3d at 470 (quoting *Wheeler v. Marine Navigation Sulphur Carriers, Inc.*, 764 F.2d 1008, 1011 (4th Cir. 1985)). This Court structured this proceeding accordingly in Case Management Order No. 3 (ECF No. 438), confining Phase 1 to "those determinations necessary to resolving whether Petitioners are entitled to exoneration from or limitation of liability" and explicitly "reject[ing] Petitioners' request that the Court determine ultimate issues of liability during Phase 1 as well." *Grace Ocean*, 765 F. Supp. 3d at 472.[3]  Petitioners' Motion is, in substance, a request to determine ultimate issues of liability and the merits of PEL Claimants' claims <u>before</u> the threshold limitation question has

---

[3] Case Management Order No. 3 is arguably law of the case when it comes to the scope of Phase 1 of this litigation. In general, "[w]hen court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999), citing *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800 (1988). This Court would be justified in revisiting the scope of Phase 1 if "(1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice." 166 F.3d at 661 (citation omitted). However, none of these factors are present here—there has been no subsequent trial, no recent change in controlling authority around the Saving to Suitors Clause, and (as set forth herein) every reason to believe that this Court's initial instincts regarding the fairness of limiting Phase 1 to Limitation on Liability are correct.

ever been resolved and the stay lifted for PEL Claimants to pursue their claims in the forums of their choice.

The Limitations Act matter before this Court remains, as it has always been, a proceeding to determine whether Petitioners may limit their liability, not to weigh the merits of PEL Claimants' claims. *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 453 (2001). The Court's discretion to manage this proceeding does not extend to deciding the merits of claims within a Limitation Act proceeding, which would constitute legal error for the reasons set forth below. At the June 1, 2026 hearing, the Court acknowledged that it had previously declined to take up *Robins* precisely because "[r]esolving the *Robins*-related claims first did not promote judicial efficiency then when claims that didn't implicate *Robins* were nonetheless pending." June 1, 2026, Tr. at 9:2–9, Ex. 4. In that hearing, this Court reasoned that the efficiency calculus has shifted because "all that's left in this case are claims for pure economic loss."  Even these developments had judicial efficiency implications (which PEL Claimants do not concede), they do not override PEL Claimants' rights under federal law and CMO No. 3.And even if the Court views itself as having the discretion pursuant to its inherent authority to manage its docket, it should decline to exercise such discretion in a manner that could permanently strip PEL Claimants of their right to have their claims adjudicated in forums of their choosing and before juries.

### i.    The Limitation Act Does Not Override the Saving to Suitors Clause

The existence of a Limitation Act proceeding does not limit a plaintiff's right to choose the venue for his substantive claims under the Saving to Suitors Clause. The Limitation Act permits a shipowner to limit liability for maritime losses to the post-voyage value of the vessel and its pending freight, provided the loss occurred without the owner's privity or knowledge. *Pickle v. Char Lee Seafood, Inc.*, 174 F.3d 444, 448 (4th Cir. 1999); *Grace Ocean*, 765 F. Supp. 3d at 465. As this Court has noted, "the Limitation Act has only a 'limited purpose' of deciding whether

7

vessel owners are entitled to limitation; it is not intended to provide a single forum to decide ultimate questions of liability." *Grace Ocean*, 765 F. Supp. 3d at 469-70 (quoting *Wheeler*, 764 F.2d at 1011). As the Supreme Court has made clear, the Act is "not one of immunity from liability but of limitation of it." *Grace Ocean*, 765 F. Supp. 3d at 469–70, quoting *Lake Tankers Corp. v. Henn*, 354 U.S. 147, 152 (1957).

At the same time, the Saving to Suitors Clause is a provision in federal law that allows plaintiffs to pursue state common law remedies for maritime claims. *Lewis*, 531 U.S. at 443–44, 454–55. The clause itself states that while "district courts shall have original jurisdiction, exclusive of the courts of the States, of … [a]ny civil case of admiralty or maritime jurisdiction," this grant is subject to the crucial caveat that it "sav[es] to suitors in all cases all other remedies to which they are otherwise entitled."  28 U.S.C. § 1333(1).

This Court has rightly recognized that Limitations Act proceedings are subject to the Saving to Suitors Clause: "[I]n order to protect the rights of claimants to pursue state-law *in personam* claims in the forum of their choosing, federal courts typically maintain the concursus only until a decision on limitation has been made; if limitation of liability is denied, the stay is lifted, and claimants are given the choice of remaining in the federal action or bringing suit in the forum of their choosing." *Grace Ocean*, 765 F. Supp. 3d at 466-67 (citing *Pickle*, 174 F.3d at 451).

> ### ii. This Court Should Not Decide The Applicability of *Robins* in a Limitations Proceeding.

Petitioners' Motion does not present a question of limitation, but rather whether PEL Claimants have legally cognizable claims at all. This is a merits question that, if decided now, would dispose of those claims with preclusive finality, in a bench proceeding PEL Claimants never chose, without any opportunity to pursue the remedies before a jury Congress preserved to them for over two centuries.

Courts have consistently rejected efforts to inject ancillary or non-Limitations Act issues into a Limitation Act proceeding. The Eleventh Circuit in *Skanska USA Civil Se. Inc. v. Bagelheads, Inc.* 75 F.4th 1290 (11th Cir. 2023), affirmed a district court's refusal to apply *Robins* to economic loss claims in a Limitation Act proceeding. 75 F.4th 1290 (11th Cir. 2023). Skanska filed petitions under the Limitation Act after 28 barges broke loose during Hurricane Sally and allided with a bridge, closing the bridge and harbor for months. Following trial on limitation, the district court found that Skanska was negligent and had knowledge of its negligence. *Id.* at 1302. Prior to that decision, Skanska had filed a motion to dismiss all economic loss claims under *Robins*, but the district court did not rule on it before dismissing Skanska's petition for exoneration or limitation of liability and dissolving the injunction barring prosecution of related litigation. *Id.* Skanska appealed, arguing that the district court was required to decide every element of negligence for every claimant, including the availability of damages, before turning to the limitation question, which would have allowed the economic loss claims to be adjudicated in federal court. *Id.* at 1306. The Eleventh Circuit rejected this argument, holding that the Limitation Act "is about limitation of liability, not immunity from liability or the exclusivity of the federal forum." *Id.* at 1307 (citing *Lake Tankers Corp.*, 354 U.S. at 152-53). The Eleventh Circuit explained that "[c]ourts ***should thus give effect to both the Limitation Act and the saving to suitors clause whenever possible and damage claimants must be allowed to litigate the vessel owner's negligence in state court***, where it is apparent that limitation cannot be granted." *Id.* (quotations and citations omitted, emphasis added).[4]

---

[4] To the extent Petitioners argue that they can expand the scope of the limitation proceeding to include the merits of Claimants' claims by also pleading "exoneration from… liability," ECF No. 1, such an argument is mistaken. The Supreme Court held in *Lewis* that "[t]he Act and the rules of practice ... do not create a freestanding right to exoneration from liability in circumstances where limitation of liability is not at issue." 531 U.S. at 453. The Fifth Circuit confirmed in *In re Tetra Applied Technologies, L.P.*, 362 F.3d 338 (5th Cir. 2004) (quoting *In re Tidewater Inc.,* 249 F.3d 342, 346-47 (5th Cir. 2001)), that the Limitation Act "itself does not expressly provide the shipowner with a right to exoneration," and that the language in Rule F of the Supplemental Rules for Admiralty or Maritime Claims and

The Sixth Circuit reached the same conclusion in *In re Muer*, 146 F.3d 410 (6th Cir. 1998), holding that a district court abused its discretion by reaching issues "ancillary" to a Limitation Act petition. *Id.* at 418-19. *Muer* arose from the 1993 sinking of a pleasure boat in which four individuals perished. After the vessel owner filed a Limitation Act petition, the claimant stipulated to the district court's exclusive jurisdiction over just the limitation question. Despite that narrow stipulation, the district court proceeded to rule on matters unrelated to limitation, including: (1) the geographic location of the accident and which substantive law governed; (2) whether the Death on the High Seas Act ("DOHSA") barred noneconomic damages; and (3) whether DOHSA also barred conscious pain and suffering claims. *Id.* at 413-14. The court then entered final judgment on those grounds, effectively terminating the entire litigation on issues unrelated to the limitation question. *Id.* at 414.

