**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

In the Matter of the Petition

of

GRACE OCEAN PRIVATE LIMITED, as
Owner of the M/V DALI,

and

SYNERGY MARINE PTE LTD, as Manager
of the M/V DALI,

for Exoneration from or Limitation of Liability

Civ. No. 24-00941-JKB

*IN ADMIRALTY*

**THE MAYOR AND CITY COUNCIL**
**OF BALTIMORE'S OPPOSITION TO**
**PETITIONERS' MOTION FOR JUDGMENT ON THE PLEADINGS**

**Table of Contents**

I.    INTRODUCTION.................................................................................................................1

II.    STATEMENT OF FACTS...................................................................................................4

A.    The 72" PCCP Water Main ...............................................................................................5

B.    The City's Roads and Bridges............................................................................................8

C.    Additional Harms .............................................................................................................10

III.    PROCEDURAL HISTORY...............................................................................................10

IV.    LEGAL STANDARD........................................................................................................12

V.    ARGUMENT .....................................................................................................................13

A.    The City Has Alleged Physical Damage To City-Owned Property .................................13

1.    Direct Physical Damage to the City's 72" Water Main ...................................................14

2.    Direct Physical Damage to the City's Transportation Infrastructure ..............................16

B.    Because The City Is A Proper Party To This Limitation Action, Adjudicating The City's Damages Exceeds The Court's Authority..................................................................................................19

C.    The City Possesses A Proprietary Interest In The Key Bridge, Because The Bridge Is An Integrated Unit Within The Fabric Of The City's Transportation System...................................................23

D.    Pragmatic Considerations Separately Support Recognition Of The City's Damages.......................25

E.    Baltimore Law Separately Guarantees The City The Right To Damages.........................................30

F.    The Intentional Act Exception To The *Robins Dry Dock* Doctrine ..................................................34

G.    Should The Court Consider Petitioners' Factual Contentions, Due Process Requires Further Discovery ................................................................................................................................35

VI.    CONCLUSION..................................................................................................................37

i

**Table of Authorities**
**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Am. Dredging Co. v. Miller*,
510 U.S. 443 (1994) ...................................................................................................... 31

*American Steamboat Co. v. Chase*,
83 U.S. [16 Wall.] 522 (1872) ...................................................................................... 20

*Ballard Shipping Co. v. Beach Shellfish*,
32 F.3d 623 (1st Cir. 1994) ..................................................................................... *passim*

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...................................................................................................... 12

*In re Bertucci Contracting Co., LLC*,
712 F.3d 245 (5th Cir. 2013) ........................................................................................ 29

*Blessey Enterprises v. M/V James E. Philpott*,
No. CIV. A. 94-2925, 1996 WL 267997 (E.D. La. May 21, 1996) ................................. 25

*Matter of Bruce Oakley, Inc.*,
No. CV-19-184-RAW-JAR, 2025 WL 1090964 (E.D. Okla. Mar. 3, 2025) ..................... 25

*Catalyst Old River Hydroelectric Ltd. P'ship v. Ingram Barge Co.*,
639 F.3d 207 (5th Cir. 2011) ........................................................................... 13, 23, 24, 25

*Charleston Area Med. Ctr., Inc. v. Blue Cross & Blue Shield Mut. of Ohio, Inc.*,
6 F.3d 243 (4th Cir. 1993) ............................................................................................. 15

*Cheek v. GL NV24 Shipping, Inc.*,
No. 2:22-CV-86, 2023 WL 5963185 (S.D. Ga. Sept. 13, 2023) ...................................... 33

*City of Miami Beach v. Cosme*,
388 So. 3d 944 (Fla. Dist. Ct. App. 2024) ..................................................................... 36

*Classic Mar. Inc. v. Glencore Singapore PTE LTD*,
No. 1:24-CV-9741-MKV, 2026 WL 370286 (S.D.N.Y. Feb. 10, 2026) .......................... 13

*Clay v. City of Huntington*,
184 W.Va. 708, 403 S.E.2d 725 (1991) ......................................................................... 36

*Consol. Aluminum Corp. v. C.F. Bean Corp.*,
772 F.2d 1217 (5th Cir. 1985) .................................................................................... 17, 18

*CXY Energy, Inc. v. Jurisch*,
No. CIV. A. 91-1705, 1992 WL 211649 (E.D. La. Aug. 17, 1992) .................................. 34

*In re Deepwater Horizon*,
   784 F.3d 1019 (5th Cir. 2015) ................................................................................... 34

*Dick Meyers Towing Service, Inc. v. U.S.*,
   577 F.2d 1023 (5th Cir. 1978) ................................................................................... 34

*Domar Ocean Transp., Ltd., Div. of Lee-Vac, Ltd. v. M/V Andrew Martin*,
   754 F.2d 616 (5th Cir. 1985) ............................................................................... 25, 27

*Drager v. PLIVA USA, Inc.*,
   741 F.3d 470 (4th Cir. 2014) .................................................................................... 13

*In re Exxon Valdez*,
   270 F.3d 1215 (9th Cir. 2001) ............................................................................. 31, 32

*F/V Robins Nest, Inc. v. Atl. Marine Diesel, Inc.*,
   1994 WL 594592 (D.N.J. Oct. 24, 1994) ................................................................... 33

*Fecht v. Makowski*,
   406 F.2d 721 (5th Cir. 1969) ............................................................................... 19, 22

*General Foods Corp. v. United States*,
   448 F. Supp. 111 (D. Md. 1978) (Pet. Mem. ) ...................................................... 29, 30

*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt.*,
   721 F.3d 264 (4th Cir. 2013) (*en banc*) ............................................................... 13, 36

*State of La. ex rel. Guste v. M/V Testbank*,
   524 F. Supp. 1170 (E.D. La. 1981), *aff'd,* 728 F.2d 748 (5th Cir. 1984) ...................... 27

*State of La. ex rel. Guste v. M/V TESTBANK*,
   752 F.2d 1019 (5th Cir. 1985) (Garwood, J. concurring specially) ............................ 27, 28

*Kaiser Aluminum & Chemical Corp. v. Marshland Dredging Co.*,
   455 F.2d 957 (5th Cir. 1972) .................................................................................... 34

*Kodiak Island Borough v. Exxon Corp.*,
   991 P.2d 757 (Alaska 1999) ..................................................................................... 33

*Latman v. Costa Cruise Lines, N.V.*,
   758 So. 2d 699 (Fla. Dist. Ct. App. 2000) .................................................................. 33

*Lewis v. Lewis & Clark Marine Inc.*,
   531 U.S. 438 (2001) ........................................................................................... 20, 29

*In re Lockheed Martin Corp.*,
   503 F.3d 351 (4th Cir. 2007) .................................................................................... 19

*Louisville & N. R. Co. v. Arrow Transp. Co.*,
   170 F. Supp. 597 (N.D. Ala. 1959) (Pet. Mem. ) ........................................................ 29

*Madruga v. Superior Court of Cal., Cnty. of San Diego*,
  346 U.S. 556 (1954) ................................................................................................................ 20

*Massey v. Ojaniit*,
  759 F.3d 343 (4th Cir. 2014) .................................................................................................. 12

*McCray v. Md. Dep't of Transp.*,
  741 F.3d 480 (4th Cir. 2014) .................................................................................................. 36

*Occupy Columbia v. Haley*,
  738 F.3d 107 (4th Cir. 2013) .................................................................................................. 12

*Offshore Logistics, Inc. v. Tallentire*,
  477 U.S. 207 (1986) ................................................................................................................ 31

*Pennzoil Producing Co. v. Offshore Express Inc.*,
  943 F.2d 1465 (5th Cir. 1991) ................................................................................................ 14

*Portland Pipe Line Corp. v. City of S. Portland*,
  288 F. Supp. 3d 321 (D. Me. 2017) ........................................................................................ 30

*Rivera v. Laporte*,
  120 Misc.2d 733 (N.Y. Sup. Ct. 1983) ................................................................................... 36

*Robins Dry Dock & Repair Co. v. Flint*,
  275 U.S. 303 (1927) ........................................................................................................ *passim*

*Robinson v. Alter Barge Line, Inc.*,
  513 F.3d 668 (7th Cir. 2008) .................................................................................................. 33

*Showa Line, Ltd. v. Diversified Fuels, Inc.*,
  Civ. A. Nos. 88–2421, 88–2432, 1991 WL 211527 (E.D. La. October 1, 1991) ................................. 34

*In re Skanska USA Civ. Se. Inc.*,
  No. 3:20CV5980/LAC/HTC, 2021 WL 4955040 (N.D. Fla. Jul. 28, 2021) .................................. 22, 23

*Skanska USA Civil Southeast Inc. v. Bagelheads, Inc.*,
  75 F.4th 1290 (11th Cir. 2023) ......................................................................................... 22, 23

*Southern Pacific Co. v. Jensen*,
  244 U.S. 205 (1917) ................................................................................................................ 31

*Valley Line Co. v. Ryan*,
  771 F.2d 366 (8th Cir. 1985) ............................................................................................. 20, 21

*Vaughan v. Atkinson*,
  369 U.S. 527 (1962) ................................................................................................................ 14

*Venore Transp. Co. v. M/V Struma*,
  583 F.2d 708 (4th Cir. 1978) ............................................................................................. 26, 27

*Wheeler v. Marine Navigation Sulphur Carriers, Inc.*,
764 F.2d 1008 (4th Cir. 1985) ................................................................................... 22

*XL Ins. Am., Inc. v. Turn Servs., L.L.C.*,
37 F.4th 204 (5th Cir. 2022) ............................................................................... 18, 26

*Yarmouth Sea Prods. Ltd. v. Scully*,
131 F.3d 389 (4th Cir. 1997) .............................................................................. 27, 28

**Statutes**

28 U.S.C. § 1333 Suitors Clause ......................................................................... *passim*

28 U.S.C. § 1333(1) ...................................................................................................... 19

an act of Congress, or [2] ............................................................................................. 31

Baltimore City Code, Art. 10 .................................................................................... 3, 30

Intentional Act ............................................................................................................. 34

Judiciary Act of 1789 .................................................................................................. 19

Liability Act .............................................................................................. 16, 20, 21, 35

New Jersey Consumer Fraud Act ................................................................................. 33

Ordinance 24-267 ........................................................................................................... 3

Ports & Waterways Safety Act ............................................................................ 3, 12, 34

**Other Authorities**

Case Management Order 3, Dkt. No. 438 ..................................................................... 16

Case Management Order No. 3. Dkt. No. 438 .............................................................. 11

Federal Rule F(5) ........................................................................................................... 4

Rule 12(b)(6) ................................................................................................................. 12

Rule 12(c) ...................................................................................................................... 13

Rule 12(d) ...................................................................................................................... 13

Rule 12(d) and Rule 56(d) ............................................................................................ 35

Rule 56 .......................................................................................................................... 13

Rule 56(d) ..................................................................................................................... 35

uniform rule .................................................................................................................. 33

*United States v. Deenadayalan*. Exhibit 1 ........................................................................................... 12, 34

## I.    **<u>INTRODUCTION</u>**

In their Motion for Judgment on the Pleadings, Petitioners seek to dismiss each of the claims of the Mayor and City Council of Baltimore ("the City"), based on the notion that the City's claims are foreclosed by *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303 (1927).

