# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA　　　　*

v.　　　　　　　　　　　　　　　　*　　CRIMINAL NO. 1:26-cr-00197-JKB

KARTHIKEYAN DEENADAYALAN,　　*

Defendant.　　　　　　　　　　　*

*****

✓ FILED ___ ,ENTERED
____ LOGGED _____ RECEIVED

1:29 pm, Jun 18 2026
AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ___ R.C. ____ Deputy

## DEFERRED PROSECUTION AGREEMENT

Karthikeyan Deenadayalan ("the Defendant") agrees to waive his right to be charged by a federal grand jury through Indictment, and agrees to be charged by the United States of America filing an Information alleging that the Defendant violated the Ports & Waterways Safety Act. 42 U.S.C. § 70036(b). After an investigation into potential violations of federal criminal law and the Defendant's background, it has been determined that the ends of justice will be served by the following agreement, which incorporates herein the Sealed Supplement:

1.　The Defendant admits that he did, in fact, commit a violation of the Ports & Waterways Safety Act, and that the attached Statement of Facts is true and correct. The Defendant agrees that if he violates this agreement, the United States Attorney's Office for the District of Maryland or the Department of Justice, Environment & Natural Resources Division (collectively, the "Government"), may elect to charge him with a violation of any federal criminal statute arising out of the March 26, 2024 allision involving the *M/V Dali* and the Francis Scott Key Bridge, including but not limited to, violations of the Ports & Waterways Safety Act, and that the admission set forth in Attachment A (the "Statement of Facts") may be admitted into evidence in any

1

subsequent legal proceeding in a United States federal court, up to and during trial and sentencing of this matter.

2. The Government agrees that the prosecution of the conduct in the Information and in the Statement of Facts shall be deferred for a period of thirty-six (36) months from the date of this agreement, provided that the Defendant abides by the terms of this agreement (including the Sealed Supplement).

3. The Defendant agrees to fulfill the following conditions:

a. The Defendant will submit to supervision by the U.S. Probation and Pretrial Services Office of the District of Maryland and by any of its designated representatives in this matter, and will dutifully follow all directions of its officers;

b. The Defendant will refrain from any violation of federal, state or local law;

c. The Defendant will contact his U.S. Pretrial Services Officer immediately if arrested or questioned by a law enforcement officer;

d. The Defendant will notify his U.S. Pretrial Services Officer immediately of any change in his place of residence or his employment;

e. The Defendant will obtain permission from the Government and the U.S. Pretrial Services Officer before travelling outside the United States for any reason;

f. The Defendant will accept service of legal process through electronic mail directed to his undersigned counsel (or any replacement counsel);

g. The Defendant waives any and all challenges to the jurisdiction of this Court, including challenges that may arise based on the Defendant's future travel and location and/or events in the future;

2

h. The Defendant further understands that, pursuant to the Sixth Amendment to the United States Constitution, and Federal Rule of Criminal Procedure 18, the Defendant has the right to be prosecuted in a district where the offense was committed. The Defendant agrees to waive any challenge to venue and consents to be prosecuted pursuant to the Information in the District of Maryland;

i. In the event prosecution is reinstituted pursuant to paragraph 4 of this agreement, the Defendant will waive any defense on the grounds that the delay from the date of this agreement and thirty-six (36) months thereafter operated to deny his right to a speedy trial under the Sixth Amendment to the United States Constitution, Rule 48(b) of the Federal Rules of Criminal Procedure, the Speedy Trial Act (18 U.S.C. Section 3161 et seq.), Local Rule 30 of the United States District Court for the District of Maryland, or the pertinent statute of limitations; and

j. The conditions listed in any Sealed Supplement.

4. In the event that the Government believes the Defendant violated the terms of this agreement, the Government may move the Court to find, by a preponderance of the evidence, that the agreement has been violated. Upon a finding by the Court that the agreement has been violated, the Government may:

a. Revoke or modify any condition of this deferred prosecution agreement;

b. Change the period of supervision;

c. Discharge the Defendant from supervision; or

d. Prosecute the Defendant for the offenses specified herein.

