**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| In the Matter of the Petition<br><br>of<br><br>GRACE OCEAN PTE LTD., as Owner of the M/V DALI,<br><br>and<br><br>SYNERGY MARINE PTE LTD, as Manager of the M/V DALI,<br><br>for Exoneration from or Limitation of Liability. | Docket No. JKB 24-cv-941<br><br>*IN ADMIRALTY* |

**PETITIONERS' REPLY TO CLAIMANT BALTIMORE COUNTY'S OPPOSITION**
**TO MOTION FOR JUDGMENT ON THE PLEADINGS**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT AND AUTHORITY ........................................................................................... 2

    1.    The County's public-safety related costs are non-recoverable under the Free Public Services Doctrine, and merely responding to an emergency involving the Bridge does not grant the County a proprietary interest in it................................. 2

    2.    The County cannot recover emergency response costs or increased road usage costs under OPA or Maryland's Environmental Code. ........................................ 10

    3.    The County lacks a recognizable damaged proprietary interest. .......................... 11

    4.    The County cannot recover via public nuisance theory....................................... 14

    5.    Petitioners Incorporate by Reference All Applicable Reply Arguments Responsive to the County's own Incorporation by Reference............................. 15

CONCLUSION....................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anne Arundel Cnty. v. City of Annapolis*,
721 A.2d 217 (Md. 1998) ................................................................................................2, 11

*Baker v. Smith & Wesson Corp.*,
No. CIV.A. 99C-09-283-FS, 2002 WL 31741522 (Del. Super. Ct. Nov. 27,
2002) .......................................................................................................................................5

*Bd. of Sup'rs of Fairfax Cnty v. U.S. Home Corp.*,
1989 WL 646518 (Va. Cir. Ct. Aug.14, 1989) ............................................................5

*In re Bertucci Contracting Co., LLC*,
712 F.3d 245 (5th Cir. 2013) ......................................................................................12

*Matter of Bruce Oakley, Inc.*,
No. CV-19-184-RAW-JAR, 2025 WL 1090964 (E.D. Okla. Mar. 3, 2025)...........................13

*Catalyst Old River Hydroelectric Ltd. P'ship v. Ingram Barge Co.*,
639 F.3d 207 (5th Cir. 2011) ...............................................................................12, 13

*City of Chicago v. Beretta U.S.A. Corp.*,
213 Ill. 2d 351 (Ill. 2004)............................................................................................5

*City of Flagstaff v. Atchison, Topeka & Santa Fe R. Co.*,
719 F.2d 322 (9th Cir. 1983) ......................................................................................5

*Cnty. of Erie, New York v. Colgan Air, Inc.*,
711 F.3d 147 (2d Cir. 2013)........................................................................................5

*Complaint of Marine Nav. Sulphur Carriers, Inc.*, 507 F. Supp. 205, 209-10 (E.D.
Va. 1980)................................................................................................................12

*In re Deepwater Horizon*,
784 F.3d 1019 (5th Cir. 2015) ....................................................................................1

*District of Columbia v. Air Florida, Inc.*,
750 F.2d 1077 (D.C.Cir.1984).................................................................................4, 5

*East River S.S. Corp. v. Transamerica*,
476 U.S. 858 (1986)..................................................................................................3, 4

*State of La. ex rel. Guste v. M/V Testbank*,
752 F.2d 1019 (5th Cir. 1985) ...........................................................................1, 12, 14

*Icelandic Coast Guard v. United Techs. Corp.*,
　722 F. Supp. 942 (D. Conn. 1989)......................................................................2, 3, 4

*Louisville & N. R. Co. v. Arrow Transp. Co.*,
　170 F. Supp. 597 (N.D. Ala. 1959)...........................................................................12

*Robins Dry Dock & Repair Co. v. Flint*,
　275 U.S. 303 (1927)................................................................................... *passim*

*In re: Sincere Navigation Corp.*,
　327 F.Supp. 1024 (E.D.La.1971)................................................................................4

*State v. Black Hills Power, Inc.*,
　2015 WY 99 (Wyo. 2015) ...........................................................................................5

*In re Taira Lynn Marine Ltd. No. 5, LLC*,
　444 F.3d 371, 380 (5th Cir. 2006) ...........................................................................12

*Venore Transp. Co. v. M/V Struma*,
　583 F.2d 708 (4th Cir. 1978) .......................................................................7, 8, 9, 10

*Walker Cnty. v. Tri-State Crematory*,
　284 Ga. App. 34 (Ga. Ct. App. 2007)........................................................................5

*Yarmouth Sea Prods. Ltd. v. Scully*,
　131 F.3d 389 (4th Cir. 1997) .................................................................................9, 10