The Sixth Circuit reversed and remanded those rulings as to the "ancillary" matters, finding that the court had overstepped the narrow jurisdictional role assigned to it under the Limitation Act and disregarded the Saving to Suitors Clause. *Id.* at 415-16, 419. The Sixth Circuit expressly rejected the argument that judicial economy justified the district court's expansive approach, finding among other things that Plaintiffs were entitled to choose their forum under the Savings to Suitors Clause. *Id.* at 418-19.

---

Asset Forfeiture Actions permitting a complaint to "demand exoneration from as well as limitation of liability" "indicates that the issue of exoneration is not exclusively reserved to the federal courts." *Id.* at 341, quoting *In re Tidewater Inc.*, 249 F.3d 342, 346-47 (5th Cir. 2001). The rules of procedure "cannot enlarge the substantive rights conferred on shipowners by the Limitation Act," and therefore "the exoneration-related language in Rule F cannot abridge the rights secured by the saving to suitors clause." *Id.; see also Skanska ,*75 F.4th at 1307–08 (quoting *Lewis*, 531 U.S. at 453) (holding that there is "no reason to think" Rule F's exoneration language "does anything more than preserve the right to contest liability while also seeking limitation," and "certainly does not 'create a freestanding right to exoneration from liability in circumstances where limitation of liability is not at issue'").

10

This court should follow the same approach adopted by the Eleventh and Sixth Circuits, and deny Petitioners' Motion because it contravenes the Saving to Suitors Clause and oversteps the bounds of the Limitation Act.

## B.     *ROBINS* DOES NOT PREEMPT MARYLAND LAW ON ECONOMIC LOSS AND PUBLIC NUISANCE.

Petitioners' Motion should be denied for the additional reason that under Supreme Court precedent as applied by the First and Ninth Circuits, *Robins* is neither a characteristic feature of general maritime law nor essential to maintaining its proper harmony and uniformity, and thus does not preempt applicable *state law* claims—including, most importantly, Maryland's rules on economic loss and public nuisance. When considered alongside the preservation of Claimants' right to pursue state law claims under the Saving to Suitors Clause as discussed above, it is clear that *Robins* is inapplicable to this litigation.

The prevailing test for whether federal maritime law preempts state law is succinctly summarized by U.S. District Judge Catherine C. Blake:

> A state law does not displace federal maritime law if it (1) "contravenes the essential purpose expressed by an act of Congress," (2) "**works material prejudice to the characteristic features of the general maritime law**," or (3) "**interferes with the proper harmony and uniformity of [the general maritime] law in its international and interstate relations**." *Southern Pacific Co. v. Jensen*, 244 U.S. 205, 216, 37 S.Ct. 524, 61 L.Ed. 1086 (1917) [superseded by statute on other grounds in *Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab. v. Perini N. River Assocs.*, 459 U.S. 297, 300, 103 S. Ct. 634, 638, 74 L. Ed. 2d 465 (1983)].

*Price v. Atl. Ro-Ro Carriers*, 45 F. Supp. 3d 494, 501 (D. Md. 2014)., In *American Dredging Co. v. Miller*, the Supreme Court reaffirmed this longstanding *Jensen* test. 510 U.S. at 447, citing *Jensen,* 244 U.S. 205 at 216 (1917). Importantly, in *American Dredging*, the U.S. Supreme Court explained that under the second step of the *Jensen* test, a "characteristic feature of the general

11

maritime law" is a law that both originates and has exclusive application in maritime law. *Id.* at 449-450. Every court that has applied *Jensen* to *Robins*, as explained more fully in *American Dredging*, has held that *Robins* is not a characteristic feature of maritime law, nor is it a doctrine whose uniform application is necessary to maintain the "proper harmony and uniformity" of maritime law, and therefore does not preempt state law on recovery of economic loss in tort.

The First Circuit in *Ballard Shipping Co. v. Beach Shellfish*, 32 F.3d 623 (1st Cir. 1994), confronted with economic loss claims arising from an oil spill in Rhode Island waters, first applied the three-part *Jensen* test to *Robins*, disposing of the first *Jensen* prong because "no act of Congress directly governs" economic loss in the general maritime context. *Id.* at 627. The *Ballard* court next held that on *Jensen*'s second prong, *Robins* was not a "characteristic feature" of maritime law because its rule originated in a general tort principle whose "concern stretches landward quite as much as seaward," *id.* at 628 (quoting *American Dredging*, 510 U.S. at 450). The *Ballard* court then applied the third *Jensen* prong by balancing state and federal interests in the case to determine whether the need for "harmony" and "uniformity" in federal maritime law outweighed state interests. The court considered three factors in concluding that Rhode Island's interest in applying its own economic loss law prevailed over *Robins*: (1) Rhode Island's "weighty" interest in "avoiding pollution in its navigable waters and on its shores, and in redressing injuries to citizens caused by pollution; (2) the fact that *Robins* did not relate to the type of "primary conduct in the maritime realm" that presents "the most direct risk of conflict between federal and state commands"; and (3) Congress's passage of the Oil Pollution Act four years prior, which explicitly allowed recovery of economic losses for oil spills and demonstrated that "Congress does not view either expansion of liability to cover purely economic losses or enactment of comparable state oil pollution regimes as an excessive burden on maritime commerce." *Id.* at 629, 631. In light of the

12

presumptive preservation of state remedies under the Saving to Suitors Clause, *id.* at 630, the *Ballard* court held that Rhode Island law should dictate what types of economic losses were too remote to warrant recovery. *Id.* at 630.

Soon thereafter, the District of New Jersey adopted nearly identical reasoning to *Ballard* in also ruling that *Robins* did not preempt state tort law. *In re Complaint of Nautilus Motor Tanker Co., Ltd.*, 900 F. Supp. 697, 702-5 (D.N.J. 1995). And seven years later, the Ninth Circuit reached the same conclusion in *In re Exxon Valdez*, 270 F.3d 1215 (9th Cir. 2001), underscoring that "Alaska's strong interest in protecting its waters and providing remedies for damages resulting from oil spills outweighs the diminished federal interest in achieving interstate harmony through the uniform application of *Robins*." *Id.* at 1253-4 (quoting *Ballard*, 32 F.3d at 630).

So it is here. *Robins* is judge-made federal common law that neither originated from nor has exclusive operation in maritime law, and Maryland has a powerful interest in protecting its citizens from the consequences of one of the biggest and most preventable man-made disasters to take place within its borders. None of the three *Jensen* prongs are met, and this Court therefore should not allow Maryland state law on economic loss and public nuisance to be preempted by *Robins*. And because (as discussed above) PEL Claimants retain their right to bring state tort claims in state court under the Saving to Suitors Clause of 28 U.S.C. § 1333(1), at minimum the question of whether PEL Claimants can recover for economic loss cannot and should not be resolved at this stage of the case. Rather, it must be determined once the Limitations Act proceedings have concluded and PEL Claimants have selected a forum in which they can have their substantive claims adjudicated—which could include Maryland state court, *see Cassidy v. Murray*, 34 F. Supp. 3d 579, 581 (D. Md. 2014) (remanding tort claims arising from maritime incident to state court

13

under Saving to Suitors Clause), or this very Court applying Maryland law under *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).[5]

Petitioners fail to address in any manner the question of whether *Robins* preempts Maryland common law. By focusing their entire brief on *Robins*, Petitioners skip over the essential threshold question of whether *Robins* even applies to the substantive claims in this matter. As established above, *Robins* is neither a characteristic feature of maritime law, nor is it a doctrine whose uniform application is necessary to maintain the "proper harmony and uniformity" of maritime law; therefore, *Robins* does not preempt the eventual application of state law—including to whether PEL Claimants can recover economic losses in tort or through a public nuisance claim.