The Court should deny Petitioners' Motion for at least six reasons.

***First***, the City has properly alleged that the allision caused physical damage to property the City unquestionably owns: (a) a 72" pre-cast concrete pipe water main that traverses underneath the Patapsco River at the location of the bridge (the "72'' PCCP Water Main" or the "Water Main"); and (b) numerous streets and bridges that are owned by the City and have been damaged by the redirection of heavy traffic and traffic overflow caused by the allision. Significantly, Petitioners previously *admitted* that this claim, at least with respect to the 72'' PCCP Water Main, is a direct allegation of damage to real property in which the City claims a valid proprietary interest, and is thus *not* subject to attack under *Robins Dry Dock*. *See* Petitioners' Motion to Stay Dkt. No. 827 ("Petitioners acknowledge that the City of Baltimore's claim also alleges damage to a water pipe that was located in the vicinity of the bridge. *Petitioners' motion would not pertain to that aspect of the City's claim*, but only with respect to economic losses stemming from the loss of the bridge, as to which they have alleged no proprietary interest.") (emphasis added).

The City of Baltimore has also alleged the allision caused direct property damage to roads and bridges within Baltimore. Although the Key Bridge itself is not owned by the City, the surrounding streets which have been damaged by vehicular overflow and the new transiting of heavy traffic that previously only went over the Key Bridge are indisputably the City's property. This increased traffic, which includes heavy commercial and hazardous material ("hazmat")

vehicles, has caused physical damage to City roads and bridges, requiring increased maintenance to address the damage and additional large-scale resurfacing needs. The damage to City streets is acute, measurable, finite, and contributes to additional economic harms, including lost City revenue. In short, the City has alleged direct physical damage to City-owned property. Its claims thus cannot be dismissed on this Motion for Judgment on the Pleadings.

*Second*, because the City has alleged damage to its physical property, the limited nature of the Limitation action means that the Court should abstain from further dissecting the City's damages and otherwise engaging in a *Robins Dry Dock* analysis with respect to the City's claims. Indeed, the only reason for the Court to engage in any *Robins Dry Dock* analysis is for the sake of judicial economy; *i.e.*, the elimination of parties from the limitation action who otherwise would have no claim whatsoever. Because the City clearly is not such a party, going further and parsing the City's damages claims runs afoul of the City's rights pursuant to the Saving to Suitors Clause, 28 U.S.C. § 1333. The City has a statutory right to pursue its damages claims in state court. Presently analyzing each of the City's claims under a *Robins Dry Dock* framework invades that right.

*Third*, even if the Court engaged in a *Robins Dry Dock* analysis with respect to each of the City's claims, that analysis should not result in the exclusion of a single claim. The City, in fact, has a proprietary interest over the Key Bridge, since the Key Bridge functioned as a vital part of the City's integrated municipal transportation network.

*Fourth*, even if the Court would otherwise be inclined to find the City does not have a proprietary interest in the Key Bridge, under Fourth Circuit law, "pragmatic considerations" in any event allow the City's damages claims. Courts have long recognized that where there are entities, like the City, which have a unique and special interest in property that was harmed, those entities can claim consequential economic damage following that property's destruction, even where no

2

technical proprietary interest exists over property that was otherwise damaged. The Key Bridge was a vital part of the City of Baltimore's municipal infrastructure. Its absence is felt by every Baltimorean. The City had a unique interest in its existence.

*Fifth*, any damages that the Court may determine are purely economic are otherwise recoverable pursuant to Baltimore City Code, Art. 10, Subt. 10, enacted as Ordinance 24-267. The Ordinance provides that in any action arising out of the allision of the M/V Dali and the Key Bridge, the City shall be entitled to recover for economic loss caused by any violation of a permit, rule, regulation, or order to which the owner or operator of the M/V Dali or its agents were subject to, or caused by, their negligence. § 10-3(a)(1). The Ordinance further provides that, in any such action, it is not necessary to prove that the loss was sustained as a result of physical injury to a person or damage to the City's property. § 10-3(a)(2). Several courts—including multiple courts of appeal across the United States—have found that such laws are not preempted by any common-law or maritime jurisprudence. The ordinance alone forecloses any application of the *Robins Dry Dock* rule to bar the City's claims, and Petitioners ignore it entirely in their Motion.

*Finally*, should a determination be made that Petitioners' intentional criminal conduct caused the allision, *Robins Dry Dock* cannot apply. On June 18, 2026, the M/V Dali's Chief Engineer, Karthikeyan Deenadayalan, entered into a deferred prosecution agreement in which he admitted to a violation of the Ports & Waterways Safety Act and acknowledged his awareness that the M/V Dali used an unsafe fuel supply pump that compromised the vessel's safe navigation and ability to recover from a loss of power. Indeed, even in the infancy of the criminal proceeding, statements by key personnel would implicate Petitioners in conduct that would take them outside the ambit of *Robins Dry Dock*. The extent to which Petitioners engaged in criminal conduct is developing and independently weighs against any premature dismissal.

Taken together, the City of Baltimore cannot be dismissed from this action on the pleadings. The City has alleged direct physical damage to its property and the Saving to Suitors Clause should compel this Court to go no further than recognizing that, having alleged such physical damage, the City is a proper party to the limitation proceeding. Even if the Court does further analyze the City's various claims, the unique nature of the City's damage, the City's proprietary interest in its municipal network, the City Ordinance separately authorizing damages, and the intentional criminal conduct exception to *Robins Dry Dock* all support denial of the Petitioners' motion.

## II.    STATEMENT OF FACTS[1]

The City of Baltimore is a municipal corporation responsible for protecting and maintaining its core infrastructure. Amended Claim ¶¶ 13-15. The City does not have title ownership to the Key Bridge. The City does own other critical infrastructure components which were damaged as a consequence of the allision, including a 72" water main and many roads and bridges throughout the City that sustained verifiable damage as a consequence of vehicular overflow. Amended Claim ¶¶ 32, 45, 47. These and other infrastructure components are maintained by the City for the health, safety, and welfare of the people of Baltimore. *Id*. at ¶¶13-15.

The Key Bridge was constructed between 1972 and 1977 "to ease the substantial traffic going into and out of the City of Baltimore, and to allow for the transportation of so-called

---

[1] This Statement of Facts is largely drawn from the Amended Claim by Mayor and City Council of Baltimore Pursuant to Supplemental Federal Rule F(5) in Relation to the Key Bridge Allision, Dkt. No. 142 ("Amended Claim"). As explained below, the allegations in that Amended Claim are more than enough to overcome Petitioners' Motion for a Judgment on the Pleadings. However, because Petitioners have chosen to reference evidence outside of those Pleadings—largely documents relating to the 72" PCCP Water Main —the City also includes additional evidence here, both in response to the purported evidence Petitioners have proffered, and to better inform the Court.

'hazardous materials'" that could not pass through the area's tunnels. *Id.* ¶ 23. Its western approach sits on Hawkins Point in the City of Baltimore, and "all 30,000 of the daily commuters who used the 1.6-mile bridge passed into or out of the City of Baltimore." *Id.* ¶ 24. One of the Bridge's approaches is located on City-owned land at Hawkins Point. *Id.* ¶ 24 & ¶ 46 n.12.

In the early morning hours of March 26, 2024, the M/V Dali lost power, dropped and dragged its anchor, allided with the Francis Scott Key Bridge, and caused its immediate collapse. *Id.* ¶¶ 25, 27, 29. In doing so, the M/V Dali damaged property owned by the City of Baltimore.

## A.    The 72" PCCP Water Main

The City of Baltimore's Amended Claim is clear—the City of Baltimore alleges that the 72'' PCCP Water Main, owned by the City of Baltimore, was damaged after the allision. *See*, *e.g.*, *id.* ¶ 32. The water main, installed in 1972, rests under the Patapsco River approximately 200 feet from the Key Bridge. *See* Affidavit of Timothy Wolfe ("Wolfe Aff.") ¶ 3.



***Location and length of the 72" Water Main***

Timothy Wolfe, Chief of the Office of Engineering & Construction for the City of Baltimore Department of Public Works, executed an affidavit outlining the response of the City of Baltimore pertaining to the 72" PCCP Water Main. *Id.* ¶ 1. As Mr. Wolfe attests, the 72" PCCP Water Main was active at the time of the allision, such that water was flowing through it when the

M/V Dali struck the Key Bridge. *Id.* ¶ 6. The 72" PCCP Water Main operated as a crucial component of the City of Baltimore's water system. *Id.* ¶¶ 5, 7-8. It was pressurized and played an active role in the supply of water throughout the City. *Id.* ¶¶ 5, 6.