5. In the event that the Defendant complies with the terms of this agreement during the 36 months from the date of this agreement, the Government shall seek no further prosecution

3

of the Defendant for the offenses specified herein or any other crime arising out of the allision and will dismiss the Information.

6.     This agreement does not provide any protection against prosecution for any allegations except those contained in the Statement of Facts or otherwise referred to in this agreement. In addition, this agreement applies only to the defendant and not to any other individuals. It is further understood that this agreement does not bind or enure to the benefit of any federal, state, local, or foreign prosecuting authority other than the United States Attorney's Office for the District of Maryland and the Environment and Natural Resources Division, Environmental Crimes Section, U.S. Department of Justice.[1]

7.     The Defendant expressly waives any and all rights to a speedy trial pursuant to 18 U.S.C. § 3161(h)(2), and the Defendant and the Government agree that the period of this DPA shall be excluded from computation under that subsection.

8.     With respect to this matter, from the date of execution of this agreement forward, this agreement supersedes any prior understandings, promises, and/or conditions between the Government and the Defendant, other than informal immunities relating to prior proffer sessions. No additional promises, agreements, or conditions have been entered into other than those set forth in this agreement and none will be entered into unless in writing and signed by all parties.

---

[1] The Government acknowledges that this Agreement does not prevent the Defendant from pursuing any and all lawful defenses that he may have should any prosecuting authority not listed in this paragraph pursue criminal charges against him.

4

AGREED:

Kelly O. Hayes
United States Attorney

for:

Adam R. F. Gustafson
Principal Deputy Assistant Attorney General
Environment & Natural Resources Division

Date: 06/15/2026

Karthikeyan Deenadayalan
Defendant

Date: 6/15/2026

Gregg L. Bernstein

John J. Connolly
ZUCKERMAN SPAEDER LLP
Counsel for the Defendant

The foregoing waiver of the defendant's right to a speedy trial is approved pursuant to 18

U.S.C. § 3161(h)(2).

Date: June 18, 2026

United States District Judge

5

✓ FILED ___ ENTERED
____ LOGGED _____ RECEIVED

1:30 pm, Jun 18 2026
AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ R.C. _____ Deputy

## ATTACHMENT A
## STATEMENT OF FACTS

### The Allision

The *Motor Vessel Dali* ("*M/V Dali*") was a 984-foot, 95,128 gross ton foreign flagged container ship registered in Singapore. The *M/V Dali* transported commercial cargo internationally and into and out of ports in the United States, including the Port of Baltimore. The Francis Scott Key Bridge ("Key Bridge") was a highway bridge that crossed the Fort McHenry Channel and was located on the lower Patapsco River near Baltimore, Maryland. At approximately 1:29 a.m. on March 26, 2024, after leaving the Port of Baltimore, the *M/V Dali* crashed into the Key Bridge, causing the death of six construction workers and the destruction of the bridge. The allision[2] also resulted in the pollution of the Patapsco River and the Chesapeake Bay from the destroyed bridge, vehicles, and debris, and from the *M/V Dali*, including oil and cargo containers. The destroyed bridge obstructed the channel and shut down the Port of Baltimore for vessel arrivals and departures. The Port of Baltimore was not fully reopened until June 10, 2024, 77 days after the allision. Reconstruction of the bridge is ongoing, and the complete eastern span of Interstate 695 has not been open since the allision.

### Relevant Parties

SYNERGY MARINE PRIVATE LTD. ("SYNERGY MARINE") was the operator of the *M/V Dali*. SYNERGY MARINE provided ship management and technical management services, which included crewing, supervision, and control over a fleet of vessels on behalf of ship owners. SYNERGY MARINE employed one of its subsidiaries, SYNERGY MARITIME PRIVATE LTD. ("SYNERGY MARITIME"), to manage several vessels, including the *M/V Dali*. SYNERGY MARITIME, in addition to managing the *M/V Dali*, managed its own fleet of vessels. SYNERGY MARITIME employed shore-based superintendents including Marine Superintendents and Technical Superintendents who were engaged in day-to-day management of both fleets. SYNERGY MARITIME was also the operator and technical manager of the *M/V Maersk Saltoro* and the *M/V Cezanne*, which were sister ships of the *M/V Dali*, meaning that they were designed with the same specifications. SYNERGY MARINE and SYNERGY MARITIME are hereinafter referred to collectively as SYNERGY.