**Statutes**

33 U.S.C.
　§§ 1251–1387.............................................................................................................11
　§ 2702..........................................................................................................................6
　§ 2702(a) ...................................................................................................................10
　§ 2702(b)(2)(F) ......................................................................................................6, 10

46 U.S.C. § 2304............................................................................................................7

Baltimore County Code § 3-2-1303.............................................................................7, 9

Md. Code Ann., Envt
　§ 4-401 .......................................................................................................................6
　§ 4-401 (c)(2)(vii) ....................................................................................................6, 10

Md. Code, Pub. Safety § 2-301......................................................................................9

**Other Authorities**

T. Schoenbaum, 2 Admiralty & Maritime Law, § 14-8 (7th ed.)................................12

Petitioners Grace Ocean Private Limited and Synergy Marine Pte Ltd. (collectively "Petitioners") submit this Memorandum of Law in Reply to Claimant Baltimore County's Opposition to Petitioners' Motion for Judgment on the Pleadings (ECF No. 872). This brief incorporates by reference Petitioners' Replies to the Oppositions filed by R.M. Metals (ECF No. 874), the Mayor and City Council of Baltimore ("City" or "City of Baltimore") (ECF No. 876) and Private Economic Loss Claimants ("PEL Claimants") (ECF No. 873) (collectively "Claimants"), which are filed contemporaneously with this Reply.

**PRELIMINARY STATEMENT**

Petitioners moved for judgment on the pleadings because, after settling with the State of Maryland (*i.e.*, the owner of the Francis Scott Key Bridge ("Key Bridge" or "Bridge") and the waters and submerged land of the Patapsco River below; the "State") and the Personal Injury Claimants, nearly all remaining Claimants' claims for damage relate solely to economic losses.[1] But the then already-well-established principle restated in *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927) has, for a near-century thereafter, been consistently applied to "den[y] a plaintiff recovery for economic loss if that loss resulted from physical damage to property in which he had no proprietary interest." *State of La. ex rel. Guste v. M/V Testbank*, 752 F.2d 1019, 1022 (5th Cir. 1985). In other words, "physical damage to a proprietary interest [is] a prerequisite to recovery for economic loss in cases of unintentional maritime tort." *Id*. at 1020. Thus, a plaintiff's lack of proprietary interest in the damaged property precludes tort recovery. *See In re Deepwater Horizon*, 784 F.3d 1019, 1030-31 (5th Cir. 2015) (affirming dismissal of tort claims by three Mexican States that lacked a proprietary interest in the damaged land and resources).

---

[1] The City of Baltimore alleges damage to its 72" water main located in the river near the Key Bridge; however, the question whether that pipe suffered any physical damage as a result of the Casualty is a matter of dispute.

1

Claimant Baltimore County (the "County") admits that the State owns the Bridge. ECF No. 872 at 12. Likewise, it is indisputable that "[t]he navigable waterways within Maryland's boundaries and the lands beneath them" are held by the State. *Anne Arundel Cnty. v. City of Annapolis*, 721 A.2d 217, 224 (Md. 1998). Nevertheless, the County claims that it should be able to recover damages for costs incurred in providing emergency response (*i.e.*, search and rescue, securing the immediate accident scene, longer-term monitoring thereafter, etc.), for alleged damage to the quality of the Patapsco River waters and sediment, and for increased wear-and-tear on County roadways in the Bridge's absence. The County is wrong—its public-safety efforts do not create a proprietary interest in the Bridge or the waters/riverbed below, and increased costs arising from longer or more difficult travel is a classic "economic loss" prohibited by *Robins*' rule in bridge-related marine casualties. Lacking a sufficient proprietary interest in any property physically damaged by the DALI's allision with the Bridge, the County's claims must be dismissed.

**ARGUMENT AND AUTHORITY**

1. **The County's public-safety related costs are non-recoverable under the Free Public Services Doctrine, and merely responding to an emergency involving the Bridge does not grant the County a proprietary interest in it.**

The County argues that it can recover via loss-shifting and search-and-rescue doctrines, with the majority of its discussion focused on contractual risk-shifting issues. But the County's less-examined reliance on *Icelandic Coast Guard v. United Techs. Corp.*, 722 F. Supp. 942 (D. Conn. 1989), in an attempt to create a purported "search-and-rescue doctrine," inadvertently sets it down the path to an actually existing and broadly-accepted common law rule that proscribes recovery by the County – *i.e.*, the Free Public Services Doctrine.