## C.   *ROBINS* DOES NOT BAR THE CLAIMS

Even if this Court were inclined to disregard the threshold issues discussed above—the Saving to Suitors Clause and applicability of Maryland state tort law—and focus solely on *Robins*, that case does not foreclose the claims in this one. Petitioners urge this Court to treat *Robins* as an absolute and categorical bar to any claim for economic loss unaccompanied by physical injury to the claimant's own property, but that characterization is not supported by the decision itself, the reasoning of the Supreme Court that decided it, or circuit court authority that has since applied it. Put simply, *Robins* contains numerous and capacious exceptions that apply to PEL Claimants.

---

[5] The difference between the federal common law of *Robins Dry Dock* and Maryland economic loss rules is not academic, as Maryland recognizes two exceptions to the economic loss bar that may lack a direct equivalent in federal common law and could apply in this case. First, economic loss is recoverable if here is an "intimate nexus" between the tortfeasor and claimant. *Jacques v. First Nat. Bank of Maryland*, 515 A.2d 756, 759 (Md. 1986). Although there is a privity exception to *Robins Dry Dock* as discussed in Section V.C.iii. below, it has yet to be determined whether other specific relationships relevant to this case would qualify PEL Claimants for this exception. Second, Maryland law recognizes an exception when economic losses result from a dangerous condition that creates a serious risk of death or personal injury. *Bryant v. Koppers, Inc.*, 627 F. Supp. 3d 466, 476 (D. Md. 2022), *aff'd,* No. 22-2017, 2023 WL 3053017 (4th Cir. Apr. 24, 2023). This exception may not be available under Federal common law. Third, Maryland common law may be more permissive than federal common law in allowing tort claims for public nuisance where, as here, plaintiffs have suffered "damages to themselves, distinct in character from any to the public." *Express Scripts, Inc. v. Anne Arundel Cnty.*, 353 A.3d 1084, 1112 (Md. 2026), citing *Cook v. Normac Corp.*, 4 A.2d 747 (Md. 1939).

*Robins* applies where loss flows through a contract with an injured third party that was "unknown to the doer of the wrong." *Robins*, 275 U.S. at 308-09. The Supreme Court simultaneously and expressly preserved the opposite case: "[W]hile intentionally to bring about a breach of contract may give rise to a cause of action . . . no authority need be cited to show that, as a general rule, at least, a tort to the person or property of one man does not make the tort-feasor liable to another merely because the injured person was under a contract with that other *unknown to the doer of the wrong*." *Id.* (emphasis added). The linchpin of the rule is not economic loss as such. It is the tortfeasor's ignorance of the downstream relationships that give rise to that loss. Where that ignorance is absent because the tortfeasor acted deliberately or because foreseeability of commercial harm was manifest, or because a contractual relationship directly connected the parties the foundational premise of *Robins* is undermined, and the bar does not apply.

Numerous independent, well-recognized considerations foreclose Petitioners' efforts to use *Robins* to exonerate themselves from any accountability for the harms they have caused to PEL Claimants. First, by its own terms and as found by a majority of circuit courts, *Robins* does not bar recovery of economic losses arising from the intentional conduct that has been pled here. Second, PEL Claimants' private economic losses were the foreseeable, proximate, and direct result of Petitioners' conduct, satisfying the foreseeability exception recognized in the *Kinsman* line of cases. Third, those PEL Claimants who stand in a direct contractual relationship with Petitioners can recover their economic losses because the existence of that privity restores the duty element that *Robins* purports to extinguish. Fourth, PEL Claimants have pled harms from pollution arising from Petitioners' conduct that is statutorily exempt from *Robins*—under CERCLA and the OPA, respectively. Each exception is addressed in turn.[6]

---

[6] This brief does not address, nor does it need to, Petitioners' argument that PEL Claimants lack a proprietary interest in the Key Bridge. To the extent the Court decides to convert Petitioners' Motion into a Rule 56 motion and decides

>    i.    ***Robins* Does Not Bar Economic Losses Arising From Intentional Conduct.**

Contrary to Petitioners' assertions, *Robins* and its progeny do not bar recovery of economic loss for claims of intentional and even reckless acts. The *Robins* Court itself limited its opinion to negligent conduct, saying "there can be no recovery for economic losses caused by *an unintentional maritime tort*," and "[t]he question is whether the respondents have an interest protected by law against *unintended injuries* inflicted upon the vessel by third parties who know nothing of the charter." 275 U.S. at 308 (emphasis added).  PEL Claimants have pled intentional conduct by Petitioners that is more than sufficient to meet its burden under Fed. R. Civ. P. 8 and 12(c). *King*, 825 F.3d at 212.

While Fourth Circuit cases applying *Robins* only concern ordinary negligence, *see, e.g., Yarmouth Sea Products, Ltd. v. Scully*, 131 F.3d 389 (4th Cir. 1997); *In re Complaint of Marine Nav. Sulphur Carriers, Inc.*, 507 F. Supp. 205, 209 (E.D. Va. 1980), *aff'd* 638 F.2d 700 (4th Cir. 1981), at least one of those decisions, *Venore Transp. Co. v. M/V Struma*, 583 F.2d 708 (4th Cir. 1978), accurately explains the underlying principle of *Robins* that "one who *unintentionally but negligently* damages the property of another ""is not liable to others who may suffer economic loss because the owner is unable to perform contractual commitments to those others."). *Id.* at 710 (emphasis added).

Other circuits applying *Robins* are even more explicit in limiting its reach to non-intentional torts. In *State of Louisiana ex rel. Guste v. M/V Testbank*, 752 F.2d 1019, 1020 n.1 (5th Cir. 1985), the Fifth Circuit sitting en banc reaffirmed *Robins* but expressly reserved two categories: "We do not address intentional tort or ultrahazardous activity, such as blasting." That

---

to evaluate Petitioners' evidence related to certain PEL Claimants' purported proprietary interests, they are addressed on a PEL Claimant-specific basis in Exhibit 1.

reservation was not idle dicta; the court understood that the policy rationale justifying the general rule simply does not extend to conduct in those categories. *See also Amoco Transport Co. v. S/S Mason Lykes*, 768 F.2d 659, 666 (5th Cir. 1985) (*Robins* applies only to "unintentional maritime torts.").

The First, Second, and Eleventh Circuits have likewise adopted the same limitation. *See Ballard*, 32 F.3d at 625, n.1 (recognizing "classic exception" for "intentionally caused" economic losses); *American Petroleum and Transport, Inc. v. City of New York*, 737 F.3d 185, 196 (2d Cir. 2013) (embracing *Robins* for "unintentional" maritime torts while explicitly acknowledging that "for some categories of claims, exceptions may well be appropriate.""); *Kingston Shipping Co., Inc. v. Roberts*, 667 F.2d 34, 35 (11th Cir. 1982) (quoting *Louisville & N. R. Co. v. M/V Bayou Lacombe*, 597 F.2d 469, 472 (5th Cir. 1979))` (limiting *Robins* rule to "unintentional maritime torts").

The Fifth Circuit's decision in *In re Deepwater Horizon*, 784 F.3d 1019 (5th Cir. 2015) is particularly instructive; there, plaintiffs alleged that BP intentionally and criminally obstructed a congressional investigation into the underlying incident. *Id.* at 1025. The Fifth Circuit agreed with the lower court that the subject conduct, while intentional, was not "causally related to the blowout, the oil spill, or the alleged harm to the Mexican states." *Id.* (quoting *In re Oil Spill*, 970 F. Supp. 2d 524, 528 (E.D. La. 2013). Here, by contrast, the causal chain is linear, direct, and unbroken. The deliberate operation of a vessel with a documented history of power failures, known to be unseaworthy, through a narrow commercial channel, is the direct and proximate cause of the Allision and every economic loss that flowed from it. There are no intervening actors, no attenuated chains of causation, and no break in the sequence connecting Petitioners' intentional and reckless act to PEL Claimants' injuries.