As the City alleges in its Amended Claim, "the Dali and its anchors caused significant damage to submerged pipes, including a 72-inch diameter water main owned and operated by the City of Baltimore, which supplies vital water to the City and its residents." *Id*. ¶ 30. This is confirmed by satellite imagery showing that after the M/V Dali struck and collapsed the Key Bridge, the vessel and debris rested overtop of the 72" water main.



***Satellite Image from 2024 Pure Technologies Robotic Inspection Showing location of 72"***
***PCCP Water Main***

The City further alleges that the water main "was damaged by the combination of the M/V Dali's evasive maneuvers necessitated by its sudden loss of power, and the collapse of the Key Bridge." *Id*. ¶ 47(a). As a result, "the City of Baltimore was forced to close the water main," and it "remains closed," while "recovery efforts around the remains of the Key Bridge have prevented the City from engaging in needed repairs to it." *Id*. ¶ 32. Damages that the City seeks to recover

from Petitioners include (but are not limited to) the costs of the "loss of use, repair, and reactivation" of the water main. *Id.* ¶ 47(a). Continued analysis has revealed that this damage will require the complete replacement of a more than two-mile submerged section of the 72" PCCP Water Main. The City of Baltimore retained Mark Webb, Principal of SSIS, LLC to perform a preliminary analysis, based on available data, the impact of the allision to the 72" PCCP Water Main. Affidavit of Mark Webb, at ¶¶ 1-2. Mr. Webb concludes that the 72" PCCP Water Main was physically damaged, that the damaged resulted from the allision, and that the 72 PCCP Water main will need to be replaced. *Id.* ¶ 16, 20, 24.

While Petitioners, in their Motion, wrongly attempt to marshal evidence indicating that the water main was not damaged (Motion at 10), hard evidence, in fact, indicates otherwise, including the work order for the closing of the water main due to the allision.

| DEPARTMENT OF HOMELAND SECURITY<br>Federal Emergency Management Agency<br>**CONTRACT WORK SUMMARY RECORD** | | PAGE ___1___ OF ___1___<br>OMB. Control Number: 1660-0017<br>Expires: November 30, 2023 | |
|---|---|---|---|
| **PAPERWORK BURDEN DISCLOSURE NOTICE**<br>Public reporting burden for this data collection is estimated to average .5 hours per response. The burden estimates includes time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and submitting this form. You are not required to respond to this collection of information unless a valid OMB control number is displayed on this form. Send comments regarding the accuracy of the burden estimate and any suggestions for reducing the burden to: Information Collections Management, Department of Homeland Security, Federal Emergency Management Agency, 500 C Street, SW, Washington, DC 20472-3100, Paperwork Reduction Project (1660-0017). **NOTE: Do not send your completed questionnaire to this address.** | | | |
| DATE<br>4/11/2024 | PA ID # | PROJECT # | DISASTER<br>Francis Scott Key Bridge collapse |
| LOCATION/SITE<br>Water valves locate on both the shore next to the where the entrances of FSK were located | CATEGORY | | PERIOD COVERING<br>3/26/2024 |
| DESCRIPTION OF WORK PERFORMED<br>Mobilized third-party vendor (Wachs) to close valves on 72" dia. water main | | | |

| DATES WORKED | CONTRACTOR | BILLING/INVOICE NUMBER | AMOUNT | COMMENTS- SCOPE |
|---|---|---|---|---|
| 3/26/2024 | Wachs | | 2685.72 | Turning of the valve for the 72" main in the harbor |
| | | | | |

Wolfe Aff. ¶¶ 10, 12. In short, the water main was working and was shut down because of damage caused by the allision.

Further, and while unnecessary for the Court to consider given the adequacy of the City's pleadings, following the allision and the subsequent valve shut off, the City of Baltimore conducted an inspection and analysis of the 72" pipe structure, which included a robotic electromagnetic test. Wolfe Aff. ¶¶ 15-16. The results of this post-allision inspection showed

7

significant damage to the concrete structure of the pipe, including the sections which were in the vicinity of the collapse and grounding of the M/V Dali. *Id.* ¶ 17. As a result of this documented damage, the City of Baltimore cannot safely return this pipe to operation and instead must engage in a costly replacement. *Id.* ¶¶ 17-18. Further, due to safety as well as engineering concerns, this replacement process cannot be carried out until after the new bridge is rebuilt. *Id.* ¶ 19.

Expert analysis also explains how the Key Bridge's collapse harmed the 72" PCCP Water Main. While, of course, at the pleadings stage, no such expert evidence is required to sustain the City's claims, to correct the inaccurate narrative proffered by Petitioners, Mr. Webb, in his affidavit, explains the impact of the Dali running aground, the falling steel debris, and the substantial surcharge loading on the soil covering the 72" PCCP Water Main. As a result of these impacts to the 72" PCCP Water Main, Mr. Webb explains that the structural integrity of the 72" PCCP Water Main was damaged, meaning that the 72" PCCP Water Main cannot return to service. *Id.* ¶¶ 13, 17-20, 24. Large scale replacement is thus necessary, a costly project which cannot be safely and practicably be completed until after new construction of the Key Bridge is completed. Webb Aff. ¶ 26.

The City of Baltimore has plainly and unequivocally alleged damage to the 72" PCCP Water Main due to the allision caused by Petitioners.

**B.    The City's Roads and Bridges**

The destruction of the Key Bridge directly harmed the City's roads and bridges. The loss of the Key Bridge "caused traffic to increase, infrastructure to experience significant additional stress, and vehicles ... to be sent through the City of Baltimore's streets ... hurting roads and bridges throughout the City," including "trucks loaded with industrial waste." *Id*. ¶ 45. The City alleges the costs of "an increased need for road maintenance and traffic management, to account for the increased traffic traveling through the City which previously would have traveled over the Key

8

Bridge," *id*. ¶ 47(e), and of the need to "repair and/or replace vital infrastructure, including but not limited to roads and bridges within Baltimore, as a direct result of the additional stress caused to that infrastructure by increased traffic resulting from the destruction of the Key Bridge," *id*. ¶ 47(f).

The City of Baltimore retained Joseph Caloggero, Vice President of the Traffic Group and a traffic engineer specializing in the analysis of traffic patterns through municipalities, to assess the impact of the Key Bridge's collapse on the City of Baltimore roads. A preliminary analysis of the traffic patterns before and after the allision indicates that there were at least 33,000 to 40,000 daily vehicles transiting the Key Bridge each day, Caloggero Aff. ¶¶ 7, 10, and the displacement of those vehicles onto Baltimore's City streets is causing substantial harm. Mr. Caloggero has already specifically identified 34 stretches of roadway suffering increased load. and executed an affidavit outlining the results of his analysis. *Id.* ¶ 11.



***Exhibit A to Caloggero Affidavit, showing the specific stretches of road impacted by the***

9

*allision*

These roadways are subject to additional damage by the wear and tear from the displaced traffic from the Key Bridge. *Id.* ¶ 12. The damage to these roadways is measurable and constant— each roadway's lifespan is shortened by this tremendous increase in load, ¶ 14, and the increased wear and tear from the traffic will require large-scale resurfacing. *Id.* ¶ 23. So long as the previous route over the Key Bridge remains out of service, these identified roadways in the City of Baltimore will continue to suffer from overburden and damage. *Id.* ¶ 18.

The damage to the streets of the City of Baltimore is measurable and discrete, with at least 34 stretches of roadways impacted. As a direct result of the allision, these roadways have been damaged and will continue to be damaged, at great cost to the City.

**C.    Additional Harms**

The City alleges further harms including the costs of "monitoring and cleanup of hazardous substances and/or other debris that have been or will be deposited into the environment and on property owned by the Claimant," *id*. ¶ 47(j); the costs of "abating the nuisance caused by the damage from the allision," *id*. ¶ 47(k); and the City's "loss of property and income tax revenue due to the substantial and foreseeable economic interruption caused by the allision," *id*. ¶ 47(i); *see also id.* ¶ 47(h). These harms are directly traceable to the allision, and to the harm to City property, such as damage to the City's roads and bridges, that the allision caused. *Id*.

Taken together, the Amended Claim alleges substantial harm to the City's physical property and additional losses traceable to it.

### III.    PROCEDURAL HISTORY

On April 1, 2024, Petitioners filed their Petition for Exoneration from or Limitation of Liability. Dkt. No. 1.

On April 22, 2024, the City filed its Answer. Dkt. No. 18. In its Fourteenth Defense, the

City specifically reserved its right to pursue all available claims in state court, pursuant to the "Saving to Suitors" clause, 28 U.S.C. § 1333, for resolution of any and all issues beyond a determination of whether admiralty jurisdiction exists and whether limitation is required. Dkt. No. 18 at 7.

On September 23, 2024, the City filed its Amended Claim. Dkt. No. 142. The substance of the City's allegations is set forth in the Statement of Facts, *supra*.

On November 7, 2024, following a Status and Scheduling Conference held on October 29, 2024, the Court entered Case Management Order No. 3. Dkt. No. 438. The Court stated that it would "confine its determinations during Phase 1 to resolving whether Petitioners are entitled to exoneration from or limitation of liability." *Id.* The Court further provided that the parties could "conduct whatever fact and expert discovery" they chose during this initial phase, that it "anticipates reopening discovery after the conclusion of Phase 1," and that "[n]o party is deemed to have waived discovery rights if they choose to refrain from pursuing certain lines of discovery (for example, discovery as to damages or other issues more focused on individual claims) until after Phase 1." *Id*.

On May 12, 2026, the Department of Justice filed an indictment against Synergy Marine Pte Ltd., Synergy Maritime Pte Ltd., and Radhakrishnan Karthik Nair.

On May 18, 2026, Petitioners filed a Motion to Stay the Trial. Dkt. No. 755. The Court denied the Motion. Dkt. No. 775.

On May 22, 2026, the Court approved the parties' proposed pretrial order and set the limitation trial to begin June 1, 2026. Dkt. No. 773.

On May 30, 2026, the parties filed a joint Motion to Stay. Dkt. No. 827. The Claimants asserted that while they consented to the Stay, the Claimants objected to an adjudication of the *Robins Dry Dock* doctrine at this phase of the litigation. Dkt. No. 829.