RADHAKRISHNAN KARTHIK NAIR ("NAIR") was an employee of SYNERGY MARITIME and, pursuant to an agreement between SYNERGY MARINE and SYNERGY MARITIME, served as the Technical Superintendent for the *M/V Dali*. As Technical Superintendent, NAIR was the principal shore-based technical representative for the *M/V Dali* and was responsible for oversight of the day-to-day engineering operations of the vessel.

TECHNICAL SUPERINTENDENT 2 ("TS 2") was an employee of SYNERGY MARITIME and was the Technical Superintendent for the *M/V Cezanne* and the *M/V Maersk Saltoro*.

---

[2] An allision is where a moving object strikes an object that is not moving.

6

OWNER was the owner of the *M/V Dali*. OWNER hired SYNERGY to act as its agent and to manage all operations of the *M/V Dali*. OWNER employed the crew of the *M/V Dali* at the time of the allision. Although technically employed by OWNER, the crew of the *M/V Dali* acted as agents and employees of SYNERGY and acted at the direction of, and were under the control of, SYNERGY.

CHARTERER was the charterer of the *M/V Dali* at the time of the allision. CHARTERER contracted with OWNER to transport cargo to and from ports around the world. CHARTERER was also responsible for paying for the fuel consumed on the *M/V Dali*.

CLASS was the classification society, also referred to as a registered organization, that was authorized by the FLAG STATE to issue the relevant safety certificates for the *M/V Dali* to do business in the United States and other international ports and waters.

Karthikeyan Deenadayalan ("Defendant") was the Chief Engineer aboard the *M/V Dali* at the time of the allision. The Defendant joined the *M/V Dali* in January 2024. The Defendant also served as the Chief Engineer on the *M/V Maersk Saltoro* from August 25, 2020 to February 3, 2021. The Defendant also previously served as the Chief Engineer on the *M/V Cezanne* from August 20, 2021 to January 7, 2022 and from January 27, 2023 to August 1, 2023. At all times relevant to this Deferred Prosecution Agreement, the Defendant was acting as an agent and employee of SYNERGY.

## Regulation of Commercial Vessels

The International Convention for the Safety of Life at Sea ("SOLAS") was an international maritime treaty first adopted in 1914 in response to the sinking of the *RMS Titanic*. SOLAS established minimum safety standards in the construction, equipment, and operation of commercial vessels such as the *M/V Dali*. At the time of the Francis Scott Key Bridge allision, 167 countries were parties to SOLAS, including the United States, Singapore, and India.

SOLAS Chapter II-1, Part E, Regulation 53 required that where standby machines were required for auxiliary machinery essential to propulsion, automatic changeover devices had to be provided (with separate requirements for main sources of electrical power). SOLAS Chapter II-1, Part C, Regulation 26 required that propulsion machinery could be sustained or restored even if one essential auxiliary system becomes inoperative. The same regulation stated that "special consideration shall be given to . . . the fuel oil supply systems for boilers or engines[.]" SOLAS Chapter II-1, Part C, Regulation 31 required that "Main and auxiliary machinery essential for the propulsion, control and safety of the ship shall be provided with effective means for its operation and control. All control systems essential for the propulsion, control and safety of the ship shall be independent or designed such that failure of one system does not degrade the performance of another system."