The County cites *Icelandic Coast Guard* for the proposition that "search and recovery costs were cognizable in admiralty despite the plaintiff suffering no cognizable property damage." ECF

2

No. 872 at 12 (citing 722 F. Supp. 942 at 948 (D. Conn. 1989)). That assessment is not correct, however, and misses a critical observation by the *Icelandic Coast Guard* court as to why the search and rescue costs were only *potentially* recoverable (or at least were not then subject to summary dismissal) under admiralty law given the specific facts of that case.

Briefly, in *Icelandic Coast Guard*, the Icelandic Coast Guard ("ICG") sued the manufacturers of a helicopter that crashed during ICG training operations over Icelandic waters. The crash killed four ICG crew members. Investigation into the crash revealed the helicopter sank without deploying emergency flotation gear, and there were indications a track mechanism on a sliding door had failed and deflected into the main rotor. ICG sought recovery against the manufacturers for the value of the aircraft, wreck recovery costs, loss of use, training for replacement flight crews, and costs for the search for the ICG crewmen. (The ICG case was consolidated with the four wrongful death cases brought by the deceased crewmen's representatives.)

The manufacturers sought dismissal of certain of ICG's claims based on the *East River* economic loss rule applicable to maritime product liability claims (*i.e.*, barring recovery for economic losses resulting from a product's injuring itself). *See East River S.S. Corp. v. Transamerica*, 476 U.S. 858 (1986). The court agreed, in part, observing that "plaintiff's claims for replacement of the aircraft, recovery of the wreck, loss of use of the aircraft, and training of replacement flight crews are commercial economic losses resulting from damage to the helicopter itself." *Id*. at 948. Those claims were accordingly dismissed. However, "the claims for the costs of searching for the helicopter's crew . . . arise out of 'personal injury' claims and are distinguishable from [ICG's] other claims on that basis . . .. Products liability claims for damages arising out of personal injury are cognizable in admiralty." *Id*.

3

In denying summary judgment seeking dismissal of the search-related costs, the court noted as follows:

> In this case the plaintiff happens to be the Icelandic agency responsible for search and rescue, and ICG claims economic losses related to those search efforts. Analysis of these particular claims for search expenses therefore may be muddied by **the general American rule that expenses for search and rescue operations are <u>a public responsibility</u> and may not be recovered from tortfeasors in the absence of authorizing legislation**. *See District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077 (D.C.Cir.1984); *see also In re: Sincere Navigation Corp.*, 327 F.Supp. 1024 (E.D.La.1971) (where maritime collision involved a federal government vessel, government can recover only expenses that would not have been incurred had the collision been between two private vessels). Nonetheless, defendants have raised no such challenge to these claims.

*Id*. at 948, n.23 (emphasis added).

So, the *Icelandic Coast Guard* court only held that claims for costs related to personal injury arising out of a maritime products liability cause of action were cognizable in admiralty. Importantly, the court did not rule that search and rescue costs were actually recoverable by the ICG, given the fact that the ICG was "the Icelandic agency responsible for search and rescue"—since the defendants had not raised the issue of the Free Public Services Doctrine, the court did not have to resolve that issue.

But the authority the district court cited, and similar authority that is in accord, makes clear that the cost of public services for protection from safety hazards is to be borne by the public as a whole, not assessed against the tortfeasor whose alleged negligence creates the need for the service. In the referenced *Air Florida* case, a commercial airliner crashed, destroying portions of a bridge before settling in the Potomac River. 750 F.2d 1078. The District of Columbia (the "city") sought to require Air Florida to pay for "the costs of emergency services and cleanup required in the aftermath of the tragedy." *Id*. at 1078. The district court dismissed the city's claim, and the D.C. Circuit affirmed, concluding that, in the absence of authorizing legislation, those expenses could not be recovered. The D.C. Circuit explained:

4

> Where emergency services are provided by the government and the costs are spread by taxes, the tortfeasor does not anticipate a demand for reimbursement. Although settled expectations must sometimes be disregarded when new tort doctrines are needed to remedy an inequitable allocation of risks and costs, where a generally fair system for spreading the costs of accidents is already in effect — as it is here through assessing taxpayers the expense of emergency services — we do not find the argument for judicial adjustment of liabilities to be compelling.
>
> **We are especially reluctant to reallocate risks where a governmental entity is the injured party. It is critically important to recognize that the government's decision to provide tax-supported services is a legislative policy determination. It is not the place of the courts to modify such decisions.** Furthermore, it is within the power of the government to protect itself from extraordinary emergency expenses by passing statutes or regulations that permit recovery from negligent parties. In other words, the city clearly has recourse to legislative initiative to eliminate or reduce the economic burdens of accidents such as the Air Florida crash.