17

*MTA Metro-North R.R. v. Buchanan Marine, L.P.*, 2006 WL 3655244 (D. Conn. Dec. 12, 2006) is similarly on point. There, a bridge allision required the bridge's primary user, a railroad that did not own the bridge, to incur repair costs. *Id.* at \*3-4. The court first held that "*Robins* [] is limited to unintentional torts and does not apply in cases of intentional tort," *id*. at \*10, and then denied summary judgment on the applicability of *Robins* to bar plaintiff's economic loss claims because there was a material issue of fact regarding whether [the bridge owner] committed an intentional tort" by failing, "knowing of the bridge's condition, to properly repair and maintain the bridge and fender system at issue[.]" *Id*.[7] Here, PEL Claimants have presented compelling facts regarding intentional—and indeed criminal—conduct leading directly to the Allision and their economic losses. *See generally,* Exhibit 1.[8] Like the plaintiff in *MTA Metro-North*, they should be permitted to test these facts at trial to determine if they can be made whole.

### ii.   PEL Claimants Suffered Harm From the Allision That Was Foreseeable, And Therefore Recoverable

PEL Claimants should recover their economic losses for the additional reason that their pled harms were an utterly foreseeable result of Petitioners' conduct. The *Kinsman* cases and their progeny establish that economic loss recovery is appropriate where the harm is sufficiently proximate to the tortfeasor's negligence. In *Kinsman I*, the Second Circuit held that where damages result from the same forces that made the defendant's conduct negligent, the unforeseeability of the exact extent of loss will not limit liability. *Petition of Kinsman Transit Co*., 338 F.2d 708, 726

---

[7] Petitioners make much hay of a Ninth Circuit case, *Nautilus Marine, Inc. v. Niemela*, 170 F.3d 1195 (9th Cir. 1999), that denied recovery for economic losses where intentional conduct had been pled. Petitioner's Mot. at 13-14. It is no accident that it is the only case Petitioners cite for this proposition because it is an outlier that is entitled to little weight from this Court. The great weight of authority (and public policy more broadly) hold that *Robins* does not apply to intentional torts.

[8] As noted above, in the short period of time since the criminal indictment of Synergy Marine Pte Ltd and Synergy Maritime Pte Ltd, new evidence has been stipulated to that further demonstrates the intentional and reckless actions of Petitioners. *See* Ex. 3. This exhibit should be considered in the event this Court converts Petitioners' motion to a Motion for Summary Judgment.

(2d Cir. 1964). *Kinsman II* further refined this principle, declining to apply *Robins* as a wholesale bar to economic loss claims where the loss is foreseeable and a duty exists between the parties—though the harm must be sufficiently direct and not so attenuated as to preclude recovery. *Petitions of Kinsman Transit Co.*, 388 F.2d 821, 824-5 (2d Cir. 1968). Courts in other circuits have similarly recognized that no absolute rule forbids economic loss recovery absent physical injury, provided damages are proximately caused and proven with reasonable certainty. *See National Steel Corp. v. Great Lakes Towing Co.*, 574 F.2d 339 (6th Cir. 1978); *In re Bethlehem Steel*, 631 F.2d 441 (6th Cir. 1980).

Petitioners' attempt to apply *Robins* as a blanket bar to any claim lacking a proprietary interest improperly reads that decision out of context and ignores the law of negligence entirely. *Robins*, properly understood, does not abrogate well-established negligence principles; it merely cabins recovery within defined parameters. PEL Claimants here have adequately pled all elements of negligence—duty, breach, causation, and damages flowing from the Allision, *see* Restatement 2d of Torts § 281—sufficient to survive a motion for judgment on the pleadings. *See* Exhibit 1. Where foreseeability and proximate cause are properly alleged, as they are here, *Robins* alone cannot be a basis for dismissal.

### iii.  PEL Claimants Who Have a Contractual Relationship With Petitioners Can Recover Economic Losses Arising From the Allision Because They Fall Within the Well-Established Privity Exception to *Robins*.

PEL Claimants Markel Syndicate Management Limited, et al,, as subrogees of Ports America Chesapeake ("PAC") (collectively the "Markel Claimants") and the Longshoremen (together, "the Privity Claimants") have a contractual relationship with Petitioners that creates a duty of care running from Petitioners to the Privity Claimants that falls within the long-recognized privity exception to *Robins*. The Privity Claimants are thus able to recover in tort foreseeable economic losses arising from the Allision.

19

a.    **The Privity Exception to *Robins* Is Well-Established In the Fourth Circuit and Elsewhere**

The Fourth Circuit staked out the privity exception to *Robins* in *Venore*, 583 F.2d 708. In *Venore*, the time charterer of the S.S. Oswego Liberty sought compensation from the owner of the M/V Struma for loss of use of the Oswego Liberty after the two vessels were in a collision and the M/V Struma conceded fault. *Id.* at 709. The Fourth Circuit ruled that the time charterer was entitled to recover its losses, despite not having suffered physical property damage, because its contractual relationship with the Oswego Liberty had "transferred the risk of loss of use from the owner to the time charterer[.]" *Id.* at 711. The Fourth Circuit made clear that this contractual transfer of risk is what distinguished the facts in *Venore* from those in *Robins*: unlike the plaintiff time charterer in *Robins*, the existence of a contractual relationship in *Venore* gave the time charterer a "possessory interest in the vessel" that was "sufficient to give it standing to claim damages." *Id.*

Numerous other courts have adopted the principle in *Venore* that a contractual transfer of risk creates an exception to *Robins* economic loss bar. The Fifth Circuit similarly held in *Amoco*, 768 F.2d 659, that *Robins* does not prevent recovery for economic losses "by a person to whom they have been contractually shifted." *Id.* at 668 (citing *Standard Navigazione v. K.Z. Michalos*, 1981 A.M.C. 748 (S.D.Tex.1981); *Venore*, 583 F.2d 708), *see also Nexen Petroleum U.S.A., Inc. v. Sea Mar Division of Pool Well Services Co.*, 497 F. Supp. 2d 787 (E.D. La. 2007) (court applied this loss-shifting rationale to permit recovery of daily hire charges where the contractual relationship had effectively shifted the economic burden of vessel damage to the non-owner plaintiff).

The contractual exception to *Robins*, as articulated in *Venore* and other cases, makes intuitive sense. As noted above, recovery in tort requires duty, breach, causation, and damages. Restatement 2d of Torts § 281. *Robins* is fundamentally a common law curtailment of a tortfeasor's

20

duty of care, *Barber Lines A/S v. M/V Donau Maru*, 764 F.2d 50, 52 (1985) ("[T]he principles underlying *Robins* remain legally sound insofar as they place plaintiffs like those before us 'outside the scope' of those to whom defendant owes a legal duty of care."), and does not speak to the other three elements of a tort. The contract between plaintiff and tortfeasor creates an independent duty of care and allows recovery where the plaintiff can otherwise plead that this duty has been breached and the breach proximately and foreseeably caused an economic loss.

    b.   **The Contract Between Privity Claimants and Petitioners Renders *Robins* Inapplicable to Those Claims**

Here, the contract between PAC and Petitioners creates precisely the duty of care that brings the Markel Claimants' claims within the privity exception set forth in *Venore*. PAC operates numerous marine terminals in the Port of Baltimore, including the Seagirt Marine Terminal ("Seagirt" or the "Terminal"), ECF No. 241 at ¶ 18, which is where the M/V Dali was moored for the two days prior to alliding with the Key Bridge and causing it to collapse. *Id.* at ¶¶ 43-47. All vessels that dock at Seagirt or any other terminal at the Port of Baltimore are subject to the Baltimore Marine Terminal Association Tariff Schedule Contract ("the BMTA Contract"), attached hereto as Exhibit 5, which binds all persons or entities that receive services from any participating terminal within the Port of Baltimore. For purposes of this litigation, the two most relevant provisions of the BMTA Contract governing the relationship between Petitioners, as operators of the M/V Dali, and PAC, as operator of Seagirt and subrogor to the Markel Claimants, are as follows:

    Rule 34-2: Liability

    4. **All parties using berths, wharves, transit sheds, cranes, mechanical equipment, or other facilities of the Terminal Operator ("Users")** shall be responsible and liable to the Terminal Operator for any damage occurring to such property during their tenancy, occupation, and/or use without regard to whom shall cause the damage, except that caused by the Terminal Operator's own

21

negligence. Unless and to the extent caused by the Terminal Operator's own negligence, all such Users shall indemnify [sic], defend, and save harmless the Terminal Operator from and against any and all losses, claims, demands, or suits for damages, including death and personal injury, and including court costs and attorney's fees, incidental to or resulting from the operations, acts, or omissions of the Users in connection with the equipment or facilities [sic]described above.