11

On June 1, 2026, the Court entered an Order determining that the "Court grants a stay to permit the parties to brief and to permit the Court to consider the applicability of *Robins Dry Dock & Repair Company v. Flint*, 275 U.S. 303 (1927) to the remaining claims." Dkt. No. 840.

On June 18, 2026, the United States entered into a deferred prosecution agreement with *M/V Dali* Chief Engineer, Karthikeyan Deenadayalan, in *United States v. Deenadayalan*. Exhibit 1. In the agreement, Deenadayalan admitted that he committed a violation of the Ports & Waterways Safety Act. Deferred Prosecution Agreement ¶ 1. Deenadayalan also stated he was aware that the M/V Dali used an unsafe fuel supply pump, which compromised the M/V Dali's safe navigation and ability to recover from the loss of power. Further, Deenadayalan knew that the inability to recover from a loss of power could adversely affect the safety of the M/V Dali, any bridge, structure, or shore area, and "would otherwise materially and adversely affect the *M/V Dali's* seaworthiness and fitness for service." *Id.* Nonetheless, the M/V Dali departed, destroyed the Key Bridge, killed six men, and devastated the City.

## IV.    LEGAL STANDARD

A motion for judgment on the pleadings is evaluated with the same deferential standard as a motion to dismiss under Rule 12(b)(6). *Occupy Columbia v. Haley*, 738 F.3d 107, 115 (4th Cir. 2013). The Court "tests only the sufficiency of the [pleading] and does not resolve the merits of the…claims or any disputes of fact." *Massey v. Ojaniit*, 759 F.3d 343, 353 (4th Cir. 2014). As with a motion to dismiss, all reasonable factual inferences must be drawn in the non-movant's favor. *Id.* As to the sufficiency of the facts alleged within the claim, the analysis is only whether the claim contains "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). Under longstanding Fourth Circuit precedent, a motion for judgment on the pleadings "should only be granted if, after

12

accepting all well-pleaded allegations in the Complaint as true and drawing all reasonable factual inferences from those facts in the [nonmoving party's] favor, it appears certain that the [non-moving party] cannot prove any set of facts in support of his claim." *See Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014) (citing *Edwards v. City of Goldsboro,* 178 F.3d 231, 244 (4th Cir. 1999)).

Where a movant presents materials outside the pleadings in connection with a Rule 12(c) motion, the Court retains discretion to exclude those materials and resolve the motion on the pleadings. If the Court instead elects to consider them, Rule 12(d) requires conversion and the nonmoving party must receive a reasonable opportunity to present all material pertinent to summary judgment. Fed. R. Civ. P. 12(d). In the Fourth Circuit, that opportunity requires both notice that the Court will treat the motion under Rule 56, and a reasonable opportunity to conduct discovery before summary judgment is decided. *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt.*, 721 F.3d 264, 281 (4th Cir. 2013) (*en banc*). Where those requirements are not satisfied, the appropriate course is to exclude the extra-pleading materials and resolve the motion under the Rule 12(c) standard.

In evaluating whether a proprietary interest has been affected by a marine casualty, courts look not merely to actual damage to the property, but to whether there was an "invasion of a proprietary interest," *Catalyst Old River Hydroelectric Ltd. P'ship v. Ingram Barge Co.*, 639 F.3d 207, 210 (5th Cir. 2011), such as where an allision causes a disruption in a property's proper use by its owner. *Id*. at 212. Further, whether a party has a cognizable "proprietary interest" in damaged property is a "fact-intensive inquir[y]" often subject to disagreement. *Classic Mar. Inc. v. Glencore Singapore PTE LTD*, No. 1:24-CV-9741-MKV, 2026 WL 370286, at *5 (S.D.N.Y. Feb. 10, 2026).

## V.    ARGUMENT

### A.    The City Has Alleged Physical Damage To City-Owned Property

The City has alleged damages to its 72" PCCP Water Main, along with dozens of roads and many bridges across the City that are suffering from vehicular overload as a consequence of the Key Bridge being eliminated from the fabric of the City's traffic.[2] The damages alleged in each respect are specific, provable, and finite. In other words, the City's damages are squarely allowed within the *Robins Dry Dock* framework. *See* Dkt. No. 142; *Robins Dry Dock*, 275 U.S. at 308-09.

### 1.    Direct Physical Damage to the City's 72" Water Main

As an initial matter—and as both Petitioners and the Court have previously acknowledged—the City suffered, and continues to suffer, physical damage to the City's water infrastructure, a 72" water main,[3] as a direct result of the allision. No interpretation of *Robins Dry Dock* removes the water main from this case. *See also Pennzoil Producing Co. v. Offshore Express Inc.*, 943 F.2d 1465, 1473 (5th Cir. 1991) ("The rule of *Robins Dry Dock* was never intended to apply to cases in which the plaintiff has suffered some physical damage to property in which he has a proprietary interest….").

Despite admitting that the City alleged direct damage to its 72" PCCP Water Main—*see* Dkt. No. 827 at 2, n. 2 (explaining that Petitioners' motion with respect to *Robins* would exempt any claim concerning the water main)—Petitioners now contend that the City does not allege "facts that substantiate its bare claim that the water main was actually damaged as a result of the

---

[2] Petitioners omit the City from the claimants they identify as having alleged public nuisance, and ask the Court not to consider any public nuisance exception as to the City. Pet. Mem. at 16 & n.18. The City, however, expressly alleges "the public nuisance suffered by the City of Baltimore and its citizens, who have had interrupted their enjoyment and use of the Key Bridge, the Patapsco River, the Baltimore Harbor and associated waterways," Amended Claim ¶ 47(n); *see also id.* ¶¶ 15, 47(k), (m), and seeks injunctive relief, *id.*, Request for Relief ¶ e. To the extent the City seeks to abate that nuisance, that relief is equitable and falls outside *Robins Dry Dock*. *See Vaughan v. Atkinson*, 369 U.S. 527, 530 (1962) ("Equity is no stranger in admiralty; admiralty courts are, indeed, authorized to grant equitable relief.").

[3] There is no dispute as to the ownership of the 72" water main. The City owns it.

Casualty." Pet. Mem. at 10. Of course, and as noted above, that assertion is plainly false: the City alleges in its Amended Claim that the 72" PCCP Water Main was located directly under the Key Bridge, and that it was harmed by "the combination of the Dali's evasive maneuvers…and the collapse of the Key Bridge." Amended Claim at ¶ 47(a). The Amended Claim alleges that the M/V Dali and its anchors "caused significant damage" to the 72" PCCP Water Main, *id*. ¶ 30, forcing the City to close the it, and otherwise preventing the City from engaging in needed repairs to it, *id*. ¶ 32. The Amended Claim further alleges that the 72" PCCP Water Main was "owned and operated by the City of Baltimore" and "supplies vital water to the City and its residents," *id*. ¶ 30, that the City "was forced to close" it and it "remains closed," *id*. ¶ 32, and that the damage requires its "loss of use, repair, and reactivation," and ultimately its replacement, *id*. ¶ 47(a).[4] Surely, these allegations are at least sufficiently plausible to emerge unscathed from the pleading stage: the City alleges that a giant bridge collapsed on top of its water main after a 957-foot vessel ran aground over top of it. It is more than plausible that the collapse and grounding did some damage. A Motion for Judgment on the Pleadings is not a mechanism to litigate such issues of causation. That is for the fact finder. *See Charleston Area Med. Ctr., Inc. v. Blue Cross & Blue Shield Mut. of Ohio, Inc*., 6 F.3d 243, 247 (4th Cir. 1993) ("issues of causation are to be decided by the jury…") (internal quotations and citations omitted).

In apparent recognition of the sufficiency of Claimant's pleading, Petitioners assert that discovery has not yet yielded "evidence of physical damage to the water main." Pet. Mem. at 10. In so asserting, however, Petitioners conveniently ignore that discovery with respect to Claimants' damages was specifically reserved for a different, not yet commenced stage of these proceedings,

---

[4] *See* detailed procedural posture, *supra* at 3-6.

15

and so was fundamentally incomplete.[5]   To support their argument, Petitioners have attached extraneous materials far beyond the pleadings including news articles intended to cast doubt on the ability of the City to *prove* its claim. These arguments are both inappropriate at the pleading stage and provably wrong.

As Mark Webb attests in his affidavit, as a matter of fact, the 72" PCCP Water Main was impacted in at least the following ways: (a) it was taken out of service after the bridge strike; (b) the M/V Dali ran aground on top of it, which imposed substantial surcharge loading on the compressible trench soils that covered it; (c) it became susceptible to cracking under excessive surcharge loading, bending moments, shear forces, and deflection caused by the M/V Dali; and (d) as a consequence, it will need to be removed and replaced. Webb Aff. ¶¶ 14, 16, 18, 20, 24.

The City has pleaded, and proffered evidence supporting that pleading, that the 72" PCCP Water Main was operational, was harmed by the allision and destruction of the bridge, was taken offline because of these terrible events, and needs to be replaced. *But for* the Petitioners' conduct, the City of Baltimore would have the water main in place and functioning, a piece of infrastructure necessary to protect vital water resources for the people of the City of Baltimore.

### 2.   Direct Physical Damage to the City's Transportation Infrastructure

The 72" PCCP Water Main is not the only City property that has been directly harmed by the allision. Although the City does not own Key Bridge itself, the City unquestionably does own the roads and bridges that suffered and continue to suffer direct physical harm by the traffic overflow caused by Petitioners' destruction of the Key Bridge. As a result of Petitioners' wrongful

---

[5] *See* Case Management Order 3, Dkt. No. 438 at 2 (explaining the "narrower role" of the "first stage" of litigation, which narrower role "better comports with the "limited purpose" of the Limitation of Liability Act," and specifically noting that "no party will be deemed to have waived any discovery rights if they choose to refrain from pursuing certain lines of discovery," such as issues relating to "individual claims"). Pursuant to CMO 3, the City's focus, to date, has been on limitation, and not on proving up its damages.