Pursuant to SOLAS Chapter IX, the owner or other company operating the vessel, and the vessel itself, must comply with the requirements of the International Safety Management Code ("ISM Code"), including the requirement to have a Safety Management System. The purpose of the ISM Code was to provide an international standard for the safe management and operation of

7

ships and for pollution prevention. The United States had codified the requirement that persons responsible for a vessel comply with ISM Code in Title 46 of the United States Code, Chapter 32, and in the regulations set forth in Title 33, Code of Federal Regulations, Part 96.

Pursuant to SOLAS Chapter IX, a Document of Compliance ("DOC") shall be issued to every company that complies with the requirements of the ISM Code. The Flag State is responsible for issuing the DOC. Pursuant to the ISM Code, vessels must carry the DOC on board. These are records regularly inspected by port states, including the United States. SYNERGY was the DOC holder for the *M/V Dali*.

A ship classification society is a non-governmental organization that established and maintained technical standards for the construction and operation of ships and offshore structures. These societies set technical rules based on experience and research, confirm that designs meet these rules, survey ships during the process of construction and commissioning, and periodically survey vessels to ensure that they continue to meet these rules.

Federal regulations promulgated by the U.S. Coast Guard listed various types of a "marine casualty or accident." 46 C.F.R. § 4.03-1. The term "marine casualty or accident" applied to "events caused by or involving a vessel and includes, but is not limited to, the following: . . . (2) Any occurrence involving a vessel that results in— . . . (ix) Reduction or loss of a vessel's electrical power, propulsion, or steering capabilities; [or] (xi) Any other circumstance that might affect or impair a vessel's seaworthiness, efficiency, or fitness for service or route."

Certain marine casualties were required to be reported by the owner, agent, master, operator, or person in charge of a vessel "[i]mmediately after the addressing of resultant safety concerns" by notifying "the nearest Sector Office, Marine Inspection Office or Coast Guard Group Office." 46 C.F.R. § 4.05-1. Immediately reportable casualties included instances where a vessel had "(3) A loss of main propulsion, primary steering, or any associated component or control system that reduces the maneuverability of the vessel; (4) An occurrence materially and adversely affecting the vessel's seaworthiness or fitness for service or route, including but not limited to fire, flooding, or failure of or damage to fixed fire-extinguishing systems, lifesaving equipment, auxiliary power-generating equipment, or bilge-pumping systems[.]" 46 C.F.R. § 4.05-1(a)(3), (4).

### The Ports & Waterways Safety Act

Congress enacted the Ports and Waterways Safety Act ("PWSA"), 46 U.S.C. §§ 70011 *et seq.*, because increased supervision of vessel and port operations was necessary to reduce the possibility of vessel or cargo loss, or damage to life, property, or the marine environment. 33 U.S.C. § 1221(c)(1). Pursuant to 46 U.S.C. § 70036(b)(1), a person violates the PWSA if the person willfully and knowingly violates a regulation promulgated under the PWSA.

The PWSA regulations governed a wide variety of vessel operations. Federal regulations authorized pursuant to the PWSA required the owner, agent, master, operator, or person in charge of a vessel to immediately notify the nearest U.S. Coast Guard Sector Office or Group Office whenever there is a hazardous condition, either aboard a vessel or caused by the vessel or its operation. 33 C.F.R. § 160.216.

A "hazardous condition" was defined as "any condition that may adversely affect the safety of any vessel, bridge, structure, or shore area or the environmental quality of any port, harbor, or navigable waterway of the United States. It may, but need not, involve collision, allision, fire, explosion, grounding, leaking, damage, injury or illness of a person aboard, or manning-shortage." 33 C.F.R. § 160.202. The requirement to notify the U.S. Coast Guard of hazardous conditions is applicable to foreign vessels bound for or departing from ports or places in the United States. 33 C.F.R. § 160.203(a)(2).

### Overview of the *M/V Dali* Fuel Supply System

Four diesel generators, also referred to as auxiliary engines, provided electric power to the *M/V Dali*. The generators were numbered 1 through 4. The generators on the *M/V Dali* consumed fuel to generate electricity. The fuel supply system that supplied fuel to the generators was designed with redundancies and automated features that enabled the system to quickly and automatically recover in the event of a power outage. For instance, the fuel supply and booster pumps that supplied fuel were designed to automatically restart following a blackout. Additionally, the fuel supply and booster pumps had a set of standby pumps that automatically started in the event of the failure of the primary pumps.