*Id*. at 1080 (emphasis added).

The D.C. Circuit's opinion was based in large part on the seminal case of *City of Flagstaff v. Atchison, Topeka & Santa Fe R. Co*., 719 F.2d 322, 323–324 (9th Cir. 1983), where the Ninth Circuit held that the city of Flagstaff could not recover the fire, police, and other emergency costs it incurred in evacuating a large area of the city after railroad cars containing petroleum derailed. Like the Ninth and the D.C. Circuits, other jurisdictions to have directly considered the issue of recovery for government provided services from tortfeasors generally reach a similar outcome.[2]

---

[2] *See, e.g.*, *City of Chicago v. Beretta U.S.A. Corp*., 213 Ill. 2d 351 (Ill. 2004) ("public expenditures made in the performance of governmental functions are not recoverable in tort."); *State v. Black Hills Power, Inc*., 2015 WY 99 (Wyo. 2015) ("like many other jurisdictions, we adopt the free public services doctrine. Absent a legislative grant of authority, the State of Wyoming may not generally recover … emergency service costs from a party whose negligence created the need for the services."); *Cnty. of Erie, New York v. Colgan Air, Inc*., 711 F.3d 147, 150 (2d Cir. 2013) (affirming dismissal of county's claims for airplane crash response costs, "public expenditures made in the performance of governmental functions are not recoverable"); *Walker Cnty. v. Tri-State Crematory*, 284 Ga. App. 34, 36–37 (Ga. Ct. App. 2007) (adopting free public services doctrine, "a county cannot recover the costs of carrying out public services from a tortfeasor whose conduct caused the need for the services."); *Baker v. Smith & Wesson Corp*., No. CIV.A. 99C-09-283-FS, 2002 WL 31741522, at \*5 (Del. Super. Ct. Nov. 27, 2002) ("absent a legislative grant of authority, local governments in Delaware may not sue in order to recover the cost of municipal services"); *Bd. of Sup'rs of Fairfax Cnty v. U.S. Home Corp*., 1989 WL 646518, at \*3 (Va. Cir. Ct. Aug.14, 1989) ("The general rule that a municipal corporation may not recover for emergency services rendered in situations caused by a private tortfeasor governs this case and bars recovery by the Fairfax Board of Supervisors.").

Here, the County has failed to identify any statute that would permit it to recover any costs incurred by its search-and-rescue efforts, its short and/or long-term emergency response, or the use of the County's equipment utilized for same. The only two statutes that the County did reference were the Oil Pollution Act, 33 U.S.C.A. § 2702, and Maryland's analogous environmental code, Md. Code Ann., Envt § 4-401. But the language in those two statutes each provides that damages for costs can only be recoverable if those damages are "caused by a discharge of oil…" *See* 33 U.S.C.A. § 2702(b)(2)(F); Md. Code Ann., Envt § 4-401 (c)(2)(vii).

While the DALI's allision with the Key Bridge resulted in substantial physical damage to both the Vessel and the Bridge and was unquestionably disruptive to both land and sea traffic, the allision did not cause any substantial discharge of oil from the DALI. And there is no credible argument that the County's search-and-rescue efforts, or its securing of the land-side approaches to the Bridge and/or monitoring the area thereafter, were related to an oil discharge or oil removal efforts. Because the categories of costs that the County seeks to recover are wholly unrelated to an oil spill response, neither OPA nor Maryland's environmental code provides a basis to avoid application of the Free Public Services Doctrine.

This is true regardless of the County's MOU related "loss-shifting" arguments. Specifically, the County points to a 2009 Memorandum of Understanding for Coordination of Law Enforcement Responsibilities Between the Maryland Department of State Police and the Baltimore County Police Department ("MOU," at ECF No. 872-3), which it contends "expressly assigns the primary responsibility for emergency response efforts to the County…" The County argues that this MOU between the State Police and the County Police effectively shifted the risk for

6

emergency response costs from the State to the County,[3] and should therefore be recoverable regardless of *Robins Dry Dock*.

These arguments primarily rely upon the case of *Venore Transp. Co. v. M/V Struma*, 583 F.2d 708 (4th Cir. 1978). In *Venore*, the plaintiff time charterer sought to recover the hire it paid to the vessel owner under their charter agreement while the chartered ship underwent repairs for damages resulting from an allision caused by the defendant. *Id.* at 709. The Fourth Circuit held that *either* the owner or the charter, "but not both, may claim damages for loss of use depending upon the charter's placement of the risk of loss of use." *Id*. at 711. In so doing, it explained that "payment for loss of use of the damaged vessel is a conventional item of recovery" for vessel owners "and the fact that the charter party has transferred the risk of loss of use from the owner to the time charterer should not extinguish the right to a recovery of a traditional item of damages." *Id*. at 710–11.