\* \* \*

7. Oil Spills and Other Pollution Incidents: All users of Terminal Operator facilities and/or services shall be responsible and liable to the Terminal Operator and shall indemnify and hold harmless the Terminal Operator for any and all losses, costs, or damages incurred as a result of oil spills from cargo or other pollution incidents caused by terminal users or their cargo, including but not limited to clean-up costs, costs of preventing subsequent discharges, and government-imposed fines and penalties, except to the extent that such losses, costs, or damages are caused by the negligence of the Terminal Operator. In the event of a pollution incident described hereunder, the Terminal Operator, in its sole discretion, may either permit the facility or service user to undertake clean-up efforts, or the Terminal Operator may undertake such clean-up efforts itself, or the Terminal Operator may engage the services of a third-party vendor to perform such clean-up. In the event that the Terminal Operator chooses to perform pollution clean-up services itself, charges for such clean-up costs will be imposed upon the responsible facility or service user(s) at the current labor and drayage rates in this Schedule, and clean-up materials will be charged at cost plus a 20% administrative fee. In the event that the Terminal Operator engages the services of a third-party vendor to perform pollution clean-up services, charges for such clean-up costs will be imposed upon the responsible facility or service user(s) at the cost of the third-party vendor plus a 20% administrative fee.

Exhibit 5 at 4-5 (emphasis added). All entities using Seagirt and other Port of Baltimore facilities have actual and constructive knowledge of the BMTA Contract, and these provisions in particular. Indeed, users of the Terminal are not provided services without submission to the MBTA Contract terms, consequently acceptance of Terminal services evidences the user's assent thereto. This is axiomatic to all maritime operators in the business of calling public terminals with tariffs, like

22

Seagirt. At all relevant times, therefore, Petitioners were in privity with PAC. *See* ECF No. 240 at Affirmative Defenses 4, 8, 9, 11.

The pled facts demonstrate a clear and direct causal relationship between Petitioners' time at the Terminal and the Allision. The M/V Dali moored at Seagirt on March 23, 2024, ECF No. 241 at ¶ 43, and departed Seagirt at 12:45 a.m. on March 26, 2024. *Id.* at ¶ 47. Less than 45 minutes after leaving Seagirt, the M/V Dali allided with the Key Bridge and caused it to collapse. *Id.* at ¶ 59. But the events of Petitioners' stay at Seagirt effectively foreordained this catastrophe. On March 25, 2024, the M/V Dali experienced two separate instances of loss of electrical power while moored at Seagirt. *Id.* ¶ 44. Petitioners were required to immediately notify the Coast Guard of these power losses under 46 C.F.R. § 4.05-1 but failed to do so. *Id.* at ¶¶ 45-6. Petitioners were also required to inform a Maryland-licensed senior pilot of these power losses—and other mechanical or electrical defects or abnormalities—when the pilot boarded the M/V Dali while it was docked at Seagirt, pursuant to 33 C.F.R. § 164.11(k), but failed to do so. *Id.* at ¶ 49.

These facts, as well as additional pled facts discussed in Exhibit 1, demonstrate direct applicability of the *Venore* privity exception to *Robins*. First, *Venore* focused on the identifiability of the tortfeasor—the charterer was a known, named party whose economic exposure was memorialized by a written contract. 583 F.2d at 710. Here, the BMTA Contract names Ports America Chesapeake, the operator of Seagirt, as a Participating Terminal Operator. Ex. 5 at Rule 34-1. The Petitioners thus knew or should have known that PAC would bear first-order economic consequences of any operational failures arising from the M/V Dali's tenancy at the Terminal.

Second, *Venore* emphasized foreseeability, noting that loss of use was a "conventional item of recovery" for vessel damage, and that transferring it to the charterer by contract was a foreseeable allocation of risk. 583 F.2d at 710–11. Here, the BMTA Contract's indemnification

clause explicitly addresses losses "incidental to or resulting from [Users'] operations, acts, or omissions" at the Terminal. Ex. 5 at Rule 34-2(4). As demonstrated in the Amended Class Action Claim, the conditions that caused the Allision originated during the vessel's tenancy at the Terminal. ECF No. 222 at ¶¶ 71-79. The Petitioners, as sophisticated commercial actors, should have foreseen that knowingly departing their berth in an unseaworthy condition—operating the vessel on improper engine configurations, with non-functioning essential equipment, and concealing prior power losses from the pilot and the Coast Guard, *see id.*—would expose PAC to economic harm, and that the BMTA Contract placed that risk squarely on the vessel.

The third and most important element of *Venore* that applies here is contractual risk allocation. The BMTA Contract allocates the risk of economic loss to Petitioners, and this risk allocation should not be nullified by *Robins*. The BMTA Contract makes the users of the Terminal "responsible and liable" for "any damage occurring to [PAC's] property during their tenancy, occupation, and/or use," and imposes a duty to indemnify for "any and all losses" arising from the vessel's "operations, acts, or omissions." Ex. 5 at Rule 34-2(4).[9] Similarly, the BMTA Contract's pollution clause renders Petitioners liable to PAC for "any and all losses, costs, or damages incurred as a result of oil spills from cargo or other pollution incidents caused by terminal users or their cargo." *Id.* at Rule 34-2(7). The foreseeable economic losses that PAC has sustained as a result of Petitioners' breach of their contractual duties—*e.g.,* lost berthing fees, disrupted cargo operations, demurrage and detention claims, knock-on effects on storage and drayage operations, snarled multi-modal transport operations, and idle infrastructure costs incurred as a result of the

---

[9] To the extent Petitioners argue that the BMTA Contract provisions did not bind them once they left the Terminal, this is no defense. The phrase "in connection with" in Rule 34-2(4) extends coverage to losses arising from the vessel's use of the facilities, including the act of departure and the downstream consequences of conditions that arose *during the period of use*. Factually, the Dali was still in the process of "departing Baltimore's Seagirt Terminal" when it transited the Fort McHenry Channel. ECF No. 222 at ¶ 79. Moreover, the damage resulting from the Allision was not a new, intervening cause; it was the direct continuation of the unseaworthy conditions that existed at Seagirt's pier. *Id*. ¶¶ 71-79.

obstruction of the Patapsco River, *see* ECF No. 241 at ¶ 67—are precisely the type of losses that the contracting parties would have recognized as falling on PAC in the event of a disaster resulting from conduct at the Terminal.

Indeed, the direct contractual transfer of risk from PAC to Petitioners presents an even stronger rationale than *Venore* for invoking the privity exception to *Robins*. Petitioners owed PAC a *direct* contractual duty of care *under the BMTA Contract*; PAC is not merely connected indirectly to the tortfeasor through a contract with a separate party suffering a physical loss, as was the case in *Venore*. Because Petitioners and PAC contracted to shift the risk of economic losses arising from the Allision squarely to Petitioners, this Court should be guided by the exception to *Robins* articulated in *Venore* and deny judgement on the pleadings as to the Privity Claimants.