(and allegedly criminal) conduct, heavy industrial traffic that used to flow over the Key Bridge now goes through Baltimore city streets, damaging the City's roads and bridges and necessitating immediate and ongoing repairs. *See generally* Amended Claim at ¶47(e). That damage to the City's roads and bridges is not an "economic loss" like those often precluded under *Robins Dry Dock*. It is direct physical harm to City property.

The 33,000 to 40,000 vehicles that used the Key Bridge on a daily basis have been forced onto the streets of Baltimore at great cost and burden to the City's property. At least 34 specific stretches of roads have already been identified as having been directly harmed by the allision. Those roads are suffering, will require large-scale resurfacing efforts, and need increased maintenance as a direct result of the loss of the Key Bridge. *See* Caloggero Aff. ¶¶ 7, 10-12, 15-16, 23. Repair is not optional: the City of Baltimore is required to address this damage to ensure safe and reliable roadways.

The principle that such physical consequences from an allision are not consequential economic losses—but properly construed as direct physical damage to a claimant's property—was borne out in *Consol. Aluminum Corp. v. C.F. Bean Corp.,* 772 F.2d 1217, 1221-22 (5th Cir. 1985). There, the plaintiff owned a power plant that used natural gas, fed by a Texaco pipeline, for operations. Defendant was engaging in dredging operations when it struck the pipeline—*i.e.*, property in which the plaintiff had no proprietary interest—six miles from the plant. *Id*. at 1219-20. The subsequent reduction in gas pressure ultimately harmed the plaintiff's power plant, causing portions of the power plant's infrastructure to crack and lose their use. *Id*. The plaintiff lost gas supply for ten days and sued for recovery of both the physical damage caused by that loss of supply to its physical infrastructure, along with the consequential economic damages of being offline for a period of time.

While the district court in *Consol. Aluminum Corp.* ruled that *Robins Dry Dock* precluded

17

the plaintiff from recovery because it did not own the property directly hurt in the allision—construing the physical harm to the powerplant as consequential economic damage—the Fifth Circuit reversed, holding that the plaintiff had alleged "*physical losses*, as well as attendant economic damages." *Id*. at 1221-22 (emphasis in original). The Fifth Circuit explained that the immediate impact of the allision was a *physical* harm to the plaintiff's actual property—even if the plaintiff's property was six miles away from the pipeline rupture, and not a party to the allision itself. Due to this physical harm to the power plant's infrastructure resulting from the allision, the "rationale for applying the rule foreclosing relief for economic harm does not apply," since a limited number of parties suffer such physical impacts. *Id*. at 1223.

*Consol. Aluminum Corp*. is readily applied here. Akin to the gas moving through the Texaco pipeline, traffic flowed over the Key Bridge. When the allision occurred, that flow stopped. The immediate impact from that flow interruption was the re-routing of heavy traffic onto Baltimore's city streets. That re-routing has caused, and continues to cause, devastating harm to Baltimore's roads and bridges, and the costs of repairing and maintaining them. *See* Amended Claim ¶ 47(e)-(f). In other words, there has been physical damage to Baltimore's infrastructure directly caused by the allision, and substantial costs to ameliorate that harm. There is no risk of double recovery, *XL Ins. Am., Inc. v. Turn Servs., L.L.C.*, 37 F.4th 204, 206 (5th Cir. 2022), for the damages the City suffered—if the City does not recover them, nobody can. Indeed, no other party is claiming such resultant physical harm at all.

The City's direct physical harm to its own roads and bridges entitles it to recover not only the cost of repairing that damage, but also the attendant economic losses that flow from it. *See Consol. Aluminum Corp.,* 772 F.2d at 1221-22. Those losses include the resulting harm to the public fisc. *See* Amended Claim ¶ 47(h)-(i). The extent of that damage will be the subject of a later damages action, and is thus not before the Court.

18

**B.** **Because The City Is A Proper Party To This Limitation Action, Adjudicating The City's Damages Exceeds The Court's Authority**

The City has alleged damage to its property. It has accordingly established that it is a proper party to this limitation proceeding. As a result, this Court should go no further in determining the scope and existence of the City's damages. To do so runs afoul of the "Saving to Suitors" statute and risks violating the City's due process rights.

The Saving to Suitors clause exists to protect claimants' rights to adjudicate their claims in a forum of their choosing. Congress amended and codified the current version of the Saving to Suitors clause, which itself originates from the original Judiciary Act of 1789 (*The Moses Taylor*, 71 U.S. 411, 416 (1866)), under 28 U.S.C. § 1333(1). *See id.* ("The district courts shall have original jurisdiction . . . of any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies"). While granting the federal courts exclusive jurisdiction over matters in admiralty, Congress has long expressly protected the common law rights of those seeking redress. The clause was designed and functions to ensure that federal jurisdiction over the limitation of liability of a vessel does not trump the rights to which plaintiffs would be entitled under state law. *See In re Lockheed Martin Corp.*, 503 F.3d 351, 354-55 (4th Cir. 2007) ("The effect of the saving-to-suitors clause as interpreted by the Supreme Court is to give a maritime plaintiff several options when bringing suit[.]"). Courts accordingly have long been careful "not to 'transform (the Limitations) Act from a protective instrument to an offensive weapon by which the shipowner could deprive suitors of their common-law rights.'" *Fecht v. Makowski*, 406 F.2d 721, 723 (5th Cir. 1969).

The City has asserted and preserved all rights to seek an adjudication before an appropriate court of the City's choosing pursuant to 28 U.S.C. § 1333. In addressing a limitation petition, a federal court has authority to determine the vessel owner's right to limit liability, but not to

unnecessarily adjudicate significant merits issues, including the claim-by-claim dissection of damages under a *Robins Dry Dock* framework. *Lewis v. Lewis & Clark Marine Inc.,* 531 U.S. 438, 445 (2001). *See also Madruga v. Superior Court of Cal., Cnty. of San Diego,* 346 U.S. 556, 560–561 (1954)*; American Steamboat Co. v. Chase,* 83 U.S. [16 Wall.] 522, 533–534 (1872)*.*

The only argument advanced by Petitioner for litigating matters related to *Robins Dry Dock* at this stage is one for judicial efficiency. In short, Petitioners urge that the Court should not expend significant resources litigating a limitation proceeding if the parties don't have any recoverable damages in the first place. But that argument is meritless with respect to the City and its claims. The City has more than plausibly alleged substantial direct damage to its property—including the 72" PCCP Water Main and the City's roads and bridges—directly caused by the allision. Further parsing of the City's damages serves no efficiency purpose.

With a claim-by-claim *Robins Dry Dock* analysis, the court would transform this limitation action from its proper function as a limited proceeding to determine whether Petitioners are afforded protection under the Limitation of Liability Act, into a weapon wielded by Petitioners to strip the City of its damages in a forum not of the City's choosing and in clear violation of 28 U.S.C. § 1333. Courts of appeal have accordingly found that district courts who engage in merits analysis extending into damages, beyond the work actually necessary to adjudicate limitation, abuse their discretion. For example, in *Valley Line Co. v. Ryan*, 771 F.2d 366 (8th Cir. 1985), a district court determined not merely whether Petitioner could limit liability, but went further, and calculated the ultimate damage suffered by the claimant, who had asserted before the damages hearing that he "should have been allowed to proceed in state court on the liability issue." *Id*. at 375. Reversing, the Eighth Circuit explained that the district court "erred in reaching the issue of liability" once it had determined limitation, *id*. at 375, as "all the shipowner is entitled to is to limit its liability and not to deprive the claimant of his right to a jury trial and a properly selected forum."

20

*Id*. at 373. *See also id*. at 374 ("for the district court to proceed with the merits of [the claimant's] claim at that point would deprive [the claimant] of his right to a jury trial.") The Eighth Circuit further found that the trial court had violated the Claimant's right to procedural due process by hearing damages issues without proper notice and opportunity to prepare. *Id*. While in a different procedural posture, the Seventh Circuit went so far as to *sua sponte* reverse a liability determination by the district court in an admiralty action, and determine that the district court should have instead abstained from taking jurisdiction over any aspect of a claim apart from determining limitation. *Complaint of McCarthy Bros. Co./Clark Bridge*, 83 F.3d 821, 831 (7th Cir. 1996).

The City of Baltimore sits in a similar posture. The City of Baltimore preserved all rights protected by 28 U.S.C. § 1333, has stated a claim, and wishes to pursue its damages claims in its chosen forum, before a jury, following the Court's determination of Petitioners' limitation right (or lack thereof). This Court would accordingly "err[] in reaching the issue" of damages once it determines limitation. *See Valley Line Co.,* 771 F.2d at 375. *Valley Line* likewise instructs that a damages proceeding without proper discovery separately violates a party's due process rights. *Id*.

Most important, however, is that the City has unquestionably alleged damage to its property—including but not limited to damage to its 72" PCCP Water Main—and even proffered additional evidence supporting that damage,[6] making a *Robins Dry Dock* analysis with respect to the City's claim completely gratuitous. As the Court itself recognized in its third Case Management Order, taking a "narrower role…better comports with the 'limited purpose' of the Limitation of Liability Act." Dkt. No. 438 at 2. In the event the Court rules Petitioners are not entitled to limitation, the Saving to Suitors clause entitles "claimants…to have the injunction against other

---

[6] *See, e.g.*, Dkt. No. 18 ¶ 6; Dkt. No. 142 ¶¶ 23-24, 29, 45, 47; Caloggero Aff. ¶¶ 7-10.

21

actions dissolved, so that they may, if they wish, proceed in a common law forum as they are entitled to do…." *Fecht*, 406 F.2d at 722. Adjudicating not merely who has stated a claim to be party to Limitation, but also the strength of the various theories of damage available for each claimant, transforms "the (Limitations) Act from a protective instrument to an offensive weapon by which the shipowner could deprive suitors of their common law rights." *Id*. (citing *Lake Tankers Corp. v. Henn*, 354 U.S. 147, 152 (1957)). *See also Wheeler v. Marine Navigation Sulphur Carriers, Inc.*, 764 F.2d 1008, 1011 (4th Cir. 1985) (citing *Fecht*, collecting cases, and underscoring the "limited purpose" of the Limitation of Liability Act).