Fuel was supplied to the generators through two separate supply lines, sometimes referred to as the Generator Engine Fuel Oil System and the Main Engine Fuel Oil System. The Generator Engine Fuel Oil System supplied fuel to generators 3 and 4 while the Main Engine Fuel Oil System supplied fuel to the main engine and generators 1 and 2. Both systems consisted of a fuel supply pump and a booster pump. Each supply and booster pump also had a standby pump.

The flushing pump was a maintenance pump, designed to flush the fuel lines and generator engines of existing fuel prior to a change in fuel type or maintenance work on the engines. Unlike the fuel supply and booster pumps, the flushing pump was not designed to automatically restart following a power loss. Unlike the fuel supply and booster pumps, the flushing pump did not have a standby pump. Unlike the fuel supply and booster pumps, the flushing pump could not be restarted from the engine control room.

The fuel supply system on the *M/V Dali* was capable of supplying three different grades of fuel to its diesel generators. The three grades ordinarily carried on the vessel were: (1) "marine gas oil" or "marine diesel oil" ("MDO" or "MGO"); (2) very low sulfur fuel oil ("VLSFO"); and (3) Heavy Fuel Oil ("HFO"). MDO/MGO is the cleanest-burning and most expensive of those fuels while HFO is the cheapest. As designed, the fuel supply system could supply MDO/MGO and VLSFO to all four diesel generators and HFO to two of the four (Nos. 1 and 2). The flushing pump, however, was not connected to the VLSFO or HFO tanks and was only capable of pumping the most expensive of those fuels, MDO/MGO.

The *M/V Dali's* use of the flushing pump as the primary fuel supply pump in the fuel supply system for generators 3 and 4 was not approved by CLASS or the flag state, Singapore.

9

### The Defendant's Tours on the *M/V Maersk Saltoro* and *M/V Cezanne*

The Defendant served as Chief Engineer aboard the *M/V Maersk Saltoro* from approximately August of 2020 to February of 2021. TS 2 was the technical superintendent employed by SYNERGY MARITIME to oversee the *M/V Maersk Saltoro*. When the Defendant joined the vessel, he noticed that the *M/V Maersk Saltoro* was using the flushing pump as the dedicated fuel supply pump for generators 3 and 4. The Defendant believed that the reliance on the fuel flushing pump was unsafe because it lacked redundancy, and so he transitioned to using the Generator Engine Fuel Oil System, including its supply and booster pumps. The vessel had recently undergone modification to its Generator Engine Fuel Oil System and its Main Engine Fuel Oil System to accommodate installation of a scrubber system that could limit pollutants discharged during combustion of heavier fuel oils. Because of the design and complexity of the Generator Engine Fuel Oil System, and the recency of the modifications to that system, it took the Defendant and his second engineer several days to calibrate and repair components of Generator Engine Fuel Oil System, including the supply and booster pumps, and make that system operable, thereby permitting use of the supply and booster pumps.

The Defendant served as Chief Engineer aboard the *M/V Cezanne* from approximately August of 2021 to January of 2022. TS 2 was the technical superintendent employed by SYNERGY MARITIME to oversee the *M/V Cezanne*. When the Defendant joined the vessel, he noticed that the vessel was using the fuel flushing pump as the dedicated fuel supply system for generators 3 and 4. The Defendant was joined by the same second engineer from his tour on the *M/V Maersk Saltoro*, and they were able to restore the operability of the Generator Engine Fuel Oil System, including its fuel supply and booster pumps.

The Defendant served as Chief Engineer aboard the *M/V Cezanne* a second time, from approximately January 2023 to August 2023. TS 2 was still the technical superintendent. When the Defendant joined the vessel, he noticed that the vessel was using the flushing pump, even though he had fixed the Generator Engine Fuel Oil System during his previous voyage. The Defendant again sought to institute the Generator Engine Fuel Oil System, including its redundant fuel supply and booster pumps, and on or about March 8, 2023, the Defendant requested mechanical seals to repair and maintain the fuel supply and booster pumps.