When squaring this result with the rule of *Robins Dry Dock*, the following was critical to the Fourth Circuit's analysis:

> It is only in a highly technical sense that the time charterer may be said **not** to be in possession of the vessel. It is a consequence of the distinction between a demise of a vessel under a bare boat charter and a time charter under which the owner furnishes the master, officers and crew, together with certain stores, supplies, insurance and taxes. **But the time chartered vessel is under the direction of the**

---

[3] The County also suggests that its search, rescue, and recovery costs should be recoverable from Petitioners because, under 46 U.S.C. § 2304, the "master or individual in charge of a vessel shall render assistance to any individual found at sea in danger of being lost[.]" The County contends that because the Vessel did not act to "rescue individuals in peril at sea," the County was required to "stepp[] in to carry out those operations," thereby purportedly creating a "special relationship" between the Vessel and the County. The County's position has no merit. First, § 2304 provides that the vessel's duty to assist is conditioned on whether it "can do so without serious danger to the master's or individual's vessel or individuals on board." Respectfully, there was no way that the DALI, her master or her crew could reasonably engage in any immediate search and rescue efforts following the allision – the DALI was effectively pinned in place under the Bridge's wreckage. In other words, no immediate aid could be rendered by the DALI's crew. Moreover, the DALI had neither the equipment nor the expertise necessary to conduct the underwater search and rescue response that the situation demanded. Finally, nothing was "shifted" from the DALI to the County – the County had its own, independent duty "to safeguard the lives and safety of all persons within the county…" *See* ECF No. 872-3 at 1 (citing Baltimore County Code§ 3-2-1303).

**charterer. The vessel sails when and where the charterer directs, carries what cargo the charterer provides, and the master is specifically required to comply with the orders of the charterer** in such things as the selection and appointment of agents. The charterer is authorized to sub-charter the vessel, but as long as it is operating the vessel for its own account and profit, **it is only in a highly technical sense that it may be said that the charterer has no possessory interest in the vessel.** Its interest in the vessel is sufficient to give it standing to claim damages, measured by charter hire paid when the owner has no claim for loss of use because its receipts of charter hire have been uninterrupted.

… The traditional item of recoverable damage is the owner's claim for loss of use. When the vessel is under a time charter, the starting point for the measurement of those damages is lost charter hire. **Our only holding is that when there has been no suspension in the payment of charter hire during the period when the vessel is out of service, the time charterer who has paid the charter hire is entitled to recover what the owner would have been entitled to recover had those payments been suspended.**

*Id*. at 711 (emphasis added).

Thus, the *Venore* decision was premised on a few key points absent here. First, had the time charterer ceased payment to the vessel's owner, the owner would have been able to recover for loss of use/hire damages from the other negligent vessel. The character of the underlying damages were such that *someone* was entitled to recover them—the only question was who. Second, the time charterer, for all practical purposes, had "possession" of the time-chartered vessel by virtue of its ability to exercise control over the vessel's operations. These elements are lacking here.

Even assuming *arguendo* that the MOU acted to "shift" responsibility for the Bridge emergency response from the State to the County (which is denied for reasons to follow), had that alleged "shifting" not occurred, the State would not have been able to recover for search and rescue / emergency response costs by operation of the Free Public Services Doctrine. These categories of damage simply are not recoverable by any governmental entity, absent an enabling statute (none of which are applicable here). Next, there is no indication that the County Police, or the County

8

generally, had the same effective "possession" of the Key Bridge like that of the *Venore* time charterer.

Separately, for any *Venore*-like contractual risk-shifting to be effective, some discrete risk must actually be wholly taken from one entity and fall entirely on the other party. In *Venore*, the risk for loss of use of the damaged vessel initially lay only with the owner but was shifted from the owner to lay solely with the time charterer. Here, reference to the MOU reveals nothing was "shifted" from State to County. As set out in the MOU's recitals, under Maryland Code, Public Safety Article § 2-301, the State police had a general duty "to safeguard the lives and safety of all persons in the State [and] to protect property…" ECF No. 872-3 at 1. Likewise, "Baltimore County Code § 3-2-1303 creates the general duty upon the [County] Police Department to safeguard the lives and safety of all persons within the county [and] protect property..." *Id*. Thus, both State and County have the ***concurrent*** responsibility to carry out any emergency response to incidents occurring within Baltimore County. The fact that the MOU designates County police as having "primary responsibility" for emergency services necessitated by "catastrophic incidents occurring within Baltimore County" (*see id*. at 5) does not mean that the State has no such responsibility. And no new "risk" to the County was delegated by virtue of the MOU—the County police were already duty-bound to act to protect the public safety for incidents occurring within the County. All that the MOU does is establish a hierarchy with respect to operational aspects of the State and County's respective emergency response duties.