> **c.    Longshoremen Labor Under the Same BMTA Contract that Binds PAC And Petitioners, and Thus Are Also Subject to the Same Privity Exception to *Robins*.**

The same BMTA Contract that creates privity between PAC and Petitioners also applies to the Longshoremen, because that agreement includes the obligation to both use and pay for the Longshoremen's labor. As a result, Petitioners also owed a contractual duty to the Longshoremen and are subject to the same *Venore* privity exception to *Robins*.

The Longshoremen are comprised of Baltimore based International Longshoremen's Association Locals 333, 953, and 1429, consisting of approximately 2,200 total members and ILA Locals 953 and 1429. *See* ECF No. 239 at 2. The Longshoremen have labor agreements with the Steamship Trade Association of Baltimore, Inc. ("STA") (negotiated under the provisions of a Master Contract between the United States Maritime Alliance, Ltd., which represents, among others, all major Marine Terminal Operators and Port Associations for each port on the East and Gulf Coasts, and the International Longshoremen's Association), whose membership includes PAC, under which STA's members (including PAC) are required to use Longshoremen at their

25

respective port facilities. The requirement to use the Longshoremen, and the labor rates negotiated between the STA and the Longshoremen, are then incorporated in the BMTA Contract. By consenting to the terms of the BMTA Contract, Petitioners thus assumed a contractual duty toward the Longshoremen—whose labor and payment terms were expressly integrated into the BMTA Contract.

Use of the Longshoremen's labor was also expressly contemplated in Grace Ocean's "Boxtime" Uniform Charter Party for Container Vessels (the "Charter Party") with Maersk Line A/S for the M/V DALI, dated September 1, 2016, attached hereto as Exhibit 6. Under the Charter Party, Maersk assumed the duties of paying for all port services while the DALI's master and crew retained the obligation of supervising and inspecting stevedoring operations. *Id.*, at pp. Petitioner_0271901 and 0271903. The Charter Party goes on to allocate risks between Grace Ocean and Maersk through various indemnity provisions and to require each party to obtain suitable insurance. *Id.*, at pp. Petitioner_0271906-07. Thus, the privity exception to *Robins* articulated in *Venore* extends to the Longshoremen as well.

### iv.    PEL Claimants May Recover for Pollution-Related Economic Losses Because Congress Abrogated *Robins* for Such Claims.

PEL Claimants' recovery for pollution-related economic losses is independently compelled by federal statute, without resort to *Robins*' contractual exception. Section 107(h) of CERCLA provides in full:

> *The owner or operator of a vessel shall be liable* in accordance with this section, ***under maritime tort law***, and as provided in section 9614 of this title *notwithstanding* any provision of the Act of March 3, 1851 (46 U.S.C. 183ff) or *the absence of physical damage to the proprietary interest of the claimant*.

42 U.S.C. § 9607(h) (emphasis added). On its face, this provision abrogates the *Robins* rule by mandating that vessels be liable in maritime tort for economic losses arising from the release of a

hazardous substance. And indeed, this interpretation is corroborated by the legislative history of the 1986 CERCLA amendments that added this section; as Senator Stafford, chair of the Senate Environment and Public Works Committee, clarified during debate, the new Section 107(h) of CERCLA "assures that physical damage to the property or some other proprietary interest of the claimant is not an essential element of a right of action. Individuals who suffer a loss have a right of action. That the injury which caused that loss was to the property of the public or to another is irrelevant. The test is whether or not the claimant experienced a loss." 132 Cong. Rec. S17,136 (daily ed. Oct. 17, 1986) (statement of Sen. Stafford).

This direct statutory override applies here, as PEL Claimants have properly pled pollution-related liability under CERCLA. *See, e.g.,* Ex. 1 at 13. CERCLA renders vessel owners and operators liable for releases of hazardous substances and the damages resulting therefrom. 42 U.S.C. § 9607(a)(1),(4). The M/V Dali is indisputably a vessel within the meaning of CERCLA. *Id.* § 9601(28). PEL Claimants have properly alleged that the Allision caused the release of at least one "hazardous substance" in the form of fourteen containers of hazardous materials, including lithium batteries, soap products, perfume, and resins. ECF No. 222, Am. Claim ¶ 111; *see also* 42 U.S.C. § 9601(14), 40 C.F.R. § 302.4, Table 302.4.  Under CERCLA Section 9706(h), Petitioners are therefore liable in maritime tort for any economic losses arising from the discharge of such hazardous materials from the M/V Dali into the Patapsco River as a result of the Allision. 42 U.S.C. § 9607(a)

Petitioners' Motion misconstrues PEL Claimants' claims related to CERCLA, interpreting it as a statutory CERCLA claim for response costs under Section 9607(a). Motion at 18-19. But PEL Claimants are simply suing "under maritime tort law," 42 U.S.C. § 9607(h), and asking this Court to rule that CERCLA nullifies *Robins* to the extent their losses are attributable to hazardous

releases caused by the Allision. PEL Claimants thus are not required to establish every element of a CERCLA claim (including response costs) as alleged by Petitioners, Petitioners' Motion at 19, as doing so would render the phrase "under maritime tort law" surplusage. To trigger the abrogation of *Robins* for maritime torts mandated by CERCLA Section 9607(h), PEL Claimants need only plead that the M/V Dali caused a hazardous release that caused them economic harm. They have easily met this standard.

v.    **Claimant Star Bulk Has Properly Alleged A Claim Under the Oil Pollution Act**

Claimant Star Bulk has plausibly alleged a valid claim under the Oil Pollution Act of 1990 ("OPA 90"). OPA 90 imposes strict liability on the responsible party for a vessel that discharges oil or poses a substantial threat of discharging oil into navigable waters of the United States for, among other things, "loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources." 33 U.S.C. § 2702(b)(2)(E). Here, Star Bulk alleges that the M/V Dali both discharged oil, as evidenced by the observed oil sheen, and posed a substantial threat of discharge because it carried approximately 1.8 million gallons of oil while grounded above a natural gas pipeline. Ex. 1 at 20; ECF No. 188 at ¶¶ 32. It further alleges that the Coast Guard treated the incident as an OPA event by establishing a Unified Command, accessing the Oil Spill Liability Trust Fund, designating the M/V Dali interests as responsible parties, and directing them to deploy containment booms. *Id.* ¶ 33. Star Bulk also alleges recoverable OPA damages—its vessel, the STAR TRIUMPH, was prevented from entering Baltimore Harbor due to the closure of the Fort McHenry Channel, causing charterers to declare force majeure, refuse to pay laytime and demurrage, and impair the vessel's earning capacity, resulting in at least $756,402.78 in lost profits and related damages. *Id.* ¶ 34-35. Those allegations fit squarely within OPA's loss-of-profits provision, which expressly permits recovery of economic

28

damages without requiring ownership of the damaged property or natural resource, and therefore must survive Petitioners' Motion.

### D.     THE CLASS ACTION CLAIMANTS ADEQUATELY ALLEGE CLASS CLAIMS

Petitioners argue that class actions are categorically prohibited in limitation proceedings, relying almost entirely on *Lloyd's Leasing Ltd. v. Bates*, 902 F.2d 368 (5th Cir. 1990). That argument fails because *Lloyd's Leasing* does not control here.[10] The mandatory limited fund classes alleged by Class Claimants are structurally incompatible with that court's concerns—and indeed are the precise type of representative action that courts have recognized as compatible with limitation proceedings.