The City's suggested approach is consistent with the one taken by this Court in CMO 3. There in creating the sensible two-phase structure of this proceeding, the Court explained that "whenever the court [denies limitation and exoneration], it is appropriate to dismiss the petition to protect the claimants' rights under the saving to suitors clause—even if that means forgoing (in part or in entirety) a decision on the vessel owner's liability." Dkt. No. 438 at 2-3. In so ruling, the Court relied on *Skanska USA Civil Southeast Inc. v. Bagelheads, Inc.*, 75 F.4th 1290, 1307 (11th Cir. 2023), a case that is highly relevant to this very issue. In *Skanska*, petitioner's barges struck a bridge, damaging the bridge and substantially harming a variety of claimants. Petitioners urged the district court to dismiss the claims as precluded by *Robins Dry Dock*. The district court denied that motion, explaining that by choosing not to rule on whether claimants' damages should be precluded based on *Robins Dry Dock*, "the court better preserves the rights of Claimants under the 'saving to suitors' clause … to choose whichever common law forum would be available to them should [Petitioner] be unable to limit its liability in this federal maritime forum." *In re Skanska USA Civ. Se. Inc.*, No. 3:20CV5980/LAC/HTC, 2021 WL 4955040, at *9 (N.D. Fla. Jul. 28, 2021). Affirming, the Eleventh Circuit explained that while Petitioner of course had a right to "have the question of limitation adjudicated in federal court . . . that is as far as it goes," such that "[o]nce

22

the district court decided that [Petitioner] was not entitled to limitation, it correctly dismissed the case so that the claimants could pursue remedies in whichever forums that they chose." *Skanska*, 75 F.4th at 1308-09.

The same is true here. Once it determines that the City is an appropriate Claimant before it in this limitation action, the Court should allow the City, following the limitation action's conclusion, to pursue its claims for damages in the forum of its choosing. Doing so "better preserves the rights of Claimants under the 'saving to suitors' clause…." *In re Skanska*, 2021 WL 4955040, at *9 (N.D. Fla. July 28, 2021).[7]

Petitioners' Motion for Judgment on the Pleadings should not become an opportunity for this Court to invade City of Baltimore's rights guaranteed by 28 U.S.C. § 1333.

**C.     The City Possesses A Proprietary Interest In The Key Bridge, Because The Bridge Is An Integrated Unit Within The Fabric Of The City's Transportation System**

While the Court should not engage in further damages analysis with respect to the City, Petitioners' contention that the City does not have a proprietary interest in the Key Bridge is incorrect. It has one: the Key Bridge was a core part of the City's municipal transportation network, a network that was fundamentally harmed and altered by the allision. The Key Bridge fed into Baltimore, helped maintain Baltimore traffic, and kept heavy trucks out of Baltimore's central streets. *See* Dkt. No. 18 ¶ 6; Dkt. No. 142 ¶¶ 23-24, 29, 45, 47; Caloggero Aff. ¶¶ 7-10. All 30,000 of the Key Bridge's daily trips departed from, or entered into, the City. The Key Bridge was, in other words, a "functional component," *Catalyst Old River*, 639 F.3d at 211, of Baltimore's core municipal infrastructure, the destruction of which is interfering with that infrastructure's ability to

---

[7] Despite the Court's citation to *Skanska* in its Order, and notwithstanding *Skanska* representing a Circuit level case involving economic losses arising from an allision with a bridge, and notwithstanding that *Skanska* discusses the appropriate timing of a *Robins Dry Dock* analysis, Petitioners fail to cite either the district or the Circuit *Skanska* decisions in their Motion.

operate.

Courts have recognized that even mere *disruption* of such a "functional component" of a claimant's property is sufficient for a claimant to allege damage to a "proprietary interest," *even where no claimant property is actually damaged in that disruption*. For example, in *Catalyst Old River*, 639 F.3d at 209, a barge drifted into an intake channel of a hydroelectric plant. While the plaintiff took water from the intake channel to operate the plant, the barge did not directly damage any of the plaintiff's property. Nevertheless, the barge disrupted the flow of water, and to allow for its extraction, the plant had to slow the intake of water, and temporarily shut down a few of its turbines, causing the plant to lose revenue due to a temporary reduction in electricity output. Reversing the district court, the Fifth Circuit relied on the fact that the intake channel's interruption impaired the normal functioning of the hydroelectric plant and so constituted a sufficient "invasion of a proprietary interest." *Id*. at 210. As the court succinctly stated:

> Catalyst argues that the presence of the barge in the intake channel, which is a functional component of Catalyst's hydroelectric generating facility, interfered with the unobstructed continuous flow of water in the channel, impairing the ability of the facility to operate as designed. We agree with Catalyst that this harm qualifies as damage to its proprietary interest.

*Id.* at 211.

The application of *Catalyst* to this case is clear: in short, because the destruction of the Key Bridge is "impairing the ability of the [municipal network] to operate as designed…this harm qualifies as damage to [the City's] proprietary interest." *See id*. Importantly, the Fifth Circuit did not hold there was a total shutdown of the hydroelectric power plant's production, *or even any physical harm to the power plant at all*: it was enough that the direct consequence of the defendant's negligence was that the "production output" was "reduced," meaning that the plaintiff's "use of the property as a hydroelectric station" was "interfere[d] with." *Id*. In other words, the City's case is even clearer: not only is its municipal network experiencing tremendous

24

disruption, that disruption is—as discussed above—causing harm to the City-owned roads and bridges. *Accord Matter of Bruce Oakley, Inc.*, No. CV-19-184-RAW-JAR, 2025 WL 1090964, at *12 (E.D. Okla. Mar. 3, 2025) (allision of barge with dam interfered with separate hydroelectric facility, allowing recovery for economic loss associated with that facility, since "the allision of the barges with the dam precluded the generation of electricity for a period of time, demonstrating the essential nature of the dam to the hydroelectric facility in carrying out its functions"). *Cf. Domar Ocean Transp., Ltd., Div. of Lee-Vac, Ltd. v. M/V Andrew Martin*, 754 F.2d 616, 619 (5th Cir. 1985) (awarding consequential economic damages for loss of optimal use of an "integrated unit," recognizing entity's "proprietary interest in the combination," and awarding economic damages where non-damaged portion was used but not to its full capacity); *Blessey Enterprises v. M/V James E. Philpott*, No. CIV. A. 94-2925, 1996 WL 267997 *6 (E.D. La. May 21, 1996) (recognizing right to "recover for loss of use of the unit.").

For the City, the use of its basic municipal infrastructure—the roads and bridges that operate as a core municipal network—has experienced and continues to experience a fundamental interruption and invasion far greater than anything the plaintiff in *Catalyst* could allege. *See* Dkt. No. 142 ¶¶ 2-3, 5, 7, 29, 45-47; Caloggero Aff. ¶¶ 10-18, 23. The Key Bridge formed an essential part of that core municipal network. *See generally* Dkt. No. 142 ¶ 23-24, 45; Caloggero Aff. ¶¶ 6-10. The City accordingly is entitled to the consequential damages that flow from the interruption caused by Petitioners' destruction of the Key Bridge.

## D.     Pragmatic Considerations Separately Support Recognition Of The City's Damages

While the Court should find that the City of Baltimore has sustained direct damage to its water main, roads, and bridges, and that the Key Bridge represented such a fundamental part of the City's core municipal network as to independently allow for the City to claim consequential economic damages arising from its destruction, separate pragmatic considerations also support a

25

damages finding here. The *Robins Dry Dock* "rule exists to avoid the possibility of limitless liability," such that "*Robins Dry Dock* is inapposite" when "the risk of double recovery from the tortfeasor is not extant." *XL Ins.*, 37 F.4th at 206. In other words, the "spectre of runaway recovery lies at the heart of the *Robins Dry Dock* rubric," *id.*, but where no such "spectre" exists, *Robins Dry Dock* will not apply. *Id.* The City's claims are different in kind from those typically precluded under *Robins Dry Dock*.

Simply put, the City has clearly suffered harm—of a sort distinct from the contractual expectation contemplated in *Robins Dry Dock* itself—that was direct, foreseeable, finite, calculable and of a kind totally unique to itself *as the municipality in which the Key Bridge was located*. This is not the harm of contractual expectancy; it is the harm of a municipality whose municipal infrastructure has been violently altered. The Fourth Circuit has cautioned against the rote application of *Robins Dry Dock* to preclude recovery where such direct, foreseeable, and unique harm is present.

For example, in *Venore Transp. Co. v. M/V Struma*, 583 F.2d 708, 710 (4th Cir. 1978), the Fourth Circuit considered whether a non-owner time charterer could recover for the loss of use of a vessel it had hired that had been harmed in a collision. In allowing consequential economic damages, the Fourth Circuit explained that, because of the economic arrangement between the *Venore* plaintiff and the vessel's owner—essentially, that the only party who was harmed by the loss of use was the plaintiff because the plaintiff had paid the vessel owner for the use of the now unusable vessel—*Robins Dry Dock* was inapplicable. The court explained that "*Robins Dry Dock* is perfectly defensible, if pragmatic considerations require the foreclosure of remote damage claims," but that where pragmatic considerations counsel otherwise—such as where its application will supply the tortfeasor with avoidance of clear foreseeable and direct harm—*Robins Dry Dock* should not be applied. *Id.* As the *Venore* court further explained, there is "nothing remote about

26

these damages; the only objection is that they were suffered by the time charterer rather than by the owner." *Id*. at 711.