During the Defendant's tour on the *M/V Maersk Saltoro* and two tours on the *M/V Cezanne*, the Defendant had multiple conversations with TS 2 about the flushing pump. The Defendant was frustrated because each time he joined a vessel, he found that the vessel was using a flushing pump, which he knew to be unsafe. In each case, the Defendant made or caused to be made any necessary repairs to enable use of the fuel supply and booster pumps, and he requisitioned the parts that were necessary to repair or maintain the system. The Defendant expressed these frustrations with TS 2 during these phone calls. During these calls, TS 2 did not respond or make any statements to acknowledge the Defendant's earlier concerns regarding the flushing pump.

10

### The Defendant's Tour on the *M/V Dali*

The Defendant joined the *M/V Dali* as Chief Engineer in or around the end of January 2024. NAIR was the technical superintendent who oversaw the technical operations of the *M/V Dali*. When the Defendant joined the vessel, he saw that the flushing pump was being used as the continuous fuel supply source for generators 3 and 4. Unlike his previous tours on the sister vessels, the Defendant found that the Generator Engine Fuel Oil System, including its fuel supply and booster pumps, was in such a state of disrepair that it could not be readily operated. The auto backwash filter motor was missing, and most of the filters were also missing. The fuel oil that was in the fuel supply lines smelled bad and Defendant knew the lines would need to be cleaned before the system could be safely operated.

The Defendant typically underwent "familiarization" with the technical superintendent prior to joining a vessel, but he did not prior to joining the *M/V Dali*. Because he did not have a familiarization, the Defendant created a list of items to discuss with NAIR after performing his initial survey of the vessel. As shown below, the first item on the list was the auto backwash filter motor needed to repair and implement the Generator Engine Fuel Oil System.



The Defendant spoke with NAIR about the auto backwash filter motor in early February. On or about February 9, 2024, the Defendant sent an email to another SYNERGY employee requesting to purchase "AE FUEL OIL AUTO BACK WASH FILTER SPARES." The Defendant expected that the parts would arrive when the *M/V Dali* reached Busan, South Korea. Busan is a global port and is known as a good location to obtain marine parts. The *M/V Dali* was not supplied with the auto back wash filter parts in Busan.

Also in early February 2024, CHARTERER sent an email to the Captain of the *M/V Dali* asking why the vessel was planning to consume an excessive amount of MGO when it could use a cheaper fuel, VLSFO. The *M/V Dali* consumed more MGO than CHARTERER expected because the flushing pump was not connected to the VLSFO tank and could not supply VLSFO to generators 3 and 4. The Defendant and NAIR spoke on the phone about CHARTERER's question. NAIR told the Defendant to draft a "convincing" email to the CHARTERER so that the CHARTERER would not ask any further questions about fuel consumption. The Defendant believed that if CHARTERER was aware that the *M/V Dali* was using an unsafe, non-redundant fuel supply system, then CHARTERER would have concerns about SYNERGY's ability to timely and safely deliver the containers aboard the *M/V Dali*. The Defendant's draft email, which he forwarded to NAIR, stated as follows:

11

QUOTE

Dear Sir,
Good day!

Vessel can safely reach KRBUS with present ROB.
Presently MGO is consumed mostly for boilers that too during slow steaming and at ports only.
3rd stby AE's are started for the purpose of BT and always one system is completely dedicated for MGO.. and this procedure
carried out for the safe navigation of vessel in coastal areas. (alternate fuel system) for LSFO.
Appreciate your understanding on the above and for your continous support.

UNQUOTE

The Defendant's draft email did not explain the difference between the fuel supply and booster pumps and the flushing pump, and instead the email stated that "one system is completely dedicated for MGO." NAIR subsequently approved of the Defendant's draft, and the Defendant or the master sent the email to CHARTERER.