The County also cites to *Yarmouth Sea Prods. Ltd. v. Scully*, 131 F.3d 389 (4th Cir. 1997) in support of its contention that the rule of *Robins* should not control here. But *Yarmouth* has no relevance to this matter. In that case, the Fourth Circuit allowed a group of fishermen to recover for profits lost after their fishing vessel was struck by a yacht and began taking on water,

necessitating repairs that cut short the fishing voyage. *Id.* at 392. The Fourth Circuit elected to join the Ninth and Eleventh Circuits in "permit[ting] crew members of fishing vessels to recover for their share of lost catch when the vessel was negligently damaged." *Id.* at 398. Given that the owner of the fishing vessel and the fishermen "were engaged in a kind of joint venture" whereby the fishermen were to have earned "60% of the boat price of the catch" (less expenses) (*id.* at 391, 398), *Yarmouth* falls neatly within *Venore*'s reasoning. Loss of use of the vessel is a generally recognized loss recoverable by the owner of a damaged vessel, but in *Yarmoth*, the vessel owner was only contractually-entitled to receive 40% of earnings. Absent the profit-sharing agreement with the fishing crew, only the owner could claim those losses. Because the character of the lost-profit damages were generally available under maritime law, the fishermen were entitled to the other 60% of damages that the vessel owner could not claim due to its assignment to the crew.[4]

2.     **The County cannot recover emergency response costs or increased road usage costs under OPA or Maryland's Environmental Code.**

OPA is a strict liability statute that holds "each responsible party for a vessel or facility from which oil was discharged … into or upon the navigable waters or adjoining shorelines or the exclusive economic zone … liable for the removal costs and damages … that result from such incident." 33 U.S.C. § 2702(a). But as explained above, OPA requires that damage claims for increased public services costs must be linked to the provision of services "***caused by*** a discharge of oil…" § 2702(b)(2)(F). The same is true for Maryland's Environmental Code. *See* § 4-401(c)(2)(vii). Here, there was no discharge of oil from the DALI as a result of the allision, and the County has not linked any of its emergency response costs to public safety activities undertaken

---

[4] Further, it is apparent that the fishing crew would be the ones actually performing the vessel's intended work of fishing. Thus, *Yarmouth* again mirrors *Venore* in that the fishing crew also had effective "possession" of the vessel by virtue of control over the ship's operations, just like *Venore*'s time charterer.

as a result of an oil discharge by Petitioners. With no causal link between the County's claims and a discharge of oil, these damages are non-recoverable under both OPA and the Maryland code.

### 3.      The County lacks a recognizable damaged proprietary interest.

The County acknowledges that it does not own the Key Bridge. Instead, the County claims that it has proprietary interests in other property damaged by the allision which brings it within the scope of recovery permissible under *Robins Dry Dock*. Specifically, the County claims to have proprietary interests in (1) the Patapsco River, and (2) other County roadways that were purportedly "injured" by the removal of the Bridge as a "functional component" of the County's overall system of roads. Neither theory of liability is availing.

First, as mentioned above, just as the State is the owner of the Key Bridge, so too is it the owner of the Patapsco River, and of the submerged lands below. *See Anne Arundel Cnty.*, 721 A.2d at 224. The County's obligation under the provisions of the Clean Water Act to ensure that the County complies with discharge restrictions related to the County's municipal storm sewer system (*see* ECF No. 872-7) does not grant the County ownership of the River. While the waters and submerged land of the Patapsco River are held in trust for the public, that trust is held by the State, not the County. *Anne Arundel Cnty.*, 721 A.2d at 224. While it is conceivable that the County might possess some riparian rights to the extent the County owns property abutting the River, those potential riparian rights do not extent to ownership interests in the River more generally, or specifically in that portion of the River formerly spanned by the Key Bridge.