The *Lloyd's Leasing* court identified three specific reasons why class actions conflict with limitation proceedings: (1) opt-out rights under Rule 23 would destroy the concursus; (2) the notice requirements of Rule 23(c)(2) conflict with Supplemental Rule F(4); and (3) Rule F contemplates that each claimant appear individually. 902 F.2d at 370. But none of those concerns are present here. First, Class Claimants have alleged mandatory limited fund classes under Fed. R. Civ. P. 23(b)(1)(B), *not* opt-out classes under Rule 23(b)(3). The Supreme Court made clear in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), that members of a Rule 23(b)(1)(B) class have no right to opt out. That eliminates *Lloyd's Leasing*'s first and most fundamental objection. Second, Rule 23(c)(2)(A) gives courts discretion to direct—or decline to direct—notice to a Rule 23(b)(1) or

---

[10] There are two proposed classes of claimants within PEL Claimants group. The first is the "R.E. West Class" comprised of R.E. West, Inc., E. Marine Motor Yacht Sales Pty Ltd., Captain Logistics LLC, American Publishing LLC, B&R Construction Services, Inc., International Trade Solutions, Inc., Penn Manufacturing Industries, LLC, PMI Eng. Exports Private Ltd., and PMI Global Technologies Pvt. Ltd. The second is compressed of claimants Gerald Barney, Thomas Crawley, Ryan Hale, Tulani Hasan, Donny Jackson, Alonzo Key, Charles Peacock, and Douglas Ramos (collectively referred to herein as the "Longshoremen," "Longshoremen Class."). Both classes are collectively referred to as the Class Claimants.

(b)(2) class, meaning there is no mandatory notice conflict with Rule F.[11] And third, because a mandatory class representative stands in the shoes of each class member, the "individual appearance" concern of Rule F(4) is satisfied as well.

Beyond that, the proposed Classes meet the *Ortiz* requirements for a limited fund class. A mandatory limited fund class is appropriate where: (1) the fund is demonstrably inadequate to satisfy all claims; (2) the entire fund will be devoted to claimant recovery; and (3) claimants are treated equitably among themselves. *Ortiz*, 527 U.S. at 838-39. Class Claimants have adequately alleged all three elements. First, the fund is limited by the very nature of this proceeding. Petitioners themselves defined the fund at approximately $43.7 million. ECF No. 1-2 at 2. The aggregated claims of the Class Claimants—comprising over 2,200 ILA members plus scores of affected businesses—dwarf that figure many times over. Even if limitation is defeated and the fund expands to available insurance proceeds, disclosed settlements already exceed $2.35 billion, and remaining policy limits will plainly be inadequate to satisfy the full universe of claims. Second, Class Claimants have alleged that the entirety of the available fund will be devoted to paying

---

[11] *See* § 1786 Notice in Class Actions—Due-Process Requirements, 7AA Fed. Prac. & Proc. (Wright & Miller) Civ. § 1786 (3d ed.), stating, in relevant part:

> Recognizing that giving notice in class actions is tied to ensuring the broadest possible binding effect of any judgment that is reached, Rule 23 contains several important provisions dealing with class notice requirements. *As set out in Rule 23(c)(2)(A), the court is given authority to direct notice of certification to a Rule 23(b)(1) or (b)(2) class.*

(emphasis added). It further states:

> As noted in the Committee Note, "The authority to direct notice to class members in a (b)(1) or (b)(2) class action should be exercised with care. *For several reasons, there may be less need for notice than in a (b)(3) class action*." Thus, the "court may decide not to direct notice after balancing the risk that notice costs may deter the pursuit of class relief against the benefits of notice" and, *if notice is directed, it is subject to the court's flexible discretion in its design*. See the Committee Note to the 2003 amendments, which is set out in vol. 12A.

*Id.* n.3 (emphasis added).

30

claimant recoveries. Third, the Classes are defined to include all persons sharing a common theory of recovery—local businesses and longshoremen affected by the Port closure—and any recovery will be distributed on an equitable, pro rata basis. These allegations satisfy *Ortiz* on their face.

The Fourth Circuit endorsed the *Ortiz* framework in *Herrera v. Charlotte School of Law, LLC*, 818 F. App'x 165 (4th Cir. 2020), affirming certification of a mandatory limited fund class under Rule 23(b)(1)(B) using the same *Ortiz* analytical framework. Petitioners do not engage with *Ortiz* or *Herrera* at all. Instead, their entire argument rests on a pre-*Ortiz* Fifth Circuit decision that addressed an entirely different class structure.

Because the mandatory limited fund classes alleged here eliminate every tension *Lloyd's Leasing* identified, and because Class Claimants have adequately pled the *Ortiz* requirements, Petitioners' motion to strike the class allegations should be denied. To the extent that the Court converts Petitioners' present Motion for Judgment on the Pleadings to a Motion for Summary Judgment, the Class Action Claimants respectfully request that the Court permit the Class Action Claimants to conduct a proper scope of class discovery as explained in further detail in the accompanying Rule 56(f) Affidavit, attached hereto as Exhibit 7.

E.    **THE NATURE OF RULE F(5) CLAIMS AND THE CIRCUMSTANCES OF FILING IN THIS PROCEEDING INDEPENDENTLY WARRANT LEAVE TO AMEND**

To the extent this Court is not inclined to deny Petitioners' Motion based on the arguments contained herein, it should grant all PEL Claimants leave to amend their pleadings in this matter before ruling on the Motion because the documents Petitioners seek to dismiss are not conventional complaints filed in a court of general jurisdiction after deliberate forum selection and full investigation of the underlying facts.

PEL Claimants' pleadings are fundamentally different in kind from pleadings filed under Fed. R. Civ. P. 8 because they have been filed under Supplemental Admiralty Rule F(5) in a federal

limitation proceeding. Rule F(5) requires only that a claimant "specify the facts upon which the claimant relies in support of the claim, the items thereof, and the dates on which the same accrued." Fed. R. Civ. P. Supp. R. F(5). Courts and leading commentators have consistently recognized that this imposes, at most, a notice function: at the claim-filing stage, "all that is necessary is that the claimant be identified and the general amount and nature of the claim be stated." 3 Benedict on Admiralty § 12[C] (2026); accord *Matter of Tappan Zee Constructors, LLC*, 2018 WL 1183711, at *3 (N.D.N.Y. Mar. 6, 2018); *Walker v. Mead*, 2014 WL 12726434 (W.D. Ark. 2014). The actual proof of the claim is filed later or proven at trial. Petitioners apply the *Twombly/Iqbal* pleading standard as though PEL Claimants had filed full-dress federal complaints -- but the operative filings were never designed to bear that evidentiary weight and measuring them against that standard conflates two fundamentally distinct procedural instruments. *Matter of G&J Fisheries, Inc.*, 67 F.4th 20, 28 (1st Cir. 2023).

The minimal pleading standard of Rule F(5) does not constrain the chosen-forum complaints PEL Claimants will file once the limitation stay is dissolved. No federal court has ever held that a claimant's complaint in its chosen forum must be limited to the precise claims, theories, or factual allegations set out in the original Rule F(5) filing. To the contrary, the Supreme Court in *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 455 (2001), emphasized that "state courts, *with all of their remedies*, may adjudicate claims like petitioner's against vessel owners so long as the vessel owner's right to seek limitation of liability is protected." The phrase "with all of their remedies" is not window dressing—it signals that chosen-forum complaints are not constrained by the scope or specificity of the Rule F(5) filing that preceded them. *Beiswenger Enterprises Corp. v. Carletta*, 86 F.3d 1032, 1036 (11th Cir. 1996) (savings to suitors clause "embodies a presumption in favor of jury trials and common law remedies in the forum of the claimant's

32

choice"). Dismissing these Rule F(5) claims with prejudice would therefore effect a result that no court has sanctioned: permanently foreclosing claims PEL Claimants have not yet had the opportunity to fully develop, on the basis of pleadings that were never designed to bear that weight, in a forum PEL Claimants never chose.