Applying that principle, the Fourth Circuit in *Yarmouth Sea Prods. Ltd. v. Scully*, 131 F.3d 389, 398 (4th Cir. 1997) again chose "pragmatic considerations" over a rote application of *Robins Dry Dock*. There, the court considered whether to allow for recovery of a fisherman's wages following the loss of a ship. As the Fourth Circuit explained, the losses to fishermen "are as foreseeable and direct a consequence of the tortfeasor's actions as the shipowner's loss of use [and] are unlike the time charterer in *Robins Dry Dock* whose contract with the shipowner is impaired 'unknown to the doer of the wrong.'" *Id.* (citing *Miller Industries v. Caterpillar Tractor Co.,* 733 F.2d 813, 820 (11th Cir. 1984)). That the City of Baltimore suffers serious damage from the destruction of a central artery is just as "foreseeable and direct a consequence of the tortfeasor's actions" as the fishermen's were in *Yarmouth*. Indeed, even more so, since a tortiously aborted fishing voyage may have in any event lead to no catch, since fish don't always bite. There is no circumstance in which the destruction of the Key Bridge would not cause material economic harm to the City in which it sat.

Indeed, the Fourth Circuit is not alone in recognizing certain pragmatic considerations when considering a *Robins Dry Dock* challenge. In *State of La. ex rel. Guste v. M/V Testbank*, 524 F. Supp. 1170, 1173 (E.D. La. 1981), *aff'd,* 728 F.2d 748 (5th Cir. 1984), *on reh'g,* 752 F.2d 1019 (5th Cir. 1985), and *aff'd sub nom. State of La. v. M/V Testbank*, 767 F.2d 916 (5th Cir. 1985), and *aff'd sub nom. Testbank, M/V*, 767 F.2d 917 (5th Cir. 1985) the district court recognized that commercial fishermen, due to their "special interest" in the waters that were polluted, were able to recover despite lacking a proprietary interest in any property damaged. Even as they affirmed the district court and issued an opinion describing the applicability of *Robins Dry Dock* in the Fifth Circuit, the commercial fishermen exception was left undisturbed. As one member of the Fifth

27

Circuit stated in concurrence, "we wisely leave to one side the claims of the commercial fishermen….I write separately only to explicitly suggest what seems implicit in the Court's opinion, namely, that the physical harm or invasion requirement may not be inflexible or without exception…." *State of La. ex rel. Guste v. M/V TESTBANK*, 752 F.2d 1019, 1035 (5th Cir. 1985) (Garwood, J. concurring specially). If commercial fishermen have a "special interest" in the waters in which they fish, *surely* the City of Baltimore has a special interest in the Key Bridge, its most important Harbor crossing.

In other words, even if the Court determines that the City of Baltimore's damages are best conceptualized as economic loss—which, as explained above—they are not, *Robins Dry Dock* still does not apply. The City's losses caused by Petitioners' destruction of Key Bridge are direct, concrete, and unique to the City. Failing to allow the City recovery due to its lack of technical ownership of the bridge would allow Petitioners a windfall of the sort that the Fourth Circuit specifically cautions against. In short, "pragmatic considerations," *Yarmouth,* 131 F.3d at 398, separately necessitate the City's recovery for the damages it has suffered.

Petitioners' authority does not otherwise counsel for dismissal of the City's claims. Petitioners highlight, in particular, four cases which Petitioners contend "deny purely economic loss claims…with facts highly analogous to those presented in this matter." Pet. Mem. at 6. But none of Petitioners' cited cases have facts even remotely analogous to those that the City alleges here. For example, in *Complaint of Marine Nav. Sulphur Carriers, Inc.*, 507 F. Supp. 205, 209 (E.D. Va. 1980*), aff'd sub nom. Marine Nav. Sulphur Carriers, Inc. v. Lone Star Indus., Inc.*, 638 F.2d 700 (4th Cir. 1981) (Pet. Mem. at 6-7), the court considered the fallout from a bridge allision where various claimants—largely business owners whose travel over the bridge in question was interrupted—alleged "indirect harm in the nature of the interference of contractual obligations, the loss of business expectancies, or the added costs of doing business," *id*. caused by the "temporary

28

inability to traverse the…[b]ridge or to navigate the underlying [r]iver."[8] Not one of the claimants in *Marine* alleged harm to, interference with, or invasion of their actual property, nor were any of the claimants a municipality. Baltimore, of course, does not allege a single claim based on a "loss of business expectancy" or "interference of contractual obligations." Rather, the City alleges real, lasting, harm to its property, and the economic fallout occurring from it.

Next, in a footnote, Petitioners cite *In re Bertucci Contracting Co., LLC*, 712 F.3d 245 (5th Cir. 2013) and *Louisville & N. R. Co. v. Arrow Transp. Co.*, 170 F. Supp. 597 (N.D. Ala. 1959) (Pet. Mem. at 6 n.5). Other than the fact that each of those cases involve bridge allisions, neither of those cases is even remotely applicable to the City of Baltimore's claims. Unlike Baltimore, no claimant in *Bertucci* or *Louisville* alleges any claims apart from contractual expectancy—no "physical damages of any kind." *See In re Bertucci*, 712 F.3d at 248. *See also Louisville*, 170 F. Supp. at 600 (damage arising solely from temporary loss of use of bridge). Needless to say, no claimant in either of those cases alleged that the bridge in question formed part of their municipal network.

Finally, Petitioners cite *General Foods Corp. v. United States*, 448 F. Supp. 111 (D. Md. 1978) (Pet. Mem. at 7), another case where the plaintiff was a business which, as a result of an allision, had to incur more expensive shipping of its goods. But, as with Petitioners' other cited cases, nothing in *General Foods* suggests a finding against Baltimore here. In *General Foods*, the District of Maryland—concerned with "virtually limitless suits"—cited a "general rule" that "negligent, as opposed to intentional, interference with contract or business rights" would not be cognizable in tort. *Id*. at 112-113. Again, the claimant in *General Foods* made no argument that it

---

[8] Significantly, despite the number of purely economic loss claimants in *Complaint of Marine Nav. Sulphur Carriers*, the Court there first adjudicated limitation, and, only after determining that the collision in question was caused by the petitioner's unseaworthiness, adjudicated damages, *including* the question of dismissal on the basis of *Robins'* application. *Id*.

was physically damaged in any way by the allision in question—the allision simply made the movement of goods a bit more expensive. By contrast, here, the City of Baltimore alleges much more direct, concrete, and cognizable injuries than the pure economic losses at issue in *General Foods*.

## E.     Baltimore Law Separately Guarantees The City The Right To Damages

Baltimore City Code, Art. 10, Subt. 10, specifically states that, in any action arising out of the allision of the M/V Dali and Francis Scott Key Bridge, the City of Baltimore "shall be entitled to recover for economic loss" that occurred as a result of "any violation of any permit, rule, regulation, or order to which the owner or operator of the M/V Dali or the owner or operator's agents were subject, or caused by the negligence of the owner or operator of the M/V Dali or the owner or operator's agents." *Id*. at § 10-3(a)(1). The ordinance lists several possible categories of economic loss "without limitation," including "loss of income," loss of "tax revenue," costs of "remedial action incurred by the City of Baltimore," and "administrative expenditures." It explicitly states that in any such action "to recover such economic loss, it is not necessary to prove that the loss was sustained as a result of physical injury to a person or damage to the City of Baltimore's property…." *Id*. at § 10-3(a)(2). Thus, the Ordinance precludes application of *Robins Dry Dock* to the City's claims.

Petitioners entirely ignore the Baltimore ordinance in their Motion. Perhaps that is unsurprising: the First Circuit, the Ninth Circuit, and many other state and federal courts have held that local laws[9] that allow for recovery of pure economic losses are not preempted by federal maritime jurisprudence. *See*, *e.g.*, *Ballard Shipping Co. v. Beach Shellfish*, 32 F.3d 623, 631 (1st

---

[9] Federal courts apply the same analysis to city ordinances as they do to state laws. *See, e.g.*, *Portland Pipe Line Corp. v. City of S. Portland*, 288 F. Supp. 3d 321, 448 (D. Me. 2017) (city ordinance regulating on shore conduct not preempted by federal maritime law).

Cir. 1994); *In re Exxon Valdez*, 270 F.3d 1215, 1250–51 (9th Cir. 2001).

The logic of this line of case law is sound. As noted above, 28 U.S.C. § 1333 guarantees claimants the right to pursue applicable state remedies, either in state court or, where there is a basis for federal jurisdiction, in federal court. *Ballard*, 32 F.3d at 626; 28 U.S.C. § 1333. The Supreme Court has explained that the "extent to which state law may be used to remedy maritime injuries is constrained by a so-called 'reverse-Erie' doctrine which requires that the substantive remedies afforded by the States conform to governing federal maritime standards." *Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 223 (1986) (citations omitted). For more than 100 years, the Supreme Court has held that a state law will only be invalid due to a contrary maritime rule if one of three pre-requisites is met: the state law "[1]contravenes the essential purpose expressed by an act of Congress, or [2] works material prejudice to the characteristic features of the general maritime law, or [3] interferes with the proper harmony and uniformity of that law in its international and interstate relations." *Southern Pacific Co. v. Jensen,* 244 U.S. 205, 216 (1917). The Supreme Court would clarify that, with respect to the second pre-requisite—the material prejudice to a "characteristic feature" prong—such a "characteristic feature" is only one that "originated in admiralty" or "has exclusive application there." *Am. Dredging Co. v. Miller*, 510 U.S. 443 (1994).

With this background, at least two Circuits have considered whether the *Robins Dry Dock* limitation on liability preempts a contrary state statute that expressly allows recovery for economic losses. In both cases, the courts correctly found that: (1) there was no relevant act of Congress mandating the *Robins Dry Dock* rule; and (2) *Robins Dry Dock* is not a "characteristic feature[]" of maritime law, since the *Robins Dry Dock* concept does not in fact "originate in admiralty" or have exclusive application there. *See generally In re Exxon Valdez*, 270 F.3d at 1251.

Regarding the last prong—whether application of a contrary local law will interfere with

31

"the proper harmony and uniformity of that law in its international and interstate relations"—both the First and Ninth Circuits have explained that Congress does not have an overriding interest in application of *Robins Dry Dock* principles, when weighed against a local interest in providing redress to harm. As the court in *Ballard* put it, the local interest in "redressing injury to its citizens" is "a weighty one." *Id*. at 629.