By early March of 2024, the *M/V Dali* still had not received the auto backwash filter motor to repair the Generator Engine Fuel Oil System. On or about March 8, 2024, an employee of SYNERGY emailed the Master of the *M/V Dali* with a list of outstanding parts requisitions, and the employee requested that the Master provide remarks as to the level of priority for each request. On or about March 21, 2024, the Defendant provided the following "Vessel remarks" to the SYNERGY employee:

| S.No | PR NO | PR STATUS | PR DESCRIPTION | Office Remarks | Vessel remarks |
|---|---|---|---|---|---|
| 1 | DALI24S0088 | | PILOT LADDER | hecking for supply in US Po | Awaiting for supply. Required for defective correction. |
| 3 | DALI24S0086 | | PARTS FOR BOILER FEED WATER PUMP MOTOR(er | Awaiting for Quote | TOP PRIORITY |
| 4 | DALI24S0084 | | REEFER CONTAINER SOCKETS SPARES | Awaiting for Quote | MEDIUM PRIORITY |
| 5 | DALI24S0083 | | Chaffing guard for the Universal fairlead | Awaiting for Quote | Received onboard. |
| 6 | DALI240009 | Ordered | EGCS CEMS Condenser Fan for A/C | In Chennai Office , will be connected with Onsigner in Asia Ports | LOW PRIORITY |
| 9 | DALI24S0072 | | AE FUEL OIL AUTO BACK WASH FILTER SPARES | Under TSI Approval | TOP PRIORITY |

The AE FUEL OIL AUTO BACK WASH FILTER SPARES was still "Under TSI Approval." The Defendant wrote that the parts were a "TOP PRIORITY" because he believed it was unsafe for the *M/V Dali* to sail without a redundant fuel supply system.

The *M/V Dali* arrived in the Port of Baltimore on or about March 23, 2024. The Defendant did not notify the U.S. Coast Guard of a hazardous condition on board the *M/V Dali*; that is, that the *M/V Dali* used a non-redundant fuel supply pump to supply fuel to two of its generators, and that the Generator Engine Fuel Oil System, with its redundant fuel supply and booster pumps, was in disrepair and incapable of being properly used.

On March 26, 2024, the M/V Dali struck the Key Bridge. At the time of the allision, the AE FUEL OIL AUTO BACK WASH FILTER SPARES still had not been delivered to the vessel.

At all times referenced in this Statement of Facts:

12

- The Defendant believed that it was unsafe to use the flushing pump as the continuous fuel supply pump for generators 3 and 4. The Defendant knew that the flushing pump lacked a redundancy, and that the lack of a redundancy compromised the vessel's safe navigation and ability to recover from a loss of power. The Defendant knew that the inability to recover from a loss of power could adversely affect the safety of the vessel itself, as well as any bridge, structure, or shore area. The Defendant also knew that the inability to recover from a loss of power could adversely affect the environmental quality of any port or navigable waterway of the United States. The Defendant also knew that the lack of a redundant fuel supply system, and the inability to recover from a power loss, could affect the vessel's electrical power, propulsion, and steering, and would otherwise materially and adversely affect the *M/V Dali's* seaworthiness and fitness for service.

- The Defendant knew that operating the *M/V Dali* with a non-redundant fuel supply pump was a violation of SOLAS.

- The Defendant knew that any modification to the fuel supply system would need to be approved by CLASS, that CLASS never approved the use of the flushing pump as a continuous fuel supply pump, and that CLASS would not approve the use of the flushing pump as a continuous fuel supply pump because it lacked any redundancy.

SO STIPULATED:

Matthew P. Phelps
Bijon Mostoufi
Kimberly Phillips
Assistant United States Attorneys

Leigh Rendé
Trial Attorney, U.S. Department of Justice

Karthikeyan Deenadayalan
Defendant

Gregg L. Bernstein
John J. Connolly
ZUCKERMAN SPAEDER LLP
Counsel for Defendant

13