Second, the alleged knock-on effect of increased motor traffic on county roads resulting from redirected vehicles that would have previously utilized the Bridge cannot support compensable damages in the County's favor. Indeed, the entire point of *Robins'* bright-line requirement for a plaintiff's proprietary interest in property physically damaged by the marine

11

casualty[5] is to limit recovery for the "virtually open ended" economic repercussions that such casualties otherwise might generate. *See, e.g.*, *Testbank*, 752 F.2d at 1022; T. Schoenbaum, 2 Admiralty & Maritime Law, § 14-8 (7th ed.). That outcome has repeatedly been affirmed in cases like this, where a bridge was damaged and usual transportation routes could no longer be used pending repair. *See, e.g.*, *In re Bertucci Contracting Co., LLC*, 712 F.3d 245, 246-48 (5th Cir. 2013) (barring residents of community from recovering economic damages from vessel owner, where vessel collided with a bridge and caused it to close for a period of time); *Louisville & N. R. Co. v. Arrow Transp. Co.*, 170 F. Supp. 597, 600 (N.D. Ala. 1959) (dismissing plaintiff railroad's claims against defendant whose vessel struck and damaged a drawbridge, allegedly resulting in economic losses during the period of time the railroad was forced to reroute its trains while the bridge was being repaired); *Complaint of Marine Nav. Sulphur Carriers, Inc.*, 507 F. Supp. 205, 209-10 (E.D. Va. 1980) (denying recovery for increased travel costs reportedly incurred by claimants after bridge was damaged by colliding vessel).

*Catalyst Old River Hydroelectric Ltd. P'ship v. Ingram Barge Co.*, 639 F.3d 207 (5th Cir. 2011), does not stand to the contrary. In *Catalyst*, a hydroelectric plant owner was permitted to recover damages for the value of generating capacity lost after electricity generators were forced offline by the reduction in water flow resulting from a barge having drifted into a water intake channel. *Id.* at 209. The County claims that this award was permitted by the Fifth Circuit despite the lack of "physical[] damage [to] plant property" because the intake channel was a "'functional

---

[5] *See In re Taira Lynn Marine Ltd. No. 5, LLC*, 444 F.3d 371, 380 (5th Cir. 2006) ("Mason and Advanced Materials claim to have suffered physical damage. Mason claims it lost eighty-eight boxes of dressed crabs that spoiled in a freezer when law enforcement officials shut off the electricity during the evacuation. Advanced Materials claims that two manufacturing runs had to be prematurely terminated and the company lost the materials in those runs and could not sell the products. ... [N]either of these claimants suffered physical damage as a result of the allision. Mason's crabs spoiled because the electricity was turned off during the evacuation, not because of contact with the barge, the bridge, or the gaseous cargo. Likewise, Advanced Materials claims losses from its inability to sell products that were in the process of being manufactured; it is not claiming that its property was damaged as a direct result of the allision.")

12

component' of the plant…" ECF No. 872 at 19. The County argues, by analogy, that the Bridge was a "functional component of the County's complex municipal transportation system" that "confers on the County a sufficient proprietary interest in the Bridge to warrant recovery…" ECF No. 872 at 19-20.

The County is mistaken for a simple reason. Namely, the Fifth Circuit took pains to note that "**Catalyst** [i.e., the plant owner] **owns the station and the surrounding property necessary for its operation**. **This includes** the banks of the Mississippi River, **the intake channel**, and the abutment on which the dam structure sits." *Id*. at 209 (emphasis added). In other words, Catalyst held a direct proprietary interest in the intake channel itself, which the barge damaged by its unwanted physical intrusion into Catalyst's private property. Catalyst owned the entirety of the plant and surrounding property necessary for the plant's successful operation—an easily recognizable proprietary interest that was directly impacted by the barge's lodging in the intake channel.[6] In contrast, the County admittedly has **no ownership interest** in the Key Bridge. Without actual ownership of the damaged/impacted "functional component" at issue (*i.e.*, the Bridge), *Catalyst* provides no basis for the County to recover for the loss of that "component" from its claimed larger "municipal transportation system."

The County argues that the Court should deny Petitioners' request for judgment on the pleadings because "[d]iscovery concerning the County's claimed proprietary interests in components of the Patapsco River … has not commenced." ECF No. 872 at 20. But no discovery

---

[6] The case of *Matter of Bruce Oakley, Inc*., No. CV-19-184-RAW-JAR, 2025 WL 1090964 (E.D. Okla. Mar. 3, 2025) is similarly unhelpful to the County. There, the U.S. Government was permitted to recover for lost electric generating capacity following allision of a barge with the Webbers Falls Dam on the Arkansas River in Oklahoma. The County failed to realize that the Webbers Falls Dam and related hydropower units are owned by the U.S. Government and operated by the U.S. Army Corps of Engineers. The U.S. therefore possessed the necessary proprietary interest in the both the dam and the separate hydroelectric facility to recover these economic damages under *Robins*.
*See* https://www.swt.usace.army.mil/Missions/Hydropower/

is necessary, because there is no factual question that the Key Bridge, the Patapsco River, and all other navigable waters and submerged land is owned by the State, and not the County. Judgment on the pleadings is both appropriate and indicated.