The circumstances of filing independently reinforce the case for amendment. Petitioners filed their limitation petition on April 1, 2024, six days after the Allision. PEL Claimants were required to file their Rule F(5) claims in the immediate aftermath of a catastrophic, still-unfolding maritime disaster, before the full extent of their losses could be assessed and investigated, and subject to rolling and in many cases much-delayed production of relevant factual information upon which fully-pled claims would necessarily rely. The practical constraints of that timeline are directly relevant to any assessment of whether the claims are sufficiently detailed. Rule F(5)'s minimal pleading standard exists in part precisely because claimants in a limitation proceeding frequently face these exigencies; they must act quickly to preserve their rights without having had the opportunity to fully investigate their claims. Any gap between the Rule F(5) filings and whatever pleading standard this Court concludes applies is a gap created by the structure of the proceeding itself, not by any lack of diligence on any PEL Claimants' part.

Even if this Court were to find any claim substantively deficient, dismissal with prejudice is not the appropriate remedy. Fed. R. Civ. P. 15(a) directs that leave to amend "shall be freely given when justice so requires," and the Supreme Court has instructed that this standard reflects a strong presumption in favor of amendment absent undue delay, bad faith, or undue prejudice to the opposing party. *Foman v. Davis*, 371 U.S. 178, 182 (1962). None of those circumstances are present here. The proceeding remains in its limitation phase. The correct remedy for any identified pleading deficiency is leave to amend, be it either in this proceeding, or consistent with the Savings

33

to Suitors analysis in Section V.A. above, in the forum of the Claimant's choosing with the full range of remedies the law provides. Dismissal with prejudice on a Rule 12(c) motion regarding Rule F(5) filings made under emergency circumstances, in a proceeding whose purpose is to determine limitation rather than to adjudicate the merits of each Claimant's case, is an outcome the law does not compel and equity does not permit.

### F.    PETITIONERS' REQUEST THAT THE MOTION BE CONSIDERED UNDER RULE 56 SHOULD BE DENIED

As represented by the Petitioners and permitted by the Court, the question of *Robins* was to be presented and considered through a Motion for Judgment on the Pleadings. June 1, 2026, Tr. at 50:12-16, Ex. 4. Despite Petitioners further moving in the alternative for summary judgment, PEL Claimants' opposition brief has relied on this Court's decision to only grant leave for a motion for judgment on the pleadings. At the same time, the arguments above and the attached exhibits make clear that there are likely to be "genuine dispute[s] as to… material facts," Fed. R. Civ. P. 56(a), regarding—at minimum—the intentionality of Petitioners' conduct. Fairly evaluating Petitioners' Motion under Rule 56 would require PEL Claimants to make an additional set of arguments that would certainly compel additional discovery and force this brief past the mandated page limit. *See* PEL Claimants' Rule 56(d) Affidavit, attached as Exhibit 7. Therefore, the Court should reject Petitioners' efforts to convert the Motion. Should this Court nonetheless elect to convert Petitioners' Motion to a Motion for Summary Judgement under Rule 56, it should allow PEL Claimants to file supplemental briefing so they can put before this Court the myriad supporting facts elicited during discovery thus far,[12] as well as expand that briefing to cross-motions and permit PEL Claimants to move for summary judgment on the question of limitations.

---

[12] Among these facts are evidence set forth in Exhibit 8, relating to fraudulent and intentional conduct by Petitioners including the systematic concealment and use of the flushing pump in violation of a myriad of safety regulations and the falsified inspections of the Vacuum Circuit breakers.

## VI.    CONCLUSION

For the foregoing reasons Petitioners' Motion for Judgment on the Pleadings as to all Purely Economic Loss Claims should be denied.

Dated: July 6, 2026                                         Respectfully Submitted,

**SMOUSE & MASON, LLC**

*/s/ Roy L. Mason*
Roy L. Mason (00922)
223 Duke of Gloucester Street
Annapolis, Maryland 21401
(T): 410-269-6620
(F): 410-269-1235
rlm@smouseandmason.com

**LOCHNER LAW FIRM, P.C.**

*/s/ Todd D. Lochner*
Todd D. Lochner (25691)
7076 Bembe Beach Rd, Suite 201 Mailbox 6
Annapolis, Maryland 21403
Tel.: 410-716-4400
Fax: 443-716-4405
tlochner@lochnerlawfirm.com

*Lead Counsel for Private Economic Loss Claimants*

**MILBERG, PLLC**

*/s/ Victoria J. Maniatis*
Victoria J. Maniatis*
405 East 50th Street
New York, NY 10022
T: (866) 252-0878
vmaniatis@milberg.com

Zachary E. Howerton (20688)
223 Duke of Gloucester Street
Annapolis, Maryland 21401

35

(T): 410-269-6620
(F): 410-269-1235
zhowerton@milberg.com

Melissa K. Sims*
100 Garden City Plaza, Suite 500
Garden City, NY 11530
T: (866) 252-0878
msims@milberg.com

*Counsel for R.E. West Class (American Publishing, LLC, B&R Construction Services, Inc., International Trading Solutions, Inc., Captain C Logistics, LLC, R.E. West, Inc., PMI ENG Exports Private LTD, PMI Global Technologies PVT LTD, and Penn Manufacturing Industries LLC), Star Bulk (Singapore) PTE. LTD, American Sugar, Inc. and Florida Sugar & Molasses Exchange, Inc., and Underwood Energy, Inc.*

**TROUTMAN PEPPER LOCKE LLP**

*/s/ Emily Huggins Jones*
Emily Huggins Jones*
Gregory Waterworth (26949)
401 9th Street, NW, Suite 1000
Washington, D.C. 20004
(617) 239 0157
(202) 274-2994 (fax)
emily.hugginsjones@troumtman.com
greg.waterworth@troutman.com

*Counsel for Markel Syndicate Management Limited (In Its Capacity as Managing Agent for Syndicate 3000 at Lloyd's), Liberty Mutual Insurance Europe SE, QBE Corporate Limited, the Sole Corporate Member of Syndicate 1036, Munich Re Syndicate Limited, for and on Behalf of Lloyd's Underwriter Syndicate No. 457, AXA XL Underwriting Agencies Limited for and on Behalf of the Corporate Member of Lloyd's Syndicate 2003, Evanston Insurance Company, and Canopius Corporate Capital Ltd., the Lead Underwriter of Lloyd's Syndicate No. 4444.*

**MURPHY, FALCON & MURPHY**

*/s/ William H. Murphy, Jr.,*
William H. Murphy, Jr., Esq. (07985)
Andrew K. O'Connell, Esq. (28168)
Ronald E. Richardson, Esq. (04673)
Jason P. Foster, Esq. (32015)
One South Street, 30th Floor
Baltimore, MD 21202
Telephone: (410) 951-8744
Facsimile: (410) 539-6599
billy.murphy@murphyfalcon.com
andrew.oconnell@murphyfalcon.com
ronald.richardson@murphyfalcon.com
jason.foster@murphyfalcon.com

*Counsel for Longshoremen Class (Gerald Barney, Thomas Crawley, Ryan Hale, Tulani Hasan, Donny Jackson, Alonzo Key, Charles Peacock, and Douglas Ramos)*

**NILES BARTON & WILMER, LLP**

*/s/ Mark J. Stiller*
Mark J. Stiller, Esq. (27408)
Niles, Barton & Wilmer, LLP
111 South Calvert Street, Suite 1400
Baltimore, MD 21202
Tel: 410-783-6361
Fax: 410-783-6363
mjstiller@nilesbarton.com

*Counsel for Consol Energy, Inc.*

**FORAN GLENNON PALANDECH PONZI & RUDLOFF, P.C.**

*/s/ Peter N. Billis*
Peter N. Billis, Esq.*
40 Wall Street, 54th Floor
New York, NY 10005
Tel: 212-257-7105
Fax: 212-257-7199
pbillis@fgppr.com

37

*Counsel for Consol Energy, Inc.*

\*Admitted *Pro Hac Vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify on July 6, 2026, I filed and served the foregoing motion on counsel of record through this Court's CM/ECF system.

By:  */s/ Roy L. Mason*
Roy L. Mason