By comparison, the federal interest in a uniform regime of damages liability calculation for maritime disputes is far less "weighty." Indeed, both the First and Ninth Circuits noted that Congress itself passed statutes that allowed for recovery of purely economic damages in some maritime cases, offering "compelling evidence that Congress does not view…expansion of liability to cover purely economic losses…as an excessive burden on maritime commerce." *In re Exxon Valdez*, 270 F.3d at 1252, citing *Ballard,* 32 F.3d at 630–31. As the *Ballard* court also explained, the local statute at issue there—concerned entirely as it was with damages availability—did not "regulate the out-of-court behavior of ships or sailors—what is sometimes called 'primary conduct,'" *id*., and it is the regulation of primary conduct that "presents the most direct risk of conflict between federal and state commands, or of inconsistency between various state regimes to which the same vessel may be subject." *Id*.

Of course, like the statute at issue in *Ballard*, and the one at issue in *in re Exxon Valdez*, the Baltimore Ordinance merely clarifies "liability…for conduct that is already unlawful," *id*., as opposed to creating new rules of behavior. In other words, there is no uniformity of *action* with which the local law interferes.

Neither is it significant that the Ordinance was passed after the allision and given retroactive application. *Ballard* itself concerned a Rhode Island statute that was passed after an oil spill, and "applied retroactively." *Id*. at 626. As the court there held, "*Robins Dry Dock* remains the rule in this circuit for federal claims; we simply hold that Rhode Island is free to chart a

32

different course." *Id*. at 631. Put another way, while Petitioners would "prefer to have a uniform rule rather than have to comply with the tort laws of each of the states through which [they] pass…if the desire for a uniform rule were enough to preempt the application of state law to maritime activities, the 'saving to suitors' provision would be empty and the legion of state laws that have been held not preempted by maritime law…would be inexplicable." *Robinson v. Alter Barge Line, Inc.,* 513 F.3d 668, 673 (7th Cir. 2008) (approvingly citing *Ballard*).

Many courts—similar to the First and Ninth Circuits—concluded that local law allowing for consequential economic damages that would otherwise be unavailable due to *Robins Dry Dock* is *not* preempted. *See also, e.g., Complaint of Nautilus Motor Tanker Co., Ltd.*, 900 F. Supp. 697, 705 (D.N.J. 1995) ("federal maritime law does not preempt New Jersey's common law, which imposes liability upon negligent actors for 'economic damages, aside from physical injury, to . . . plaintiffs comprising an identifiable class with respect to whom defendant knows or has reason to know are likely to suffer such damages from its conduct,'"); *Kodiak Island Borough v. Exxon Corp.*, 991 P.2d 757, 769 (Alaska 1999) ("We conclude, therefore, that, in allowing recovery for purely economic damages, Alaska's hazardous substances statutes do not unduly interfere with the harmony or uniformity of federal maritime law."); *Cheek v. GL NV24 Shipping, Inc.*, No. 2:22-CV-86, 2023 WL 5963185, at \*19 (S.D. Ga. Sept. 13, 2023) (citing *Ballard* approvingly and finding no maritime law preemption of state law damages claims in nuisance); *F/V Robins Nest, Inc. v. Atl. Marine Diesel, Inc.,* 1994 WL 594592, at \*3 (D.N.J. Oct. 24, 1994) (relying on *Ballard* in finding that the New Jersey Consumer Fraud Act was not preempted by maritime law); *Latman v. Costa Cruise Lines, N.V.*, 758 So. 2d 699, 702 (Fla. Dist. Ct. App. 2000) (concluding that FDUTPA is applicable and not preempted by federal maritime law).

So too here. The City of Baltimore has "chart[ed] a different course," *Ballard*, 32 F.3d at 631, and chosen to allow consequential economic damages arising out of the Key Bridge disaster.

*Robins Dry Dock* is no barrier to the law's application.

**F.        The Intentional Act Exception To The *Robins Dry Dock* Doctrine**

Even if the Court were to construe the City's damages as "economic," *Robins* would still not apply, because those damages were caused by Petitioners' intentional acts. *See Kaiser Aluminum & Chemical Corp. v. Marshland Dredging Co.*, 455 F.2d 957 (5th Cir. 1972); *Dick Meyers Towing Service, Inc. v. U.S.*, 577 F.2d 1023 (5th Cir. 1978); *CXY Energy, Inc. v. Jurisch*, No. CIV. A. 91-1705, 1992 WL 211649 (E.D. La. Aug. 17, 1992) (where a plaintiff asserts an intentional tort, the claim does not fall within the exclusions of the *Robins Dry Dock* doctrine). Federal courts have also recognized a fraud exception to *Robins Dry Dock. See Showa Line, Ltd. v. Diversified Fuels, Inc.*, Civ. A. Nos. 88–2421, 88–2432, 1991 WL 211527 (E.D. La. October 1, 1991) (denying a motion for summary judgment based on *Robins Dry Dock* because the Claimant made allegations of fraud and other intentional torts that "[took] the claims out of the *Robins Dry Dock* parameters"). Moreover, while Petitioners rely on *Deepwater Horizon* to assert the complete absence of a criminal conduct exception to *Robins Dry Dock*, that Court very clearly left open the question of whether intentional criminal conduct which causes the actual harm, as opposed to just collateral conduct, bars the application of the *Robins Dry Dock* doctrine. *In re Deepwater Horizon,* 784 F.3d 1019 (5th Cir. 2015); *See also Ballard*, 32 F.3d at 625 n.1 (referring to cases of intentional torts as a "classic exception" to *Robins Dry Dock*).

This case represents just such an example of intentional criminal conduct causing the harm in question. The United States entered into a deferred prosecution agreement with *M/V Dali* Chief Engineer, Karthikeyan Deenadayalan, in *United States v. Deenadayalan*. Exhibit 1; Webb Aff. ¶ 15. In the agreement, Deenadayalan admitted that he committed a violation of the Ports & Waterways Safety Act. Deferred Prosecution Agreement ¶ 1. Deenadayalan also stated he was aware that the M/V Dali used an unsafe fuel supply pump, which compromised the M/V Dali's

34

safe navigation and ability to recover from the loss of power. Further, Deenadayalan knew that the inability to recover from a loss of power could adversely affect the safety of the M/V Dali, any bridge, structure, or shore area, and "would otherwise materially and adversely affect the *M/V Dali's* seaworthiness and fitness for service." The United States's Indictment further alleges that Petitioner Synergy committed so-called "specific intent" crimes, including criminal conspiracy, and that that crime directly contributed to the allision. *See* Indictment ¶¶ 101-108.

Where such intentional criminal conduct causes a casualty, there can be no limitation of liability—neither under the Limitation of Liability Act, nor under any economic loss doctrine. As Deenadayalan has affirmatively *admitted* to intentional, fraudulent, and criminal conduct, in the event the Court deems any of the City's claims to be "purely economic"—again, such a conclusion would be contrary to law—the intentional act exception is applicable, and any dismissal of the City's claims pursuant to the *Robins Dry Dock* doctrine would be error.

**G.    Should The Court Consider Petitioners' Factual Contentions, Due Process Requires Further Discovery**

While, for the reasons explained above, the Court would be committing error by presently analyzing the City's damages claims, such analysis clearly cannot happen right away. Whether the City's damages are analyzed under *Robins Dry Dock* or under any other framework, Petitioners ask the Court to resolve questions of impact, causation, and the categories of recoverable loss on an undeveloped record.

In other words, if the Court converts the motion into a summary judgment motion and is inclined to grant such a motion, despite the allegations and affidavits submitted herein, Rule 12(d) and Rule 56(d) entitle the City to conduct discovery first. The City has made the requisite Rule 56(d) showing: its accompanying affidavit sets forth, for specified reasons, the facts essential to its opposition that the City cannot presently fully present, and identifies the discovery that the City

would take to develop them. *See* Affidavit of Adam Levitt ¶¶ 4-8. That discovery bears on the nature and extent of the physical harm to the City's property and the losses flowing from it, much of which is documented in records held by third parties and government entities. *Id.* at ¶¶ 5-7.

Moreover, the City reserved such right in reliance on CMO 3, and discovery bears directly on the impact to the City's property and on every category of damages Petitioners seek to defeat. Resolving the motion against the City without that discovery would ensure the precise prejudice the conversion rule guards against. *See McCray v. Md. Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2014) (summary judgment before discovery forces the nonmovant into "a fencing match without a sword or mask"); *Greater Balt.*, 721 F.3d at 281 (vacating summary judgment converted without a reasonable opportunity for discovery).

Further, entering summary judgment against the City—where discovery with respect to the City's damages allegations was largely reserved for a later yet-to-be-commenced portion of the litigation—would represent clear error because it would deprive the City of its substantive and procedural due process rights, which the City, like any other litigant, is herein owed. *Rivera v. Laporte*, 120 Misc.2d 733 (N.Y. Sup. Ct. 1983); *Clay v. City of Huntington*, 184 W.Va. 708, 403 S.E.2d 725 (1991); *City of Miami Beach v. Cosme*, 388 So. 3d 944 (Fla. Dist. Ct. App. 2024).

## VI.    CONCLUSION

For all of the foregoing reasons, Petitioners' Motion for Judgment on the Pleadings should be denied.

Dated:  July 6, 2026

Respectfully submitted,

/s/*Adam J. Levitt*
Adam J. Levitt
Diandra "Fu" Debrosse
Daniel R. Schwartz
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel.: 312-214-7900
alevitt@dicellolevitt.com
fu@dicellolevitt.com
dschwartz@dicellolevitt.com

*Lead Counsel for the Local Government Claimants and Counsel for the City of Baltimore*

Jeffrey P. Goodman
Javier Puga
**SALTZ MONGELUZZI BENDESKY P.C.**
1650 Market Street, 52nd Floor
Philadelphia, Pennsylvania  19103
Tel: 215-496-8282
jgoodman@smbb.com
jpuga@smbb.com

*Counsel for the City of Baltimore*

37

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this sixth day of July, 2026, a copy of the foregoing response brief was served via the court's CM/ECF system on all counsel of record.

/s/ *Adam J. Levitt*
Adam J. Levitt

38