### 4.      The County cannot recover via public nuisance theory.

The County briefly acknowledges Petitioners' opening brief and its explanation of why public nuisance claims are not cognizable in admiralty when they cannot satisfy the rule of *Robins Dry Dock*. *See* ECF No. 856-1 at 16-18 (discussing *Testbank*, 752 F.2d at 1030-31). But the County maintains that *Testbank* is inapplicable, because that case "did not consider a nuisance theory advanced by a public entity" like the County. *See* ECF No. 872 at 21. This argument does the County no favors—the Free Public Services Doctrine once again blocks recovery.

In the County's Claim, its public nuisance cause of action is framed in pertinent part as follows:

> This claim is premised on the County's responsibility for, among other things, the preservation and maintenance of its property and public waterways and shorelines within the County, the safety, health, and welfare of its residents, the economic wellbeing of its residents and businesses, and maintaining the flow of commerce into, out of, and within, its borders.

> As a direct and proximate result of failures, acts, or omissions by, or on behalf of, Petitioners, Petitioners created a danger and hazard by, among other things, causing harm to the County's property and public waterways and shorelines within the County, the safety, health, and welfare of the County's residents, the County's residents' economic wellbeing, and commerce in the area, thereby creating a public nuisance.

ECF No. 171 at 20.

In other words, the County has conceded that it possesses an independent "responsibility" to maintain and preserve those things within the County, mindful of "the safety, health, and welfare of its residents, the economic wellbeing of its residents and businesses, and maintaining the flow of commerce into, out of, and within, its borders." So, to the extent that the County incurs any

14

costs in acting to remedy those things it maintains constitute a "public nuisance," it does so based on the County's policy decision that such efforts serve the public good. With that being the case, the County can only recover against an alleged tortfeasor who caused said public nuisance to the extent allowed by statute. Again, no such statute has been shown to apply to the matter at hand. The County must therefore bear any resulting costs on its own.

**5.    Petitioners Incorporate by Reference All Applicable Reply Arguments Responsive to the County's own Incorporation by Reference.**

In its closing, the County incorporates by reference certain arguments raised by Claimant Mayor & City Council of Baltimore – namely, those related to "Saving to Suitors," *Robins*' "intended act exception," and due process considerations. Petitioners in turn incorporate by reference their reply arguments made to these points in their reply to Baltimore City's brief.

<u>**CONCLUSION**</u>

The Court should grant Petitioners' motion and dismiss the remaining claims as a matter of law. Under *Robins Dry Dock* and progeny, the remaining Economic Loss Claimants, including Baltimore County, are not entitled to recover economic loss damages as a matter of law, because there is no evidence that these Claimants incurred physical damage to a legitimate proprietary interest. Moreover, the County's claims are largely independently barred by application of the Free Public Services Doctrine. The County's claims should be dismissed with prejudice.

Dated: July 20, 2026

DUANE MORRIS LLP

*/s/ Laurie G. Furshman*
Laurie G. Furshman (Bar No. 29604)
Lgfurshman@duanemorris.com
Robert B. Hopkins (Bar No. 06017)
Rbhopkins@duanemorris.com
Tristan A. Dietrick (Bar No. 31238)
tdietrick@duanemorris.com

1201 Wills Street, Suite 330
Baltimore, MD 21321
(410) 949-2900
BLANK ROME LLP

Luke M. Reid (Bar No. 31228)
Luke.Reid@blankrome.com
125 High Street, 3rd Floor
Boston, MA 02110
617-415-1200

William R. Bennett, III*
William.Bennett@blankrome.com
Thomas H. Belknap, Jr.*
Thomas.Belknap@blankrome.com
Noe S. Hamra
Noe.Hamra@blankrome.com*
Neil P. McMillan
Neil.McMillan@blankrome.com*
1271 Avenue of the Americas
New York, NY 10020
212-885-5000

Kierstan L. Carlson*
Kierstan.Carlson@blankrome.com
Emma C. Jones*
Emma.Jones@blankrome.com
1825 Eye St. NW
Washington, DC 20006
202-420-2200
*Admitted *pro hac vice*

16

## CERTIFICATE OF SERVICE

I CERTIFY that on this 20th day of July 2026, the foregoing Reply to Claimant Baltimore County's Opposition to Motion for Judgment on the Pleadings was filed in the United States District Court for the District of Maryland via the Court's CM/ECF filing system, which will provide notice of this filing to all counsel of record.


/s/ *Laurie G. Furshman*
Laurie G. Furshman (Bar No. 29604)
LGFurshman@duanemorris.com


17